Bijan Amini
Edward P. Dolido
Jeffrey Chubak
STORCH AMINI PC
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
bamini@storchamini.com
edolido@storchamini.com
jchubak@storchamini.com
*Attorneys for Defendant Brian Mullaney*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>WONDERWORK, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 16-13607-smb<br><br>Adv. Pro. No. 18-1873-smb |
| VINCENT A. SAMA, as Litigation Trustee<br>of the WW Litigation Trust,<br><br>Plaintiff,<br><br>- against -<br><br>BRIAN MULLANEY, HANA FUCHS,<br>THEODORE DYSART, RAVI KANT,<br>JOHN J. CONEYS, STEVEN LEVITT,<br>CLARK KOKICH, STEVEN RAPPAPORT,<br>RICHARD PRICE, and MARK ATKINSON,<br><br>Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF BRIAN**
**MULLANEY'S MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................... 7

I.  THE FOURTH CLAIM FAILS TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY OR WASTE BECAUSE PLAINTIFF FAILS TO OVERCOME THE BUSINESS JUDGMENT RULE .............................................................................................................. 7

    A.  The Complaint Fails to Plead Breach of the Duty of Care ...................................... 9

    B.  The Complaint Fails to Plead Breach of the Duty of Loyalty ............................. 10

        1.  Self-Dealing ............................................................................................. 11

        2.  Good Faith ................................................................................................ 13

    C.  The Complaint Fails to Plead Waste ..................................................................... 20

II.  THE FIFTH, SIXTH, AND SEVENTH CLAIMS TO AVOID AND RECOVER ALLEGED CONSTRUCTIVE FRAUDULENT TRANSFERS SHOULD BE DISMISSED FOR FAILURE TO PLEAD LACK OF FAIR CONSIDERATION OR INSOLVENCY ........................................................................................................................ 22

III.  THE EIGHTH CLAIM TO AVOID AND RECOVER ALLEGED PREFERENTIAL TRANSFERS LIKEWISE FAILS ........................................................................................ 27

IV.  THE NINTH CLAIM TO AVOID AND RECOVER POSTPETITION TRANSFERS SHOULD BE DISMISSED ................................................................................................... 28

V.  THE TENTH CLAIM FOR BREACH OF THE EMPLOYMENT AGREEMENT SHOULD BE DISMISSED ................................................................................................... 29

VI.  THE ELEVENTH CLAIM FOR UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED FOR FAILURE TO PLEAD THAT MULLANEY BENEFITTED AT DEBTOR'S EXPENSE AND BECAUSE HIS COMPENSATION WAS GOVERNED BY A BOARD-APPROVED AGREEMENT ............................................................................... 32

VII.  THE TWELFTH CLAIM SHOULD BE DISMISSED FOR FAILURE TO PLEAD A VALID BASIS FOR DISALLOWANCE ............................................................................. 33

VIII.  THE THIRTEENTH CLAIM CANNOT STAND ALONE ............................................ 34

CONCLUSION ...................................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re 21st Century Holdings*,
    591 B.R. 134 (Bankr. S.D.N.Y. 2018) ................................................................. 33

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................ 8, 23, 24

*In re Atl. Computer Sys.*,
    173 B.R. 858 (S.D.N.Y. 1994) ...................................................................... 34

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................... 8, 23

*Beth Israel Med. Center v. Horizon Blue Cross and Blue Shield of N.J., Inc.*,
    448 F.3d 573 (2d Cir. 2006) ........................................................................ 32

*In re BH S & B Holdings LLC*,
    420 B.R. 112 (Bankr. S.D.N.Y. 2009) ............................................................. 7, 8

*Boston Trading Group, Inc. v. Burnazos*,
    835 F.2d 1504 (1st Cir. 1987) ...................................................................... 24

*Carco Group, Inc. v. Maconachy*,
    383 F. App'x 73 (2d Cir. 2010) .................................................................... 30

*In re Checkmate Stereo and Elecs., Ltd.*,
    9 B.R. 585 (Bankr. E.D.N.Y. 1981) ................................................................ 24

*Cohen v. Sutherland*,
    257 F.2d 737 (2d Cir. 1958) ........................................................................ 24

*CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd.*,
    No. 03-cv-7936, 2007 WL 2915181 (S.D.N.Y. Oct.4, 2007) ................................... 7

*CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd.*,
    807 F. Supp. 2d 199 (S.D.N.Y. 2011) .............................................................. 7

*Diesel Props. S.r.l. v. Greystone Bus. Credit II LLC*,
    631 F.3d 42 (2d Cir. 2011) ..................................................................... 29, 30

*In re Dreier LLP*,
    452 B.R. 391 (Bankr. S.D.N.Y. 2011) .............................................................. 24

*In re DSI Renal Holdings, LLC,*
  574 B.R. 446 (Bankr. D. Del. 2017) .................................................................................. 20, 21

*HBE Leasing Corp. v. Frank,*
  48 F.3d 623 (2d Cir. 1995)......................................................................................................... 24

*In re Herberman,*
  122 B.R. 273 (Bankr. W.D. Texas 1990)................................................................................. 28

*In re Hydrogen, L.L.C.,*
  431 B.R. 337 (Bankr. S.D.N.Y. 2010) ........................................................ 11, 24, 32, 33, 34

*Innovative BioDefense, Inc. v. VSP Techs., Inc.,*
  No. 12-cv-3710, 2013 WL 3389008 (S.D.N.Y. July 3, 2013)............................................... 32

*In re Ky. Truck Sales, Inc.,*
  52 B.R. 797 (Bankr. W.D. Ky. 1985) ....................................................................................... 24

*In re New Century,*
  588 F. Supp. 2d 1206 (C.D. Cal. 2008) ..................................................................................... 3

*Nixon v. Lucas,*
  42 F.2d 833 (2d Cir. 1930)......................................................................................................... 24

*In re Operations NY LLC,*
  490 B.R.84 (Bankr. S.D.N.Y. 2013) .......................................................................... 3, 23, 27

*Pani v. Empire Blue Cross Blue Shield,*
  152 F.3d 67 (2d Cir. 1998) ........................................................................................................ 23

*Picard v. Greiff,*
  476 B.R. 715 (S.D.N.Y. 2012).................................................................................................. 23

*In re Polaroid Corp. Secs. Litig.,*
  465 F. Supp. 2d 232 (S.D.N.Y. 2006)...................................................................................... 23

*In re Refco Inc. Secs. Litig.,*
  826 F. Supp. 2d 478 (S.D.N.Y. 2011) ........................................................................................ 7

*Roth v. Jennings,*
  489 F.3d 499 (2d Cir. 2007)........................................................................................................ 3

*Rothman v. Gregor,*
  220 F.3d 81 (2d Cir. 2000)........................................................................................................... 3

*Matter of S & W Exporters, Inc.,*
  16 B.R. 941 (Bankr. S.D.N.Y. 1982) ....................................................................................... 24

*In re Sharp Int'l Corp.*,
403 F.3d 43 (2d Cir. 2005)..................................................................... 24

*In re Signature Apparel Group LLC*,
577 B.R. 54 (Bankr. S.D.N.Y. 2017)...................................................... 9

*SIPC v. Bernard L. Madoff Invs. Secs. LLC*,
516 B.R. 18 (S.D.N.Y. 2014)................................................................. 23

*In re Tower Air, Inc.*,
416 F.3d 229 (3d Cir. 2005)................................................................... 8

*In re USDigital, Inc.*,
443 B.R. 22 (Bankr. D. Del. 2011) ............................................... 9, 10, 11

*In re W.J. Bradley Mortgage Capital, LLC*,
No. 16-bk-11049, 2019 WL 454145 (Bankr. D. Del. Feb. 1, 2019)....................... 8

*In re White Metal Rolling and Stamping Corp.*,
222 B.R. 417 (Bankr. S.D.N.Y. 1998)................................................... 23

**New York State Court Cases**

*Basis Yield Alpha Fund (Master) v. Goldman Sachs Group, Inc.*,
115 A.D.3d 128, 980 N.Y.S.2d 21 (1ˢᵗ Dep't 2014) .............................. 32

*Clark-Fitzpatrick, Inc. v. LIRR*,
70 N.Y.2d 382, 516 N.E.2d 190 (1987).................................................. 32

*Derouin's Plumbing & Heating, Inc. v. City of Watertown*,
71 A.D.2d 822, 419 N.Y.S.2d 390 (4ᵗʰ Dep't 1979)............................. 30

*Gilbert v. Rothschild*,
280 N.Y. 66, 19 N.E.2d 785 (1939)....................................................... 31

*Loreley Fin. (Jersey) No. 28, Ltd. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
117 A.D.3d 463, 985 N.Y.S.2d 499 (1ˢᵗ Dep't 2014) ...................... 31, 32

*Luo v. Main St. Assocs.*,
212 A.D.2d 675, 622 N.Y.S.2d 761 (1ˢᵗ Dep't 1995) .......................... 30

*Pullman v. Alley*,
53 N.Y. 637 (1873) .............................................................................. 31

*Singh v. Carrington*,
18 A.D.3d 855, 796 N.Y.S.2d 668 (2d Dep't 2005) ............................. 31

*Slater v. Slater*,
208 A.D. 567, 204 N.Y.S. 112 (App. Div. 1924) ................................ 31

*Slater v. Slater,*
240 N.Y. 557, 148 N.E. 703 (1925) ................................................................. 31

*Southern Industries v. Jeremias,*
66 A.D.2d 178, 411 N.Y.S.2d 945 (2d Dep't 1978) ........................................... 24

**Delaware State Court Cases**

*Brehm v. Eisner,*
746 A.2d 244 (Del. 2000) ............................................................................. 20, 21

*In re Caremark Int'l Inc. Deriv. Litig.,*
698 A.2d 959 (Del. Ch. 1996) .............................................................................. 8

*Cede & Co. v. Technicolor, Inc.,*
634 A.2d 345 (Del. 1993) .................................................................................. 8, 9

*Cede & Co. v. Technicolor, Inc.,*
636 A.2d 956 (Del. 1994) ..................................................................................... 8

*In re Citigroup, Inc. Shareholder Derivative Litigation,*
964 A.2d 106 (Del. Ch. 2009) ............................................................................ 20

*Crescent Mach I Partners L.P. v. Turner,*
846 A.2d 963 (Del. Ch. 2000) .............................................................................. 8

*Gagliardi v. TriFoods Int'l, Inc.,*
683 A.2d 1049 (Del. Ch. 1996) ............................................................................ 7

*Hampshire Group, Ltd. v. Kuttner,*
Civ. A. 3607-VCS, 2010 WL 2739995 (Del. Ch. July 12, 2010) ............. 15, 16, 18, 19, 21

*Joyce v. Cuccia,*
Civ. A. 14953- JBJ, 1997 WL 257448 (Del. Ch. May 14, 1997) ......................... 10

*Oberly v. Kirby,*
592 A.2d 445 (Del. 1991) ..................................................................................... 8

*President & Fellows of Harvard Coll. v. Glancy,*
Civ. A. 18790-SPL, 2003 WL 21026784 (Del. Ch. Mar. 21, 2003) .................... 22

*In re Walt Disney Co. Deriv. Litig.,*
906 A.2d 27 (Del.2006) ................................................................................. 11, 21

*White v. Panic,*
783 A.2d 543 (Del. 2001) ................................................................................... 20

**Statutes**

11 U.S.C. § 502 ............................................................................................ 29, 34

11 U.S.C. § 503 ................................................................................................... 28

11 U.S.C. § 544 ................................................................................................... 22

11 U.S.C. § 547 ................................................................................................... 27

11 U.S.C. § 548 ............................................................................................ 22, 23

11 U.S.C. § 549 ................................................................................................... 29

11 U.S.C. § 1108 ................................................................................................. 28

Del. Code Ann. tit. 8, § 144 .............................................................................. 13

N.Y. Debtor and Creditor Law § 272 ........................................................... 23, 24

N.Y. Debtor and Creditor Law § 273 ........................................................... 22, 23

N.Y. Debtor and Creditor Law § 274 ........................................................... 22, 23

N.Y. Debtor and Creditor Law § 275 ........................................................... 22, 23

**Rules**

Fed. R. Civ. P. 9 ................................................................................................. 33

Fed. R. Civ. P. 12 ............................................................................................. 1, 8

Defendant Brian Mullaney ("Mullaney") submits this memorandum of law in support of his motion to dismiss the Complaint with prejudice as against him, pursuant to Fed. R. Civ. P. 12(b)(6).

## **INTRODUCTION**

The Complaint describes Debtor WonderWork, Inc. ("Debtor") as a charity with an undeniably accomplished board of directors, all of whom but Mullaney, the founder and CEO, were independent. (Compl. ¶¶ 10-17.) It describes how this independent board considered and approved of Mullaney's allegedly "lavish" and "excessive" salary and benefits and countenanced his unorthodox compensation schedule. (Compl. ¶¶ 1, 56-59, 68-70, 74, 77, 83, 85, 91.) And its conclusory characterization of the board as "passive and overly deferential" (*id*. ¶ 1) is belied by its factual allegations which describe a board that went so far as to hire a compensation consultant (who concluded that Mullaney's compensation, albeit "on the high side," was not unreasonable (*id.* ¶ 65)), and which recognize that the subject of Mullaney's compensation was so contentious that one board member even resigned over it (*id*. ¶ 51).

The Complaint also lays out the facts that demonstrate that the board's approval of Mullaney's compensation and expenses—whether it was wise or foolish—was not irrational. Mullaney is recognized to have a proven track record, having raised a record $120 million in a single year on behalf of SmileTrain, Inc. ("SmileTrain"), the charity he had previously co-founded. (*Id*. ¶ 59.) And his skills were unique and personal. Mullaney was not merely a marketing expert, but a man who is able to raise tens of millions of dollars from his personal contacts.[1]

---

[1] It turned out that Debtor's investment in Mullaney was in fact profitable. In its first six years of existence, Debtor had already amassed over $54 million in donations, of which at least $18 million came through Mullaney's personal appeals. (Report (defined below) pp. 4, 95.) Meanwhile, to obtain those results for the Debtor, Plaintiff alleges that Mullaney "received" $4.4 million all-in (*i.e.*, the sum at which Plaintiff quantifies Mullaney's total salary, benefits, and allegedly

For that to be true, it was necessarily the case that Mullaney's personal contacts include the sort of individual who can, and will in the blink of an eye, donate several million dollars to help the destitute in underdeveloped countries. There is nothing irrational about the board concluding that Mullaney was bringing something unique to the table with his skills and relationships, nor in recognizing that Mullaney would have to incur certain expenses to develop and maintain relationships with such potential donors. (*Id.* ¶ 72.) For example, it would be clearly rational to conclude that it might be a legitimate business expense, and a wise business move under the circumstances, to bring one's spouse along on social events with potential donors. (*Id.* ¶ 69.) And as long as Mullaney was reasonably expected to bring in substantially more income (*i.e.,* donations) than the expenses he was incurring to obtain it, it was not irrational to countenance continuation of the innovative expense and payroll practices that he and Hana Fuchs, Debtor's former CFO ("Fuchs"), are alleged to have begun years ago during their successes at SmileTrain. (*Id.* ¶ 85.)

In short, the Complaint does nothing more than broadly challenge decisions by Mullaney and the independent board, declaring Mullaney to have been "over-compensated" (Compl. ¶ 1) and Mullaney to have "charged excessive and personal expenses to Debtor largely through his American Express account" (*id.* ¶ 92, Ex. A (alleging only aggregate annual charges)), but the few facts alleged in support of those allegations are fully consistent with defensible, whether "correct" or not, business judgments. Few rules are as strictly enforced as Delaware's business judgment rule and the Complaint does not merely fail to effectively "plead around" the rule, it pleads itself squarely into it.

---

improperly-reimbursed expenses over the same six-year period), including amounts awarded to him but which he never actually received. (Compl. ¶¶ 85-88 and Ex. A.)

As such, and as discussed in more detail below, the Complaint fails to state a claim for breach of fiduciary duty upon which relief can be granted against Mullaney. The claim fares no better when recast as a breach of contract or unjust enrichment claim, as is also discussed below together with the remaining avoidance claims.

## BACKGROUND

This adversary proceeding is brought by the Litigation Trustee of the postconfirmation trust established under the chapter 11 plan of Debtor charity WonderWork, Inc., against Debtor's former directors and two former officers.

Mullaney is a Madison Avenue marketing expert who used his skills to turn SmileTrain, the charity he founded in 1999 with Charles Wang ("Wang"), then CEO of Computer Associates, Inc., into "the world's largest cleft [palate] charity, raising $120 million a year at its peak and helping to provide 120,000 surgeries a year." (Final Report of Jason R. Lilien, Examiner (ECF No. 303, p.60) (together with the exhibits thereto, the "Report").[2]) As the Examiner found, Mullaney "helped build a huge direct-mail based charity, raising hundreds of millions of dollars over the span of a decade." (*Id.* p. 1.)

After Wang forced Mullaney and his entire management team out of SmileTrain, Mullaney formed a new charity in March 2011, Debtor, which would and did address a wider variety of surgical needs throughout the world. Wang did not let it go and, as the Examiner found, it was "that feud [with Wang that] ultimately led [Debtor] to Chapter 11." (*Id.* p. 2.) Thus, when Debtor commenced an arbitration for unpaid fees against former client HelpMeSee, Inc.

---

[2] The Court may consider court filings, including the Report, on this motion. *In re Polaroid Corp. Secs. Litig.*, 465 F. Supp. 2d 232, 241 (S.D.N.Y. 2006); *In re New Century*, 588 F. Supp. 2d 1206, 1220-21 (C.D. Cal. 2008). *See generally Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *In re Operations NY LLC*, 490 B.R.84, 92 (Bankr. S.D.N.Y. 2013).

("HelpMeSee") (a charity that Mullaney had helped establish and which he had named), Wang/SmileTrain assisted HelpMeSee with the defense and the assertion of counterclaims which fomented "a multi-year, multi-million dollar, hotly-contested arbitration proceeding, encouraged, if not funded, by Wang." (*Id*.) The resulting $14.2 million arbitration award in HelpMeSee's favor ("Award") is what led to Debtor's chapter 11 filing, and the Examiner noted "HelpMeSee's expenditure of nearly $5.9 million in fees in the Arbitration to obtain an award of $8.3 million in damages suggests that it was motivated by something more than just obtaining damages," and that SmileTrain's assistance "suggests that it, too, had motives other than seeing a just resolution of the Arbitration."[3] (*Id*. p. 269.) That was particularly hard to justify in that the practical effect of the judgment is just that one charity, rather than the other, will determine which beneficiaries the funds will assist, and *neither* charity will be distributing to any beneficiaries the approximately $15 million that is now going to attorneys. The subsequently-appointed Examiner expressly found SmileTrain's motives to be "distasteful" and concluded that the Debtor could assert tortious interference claims against both SmileTrain and HelpMeSee (Report pp. 264-69), although no such suit was brought.

---

[3] In contrast, the Debtor incurred "approximately $1.1 million in [attorneys'] fees relating to the arbitration." (Report p. 45.) Meanwhile, Wang was offering departing SmileTrain employees substantial severance packages on the express condition that they not work for Mullaney. A number of them rejected Wang's offer, including Fuchs who joined Mullaney as Debtor's CFO. (*Id*. p. 59.) The Examiner further found that SmileTrain had refused to work with vendors who worked with Mullaney (*id*. pp. 50-51), and that Wang was responsible for numerous lawsuits against Mullaney and those associated with him (more than ten years of litigation in state court, federal court, London High Court of Justice, and now this Court) such that, as "a result, the Debtor and its small staff have been forced to expend an exorbitant amount of time and resources defending lawsuits instead of advancing the Debtor's missions." (*Id*. p. 44.) In the vast majority of those lawsuits, Wang/SmileTrain was represented by Vincent Sama, the Plaintiff herein, who also represented HelpMeSee in the arbitration against Debtor. (ECF No. 336-5, Report Ex. 58, ¶ 2.)

The Court appointed as Examiner Jason R. Lilien, a former Bureau Chief of the New York State Attorney General Charities Bureau. As the Examiner saw it, he was "tasked with two major jobs: first to determine, in accordance with New York State charity law, the Debtor's actual restricted fund balance, and second, to report to the Court on potential causes of action the estate might have, including traditional Chapter 5 avoidance actions, as well as potential claims arising from mismanagement or wrongful conduct by the principals of the Debtor." (Report pp. 2-3.)

The Examiner produced his Report at an aggregate cost to the Debtor's estate of $2.3 million. (Compl. ¶ 122.) As to his first task, the Examiner found that New York law "is silent" and there was an absence of "any relevant case law on point" as to several "difficult" questions, and that he was resolving "what appear to be a number of issues of first impression" (*e.g.*, Report pp. 5, 24, 147-149). He further acknowledged he was applying novel conclusions as to "reliance on accounting rules related to cost allocation [that] may also prove unpopular in the non-profit world" (*id*. p. 6), and, on the basis of such judgments, concluded that the actual restricted fund balance was different than what the Debtor had believed (*id*. p. 5).

The Examiner fulfilled his second task by dutifully identifying what he deemed to be "colorable" claims against everyone: the board of directors, the officers Mullaney and Fuchs, the auditor KPMG, and against SmileTrain and HelpMeSee for tortious interference.[4] The Litigation Trustee has now commenced litigation against everyone except his clients SmileTrain and HelpMeSee.

---

[4] The Examiner also considered other claims against HelpMeSee, SmileTrain "and their common counsel" (*i.e.*, the Litigation Trustee), and observed that their actions "exhibit a pattern aimed at undermining the Debtor's operations at substantial cost to all three charities," but nevertheless opined that claims against them for abuse of process or prima facie tort were not worth pursuing. (Report pp. 269-70.)

The Fourth Claim of [sic] Relief alleging breach of fiduciary duty is asserted jointly against Mullaney and Fuchs. Additional claims are asserted against Mullaney seeking forfeiture of all salary, bonuses, and other compensation received over varying periods, up to six years, under various avoidance theories (Fifth through Ninth Claims) and breach of contract and unjust enrichment theories (Tenth and Eleventh Claims). The Litigation Trustee also seeks disallowance of Mullaney's claim for unpaid compensation (Twelfth and Thirteenth Claims).

The respective claims are addressed below, but they have one common thread: other than accusing Mullaney of being paid too much (as salary or reimbursed expenses), the Complaint, like the Report itself, does not accuse Defendants of benefitting themselves in any way, or of harming the charity's beneficiaries. It concluded that Debtor "is a poorly governed, costly and highly inefficient operation in which only a small fraction of donations are [sic] used to help people in need," but it "is not a sham charity, at least in the traditional sense. Over the years, it has funded numerous medical procedures in developing countries and seemingly operated within a traditional organizational structure."[5] (Report p. 1.) As discussed below, it is contrary to Delaware corporate law to compel an officer to forfeit all compensation, duly approved by an independent board, just because he can be said, in hindsight, to have run an (arguably) inefficient charity. As material here, the Complaint plausibly alleges nothing more than that.

---

[5] That is equally true of the Award in favor of HelpMeSee which precipitated this bankruptcy: Mullaney was found to have engaged in contractual misconduct for the benefit of Debtor, not for his own personal benefit. (*See generally* Report Ex. 58.)

# ARGUMENT

## I. THE FOURTH CLAIM FAILS TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY OR WASTE BECAUSE PLAINTIFF FAILS TO OVERCOME THE BUSINESS JUDGMENT RULE

Plaintiff's Fourth Claim attempts to plead breach of fiduciary duty by itemizing nine acts alleged to constitute breaches, by Mullaney and Fuchs, of the duty of care (Compl. ¶ 141), and another five claimed to be violations of the duties "of loyalty and good faith" (*id.* ¶ 142), all of which are summarily alleged to have caused Debtor "millions of dollars in damages" (*id.* ¶ 143) and to constitute "waste" (*id.* ¶ 144).[6]

As such, Plaintiff is attempting to "plead-around" the Delaware business judgment rule, which creates an automatic presumption that directors and officers "have acted on an informed basis and in the honest belief they acted in the best interest of the corporation." *In re BH S & B Holdings LLC*, 420 B.R. 112, 146 (Bankr. S.D.N.Y. 2009) (quoting *CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd.,* No. 03-cv-7936, 2007 WL 2915181, at *3 (S.D.N.Y. Oct.4, 2007)), *aff'd as modified,* 807 F. Supp. 2d 199 (S.D.N.Y. 2011). *See also Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 (Del. Ch. 1996) ("in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith").

Few rules are more firmly established or stringently applied under Delaware corporate law than the business judgment rule which prohibits second-guessing even of board or management decisions which the court believes to be "substantively wrong, … 'stupid,' … 'egregious' or

---

[6] Because the Debtor is a Delaware corporation, the "internal affairs doctrine" dictates that the breach of fiduciary duty claim be analyzed under Delaware law. *E.g.*, *In re Refco Inc. Secs. Litig.*, 826 F. Supp. 2d 478, 501 (S.D.N.Y. 2011).

'irrational.'" *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). The rule applies with equal force in the context of nonprofit Delaware corporations. *E.g.*, *Oberly v. Kirby*, 592 A.2d 445, 462 (Del. 1991) ("A court cannot second-guess the wisdom of facially valid decisions made by charitable fiduciaries any more than it can question the business judgment of the directors of a for-profit corporation").

To withstand a Rule 12(b)(6) motion, and only then be able to put the substance of the officer/director's conduct at issue, Plaintiff "must plead around the business judgment rule." *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005). To do so, a plaintiff must "sufficiently plead facts which if true would take defendants' actions outside the protection afforded by the business judgment rule*." BH S&B*, 420 B.R. at 146 (quoting *Crescent Mach I Partners L.P. v. Turner,* 846 A.2d 963, 984 (Del. Ch. 2000)). And to satisfy plausibility requirements, he must do so by pleading facts that are more than "merely consistent with a defendant's liability." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). He fails to do so here as a matter of law.

To overcome the business judgment rule, it is Plaintiff's burden to plead that Defendants, in reaching their challenged decision, "breached any one of the triads of their fiduciary duty— good faith, loyalty or due care." *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del. 1993), *modified on other grounds,* 636 A.2d 956 (Del. 1994). *See also In re W.J. Bradley Mortgage Capital, LLC*, No. 16-bk-11049, 2019 WL 454145, at *7 (Bankr. D. Del. Feb. 1, 2019) (same). "Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task." *BH S & B*, 420 B.R. at 146 (quoting *Tower Air,* 416 F.3d at 238).

We separately address the duty of care first, and then the duties of loyalty and good faith.

## A.     The Complaint Fails to Plead Breach of the Duty of Care

The first of the triad, the duty of due care, is the obligation of officers and directors "to inform themselves, prior to making a business decision, of all material information reasonably available to them." *In re Signature Apparel Group LLC*, 577 B.R. 54, 99 (Bankr. S.D.N.Y. 2017) (quoting *Cede & Co.*, 634 A.2d at 367).    The duty is not breached by conduct short of gross negligence.    *Id*.    "The precise behavior constituting gross negligence varies depending on the context, but in general 'a trial court will not find a board to have breached its duty of care unless the directors individually and the board collectively have failed to inform themselves fully and in a deliberate manner.'"    *In re USDigital, Inc.,* 443 B.R. 22, 41 (Bankr. D. Del. 2011) (quoting *Cede,* 634 A.2d at 368).

None of the items alleged in Paragraph 141 of the Complaint to purportedly reflect breaches of the "duty of care" reflect any failure to make considered and informed decisions.    At best, they purport to identify *wrong* decisions—precisely the business decisions that the business judgment rule precludes the court from inquiring into.    Addressing each allegation briefly in turn:

(1) "routinely mismanaging the Debtor, including failing to properly account for and spend Debtor's donations and restricted funds"—that could not be more directly the inquiry prohibited by the business judgment rule.

(2) "failing to comply with the terms of Debtor's corporate governing documents, policies, and applicable law"—this is the same thing, an allegation that Defendants failed to perform adequately, not that they failed to be informed and deliberate (even if wrong).

(3) "improperly accounting for Mullaney's expenditures"—same.

(4) "making clearly false and misleading statements in Debtor's public filings"—same.

(5) "authorizing excessive and inappropriate spending of Debtor's funds"—same.

(6) "misleading donors both in Debtor's public disclosures, including in response to email communications inquiring about Mullaney's compensation"—same.

(7) "using false solicitation materials, in violation of applicable law"—same.

(8) "permitting Debtor to alter its accounting and grant making practices to permit Debtor to try to hinder, delay or defraud creditors"—same.

(9) "otherwise failing to discharge their duties as directors and/or officers with the degree of care, skill, prudence, and diligence required of them and acting with gross negligence and reckless indifference as outlined in the Report"—*see* (1), *supra*.

Plaintiff's "due care allegations" are simply an attempt to pull himself up by his own bootstraps: As noted above, the business judgment rule exists specifically to prevent courts from second-guessing business decisions. Yet Plaintiff is attempting to do exactly that, to criticize a host of business judgments and then assert that they have thereby "pleaded around" the business judgment rule. It does not work that way.

## B.    The Complaint Fails to Plead Breach of the Duty of Loyalty

The duty of loyalty is breached by engaging in "a self-interested transaction" that is "unfair to the shareholders." *USDigital*, 443 B.R. at 41 (citing *Joyce v. Cuccia*, Civ. A. 14953- JBJ, 1997 WL 257448, at *5 (Del. Ch. May 14, 1997). In addition, the duty of good faith is a "subsidiary element" of the duty of loyalty and:

> [t]he Delaware Supreme Court has recognized three non-exclusive categories of conduct indicative of a failure to act in good faith. *First*, a failure to act in good faith may be established when a director "intentionally acts with a purpose other than that of advancing the best interests of the corporation." *Second*, a failure to act in good faith may be established when a director "acts with the intent to violate applicable positive law." *Third*, a failure to act in good faith may be established when a director "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."

*USDigital*, 443 B.R. at 41 (emphasis added) (quoting *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006)).

Plaintiff has not clearly indicated into which of the foregoing categories he believes his allegations fall, inasmuch as he merely alleges:

> 142.    Mullaney and Fuchs breached their duties of loyalty and good faith by, among other things, (a) keeping Mullaney's "limbo pay" off Debtor's books in a private, side ledger; (b) knowingly maintaining such payroll ledger as a mechanism for making Mullaney's compensation appear less than it actually was on Debtor's public disclosures and to allow Mullaney to evade the payment of income tax; (c) submitting and/or approving inappropriate expenses, including excessive, unsubstantiated, and personal expenses; (d) directing Debtor to fund inappropriate expenditures and excessive salaries, including paying Fuchs a $120,000 signing bonus; and (e) permitting Debtor to pay Mullaney $395,833.32 in post-petition non-ordinary course payments on the eve of release of the Report without disclosure or approval of the Court.

### 1.    Self-Dealing

The only alleged self-dealing by Mullaney consists of broad assertions that his salary and benefits were too high and that he was improperly reimbursing personal expenses by not following corporate policy and by crediting such expenses against earned but unpaid bonuses in his "limbo account." (Compl. ¶ 142(a), (b), (c), (e).) The conclusory assertions that bonuses and other compensation were "excessive" is insufficient to state a claim in the absence of supporting facts. *E.g.*, *In re Hydrogen, L.L.C.*, 431 B.R. 337, 348-49 (Bankr. S.D.N.Y. 2010). Here, the only relevant fact alleged is that an independent compensation consulted concluded that Mullaney's compensation "was at the high end," but not too high. (Compl. ¶ 65.)

The Complaint acknowledges, moreover, that every one of those things was done with the knowledge and agreement of the independent members of the board of directors. (*See, e.g.,* Compl. ¶ 58 (pleading that "the Board sanctioned Mullaney's actions"), ¶ 59 (board agreed to the same

salary Mullaney earned at SmileTrain and specifically awarded bonuses to him in each of 2013, 2014, 2015, and 2016); ¶¶ 60, 66 (board hired compensation expert who noted that Mullaney was receiving compensation in the top 75th percentile relative to his "peers" but did not conclude it was unreasonable); ¶ 51 (compensation vigorously discussed inasmuch as one director resigned in disagreement); ¶ 67 (board did not just rubber-stamp compensation expert's recommendations); ¶¶ 69, 75 (board finalized written agreement with Mullaney that expressly agreed to various reimbursements that Plaintiff now attacks, such as payment of Mullaney's life insurance for his wife's benefit, and similarly permitting her to travel with him); ¶ 78 (board determined to indemnify Mullaney in Wang suit); ¶ 81 (independent director signed-off on Mullaney's settlement); ¶ 83 ("one or more Board members reviewed and approved [Mullaney's] legal invoices"); ¶ 85 (board had knowledge of separate "payroll ledger" and "limbo pay"); ¶ 91 ("The Board was aware of Debtor's practice of maintaining this secret payroll ledger and seeking reimbursement of expenses through the 'limbo pay'").)

Accordingly, Mullaney is protected by Delaware statute which provides in pertinent part:

> (a) No contract or transaction between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee which authorizes the contract or transaction, or solely because any such director's or officer's votes are counted for such purpose, if:

> (1) The material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

> \*    \*    \*

> (b) Common or interested directors may be counted in determining
> the presence of a quorum at a meeting of the board of directors or of
> a committee which authorizes the contract or transaction.

Del. Code Ann. tit. 8, § 144.  Plaintiff does not and cannot allege that anything that could possibly

be characterized as self-dealing by Mullaney was not fully disclosed to and approved by the

independent members of the board.  Standing in their shoes today, Plaintiff has no more right to

blame Mullaney than they do.

    2.    <u>Good Faith</u>

As quoted above (p. 10, *supra*), the Delaware Supreme Court has identified three categories

of "good faith" loyalty violations that could, if properly supported, overcome the business

judgment rule.  Plaintiff's allegations, however, fit none of them.

    a.    "intentionally acts with a purpose other than that of advancing the
best interests of the corporation"

The "wrongdoing" allegedly engaged in by Mullaney was, on the face of the allegations

themselves, either (1) specifically approved by the board as discussed above in connection with

his salary and benefits; or (2) engaged in for the purpose of obtaining increased donations for the

express benefit of the charity's mission, as is the case with the allegedly false solicitation materials

and supposedly extravagant outings with potential donors.[7]  At worst, the Complaint alleges that

---

[7] Moreover, each of these clearly reflects a rational business judgment that the Examiner and Plaintiff might not agree with, but which is no less a protected business judgment.  For example, among the donation solicitations the Examiner (a former regulator) thought misleading was a "remittance slip" which contained checkboxes, each of which indicated a donation and narrative, for example, "$300, which can provide one full eye surgery." (Report p. 107; Compl. ¶ 106.)  That can reasonably be understood as simply equating the magnitude of the donation with what that donation "can provide," as opposed to the Examiner's characterization as "allow[ing] a donor to select … how their money should be used." (Report p. 107.)  Nor is it irrational to, for example, take a spouse along on a trip to meet a potential donor and her spouse, or to reimburse as a business expense a yearly trip taken with "the largest donor to the Debtor." (*Id*. pp. 212-13.)  As Vice Chancellor Strine explained, virtually anything can be a legitimate business expense in the right circumstances. *See Hampshire Group, Ltd. v. Kuttner,* Civ. A. 3607-VCS, 2010 WL 2739995, at

Mullaney believed—and the board agreed—that it was good for the charity to keep its founder and chief fundraiser happy and the resources to continue his very successful fundraising. It might not have been wise, but it still would not evidence an intent to act contrary to the best interests of the charity when the founder was only beginning to ramp up and was already responsible for donations exceeding, by many multiples, his costs.

    b.  "acts with the intent to violate applicable positive law"

Plaintiff seems to be alleging that the Debtor violated various laws ranging from failing to comply with reporting requirements (*e.g.*, Compl. ¶ 43), or reimbursing, as business expenses, items Plaintiff wants to characterize as personal expenses (*e.g.*, *id*. ¶ 72), to soliciting donations based on misleading materials (*e.g.*, *id*. ¶ 106). But absent allegations plausibly suggesting that such violations of law—if they actually were violations—were intentional, at most they are merely allegations of bad business decisions. The allegations of *scienter* necessary to make this a loyalty issue are entirely absent.

Scienter cannot plausibly be inferred from allegations that a "separate 'payroll ledger' [was used] that tracked Mullaney's base pay and bonus and reflected what he referred to as his 'limbo pay,'" and that this "was a continuation of a practice Mullaney and Fuchs had started at Smile Train, which among other issues, resulted in Smile Train, following an internal investigation, reissuing Mullaney's W-2s for the years 2002-2010 that reported an additional $1,144,574 in income as a result of the deferrals and improper travel and expense items" (Compl. ¶ 85.)

---

*17 (Del. Ch. July 12, 2010) (even purchases from a "sex shop" might have been legitimate business expenses because "[i]t is possible, one imagines, for the CEO of a clothing company to find useful business inspiration in clothing and images in adult stores"). Plaintiff is simply assuming (as the Examiner did) that some of Mullaney's business expenses will not be justifiable; that does not satisfy his burden to overcome the business judgment rule by pleading specific facts that take it out of the realm of honest mistake.

What is most notable is that there is no allegation that this "practice" was illegal or improper. Instead, the pleading contains just innuendo: it does not allege that this "practice" was the cause of the reissuance, but just one "among other issues"; it does not allege that the "internal investigation" required the reissuance, but only that the reissuance "followed" the investigation. It alleges that, as a result of continuing that practice at Debtor, "Mullaney never paid taxes on his bonus amounts, Mullaney's bonuses were not reported on his W-2 and Mullaney paid no FICA taxes on those amounts," but it never alleges that this was not legitimate tax avoidance or that, aside from offsetting some expenses against the amounts owed him, Mullaney actually received the amounts upon which the Plaintiff thinks he owes taxes. (*Id*. ¶ 86.) "Whether it is admirable or not, tax planning is regularly done." *Hampshire Group,* 2010 WL 2739995, at *33.

For purposes of this motion, however, the question is not whether this practice represented a legitimate tax avoidance strategy but, assuming *arguendo* that it was not, the question is whether there are sufficient allegations from which to conclude that Mullaney intended to violate the law. In that regard, the admission that the very same conduct went on for nearly a decade at SmileTrain, unchallenged by SmileTrain or its outside auditors until *after* Mullaney and Fuchs left and became the subject of Wang's recognized vendetta (Report pp. 2, 33-34, 50, 61, 92 n.218, 269-70), undermines any probative value that SmileTrain's restatement of Mullaney's W-2s, so that he would owe more taxes, might otherwise have had to show that he should have known the practice to be improper (if it in fact was).

That is, the Complaint alleges no reason that Mullaney should have construed SmileTrain's investigation/reissuance to be anything other than another attempt by Wang to punish Mullaney for leaving, and no plausible explanation as to why, from that, Mullaney should necessarily have concluded that a practice openly employed for the better part of a decade at SmileTrain, with full

knowledge and approval of its auditors and its board, and which thereafter was openly practiced at Debtor and passed muster by its separate auditors[8] and its independent board, was necessarily illegal.  (Compl. ¶¶ 85, 91.)

Moreover, Mullaney's "limbo pay" practice is not, on its face, so obviously improper that knowledge might be presumed.  In that regard, *Hampshire Group,* a case the Examiner thought presented facts "remarkably similar" to those here (Report p. 269), is instructive once it is understood what Mullaney is alleged to have done.

In a nutshell, it is this: Mullaney was awarded salary totaling $475,000 per year, plus bonus of $250,000 each year (but no bonus in 2011 or 2012 and only $200,000 in 2015), and elected not to take all of it on a regular schedule, and ultimately never received  hundreds of thousands of dollars that had been awarded to him. of it.  (Compl. ¶¶ 23, 87.)  Instead, he drew down on his salary, in the Complaint's word, "erratic[ly]," taking salary in varying amounts in different months, sometimes taking nothing, but always taking a total of $475,000, and no more, each year.  (*Id.* ¶ 87.)  That possibility had been expressly agreed to in his Employment Agreement which provides that his annual salary was "payable in equal semi-monthly installments less deductions required by law *or as otherwise agreed to by Mullaney.*"  (ECF No. 339-4, Mullaney Ex. 41 ("Employment Agreement") § 3(a) (emphasis added).)

The bonuses awarded to Mullaney were not actually paid to him but recorded "as 'limbo pay' in [a] side ledger."  (Compl. ¶ 87.)  In other words, the bonus that was awarded to him was noted but would remain owed and unpaid indefinitely and, in the meantime, available interest-free to the Debtor.  To the extent that Mullaney owed money to Debtor from time-to-time, for

---

[8] Plaintiff commenced a separate action against Debtor's outside auditors alleging that they knew of that practice when issuing unqualified Audit Reports.  *See* Complaint filed in *Sama v. KPMG LLP*, No. 18-ap-1868.

reimbursement of personal expenses and the like, he offset it against the amounts Debtor owed him. (*Id.* ¶ 89.) The Examiner found that Mullaney even permitted amounts that clearly were legitimate business expenses to be offset against, and thereby to reduce, the amounts the Debtor owed him. (Report pp. 215-17.) And not having to pay out the amounts maintained as "limbo pay" obviously had beneficial effects on Debtor's cash flow.

Disputed individual expense items aside (which are not specifically identified in any event), Plaintiff is not claiming that Mullaney received anything more through this use of a "limbo account" than the salary and bonus the board had promised him and, in fact, quite a bit less. (In his Twelfth and Thirteenth Claims, discussed *infra*, Plaintiff seeks to disallow Mullaney's claim for bonuses that he had been awarded by the board but never received, through offset or otherwise.)[9] Plaintiff is not denying that it was in the Debtor's financial interest to have Mullaney defer payment in that way, nor is he alleging that Mullaney sought to conceal that practice from the board or independent auditors. To the extent that Mullaney is alleged to have claimed an undeserved tax benefit from this procedure, the absence of any facts from which to conclude he intended to violate the law is dispositive.

---

[9] The Complaint acknowledges that Mullaney had been awarded bonuses by the board totaling $950,000 over six years but that he received none of it directly. (Compl. ¶ 87.) It further alleges that he charged "at least $400,000" of "suspect expenses" to his "limbo pay," meaning that he charged those expenses that that were not legitimate business expenses against the amounts Debtor owed him. (*Id.* ¶ 89.) It is unclear why Plaintiff employs the term "suspect expenses" when they are described as nothing more than expenses that Mullaney acknowledged to be personal expenses and which, instead of reimbursing Debtor for such amounts directly, he offset against amounts Debtor owed to him. In any event, by Plaintiff's calculation the "at least $400,000" would leave Mullaney still owed "about" $550,000 by Debtor. Mullaney calculates the correct amount as being $641,320, the amount of his claim. (Compl. ¶ 23.) Not only does Plaintiff seek to disallow that claim (Twelfth and Thirteenth Claims), but Plaintiff's avoidance claims seek to recover from Mullaney all the sums awarded to him but concededly never even paid to him. (*See, e.g.*, Compl. Ex. A (seeking to recover the full $950,000 in bonuses).)

That is where Vice Chancellor Strine's decision in *Hampshire Group* is directly on point. In that case, the company's CFO was found to have knowingly violated the law by reimbursing, as business expenses, the very expenses that the employees had marked with a "P" for personal. 2010 WL 2739995, at *25. The scienter there came from the fact that all personal expenses were booked as business expenses on the company ledger, and a secret side-ledger was kept to differentiate the business from the personal expenses, not to correct the company ledger but for the separate purpose of accounting for how much of a $140,000 secret slush-fund that had been promised to each executive was thus consumed by charging personal expenses as business expenses. *Id.* at *24-25. The CFO was found to have breached his duty of loyalty because he "knew that the [executives] were not complying with the law and did not stop the practice even when it became clear to him." *Id.* at *25.

Here, after reciting an extended version of the foregoing (Report pp. 260-61), the Examiner concluded that "Mullaney's and Fuchs' practice in maintaining the off the books, private ledger of Mullaney's 'limbo pay' [is] remarkably similar to the facts in *Hampshire Group*" (Report p. 262), but that is not a fair characterization. The "secret ledger" in *Hampshire Group* was being kept to document a secret side agreement to allow $140,000 of personal expenses to be reimbursed as business expenses, which was clearly known to be wrongful. In contrast, Mullaney's "limbo account" was recording amounts which the independent board had awarded, but not yet paid, to Mullaney. The question presented here is not whether expenses were mischaracterized,[10] but

_____

[10] The Examiner disputes whether it was proper for Mullaney to account for various (never particularized) expenses as business expenses, and whether such expenses were extravagant but, as discussed above, those are business judgment-level issues that the Court should never have to reach. There is no allegation that Mullaney fraudulently mischaracterized anything, only that some of the characterizations might be disputed.

whether it was proper to offset amounts Mullaney concededly owed the Debtor against amounts the Debtor concededly owed him and, if not, whether Mullaney knew it was not.

Thus, where the *Hampshire Group* decision actually does present a situation "remarkably similar" to that presented here is with respect to a different breach of fiduciary claim, what the court there characterized as the "sweater caper." 2010 WL 2739995, at *31. In that case, the company could not take a tax deduction for donating its surplus sweaters to charity because they had no market value due to their imperfections so, instead, the company for years encouraged its employees to take the tax deduction by creating the fiction that the company was giving the value-less sweaters to its employees and that it was *the employees* who were donating them to the charities. *Id.* at *30-31.

While that seems on its face to be a hare-brained idea, inasmuch as "if [the sweaters] had no value if contributed by [the company], it is difficult to see how [the sweaters] could have value if contributed to charities on behalf of employees," *id*. at *30, Vice Chancellor Strine nevertheless refused to hold that even the CFO could be charged with knowledge that the scheme was necessarily improper until he disregarded a board directive to stop, given the complexities of the tax laws and the length of time the availability of the deduction had been presumed legitimate. *Id.* at *31-32.

The same is true here. The allegation that Mullaney believed that he was entitled to tax benefits by not actually receiving the bonuses he was entitled to receive is not, on its face, any more outrageous than the logic behind the "sweater caper." Indeed, quite a bit less so, if it is improper at all, as it certainly is not obvious that there is an obligation to declare income that has not been received and may never be received. In any event, Plaintiff has failed to plead any basis on which to infer that Mullaney knew the use of the "limbo account" to be somehow improper or,

indeed, had reason even to question it given the length of time that it was openly accepted by SmileTrain, the Debtor, and their respective outside auditors. He has thus failed to plead around the business judgment rule on the basis of an intentional violation of law.

<blockquote>c.      "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties"</blockquote>

It is not clear what allegations, if any, Plaintiff might try to shoehorn into this category but, whatever they might be, it is clear that they will not support the necessary scienter for the same reasons discussed in connection with category (b), above.

## C.      The Complaint Fails to Plead Waste

Waste claims under Delaware law may only be asserted against directors, not corporate officers. *In re DSI Renal Holdings, LLC*, 574 B.R. 446, 447 (Bankr. D. Del. 2017) ("the Trustee has not cited to (nor did I uncover) any cases in which the Delaware courts have determined that officers … could be liable for corporate waste. In the absence of precedent from the Delaware courts, I will dismiss" the waste claim). Accordingly, the waste claim against Mullaney for conduct undertaken as officer should be dismissed.

For a waste claim against Mullaney as director to survive dismissal, the Complaint must allege that he "authorized 'an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.'" *In re Citigroup, Inc. Shareholder Derivative Litigation*, 964 A.2d 106, 136 (Del. Ch. 2009) (quoting *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)). "The test to show corporate waste is difficult for any plaintiff to meet; indeed, '[t]o prevail on a waste claim … the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." *Id.* (citing *White v. Panic*, 783 A.2d 543, 554 n.36 (Del. 2001)). "'In evaluating a waste

claim, courts look to the exchange *itself* [rather than process]. The exchange must be *irrational*.' 'Waste is a standard rarely satisfied in Delaware courts.'" *DSI Renal*, 574 B.R. at 477 (footnotes with citations omitted).

It is not clear which transactions Plaintiff is seeking to characterize as waste, and the "Complaint fails on its face to meet the waste test because it does not allege with particularity facts tending to show that no reasonable business person would have made the decision that the … Board made." *Brehm*, 746 A.2d at 266. That standard is not satisfied here, even were it clear what transactions Plaintiff is trying to characterize as waste. Presumably, the one paragraph of the Complaint that uses the word "waste" is referring to the compensation Mullaney and Fuchs were receiving, and the expenses reimbursed through the allegedly lax processes described in Paragraphs 141 and 142, because those are the only alleged expenditures of corporate assets other than payments to beneficiaries. (Compl. ¶ 144.) But, as noted above, Mullaney owed no fiduciary duty when negotiating his own pay. *E.g., Walt Disney,* 906 A.2d at 49 (no breach of fiduciary duty possible where material terms of employment were negotiated prior to assuming duties as officer).

Mullaney's compensation was not "irrational." The Complaint recites that his salary and bonuses were each expressly considered and then reconsidered by the board together with advice from a compensation expert and, even crediting Plaintiff's incorrect assertion that certain reimbursed expenses should be counted as compensation, the $4.4 million that Plaintiff is claiming Mullaney received over six years (Compl. Ex. A) is hardly unreasonable compensation for someone responsible for bringing in $54.4 million over the same period (Report p. 4) and who, at the prior charity he founded, had shown himself capable of growing that to $120 million *per year*. *See, e.g. Hampshire Group*, 2010 WL 2739995, at *22 (rejecting waste claim premised on

reimbursement of excessive and personal expenses because, as a business matter, there is nothing irrational with letting an executive "live like Diddy" as long he added more value than he extracted).

Plaintiff does not dispute that Mullaney provided *some* value for the compensation received. That is enough to defeat a waste claim. *President & Fellows of Harvard Coll. v. Glancy,* Civ. A. 18790-SPL, 2003 WL 21026784, at *23 (Del. Ch. Mar. 21, 2003) (citation omitted) (to support a waste claim, the alleged facts must "establish a complete failure of consideration").

## II. THE FIFTH, SIXTH, AND SEVENTH CLAIMS TO AVOID AND RECOVER ALLEGED CONSTRUCTIVE FRAUDULENT TRANSFERS SHOULD BE DISMISSED FOR FAILURE TO PLEAD LACK OF FAIR CONSIDERATION OR INSOLVENCY

The Fifth Claim seeks to avoid all payments made by Debtor to Mullaney, or deemed made for his benefit, for the six years prior to filing this complaint—*i.e.*, from two months before Debtor even existed. (Compl. ¶¶ 5, 146.) The theory is that every dollar ever paid or reimbursed by Debtor to Mullaney, totaling at least $4,474,951.09 over six years, was "constructively fraudulent" under New York Debtor and Creditor Law §§ 273, 274 or 275, made applicable by Bankruptcy Code § 544(b).[11] In other words, despite Mullaney's founding a charity and acting as its sole fundraiser with just a tiny team of seven or eight employees, and nevertheless raising over $50 million for it, of which no one disputes that many millions of dollars served the charitable mission by funding "numerous medical procedures in developing countries" (even if those same people criticize the level of administrative expenses incurred), and despite Mullaney having devoted six years to that cause, Plaintiff contends Mullaney should forfeit (regardless of whether he even can)

---

[11] The Sixth Claim seeks the same relief, but only for a 2-year period pursuant to Bankruptcy Code section 548(b) (Compl. ¶154) [*sic*, should be section 548(a)(1)(B)(ii)(I)-(III)]. And the Seventh Claim seeks a yet smaller subset of those payments pursuant to section 548(a)(1)(B)[(ii)(IV)].).

every penny of compensation he received over those six years, even though there is no allegation

of fraud or self-dealing (beyond broad allegations of alleged improper reimbursement of expenses)

and the worst that can be said comes down to the charity having been "poorly governed, costly

and highly inefficient." (Compl. ¶ 56.)[12]

Every one of the claims, however, requires that the Debtor have not received "reasonably

equivalent value" (under Bankruptcy Code § 548(a)((1)(B)(1) for Claims Six and Seven) or "fair

consideration" (under New York Debtor and Creditor Law §§ 273, 274, 275, for Claim Five) in

exchange for a corresponding transfer. The principal difference between the two terms is that

under New York law it is the plaintiff's obligation to plead the absence of good faith as part of the

absence of fair consideration, whereas good faith is an affirmative defense under section 548(c)

once the plaintiff has proven lack of reasonably equivalent value. *See* Debtor and Creditor Law §

272(a); *Operations NY*, 490 B.R. at 96-97. Nevertheless, a section 548 constructive fraudulent

transfer claim is subject to dismissal if it is apparent from the Complaint, or other documents

properly considered on a motion to dismiss, that the affirmative defense is available. *E.g.*, *SIPC

v. Bernard L. Madoff Invs. Secs. LLC*, 516 B.R. 18, 24 (S.D.N.Y. 2014) (citing *Picard v. Greiff*,

476 B.R. 715, 723 (S.D.N.Y. 2012) and *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74

(2d Cir. 1998)).[13]

---

[12] The Complaint pleads the conclusion that "Mullaney failed to provide any value to Debtor in
exchange for his substantial salary, benefits, and expense payments" (Compl. ¶ 180), but that is
another example of an allegation entitled to no weight whatsoever under *Twombly/Iqbal.*

[13] Plaintiff may attempt to argue that, under New York law (but not the Bankruptcy Code),
the "insider exception" renders any transfer to an insider constructively fraudulent. This Court,
like some others within this Circuit, has in the past concluded that "[a] transfer made by an
insolvent debtor to an … insider in satisfaction of an antecedent debt lacks good faith and is
constructively fraudulent." *In re White Metal Rolling and Stamping Corp.*, 222 B.R. 417, 430
(Bankr. S.D.N.Y. 1998). Such argument, if made, should be rejected. This "insider exception" is
unique to New York courts and finds no support in the statutory text of section 272. Rather, the

Plaintiff, in order to recover every penny paid to Mullaney by Debtor since its founding, as he seeks to do, must necessarily be alleging that Mullaney did not provide *any* value in exchange for his salary, bonus and perks over the course of six years. That is facially implausible inasmuch as Mullaney did, after all, at least found the charity, raise in excess of $50 million for it, and cause it to fund surgeries in developing countries. *See Iqbal*, 556 U.S. at 679 (plausibility "requires the reviewing court to draw on its judicial experience and common sense"). *See also Hydrogen*, 431 B.R. at 354 (dismissing constructive fraudulent conveyance claim where the complaint "sets forth no facts supporting the allegation that the Debtor failed to receive 'reasonably equivalent value' or 'fair consideration' in exchange for the payment of bonuses and other compensation to Defendants.")

---

exception has been justified on the ground that "the UFCA … [unlike the Bankruptcy Code] is a set of legal rather than equitable doctrines, whose purpose is not to provide equal distribution of a debtor's estate among creditors, but to aid specific creditors who have been defrauded by the transfer of a debtor's property." *In re Dreier LLP*, 452 B.R. 391, 443-44 (Bankr. S.D.N.Y. 2011) (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634-35 (2d Cir. 1995) (citing *Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1508 (1ˢᵗ Cir. 1987))). This justification is problematic insofar as courts have held that "to promote a uniform national interpretation of the UFCA, both this Circuit and the courts of New York have encouraged recourse to the case law of other jurisdictions." *In re Sharp Int'l Corp.*, 403 F.3d 43, 55 (2d Cir. 2005) (citing *HBE*, 48 F.3d at 634 n.8)); *see also Southern Industries v. Jeremias*, 66 A.D.2d 178, 183, 411 N.Y.S.2d 945 (2d Dep't 1978) (same). Such a uniform interpretation weighs *against* the imposition of an "insider exception" applicable solely to New York as courts interpreting the Uniform Fraudulent Conveyance Act ("UFCA"), as enacted within the Bankruptcy Act (*see Cohen v. Sutherland*, 257 F.2d 737, 742 (2d Cir. 1958)), even within this District, have rejected the existence of said exception, citing out-of-district authorities interpreting Bankruptcy Act section 107, subd. d(1) which tracks Debtor and Creditor Law § 272. *E.g.*, *In re Checkmate Stereo and Elecs., Ltd.*, 9 B.R. 585, 618 (Bankr. E.D.N.Y. 1981) (quoting Fifth and Seventh Circuit authorities interpreting the federal codification of the UFCA under the Bankruptcy Act for the proposition that transactions that carry the earmarks of arm's length bargaining are considered to be in good faith); *Matter of S & W Exporters, Inc.*, 16 B.R. 941, 946 (Bankr. S.D.N.Y. 1982) (same); *see also In re Ky. Truck Sales, Inc.*, 52 B.R. 797, 806 n.19 (Bankr. W.D. Ky. 1985) (citing *Nixon v. Lucas*, 42 F.2d 833 (2d Cir. 1930) for the proposition that "[i]f the terms of the transaction between the corporation and its controlling shareholder are basically fair, then the effects of that transaction are the same as if they occurred between any two unrelated parties"). In any event, as discussed in the text, the New York claims still fail even if the "insider exception" were recognized.

Moreover, even had Plaintiff pleaded failure to provide reasonably equivalent value, his Fifth and Sixth Claims would still fail to state cognizable claims because his allegations of insolvency (by any of the three measures) are likewise implausible. First, there is no allegation whatsoever that the Debtor was actually or constructively insolvent by any measure before HelpMeSee filed its Answering Statement and Counterclaim Request in the arbitration on May 9, 2013. *Help Me See, Inc. v. WonderWork, Inc.*, Index No. 655667/2016 (Sup. Ct. N.Y. Co. Oct. 26, 2016) (NYSCEF Doc. No. 3 (Affirmation of Vincent A. Sama in Support of Petition to Confirm Arbitration Award), Ex. D). Accordingly, there is no basis alleged to avoiding any payments prior to that date.

But even then, the Complaint contains no facts, just the *ipse dixit* assertion that, "[i]n fact, at the time Debtor entered into its impact loans, Debtor was already insolvent due to its malfeasance towards HelpMeSee, which ultimately resulted in [the] arbitration award." (Compl. ¶ 114.) No basis for the assertion is provided; indeed, the Complaint contains no basis for concluding Debtor was insolvent even subsequently, after entering into the so-called "impact loans" beginning in May 2013. (Compl. ¶ 108.)

The Complaint declares that "the Board permitted Mullaney to enter into a series of impact loans that collectively totaled close to $10 million payable in five years, even though such loans rendered Debtor insolvent." (Compl. ¶ 108.) But, again, that declaration that those loans rendered the Debtor insolvent is wholly unsupported, contradicts the allegation of Paragraph 114 that it was the Award that rendered Debtor insolvent, and, if viewed as pleading "in the alternative," still fails to allege which in the series of loans is the one that supposedly rendered Debtor insolvent.

In fact, the Report actually disproves the assertion that the Award or any of the impact loans rendered Debtor insolvent at all. The Examiner accepted Debtor's disclosures that, as of December 29, 2016 ("Petition Date"), Debtor had $21,770,674 in assets and $26,567,042.28 in liabilities. (Report p. 7 & n.4.) Of the liabilities, the Award accounted for $16,059,833.50 (*id*. p. 7 n.4), and over $9 million of the remainder constituted "impact loans" (*id*. p. 78) that had maturity dates between May 2018 and January 2020 (Compl. ¶ 108). The Examiner recognized that "impact investments are supposed to allow investors to achieve a return on their capital while also creating a positive social impact" (Report p. 78) but, as conventionally understood, "impact" investments did not make much sense when applied to Debtor insofar as "the focus of such investment is generally on privately-owned social purpose companies and nonprofit revenue generating organizations that can ultimately produce funds to repay the impact investment rather than on traditional nonprofits that make grants and provide services free of charge, such as the Debtor." (*Id*. p. 79, footnote omitted). The Examiner further explained Mullaney structured these as "impact loans" not as an "impact investment" as the term is commonly used, but as a fundraising tactic with the expectation that these "loans" would never have to be repaid:

> The Debtor chose to pursue Impact Loans from various individuals in lieu of traditional donations because of the potential close relationship that could be cultivated as a result of the loan. Mullaney thought parties would likely give more money to the Debtor in the form of a loan than a donation and that the five-year term of the loans would give the Debtor an audition period to prove that it deserved the funds and had earned them. He hoped from the beginning that the loans would be forgiven.

(*Id*.)

The Examiner further admitted that Mullaney "appeared to have a basis for taking such a position. Several of the Lenders have already forgiven portions of the impact loans prior to maturity" and pre-bankruptcy. (Report pp. 89-90.) Subsequently, the largest such lender, the

Thompson Family Foundation, forgave its entire $8 million loan balance. (ECF No. 435 §§ 4.4(b), 5.4; ECF No. 454-3.) Subtracting that from Debtor's liabilities as of the Petition Date, Debtor's assets exceeded its liabilities by more than $3.18 million. The acknowledged (and justified) expectation these "loans" would never have to be repaid negates any inference that Debtor was expecting to be unable to pay its debts as they matured, and there is no showing that $3.18 million was "unreasonably small capital" for a charity like Debtor. There is simply no allegation of insolvency necessary to support the Fifth and Sixth Claims, even if failure to provide reasonably equivalent value, or fair consideration, had been alleged.

## III.   THE EIGHTH CLAIM TO AVOID AND RECOVER ALLEGED PREFERENTIAL TRANSFERS LIKEWISE FAILS

The Eighth Claim seeks to recover all amounts, totaling at least $484,212, that were paid to Mullaney during the one-year preference period. (Compl. ¶ 161.) Such a claim requires that the transfers have been made "while the debtor is insolvent." 11 U.S.C. § 547(b)(3). As discussed above, any presumption of insolvency is rebutted by the Complaint's incorporation of the Report which contains the facts showing that Debtor was *never* balance sheet insolvent before the Petition Date. (*See* pp. 25-27, *supra*.)

Moreover, to be a voidable preference, the payment must have enabled the creditor "to receive more than such creditor would receive if the case were a case under chapter 7 of this title." 11 U.S.C. § 547(b)(5)(A). Again, the facts alleged actually show that any creditors who did not convert their loans into donations could have been paid *in full* in a hypothetical chapter 7 liquidation. (*See* pp. 25-27, *supra*.) *See, e.g., Operations NY*, 490 B.R. at 102 (dismissing complaint that failed to plead satisfaction of section 547(b)(5)).

This claim should be dismissed because the extant facts render the wholly conclusory allegations of insolvency not merely implausible, but untrue.

## IV. THE NINTH CLAIM TO AVOID AND RECOVER POSTPETITION TRANSFERS SHOULD BE DISMISSED

Mullaney raised over $8 million for the Debtor postpetition (Report pp. 31, 94, 144 n.318) and, during that time, reimbursed his expenses totaling $60,460.18 and took salary totaling $395,833.32. (Compl. Ex. D.) The $237,550.00 in salary paid in September 2017 (*id.*) was earned under Mullaney's Employment Agreement granting him salary of $475,000 per year (September was nine-twelfths into the year, and thus Mullaney had earned salary of $356,250 at the time of the payment).

The $237,500 in salary paid is thus not avoidable because it was earned postpetition and paid pursuant to his Employment Agreement. (Employment Agreement § 2(a).) As noted in *In re Herberman*, 122 B.R. 273, 282 (Bankr. W.D. Texas 1990):

> [that officers are estate fiduciaries] does not, of course, mean that the [officer] is expected to work for the estate for free. The [officer] justifiably expects to be paid for services rendered to the estate. Indeed, the Bankruptcy Code contemplates that the estate will incur expenses in its operations, including the wage and salary expenses associated with the estate's income production. 11 U.S.C. §§ 1108, 503(b)(1)(A). To the extent that compensating the [officer] for contributing to the income production process is itself "in the ordinary course of business of the debtor," that compensation is permitted.[14]

There can be little doubt Mullaney contributed to the income production process both pre- and postpetition. As noted above, the Examiner found that he raised $8 million postpetition—more than twenty times postpetition salary paid to him. Nor can there be any doubt payment of his salary under his compensation program and reimbursement of his expenses was in the ordinary

---

[14] *Herberman* concerned salary taken by an individual debtor (considered an "officer" of the estate, 122 B.R. at 279-80). However, the above-quoted language applies with equal force to corporate officers of a debtor.

course of business under Bankruptcy Code section 363(c)(1). (*See* Compl. Ex. A (identifying all salary payments made since the Debtor's formation).)

Inasmuch as Mullaney hereby agrees that the balance of his salary received in October 2017 is concededly avoidable under Bankruptcy Code section 549 in the net amount of $66,304.88,[15] there is nothing more to be recovered on this claim and it should, therefore, be dismissed. The $66,304.88 need not be currently paid because it may be offset against his scheduled claim under the doctrine of recoupment (*see* p. 34 n.18, *infra*).

## V. THE TENTH CLAIM FOR BREACH OF THE EMPLOYMENT AGREEMENT SHOULD BE DISMISSED

The Tenth Claim alleges "Mullaney breached his duties under the Employment Agreement by promulgating false and misleading fundraising campaigns and overseeing false and misleading financial reporting as further extensively detailed in the Report." (Compl. ¶ 176.) Even were those allegations credited as true (and they are not, *see, e.g.*, p. 13 n.7, *supra*), they helped, not hurt, the Debtor because those actions are not alleged to have been taken for personal benefit but to increase donations. (*E.g.*, Report p. 271.) As such, Plaintiff cannot and does not plead any damages, which are an essential element of the claim under New York law (made applicable through Section 13 of the Employment Agreement, its choice of law clause). *Diesel Props. S.r.l. v. Greystone Bus. Credit*

---

[15] The full $158,283.21 identified in Compl. Ex. D is subject avoidance by the Litigation Trustee. However, transmitting that amount to Plaintiff will give rise to an unsecured claim in Mullaney's favor in that amount pursuant to Bankruptcy Code section 502(h); Debtor's chapter 11 plan provides for a 58.11% recovery to holders of allowed unsecured claims (ECF No. 435 § 4.4(b); ECF No. 410 (disclosure statement projected recoveries), p.3; *see also* ECF No. 435-1, Terms of Settlement ¶5); and neither the litigation trust agreement (ECF No. 454-4) nor plan provisions concerning the trust (ECF No. 435 Art. IX) permits the Litigation Trustee to make distributions to holders of allowed section 502(h) claims, but rather only provides for distributions of the trust res on a pro rata basis to HelpMeSee and the other three creditors that elected on their ballots to fund the instant litigation (ECF No. 435 § 9.5; ECF No. 464 ¶8). Therefore, to preserve Mullaney's right to a section 502(h) claim and provide him with the same distribution as other unsecured creditors, he should only remit 41.89%, or $66,304.88, to the estate at the appropriate time.

*II LLC*, 631 F.3d 42, 52 (2d Cir. 2011); *Carco Group, Inc. v. Maconachy,* 383 F. App'x 73, 75 (2d Cir. 2010) ("Damages for breach of contract must be 'directly and proximately caused' by the breach.")

Instead of damages, Plaintiff seeks rescission: "[a]s a result, Mullaney should be directed to return all amounts paid under the Employment Agreement and should not be entitled to any additional amounts awarded under the Agreement." (Compl. ¶176.) *See Derouin's Plumbing & Heating, Inc. v. City of Watertown,* 71 A.D.2d 822, 419 N.Y.S.2d 390, 391 (4th Dep't 1979) ("Although the complaint did not specifically mention rescission it is plain that this is the type of relief the plaintiff sought [and] the trial court should have treated this case as an equitable action for rescission").

But rescission is an available remedy only for "a breach that substantially defeats the purpose of the contract." 16 N.Y. Jur. 2d Cancellation of Instruments § 13 (2d ed.) *See also Luo v. Main St. Assocs.,* 212 A.D.2d 675, 676, 622 N.Y.S.2d 761 (1st Dep't 1995) (claim for rescission based on breach of contract should have been dismissed where the alleged breach "is not a material breach on which to base the equitable remedy of rescission"). Here, Plaintiff does not allege that Mullaney's supposedly "false and misleading fundraising campaigns [and] financial reporting" (Compl. ¶ 176) defeated the purpose of the contract. To the contrary, the Complaint does not dispute that they were undertaken "with the goal of maximizing WonderWork's impact on its fundamental mission of providing free surgeries for indigent children and adults," precisely what it identifies as Mullaney's duties and responsibilities under his Employment Agreement. (Compl. ¶ 175).

Moreover, rescission is available only "when there is lacking complete and adequate remedy at law and where the status quo may be substantially restored." *Rudman v. Cowles*

*Commc'ns, Inc.*, 30 N.Y.2d 1, 13 (1972).  And, in such event, a plaintiff must tender back any consideration received.  *Gilbert v. Rothschild*, 280 N.Y. 66, 72, 19 N.E.2d 785, 787 (1939).  Neither requirement is satisfied.

First, Debtor has not been damaged and the Employment Agreement itself provides an adequate remedy at law:  If, as Plaintiff alleges, Mullaney was responsible for misleading, and therefore "illegal," fundraising campaigns, Debtor's remedy under the contract was to immediately terminate his employment "for cause" (Employment Agreement § 6(b)(2) (violation of law)) and thereby cause him to forfeit severance pay (which Mullaney has not sought), but the agreement expressly provides that Mullaney remains entitled to unpaid salary and benefits (and, of course, entitled to keep what was earned and paid).  (Employment Agreement § 6(f)(i).)  Plaintiff's failure to plead the inadequacy of that remedy is, itself, grounds for denying rescission.  *See, e.g., Loreley Fin. (Jersey) No. 28, Ltd. v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 117 A.D.3d 463, 468, 985 N.Y.S.2d 499 (1st Dep't 2014) ("the motion court properly dismissed the rescission cause of action because the complaint fails to allege the absence of a 'complete and adequate remedy at law'").

Second, a plaintiff must tender back any consideration received (as noted above) and, even then, "[r]escission is not appropriate where, as here, the status quo cannot be 'substantially restored.'" *Singh v. Carrington,* 18 A.D.3d 855, 857, 796 N.Y.S.2d 668, 669 (2d Dep't 2005).  "If it cannot be [fully restored and, therefore, the agreement] rescinded in toto, it cannot be rescinded at all; but the party complaining of the nonperformance, or the fraud, must resort to an action for damages." *Slater v. Slater*, 208 A.D. 567, 573, 204 N.Y.S. 112, 117 (App. Div. 1924) (quoting *Pullman v. Alley*, 53 N.Y. 637 (1873)), *aff'd,* 240 N.Y. 557, 148 N.E. 703 (1925).  Here, Plaintiff has never tendered back the six years of Mullaney's life that he devoted to raising $54

million for Debtor, nor explained how he could do so to restore the *status quo ante*. Plaintiff has accordingly failed to state a cause of action.

## VI. THE ELEVENTH CLAIM FOR UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED FOR FAILURE TO PLEAD THAT MULLANEY BENEFITTED AT DEBTOR'S EXPENSE AND BECAUSE HIS COMPENSATION WAS GOVERNED BY A BOARD-APPROVED AGREEMENT

"The theory of unjust enrichment is one created in law in the absence of any agreement." *Loreley,* 117 A.D.3d at 468 (quoting *Basis Yield Alpha Fund (Master) v. Goldman Sachs Group, Inc.,* 115 A.D.3d 128, 141, 980 N.Y.S.2d 21 (1st Dep't 2014)).[16] Accordingly, "the existence of a valid and enforceable … contract governing a particular subject matter precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v. LIRR*, 70 N.Y.2d 382, 388-89, 516 N.E.2d 190 (1987).

Here, the Complaint alleges that Mullaney's salary and benefits were governed by a formal written Employment Agreement as of January 1, 2016 (Compl. ¶ 174), and before that, by the agreement of the board (*e.g.*, Compl. ¶¶ 59, 65, 67, 68-70, 72, 74-75, 77, 83, 91; Report p. 195.) It therefore fails to state a claim for unjust enrichment. *See, e.g., Beth Israel Med. Center v. Horizon Blue Cross and Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) ("*Clark-Fitzpatrick* precludes unjust enrichment claims whenever there is a valid and enforceable contract governing a particular subject matter, whether that contract is written, oral, or implied-in-fact"); *Loreley,* 117 A.D.3d at 468 ("the unjust enrichment cause of action should have been dismissed because the … transaction was governed by written agreements.")

Moreover, to the extent that the Complaint alleges "that Defendants were enriched in the form of bonus and other compensation payments [the] Complaint does not adequately explain

---

[16] New York law applies to this claim. *E.g.*, *Innovative BioDefense, Inc. v. VSP Techs., Inc.*, No. 12-cv-3710, 2013 WL 3389008, at *6 n.8 (S.D.N.Y. July 3, 2013); *Hydrogen*, 431 B.R. at 359.

factually how 'equity and good conscience militate against' allowing Defendants to retain such payments." *Hydrogen*, 431 B.R. at 359 (granting motion to dismiss unjust enrichment claim for that reason).

## VII. THE TWELFTH CLAIM SHOULD BE DISMISSED FOR FAILURE TO PLEAD A VALID BASIS FOR DISALLOWANCE

The Twelfth Claim for Relief is an objection to Mullaney's claim for back pay and seeks its disallowance on the grounds that: (1) the subject bonus payments of which the back pay claim is comprised were "excessive and unwarranted" and "were obtained [*i.e.*, approved by the board] under false and misleading pretenses, including that Mullaney was running a model charity, when in fact he used Debtor to further his own interests at the expense of the charity," and (2) "the Mullaney Claim which is based on a claim arising under the Employment Agreement is not valid because Mullaney materially breached the Employment Agreement and the Agreement itself is an avoidable transfer." (Compl. ¶183.)

The allegation that bonuses were obtained through "false and misleading pretenses" to the board appears to be an allegation of fraudulent inducement. This casual reference to "pretenses" is wholly inconsistent with the remainder of the Complaint which alleges that the board was aware of everything Mullaney had done (*see, e.g.,* paragraphs cited *supra* at pp. 11-12), and which acknowledges that the board did not just rubber-stamp annual bonus awards inasmuch as it awarded Mullaney less than the maximum amount in 2015. (Compl. ¶¶ 59, 178.) This bare allegation of unidentified "false and misleading pretenses" certainly does not comply, as it must, with Fed. R. Civ. P. 9(b). *E.g.*, *In re 21st Century Holdings*, 591 B.R. 134, 141 (Bankr. S.D.N.Y. 2018). Beyond that new allegation, this claim just rehashes the bases for Plaintiff's other claims and fails for the same reasons they do, as discussed above.

## VIII.  THE THIRTEENTH CLAIM CANNOT STAND ALONE

The Thirteenth Claim seeks to disallow Mullaney's claim for back pay pursuant to Bankruptcy Code section 502(d), on the ground that he has not first returned any avoidable transfers. Because the claims for avoidable transfers should all be dismissed for the reasons discussed above, this claim should be dismissed because it cannot stand alone. *Hydrogen,* 431 B.R. at 363. *See also In re Atl. Computer Sys.,* 173 B.R. 858, 861 (S.D.N.Y. 1994) (there must be an adjudication of liability, and an opportunity to pay, before there can be liability under section 502(d)).[17]

## CONCLUSION

The Claims against Mullaney should be dismissed with prejudice.

Dated: April 2, 2019
New York, New York

Respectfully submitted,

/s/ Jeffrey Chubak
Bijan Amini
Edward P. Dolido
Jeffrey Chubak
STORCH AMINI PC
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
bamini@storchamini.com
edolido@storchamini.com
jchubak@storchamini.com
*Attorneys for Defendant Brian Mullaney*

---

[17] While Mullaney concedes the obligation to return $66,304.88 of unearned salary paid to him after the Petition Date (*see* p. 29, *supra*), he has no obligation to pay such amount before his own claim for back pay is adjudicated because it is subject to the doctrine of recoupment. *E.g.*, *Atl. Computer Sys.,* 173 B.R. at 860-61.