UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X
In re:                                                          :
                                                                :       Chapter 11
WONDERWORK, INC.,                                               :       Case No. 16-13607 (SMB)

                                    Debtor.                     :


---------------------------------------------------------------- :
VINCENT A. SAMA, as Litigation Trustee of the
WW LITIGATION TRUST,                                            :
                                                                        Adv. No. 18-1873 (SMB)
                                    Plaintiff,                  :
        -against-
                                                                :
BRIAN MULLANEY, HANA FUCHS, THEODORE
DYSART, RAVI KANT, JOHN J. CONEYS,                             :
STEVEN LEVITT, CLARK KOKICH, STEVEN
RAPPAPORT, RICHARD PRICE, and MARK                             :
ATKINSON
                                                                :

                                    Defendants.  :
---------------------------------------------------------------- X


**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................... 3

I.   The Complaint Pleads Breach of Fiduciary Duty Claims Against Each of The Director
     Defendants ...................................................................................................... 4

     A.   The Trustee Did Not Engage in Impermissible Group Pleading ........................... 4

     B.   The Director Defendants Breached Their Fiduciary Duties ................................. 6

          1.   The Director Defendants Are Not Entitled to Volunteer Immunity .......... 6

          2.   The Business Judgment Rule Does Not Apply ......................................... 8

     C.   The Complaint Sufficiently Alleges Corporate Waste ....................................... 19

     D.   Allegations Prior to December 2013 Are Not Time-Barred ............................... 21

II.  The Claims Against Mullaney and Fuchs Should Not Be Dismissed ............................ 22

     A.   Count Four: Breach of Fiduciary Duty/Waste ................................................. 22

          1.   Mullaney and Fuchs Violated the Duty Of Care ..................................... 23

          2.   Mullaney and Fuchs Violated the Duty Of Loyalty and Good Faith ........ 24

     B.   Count Five: Constructive Fraudulent Conveyance, Section 544(b) .................... 27

          1.   The Trustee Has Alleged Lack of Fair Consideration ............................. 28

          2.   The Trustee Has Alleged Insolvency ..................................................... 29

     C.   Counts Six & Seven: Fraudulent Transfer, Section 548 .................................... 32

     D.   Count Eight: Avoidance/Preferential Transfers ............................................... 34

     E.   Count Nine: Avoidable Transfer, Section 549 ................................................. 35

     F.   Count Ten: Breach of Contract .................................................................... 38

     G.   Count Eleven: Unjust Enrichment ................................................................ 38

     H.   Counts Twelve and Thirteen: Disallowance of Claim ...................................... 39

III. In The Alternative, The Trustee Should Be Granted Leave to Amend ......................... 39

CONCLUSION ....................................................................................................... 40

**Cases**                                                                                                          **Page(s)**

*Aldina v. Internet.com Corp.*,
    No. CIV. A. 17235-NC, 2002 WL 31584292 (Del. Ch. 2002)...........................................9, 23

*Allegaert v. Warren*,
    480 F. Supp. 817 (S.D.N.Y. 1979) ....................................................................................21

*Am. Media, Inc. v Bainbridge & Knight Labs., LLC*,
    135 A.D.3d 477 (1st Dep't 2016) ................................................................................28, 29

*Appalachian Enters., Inc. v. ePayment Sols., Ltd.*,
    No. 01 CV 11502 (GBD), 2004 WL 2813121 (S.D.N.Y. Dec. 8, 2004)..............................5, 6

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..........................................................................................................3

*Beam ex rel. Martha Stewart Living Omnimedia, Inc, v. Sewart*,
    833 A.2d 961 (Del. Ch. 2003)...........................................................................................11

*Brehm v. Eisner*,
    *746 A.2d 244, 262 (Del. 2000)*.....................................................................................4, 15

*Broesler v. Wardens and Vestry of St. Barnabas Episcopal Church*,
    No. 10C-04-222 FSS, 2011 WL 2174924 (Del. Super. Ct. Feb. 28, 2011) ...........................7

*California Pub. Employees' Ret. Sys. v. Coulter*,
    No. CIV.A. 19191, 2002 WL 31888343 (Del. Ch. Dec. 18, 2002) ......................................15

*Capax Discovery, Inc. v. AEP RSD Inv'rs, LLC*,
    285 F. Supp. 3d 579 (W.D.N.Y. 2018) .............................................................................38

*Chen v. Howard-Anderson*,
    87 A.3d 648 (Del. Ch. 2014).............................................................................................5

*CMS Inv. Holdings, LLC v. Castle*,
    No. CV 9468-VCP, 2015 WL 3894021 (Del. Ch. June 23, 2015) .......................................12

*Crescent/March I Partners, L.P. v. Turner*,
    846 A.2d 963 (D. Ch. 2000) ........................................................................................8, 22

*Desimone v. Barrows*,
    924 A.2d 908 (Del. Ch. 2007)...........................................................................................10

*EAC of N.Y., Inc. v. Capri 400, Inc.*,
    49 A.D.3d 1006 (3d Dep't 2008) ......................................................................................28

*Gao v. JPMorgan Chase & Co.*,
   No. 14 CIV. 4281 PAC, 2015 WL 3606308 (S.D.N.Y. June 9, 2015).....................38

*H2O Plus, LLC v. Arch Pers. Care Prod., L.P.*,
   Civ. No. 10–3089(WJM2011–MF), 2011 WL 2038775 (D.N.J. May 22, 2011) ...................4

*Hampshire Group, Ltd. v. Kuttner*,
   No. CIV.A. 3607-VCS, 2010 WL 2739995 (Del. Ch. July 12, 2010)....................27

*Harrison v. N.J. Cmty. Bank (In re Jesup & Lamont, Inc.)*,
   507 B.R. 452 (Bankr. S.D.N.Y. 2014) ..................................................33

*Heineman v. Datapoint Corp.*
   No. CIV. A. 7956, 1990 WL 154149 (Del. Ch. Oct. 9, 1990)................................20

*In re Adler, Coleman Clearing Corp.*,
   263 B.R. 406 (Bankr. S.D.N.Y. 2001) ..................................................33

*In re Atlantic Computer Sys.*,
   173 B.R. 858 (S.D.N.Y. 1994).........................................................37

*In re Caremark Intern, Inc. Derivative Litig.*,
   698 A.2d 959 (Del. Ch. 1996).......................................................9, 10

*In re Chase & Sanborn Corp.*,
   124 B.R. 371 (Bankr. S.D. Fl. 1991) ..................................................38

*In re Cornerstone Therapeutics Inc., Stockholder Litig.*,
   115 A.3d 1173 (Del. 2015) ............................................................5

*In re DeFlora Lake Dev. Assocs., Inc.*,
   571 B.R. 587 (Bankr. S.D.N.Y. 2017)...................................................3

*In re Dewey & Leboeuf LLP*,
   No. 12-12321 (MG), 2014 WL 201586, (Bankr. S.D.N.Y. Jan. 16, 2014) ............................21

*In re Dewey & LeBoeuf LLP*,
   No. 12-12321 (MG), 2014 WL 4746209 (Bankr. S.D.N.Y. Sept. 23, 2014)...................33, 34

*In re Dreier LLP*,
   452 B.R. 391 (Bankr. S.D.N.Y. 2011) ..................................................28

*In re Fairfield Sentry Ltd.*,
   596 B.R. 275 (Bankr. S.D.N.Y. 2018) ..................................................34

*In re Friends for Long Island's Heritage*,
   911 N.Y.S.2d 412 (2d Dep't 2010).....................................................31

*In re Hydrogen, L.L.C.*,
    431 B.R. 337 (Bankr. S.D.N.Y. 2010) ...................................................................6

*In re Incentium, LLC*,
    473 B.R. 264 (Bankr. E.D. Tenn. 2012) ..............................................................33

*In re Ruffini*,
    No. 11-78841-REG, 2014 WL 714732 (Bankr. E.D.N.Y. Feb. 25, 2014) ...........33

*In re SandRidge Energy, Inc. Shareholder Derivative Litigation*,
    302 F.R.D. 628 (W.D. OK 2014)........................................................................11

*In re Save Our Springs (S.O.S.) Alliance, Inc.*,
    388 B.R. 202 (Bankr. W.D. Tex. Apr. 11, 2008).................................................31

*In re Stoecker*,
    131 B.R. 979 (Bankr. N.D. Ill. 1991) .................................................................36

*In re Velo Holdings Inc.*,
    472 B.R. 201 (Bankr. S.D.N.Y. 2012) ...............................................................35

*In re Walt Disney Co. Derivative Litig.*,
    906 A.2d 27 (Del. 2006) ........................................................................... *passim*

*In re Walt Disney Co. Derivative Litig.*,
    825 A.2d 297 (Del. Ch. 2003).............................................................................9

*In re White Metal Rolling & Stamping Corp.*,
    222 B.R. 417 (Bankr. S.D.N.Y. 1998) (Bernstein, J.) ......................................28

*LaLonde v. Textron, Inc.*,
    369 F.3d 1 (1st Cir. 2004) ...................................................................................6

*Lenel Sys. Int'l, Inc. v. Smith*,
    34 A.D.3d 1284 (4th Dep't 2006) ......................................................................38

*Levy v. Young Inst. Inc.*,
    103 F. Supp. 3d 426 (S.D.N.Y. 2015).................................................................22

*Lewis v. Vogelstein*,
    699 A.2d 327, 336 (Del. Ch. 1997).....................................................................20

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC.*,
    797 F.3d 160 (2d Cir. 2015)...............................................................................39

*Malinowski v. New York State DOL (In re Malinowski)*,
    156 F.3d 131 (2d Cir. 1988)..........................................................................37, 38

*McMahan & Co. v. Donaldson, Lufkin & Jenrette,*
  727 F. Supp. 833 (S.D.N.Y. 1989) ..........................................................22

*McMullin v. Beran,*
  765 A.2d 910 (Del. 2000) ...................................................................8, 23

*McPadden v. Sidhu,*
  964 A.2d 1262 (Del. Ch. 2008)................................................................15

*Murray Eng'g P.C. v. Remke,*
  No. 17 CIV. 6267 (KPF), 2018 WL 3773991 (S.D.N.Y. Aug. 9, 2018) .........................27, 28

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Forman 635 Joint Venture,*
  No. 94 Civ. 1312, 1996 WL 507317 (S.D.N.Y. Sept. 6, 1996) .............................21

*Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman,*
  277 B.R. 20 (S.D.N.Y. 2002)...................................................................21

*Oxbow Calcining USA Inc., v. Am. Indus. Partners,*
  96 A.D.3d 646 (1st Dep't 2012) ...............................................................22

*Pereira v. Cogan,*
  No. 00 CIV. 619 (RWS), 2001 WL 243537 (S.D.N.Y. Mar. 8, 2001), *rev'd on
  other grounds, Pereira v. Farace,* 413 F.3d 330 (2d Cir. 2005) ...........................21

*President & Fellows of Harvard Coll v. Glancy,*
  Civ. A. 18790-SPL, 2003 WL 21026784 (Del. Ch. Mar. 21, 2003).............................20

*Rochez Bros. v. Sears Ecological Applications Co. (In re Rochez Bros.),*
  326 B.R. 579 (Bankr. W.D. Pa. 2005) ......................................................36, 38

*Salahuddin v. Cuomo,*
  861 F.2d 40 (2d Cir. 1988)......................................................................6

*Sec. Investor Protection Corp. v. Bernard Madoff Investment Sec., LLC*
  2009 Bankr. LEXIS 446 (Bankr. S.D.N.Y. Feb. 24, 2009) ....................................37

*Stone v. Ritter,*
  911 A.2d 362 (Del. 2006) ..................................................................10, 11

*TheECheck.com, LLC v. NEMC Fin. Servs. Grp. Inc.,*
  No. 16-CV-8722 (PKC), 2017 WL 2627912 (S.D.N.Y. June 16, 2017)................................5

*Westinghouse Credit Corp. v. D'Urso,*
  278 F.3d 138 (2d Cir. 2002).................................................................37

*Wimbledon Financing Master Fund, Ltd. v. Wimbledon Fund, SPC*,
    No. 652771/2016, 2016 WL 7440844 (N.Y. Sup. Ct. N.Y. County Dec. 22,
    2016) ........................................................................................................................28

*Winick Realty Grp. LLC v. Austin & Assocs.*,
    51 A.D.3d 408 (1st Dep't 2008) ..........................................................................39

*Zegelstein v. Chaudhry*,
    No. 16-CV-3090 (KBF), 2017 WL 4737263 (S.D.N.Y. Oct. 18, 2017) ..................5

## **Statutes**

10 Del. C. § 8133 ....................................................................................................6, 7, 8

11 U.S.C § 363(c)(1) ...................................................................................................35

11 U.S.C § 502............................................................................................36, 37, 38, 39

11 U.S.C. § 541(c) ......................................................................................................31

11 U.S.C. § 544....................................................................................................27, 33

11 U.S.C. § 548....................................................................................14, 32, 33, 34

11 U.S.C. § 549....................................................................................14, 35, 36

11 U.S.C. § 550....................................................................................35, 36, 37

Del. Gen. Corp. Law Section 141(e)..........................................................................15

I.R.C § 4858 ..............................................................................................................11

New York's Debtor & Creditor Law § 273 ...........................................................27, 29

New York's Debtor & Creditor Law § 274 ...........................................................27, 29

New York's Debtor & Creditor Law § 275 ...........................................................27, 29

United Kingdom Charities Act of 1993 ......................................................................11

## **Rules**

CPLR § 202.................................................................................................................21

CPLR § 213(7).............................................................................................................22

Fed. R. Civ. P. Rule 8 ........................................................................................3, 4, 5, 6

Fed. R. Civ. P. Rule 12(e)...............................................................................................6

Fed. R. Bankr. P. Rule 7008 ............................................................................................................3

Plaintiff Vincent A. Sama, as Litigation Trustee of the WW Litigation Trust (the "Trustee" or "Plaintiff"), respectfully requests that the Court deny the motions to dismiss of Defendants Brian Mullaney ("Mullaney"), Hana Fuchs ("Fuchs"), Theodore Dysart ("Dysart"), John J. Coneys ("Coneys"), Steven Levitt ("Levitt"), Clark Kokich ("Kokich"), Steven Rappaport ("Rappaport"), Richard Price ("Price"), and Mark Atkinson ("Atkinson," together with Coneys, Levitt, Kokich, Rappaport, Price, and Dysart, the "Director Defendants") and with Mullaney (the "Board"))[1], or in the alternative, grant him leave to amend.

## PRELIMINARY STATEMENT

There is no serious dispute that WonderWork, Inc. (the "Debtor") was a fraud, and in the words of the Court-appointed examiner, "presents a case study on how a dominant CEO, left unchecked by a passive and overly deferential Board of Directors, can damage a charity beyond repair." *See* Final Report of Jason Lilien ("Examiner"), dated October 25, 2017 [Dkt. No. 303] ("Ex. Rep."), at 1. Indeed, the Examiner determined that Debtor was "a poorly governed, costly and highly inefficient operation in which only a small fraction of donations are used to help people in need." *Id*. The Defendants are the very individuals charged with running and overseeing Debtor, yet each one, through his or her respective motion to dismiss, seeks to evade his or her responsibility. If the Defendants have their way, no one would be responsible for Debtor's wrongdoing. Unsurprisingly, applicable law does not support such a result.

---

[1] *See* Memorandum of Law in Support of Motion to Dismiss Litigation Trustee's Adversary Complaint as Against Defendant John J. Coneys, [Dkt. 20] ("Coney's Br."); Memorandum of Law in Support of Motion to Dismiss the Trustee's Complaint as Against Theodore Dysart, [Dkt. 23] ("Dysart Br."); Memorandum of Law in Support of Motion to Dismiss the Trustee's Second and Third Claims or in the Alternative for a More Definite Statement, [Dkt. 26] ("Levitt Defs. Br." or "Levitt Motion to Dismiss"); Motion of Defendant Mark Atkinson to Dismiss the Second and Third Claims of the Complaint or in the Alternative for a More Definite Statement [Dkt. 27] (joining the Levitt Motion to Dismiss); Memorandum of Law in Support of Brian Mullaney's Motion to Dismiss the Complaint, [Dkt. 29] ("Mullaney Br."); Memorandum of Law in Support of Motion to Dismiss the Complaint as Against Hana Fuchs, [Dkt. 31] ("Fuchs Br."). Although the Trustee also brought suit against Ravi Kant, service has not been effectuated on Mr. Kant who, on information and belief, resides in India.

The Director Defendants admit that, as board members, they had fiduciary duties to Debtor. Yet, the Director Defendants' arguments boil down to a single argument: as directors of a non-profit who did not engage in self-dealing, the business judgment rule protects them from being held accountable for any of their actions or any wrongdoing that occurred on their watch no matter what transpired. That is not the law; the business judgment rule does not apply to action not taken: (1) in good faith; (2) in the honest belief that the action was in the best interest of the corporation; or (3) on an informed basis. There can be no dispute that, at a minimum, glaring red flags should have alerted the Director Defendants to some, if not all, of the many issues at Debtor. But, the Director Defendants abdicated their duties when they never even questioned management's actions and instead, rubberstamped CEO Mullaney's transparently unreasonable demands, including permitting him to use the charity as his personal piggy bank and to defraud donors and the public through charitable solicitations and financial materials replete with errors and misrepresentations. While the Director Defendants claim reliance on experts, that defense is unavailing when, as is the case here and as the Director Defendants knew at the time, the expert was given incomplete information or the expert advised against the transaction. Finally, while the Director Defendants raise factual disputes with respect to the well-pled allegations in the Complaint, factual disputes are not appropriate on a motion to dismiss.

Debtor's former CEO Mullaney's and CFO Fuchs' motions to dismiss are similarly baseless. According to Mullaney, the law provides that a CEO of a non-profit can "live like Diddy" off ill-gotten gains taken from a charity, commit accounting, tax, and consumer fraud, and illegally siphon money from Debtor during its chapter 11 case, but be completely immune from liability under the business judgment rule as long as the CEO raised one cent more than he squandered or misappropriated. Mullaney Br. at 22. Mullaney contends that the same actions that

the Examiner, the former head of the New York Attorney General's Charities Bureau, thought should *result in a criminal referral* are shielded – as a matter of Delaware law – from all liability. While Mullaney takes comfort in the Board's alleged actions (or inactions) in the face of his myriad abuses, the Director Defendants breached their fiduciary duty of care by turning a blind eye to the numerous red flags surrounding Debtor and Mullaney. Throughout his Motion, Mullaney repeatedly asks that this Court credit his (inaccurate and self-serving) rendition of events over the well-pled allegations of the Complaint. The Trustee will do his best to refrain from wasting this Court's time by disputing Mullaney's factual arguments; rather those factual issues (which the Trustee can and will prove in this case) only underscore that almost all of what Mullaney raises is not the proper subject of a motion to dismiss.

## ARGUMENT

Under Federal Rule of Civil Procedure ("<u>Rule</u>") 8(a), incorporated and made applicable herein by Federal Rule of Bankruptcy Procedure ("<u>Bankruptcy Rule</u>") 7008, to state a claim for relief the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." *In re DeFlora Lake Dev. Assocs., Inc.*, 571 B.R. 587, 593–94 (Bankr. S.D.N.Y. 2017) (quoting Rule 8(a)(2)). In reviewing a motion to dismiss, a court must accept the factual allegations of the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *In re DeFlora Lake Dev. Assocs., Inc.*, 571 B.R. at 593–94. A complaint will survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" *Iqbal*, 556 U.S. at 678 (citation omitted). "A claim has facial plausibility when the [pleaded] factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

# I. THE COMPLAINT PLEADS BREACH OF FIDUCIARY DUTY CLAIMS AGAINST EACH OF THE DIRECTOR DEFENDANTS

## A. THE TRUSTEE DID NOT ENGAGE IN IMPERMISSIBLE GROUP PLEADING

As a preliminary matter, the Director Defendants argue that, because the Complaint refers to the "Board" collectively throughout the fact section and the Board composition changed over time, the Complaint fails to comply with Rule 8 by engaging in "group pleading." Levitt Defs. Br. at 8; Dysart Br. at 5. This overstates Plaintiff's burden and mischaracterizes the Complaint. Pursuant to Rule 8(a)(2), the Complaint must only provide "a short and plain statement of the claim showing that the pleader is entitled to relief" which the Complaint does here.

The Director Defendants are similarly situated in that they all served as members of Debtor's Board for some common period. The Complaint carefully separates the counts against the Director Defendants by time period and delineates to which individuals each of the counts apply to address the differing composition of Debtor's Board over time:

- The First Count applies to the Director Defendants who served on the Board during the period of March 2011 to November 2015 (*i.e.*, Dysart, Kant, and Coneys);

- The Second Count applies to the Director Defendants who served on the Board during the period of December 2015 through the Petition Date (*i.e.*, Kant, Coneys, Levitt, Kokich, Rappaport, Price, and Atkinson);

- The Third Count applies to the Director Defendants who served on the Board during the period of the Petition Date to present (*i.e.*, Coneys, Levitt, Kokich, Rappaport, Price, and Atkinson).

This more than satisfies Plaintiff's pleading burden. *See H2O Plus, LLC v. Arch Pers. Care Prod., L.P.*, No. CIV. 10-3089 WJM MF, 2011 WL 2038775, at *2 (D.N.J. May 22, 2011) ("While Plaintiff did lump the Arch Defendants together in the description of the facts, looking to the Complaint and the attached exhibits as a whole clearly shows which claims are made against Arch PCP and which against Arch Chemicals."). The cases cited by the Director

Defendants for failure to comply with Rule 8 are either inapposite[2] or distinguishable because those cases involved allegations that ***never specified which counts*** were alleged against different defendants.[3] Moreover, the Complaint also includes specific detail regarding the actions of the individual Director Defendants where such detail was known to the Plaintiff.[4]

The Director Defendants who are the subject of the Levitt Motion to Dismiss attempt to muddle the issues and contend that substantially all of the alleged misconduct occurred prior to their joining the Board in December 2015. Levitt Defs. Br. at 14. That is simply not true[5] — actions by the Board prior to December 2015 are only included in the First Count of the Complaint, which by its plain terms is limited to Dysart, Coneys, and Kant, and is not asserted against any of the Director Defendants who are the subject of the Levitt Motion to Dismiss. The Second and Third Counts, which are asserted against, among others, the Director Defendants who are the subject of the Levitt Motion to Dismiss, pertain to post-December 2015 conduct,

---

[2] *See Zegelstein v. Chaudhry*, No. 16-CV-3090 (KBF), 2017 WL 4737263, at *5 (S.D.N.Y. Oct. 18, 2017) (dismissing complaint when the "allegations fall short of each of the asserted claims as to each defendant" and "do not plausibly support any claim"); *Chen v. Howard-Anderson*, 87 A.3d 648, 676–77 (Del. Ch. 2014) (at trial, the court should evaluate each director's potential liability individually to determine if an exculpatory clause applies); *In re Cornerstone Therapeutics Inc., Stockholder Litig.*, 115 A.3d 1173, 1182 (Del. 2015) (in addressing question of whether plaintiff had to plead non-exculpated claims against directors protected by an exculpatory provision, court rejected plaintiffs' argument that they should be entitled to automatic inferences about directors who participated in an interested transaction because each director has a right to have claims against him or her considered individually).

[3] *See TheECheck.com, LLC v. NEMC Fin. Servs. Grp. Inc.*, No. 16-CV-8722 (PKC), 2017 WL 2627912, at *2 (S.D.N.Y. June 16, 2017) (dismissing complaint when it did not differentiate the claims between the five defendants, which included individuals and corporate defendants, and did not allege facts about the conduct of any individual defendant); *Appalachian Enters., Inc. v. ePayment Sols., Ltd.*, No. 01 CV 11502 (GBD), 2004 WL 2813121, at *7 (S.D.N.Y. Dec. 8, 2004) ("[T]he complaint simply attributes the wrongful acts as being committed collectively by the seventeen defendants. Moreover, the complaint fails to reveal the specific relationship, if any, that these defendants share.").

[4] *See e.g.*, Compl. ¶ 53 (describing Board committees and which Director Defendants were members of each committee); ¶ 55 (describing Coneys' role as "Lead Independent Director"); ¶ 68 (describing Coneys' involvement in negotiating Mullaney's employment agreement); ¶ 103 (describing actions of Coneys and Price relating to the arbitration award); ¶ 126 (describing breaches of fiduciary duty and waste by Dysart, Kant, and Coneys during period from March 2011 to at least November 2015); ¶ 131 (describing breaches of fiduciary duty and waste by each of the Director Defendants during period from December 2015 through the Petition Date); ¶ 136 (describing breaches of fiduciary duty and waste by each of Coneys, Levitt, Kokich, Rappaport, Price, and Atkinson during period following the Petition Date and including specific actions undertaken by Coneys and Price).

[5] For example, the Director Defendants in the Levitt Motion to Dismiss ignore the fact that the Mullaney was awarded his full salary and the Board approved a $250,000 bonus in 2016. *See* Levitt Defs. Br. at 14.

including for actions that took place during the bankruptcy proceeding. Moreover, as the Director Defendants acknowledge (Levitt Defs. Br., at 23), the proper response to a Rule 8 deficiency is a motion for a more definite statement under Rule 12(e); dismissal is not the appropriate remedy.[6] Thus, there is no basis to dismiss on account of alleged group pleading.

**B.    THE DIRECTOR DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES**

The Complaint outlines systematic and pervasive mismanagement and misconduct at every level of Debtor's operations that the Director Defendants either knew or should have known and allege claims for breach of fiduciary duty. As set forth below, the conduct alleged rises to the level of gross negligence and the Complaint adequately pleads claims for breach of fiduciary duty. The Director Defendants contend that they are immune from liability under the volunteer immunity defense and business judgment rule but, accepting the factual allegations of the Complaint as true, neither is applicable here.

**1.    The Director Defendants Are Not Entitled to Volunteer Immunity**

The Director Defendants argue that they can rely on the immunity granted to volunteers under 10 Del. C. § 8133, which extends to volunteers who perform a "negligent act or omission performed during or in connection with an activity of such organization." 10 Del. C. § 8133.[7] But, the application of Section 8133 immunity is inappropriate because the Complaint alleges conduct that falls outside the scope and application of Section 8133 in two separate respects.

---

[6] *See Appalachian Enterprises, Inc,* 2004 WL 2813121, at *7 (internal quotations omitted) (citing *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir. 1988)) ("Dismissal for failure to comply with the rule is generally 'reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.'"); *LaLonde v. Textron, Inc.*, 369 F.3d 1, 6 (1st Cir. 2004) ("[T]he proper response should have been a motion for a more definite statement under Fed.R.Civ.P. 12(e) and not a motion for dismissal on the merits.").

[7] Debtor was incorporated under the laws of Delaware and therefore claims for breach of fiduciary duty that relate to the internal affairs of the corporation are governed by Delaware law. *See In re Hydrogen, L.L.C.,* 431 B.R. 337, 346 (Bankr. S.D.N.Y. 2010).

First, the Complaint alleges that the Director Defendants took actions that were not in connection with an "activity" within the meaning of Section 8133. Section 8133(a)(1) defines "activity" as "any decision, act or event undertaken by an organization in furtherance of the purpose or purposes for which such organization was organized and exempted from federal income tax" 10 Del. C. § 8133. A basis of the allegations in the Complaint against the Director Defendants is that they either approved or failed to monitor acts that were inconsistent with Debtor's charitable purpose. The Examiner found that WonderWork "raised, and then misapplied and misused, millions of charitable donations" all under the helm of Mullaney, who was "left unchecked by a passive and overly deferential Board of Directors" and who operated Debtor "in disregard of key legal requirements and industry standards" (Ex. Rep. at 1), and for his "own benefit through excessive compensation and benefits and under reported income"[8] (*id*. at 5). The Examiner specifically found that Debtor "depart[ed] substantially from [its] stated purpose." *Id*. at 31. The Examiner also found that Debtor represented to the IRS in its Form 1023 application for tax exemption "that it would not be fundraising for other organizations" and never corrected that representation even though it was doing exactly that. *Id*. at 28. Consequently, the Directors Defendants' actions were not performed in furtherance of the purpose for which the Debtor was organized and are outside the scope of Section 8133.[9] Second, Section 8133 immunity does not extend to "any act or omission constituting willful and wanton or grossly negligent conduct" 10 Del. C. § 8133(b); *see also Broesler v. Wardens and Vestry of*

---

[8] For example, although Debtor's purpose was to provide assistance to children and adults, Debtor "abused the public's trust from its inception," including by misleading donors as to what countries Debtor operated in, which entities received their donations, what type of patient Debtor used their money to operate on, and for what purposes Debtor used their donations (Compl. ¶ 56), while at the same time grossly overcompensating Mullaney, who received a base salary of $475,000 and annual bonuses in excess of $200,000, in addition to hundreds of thousands of dollars in reimbursements for improper or personal expenses (*id*. ¶¶ 57, 76–84, 90, *see also id*. Exs. A–E).

[9] In similar regard, there is an issue of fact about whether the Debtor was an "organization" within the scope of Section 8133 (defining an organization as a not-for-profit entity "engaged in any activity within the State [of Delaware] in furtherance of a purpose for which it was organized").

*St. Barnabas Episcopal Church*, No. 10C-04-222 FSS, 2011 WL 2174924, at *2 (Del. Super. Ct. Feb. 28, 2011). Therefore, even if Section 8133 applies to Debtor's activities, it does not relieve the Director Defendants of liability because the Director Defendants were grossly negligent (or engaged in willful and wanton conduct) as discussed in more detail below.

## 2. The Business Judgment Rule Does Not Apply

The Complaint alleges that, in addition to sanctioning actions that violated applicable law, the Director Defendants were "asleep at the switch" and failed to stop the pervasive and systematic fraud and mismanagement at every level of Debtor's operations despite numerous red flags. Contrary to the Director Defendants' arguments, Plaintiff need not allege that the Director Defendants were acting in their own self-interest to state a claim for breach of fiduciary duty. *See In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 66 (Del. 2006) ("Cases have arisen where corporate directors have no conflicting self-interest in a decision, yet engage in misconduct that is more culpable than simple inattention or failure to be informed of all facts material to the decision. To protect the interests of the corporation and its shareholders, fiduciary conduct of this kind, which does not involve disloyalty (as traditionally defined) but is qualitatively more culpable than gross negligence, should be proscribed.").

As Defendants acknowledge, the presumption of the business judgment rule is overcome if a plaintiff shows "that the defendant directors failed to act (1) in good faith; (2) in the honest belief that the action was in the best interest of the corporation; or (3) on an informed basis." *Crescent/March I Partners, L.P. v. Turner*, 846 A.2d 963, 984 (D. Ch. 2000) (cited in Dysart Br. at 15). Where, as is the case here, directors fail to exercise "due care" to inform themselves of the business's operations, the presumption of the business judgment rule is rebutted.[10] While the

---

[10] *See, e.g., McMullin v. Beran*, 765 A.2d 910, 922 (Del. 2000) ("The business judgment rule is rebutted if the plaintiff shows that the directors failed to exercise due care in informing themselves before making their decision.");

Director Defendants point to *In re Caremark Intern, Inc. Derivative Litigation*, 698 A.2d 959, 970 (Del. Ch. 1996), to argue that Plaintiff's allegations amount to a failure to monitor claim and failure to monitor claims fail as a matter of law, the application of the *Caremark* standard does not mandate automatic dismissal. First, the Trustee, upon information and belief, alleged that the Director Defendants either knew or should have known certain information regarding Debtor's operations. Compl. ¶¶ 95–107. The Director Defendants and Mullaney claim that Mullaney acted with the "knowledge and agreement of the independent members of the board of directors." Mullaney Br. at 11; *see also* Dysart Br. at 16–17. Consequently, while the Trustee potentially alleged a *Caremark* failure to monitor claim, the Trustee also alleged knowing violations of law. The Delaware Supreme Court has explained that a showing of lack of good faith can overcome the business judgment presumption "where the fiduciary intentionally acts with a purpose other than that of advancing the best interest of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *In re Walt Disney Co. Derivative Litigation*, 906 A.2d 27 at 67. At a minimum, there is an issue of fact as to whether these are properly characterized as *Caremark* claims.

Moreover, even if the Complaint includes failure to monitor claims, Plaintiff has alleged a valid claim under *Caremark*. Under Delaware law, a failure to monitor claim exists when "(a) the directors utterly failed to implement any reporting or information system or controls; or

---

*see also Aldina v. Internet.com Corp.*, No. CIV. A. 17235-NC, 2002 WL 31584292, at *8 (Del. Ch. 2002) (finding that, even where the board had informed itself through several rounds of board deliberations, reports by experts, and by conducting a market survey, the Complaint alleged that the directors were not fully informed because the board had no information about the value of the asset and received no fairness opinion regarding the transaction); *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 297, 286 (Del. Ch. 2003) (holding that where directors did not review draft employment agreements and the compensation committee only received a summary of the employment agreement's terms and conditions, did not ask any questions, and did not take any time to review the documents for approval, there was sufficient reason to doubt the business judgment protection).

(b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *see also In re Caremark Intern, Inc. Derivative Litigation*, 698 A.2d at 970 ("[A] director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists"). Thus, where a claim against the directors "is predicated upon ignorance of liability creating activities within the corporation . . . a sustained or systematic failure of the board to exercise oversite . . . will establish the lack of good faith that is a necessary condition to liability." *Stone*, 911 A.2d at 370; *see also Desimone v. Barrows*, 924 A.2d 908, 935 (Del. Ch. 2007) ("[D]irector liability for failure to monitor required a finding that the directors acted with the state of mind traditionally used to define the mindset of disloyal director—bad faith—because their indolence was so persistent that it could not be ascribed to anything other than a knowing decision not to even try to make sure the corporation's officers had developed and were implementing a prudent approach to ensuring law compliance.").

That type of conduct is exactly what is alleged in the Complaint. As the Examiner found, the "Board abrogated its responsibility to oversee the Debtor's fundraising practices both with respect to content and practices, its record keeping with respect to restricted funds, and with its accounting practices in general, placing undue reliance on Debtor's management." Ex. Rep. at 259; *see also id.* at 1 ("WonderWork presents a case study on how a dominant CEO, ***left unchecked by a passive and overly deferential Board of Directors***, can damage a charity beyond repair.") (emphasis added); Compl. ¶¶ 95–96. Indeed, in considering whether a cause of action was sustainable under *Caremark*, the Examiner concluded that the Defendant Directors "failed to adequately oversee the Debtor's business operations in a number of ways." Ex. Rep. at 258.

"Red flags," or facts that show "the board was aware that . . . internal controls were inadequate, that these inadequacies would result in illegal activity, and that the board chose to do nothing about the problems it allegedly knew existed," also establish director liability.[11] *Stone,* 911 A.2d at 370. Here, among other things, the Complaint alleges that, at a minimum, the Director Defendants were aware of and ignored the following red flags:

- The Board knew that ***Debtor kept two sets of books, including a second separate "payroll ledger" that was not included in Debtor's general ledger or financial statements*** to track Mullaney's base pay and bonus and reflected what he referred to as his "limbo pay," such that nowhere did Debtor actually disclose the true nature of Mullaney's compensation. Had the Director Defendants sought more information about Mullaney's practices, they would have learned that, in addition to his base pay and bonus, he incurred hundreds of thousands of dollars in expenses that were either excessive, undocumented or lacked a proper business purpose (Compl. ¶ 85);[12]

- Pearl Meyer, the Board's compensation consultant, refused to conclude that Mullaney's compensation was reasonable pursuant to the Intermediate Sanctions rule in Section 4858 of the IRC, even though the Board offered Pearl Meyer an additional $5,000 if they could reach that conclusion (*id*. ¶ 60);

- Smile Train UK brought and won suit against Mullaney for violation of United Kingdom Charities Act of 1993 for approving compensation to himself in violation of UK law (*id*. ¶ 84);

- After Debtor, at Mullaney's request, commenced arbitration against Help Me See, Inc. ("HMS"), Debtor found itself with an arbitration award in excess of $16 million, with express and disturbing findings regarding Mullaney, including that he acted in an "unconscionable" and "reprehensible manner" (*id*. ¶ 114);

- On the Board's watch, Smile Train sued Mullaney for copyright infringement in connection with a promotional book he sent out to solicit funds for WonderWork and accused Mullaney of stealing Smile Train's donor list; the Board responded by using

---

[11] Courts have found sufficient red flags exist where the board of directors ignored a CEO's self-interested behavior, failed to prevent him from taking illegal actions, and granted wasteful compensation packages to him and other senior executives. *See In re SandRidge Energy, Inc. Shareholder Derivative Litigation*, 302 F.R.D. 628, 636 (W.D. OK 2014). Dysart cites to *Beam ex rel. Martha Stewart Living Omnimedia, Inc, v. Sewart*, 833 A.2d 961, 971 (Del. Ch. 2003), for the proposition that, "[a]bsent cause for suspicion, there is no duty upon the directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists." Dysart Br. at 9–10. But, as discussed below, there was more than sufficient cause for suspicion.

[12] Mullaney and Fuchs' prior practices with respect to the "limbo pay" at Smile Train resulted in Smile Train reissuing Mullaney's W-2s for the years 2006-2010 and resulted in Mullaney having to report an additional $1,114,574 in income (*id*. ¶ 85).

Debtor's assets to pay $695,357 to cover Mullaney's personal legal fees and the settlement payment (*id.* ¶¶ 78–80);

- Smile Train subpoenaed Mullaney personally in connection with a lawsuit brought against Smile Train's outside computer consultant, Gregory Sheehan and his company, Ferris Consulting, Inc., alleging that Sheehan assisted Mullaney in illegally obtaining confidential and proprietary information belonging to Smile Train; the Board authorized the payment of Mullaney's fees to quash the subpoena (*id.* ¶ 83);

- With the express intent to hinder and delay its creditors, Debtor undertook an effort to reclassify a greater volume of its contributions as restricted in anticipation of an adverse ruling in the arbitration with HMS in June 2016. This effort increased greatly following the arbitration ruling, with Debtor labeling the majority of its money restricted to surgery programs, a category that never existed before issuance of the arbitration award. Board members Coneys and Price specifically instructed Debtor to "restrict" their donations after the filing of the bankruptcy petition (*id.* ¶ 103);

- Debtor's fundraising campaigns, which formed the bulk of Debtor's activities, grossly misstated Debtor's activities, including countries in which Debtor operated, the use of the donated funds, the populations that Debtor served, and the nature of Debtor's donors, among other issues (*id.* ¶¶ 105–106); and

- Debtor's former auditor KMPG refused to conduct its 2016 audit and BDO, the new auditor Debtor retained to do the audit, was unable to complete the audit by the statutory May 15, 2017 deadline or at any time thereafter (*id.* ¶ 32). Rather than address these red flags, the Board took no action and continued to allow Mullaney to do whatever he wanted, including deceiving the Court about the audit's status.

Despite these glaring and numerous red flags—which were clear indicators to any reasonable person that Mullaney required *at a minimum* close and careful monitoring and oversight[13]—the Director Defendants not only failed to monitor operations, including Debtor's accounting and fundraising practices, but (with the exception of Dysart who resigned)[14] continued to vouch for and support Mullaney, including to this Court when they submitted sworn affidavits in

---

[13] Indeed, this Court at the First Day hearing observed Mullaney's and the Debtor's salary excesses (Jan. 5, 2017 Tr. 13:8-10 "I'm just — it just seems — strikes me as a large payroll for 30 days, considering the number of employees"), and the unusual circumstances of the arbitration (*id.* at 7:16–21 "THE COURT: Well, the description in the First Day Declaration is curious. You sued them for severance payments and they wind up with a substantial $16 million arbitration award. MR. CAHN: Yes, Your Honor. THE COURT: There's something missing.").

[14] Dysart asserts that his resignation absolved him from liability for any future acts, but that is not the law. Dysart cannot walk away from fraud and thereby proclaim that he washed his hands of his duties. *See CMS Inv. Holdings, LLC v. Castle*, No. CV 9468-VCP, 2015 WL 3894021, at *20 (Del. Ch. June 23, 2015) (declining to dismiss a claim for a breach of fiduciary duty against a director who may have been aware of a plan to facilitate the company's insolvency and did nothing about it other than resign from the board prior to the company's financial collapse).

opposition to HMS's motion to appoint a trustee for Debtor. [Dkt. Nos. 52, 55–58, 60]. Those affidavits not only include ostensibly false statements (*e.g.*, that the Board was "dedicated, hands-on, and active in its supervision of [Mullaney] and the organization's management generally," (Compl. ¶ 25)), but permitted Mullaney to control Debtor during the bankruptcy where he committed further misdeeds, including altering Debtor's grant making practices to dissipate millions in restricted funds in violation of prior representations to the Court that Debtor would not spend restricted money without Court approval in consultation with and on notice to the New York Attorney General; extracting more money in the form of improper business expenses; repeatedly deceiving the Court and parties in interest about the status of the BDO audit; and paying himself two unauthorized and non–ordinary course payments on the eve of the submission of the Examiner Report totaling $395,833.32. *Id.* ¶¶ 85, 142; [Dkt. 4, at ¶ 12 & 258].

### a.    The Director Defendants' Other Arguments are Unavailing

The Director Defendants raise assorted other arguments to dismiss certain claims and/or allegations, but as shown below, these arguments are unavailing on a motion to dismiss.

- Legal Expenses:  Coneys argues that the Board's decision to fund Mullaney's defense in personal lawsuits could not be irrational because the lawsuits could have negatively impacted Debtor's fundraising. Coneys Br. at 14. That hindsight justification just raises an issue of fact about whether the payments made were in the best interest of Debtor after due consideration and whether the Board properly informed itself in making its decision. Moreover, with that flawed logic, the Board could justify paying Mullaney's personal defenses in connection with virtually any type of claim (*e.g.*, a sexual harassment claim) because it otherwise might impact Debtor's fundraising.

- Impact Loans: Coneys claims that the approval of the impact loans was reasonable and Plaintiff's allegations that they rendered Debtor insolvent are "utterly detached from reality" because Mullaney and the Directors believed that the loans would be forgiven. Coneys Br. at 14. Not only does this set forth an issue of fact as to Mullaney and the Board's subjective beliefs and whether such beliefs were reasonable, but, as is shown in

Section II.B.2 below, this is the opposite of the position taken in this bankruptcy case by Debtor and is directly contradicted by the contemporaneous Board minutes.[15]

- Employment Agreement: The Levitt Motion to Dismiss alleges that the "core" claim regarding the Board's approval of the Employment Agreement must be dismissed because it is unclear if it was approved while they were members of the Board. The Complaint alleges that the Agreement was executed in December 2015, and became effective January 1, 2016. Compl. ¶ 68–69. These Director Defendants represent that they were approved as new Board members on December 23, 2015. Levitt Defs. Br. at 9. Thus, there is an issue of fact whether they had any responsibility for approving or ratifying the Employment Agreement with Mullaney.

- Reclassification of donations: Coneys contends that there are no allegations in the Complaint stating that the reclassification of donations was improper. That is not true: the Complaint states in no uncertain terms that the reclassification of donations was done in an attempt to "hinder, delay, and defraud creditors," including HMS in violation of Bankruptcy Code §§ 548 and 549. Compl. ¶ 131, 136; *see also* Ex. Rep. at 253 ("Numerous badges of fraud also support the inference that the transfers to the restricted fund account were made with an actual intent to hinder, delay, or defraud the Debtor's creditors."), 255 (describing Debtor's improper efforts to reclassify donations after the Petition Date).

Plaintiff has more than met its duty to plead breach of fiduciary duty claims as against each of the Director Defendants that are not susceptible to dismissal at this stage.

### b. The Director Defendants' Alleged Reliance on Experts is Not a Basis to Dismiss the Complaint

The Director Defendants contend that the Complaint can be dismissed because they purportedly relied on "experts" in making their decisions. Coneys Br. at 12; Levitt Defs. Br. at 21–22; Dysart Br. at 16. In *Brehm v. Eisner*, the case advanced by the Director Defendants, the court held that for a plaintiff to plead around a reliance on experts defense, it must allege facts that, if proved, would show that: "(a) the directors did not in fact rely on the expert; (b) their reliance was not in good faith; (c) they did not reasonably believe that the expert's advice was

---

[15] At Debtor's July 22, 2013 Board meeting, the Directors discussed how "Mullaney will present a 10-year budget that shows how WonderWork will be able to pay off "impact loans" at the following meeting. In October 2013, Debtor's internal presentations to the Board did not project Debtor repaying the loans until October 2021 (after the maturity dates), and then only at 66%. Compl. ¶ 111. In February 2015, Dysart also expressed concern about being able to pay back the impact loans, indicating that he expected they would have to be repaid.

within the expert's professional competence; (d) the expert was not selected with reasonable care by or on behalf of the corporation, and the faulty selection process was attributable to the directors; (e) the subject matter . . . that was material and reasonably available was so obvious that the board's failure to consider it was grossly negligent regardless of the expert's advice or lack of advice; or (f) that the decision of the Board was so unconscionable as to constitute waste or fraud."[16] 746 A.2d 244, 262 (Del. 2000); *see also* Section 141(e) Del. Gen. Corp. Law. The Trustee has pled squarely within this framework.

At a minimum, it is well-settled that a defendant cannot take advantage of a reliance defense where, based upon the allegations of the complaint, defendants either knew that the expert's report was based on inaccurate data, or "worked very hard not to know that information—facts which were both material and obvious" *Coulter*, 2002 WL 31888343, at *12 (holding that if either reliance was not in good faith (prong b) or defendants were grossly negligent (prong e), the defense did not apply); *see also McPadden v. Sidhu*, 964 A.2d 1262, 1273 (Del. Ch. 2008) ("Because . . . I conclude that the Director Defendants' actions . . . were grossly negligent, I need not further consider the board's reliance on the . . . fairness opinion or reliability of the opinion."). As set forth below, there are issues of fact as to whether the Director Defendants could reasonably rely on the KMPG audit opinion or the Pearl Meyer report when carrying out their duties and whether the Director Defendants acted in a grossly negligent manner with respect thereto.

(i)     KPMG's Audits Could Not Be Relied Upon

Debtor's financial statements were replete with errors, as became apparent during the bankruptcy when BDO was unable to complete Debtor's 2016 audit and found ten issues

---

[16] Courts do not require that the allegations in the complaint meet every prong. *See, e.g.*, *California Pub. Employees' Ret. Sys. v. Coulter*, No. CIV.A. 19191, 2002 WL 31888343, at *12 (Del. Ch. Dec. 18, 2002).

requiring material adjustments and nine material weaknesses and deficiencies in Debtor's books and records. [Dkt. 265]. The Complaint alleges rampant financial mismanagement at Debtor, including that the Debtor's pre-audited financial and compensation data in the general ledger was false, misleading, or contrary to law, as a result of: Mullaney's secret payroll ledger practice, of which the Director Defendants were aware (Compl. ¶ 85); Debtors' failure to properly account for restricted and unrestricted donations (*id*. ¶ 98); and Debtor's improper use of the joint allocation rules and in kind contribution rules (*id*. ¶¶ 101–02). The Director Defendants, at a minimum, knew of and approved some, if not all, of these practices.

The Secret Payroll Ledger: The Director Defendants (all of whom were highly sophisticated and some of whom had particular expertise in finance, including a former PwC auditor) awarded Mullaney a bonus each and every year since 2013, yet knew that the bonus did not appear on Debtor's financial statements or IRS reporting. *Id*. ¶ 86. The Director Defendants *never inquired* about this obvious omission. Moreover, it is unclear exactly what was disclosed to KPMG with respect to the "limbo pay," and whether KPMG was fully apprised of Debtor's secret ledger and second set of books. Regardless of what KPMG knew, there can be no question that the Director Defendants were well-aware of Mullaney's practice of "deferring" his pay regularly and not paying taxes on it, and either knew or failed to seek adequate information and therefore allowed it to continue to Debtor's detriment. Indeed, the Board went so far as to formally memorialize Mullaney's unorthodox and illegal compensation arrangement when Coneys "took the lead in finalizing Mullaney's employment agreement without the assistance of outside counsel." Ex. Rep. at 204. That Agreement permitted Mullaney to arbitrarily take and defer salary and, in addition to base salary, bonus, and severance payments, provided that Debtor would pay the premiums on approved life insurance policies under which Mullaney had

designated his wife as the beneficiary, bring his wife at Debtor's expense to major donor events, visits, and overseas program trips, and otherwise pay for "such other perquisites approved by the Board." *Id.*[17]

Restricted Fund Accounting: Under the New York Not-for-Profit Corporation law and FAS 117 applying to Financial Statements of Not-for-Profit Organizations, Debtor is required to account for the terms of the gift instrument and report its assets according to three categories: permanently restricted, temporarily restricted, and unrestricted. There can be no question that Debtor's practices in this regard were deficient and not in compliance with law. Rather, as the Examiner explained, BDO discovered, and as alleged in the Complaint, at the end of each fiscal year in connection with the annual audit, Fuchs would create a "roll forward" schedule to show the alleged change in restricted fund balances. These unaudited figures were inaccurate because the Debtor failed to segregate its restricted funds and properly account for them. Moreover, because Debtor did not comply with the gift instruments and donor restrictions accompanying contributions, the numbers that Debtor reported to KPMG were inaccurate. Compl. ¶¶ 100, 102; *see also* Ex. Rep. at 150 (describing Debtor's "overly simplistic" approach to accounting for restricted donations, which was "inconsistent with legal standards"). Debtor also abused the joint cost allocation rules by charging a significant and improper amount of its overall printing, publication, and postage charges related to its direct mail as "program" expenses in its financial statements. Ex. Rep. at 161; *see also* Compl. ¶ 100. Finally, Debtor used the in kind contribution

---

[17] Coneys, in particular, admits his failure to obtain adequate information when he states that he believed the "limbo pay" classifications were proper and did not harm the Company and was surprised when Mullaney asserted a claim for foregone bonuses. Coneys Br. at 13. Had the Director Defendants sought more information about Mullaney's practices, they would have learned that his compensation was not accurately reported on Debtor's books, financial statements, or public filings and that Mullaney was failing to pay taxes on his compensation, and, as a result, was subjecting Debtor to potential liability for payroll taxes, penalties and interest on the unrecorded compensation, and even potentially jeopardized Debtor's 501(c)(3) status. This goes far beyond reasonable decisions that are subject to the business judgment rule and thus the claims should not be dismissed. Moreover, the Board knew about the bonuses and it was the Board's duty, especially Coneys' as audit committee chairman, to ensure that the financial information presented was accurate. *See* Ex. Rep. at 259 (noting that Coneys had communications with auditor).

rules to falsely inflate grants received. Specifically, Debtor would report as an in kind contribution the difference between its contribution to the entity performing the surgery and the actual cost of the surgery. Debtor would then book a corresponding grant cancelling out the net effect of this supposed contribution, thereby inflating the amount of donations and grants it actually received by an aggregate of more than $5 million. Compl. ¶ 102. Management's extensive and varied misrepresentations to its auditors, of which the Director Defendants were or should have been aware, render KPMG's reports and conclusions unreliable and preclude the Director Defendants from relying on KPMG's advice as a defense.

The Debtors' accounting practices as described above and in the Complaint were undertaken with an intent to violate, or with utter disregard of, applicable law and, as such, should be viewed as lacking good faith and thus preclude application of the reliance defense. *Cf.* *In re Walt Disney Co. Derivative Litigation,*, 906 A.2d 27 at 67 ("where the fiduciary acts with the intent to violate applicable positive law," that reflects a lack of good faith to overcome the business judgment presumption).

(ii)      Director Defendants Could Not Rely on Pearl Meyer

Not only were there significant red flags regarding Mullaney's compensation and financial reporting practices, but the Complaint alleges that the Director Defendants did not have an honest belief that their actions regarding Mullaney's compensation were in the best interest of the charity and that the Board did not approve Mullaney's compensation on an informed basis. Dysart and Coneys, however, assert that they relied on the Pearl Meyer report, but the Pearl Meyer report and the circumstances surrounding it were itself a red flag.

The Board retained executive compensation consultant Pearl Meyer in May 2013 to review Mullaney's compensation. Compl. ¶ 60. Under the IRC's Intermediate Sanctions rule, a board must comply with three requirements when engaging a compensation consultant to

determine the reasonableness of a salary payment: the decision must be made by independent board members; comparisons should be made to similar organizations; and the decision must be documented. Compl. ¶¶ 61–64. As set forth in the Complaint, the Board complied with none of these requirements (and was aware of that): Mullaney interfered with Pearl Meyer's review and assessment (*id*. ¶ 62); comparisons were not made to similar organizations (*id*. ¶ 63); and the compensation decisions were insufficiently documented (*id*. ¶ 64).[18] Consequently, although Debtor offered Pearl Meyer $5,000 if it could state that Mullaney's pay was "reasonable" pursuant to the Intermediate Sanctions rule, Pearl Meyer expressly declined to give an opinion on whether the compensation paid to Mullaney was reasonable or not and was unable to conclude that Mullaney's salary did not violate the Intermediate Sanctions rule. *Id*. ¶¶ 60–67. Moreover, the Board cannot rely on Pearl Meyer as a defense because it failed to comply with Pearl Meyer's recommendations: the Board did not evaluate Mullaney's substantial other contractual requests; the Board did not re-review Mullaney's salary; and the Board awarded Mullaney a full bonus (with the exception of 2015) despite a lack of exceptional performance. *Id*. ¶¶ 66–67.

### C. THE COMPLAINT SUFFICIENTLY ALLEGES CORPORATE WASTE

To state a claim for corporate waste under Delaware law, a plaintiff must "demonstrate that the . . . directors authorize[d] an exchange that was so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received *adequate*

---

[18] At Mullaney's insistence, Pearl Meyer used a peer group that was defined by Mullaney, which included "High Growth Non-Profits" and "High Growth For-Profits" to evaluate Mullaney's compensation. This in and of itself precludes the Board's reasonable reliance on Pearl Meyer. Despite improperly gerrymandering the sample set, Pearl Meyer found that Mullaney's *base salary* alone of $475,000 was at the high end of the competitive range, and a bonus of $50,000-$200,000 should only be awarded if his performance was in the 75th percentile—which it never was—and that the Board needed to quantify Mullaney's other compensation. Compl. ¶¶ 63–65; *see also* Ex. Rep. at 200–03 (explaining in detail the Intermediate Sanctions rule and why the Board had no right to rely on Pearl Meyer as a matter of law).

*consideration.*" *President & Fellows of Harvard Coll v. Glancy,* Civ. A. 18790-SPL, 2003 WL 21026784, at *23 (Del. Ch. Mar. 21, 2003) (emphasis added) (internal quotation marks and citation omitted); *see also Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997) (Delaware courts routinely define waste as "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade."). Although the Director Defendants assert that the Court needs to find that there was *no consideration* for a claim of waste to succeed (*see* Coneys Br. at 17; Dysart Br. at 13), that is not the law. *See Heineman v. Datapoint Corp.* No. CIV. A. 7956, 1990 WL 154149, at *2 (Del. Ch. Oct. 9, 1990) ("Even assuming that payments complained about here did serve a valid business purpose," court denied motion to dismiss where complaint challenged the board's approval of payments totaling $15 million to themselves and to officers of the company). Here, the Director Defendants approved and permitted excessive compensation benefits for Mullaney, including approving bonuses that exceeded the compensation recommended by a compensation consultant, paying Mullaney's personal legal fees, commuting costs and other personal expenses, and entering into the Employment Agreement that ran counter to the advice received by a professional consultant paid to evaluate the reasonableness of Mullaney's salary.[19] The Complaint therefore more than supports a finding of "disproportionately small" consideration as compared with Mullaney's excessive compensation package. *See Lewis*, 699 A.2d at 336; *Heineman*, 1990 WL 154149, at *2; *see also* Section II.B.1 below (Debtor's failed to receive fair consideration and reasonably equivalent value for the money expended on Mullaney).

---

[19] For instance, with respect to Mullaney's bonuses, Pearl Meyer noted that the maximum award of $250,000, or 53% of [Mullaney's] base salary, was very high for a non-profit and would only be warranted if Mullaney was able to repeat Smile Train's growth. *See* Compl. ¶ 65. Debtor raised a mere $12 million in its best year, whereas Smile Train raised $120 million in Mullaney's last year there. Yet, the Board annually approved bonuses in the amount of $250,000, except for 2015, when it approved a $200,000 bonus. Compl. ¶ 59.

Coneys and Dysart claim that the breach of fiduciary duty claims against them for actions that occurred prior to December 2013 are time-barred under Delaware law. But there is, at minimum, an issue of fact as to whether New York's six-year statute of limitations, and not Delaware's three year statute, applies.

A federal court exercising its "related to" bankruptcy jurisdiction over state law claims applies the choice of law rules of the forum state in order to determine the applicable statute of limitations. *See In re Dewey & Leboeuf LLP*, No. 12-12321 (MG), 2014 WL 201586, at *3 (Bankr. S.D.N.Y. Jan. 16, 2014) (applying New York choice of law rules). New York's borrowing statute, CPLR § 202, provides that the New York statute of limitations applies where a plaintiff is a New York resident, but where a plaintiff is a non-resident the court should apply the shorter of (1) New York's period of limitations or (2) the statute of limitations applicable where the plaintiff resides. Coneys and Dysart argue that WonderWork is a nonresident of New York because WonderWork was incorporated in Delaware and, therefore, New York's borrowing statute applies. Coneys Br. at 5; Dysart Br. at 19. But, where a corporation[20] is the injured party, "[d]istrict courts in this circuit applying New York law have held that the residence of a corporation for purposes of New York's borrowing statute is the corporation's principal place of business." *Pereira v. Cogan*, No. 00 CIV. 619 (RWS), 2001 WL 243537, at *18 (S.D.N.Y. Mar. 8, 2001), *rev'd on other grounds*, *Pereira v. Farace,* 413 F.3d 330 (2d Cir. 2005); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Forman 635 Joint Venture*, No. 94 Civ. 1312, 1996 WL 507317, at *4 (S.D.N.Y. Sept. 6, 1996); *Allegaert v. Warren,* 480 F. Supp. 817,

---

[20] When the plaintiff is a bankruptcy trustee suing as a representative of the estate of a bankrupt corporation, "it is the residency of the corporation which is applicable." *Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 30 (S.D.N.Y. 2002).

820 n. 7 (S.D.N.Y. 1979); *McMahan & Co. v. Donaldson, Lufkin & Jenrette*, 727 F. Supp. 833, 834 (S.D.N.Y. 1989) (stating same rule, in dicta).

Debtor's principal place of business is New York.[21] Moreover, the actions asserted here accrued in New York because Debtor "sustain[ed] the economic impact of the loss" in New York and all of the actions alleged against the Defendants took place in New York. *Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 96 A.D.3d 646, 651 (1st Dep't 2012) (finding that six-year statute of limitations under CPLR § 213(7) "applies to actions for breach of fiduciary duty by or on behalf of a corporation against a present or former corporate director or officer."). Accordingly, New York's six year statute of limitations applies[22] and Defendants Coneys' and Dysart's motions to dismiss any claim that accrued before December 28, 2013 as time-barred should be denied.[23]

## II. THE CLAIMS AGAINST MULLANEY AND FUCHS SHOULD NOT BE DISMISSED

### A. COUNT FOUR: BREACH OF FIDUCIARY DUTY/WASTE

As Mullaney acknowledges, the business judgment rule does not protect actions that breach "one of the triads of [] fiduciary duty — good faith, loyalty or due care." Mullaney Br. at 7–8; *see Crescent/March I Partners, L.P.*, 846 A.2d at 984. The Complaint alleges that Mullaney and Fuchs repeatedly and routinely violated their fiduciary duties to Debtor in a number of ways.

---

[21] Debtor maintained its offices in New York; registered to solicit charitable contributions with the New York Attorney General; and was obligated to comply with New York's registration and solicitation laws (Compl. ¶¶ 41–42); whereas its sole connection to Delaware is that it was incorporated there (which only occurred because Debtor botched its initial attempt to incorporate in New York). *See* [Dkt. No. 1 (Debtor's Chapter 11 Petition) (listing 411 Fifth Avenue, Suite 702, New York, New York as Debtor's principal place of business)].

[22] *See* CPLR § 213(7); *see also Levy v. Young Inst. Inc.*, 103 F. Supp. 3d 426, 434 (S.D.N.Y. 2015) ("[U]nder New York [CPLR § 213(7)] an action by a corporation against one of its directors (or former directors) for breach of fiduciary duty is subject to a six-year limitations period.").

[23] For the same reasons, the allegations against Mullaney and Fuchs in support of Count Four for breach of fiduciary duty and waste are not time-barred.

1.        **Mullaney and Fuchs Violated the Duty Of Care**

Mullaney admits that an officer breaches the duty of care if he or she fails to inform him/herself fully and in a deliberate manner. Mullaney Br. at 9; *see also McMullin*, 765 A.2d at 921; *Aldina*, 2002 WL 31584292, at *8. The Complaint alleges exactly that and the Court must, at this stage, accept those allegations as true — the Complaint provides detailed allegations of Mullaney and Fuchs acting deliberately in breach of their duty of care including, for example, undertaking illegal and criminal activity, generally mismanaging Debtor, failing to comply with Debtor's governance requirements, authorizing excessive and inappropriate spending, making false statements and filings, violating accounting rules, and misleading donors. *At best*, Mullaney and Fuchs are guilty of breaching their duty of care by intentionally failing to inform themselves of the basic accounting and legal standards applicable to a non-profit organizations in the face of multiple red flags, including the rules relating to restricted and unrestricted funds, donor solicitations, executive compensation, and a charity's reporting obligations. Mullaney argues, without citation, that the parade of misdeeds on his watch are all protected by the business judgment rule *as a matter of law* because they were "reasonable" business decisions. The Court need only look at the list promulgated by Mullaney to see the absurdity of this position.

The allegations that Mullaney and Fuchs argue should be immune from review include clear and repeated violations of applicable law, including actions that, at a bare minimum, Mullaney and Fuchs should have known were illegal and in some cases outright criminal. The Complaint alleges (and the former head of the NY Attorney General's Charities Bureau found) that Mullaney and Fuchs "operated in disregard of key legal requirements and industry standards regarding charitable solicitation, restricted gift practices, financial reporting, and compensation standards from the outset" (Compl. ¶ 2; Ex. Rep. at 1), and are guilty of "routinely mismanaging Debtor, including failing to properly account for and spend Debtor's donations and restricted

funds;" "failing to comply with the terms of Debtor's corporate governing documents, policies, and applicable law;" "improperly accounting for Mullaney's expenditures"; "making clearly false and misleading statements in Debtor's public filings;" "authorizing excessive and inappropriate spending of Debtor's funds;" "misleading donors both in Debtor's public disclosures, including in response to communications inquiring about Mullaney's compensation;" "using false solicitation materials, in violation of applicable law;" and "permitting Debtor to alter its accounting and grant making practices to hinder delay and defraud creditors" (Compl. ¶ 141; Mullaney Br. at 9–10; *see also* Ex. Rep.).[24] The business judgment defense certainly does not shield officers from actions that they knew were illegal or fraudulent, nor officers' false, misleading, or deceptive actions or statements, nor officers' consistent failure to comply with basic corporate governance requirements and accounting rules, all of which are alleged in detail in the Complaint. At the motion to dismiss stage, these allegations are more than sufficient to allege a breach of duty. The only question is whether Mullaney and Fuchs violated their duty of care by failing to be informed with respect to their duties to the organization in bad faith or if, as the Trustee believes, Mullaney and Fuchs knowingly and intentionally violated law, but either result supports the conclusion that Mullaney and Fuchs breached their duty of care.

### 2. Mullaney and Fuchs Violated the Duty Of Loyalty and Good Faith

Mullaney acknowledges that a director or officer breaches the duty of loyalty by engaging in a self-dealing transaction and breaches the subsidiary duty of good faith if the director or officer: (a) intentionally acts with a purpose other than that of advancing the best

---

[24] Although Fuchs tries to minimize her involvement arguing that the Complaint "fails to plausibly plead that she 'acted in bad faith for a purpose other than advancing the best interests of the corporation'" (Fuchs Br. at 3), and that her "service included her acknowledged (extensive) cooperation with the Examine," (Fuchs Br. at 2), the Examiner himself painted Fuchs in a far less flattering light. *See* Ex. Rep. at 62 ("The Examiner found Fuchs to be evasive and inconsistent throughout [her] interview, and when confronted with e-mails or with documents, forgetful, particularly with respect to Mullaney's "limbo pay.").

interests of the corporation; (b) acts with the intent to violate applicable positive law; and (c) intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties. Mullaney Br. at 10; *see also In re Walt Disney Co. Derivative Litigation,*, 906 A.2d at 67. Mullaney and Fuchs set forth a series of arguments to defeat this claim, each one more absurd than the next.

Mullaney argues that he did not breach the duty of loyalty because he did not engage in any self-dealing transactions, but the Complaint alleges that he engaged in several self-dealing transactions including interfering with the Pearl Meyer report to justify his inflated salary (Compl. ¶ 67); inducing Fuchs to drop her lawsuit against Smile Train that would have exposed Mullaney to personal liability by causing the Debtor to pay her a $120,000 signing bonus and agreeing to a 3-year guaranteed employment agreement at a base salary of $200,000 (the same salary she earned at Smile Train, despite Debtor's small size) (*id*. ¶ 93); using Debtor to pay his personal legal expenses (and in amounts in excess of those approved the Board) (*id*. ¶¶ 76–84); awarding himself "limbo pay" upon request (*id*. ¶ 87); and negotiating his employment agreement with Debtor without Debtor having the advice of outside counsel (*id*. ¶ 68). Mullaney further claims that, even if he did engage in self-dealing, he is protected because the Complaint has failed to allege "anything that could possibly be characterized as self-dealing by Mullaney" that was not "fully disclosed to and approved by the Board." Mullaney Br. at 13. That is false. For instance, the Complaint alleges that Debtor paid Mullaney $395,833.32 in two payments on the eve of the submission of the Examiner Report without Board approval (Compl. ¶ 142); Mullaney agreed to pay Fuchs a signing bonus and enter into the 3-year employment agreement in exchange for her agreeing to drop the Smile Train suit without Board approval (*id*. ¶ 93); and Mullaney and Fuchs caused Debtor to pay $245,357.45 in fees in the Smile Train Copyright

Case, despite the Board agreeing to cover only up to $150,000 of Mullaney's legal fees (*id*. ¶¶ 78, 80). In any event, while Mullaney claims that the Board had knowledge, the degree of disclosure to the Board and whether the Board approved any of the matters at issue will be a subject of discovery and does not provide grounds to dismiss.

Straining his credibility, Mullaney also argues that he cannot be liable as a matter of law because he did not intentionally act with a purpose other than advancing the best interest of Debtor — even though he was committing tax fraud, incurring personal, unsubstantiated, and grossly excessive expenses, and sending false and misleading solicitations — because "it was good for the charity to keep its founder and chief fundraiser happy."[25] Mullaney Br. at 14. Mullaney argues that his actions "advanced" the interests of Debtor because, by sending fraudulent and false solicitations, the charity raised more money. Mullaney Br. at 13. Mullaney's defenses are not ripe for decision on a motion to dismiss, but rather raise issues of fact to be determined by a Court, but keeping an executive "happy" by violating the law is not a cognizable defense. Indeed, actions undertaken with the intent to violate law takes such actions outside the business judgment rule even if they otherwise were purportedly in the company's interest. *In re Walt Disney Co. Derivative Litigation*, 906 A.2d 27 at 67.

Finally, Mullaney contends that the scheme he and Fuchs set up to avoid taxes was not "on its face so obviously improper that knowledge might be presumed." Mullaney Br. at 16.

---

[25] Mullaney and Fuchs also argue that the Complaint fails to allege that he and Fuchs acted with the "intent to violate applicable positive law" because, even though the Complaint alleges that Mullaney and Fuchs knew that they were acting in violation of the law, those allegations should be ignored. Mullaney Br. at 14; Fuchs Br. at 6. According to Mullaney and Fuchs, this Court should disregard any allegations of knowledge because Mullaney and Fuchs could have "reasonably believed" that their prior issues at Smile Train (which resulted in multiple different multimillion dollar findings against Mullaney by different independent tribunals and fact finders) were all just the product of an alleged vendetta by Charles Wang. Mullaney Br. at 3; Fuchs Br. at 4–5. Not only is this argument an admission that Mullaney and Fuchs breached their duty of care by failing to investigate the propriety of engaging in a course of conduct that had already resulted in several adverse findings, but for purposes of a motion to dismiss, the Court must accept the factual allegations of the Complaint as true, so for this reason alone, Mullaney's and Fuchs' argument to disregard allegations in the Complaint should be rejected wholesale.

Even if his argument were credited, which it should not be, it is unquestionably an issue of fact. Furthermore, the fact that Mullaney and Fuchs maintained two sets of books for purposes of his compensation scheme and that they had previously been informed that this practice was improper is sufficient to allege knowledge, particularly at the motion to dismiss phase. Mullaney's attempt to distinguish this case from *Hampshire Group, Ltd. v. Kuttner*, No. CIV.A. 3607-VCS, 2010 WL 2739995 (Del. Ch. July 12, 2010), which is exactly on point, must be rejected. In *Hampshire*, as at Debtor, executives kept a separate, handwritten ledger for personal expenses. *Id*. at *24. The Delaware Chancery Court found that, when the CFO became aware of the practice but failed to stop it, he breached his fiduciary duty of loyalty to the company. *Id*. at *25. Here, and as in *Hampshire,* Mullaney and Fuchs breached their duties to Debtor by maintaining a separate, private ledger for Mullaney's "limbo pay" and thus making his compensation appear less on Debtor's Form 990s and Financial Statements (with the apparent goal of defrauding both donors and the IRS). Accordingly, Count Four should not be dismissed. [26]

### B.    COUNT FIVE: CONSTRUCTIVE FRAUDULENT CONVEYANCE, SECTION 544(B)

Bankruptcy Code § 544 gives the trustee the power to avoid any transaction that is "voidable under applicable law by a creditor holding an unsecured claim," which here include claims that a judgment creditor would have under New York's Debtor & Creditor Law (the "DCL") §§ 273, 274, and 275. *See Murray Eng'g P.C. v. Remke*, No. 17 CIV. 6267 (KPF), 2018 WL 3773991, at *16 (S.D.N.Y. Aug. 9, 2018). To state a claim for constructive fraudulent conveyance under New York law, plaintiff must allege that the conveyance was "without fair consideration," and was made when Debtor (a) was insolvent or became insolvent (§ 273); (b)

---

[26]   The Trustee has also pled a claim for waste as to Mullaney. Mullaney argues that the Trustee failed to plead waste because Mullaney was an officer and there can be no waste claim vis-à-vis officers, but Mullaney breached his fiduciary duties as both a director and officer; therefore waste is sufficiently pled.

was engaged in a business or transaction, or was about to engage in business or transaction, for which any property remaining with the debtor was an unreasonably small capital (§ 274); and/or (c) intended to incur, or believed that the Debtor would incur debts that would be beyond the Debtor's ability to pay as such debts matured (§ 275).

### 1.     The Trustee Has Alleged Lack of Fair Consideration

"Under the DCL, fair consideration exists where the transferor, in good faith, receives 'fair equivalent' property or a similarly equivalent antecedent debt is discharged" *Murray Eng'g P.C.*, 2018 WL 3773991, at *16; *In re White Metal Rolling & Stamping Corp.,* 222 B.R. 417, 429 (Bankr. S.D.N.Y. 1998) (Bernstein, J.). With respect to the issue of fair consideration, "[t]o defeat a motion to dismiss, the [plaintiff] need only allege a lack of 'fair consideration' by pleading a lack of 'fair equivalent' value or a lack of good faith on the part of the transferee." *In re Dreier LLP,* 452 B.R. 391, 443 (Bankr. S.D.N.Y. 2011); *see also Wimbledon Financing Master Fund, Ltd. v. Wimbledon Fund, SPC,* No. 652771/2016, 2016 WL 7440844, at *4 (N.Y. Sup. Ct. N.Y. County Dec. 22, 2016) ("[Matters of insolvency] and whether fair consideration was paid, are generally questions of fact which must be determined under the circumstances of the particular case.").

Mullaney, however, asserts that "fair consideration" was not pled because Plaintiff must plead that Mullaney did not provide *any* value in exchange for his salary, bonus, and perks (Mullaney Br. at 24), but that is a misstatement of the law. Under New York law, payment to an insider when the Debtor was insolvent is *per se* not in good faith and not "fair consideration." *See White Metal*, 222 B.R. at 430 ("A transfer made by an insolvent debtor to an affiliate or insider in satisfaction of an antecedent debt lacks good faith and is constructively fraudulent.").[27]

---

[27] *See also Am. Media, Inc. v Bainbridge & Knight Labs., LLC*, 135 A.D.3d 477, 478 (1st Dep't 2016) (citing *EAC of N.Y., Inc. v Capri 400, Inc.*, 49 A.D.3d 1006, 1007 (3d Dep't 2008) ("The requirement of good faith is not

Finally, even without the insider exception,[28] there is at least an issue of fact as to whether the $4,474,951 that Mullaney received in remuneration for running an approximately nine-person fraudulent charity in the 6-year period prior to the filing of the bankruptcy was "fair consideration" for the services provided and whether Mullaney lacked good faith in connection therewith. Accordingly, the Trustee satisfied his burden to allege lack of fair consideration.

## 2. The Trustee Has Alleged Insolvency

To allege insolvency under the DCL, Plaintiff must allege either that Debtor: (a) was insolvent or became insolvent because of the 6-Year transfers (§ 273); (b) was engaged in a business or transaction, or was about to engage in business or transaction, for which any property remaining with the debtor was an unreasonably small capital (§ 274); and/or (c) intended to incur, or believed that the debtor would incur debts that would be beyond the debtor's ability to pay as such debts matured (§ 275). Plaintiff has alleged all three prongs of insolvency.

First, Debtor was insolvent virtually from its inception. As set forth in the Complaint, Debtor entered into a fundraising agreement with HMS in 2011. Compl. ¶ 115. Rather than pay HMS the funds it raised under the agreement as it was required to, Debtor kept the money and then brought an arbitration against HMS. *Id.* ¶¶ 116, 118. HMS ultimately was awarded in excess of $8 million in compensatory damages (in addition to prejudgment interest and attorneys' fees and costs) as a result of Debtor's conduct under the agreement. Although Debtor had no capital of its own from its outset (because those funds rightfully belonged to HMS), Debtor intended to

---

fulfilled through preferential transfers of corporate funds to directors, officers or shareholders of a corporation that is, or later becomes, insolvent, in derogation of the rights of general creditors.").

[28] Mullaney makes a policy argument that the Court should overrule the "insider exception" under New York law. Mullaney Br. at n.13. But, whether Mullaney likes it or not, New York law clearly holds that "[a]n insider payment is not in good faith, regardless of whether or not it was paid on account of an antecedent debt." *Am. Media, Inc., LLC*, 135 A.D3.d at 478. Regardless, this is not the case on which to reconsider New York law. The "antecedent debt" that Mullaney seeks to shield from the trustee's avoidance powers are the salary and expense payments he received as a result of his fraudulent and illegal compensation scheme and, even without the benefit of the insider exception, Plaintiff has alleged both a lack of good faith and unfair consideration.

and did embark on a multi-million dollar, aggressive direct mail marketing campaign. Debtor's insolvency deepened as it incurred huge expenses in connection with its direct mail campaigns.

Debtor tried to address its funding shortfall by entering into "impact" loans. *Id.* ¶ 108. Beginning in 2013, Debtor entered into seven unsecured loans with maturity dates starting in May 2018 and ending in January 2020, with approximately $8 million due on May 15, 2018. *Id.* ¶ 108. The impact lenders limited Debtor's ability to use the funds borrowed, with six of the seven impact loans providing that the loans would be used to assist Debtor in "generating additional funding for WonderWork programs and to facilitate a more efficient delivery of surgeries for the poor and needy served by WonderWork," and requiring Debtor to "use the proceeds of the funds exclusively" for these purposes. *Id.* ¶ 110. In other words, Debtor was required to use the bulk of these loans for its fundraising purposes, which Debtor did by spending them on direct mail. The direct mail campaigns that Debtor launched, however, created solicitations that required that any money Debtor receive on account of those campaigns be restricted to programmatic functions. Thus, Debtor could not use the funds raised through direct mail to repay the impact loans and Debtor had no other viable source of repayment, particularly as all of the impact loans came due from 2018 to 2020. *Id.* ¶ 112. Indeed, Debtor itself admitted it was insolvent in internal presentations to the Board as early as October 2013, when those presentations did not project Debtor repaying the loans until October 2021 (after the applicable maturity dates), and even then only showed a partial repayment at 66%. *Id.* ¶ 111.

Mullaney argues that the impact loans did not render Debtor insolvent because Debtor had $21 million in assets and $26 million in liabilities at the time of the filing, which in and of itself is an admission that Debtor was balance sheet insolvent. Mullaney Br. at 25–26. But even that does not sufficiently address Debtor's financial distress. In presenting his numbers,

Mullaney ignores the distinction between restricted and unrestricted funds. Restricted funds cannot be used for any purposes other than their donor-restricted purpose, are not part of the estate, and cannot be distributed to creditors, and therefore should not be considered when computing solvency.[29] Thus, Debtor did not have $21 million in assets available to satisfy its liabilities at the outset of the bankruptcy, it had some number far lower (*i.e.,* approximately $5 million).[30] Next, Mullaney claims that the $7.5 million impact loan provided by the Thompson Family Foundation (the "Foundation") should not be counted as part of Debtor's liabilities because the Foundation ultimately forewent its distribution right under the Debtor's bankruptcy plan (the "Plan"). Mullaney Br. at 25–26. The various impact lenders' intent is, at best, an issue of fact and not appropriate on a motion to dismiss. Subsequent events are also irrelevant to the question of whether at the time of the asserted transfers, the Debtor was insolvent; that question would be determined by the liabilities on Debtor's books at such time. Moreover, on Mullaney's watch, Debtor stridently argued that the loans were real debts and not disguised donations. *See* Section I.B.2 *supra*. As part of the Plan, Debtor made distributions to all impact lenders (other than the Foundation), which comprised approximately 65% of the total unrestricted funds distributed under the Plan. The fact that the Foundation — in the context of a global settlement relating to the Plan — ultimately (and altruistically) agreed to waive its right to receive a distribution, more than a year after the Petition Date, does not alter the fact that the Foundation

---

[29] *See, e.g.*, Ex. Rep. at 250 ("[D]onations made to a nonprofit debtor that are restricted as to use are not property of the debtor's estate pursuant to section 541(c) of the Bankruptcy Code.") (citing *inter alia In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202, 247 (Bankr. W.D. Tex. Apr. 11, 2008)); *see also* [Dkt. 436 (Amended Disclosure Statement re Amended Chapter 11 Plan of Liquidation for WonderWork, Inc.) ("Disclosure Statement") at 16–17 (citing *In re Friends for Long Island's Heritage*, 911 N.Y.S.2d 412, 420 (2d Dep't 2010) (Chapter 11 trustee performed its own restricted funds analysis and determined that Debtor had $15,860,734 in Restricted Funds that were not available to its creditors.)].

[30] The Examiner concluded that as of December 29, 2016, the day Debtor filed, it had approximately $16.25 million in restricted funds. Ex. Rep. at 179. Based on that calculation, that would leave Debtor with approximately $5 million of assets available to satisfy $26 million in liabilities.

had a viable and enforceable debt that entitled it to receive $7,987,808.22 and that Debtor was insolvent. The Foundation's decision to forgo the distribution right does not say anything as to whether or Foundation would have done so in the absence of the bankruptcy case.[31] None of the other impact lenders agreed to forego their distributions. Moreover, it is inequitable (and disingenuous) for Mullaney to take the position that the impact loans are fake loans now that it advantages him, but to have taken exactly the opposite position throughout Debtor's bankruptcy case. *See* WON07735 [Dkt. 405, Ex. A (filed under seal)] (Mullaney Nov. 15, 2016 email: "I do not think hope [sic] [HMS] will reject a $3, $4 or $5 million settlement in light of the fact that we can always pay back our impact loans, distribute all our restricted donations and close our doors. That scenario would leave them with next to nothing.")]. Finally, even without the Foundation's claim, reducing the Debtors' liabilities to approximately $18 million, the Debtor was insolvent based on the comparison of its remaining liabilities to its unrestricted assets.

Ultimately, all of Mullaney's arguments about solvency turn on issues of fact and are belied by the allegations set forth in the Complaint. At this stage, the Court must accept the allegations of the Complaint as true and draw all reasonable inferences in the Plaintiff's favor. For that reason alone, Mullaney's insolvency arguments can be quickly rejected.

### C. COUNTS SIX & SEVEN: FRAUDULENT TRANSFER, SECTION 548

Under section 548 a trustee can avoid any transfer in which the Debtor received "less than a reasonably equivalent value" and rendered the Debtor insolvent. Section 548 claims are subject to a two (2) year statute of limitations, rather than the six (6) year statute provided to

---

[31] As point of fact, the Foundation's willingness to waive its right to receive a distribution was not a pre-ordained result and was a product of extensive negotiations among the Foundation, HMS, the chapter 11 trustee and the New York Attorney General's Office. The Foundation was only willing to grant that waiver after it was satisfied that Debtor's restricted funds were being transferred to charitable entities that could best fulfill Debtor's mission. The Foundation was not generally willing to waive its distribution rights and only agreed to do so in connection with the Plan and subject to a number of conditions. *See* Disclosure Statement at 18-19 (describing negotiations and Plan settlement with the Foundation).

fraudulent conveyances under New York law. When examining constructive fraudulent transfer claims under section 548, courts use the term "fair consideration" interchangeably with "reasonably equivalent value." *See In re Dewey & LeBoeuf LLP,* No. 12-12321 (MG), 2014 WL 4746209, at *11 (Bankr. S.D.N.Y. Sept. 23, 2014). Like "fair consideration," the question of reasonably equivalent value is a fact-based analysis that turns on the "facts and circumstances of each case" and requires the court to "compare what was given with what was received." *Id.* at *10.[32]

The $1,743,370 that Mullaney received in compensation and expenses in the 2-years preceding the bankruptcy exceeds what could be considered "reasonably equivalent" value for his services running a small bankrupt charity, particularly in view of the fraud and illegal conduct he undertook while operating it. *See* Compl. at Ex. B, at 2. Because the Trustee has alleged insolvency under section 544, and section 548 uses the same concepts to establish insolvency, the Trustee has adequately alleged insolvency under sections 548(B)(ii)(I); (II); and (III). However, unlike Section 544, Section 548 includes an additional provision that allows the Trustee to recover transfers made for "less than a reasonably equivalent value," if the Debtor "made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business." In other words, insolvency is not an element of a claim under Section 548(B)(ii)(IV), which involves transfers made to the benefit of an insider, under an employment agreement, not in the ordinary course. *See In re Incentium, LLC*, 473 B.R. 264, 268 (Bankr. E.D. Tenn. 2012).

---

[32] *See also Harrison v. N.J. Cmty. Bank (In re Jesup & Lamont, Inc.)*, 507 B.R. 452, 470 (Bankr. S.D.N.Y. 2014) ("Whether the debtor received 'reasonably equivalent value' for the alleged fraudulent transfer is ordinarily a question of fact."); *In re Adler, Coleman Clearing Corp.,* 263 B.R. 406, 466 (Bankr. S.D.N.Y. 2001) ("[G]enerally[,] whether a transfer is for 'reasonably equivalent value' is largely a question of fact...."). The only difference is that the state law concept of "fair consideration" under section 544 includes an examination of good faith, whereas good faith is an affirmative defense under section 548. *In re Ruffini,* No. 11-78841-REG, 2014 WL 714732, at *7 (Bankr. E.D.N.Y. Feb. 25, 2014); *see also* 11 U.S.C. 548(c).

Consequently, even if not insolvent, the Trustee can recover any transfers made to Mullaney under his employment agreement in the two year period preceding the petition date that are not in the ordinary course of business. Here, given the highly unorthodox manner in which Mullaney was paid, there are at least issues of facts as to whether any of the payments to Mullaney were made in the ordinary course. *See In re Dewey & LeBoeuf LLP,* 2014 WL 4746209, at *9 (To allege an ordinary course defense under section 548(B)(ii)(IV), "the transfer must satisfy both a subjective and an objective test. The subjective element requires an examination of whether [the] transfer was ordinary between the parties to the transfer. By contrast, the objective test [ ] looks not to the specifics of the transaction between the debtor and the particular creditor, but rather focuses on the general practices in the industry.") (internal quotations and citations omitted)); *see also In re Fairfield Sentry Ltd.,* 596 B.R. 275, 306 (Bankr. S.D.N.Y. 2018) (the ordinary course defense raises issues of fact and is not appropriately decided on a motion to dismiss).

### D.   COUNT EIGHT: AVOIDANCE/PREFERENTIAL TRANSFERS

In moving to dismiss the Eighth Claim for avoidance of preferential transfers, Mullaney contends that the facts establish that (1) Debtor was not insolvent at the time of the preferential transfers, and (2) the preferential transfers did not enable Mullaney to receive more than he would have received if the case were converted to chapter 7, and the Eighth Claim should be dismissed. Mullaney's contentions, *in their best light*, raise issues of fact that cannot be disposed of in the context of a motion to dismiss. Further, Mullaney's contentions are contradicted by the allegations in the Complaint, the factual record, strain credulity, and are frivolous.

First, as discussed above (*see* Section II.B.2), the Debtor was balance sheet insolvent as of the time of the preferential transfer. As to whether the preferential transfers enabled Mullaney to receive more than he would in a hypothetical chapter 7 case, the facts establish that he would not. Mullaney received a 100% recovery on the preferential transfers. In the liquidation analysis

prepared by the chapter 11 trustee and submitted with the Disclosure Statement accompanying the Plan, he concluded that in a hypothetical chapter 7 case, the estate was administratively insolvent, general unsecured creditors would not receive any recovery, and that the estate had more than a $30 million shortfall. [Dkt. 436 ("Schedule of General Unsecured Claims) at 2]. Mullaney has not offered any facts to rebut the Trustee's liquidation analysis, which the Court relied on in confirming the Plan.[33]  Therefore the Eighth Claim should not be dismissed.

### E.    COUNT NINE: AVOIDABLE TRANSFER, SECTION 549

Mullaney concedes that the October 2017 post-petition transfer of $158,231.21 is avoidable under Section 549. Mullaney Br. at 29. Mullaney offers no rationale for his concession, but it is self-evident — Mullaney did not have a legal entitlement to the payment and it was thus an unauthorized avoidable transfer.[34]  Rather than returning the payment as he is required to do, Mullaney concocts a series of improper offsets.

First, Mullaney says he is entitled to a credit for the approximate 58% distribution made to unsecured creditors under Debtor's Plan in respect of his resulting 502(h) claim. This puts the cart a few miles before the horse. Under section 502(h), a claim on account of a transferee having to return property under section 550 is to be determined and *allowed* or *disallowed* as otherwise provided by section 502. In other words, a transferee who pays back an avoidable

---

[33] While the recoveries under the Plan are not relevant to assessing the hypothetical chapter 7 recoveries, it is notable that under the Plan (which encompassed a global settlement that was predicated on (i) the Foundation and HMS waiving their rights to distributions as general unsecured creditors, (ii) HMS making a cash contribution to the Debtor of $834,072, and (iii) certain professionals' agreeing to material reductions of their fees, none of which would be available in a hypothetical chapter 7 case), general unsecured creditors only received approximately 58% recoveries. So even from that perspective (which is not the right measure), Mullaney received a greater recovery in respect of the preferential transfers.

[34] Mullaney argues that there can be no "doubt that the payment of his salary under his compensation program and reimbursement of his expenses was in the ordinary course of business under Bankruptcy Code § 363(c)(1)." But, to determine whether a transfer is under the ordinary course for purposes of section 363, courts employ both an objective and subjective test. *See In re Velo Holdings Inc.*, 472 B.R. 201, 211–12 (Bankr. S.D.N.Y. 2012). There is nothing objectively reasonable about Mullaney's unorthodox and illegal compensation program, which permitted him to extract another $400,000 from Debtor on the eve of the release of the Examiner's Report.

payment does not, as Mullaney assumes, automatically receive an allowed general unsecured claim pursuant to Section 502(h). Instead, Section 502(h) provides that such a transferee may assert a general unsecured claim on account of the returned avoidable payment and that claim may be subject to allowance or disallowance depending on the applicable facts and law with regard to such claim. To be sure, if Mullaney had no legal entitlement to the $158,231.21 (*i.e.*, because he stole it from Debtor), he does not, by virtue of his return of that improper payment, receive an allowed general unsecured claim under section 502(h); in such case, any such asserted 502(h) claim would clearly be disallowed. That is what the Trustee believes is the appropriate result. In any case, at best, after paying back the concededly avoidable October 2017 payment, Mullaney can assert a section 502(h) general unsecured claim and the Court — not Mullaney — can then determine whether that claim should be allowed.

Second, Mullaney has no right to claim a credit under the Bankruptcy Code for the distribution that was made to general unsecured creditors under the Plan and effectively recover that distribution from the Liquidating Trust. Instead, section 550 clearly provides that the full value of the avoidable transfer can be recovered from the recipient of such transfer (*i.e.,* Mullaney in respect of the $158,231.21 he concedes is avoidable) and nothing in section 550 or otherwise in the Bankruptcy Code grants the transferee a right of offset or credit on account of a section 502(h) claim.[35] Moreover, Mullaney's approach is contrary to the Plan. Under the Plan, general unsecured claims are asserted against Debtor and recoverable from Debtor. The

---

[35] For this reason, this exact argument was rejected by the bankruptcy court in *Rochez Bros. v. Sears Ecological Applications Co. (In re Rochez Bros.)*, 326 B.R. 579, 587 (Bankr. W.D. Pa. 2005): "the Court holds, as a matter of law, that an avoidance action defendant, such as a § 549(a) defendant, cannot, via equitable recoupment, offset against its avoidance liability — i.e., liability to a bankruptcy estate to return transferred property or its value — its future § 502(h) claim, that is essentially the original debt that was satisfied with the avoided transfer." The bankruptcy court recognized that, "although the doctrines of setoff and recoupment are distinct, the two nevertheless are indistinguishable vis-à-vis whether they may be used, in conjunction with a § 502(h) claim, as a defense to a preference action" *Id.* (citing *In re Stoecker*, 131 B.R. 979, 984 (Bankr. N.D. Ill. 1991) (disallowing recoupment as a defense to a preference action for the same reason that setoff is disallowed "because in essence, recoupment is merely the setoff defense as limited by the same transaction requirement.")).

Litigation Trust has no liability in respect of general unsecured claims and the Plan expressly bars/enjoins the assertion of such claims against the Litigation Trust. *See* [Dkt. 435 (Amended Chapter 11 Plan of Liquidation for the Bankruptcy Estate of WonderWork), at § 9.7]; [Dkt. 475 (Order Confirming Amended Ch. 11 Plan), at 20]. Accordingly, after paying back the full amount of the October 2017 illegal payment, Mullaney can assert a section 502(h) general unsecured claim against the Debtor, and face a determination by the Court as to whether such claim should be allowed or disallowed, and then receive treatment in accordance with the Plan.[36]

After taking this improper credit for his purported 502(h) claim, Mullaney next claims he can offset the balance against his scheduled claim under the doctrine of recoupment. In general, recoupment is limited to claims that arise under the same integrated transaction. Mullaney has not identified any facts that support the notion that his 502(h) claim (or the underlying, unspecified claim supporting the October 2017 payment that gives rise to the avoidable transfer) arises from the same integrated transaction as his scheduled claim. Undoubtedly, Mullaney's prepetition claim for bonuses in multiple years prior to the Petition Date does not arise out of the same transaction that gives rise to his 502(h) claim on account of an avoidable post-petition transfer. *See, e.g.*, *Westinghouse Credit Corp. v. D'Urso,* 278 F.3d 138, 147 (2d Cir. 2002) (applying "single integrated transaction" test where both debts arise out of a single integrated transaction and it would be inequitable for the debtor to enjoy the benefits of the transaction without meeting its obligations, and rejecting recoupment); *Malinowski v. New York State DOL (In re Malinowski)*, 156 F.3d 131, 133 (2d Cir. 1988) (same).[37] Moreover, courts have

---

[36] Mullaney has not filed a proof of claim in respect of his asserted 502(h) claim and accordingly may be time barred in respect of such claim. *Cf. Sec. Investor Protection Corp. v. Bernard Madoff Investment Sec., LLC,* Adv. Pro. No. 08-01789 (BRL), 2009 Bankr. LEXIS 446 (Bankr. S.D.N.Y. Feb, 24, 2009). But that is an issue for another day, after Mullaney repays the avoidable transfer and then files a proof of claim in respect of his asserted 502(h) claim.

[37] Mullaney's reliance on *In re Atlantic Computer Sys.*, 173 B.R. 858 (Bankr. S.D.N.Y. 1994) is inapposite. Unlike the facts of this case, there was no claim for avoidable transfers in *Atlantic Computer Systems. Id.* Further, the court

categorically rejected the application of recoupment to avoidance action recoveries under section 550.[38] Further, Mullaney also ignores the fact that the Complaint seeks to disallow the scheduled claim — in no event can Mullaney recoup against a disallowed claim.

## F.     COUNT TEN: BREACH OF CONTRACT

The Trustee alleged that Mullaney breached his Employment Agreement. As his defense, Mullaney argues that, even if he breached, there are no damages because the breaches helped Debtor by permitting it to raise more money.[39] That is not true; the fraud Mullaney perpetuated led to Debtor's demise and caused the Debtor extensive damages, including the costs and expenses associated with the bankruptcy case.[40]

## G.     COUNT ELEVEN: UNJUST ENRICHMENT

At the pleading stage, it is permissible to plead unjust enrichment in the alternative to a breach of contract.[41] Although the Employment Agreement, which was effective as of January 1,

---

found that where the bankruptcy court rejected the recoupment claim, it only had to set a reasonable deadline for the property to be turned over. *Id.*

[38] *In re Rochez Bros.*, 326 B.R. at 587–88; *see also In re Chase & Sanborn Corp.*, 124 B.R. 371, 374 (Bankr. S.D. Fl. 1991) (disallowing setoff of § 502(h) claim against a preference avoidance claim because "section 502(d) bars the allowance of a claim of a creditor that has received a preference unless the preference is returned.").

[39] Mullaney also overstates the amount of money Debtor raised during the bankruptcy case. Mullaney claims to have raised $8 million, but Debtor did not raise anywhere near that amount during the bankruptcy case. According to Debtor's last filed monthly operating report for September 2017 signed by Fuchs (before Mullaney's resignation) [Dkt. 288, at 5], Debtor's gross revenues were $2.79 million, far less than the $8 million claimed by Mullaney. The operating report explains "[t]he number listed in this row is the total donations received by WonderWork on an accrual basis in the applicable reporting period," which is the petition date to present. The chapter 11 trustee's October 2017 operating report lists that amount as $2.89 million [Dkt. 368, at 5]. Mullaney cannot take "credit" for any post October donations because he resigned in early November 2017.

[40] The Debtor was unable to reorganize as a direct result of Mullaney's malfeasance. The chapter 11 trustee was appointed solely because the Court determined, in the wake of the audit fiasco and the Examiner Report, that Mullaney and Fuchs were unfit to run the Debtor. Mullaney argues that the Trustee's only claim is for rescission and that the elements for rescission cannot be satisfied, but that is not true. Mullaney's malfeasance, which permeated every aspect of Debtor's practices, defeated the purpose of his Employment Agreement and therefore, the Trustee has, at the pleading stage, satisfied the requirements for rescission. *See Lenel Sys. Int'l, Inc. v. Smith*, 34 A.D.3d 1284 (4th Dep't 2006). While the Trustee must elect between damages and rescission at some point, the Trustee need not elect his remedy now. *See Capax Discovery, Inc. v. AEP RSD Inv'rs, LLC*, 285 F. Supp. 3d 579, 593 (W.D.N.Y. 2018).

[41] *See Gao v. JPMorgan Chase & Co.*, No. 14 CIV. 4281 PAC, 2015 WL 3606308, at *5 (S.D.N.Y. June 9, 2015) ("[I]f the validity or enforceability of a contract is in doubt or uncertain, claims of unjust enrichment may survive a

2016, governs any amounts that Mullaney was paid from that date forward under the Agreement, it is unclear under what arrangement Mullaney was being compensated prior to January 1, 2016 and whether the amounts Mullaney took after January 1, 2016 were under the Agreement.[42] Therefore, the Trustee can plead both unjust enrichment and breach of contract.[43]

### H.   COUNTS TWELVE AND THIRTEEN: DISALLOWANCE OF CLAIM

Mullaney's "claim", which is comprised of his unpaid "limbo pay" should be disallowed. As set forth above, Mullaney's practices with regard to his salary were illegal and improper. Accordingly, and for all the reasons set forth above that require Mullaney to return the money he took from Debtor in salary, bonuses, and expenses, Mullaney's claim against the estate for additional excessive, unwarranted, and illegal payments in the form of his still "deferred" compensation should be disallowed and the Court should not dismiss the Twelfth Claim. Mullaney admits that he has received an avoidable transfer. Mullaney Br. at 29. As the admitted recipient of an avoidable transfer that he has not paid back, as well as the numerous other avoidable transfers alleged in the Complaint, Mullaney's claim is subject to disallowance as a matter of law under section 502(d) and Count Thirteen should not be dismissed.

## III.   <u>IN THE ALTERNATIVE, THE TRUSTEE SHOULD BE GRANTED LEAVE TO AMEND</u>

In the event the Court grants the motions to dismiss in whole or in part, Plaintiff respectfully requests leave to amend to cure any deficiencies. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC.*, 797 F.3d 160, 190 (2d Cir. 2015).

---

motion to dismiss.") (internal citation and quotation marks omitted); *see also Winick Realty Grp. LLC v. Austin & Assocs.*, 51 A.D.3d 408, 857 (1st Dep't 2008).

[42] Mullaney argues that his employment was governed by an oral agreement of the Board, but it is unclear whether that alleged "agreement" actually amounted to a legally enforceable contract.

[43] While Mullaney argues the Complaint fails to explain how equity and good conscience militate against Mullaney retaining his ill-gotten gains, the Complaint recites a litany of bad acts done by Mullaney and dedicates pages to explaining the different ways that Mullaney's compensation practices were abusive, excessive, and illegal.

## <u>CONCLUSION</u>

For the forgoing reasons, the Defendants' Motions to Dismiss the Complaint should be denied, or in the alternative, the Trustee should be granted leave to amend.

Dated: New York, New York
April 26, 2019

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *Benjamin Mintz*

Benjamin Mintz
Peta Gordon
250 West 55th Street
New York, New York 10019
Telephone: (212) 836-8000

*Attorneys for Plaintiff Vincent A. Sama, as*
*Trustee of the WW Litigation Trust*

40