Bijan Amini
Edward P. Dolido
Jeffrey Chubak
STORCH AMINI PC
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
bamini@storchamini.com
edolido@storchamini.com
jchubak@storchamini.com
*Attorneys for Defendant Brian Mullaney*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>WONDERWORK, INC.,<br><br>               Debtor. | Chapter 11<br><br>Case No. 16-13607-smb<br><br>Adv. Pro. No. 18-1873-smb<br><br>ECF Nos. 28-29, 36 |
| VINCENT A. SAMA, as Litigation Trustee of the WW Litigation Trust,<br><br>               Plaintiff,<br><br>      - against -<br><br>BRIAN MULLANEY, HANA FUCHS, THEODORE DYSART, RAVI KANT, JOHN J. CONEYS, STEVEN LEVITT, CLARK KOKICH, STEVEN RAPPAPORT, RICHARD PRICE, and MARK ATKINSON,<br><br>               Defendants. | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF BRIAN
MULLANEY'S MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

**Page**

Table of Authorities ........................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.     COUNT 4: BREACH OF FIDUCIARY DUTY AND WASTE ....................................... 2

      A.      Alleged Conduct Supposedly "Pleading Around" the Business Judgment Rule .... 2

            1.      "Excessive Compensation and Expenses" .................................................. 2

            2.      "Limbo Pay" and the "Secret Payroll Ledger" ......................................... 3

            3.      Reclassification of Contributions ............................................................. 5

            4.      Impact Loans ........................................................................................... 6

            5.      Legal Fees ............................................................................................... 7

      B.      Duty of Loyalty ................................................................................................ 7

            1.      Self-Dealing ........................................................................................... 7

            2.      Good Faith ............................................................................................... 9

      C.      Duty of Care .................................................................................................... 11

      D.      Waste ............................................................................................................... 12

II.    COUNTS 5-7: CONSTRUCTIVE FRAUDULENT TRANSFER ............................... 12

      A.      Fair Consideration ........................................................................................... 12

      B.      Insolvency ....................................................................................................... 15

III.   COUNT 8: PREFERENCE ....................................................................................... 17

IV.   COUNT 9: POSTPETITION TRANSFER ................................................................ 17

V.     COUNT 10: BREACH OF CONTRACT .................................................................. 18

VI.   COUNT 11: UNJUST ENRICHMENT ..................................................................... 20

VII.   COUNTS 12-13: CLAIM DISALLOWANCE .......................................................... 20

CONCLUSION .............................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Agerbrink v. Model Serv. LLC*,
  155 F. Supp. 3d 448 (S.D.N.Y. 2016) .................................................................. 20

*Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*,
  716 F. App'x 23 (2d Cir. 2017) ........................................................................... 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................ 1, 10

*Bank of Commc'ns v. Ocean Dev. Am., Inc.*,
  904 F.Supp.2d 356 (S.D.N.Y. 2012) .................................................................... 13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................ 1, 11

*In re BH S&B Holdings LLC*,
  420 B.R. 112 (Bankr. S.D.N.Y. 2009) ................................................................... 1

*In re CIS Corp.*,
  195 B.R. 251 (Bankr. S.D.N.Y. 1996) .................................................................. 17

*In re Crossroad Health Ministry, Inc.*,
  319 B.R. 778 (Bankr. D.C. 2005) ........................................................................ 15

*In re Dewey & LeBoeuf LLP*,
  No. 14-ap-1919, 2014 WL 4746209 (S.D.N.Y. Sept. 23, 2014) ........................... 14

*In re Gardens Regional Hosp. and Med. Ctr.*,
  567 B.R. 820 (Bankr. C.D. Cal. 2017) ................................................................. 15

*In re Le Café Crème, Ltd.*,
  244 B.R. 221 (Bankr. S.D.N.Y. 2000) .................................................................. 14

*L-7 Designs, Inc. v. Old Navy, LLC*,
  647 F.3d 419 (2d Cir. 2011) ............................................................................... 11

*In re Mama D'Angelo, Inc.*,
  55 F.3d 552 (10th Cir. 1995) .............................................................................. 16

*Paloian v. LaSalle Bank, N.A.*,
  619 F.3d 688 (7th Cir. 2010) .............................................................................. 16

*In re Rickel & Assocs., Inc.*,
  272 B.R. 74 (Bankr. S.D.N.Y. 2002) ..................................................................... 1

*In re Rochez Bros., Inc.*,
    326 B.R. 579 (Bankr. W.D. Pa. 2005) .................................................................. 18

*In re Roth Am., Inc.*,
    975 F.2d 949 (3d Cir. 1992) ................................................................................... 17

*Staudinger+Franke GMBH v. Casey*,
    No. 13-cv-6124, 2015 WL 3561409 (S.D.N.Y. June 8, 2015) ........................ 13, 14

*In re Think3, Inc.,*
    529 B.R. 147 (Bankr. W.D. Tex. 2015) .................................................................. 8

*In re White Metal Rolling & Stamping Corp.*,
    222 B.R. 417 (Bankr. S.D.N.Y. 1998) .................................................................. 13

*In re W.R. Grace & Co.,*
    281 B.R. 852 (Bankr. D. Del. 2002) ..................................................................... 16

*In re Yonkers Hamilton Sanitarium Inc.*,
    34 B.R. 385, 386 (S.D.N.Y. 1983) ........................................................................ 18

**State Court Cases**

*Brehm v. Eisner*,
    746 A.2d 244 (Del. 2000) ................................................................................ 1, 2, 3

*Cilco Cement Corp v. White*,
    55 A.D.2d 668, 390 N.Y.S.2d 17 (2d Dep't 1976) ............................................... 13

*Denckla v. Ind. Found.*,
    193 A.2d 538 (Del. 1963) ....................................................................................... 2

*Kirschner v. KPMG LLP*,
    15 N.Y.3d 446 (2010) ..................................................................................... 10, 19

*Oberly v. Kirby*,
    592 A.2d 445 (Del. 1991) .................................................................................... 2, 7

*In re Realty Corp. v. Mitchell*,
    No. 150344/2013, 2013 WL 3929620 (Sup. Ct. N.Y. Co. July 25, 2013) ............ 14

*In re Trados Inc. S'holder Litig.*,
    73 A.3d 17 (Del. Ch. 2013) .................................................................................... 8

*In re Walt Disney Co. Deriv. Litig.*,
    907 A.2d 693 (Del. Ch. 2005) .............................................................................. 12

*In re Walt Disney Co. Deriv. Litig.*,
    906 A.2d 26 (Del. Supr. 2006) ............................................................................. 12

**Statutes**

8 Del. C. § 144 ...................................................................................................... 7

11 U.S.C. § 363 ............................................................................................... 15, 17

11 U.S.C. § 502 ............................................................................................... 18, 20

11 U.S.C. § 541 .................................................................................................... 15

11 U.S.C. § 550 ............................................................................................... 11, 20

11 U.S.C. § 1123 .................................................................................................. 18

11 U.S.C. § 1129 .................................................................................................. 15

## INTRODUCTION[1]

Plaintiff's opposition vividly illustrates why *Twombly* and *Iqbal*, and the Delaware business judgment rule, alone are dispositive in mandating dismissal. Under the former, it is not enough to plead facts "merely consistent with a defendant's liability," but rather facts must be pleaded that would "permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Under the latter, the complaint must succeed at the "near-Herculean task" of pleading "facts which if true would take defendants' actions outside the protection afforded by the business judgment rule." *In re BH S&B Holdings LLC*, 420 B.R. 112, 146-47 (Bankr. S.D.N.Y. 2009). The facts Plaintiff alleges are insufficient to do either.

The Complaint alleges conclusions — *e.g.*, Mullaney "routinely mismanaged the Debtor" and "fail[ed] to comply with the terms of Debtor's corporate governing documents," or incurred "excessive expenses" — and the opposition brief takes it even further, accusing Mullaney of, *inter alia*, "committing tax fraud." (Opp. Br. p. 26.) But, the assertion of "tax fraud," like the other conclusory accusations, is unaccompanied by meaningful factual allegations and, as the Delaware Supreme Court has held, one does not overcome the business judgment rule by a "pastiche of prolix invective." *Brehm v. Eisner*, 746 A.2d 244, 249 (Del. 2000).

Cutting through the naked conclusions, the facts alleged simply do not support the tone of outrage Plaintiff adopts, or the causes of action he asserts. His opposition brief relies very heavily on the Examiner's Report, but almost exclusively upon the Examiner's conclusions, rather than his findings of fact. Said conclusions are entitled to no weight whatsoever because the conclusory pleading which the Supreme Court instructs is to be ignored on this motion is no less conclusory when it is the hearsay of an examiner. *In re Rickel & Assocs., Inc.*, 272 B.R. 74, 87-88 (Bankr. S.D.N.Y. 2002).

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in Mullaney's moving brief.

Further, the Examiner was upfront about approaching his Report from the perspective of his former role in the New York Attorney General's Charity Bureau. It was and is the role of the Bureau to look after charitable beneficiaries' interests; that is not Plaintiff's role here. *E.g., Oberly v. Kirby*, 592 A.2d 445, 467-68 (Del. 1991) ("By failing to challenge a given transaction, the [in that case Delaware] Attorney General would effectively ratify it on behalf of the beneficiaries"). Thus, the standard by which Mullaney's conduct is to be evaluated in this action is not that which the Examiner purported to apply. "[T]he test as to the legality of action taken by the governing board of the [charitable] corporation is to be determined in accordance with principles of corporate law rather than the principles governing the fiduciary relationship between trustees of a technical trust and their trust." *Id.* at 466 (quoting *Denckla v. Ind. Found.*, 193 A.2d 538, 541 (Del. 1963)).

## ARGUMENT

## I.  COUNT 4: BREACH OF FIDUCIARY DUTY AND WASTE

As he did in his moving brief, Mullaney separately discusses, below, Plaintiff's arguments as pertinent to the two relevant fiduciary duties, that of care and loyalty, as well as the two sub-species of loyalty, the duties of good faith and to avoid self-dealing. But first it is instructive to review the allegedly culpable conduct in light of the Delaware Supreme Court's admonition that the business judgment rule protects imperfect conduct and that a case such as this seeking to impose personal liability "is not about the failure of the [officers] and directors to establish and carry out ideal corporate governance practices." *Brehm*, 746 A.2d at 255-56.

### A.  Alleged Conduct Supposedly "Pleading Around" the Business Judgment Rule

1.  "Excessive Compensation and Expenses"

The Complaint acknowledges that Mullaney received the same salary that he did at SmileTrain. (Compl. ¶ 59.) Its criticism is based on Debtor's having raised $12 million in its "best year" whereas SmileTrain raised $120 million (*id.*), but that just confirms the salary was rational. Of course, Debtor did not achieve in its short existence the same revenues SmileTrain

was able to build up over twelve years (especially given the costly and distracting lawsuits which the Examiner found to have been driven by the animus of SmileTrain's co-founder, Charles Wang (Report pp. 1-2, 44, 61), but the Complaint offers no reason not to expect that it would do just as well as SmileTrain given the chance under Mullaney's management. In any event, as noted in his moving brief (p. 21) and simply dismissed by Plaintiff without discussion, "the size and structure of executive compensation are inherently matters of judgment." *Brehm,* 746 A.2d at 263 ("It is the essence of business judgment for a board to determine if a 'particular individual warrant[s] large amounts of money, whether in the form of current salary or severance provisions'").

The Pearl Meyer report provides no basis to second-guess that judgment for two reasons: First, the Complaint acknowledges the report's purpose was to "establish a rebuttable presumption of reasonableness" under the Tax Code's "Intermediate Sanctions Rule." (Compl ¶¶ 60-61.) It alleges that the Board might be unable to rely on Pearl Meyer's report to take advantage of such presumption, but that does not *ipso facto* mean that the compensation was unreasonable or that it would not satisfy the Rule even without the benefit of the presumption. In fact, there is nothing to suggest the IRS would have found it unreasonable; the IRS is not even alleged to have questioned it. Second, Pearl Meyer found Mullaney's salary to be reasonable — within the 75th percentile of comparable executives — which might be the high end of the range but, by definition, is still within the range. Moreover, as noted in the moving brief (p. 21) and, again, not denied by Plaintiff, Mullaney had no fiduciary duty when negotiating his own salary.

### 2. "Limbo Pay" and the "Secret Payroll Ledger"

Mullaney's "limbo pay" and the "secret payroll ledger" are described with those ominous-sounding terms, but the facts alleged are wholly innocuous. Although the Board awarded Mullaney a bonus of at least $200,000 in each of 2013-2016 (and nothing in 2011 or 2012) *the Complaint acknowledges Mullaney never directly received any of those bonuses*. Instead, their amounts were

noted in a spreadsheet as amounts owed to him (there are no facts to support the characterization of that spreadsheet as "secret").[2] Given that Mullaney never received any bonuses, the allegations that they should have been reported to the IRS, or appear on financial statements, or that there was illegality involved, are without foundation. Defendants have not identified any basis on which the Debtor or Mullaney were obligated to make disclosure of "compensation" that Mullaney never received, and from all indications never actually expected to receive.[3]

Nor is anything improper alleged when Mullaney is accused of having charged certain expenses against his "limbo pay." (*E.g.*, Compl. ¶ 89.) Inasmuch as "limbo pay" was Mullaney's money (awarded by the Board but not yet distributed to him and not yet formally disclaimed) Mullaney would be entirely justified in using it to pay personal expenses. The closest Plaintiff comes to alleging some species of "wrongdoing" is asserting that allegedly reimbursed personal expenses in some unquantified amount should have been declared as income. (*Id*. ¶¶ 86, 89.)

The heart of this allegation is that "Mullaney would selectively instruct Fuchs to deduct personal, unsubstantiated or excessive expenses that Debtor paid from his 'limbo pay'" and, from that, Plaintiff concludes that "[b]y utilizing his 'limbo pay' as an offset against illegitimate expenses, Mullaney avoided paying income tax on his salary or bonus." (Compl. ¶ 89.) But the conclusion does not necessarily follow from that premise, not merely because there is no allegation that the salary was not fully declared and all income taxes paid, nor just because there is no dispute that Mullaney never received any bonus except arguably to the limited extent that personal expenses allegedly were charged to it, but also because "unsubstantiated or excessive expenses"

---

[2] In fact, Plaintiff alleges "there can be no question that the Director Defendants were 'well-aware'" of the practice, and frankly admits he has no reason to believe that the auditors were not equally aware of it. (Opp. Br. p. 16.)

[3] Mullaney claimed such amounts in bankruptcy, but he would have been foolish not to do so given that Plaintiff is seeking to include such amounts in "damages" sought from Mullaney despite recognizing he never received the funds.

are not necessarily illegitimate. The facts alleged are equally, if not more, consistent with Mullaney acting in the Debtor's interest by (1) foregoing earned and awarded bonuses, which Plaintiff admits and which is to the obvious benefit of the Debtor; and then, (2) as a means of mooting any issues as to expenses that were inadequately undocumented or which might be challenged as personal or excessive, reasoning accurately that the almost $1 million in uncollected bonuses were more than enough to offset any such "suspect expenses." Whether or not this had any tax implications, the allegations provide no basis for inferring any intent to violate any tax laws.

And this is where the wisdom of the business judgment rule achieves clear focus: Plaintiff is asking to litigate whether Debtor's management made the correct call with respect to not just Mullaney's salary and bonuses, but untold numbers of individual "suspect" expense items which Plaintiff unilaterally deems questionable. The correct categorization will seldom be self-evident because, when one's job consists of building a rapport with, and earning the trust of, wealthy individuals, and persuading them to make donations to the Debtor, business expenses may be difficult to differentiate from leisure expenses, but they would still be legitimate business expenses. The business judgment rule exists precisely to spare directors and officers (and courts) from such second-guessing and micromanaging.

3.    Reclassification of Contributions

As recognized in Plaintiff's brief (p. 17), the Examiner found it was Hana Fuchs's practice to reconcile restricted funds balances at the end of each fiscal year and that, until such annual audit occurred, "it would have been impossible for the Debtor (or any other person) to know the exact balance of restricted funds at any point in the year." (Report p. 160.)

Thus, the allegations that this audit was undertaken "commencing in June 2016 … in anticipation of an adverse ruling in the arbitration it had commenced [and t]his effort increased greatly following receipt of the adverse ruling" (Compl. ¶ 103) describe nothing more than Debtor

performing that reconciliation and classification in view of the importance of having those figures when the inevitable bankruptcy filing occurred as a result of an adverse ruling. Indeed, the effect of ensuring restricted funds are properly classified is, according to Plaintiff's brief (p. 14, citing Report p. 255)), that they remain protected for the charity's beneficiaries. Plaintiff is not accusing Mullaney of trying to benefit himself, but of protecting from creditors monies earmarked for the charity's beneficiaries, in other words, for performing his fiduciary duties.[4]

In light of the self-evident nature of this, it is difficult to understand why the Examiner found "the circumstances and timing of Debtor's attempts to make these changes raise serious questions as to its motivation," or why that matters given his recognition in the same paragraph it is unlikely that his own "reclassifications" would differ much from the Debtor's. (Report p. 159.)

### 4. Impact Loans

There is nothing nefarious or contradictory about the "Impact Loans." They were legitimate loans that had to be repaid *unless* Mullaney was able to use the resulting relationship to reassure the lenders that the money would have a tremendous impact if the loans were forgiven. This is an ingenious albeit risky way to raise money for obvious reasons, particularly because it depends entirely upon the personal skills of one man, Mullaney, who must be able to convince at least some lenders to forgive their loans. (Those extraordinary skills also explain in part why Mullaney's compensation was justified.) There is nothing contradictory about planning to repay them all while expecting and hoping that not to be fully necessary. As the Examiner recognized, Mullaney's expectation of success was justified as certain lenders forgave their loans prepetition (Report pp. 89-90) and, as discussed below, another did postpetition.

---

[4] Similarly, there is no allegation that by allegedly having "dramatically accelerated [Debtor's] grant-making process" (Compl. ¶104) Mullaney benefitted himself or anyone other than the charity's beneficiaries who received such grants. Nor is there any allegation that such grant money was not similarly restricted such that it necessarily would have gone to those beneficiaries anyway, just more slowly.

5.      Legal Fees

Plaintiff — who was, not coincidentally, counsel for SmileTrain — does not dispute the facts on which the Examiner concluded Wang and SmileTrain were "[t]he Genesis of the Debtor's legal problems," and that SmileTrain intentionally caused Debtor operational problems by interfering with its vendors, which "ultimately resulted in the Debtor's bankruptcy." (Report pp. 44-51.) He does not dispute that he took on representation of HelpMeSee, "encouraged, if not funded by Wang," (Report p. 2), and then ran up a $5.9 million bill pursuing an arbitration award of just over $8 million (*id*. p. 269), which, because it was an award between charities, essentially amounted to little more than the right to designate the particular charitable beneficiaries of the funds, but which he nevertheless claims rendered Debtor insolvent. Wang's vendetta was no secret and, as the Examiner recognized, his legal actions, regardless of the nominal defendant (whether Mullaney, Debtor, or a vendor), were all directed to destroying Mullaney and, concomitantly, the Debtor. Plaintiff has made no factual allegations inconsistent with a good faith business judgment by the Board that it was in Debtor's interest to assist Mullaney in defense of the attacks and to ratify any expenditures that exceeded the initial estimates because, given Wang's virtually unlimited resources, those lawsuits represented the difference between the Debtor's life and death.

**B.      Duty of Loyalty**

1.      Self-Dealing

In his moving brief (pp. 11-13), Mullaney explained the Fourth Claim should be dismissed insofar as it asserts a self-dealing claim, because the Complaint acknowledges his transactions with the Debtor were approved by an independent Board, and Mullaney is thus insulated from liability under 8 Del. C. § 144.[5] Plaintiff's opposition does not deny the dispositive principle and, instead,

---

[5] "The fact that a corporation is to be managed on behalf of charitable beneficiaries rather than stockholders does not alter the basic premise that interested transactions are not inherently wrong. The key to upholding an interested transaction is the approval of some neutral decision-making body." *Oberly*, 592 A.2d at 67. Moreover,

footnote continued . . .

points to just three allegations of supposed self-dealing that he contends were not Board-approved:

First, that "Debtor paid Mullaney $395,833.32 on the eve of the submission of the Examiner Report without Board approval." (Opp. Br. p. 25, citing Compl. ¶ 142.) But that assertion is belied by the Complaint's other allegations, namely that such payments were "Salary (per Employment Agreement)" (Compl. Ex. D), and that the Board had approved the salary and employment agreement which expressly conferred on Mullaney discretion to determine how and when he drew it down. (Employment Agreement § 3(a).)

Second, that "Mullaney agreed to pay Fuchs a signing bonus and enter into the 3-year employment agreement in exchange for her agreeing to drop the Smile Train suit without Board approval." (Id., citing Compl. ¶93.) But the Complaint does not allege this was done without Board approval.[6]

Third, that "Mullaney and Fuchs caused Debtor to pay $245,357.45 in fees in the Smile Train Copyright Case, despite the Board agreeing to cover only up to $150,000 of Mullaney's legal fees." (Opp. Br. pp. 25-26, citing Compl. ¶¶ 78, 80.) Again, the Complaint does not allege that. Rather, it alleges that the Board initially "resolved to indemnify Mullaney for up to $150,000" (Compl. ¶ 78), but contains no allegation that the Board did not subsequently authorize or ratify

---

where the director or officer was self-interested (as opposed to actually "self-dealing" which requires that he or she be on both sides of a transaction), the interest must be alleged to be material before it can support a loyalty claim. E.g., In re Think3, Inc., 529 B.R. 147, 175-76 (Bankr. W.D. Tex. 2015). Materiality is a subjective standard which disregards any transaction not "of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties ... without being influenced by [his] overriding personal interest." In re Trados Inc. S'holder Litig., 73 A.3d 17, 45 (Del. Ch. 2013).

[6] Moreover, it is tautological that the Examiner's observation that he "did not uncover any evidence that the Board knew of the $120,000 payment to Fuchs or of her employment agreement" (Report p. 50) is not evidence that they did not in fact know about it and approve it in advance. Nor does it negate that it was, in any event, fully disclosed and subsequently ratified. Similarly, the Complaint accuses Mullaney of "request[ing] that Fuchs dismiss her lawsuit against Smile Train in order to conceal his own malfeasance" (Compl. ¶ 93) without any factual foundation at all for attributing such intent to Mullaney, especially when the Examiner recognized that the request was driven by a donor's threat to withhold $4 million if the lawsuit were not resolved, and that the "malfeasance" had already been "disclosed" in SmileTrain's counterclaim against Fuchs. (Report pp. 49-50.)

the additional $95,000, especially when it recognizes that an independent director signed the SmileTrain Copyright Case settlement agreement, (*id.* ¶ 81), makes no allegation that it had not been routinely disclosed in the subsequent three years prior to the petition date, and acknowledges that "one or more Board members reviewed and approved [at least other] legal invoices" (*id.* ¶ 83).

2. <u>Good Faith</u>

In his moving brief, Mullaney explained why Plaintiff had not pleaded a cognizable claim under any of the three categories of good faith-loyalty violations. Plaintiff fails to so much as mention one category, "intentional failure to act in the face of a known duty," and so we now address only his arguments with respect to the remaining two.

a. "intentionally acts with a purpose other than that of advancing the best interests of the corporation"

Plaintiff asserts that "Mullaney also argues that he cannot be liable as a matter of law because he did not intentionally act with a purpose other than advancing the best interest of the Debtor" and that such "defenses are not ripe for decision on a motion to dismiss." (Opp. Br. p. 26.) But that has it backwards. Mullaney is not making any such "argument" because it is Plaintiff's burden to plead around the business judgment rule.

b. "acts with the intent to violate applicable positive law"

As discussed in Mullaney's moving brief (pp. 14-20), the Complaint does not plausibly allege facts supporting even an inference that he intended to violate any law. Plaintiff does not dispute that such *scienter* allegations are an obvious prerequisite to a claim under this prong. Instead, he offers just two arguments. The first is a strawman asserted in a footnote wherein he accuses Mullaney of arguing that the Complaint fails to allege an intent to violate the law on the ground that, "even though the Complaint alleges that Mullaney … knew that they were acting in violation of the law, those allegations should be ignored." (Opp. Br. p. 26 n.25.) That is nonsense; the only reason Mullaney contends the Complaint's allegations of knowledge should be ignored is

when they are merely "labels and conclusions" and "naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678. That does, however, describe all of them.

The second argument mischaracterizes facts and assumes its own conclusion by stating Mullaney "contends that the scheme he and Fuchs set up to avoid taxes was not, 'on its face so obviously improper that knowledge might be presumed.'" (Opp. Br. p. 26 (quoting (out of context) Moving Br. p. 16.)) There is no allegation in any way suggesting "a scheme to avoid taxes." What Mullaney was referring to on page 16 was the "'limbo pay' practice" and the Complaint contains no allegations that support characterization of it as "a scheme to avoid taxes."

But the bigger question is a simpler one: whether the Complaint plausibly alleges that Mullaney intended to violate some law (presumably a law governing payment of income taxes)[7] on the basis of nothing more than just allegations (1) that, to the benefit of the Debtor, Mullaney declined to draw down almost a million dollars in bonuses that he could legitimately have taken, but instead just noted on a spreadsheet; (2) consistent with a rational, even if questionable, conclusion by one in Mullaney's position that it did not really matter that he did not have documentation for certain legitimate business expenses, or that it was not worth the effort to demonstrate that they were in fact legitimate or not excessive business expenses, when the aggregate amount of such "suspect" expenses paled in comparison to bonuses he had foregone; (3) that confirm that Mullaney openly maintained the same practice for over half a decade at the

---

[7] Neither the Complaint nor Plaintiff's opposition brief identifies a statute that is supposedly violated intentionally, we are just led to understand that it has something to do with taxes and is supposedly criminal. In addition, Plaintiff sprinkles in references to misstatements in solicitation materials (*e.g.,* Compl. ¶ 106; Opp. Br. p. 26), but pleads only the Examiner's conclusions, not the facts (*id.*). Mullaney gives examples in his moving brief as to how those conclusions were unwarranted (*e.g.*, p. 13 n.7), as to which Plaintiff offers no response. In fact, the Examiner expressly noted that several of his conclusions were based on his own interpretation of the law, unsupported by caselaw or contrary to standard industry practice, and that he was determining (generally in the estate's favor) "what appear to be a number of issues of first impression." (Report pp. 24, 147-49.) For present purposes, it is enough to note even if certain solicitation materials could fairly be characterized as inaccurate, there still would be nothing in the Complaint to suggest that Mullaney was responsible and intended thereby to be violating a law, or that the Debtor had any right to recover for that. *See Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 468 (2010) (quoted at p. 19, *infra*).

Debtor without objection by the Board or its auditors, after having similarly maintained the same practices at SmileTrain for a decade, again without any objection, at least until the falling out with Wang and the commencement of his scorched-earth vendetta against Mullaney; and (4) that the "investigation" undertaken in furtherance of Wang's vendetta somehow put Mullaney on notice that something he had done at SmileTrain, and then at the Debtor, was so unquestionably illegal that Mullaney could not have thereafter done that same something without intentionally desiring to violate the law.  (*See* Moving Br. pp. 14-17, pointing out how the Complaint's allegations about the SmileTrain "investigation" do not actually allege that they put Mullaney "on notice" of any identified fact.)

 Mullaney respectfully submits that such allegations do not plausibly allege the necessary *scienter* in view of "the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). *See also Twombly*, 550 U.S. at 570 (plausibility is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully," and dismissal is appropriate where a plaintiff cannot "nudge [his] claims across the line from conceivable to plausible").  Plaintiff's ultimate cry that questions of intent present fact issues not suitable for determination at this stage (Opp. Br. p. 27), would be correct only if he had first created such a factual issue by plausibly alleging a basis for concluding that Mullaney intended to violate a law.

### C.    Duty of Care

Plaintiff defends his fiduciary duty claim as arising from a breach of the duty of care only insofar as it alleges that Mullaney "fail[ed] to inform him[self] fully and in a deliberate manner." (Opp. Br. p. 23.)  He fails, however, to identify a single allegation that supposedly shows any of the litany of supposed bad acts — ranging from "undertaking [wholly unspecified] illegal and criminal activity" to "generally mismanaging debtor" — resulted from "failing to inform himself"

of something, let alone "in a deliberate manner." (*Id.*)  As discussed in the moving brief (pp. 9-10), even if every act alleged can be shown to have actually occurred and Mullaney were responsible, the business judgment rule would still bar the breach of fiduciary duty claim absent plausible allegations that it resulted from conduct at least as culpable as gross negligence.  Plaintiff does not dispute the law, does not identify any allegation claimed to be suggestive of gross negligence, and merely states "[t]he business judgment defense certainly does not shield officers from actions that they knew were illegal or fraudulent"—which is true, but is not alleged here as discussed above — "nor officers' false, misleading, or deceptive actions or statements, nor officers' consistent failure to comply with basic corporate governance requirements and accounting rules" — which is not true unless the result of at least gross negligence, which again is not alleged.  (Opp. Br. pp. 23-24.)[8]

### D.  Waste

Plaintiff addresses his waste claim only in a footnote responding to an argument Mullaney did not make.  (Opp. Br. p. 27 n.26.)  There is no opposition to dismissal for the reasons Mullaney identified.  (Moving Br. pp. 20-22.)

## II.  COUNTS 5-7: CONSTRUCTIVE FRAUDULENT TRANSFER

### A.  Fair Consideration

Plaintiff claims to have satisfied this requirement both by pleading "lack of 'fair equivalent' value" and lack of good faith under New York's "insider exception."  (Opp. Br. p. 28.)  He succeeded with neither. As to "equivalent value," he simply misstates Mullaney's position by claiming Mullaney asserted "that 'fair consideration' was not pled because Plaintiff must plead that Mullaney did not provide *any* value in exchange for his salary, bonus, and perks."  (Opp. Br.

---

[8] "In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."  *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 750 (Del. Ch. 2005), *aff'd*, 906 A.2d 26 (Del. Supr. 2006).

p. 28 (emphasis in original).) It is not that Plaintiff *must plead*, here Plaintiff *did plead*. (Compl. ¶ 180 ("Mullaney failed to provide any value to Debtor in exchange for his substantial salary.")) What Mullaney had done was to point out that Plaintiff's pleading was inherently implausible in that it alleged not merely that Mullaney was somewhat overpaid, but that he was necessarily alleging that Mullaney added *negative value* insofar as it asserts that Mullaney is entitled to retain none of his salary over six years, none of his bonuses, and that he has to "return" bonuses that were never paid. (Moving Br. pp. 22-24.)

As to Plaintiff's reliance on the "insider exception," the Court need not reject it on the basis of "policy arguments" (Opp. Br. p. 29 n.28) as it simply does not apply here in that no antecedent debt is involved. *See, e.g., In re White Metal Rolling & Stamping Corp.*, 222 B.R. 417, 430 (Bankr. S.D.N.Y. 1998) ("A transfer made by an insolvent debtor to an affiliate or insider in satisfaction of an antecedent debt lacks good faith and is constructively fraudulent.")[9] In *Am. Federated Title Corp.*, 716 F. App'x at 26-27, the Second Circuit confirmed the "insider exception" applies only where an insider tries to satisfy an antecedent debt and does not preclude normal payment of salary:

> In *HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995) … we distinguished "preferential payments of *pre-existing* obligations ... to a debtor corporation's shareholders, officers, or directors" from transfers made in exchange for "*contemporaneous* advance[s] of funds." *Id.* at 634–35 (first emphasis added). We observed there that the latter category of payments "could not be found to be fraudulent[]" because "a present advance of commensurate value does not ordinarily prejudice other creditors …"

> Moreover, post-*HBE Leasing* decisions of several state and federal courts echo the distinction that we drew in *HBE Leasing*. *See, e.g.*, *Bank of Commc'ns v. Ocean Dev. Am., Inc.*, 904 F.Supp.2d 356, 361 (S.D.N.Y. 2012); *Staudinger+Franke GMBH v. Casey*, No. 13 Cv. 6124 (JGK), 2015 WL 3561409, at *11 (S.D.N.Y. June 8, 2015). And in *Cilco Cement Corp v. White*, 55 A.D.2d 668, 390 N.Y.S.2d 17, 8 (App. Div. 2d Dep't 1976), a pre-*HBE Leasing* case, the Appellate Division

---

[9] Plaintiff characterizes this Court's holding in *White Metal* as "payment to an insider when the debtor was insolvent is *per se* not in good faith and not 'fair consideration.'" (Opp. Br. p. 28). That was not the Court's holding and, although other courts have in the past purported to apply such *per se* rule, the Second Circuit in *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.,* 716 F. App'x 23, 27 (2d Cir. 2017), recently made clear that it is neither a *per se* rule, but merely a presumption, and in any event is not applicable to the facts here, as discussed below.

declined to apply the presumption of impropriety for which AFTC argues, instead concluding that continued salary payments to corporate officers of a failing corporation were not fraudulent conveyances in light of services contemporaneously rendered. *See* 55 A.D.2d at 668-69, 390 N.Y.S.2d 178.

Payment of normal salary for normal work is thus "an exception to the insider exception" precisely because it is in the interest of creditors that the debtor's insiders continue to work, which obviously would not happen if officers knew they would not be paid for anything they do. *Id. See also In re Realty Corp. v. Mitchell*, No. 150344/2013, 2013 WL 3929620, at *7 (Sup. Ct. N.Y. Co. July 25, 2013) ("While transfers from the debtor to insiders to repay loans made by the insiders are deemed to be fraudulent conveyances, transfers for salaries in return for work are not (*see In re Le Café Crème, Ltd.*, 244 BR 221, 241, 243 [Bankr SDNY 2000])").[10]

Plaintiff's final argument is "given the highly unorthodox manner in which Mullaney was paid, there are at least issues of fact as to whether any of the payments to Mullaney were made in the ordinary course." (Opp. Br. p. 34, citing *In re Dewey & LeBoeuf LLP*, No. 14-ap-1919, 2014 WL 4746209, at *9 (S.D.N.Y. Sept. 23, 2014).) But the "ordinary course" question relates only to Claims 6 and 7 (*id.*), and then is already answered by identifying the payments at issue to be regular salary. In *Dewey*, for example, the defendant tried to pass off as mere "salary" payments received under a "consulting contract" that "does not actually require [him] to do any work," and which contained, *inter alia*, "poison pill provisions." 2014 WL 4746209, at *2, 11. Simply stated,

---

[10] Recognizing there might be an exception-to-the-exception-to-the-insider-exception to the extent that the "salary was excessive in light of the Defendants' employment responsibilities," *Staudinger+Franke GMBH,* 2015 WL 3561409, at *11, Plaintiff argues "there is at least an issue of fact" as to whether the services Mullaney provided were fairly valued. (Opp. Br. p. 29.) Whatever might be the evidentiary threshold that justifies an factual inquiry as to the value of every employee's services versus the salary received, it certainly is not crossed by pleading, as Plaintiff does, simply that Mullaney was paid "too much," even while simultaneously relying on the Report which acknowledged, *inter alia,* that Mullaney was personally responsible for raising at least $18 million through personal appeals alone (Report p. 95), far in excess of his "cost," and when pleading that a third-party compensation expert concluded that his compensation was well within range of his peers. (Compl. ¶65.) For the same reasons — no officer would incur any expense on behalf of a company if he would have to reach into his own pocket to do so — Plaintiff's conclusory allegations that expenses were "too high" are not sufficient to cross that threshold either.

footnote continued . . .

there is no fact issue as to whether salary is paid "in the normal course" since salary is paid in the normal course of any employment. Full stop. The inquiry is concerned with ensuring an employee receives what he normally expects in exchange for continuing to work, *i.e.,* salary or other reasonably expected compensation. Those concerns do not in any way implicate—and Plaintiff is unable to cite anything that suggests that they do — *how* salary is paid, whether by green check or blue check, or whether it is weekly or biweekly or drawn down sporadically by prior agreement.[11]

## B. Insolvency

Plaintiff's claim that he "alleged all three prongs of insolvency" (Opp. Br. p. 29) fails as to all three "prongs" for two reasons: (1) it mischaracterizes the "restricted funds," and (2) it applies inconsistent rules to assets and liabilities. Plaintiff knows his assertion that "[r]estricted funds cannot be used for any purposes other than their donor-restricted purpose, are not part of the estate, and cannot be distributed to creditors, and therefore should not be considered when computing solvency" (Opp. Br. p. 29) is false.[12] The judgment of his client, HelpMeSee, was in fact paid with restricted funds in this case. (ECF No. 435 §§ 4.3(b), 5.3.) Plaintiff is trying to count the HelpMeSee judgment without also counting funds available to satisfy it, whether restricted or not.

Likewise, Plaintiff must know he is wrong when he states "[s]ubsequent events are also irrelevant to the question of whether, at the time of the asserted transfers, the Debtor was insolvent" (Opp. Br. p. 29), because he, like the Examiner, relies on HelpMeSee's ultimate judgment amount to ascertain the Debtor's solvency in prior periods when that claim was inchoate and unliquidated.

---

[11] The same would be true of any argument that the payments to Mullaney were not sufficiently "contemporaneous." Salary for current work is by definition contemporaneous because the right to payment accrues and affixes at the time the work is performed. To conclude that Mullaney is not entitled to his regular salary because it was his regular practice to draw it down on an irregular basis would deprive him of precisely what is supposed to be protected.

[12] The Bankruptcy Code merely limits the ability to transfer charitable funds to the extent permitted by applicable nonbankruptcy law. 11 U.S.C. §§ 541(f), 363(d)(1), 1129(a)(16). *E.g.*, *In re Crossroad Health Ministry, Inc.*, 319 B.R. 778 (Bankr. D.C. 2005); *In re Gardens Regional Hosp. and Med. Ctr.*, 567 B.R. 820 (Bankr. C.D. Cal. 2017).

Insolvency may be measured with hindsight. *In re Turner & Cook, Inc.*, 507 B.R. 101, 109 (Bankr. D. Vt. 2014) ("When a liability was contingent at the time of the challenged transfers but is reduced to judgment before the court's insolvency determination … a court may permissibly use the judgment amount in valuing the contingent liability at the time of the transfers"). But the same rule applies to assets. *In re W.R. Grace & Co.*, 281 B.R. 852, 869 (Bankr. D. Del. 2002) (quoting *In re Mama D'Angelo, Inc.*, 55 F.3d 552, 556 (10th Cir. 1995)). Thus, in *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 693-94 (7th Cir. 2010), Judge Easterbrook held it was reversible error to consider a contingent liability later liquidated at $18.5 million without also considering that joint tortfeasor, "Desnick," surprisingly stepped in to pay the entire liability from his personal resources:

> As it happened, Desnick paid the whole $18.5 million out of his own resources. Paloian contends that none of the money that Desnick supplied belonged on the asset side of the balance sheet as of mid-1997, because it was speculative how much he could or would pay. Yet Desnick's personal wealth is not pie in the sky; it is the sort of thing that banks would loan money against (and did). If Desnick had made out a note, in the Hospital's favor, for $18.5 million, a court would not ignore it when toting up the Hospital's assets. The judge would discount the note to reflect the probability that it could be collected. The discount might be substantial, but the court would not value the note at zero. Yet that's what the bankruptcy court did: it valued contingent liabilities at 100¢ on the dollar and contingent assets at 0¢ on the dollar. The treatment must be symmetrical. (So too with hindsight: If a court uses hindsight to value the liability at $18.5 million, it must use hindsight to value Desnick's share at $18.5 million, for a net zero effect on the Hospital's balance sheet.)

That is why it is wrong to ignore that Thompson Family Foundation forgave its $8 million impact loan as Plaintiff urges. (Opp. Br. pp. 31-32.) As discussed in his moving brief (pp. 26-27) and above, "impact loans" were not "fake loans" (Opp. Br. p. 32) at all, but legitimate loans that Mullaney "hoped from the beginning … would be forgiven." (Report p. 80.) And as the Examiner recognized long before the Foundation forgave its loan, Mullaney "appeared to have a basis for taking such a position. Several of the Lenders have already forgiven portions of the Impact Loans prior to maturity [prepetition]." (Report pp. 89-90.) Unlike "Desnick's' completely unexpected payment in *Paloian,* forgiveness of the impact loans was entirely and justifiably expected.

16

In short, by failing to credit Debtor for "restricted funds" in fact available to satisfy at least one creditor's claim, and for the likelihood that some or all of the "impact loans" would be forgiven as it is undisputed to have always been intended and to have occurred, Plaintiff has failed to plausibly plead insolvency.

## III.    COUNT 8: PREFERENCE

In his moving brief, Mullaney explained that the preference claim should be dismissed for failure to plead balance sheet insolvency at the time of the transfers, or that said transfers enabled him to receive more than in a hypothetical chapter 7 liquidation.  (Moving Br. p. 27.)  Plaintiff's insolvency arguments are addressed above.  His hypothetical liquidation test arguments fail because he relies on the disclosure statement's liquidation analysis (Opp. Br. p. 35), which reflected millions of dollars in administrative expenses that had been incurred, whereas the proper analysis looks to the petition date.  *In re CIS Corp.*, 195 B.R. 251, 262 (Bankr. S.D.N.Y. 1996).

## IV.    COUNT 9: POSTPETITION TRANSFER

In his moving brief (pp. 28-29), Mullaney explained that one of his two postpetition payments is not avoidable because it was an ordinary course payment under section 363(c)(1).  Plaintiff's response is that the payment was not ordinary course because it does not satisfy the "horizontal dimension" test under section 363(c)(1).  (Opp. Br. p. 35, n.14.)  This argument fails.  That test asks "whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry … For example, 'raising a crop would not be in the ordinary course of business for a widget manufacturer.'"  *In re Roth Am., Inc.*, 975 F.2d 949, 953 (3d Cir. 1992).  Thus, the relevant inquiry is not whether payments under the Employment Agreement were made at common intervals, but whether it is ordinary for businesses in the industry to pay their officers salaries under employment contracts.  There can be little doubt it is.

As to the other payment, Plaintiff argues that avoidance liability cannot be offset against

the Mullaney Claim, because they do not arise under the same transaction. (Opp. Br. p. 37.) That is false, as they both plainly arise under Mullaney's compensation program. Plaintiff also suggests offset is unavailable because the Mullaney Claim is a prepetition claim, whereas the subject transfer is postpetition. Recoupment, however, does not require mutuality. *In re Yonkers Hamilton Sanitarium Inc.*, 34 B.R. 385, 386 (S.D.N.Y. 1983).

Plaintiff's argument that Mullaney is not entitled to a section 502(h) claim, or that such claim cannot be offset against avoidance liability, also fails. Plaintiff states he has no section 502(h) claim because he had no right to payment in the first instance. (Opp. Br. p. 36.) However, the Complaint acknowledges the validity of his Employment Contract; indeed, Plaintiff sued Debtor's other directors for approving his compensation program. (Compl. ¶ 126(c), 131(c).) Plaintiff's offset argument fares no better.[13]

## V. COUNT 10: BREACH OF CONTRACT

In his moving brief, Mullaney argued the breach of contract claim should be dismissed

---

[13] Plaintiff's offset argument is based on the Debtor's plan providing for Plaintiff to keep avoidance recoveries, but for the Plan Administrator (Chapter 11 Trustee) to make distributions on allowed unsecured claims. In practical terms, Plaintiff states the plan was unconfirmable when proposed, because it provided for creditors identified in Exhibit C to the disclosure statement to receive a 58.11% distribution, and for avoidance defendants in the same class to receive markedly less, if anything, notwithstanding section 1123(a)(4), and that this result should be acceptable because the plan is now effective. The unfairness of this result is obvious. The Plan Administrator's operating report for Q1 2019 (ECF No. 516) shows he has $506,911 in the bank. Plaintiff asserts avoidance claims seeking to recover roughly $5 million (Compl. Ex. A, D) from Mullaney. Depriving Mullaney of offset rights would thus serve to deprive him of his section 502(h) claim, as the Plan Administrator will inevitably lack funds needed to make a 58.11% distribution on account of Mullaney's section 502(h) claim, should this motion be denied and Plaintiff prevail on just a small portion of his avoidance claims. Plaintiff cites *In re Rochez Bros., Inc.*, 326 B.R. 579 (Bankr. W.D. Pa. 2005) for his position that Mullaney's avoidance liability cannot be offset by a section 502(h) claim. The rationale for the decision is inapplicable here, however. *Rochez Bros.* gave two reasons for its rejection of the requested equitable recoupment: First, "absen[t] this rule[,] no [avoidance] action could [generally] be successfully maintained." *Id.* at 587. That rationale is inapplicable, as Mullaney's offset would still leave him on the hook for 41.89% of any avoided payment. Second, for "recoupment to be available to a defendant, such defendant must presently possess a claim against its plaintiff that can be offset against such defendant's liability to such plaintiff. Unfortunately, for an avoidance action defendant, a future § 502(h) claim is just that—a future claim, which … does not presently exist." *Id.* Mullaney has an independent, prepetition claim. Further, the rationale is at odds with the Bankruptcy Code's expansive definition of claim and inapplicable insofar as Mullaney asserted an informal section 502(h) claim in his response to HelpMeSee's pre-effective date claim objection. (ECF No. 484, ¶12.) Further, neither *Rochez Bros.* nor any other authority cited by Plaintiff dealt with a situation where, as here, the avoidance claim was being brought by a trustee that had no obligation to make payment on a section 502(h) claim, and the entity left liable was a shell.

because the alleged false and mislead fundraising campaigns and financial reporting on which it is premised did not result in damages (Moving Br. p.29), and the cause of action seeks unavailable relief, in the form of the rescission of the Employment Agreement (*id*. pp. 30-31). Plaintiff effectively concedes lack of damages inasmuch as his entire argument is that "the fraud Mullaney perpetuated led to Debtor's demise and caused the Debtor extensive damages, including the costs and expenses associated with the bankruptcy case," (Opp. Br. p. 38), because that is not what is pleaded, and because such damages are not recoverable in any event under New York law where, as here, the alleged conduct was not so directly adverse to Debtor's interests that Mullaney could be accused of having "totally abandoned" the Debtor. *Kirschner*, 15 N.Y.3d at 468 ("Even where the insiders' fraud can be said to have caused the company's ultimate bankruptcy, it does not follow that the insiders 'totally abandoned' the company").

No "fraud" is even alleged, let alone with particularity. The breach of contract claim is based on two alleged breaches: "Mullaney breached his duties under the Employment Agreement by promulgating false and misleading fundraising campaigns and overseeing false and misleading financial reporting." (Compl. ¶ 176.) But there is no allegation that this bankruptcy case resulted from "false and misleading" fundraising campaigns, nor from "false and misleading financial reporting." (*See* Moving Br. p. 30 (damages must be "directly and proximately" caused by the breach).) Likewise, Plaintiff does not dispute that rescission is unavailable here both because the Employment Agreement provides an adequate remedy at law (termination for cause) and the *status quo ante* cannot be restored. (Moving Br. pp. 30-31.) Although a plaintiff may plead alternative claims for contract damages and rescission, here Plaintiff has pleaded solely a rescission claim.[14]

---

[14] In a footnote, Plaintiff argues "Mullaney's malfeasance, which permeated every aspect of Debtor's practices, defeated the purpose of his Employment Agreement and therefore … satisfied the requirements for rescission." (Opp. Br. p. 38.) That "discussion" ignored the two requirements specifically addressed in Mullaney's moving brief and forgets that the breach of contract claim is not predicated on any such "permeating" conduct.

## VI.    COUNT 11: UNJUST ENRICHMENT

In his moving brief (p. 32), Mullaney explained that the unjust enrichment claim should be dismissed because his compensation and benefits were governed by the Employment Agreement as of January 1, 2016, and before that by Board agreement, thereby precluding a quasi-contract claim.  Plaintiff argues he should be allowed to plead unjust enrichment in the alternative since "it is unclear under what arrangement Mullaney was being compensated prior to January 1, 2016 and whether the amounts Mullaney took after January 1, 2016 were under the [Employment] Agreement." (Opp. Br. p. 39.)  But the Complaint pleads the Employment Agreement "formalized [and thus ratified] many of the other compensatory benefits Mullaney was already receiving" (Compl. ¶ 69) and any "benefits" not permitted by the contract would have been taken in breach of the contract and would not support an unjust enrichment claim.  *Agerbrink v. Model Serv. LLC*, 155 F. Supp.3d 448, 458-59 (S.D.N.Y. 2016) (for alternative unjust enrichment claim to survive dismissal, plaintiff must at least allege the subject contract is unenforceable).  The Complaint does not allege that the Employment Agreement, whether written or oral, did not give rise to enforceable contract rights.  Indeed, as noted above, Plaintiff is suing Debtor's former directors because it did.

## VII.    COUNTS 12-13: CLAIM DISALLOWANCE

Plaintiff's stated basis for disallowance of the Mullaney Claim under section 502(b) is that Mullaney is not entitled to back pay because his compensation was excessive. (Compl. ¶ 183.)  In his moving brief (p. 33), Mullaney explained that this fails to state a claim for disallowance because it simply rehashes the bases for the other stated claims and fails for the same reasons as they.  Plaintiff's sole response is that the claim should be disallowed simply because "Mullaney's practices with regard to his salary were illegal and improper." (Opp. Br. p. 39.)  That is not a valid basis for disallowance.   Plaintiff further has no right to relief under section 502(d), as no property is recoverable from Mullaney under section 550.

## **CONCLUSION**

For the foregoing reasons, the Claims against Mullaney should be dismissed with prejudice

and such other and further relief granted to Mullaney as is just and equitable.

Dated: May 17, 2019
     New York, New York

Respectfully submitted,

<u>/s/ Bijan Amini</u>
Bijan Amini
Edward P. Dolido
Jeffrey Chubak
STORCH AMINI PC
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
bamini@storchamini.com
edolido@storchamini.com
jchubak@storchamini.com
*Attorneys for Defendant Brian Mullaney*