UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

In re:                                         :
                                               :        Chapter 11
WONDERWORK, INC.,                              :
                                               :        Case No. 16-13607 (SMB)
                    Debtor                      :
-------------------------------------------------------X
                                               :        Adv. Pro. No. 18-01873 (SMB)
VINCENT A. SAMA, as Litigation Trustee         :
of the WW LITIGATION TRUST,                    :
                                               :
                    Plaintiff,                  :
                                               :
         - against -                           :
                                               :
BRIAN MULLANEY, HANA FUCHS,                     :
THEODORE DYSART, RAVI KANT,                     :
JOHN J. CONEYS, STEVEN LEVITT,                  :
CLARK KOKICH, STEVEN RAPPAPORT,                 :
RICHARD PRICE, and MARK ATKINSON,               :
                                               :
                    Defendants.                 :
-------------------------------------------------------X

## MEMORANDUM DECISION GRANTING IN PART
## AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

**A P P E A R A N C E S:**

ARNOLD & PORTER KAYE SCHOLLER LLP
250 West 55th Street
New York, New York 10019

  Benjamin Mintz, Esq.
  Peta Gordon, Esq.
   Of Counsel

*Attorneys for Plaintiff Vincent A. Sama, as Trustee*
 *of the WW Litigation Trust*

STORCH AMINI PC
140 East 45th Street, 25th Floor
New York, New York 10017

  Bijan Amini, Esq.
  Edward P. Dolido, Esq.
  Jeffrey Chubak, Esq.

Of Counsel

*Attorneys for Defendant Brian Mullaney*

DRINKER BIDDLE & REATH LLP
1177 Avenue of the Americas, 41st Floor
New York, New York 10036-2714

Frank F. Velocci, Esq.
Of Counsel

*Attorneys for Defendant Theodore Dysart*

CERTILMAN BALIN ADLER & HYMAN, LLP
90 Merrick Avenue – 9th Floor
East Meadow, New York 11554

Paul B. Sweeney, Esq.
Nicole L. Milone, Esq.
Of Counsel

*Attorneys for Defendant John J. Coneys*

SMITH, GAMBRELL & RUSSELL, LLP
1301 Avenue of the Americas, 21st Floor
New York, New York 10019

John G. McCarthy, Esq.
Victor M. Metsch, Esq.
Edward J. Heppt, Esq.
Of Counsel

*Attorneys for Defendants Steven Levitt, Clark Kokich,*
  *Steven Rappaport and Richard Price*

LAW OFFICE OF ROBERT R. VIDUCICH
40 Wall Street, 28th Floor
New York, New York 10005

Robert R. Viducich, Esq.
Of Counsel

*Attorneys for Defendant Hana Fuchs*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge**

The plaintiff, Vincent A. Sama, as trustee of the WW Litigation Trust ("Plaintiff"),

asserts thirteen causes of action against nine remaining defendants (Kant was never

served), all former officers and directors of the debtor WonderWork, Inc. ("Debtor" or

"WW"). (*Complaint*, dated Dec. 28, 2018 (ECF Doc. # 1).)[1] They include Brian

Mullaney, the Debtor's founder and former chief executive officer, Hana Fuchs, its

former chief financial officer and Theodore Dysart, John J. Coneys, Steven Levitt, Clark

Kokich, Steven Rappaport, Richard Price, and Mark Atkinson, all former directors

("Director Defendants" and collectively with Mullaney and Fuchs, the "Defendants").

Each of the Defendants moved to dismiss the *Complaint*.[2]  For the reasons that follow,

the Defendants' motions to dismiss are granted in part and denied in part, and the

Plaintiff is granted leave to replead.

## BACKGROUND[3]

The Debtor was formed by Mullaney as a not-for-profit corporation under

Delaware law on or about March 7, 2011.  (¶ 5.)  According to its amended certificate of

incorporation:

> The purposes for which the Corporation is formed are to provide
> treatment, surgery, and related assistance to children in developing
> countries suffering from disease, illness, or malady, including but not
> necessarily limited to blindness, cleft palate, club foot, hydrocephalus, and

---

[1]      "ECF" refers to the docket in this adversary proceeding.

[2]      *Memorandum of Law in Support of Motion to Dismiss Litigation Trustee's Adversary Complaint as Against Defendant John J. Coneys*, dated Apr. 2, 2019 ("*Coneys MTD*") (ECF Doc. # 20); *Memorandum of Law in Support of Motion to Dismiss the Trustee's Complaint as Against Theodore Dysart*, dated Apr. 2, 2019 ("*Dysart MTD*") (ECF Doc. # 23); *Memorandum of Law in Support of Motion to Dismiss the Trustee's Second and Third Claims or in the Alternative for a More Definite Statement*, dated Apr. 2, 2019 ("*2015 Directors MTD*") (ECF Doc. # 26); *Motion of Defendant Mark Atkinson to Dismiss the Second and Third Claims of the Complaint or in the Alternative for a More Definite Statement*, dated Apr. 2, 2019 ("*Atkinson MTD*") (ECF Doc. # 27); *Memorandum of Law in Support of Brian Mullaney's Motion to Dismiss the Complaint*, dated Apr. 2, 2019 ("*Mullaney MTD*") (ECF Doc. # 29); *Memorandum of Law in Support of Motion to Dismiss the Complaint as Against Hana Fuchs*, dated Apr. 2, 2019 ("*Fuchs MTD*") (ECF Doc. # 31).)  The Plaintiff voluntarily dismissed the claims against defendant Ravi Kant, without prejudice.  (ECF Doc. # 47.)

[3]      The Background discussion is derived from the *Complaint* and the documents attached to and/or relied on in the *Complaint*.  The notation "(¶ ___)" refers to the paragraphs in the *Complaint*.

> burns; and to further support and educate doctors and the public on
> potential treatments and surgical techniques, as well as creating general
> awareness of these maladies and available treatments.

(¶ 46; *Notice of Filing of Volume 1 of Redacted Document Exhibits to Final Report of Jason R. Lilien, Examiner* ("*Volume 1 of Exhibits*"), Ex. 3, at WON-EX 0019 (Case No. 16-13607, ECF Doc. # 336).)  WW was further authorized to "engage in other charitable and educational activities" consistent with its federal tax-exempt status under I.R.C. § 501(c)(3) and to "engage in all lawful activities for which nonprofit corporations may be organized" under Delaware law.  (*Volume 1 of Exhibits*, Ex. 3, at WON-EX 0019.)

WW obtained tax-exempt status from the Internal Revenue Service on September 1, 2011 and was registered to solicit charitable contributions under Article 7-A of the New York Executive Law in May 2012.  (¶ 41.)  Under Article 7-A, WW was required to comply with registration and solicitation laws and make certain annual public financial reporting.  (¶ 42.)  These reports were certified as correct each year by Mullaney and Fuchs.  (¶ 43.)

## A.    WW's Board and Management

Different Director Defendants served on WW's Board of Directors ("Board") at different times.  At the first meeting on April 12, 2012, attended by Mullaney and Dysart, Mullaney was selected as president and Dysart as secretary and treasurer.  (¶ 45.)  Coneys joined the Board in December 2012 and at times served as the "Lead Independent Director."  (¶¶ 12, 48.)

The Board formed an audit committee at its February 2013 meeting with Coneys as chair and nominating and compensation committees with Dysart as chair.  (¶ 49.)  There is no evidence of any formal meetings of these committees.  (¶ 50.)  Dysart

resigned from the Board in or about November 2015 "following disagreements with Mullaney, in particular with respect to Mullaney's compensation and whether employment counsel should be employed in connection with formalizing Mullaney's employment agreement." (¶ 51.)

Defendants Levitt, Kokich, Rappaport, Price and Atkinson ("2015 Directors") joined the Board in December 2015 but did not attend a Board meeting until March 2016. (¶ 52.) At a June 2016 Board Meeting, the Board reconstituted the audit, nominating, and compensation committees, with Coneys, Kant, Kokich, and Levitt serving on the nominating and compensation committee and Coneys and Rappaport serving on the audit committee. In addition, non-defendant Richard Steele, Coneys and Mullaney staffed the finance and investment committee. After the Debtor filed its chapter 11 petition on December 29, 2016 ("Petition Date"), Kant and Steele resigned from the Board leaving Mullaney, Coneys, Kokich, Levitt, Rappaport, Price and Atkinson as the remaining directors. (¶¶ 23, 54.)

Although it is not clear that Mullaney was ever formally named chairman of the Board, he served in that role for all intents and purposes. (¶ 55.) After the Better Business Bureau told WW that its

accreditation required a charity's chairman of the Board to be different from a charity's CEO, Coneys was identified as WW's "Lead Independent Director." (¶ 55.) As Lead Independent Director, Coneys' role was "primarily to finalize Mullaney's employment agreement in late 2015, which had been in negotiation since October 2012 and had taken up a considerable amount of Board time." (¶ 55.)

**B.    Mullaney's Compensation**

The principal claims asserted in the adversary proceeding center on Mullaney's

compensation and perquisites.  His compensation included an annual base salary of

$475,000 and annual bonuses of between $200,000 and $250,000, the same

compensation he had received from his prior employer, Smile Train, Inc. ("Smile Train"

or "ST").  (¶¶ 57, 59.)  However, ST raised $120 million in Mullaney's last year and

funded 120,000 surgeries per year.  (¶ 59.)  By contrast, WW raised $12 million in its

best year.  (¶ 59.)  Mullaney's additional benefits included commuting costs between

New York and Boston, first class travel for him and his spouse, personal life insurance,

and hundreds of thousands of dollars of expenses.  (¶ 57.)

At Dysart's recommendation, and over Mullaney's objection, the Board retained a

compensation consultant in May 2013, Pearl Meyer & Partners ("Pearl Meyer"), to

evaluate Mullaney's salary.  (¶ 60.)  Pearl Meyer warned Dysart that it might not be able

to conclude that Mullaney's salary was reasonable under section 4958 of the Internal

Revenue Code, known as the "Intermediate Sanctions" rule.[4]  (¶ 60.)  Pearl Meyer's

engagement letter provided an incentive in the form of a $5,000.00 fee increase (over

---

[4]    A tax-exempt non-profit corporation that makes "excess benefit transactions" for the benefit of a "disqualified person," such as a chief executive officer, may be subject to "intermediate sanctions" under the Internal Revenue Code.  26 U.S.C. § 4958.  Under the intermediate sanctions rules, "excess benefit transactions" are "transactions in which an economic benefit is provided by the tax-exempt organization . . . [that] exceeds the value of the consideration (such as performance for services) received by the organization."  *Levy v. Young Adult Inst., Inc.*, No. 13CV02861 (JPO)(SN), 2015 WL 13745763, at *5 (S.D.N.Y. Oct. 9, 2015), *report and recommendation adopted*, No. 13-CV-2861 (JPO), 2015 WL 7820497 (S.D.N.Y. Dec. 2, 2015), *aff'd*, 744 F. App'x 12 (2d Cir. 2018).  If the IRS determines that there has been an excess benefit transaction, the disqualified person must correct the excess benefit and the IRS may impose a 25% tax on the value of the excess benefit on the recipient.  *Id.*, at *6.

the $18,137.00 it was receiving to evaluate Mullaney's compensation) if it could state that his pay was reasonable under the Intermediate Sanctions rule.  (¶ 60.)

Pearl Meyer presented its final report ("Pearl Meyer Report") at a Board meeting on June 13, 2013.  (¶ 60; *Notice of Filing of Volume 1 of Redacted Interview Transcripts and Exhibits to Final Report of Jason R. Lilien, Examiner* ("*Volume 1 of Transcripts and Exhibits*"), Mullaney Exhibit 43,[5] (Case No. 16-13607, ECF Doc. # 339).) The Pearl Meyer Report did not state that Mullaney's compensation was reasonable under the "Intermediate Sanctions" rule, (¶ 60), and declined to express an opinion on whether Mullaney's compensation was reasonable.  (¶ 66.)  It concluded that Mullaney's base salary was at the high end of the competitive range and his bonus was very high for a non-profit.  It would only be warranted if Mullaney were able to repeat his success at ST. (¶ 65.)  Pearl Meyer recommended that if the Board accepted the peer groupings as reasonable,[6] it should keep Mullaney's salary at $475,000.00 but offer a bonus in the range of $50,000.00 to $200,000.00 if his performance warranted it.  (¶ 66.)  The Pearl Meyer Report also recommended, among other things, that the Board quantify his other forms of compensation, such as spousal travel expenses, commuting expenses, *etc.*, in determining the amount of his bonus and periodically review his compensation package. (¶ 66.)

---

[5]    The "Mullaney Exhibits" were marked as exhibits at the deposition of Mullaney conducted by the Examiner's attorney and form part of the exhibits to the *Final Report of Jason R. Lilien, Examiner*, dated Oct. 25, 2017 ("*Examiner's Report*") (Case No. 16-13607, ECF Doc. # 303).

[6]    Instead of limiting salary comparisons to similarly sized charities, at Mullaney's prompting the Pearl Meyer Report compared Mullaney's compensation to the following four groups: traditional non-profits of purportedly comparable size to WW, but with a much higher median revenue of $35.8 million; high growth non-profits that had achieved aggressive growth of larger size than WW; high growth for-profit publicly traded companies; and university development officers.  (¶ 63.)

The Board did not follow Pearl Meyer's recommendations. [7]  (¶ 67.)  It never quantified Mullaney's other compensation, never again reviewed Mullaney's compensation and awarded him a $250,000.00 bonus every year except 2015, when it awarded him a $200,000.00 bonus.  (¶ 67.)

As a result of an effort led by Coneys after Dysart's resignation, the Board entered into a written employment agreement with Mullaney in December 2015 ("Employment Agreement").  (¶ 68; Mullaney Exhibit 41, at WON1237.)  The Employment Agreement provided a yearly salary of $475,000.00, a discretionary bonus of $250,000.00 and payment of various other benefits such as spousal travel and life insurance premiums. (¶ 69.)

As noted, WW also paid for Mullaney's other expenses that were either excessive or personal and the Board failed to follow its policies and procedures in connection with monitoring and reimbursing these expenses.  (¶ 70.)  WW's travel policy provided that WW would not reimburse personal expenses, would only cover actual and reasonable expenses, would not reimburse spousal travel without a business purposes, would only reimburse substantiated expenses and any such reimbursement must be reported as income.  (¶ 71.)  Travel expenses had to be approved by a supervisor or by WW's chief financial officer, Fuchs.  (¶ 71.)  Despite these policies and procedures, Mullaney was reimbursed for personal expenses, substantiation was not required, spousal travel expenses were covered and not reported as compensation, no internal approvals were required and excessive expenses were reimbursed, such as first class or business class

---

[7]    This does not necessarily mean that the Board or the Debtor adopted or was bound by the Pearl Meyer Report or its conclusions and recommendations.

travel as a general practice.  (¶ 72.)  Mullaney was also reimbursed, as a business expense, for the cost of commuting between Boston and New York as well as transportation, meals and hotels, including $400 per night stays at the Langham Hotel.  (¶ 73.)

From 2012 to 2016, WW also maintained a high value life insurance policy for Mullaney, with his wife as the beneficiary.  (¶ 74.)  Yearly premiums varied and were $9,602.00 in 2016.  (¶ 74.)  The Board authorized the payment of these premiums, but there is no evidence that this was considered when determining the reasonableness of Mullaney's salary.  (¶ 75.)  None of WW's other employees received a similar benefit.  (¶ 74.)

According to the *Complaint*, Mullaney was not the only overcompensated officer.  Fuchs, WW's chief financial officer, like Mullaney, had been employed at ST.  In April 2011, she sued ST for over $1 million in damages under an employment agreement.  (¶ 93.)  Mullaney asked Fuchs to dismiss the lawsuit in order to conceal his own malfeasance at ST.  (¶ 93.)  Fuchs agreed in exchange for an employment agreement ("Fuchs Employment Agreement") with WW that paid her a $120,000.00 signing bonus and promised three years of guaranteed employment at a base salary of $200,000.00 per year.  (¶ 93.)  Mullaney approved Fuchs's compensation.  (¶ 93.)  Mullaney also approved significant signing bonuses for other WW employees.  (¶ 94.)  Delois Greenwood, chief program officer, had a first paycheck of $29,166.67, whereas all subsequent paychecks were for $14,583.  (¶94.)  Karen Lazarus, director of strategic projects, received $169,000 in salary her first year, but only $121,500 in subsequent years.  (¶ 94.)

### 1.    Litigation Expenses

With the Board's approval, WW paid many of Mullaney's expenses incurred in connection with lawsuits brought by his former employer, ST, to which WW was not a party.  The Board resolved to indemnify Mullaney for up to $150,000.00 in connection with a civil suit brought by ST against Mullaney for copyright infringement and misappropriation of trade secrets, including ST's donor list, (¶ 78), *Smile Train, Inc. v. Brian F. Mullaney*, Case No. 12-cv-9102 (S.D.N.Y.) ("Copyright Suit"), and ultimately spent $245,357.45 on Mullaney's legal fees in connection with the suit.  (¶ 80.)  The Copyright Suit settled in July 2013, and WW agreed to pay $450,000.00 to ST, which was characterized as a donation.  (¶ 81.)  This settlement agreement was signed by Coneys on behalf of WW.  (¶ 81.)  In addition, one or more members of the Board approved the payment of at least $58,539.38 in legal invoices to quash a subpoena ST had served on Mullaney in connection with a lawsuit brought against third parties, (¶ 83), and paid over $14,000.00 for Mullaney's travel expenses for two trips to London in 2013 in connection with a lawsuit brought by ST against Mullaney, personally, for alleged violation of the United Kingdom Charities Act of 1993.  (¶ 84.)  Mullaney also charged excessive and personal expenses to WW through his American Express account, including transportation and meals related to his commute from Boston to New York and frequent first-class travel to, among other places, London and Dubai.  (¶ 92.)

### 2.    The "Limbo Pay" Payroll Ledger

With the knowledge of the Board, Mullaney used WW to avoid paying income tax. (¶ 85.)  Rather than receive his salary and bonus payments when awarded, the amounts due to Mullaney were tracked on a separate payroll ledger and paid in accordance with

Mullaney's instructions.  (¶¶ 85, 86.)  Mullaney never paid taxes on his bonuses which were instead recorded by Fuchs as "limbo pay" in a "side ledger."  (¶¶ 86, 87.)  Mullaney would instruct Fuchs to deduct certain personal, unsubstantiated or excessive expenses from this "limbo pay."  (¶ 89.)  This practice allowed Mullaney to avoid paying income taxes on his bonus income and some of his salary.[8]  (¶ 89.)  The types of expenses deducted from Mullaney's "limbo pay" were purely personal expenses such as dinner with friends, a limousine for his wife's birthday, expenses from a trip he took with his daughter, chauffeured cars, commuting expenses to and from Boston; excessive expenses, such as a $20,000 dinner at the Four Seasons and a $9,000.00 three-night trip to Maine; and unsubstantiated expenses, including $30,000.00 to cover "about half" of his commuting expenses in 2014 and 2015.  (¶ 90.)  The Board was aware of this practice but never instructed Mullaney or Fuchs to discontinue it.  (¶ 91.)

As of the Petition Date, the Debtor claimed to owe substantial sums to Mullaney. The Debtor's amended schedules in this case stated that Mullaney held a general unsecured claim in the amount of $641,320.00 ("Mullaney Claim") on account of back pay.  (¶ 23.)  On September 27, 2017, the Debtor made a post-petition payment in the sum of $237,550.00 to Mullaney without disclosure or Court approval and days before the scheduled release of the *Examiner's Report*, discussed below, made another payment to Mullaney in the sum of $158,283.32.  (¶ 33.)

---

[8]    Mullaney and Fuchs had followed the same practice when they worked at ST.  (¶ 85.)  ST undertook an internal investigation of this practice, which led to the reissuance of Mullaney's W-2's for the years 2002-2010, reporting an additional $1,144,574.00 in income.  (¶ 85.)

**B.    Fundraising Practices**

**1.    Restricted Assets**

Generally, a charitable corporation licensed to operate in New York has full ownership of its funds and may use them for "any purpose specified in its certificate of incorporation." N.Y. NOT-FOR-PROFIT CORP. LAW § 513(a) (2014). Where, however, a donor specifies a purpose in the gift instrument, the donation must be applied to that purpose and "to the payment of the reasonable and proper expenses of administration of such assets." N.Y. NOT-FOR-PROFIT CORP. LAW § 513(b); *see also In re Friends for Long Island's Heritage*, 911 N.Y.S.2d 412, 420 (N.Y. App. Div. 2010) (holding that donor-restricted funds cannot be used to satisfy creditors of a charitable corporation). The governing board of the charitable corporation must maintain accurate accounts of restricted funds kept separate and apart from the accounts of its other assets. N.Y. NOT-FOR-PROFIT CORP. LAW § 513(b). Unless a particular gift instrument provides otherwise, the treasurer must make an annual report concerning restricted assets, "the use made of such assets and of the income thereof." N.Y. NOT-FOR-PROFIT CORP. LAW § 513(b).

According to the *Complaint*, WW's directors failed to supervise WW's accounting and fundraising practices, (¶ 95), and failed to follow the policy manual approved by the Board in October 2012. (¶ 96.) In particular, restricted funds were not accounted for, segregated or expended consistent with applicable law, adequate controls were not in place and restricted account balances were calculated only at the end of each fiscal year. (¶ 98.) WW also improperly charged its restricted funds with a portion of WW's direct mailing costs. (¶ 99.) WW included "public awareness" materials in its direct mailings in order to use restricted funds to support its direct mail fundraising costs, which

resulted in underreporting of restricted fund balances and over-reporting of its program expenditures.  (¶ 100.)

In 2016, WW began an effort to reclassify more of its contributions as restricted and created a new category of restricted funds that were restricted to surgery programs. (¶ 103.)  Following an adverse arbitration award entered against WW in favor of Help Me See, Inc. ("HMS"), WW's Board, including Defendants Coneys and Price, instructed WW to restrict its donations.  (¶ 103.)  Following the arbitration award, WW also increased its grant-making process.  (¶ 104.)  These actions were taken to prevent HMS from collecting its arbitration award.  (¶ 104.)

### 2.    Misrepresentations to Donors

Contrary to its representations to donors, WW did not pay the entire cost of a surgery.  It paid only a set amount.  (¶ 102.)  WW overinflated its grant income by reporting, as an "in-kind" contribution, the difference between the cost of a surgery and the amount it donated towards the surgery.  (¶ 101.)   This practice allowed WW to inflate the amount of its donations and the amount of its grants.  (¶ 102.)

WW's fundraising solicitations also misrepresented its work.  (¶ 105.)  WW represented that (a) the donations would pay for surgeries but were, in fact, used for direct mail expenses, (b) the donations would be matched to double or triple the number of surgeries but matching funds were used for WW's expenses, (c) the donations were used to cure blindness but most patients were not blind, (d) the surgeries were free which was not always true, and (e) WW had virtually no overhead expenses and no gifts from large foundations which was not true.  (¶ 106.)  The Board

knew or should have known that the contents of WW's fundraising materials were false or misleading.  (¶ 107.)

## C.    Impact Loans

From May 2013 until 2014, the Board permitted Mullaney to enter into seven unsecured loan agreements with charitable foundations and wealthy individuals totaling nearly $10 million.  (¶ 108.)   These "impact loans" were pitched as a way for WW to raise capital to fund its direct mail fundraising program, to scale its capacity to provide more surgeries.  (¶ 109.)  Six of the loan agreements stated that the proceeds would be used exclusively to generate additional funding for WW.  (¶ 110.)  The other loan agreement provided that at least 80% of the loan proceeds must fund surgeries while the remaining 20% could be used for general operating support.  (¶ 110.)

WW's policy manual provided that it must maintain assets that are no less than 100% of liabilities.  (¶ 97.)  However, WW's ten-year marketing projections presented to the Board in October 2013, did not project repayment of the impact loans until October 2021, even though the maturity dates under the loan agreements ran from 2018 to 2020.  (¶ 111.)  WW would never have been able to repay the loans because it never had sufficient unrestricted funds or a reasonable means to generate sufficient unrestricted funds to do so.  (¶ 112.)  Plaintiff asserts that the entry into these loan agreements rendered WW insolvent.  (¶ 113.)

## D.    HMS Arbitration

WW and HMS entered into a fundraising agreement in August 2011, under which WW earned an annual fee of $2 million.  (¶ 115.)  WW used HMS's work and mission to

raise funds for itself in breach of the fundraising agreement. (¶ 115.) HMS terminated the agreement for cause in August 2012. (¶ 115.) WW commenced an arbitration against HMS in March 2013, seeking approximately $1.3 million in damages alleging HMS had terminated the agreement without cause. (¶¶ 116.) HMS counterclaimed for breach of contract, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, fraudulent inducement, copyright infringement, conversion, an accounting and attorneys' fees, and sought in excess of $8 million in damages. (¶¶ 116, 118.)

On October 13, 2016, the arbitrator awarded HMS $8,342,315.00 plus legal fees and interest. (¶ 120.) The arbitration award related to conduct of WW between August 2011 and August 2012. (¶ 120.) The arbitrator further awarded HMS $4,706,554.00 in attorneys' fees and $149,564.00 in costs as a discovery sanction. (¶ 120.) In addition, WW spent approximately $925,000.00 in legal fees and expenses relating to the arbitration. (¶ 119.) The Board did not involve itself in the arbitration or do any investigation into the claims asserted against WW or into alleged discovery abuses. (¶ 119.) The HMS Arbitration award against WW ultimately drove it into bankruptcy. (¶ 121.)

## E.    The Bankruptcy and the *Examiner's Report*

The Debtor filed a voluntary chapter 11 petition on December 29, 2016, (¶ 23), and HMS quickly moved for the appointment of a chapter 11 trustee. (¶ 24.) The Debtor opposed the motion and directors Kokich, Coneys, Levitt, Price, Rappaport and Atkinson each filed declarations in support of the Debtor's opposition which asserted their confidence in Mullaney. (¶¶ 24-25.) The Bankruptcy Court opted to appoint an examiner, Jason R. Lilien, Esq., on May 10, 2017, to investigate, among other things,

potential estate causes of action.  (¶¶ 26-28, 30.)  On May 24, 2017, the Bankruptcy Court approved the Debtor's retention of BDO USA LLP ("BDO") to perform an audit of the Debtor's financial statements dated June 30, 2016 but the audit was never completed.  (¶ 32.)

The 274-page *Examiner's Report*, dated October 25, 2017, was publicly filed in redacted form on November 3, 2017.  (¶ 34.)  The Examiner recommended that the matter be referred to the New York State Attorney General and that a chapter 11 trustee be appointed in the Debtor's case.  (¶ 34.)  Mullaney resigned immediately upon release of the *Examiner's Report.*  (¶ 34.)  A chapter 11 trustee was appointed and on September 21, 2018, the Court confirmed ("Confirmation Order") a chapter 11 plan of liquidation ("Liquidation Plan") for the Debtor.  (¶¶ 35-36.)  The Confirmation Order and Liquidation Plan established the WW Litigation Trust and appointed the Plaintiff as litigation trustee.  (¶¶ 38-39.)  All claims described in the *Examiner's Report* were transferred to the WW Litigation Trust.  (¶ 39.)

The Debtor has incurred professional fees in connection with the bankruptcy, (¶ 122), and the *Complaint* alleges that a substantial portion of these expenses would have been unnecessary if the Board had "discharged their [sic] duties appropriately."  (¶ 123.)

## H.    This Adversary Proceeding

The Plaintiff filed the *Complaint* commencing this adversary proceeding on December 28, 2018.  The *Complaint* contains the following thirteen counts:

| Count | Defendants | Claim |
|---|---|---|
| 1 | Dysart, Kant, Coneys | The Defendants breached their fiduciary duties of care and loyalty and engaged in waste of corporate assets |

|   |   |   |
|---|---|---|
|   |   | from March 2011 until least November 2015, through lack of oversight and affirmative conduct, by approving Mullaney's excessive compensation; permitting Mullaney and Fuchs to defer his compensation and deduct personal expenses; failing to stay apprised of the arbitration; authorizing the Debtor to pay Mullaney's legal fees, expenses and settlements in connection with his lawsuits with ST; abrogating their responsibilities to oversee the Debtor's fundraising activities specifically in regard to restricted funds; permitting the Debtor to enter into impact loans while insolvent; making false and misleading statements in the Debtor's public filings. (¶¶ 124-28.) |
| 2 | All Director Defendants except Dysart | The Defendants breached their fiduciary duties of care and loyalty and engaged in waste of corporate assets from December 2015 to the Petition Date, through lack of oversight and affirmative conduct, by approving Mullaney's excessive compensation, including the approval of his Employment Agreement; permitting Mullaney to defer his compensation and deduct personal expenses; abrogating their responsibilities to oversee the Debtor's fundraising activities specifically in regard to restricted funds; allowing the Debtor to attempt to hinder, delay and defraud HMS from collecting its judgment against the Debtor; and making false and misleading statements in the Debtor's public filings. (¶¶ 129-33.) |
| 3 | All Director Defendants except Dysart and Kant | The Defendants breached their fiduciary duties of care and loyalty and engaged in waste of corporate assets after the Petition Date, through lack of oversight and affirmative conduct, by permitting the Debtor to alter its accounting and grant making practices to try to hinder, delay or defraud creditors; executing declarations in favor of retaining Mullaney as chief executive officer of the Debtor and in opposition to the HMS motion to appoint a trustee without adequate investigation into the underlying claims; making or permitting the Debtor to make false or misleading statements in public filings; and, as to Coneys and Price, by attempting to hinder, delay and defraud creditors by retroactively restricting the Debtor's donations. (¶¶ 134-38.) |

| 4 | Mullaney and Fuchs | Mullaney and Fuchs breached their fiduciary duties of care and loyalty and engaged in waste of corporate assets by mismanaging the Debtor; failing to properly account for and expend restricted funds; failing to comply with the Debtor's governing documents, policies and applicable law; improperly accounting for Mullaney's expenditures; misleading donors; using false solicitation materials; permitting the Debtor to alter its accounting and grant making practices to hinder, delay or defraud creditors; employing the "limbo pay" side ledger practice; submitting or approving excessive, unsubstantiated and personal expenses; approving inappropriate expenditures and excessive salaries, including Fuchs' $120,000 signing bonus; and permitting the payment of $395,833.32 to Mullaney post-petition without disclosure or Court approval on the eve of the release of the *Examiner's Report*.  (¶¶ 139-44.) |
| 5 | Mullaney | On and after December 29, 2010, Mullaney received fraudulent conveyances from the Debtor that can be avoided under Bankruptcy Code section 544(b) and New York Debtor and Creditor Law sections 273, 274 and 275 in the form of excessive salary payments, benefits and reimbursed excessive, personal or unsubstantiated expenses and through the execution of Mullaney's Employment Agreement, which provided excess compensation.  (¶¶ 145-49.) |
| 6 | Mullaney | On and after December 29, 2014, Mullaney received constructive fraudulent transfers from the Debtor that can be avoided under section 548(b)[9] of the Bankruptcy Code in the form of excess salary payments, benefits and reimbursed excessive, personal or unsubstantiated expenses.  (¶¶ 150-54.) |
| 7 | Mullaney | On or after December 29, 2014, Mullaney received constructive fraudulent transfers from the Debtor that can be avoided under section 548(a)(1)(B) of the Bankruptcy Code in the form of excess salary payments, benefits and reimbursed excessive, personal or unsubstantiated expenses and through the |

---

[9]     The Debtor is not a partnership and Mullaney is not a general partner, so section 548(b) does not apply.  Mullaney believes that this was a typo, and section 548(a)(1)(B)(ii)(I)-(III) was intended. (*Mullaney MTD*, p. 22, n.11.)

| | | execution of Mullaney's Employment Agreement, which provided excess compensation.  (¶¶ 155-59.) |
|---|---|---|
| 8 | Mullaney | In the year prior to the Petition Date, Mullaney (an insider) received preferential transfers from the Debtor of back pay and personal expenses deducted from Mullaney's limbo pay, plus interest, that are avoidable under section 547(b) of the Bankruptcy Code.  (¶¶ 160-67.) |
| 9 | Mullaney | Post-petition, Mullaney received unauthorized transfers from the Debtor that are avoidable under section 549 of the Bankruptcy Code.  (¶¶ 168-72.) |
| 10 | Mullaney | Mullaney breached his Employment Agreement with the Debtor by promulgating false and misleading fundraising campaigns and overseeing false and misleading financial reporting.  (¶¶ 173-76.) |
| 11 | Mullaney | Mullaney was unjustly enriched by receiving excess payments of salary and bonuses from the Debtor.  (¶¶ 177-80.) |
| 12 | Mullaney | Mullaney's Claim should be disallowed as his salary and back pay were excessive and unwarranted; the bonuses were obtained under false and misleading pretenses; the Employment Agreement is not valid, Mullaney materially breached the Employment Agreement; and the Employment Agreement is an avoidable transfer.  (¶¶ 181-85.) |
| 13 | Mullaney | Because Mullaney is the recipient of avoidable fraudulent and preferential transfers, Mullaney's Claim should be disallowed under section 502(d) of the Bankruptcy Code.  (¶¶ 186-89.) |

All the Defendants moved to dismiss the Complaint and all extensively addressed the *Examiner's Report* and his findings and conclusions.  The Director Defendants argue that they are protected from liability by the Delaware volunteer immunity statute and that the Plaintiff has failed to state a claim against them as a matter of law, including under *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch.

1996). (*Coneys MTD*, pp. 6-21; *Dysart MTD*, pp. 5-18; *2015 Directors MTD*, pp. 16-22.) Coneys and Dysart also assert that the claims against them are barred, in part, by the applicable statute of limitations. (*Coneys MTD*, pp. 5-6; *Dysart MTD*, pp. 18-20.) Dysart argues that the Complaint fails to allege any wrongdoing on his part and engages in improper group pleading. (*Dysart MTD*, pp. 4-5.) Directors Levitt, Kokich, Rappaport, and Price assert that the claims against them should be dismissed due to improper group pleading and that many of the facts alleged in the Complaint occurred prior to their joining the Debtor's Board. (*2015 Directors MTD*, pp. 8-12, 17-18, 21.) Atkinson filed a separate motion to dismiss, joining in the arguments raised in the *2015 Directors MTD*. (*Atkinson MTD*, pp. 1-2.)

Fuchs moved to dismiss the claim against her on the basis that the Plaintiff has failed to overcome the business judgment rule, failed to allege improper self-dealing and cannot assert a claim for corporate waste against Fuchs because such claims can only be asserted against directors, not officers. (*Fuchs MTD*, pp. 2-3, 6.)

Mullaney moved to dismiss the claims against him in their entirety. (*Mullaney MTD*, p. 1.) He asserts that the Plaintiff has failed to state a claim for breach of fiduciary duty or waste (Count 4) because the *Complaint* merely questions business decisions and fails to overcome the business judgment rule, (*Mullaney MTD*, pp. 7-22); the claims for constructive fraudulent transfer under New York law and the Bankruptcy Code (Counts 5, 6 and 7) and the preference claims (Count 8) must be dismissed because the Plaintiff has failed to plead lack of fair consideration or insolvency, as the justified expectation from the beginning was that WW's impact loans would be forgiven, or that Mullaney would have received less in a liquidation under chapter 7 (*Mullaney MTD*, pp. 22-27);

the claim seeking to avoid and recover post-petition transfers (Count 9) should be dismissed because the transfers (other than $158,283.21)[10] relate to salary owed post-petition under his Employment Agreement and Mullaney's employment undoubtedly benefitted the Debtor post-petition, given that he raised $8 million in donations in that period (*Mullaney MTD*, pp. 28-29); the claim for breach of Mullaney's Employment Agreement (Count 10) should be dismissed because Plaintiff has not alleged damages and even if the allegations were true they resulted in increased donations to WW and has not pleaded facts sufficient to support rescission under New York law (*Mullaney MTD*, pp. 29-32); the claim for unjust enrichment (Count 11) must be dismissed because Mullaney's compensation was governed by a Board-approved Employment Agreement and the Plaintiff fails to allege facts supporting unjust enrichment (*Mullaney MTD*, pp. 32-33); the claims for disallowance of Mullaney's claim against the Debtor (Counts 12 and 13) should be dismissed because they merely re-hash the other counts in the *Complaint* and a claim for disallowance under section 502(d) cannot stand alone. (*Mullaney MTD*, pp. 33-34.)

*Plaintiff's Opposition to Defendants' Motions to Dismiss*, dated April 26, 2019 ("*Opposition*") (ECF Doc. # 36), asserted that the *Complaint* adequately pleads claims for breach of fiduciary duty against each of the Directors, it does not engage in impermissible group pleading, the Directors are not entitled to volunteer immunity and the business judgment rule does not apply. (*Opposition*, pp. 4-22.) Furthermore, the

---

[10]    Mullaney argues that although this $158,283.21 may be subject to avoidance, because the Liquidation Plan provides for a 58.11% recovery to unsecured creditors but does not allow for the payment of claims arising under section 502(h) upon the recovery of avoidable transfers, he should only be liable for 41.89% of this amount, or $66,304.88. Moreover, Mullaney argues this amount may be offset against his claim against the Debtor under the doctrine of recoupment. (*Mullaney MTD*, p. 29 & n. 15.)

claims for breach of fiduciary duty and waste against Mullaney and Fuchs are adequately pled, the fraudulent transfer and preference claims against Mullaney should not be dismissed as the *Complaint* alleges insolvency and lack of fair consideration and the remaining claims against Mullaney should not be dismissed. (*Opposition*, pp. 22-39.)  If the Court grants the motions to dismiss in whole or in part, the Plaintiff requests leave to amend the *Complaint* to cure any deficiencies. (*Opposition*, p. 39.)  Only Coneys, Fuchs and Mullaney ask that the *Complaint* be dismissed with prejudice. (*Coneys MTD*, p. 21; *Fuchs MTD*, p. 8; *Mullaney MTD*, p. 34.)

## DISCUSSION

### A.    Jurisdiction

The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334(b) and the *Amended Standing Order of Reference*, No. M 10-468, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012). (¶ 18.)  The Court retained jurisdiction to hear and determine actions brought by the Litigation Trustee under section 12.1(e) of the Liquidation Plan and paragraph 39 of the Confirmation Order.  Furthermore, the plan liquidated the Debtor and transferred the claims asserted by the Plaintiff to the Litigation Trust for the benefit of the holders of Litigation Trust Interests, including unsecured creditors.  Accordingly, the adversary proceeding bears a close nexus to the implementation and execution of the plan and post-confirmation jurisdiction exists.  *See Residential Funding Co. v. Greenpoint Mortgage Funding, Inc.* (*In re Residential Capital, LLC*)*,* 519 B.R. 593, 600 (S.D.N.Y. 2014); *Krys v. Sugrue*, Nos. 08 Civ. 3065 (GEL), 2008 WL 4700920, at *6 (S.D.N.Y. Oct. 23, 2008).

## B.     Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *accord Twombly*, 550 U.S. at 556.  It is not sufficient for the complaint to plead facts that "permit the court to infer . . . the mere possibility of misconduct," *Iqbal*, 556 U.S. at 679; he must state "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly,* 550 U.S. at 555). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  The court should assume the veracity of all "well-pleaded factual allegations," and determine whether, together, they plausibly give rise to an entitlement of relief, *id.*, but where the amended pleading directly contradicts the facts alleged in an earlier pleading, the court may accept the allegations in the original pleading as true. *See Vasquez v. Reilly*, No. 15-CV-9528 (KMK), 2017 WL 946306, at *3 (S.D.N.Y. Mar. 9, 2017); *Colliton v. Cravath, Swaine & Moore LLP*, No. 08 Civ 0400 (NRB), 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008), *aff'd*, 356 F. App'x 535 (2d Cir. 2009).

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to

dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007).  The court may also consider documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002); *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir. 1993); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir. 1991), *cert. denied,* 503 U.S. 960 (1992); *McKevitt v. Mueller,* 689 F. Supp. 2d 661, 665 (S.D.N.Y. 2010). Where the complaint cites or quotes from excerpts of a document, the court may consider other parts of the same document submitted by the parties on a motion to dismiss. *131 Main St. Assocs. v. Manko,* 897 F. Supp. 1507, 1532 n. 23 (S.D.N.Y. 1995). If "the documents contradict the allegations of a plaintiff's complaint, the documents control and the [c]ourt need not accept as true the allegations in the complaint." *2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assurance Co.,* 96 F. Supp. 3d 182, 199 (S.D.N.Y. 2015) (quoting *Bill Diodato Photography LLC v. Avon Prods., Inc.,* No. 12–CV–847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012)) (citing authorities).  The *Complaint* relies on the 274-page *Examiner's Report*[11] and includes references to the Examiner's conclusions.  However, the conclusory statements attributed to the Examiner are entitled to the same consideration as the other conclusory statements in the *Complaint* — none.[12]

---

[11]    The *Examiner's Report* is accompanied by approximately four boxes of exhibits, deposition transcripts and deposition exhibits.

[12]    Perceiving that the *Complaint* relied on the Examiner's own conclusory statements, the Court granted the parties the opportunity to identify facts in the *Examiner's Report* and its exhibits to supplement the factual allegations allegedly missing from the *Complaint* or that supported the motions to

### C.     Breach of Fiduciary Duties of Care and Loyalty

### 1.     Fiduciary Duties of Care and Loyalty under Delaware Law

The Debtor was incorporated under Delaware law and claims for breach of

fiduciary duty are governed by Delaware law under the internal affairs doctrine.

*Hausman v. Buckley*, 299 F.2d 696, 703 (2d Cir. 1962); *Official Committee of*

*Unsecured Creditors of Hydrogen, L.L.C. v. Blomen (In re Hydrogen LLC)*, 431 B.R.

337, 346–47 (Bankr. S.D.N.Y. 2010).   Officers and directors of Delaware corporations

owe fiduciary duties of care and loyalty to their corporation.   *Gantler v. Stephens*, 965

A.2d 695, 709 (Del. 2009).   The duty of loyalty may be violated where a "fiduciary

intentionally acts with a purpose other than that of advancing the best interests of the

corporation."   *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006)

("*Walt Disney II*"); *accord In re Orchard Enterprises, Inc. Stockholder Litig.*, 88 A.3d 1,

33 (Del. Ch. 2014).   This includes circumstances where there is "a financial or other

cognizable fiduciary conflict of interest," or "where the fiduciary fails to act in good

faith."   *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).   The requirement to act in good

---

dismiss.  (*Order Setting Deadline to File Post-Argument Submissions*, July 19, 2019 ("*Order*") (ECF Doc. # 50).)  In response, the Plaintiff submitted a seventeen page table that, in many cases, provided a reference, description and explanation of the relevance of a particular document without directly identifying the factual statement the Plaintiff wanted me to read.  (*See* ECF Doc. # 55-1.)  Thus, the Court had to read the entire document and pinpoint or guess about the factual statement on which the Plaintiff was relying.  In addition, the Plaintiff delivered four bankers' boxes to my chambers containing the exhibits to the *Examiner's Report*.

The Defendants objected that the Plaintiff's submission did not comply with the *Order* and the Court held a conference.  At the conference, I clarified that I was seeking specific factual statements in the *Examiner's Report* and exhibits and predicted a relatively minimal submission consisting of those facts that were not already alleged in the *Complaint*.  If they were already alleged in the *Complaint*, it was unnecessary to refer me to the same facts in the *Examiner's Report*. The Plaintiff tried again, and this time, the submission amounted to over fifty pages of what appeared to be a second brief in opposition to the motions to dismiss based on the *Examiner's Report* rather than the allegations in the *Complaint*.  (*See* ECF Doc. # 64.)  Several Defendants again complained and requested a conference.  At the ensuing conference, I stated that I was not seeking further briefing on the motion to dismiss and the new submission was not consistent with the *Order*.  Consequently, I essentially vacated the *Order* and I have independently reviewed the *Examiner's Report* and its exhibits.

faith is "a subsidiary element, *i.e.*, a condition, of the fundamental duty of loyalty." *In re Orchard Enterprises*, 88 A.3d at 32–33 (quoting *Stone v. Ritter*, 911 A.2d at 370). An officer or director "cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest." *Stone v. Ritter*, 911 A.2d at 370 (quoting *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003)).

The duty of care requires directors of a Delaware corporation to "use that amount of care which ordinarily careful and prudent [persons] would use in similar circumstances" and consider "all material information reasonably available" in making decisions on behalf of the corporation. *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005) ("*Walt Disney I*") (citations omitted), *aff'd*, 906 A.2d 27 (Del. 2006). When making a business decision, a board need not be "informed of every fact," but must consider the "'material facts that are reasonably available at the time of the decision." *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000); *accord Bridgeport Holdings Inc. Liquid. Tr. v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 569 (Bankr. D. Del. 2008); *Zimmerman v. Crothall*, No. CIV. A. 6001-VCP, 2012 WL 707238, at *7 (Del. Ch. Mar. 5, 2012), *as revised* (Mar. 27, 2012). "Irrationality is the outer limit of the business judgment rule." *Brehm*, 746 A.2d at 264.

Under the business judgment rule, the law presumes that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). The party challenging the board's decision must establish facts rebutting the presumption. *Id.* The business judgment rule encourages corporate fiduciaries to take risks that "in their business judgment, are in the best interest of the

26

corporation" by protecting them from personal liability if it turns out, in the end, that they "made poor business decisions." *In re Goldman Sachs Grp., Inc. S'holder Litig.*, No. CIV.A. 5215-VCG, 2011 WL 4826104, at *23 (Del. Ch. Oct. 12, 2011). Once the presumption is rebutted, an "entire fairness" standard applies, which requires the defendant to establish "to the *court's* satisfaction that the [challenged] transaction was the product of both fair dealing and fair price." *Calma on Behalf of Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 577 (Del. Ch. 2015) (emphasis in original).

A director may be liable for breach of their fiduciary duties in two contexts. First, liability may flow "*from a board decision* that results in a loss because that decision was ill advised or 'negligent.'" *Caremark*, 698 A.2d at 967 (emphasis in original). Second, liability may arise "from an *unconsidered failure of the board to act* in circumstances in which due attention would, arguably, have prevented the loss." *Id.* (emphasis in original). Where liability arises from director *inaction*, a plaintiff must show a "lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight." *Walt Disney I*, 907 A.2d at 750 (citation omitted). Where the allegation is a lack of oversight, often referred to as a *Caremark* claim, the plaintiff must show "either (1) that the directors knew or (2) should have known that violations of law were occurring and, in either event, (3) that the directors took no steps in a good faith effort to prevent or remedy that situation, and (4) that such failure proximately resulted in the losses complained of." *Caremark*, 698 A.2d at 971. To establish a *Caremark* claim, either "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being

27

informed of risks or problems requiring their attention." *Stone v. Ritter*, 911 A.2d at

370.  In either circumstance, the directors are only liable if they "knew that they were

not discharging their fiduciary obligations." *Id.*

A *Caremark* claim is rooted in bad faith and not mere negligence or poor

management.  *Corporate Risk Holdings LLC v. Rowlands*, No. 17-cv-5225 (RJS), 2018

WL 9517195, at *3 (S.D.N.Y. Sept. 28, 2018).  The Delaware Supreme Court has

observed that subjecting directors to personal liability for the failures of a corporation's

employees is "possibly the most difficult theory in corporation law upon which a

plaintiff might hope to win a judgment." *Stone v. Ritter*, 911 A.2d at 372 (quoting

*Caremark*, 698 A.2d at 967).  To hold directors liable for failing to monitor, the plaintiff

must show that the directors "acted with a state of mind consistent with a conscious

decision to breach their duty of care," *Desimone v. Barrows*, 924 A.2d 908, 935 (De. Ch.

2007); *accord In re SAIC Inc, Derivative Litig.*, 948 F. Supp.2d 366, 381 (S.D.N.Y.

2013), *aff'd*, 553 F. App'x 54 (2d Cir. 2014), and "knew that they were not discharging

their fiduciary obligations." *Stone v. Ritter*, 91 A.2d at 370.  "[T]here must be

allegations suggesting bad faith approximating an intentional dereliction of duty, a

conscious disregard for responsibilities, or actions taken with intent to violate applicable

positive law." *Corporate Risk Holdings LLC v. Rowlands*, 2018 WL 9517195, at *4

(quotation marks and internal citation omitted); *accord In re Citigroup S'holder

Derivative Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009) ("[T]o establish oversight liability a

plaintiff must show that the directors *knew* they were not discharging their fiduciary

obligations or that the directors demonstrated a *conscious* disregard for their

responsibilities such as by failing to act in the face of a known duty to act.") (emphasis in original).

### 2.    Fiduciary Duties to a Charitable Corporation

Under Delaware law, fiduciaries of a non-profit charitable corporation owe fiduciary duties to the corporation itself and to its beneficiaries. *Oberly v. Kirby*, 592 A.2d 445, 461–62 (Del. 1991); *see also Gassis v. Corkery*, No. CIV A 8868-VCG, 2014 WL 2200319, at *14 (Del. Ch. May 28, 2014), *aff'd*, 113 A.3d 1080 (Del. 2015) (The board of directors of a charitable corporation "owes fiduciary duties to its *beneficiaries*, not to its members *qua* members or directors *qua* directors." (emphasis in original)). When a corporation is "created for a limited charitable purpose rather than a generalized business purpose, those who control it have a special duty to advance its charitable goals and protect its assets." *Oberly v. Kirby*, 592 A.2d at 462.  Actions that pose a "palpable and identifiable threat" to the charitable purpose of the corporation would be contrary to its certificate of incorporation "and hence *ultra vires*." *Id.* at 462 (citing *Denckla v. Indep. Found.*, 193 A.2d 538, 541 (Del. 1963)).

A claim for breach of a fiduciary duty owed to a charitable corporation "is limited to (a) any financial harm or jeopardy to the [charitable corporation] itself and its beneficiaries and (b) any personal benefit to [the fiduciary] or his family, notwithstanding the absence of harm to the [charitable corporation]." *Id.*  Directors of a charitable corporation, like directors of other Delaware corporations, are protected by the business judgment rule.  "A court cannot second-guess the wisdom of facially valid decisions made by charitable fiduciaries, any more than it can question the business judgment of the directors of a for-profit corporation." *Id.*

### 3.    Volunteer Immunity

If the directors of a tax-exempt Delaware charitable corporation receive no compensation for their board service, they are also protected by the Delaware volunteer immunity statute, 10 DEL. C. § 8133.[13]  Under this statute, no volunteer of a not-for-profit organization "shall be subject to suit directly, derivatively or by way of contribution for any civil damages under the laws of Delaware resulting from any negligent act or omission performed during or in connection with an activity of such organization."  10 DEL. C. § 8133(b).  The statute excepts the grant of immunity for any "act or omission constituting willful and wanton or grossly negligent conduct."  10 DEL. C. § 8133(d); *see also Gilliland v. St. Joseph's at Providence Creek*, No. 04C-09-042, 2006 WL 258259, at *3 (Del. Super. Ct. Jan. 27, 2006) (dismissing claims brought against a volunteer director of a non-profit organization due to the protection of 10 DEL. C. § 8133 and refusing to extend the personal participation doctrine to volunteers protected by the statute).

Case law has not defined the meaning of "willful and wanton or grossly negligent conduct" as used in section 8133 and the Court looks to the meaning given to those phrases used in other statutes and by the courts.  For example, Delaware law requires proof of gross negligence in order to prove a breach of a director's duty of care.  In this context, gross negligence "generally requires that officers, directors, and managers fail

---

[13]    As noted, Levitt's firm performed analytics work for WW and received approximately $15,000 for its work.  (¶ 13.)  The Plaintiff has not argued that this compensation stripped Levitt of the protection of volunteer immunity.  Instead, the Plaintiff posits that section 8133 may not apply because the Directors' alleged wrongdoing did not qualify as an "activity" undertaken by the Debtor in furtherance of its purpose for which it was organized, (*Opposition*, p. 7), and the Debtor may not be an "organization" within the meaning of the statute for the same reason.  (*Id.*, p. 7 n. 9.)  The Plaintiff reads the immunity statute too restrictively limiting it for the most part to conduct that is not wrongful.  If that is the conduct the statute immunizes from liability, it would be unnecessary.

to inform themselves fully and in a deliberate manner." *In re W.J. Bradley Mortg. Capital, LLC*, 598 B.R. 150, 163 (Bankr. D. Del. 2019); *accord In re Zale Corp. Stockholders Litig.*, Civil Action No. 9388–VCP, 2015 WL 6551418, at *5 (Del. Ch. Oct. 29, 2015) ("The key issues in evaluating a duty of care claim under the gross negligence standard are 'whether there was a real effort to be informed and exercise judgment.'") (quoting *Caremark*, 698 A.2d at 968)). "To support an inference of gross negligence, 'the decision has to be so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion.'" *Zale*, 2015 WL6551418, at *4 (quoting *Solash v. Telex Corp.*, 1988 WL 3587, at *8 (Del. Ch. Jan. 19, 1988)).

"Wilful and wanton" is not a standard of care (or lack of care) used in connection with a breach of fiduciary duty claim; the Court has not located any such use. When used in other contexts, the phrase or similar phrases refer to "conscious indifference" or an "I don't care" attitude. *Couden v. Duffy*, 446 F.3d 483, 498 (3d Cir. 2006) (interpreting the exception from immunity under the Delaware Tort Claims Act for conduct constituting "wanton negligence"); *Brown v. United Water Delaware, Inc.*, 3 A.3d 272, 276 (Del. 2010) (interpreting exception to the filed-rate doctrine for "willful or wanton" behavior).[14]

Where the claim is based on the breach of the duty of care, "irrationality may be the functional equivalent of the waste test." *Brehm*, 746 A.3d at 264. To sustain a claim

---

[14]    Since Delaware corporate law already protects a director in the absence of gross negligence, the type of conduct that excepts a director from the protections of the volunteer immunity statute arguably requires more egregious conduct. This conclusion is buttressed under the doctrine of *noscitur a sociis* by the juxtaposition of "wilful and wanton" conduct and "grossly negligent conduct." *Noscitur a sociis* is, put simply, the principle that "a word is known by the company it keeps." *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015); *accord United States v. Williams*, 553 U.S. 285, 294 (2008) ("[A] word is given more precise content by the neighboring words with which it is associated."); *see also* 2A Norman J. Singer, Sutherland Statutory Construction § 47:16 at 353-64 (7th ed. 2014) (discussing *noscitur a sociis*).

of corporate waste, the plaintiff must show "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Id.* at 263 (quoting *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997).)

> If, however, there is *any substantial* consideration received by the corporation, and if there is a *good faith judgment* that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude *ex post* that the transaction was unreasonably risky. Any other rule would deter corporate boards from the optimal rational acceptance of risk, for reasons explained elsewhere. Courts are ill-fitted to attempt to weigh the "adequacy" of consideration under the waste standard or, *ex post,* to judge appropriate degrees of business risk.

*Id.* (quoting *Lewis*, 699 A.2d at 336 (emphasis in original)). Thus, waste is "confined to unconscionable cases where directors irrationally squander or give away corporate assets." *Id.*

With this background, we turn to the claims asserted against the directors asserted in the First, Second and Third Claims for Relief. These claims correspond to specific periods. The First Claim is asserted against the directors that served on the Board from March 2011 until at least November 2015 ("First Period"). The Second Claim covers the claims arising between December 2015 and the December 29, 2016 Petition Date ("Second Period"). The Third Claim asserts claims against the directors that served post-petition. ("Third Period" or "Post-Petition Period").

**D.    The First, Second and Third Claims - Group Pleading**

Every complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (made applicable through Fed. R. Bankr. P. 7008). When a complaint is brought against multiple defendants, it

cannot "lump[] all the defendants together in each claim and provid[e] no factual basis to distinguish their conduct." *Atuahene v. City of Hartford*, 10 F. Appx. 33, 34 (2d Cir. 2001) (summary order). "The group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint." *Elliott Assocs., L.P. v. Hayes*, 141 F. Supp. 2d 344, 354 (S.D.N.Y. 2000), *aff'd*, 26 F. App'x 83 (2d Cir. 2002); *accord Goldin Assocs., L.L.C. v. Donaldson, Lufkin & Jenrette Sec. Corp.,* No. 00 Civ. 8688(WHP), 2003 WL 22218643, *4 (S.D.N.Y. Sept. 25, 2003). Courts allow group pleading where the plaintiffs charge that the officers and directors with day-to-day responsibility for a corporation's operations committed fraud through the utterance of corporate group statements such as SEC filings and press releases. *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 281 (S.D.N.Y. 2014); *In re BISYS Sec. Litig*, 397 F. Supp. 2d 430, 438, 440-41 (S.D.N.Y. 2005), *reconsideration denied*, No. 04 Civ. 3884(LAK), 2005 WL 3078482 (S.D.N.Y. Nov. 16, 2005); *Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225, 237 (S.D.N.Y. 2000); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999). To invoke the doctrine, the complaint must allege facts showing that the defendant was "a corporate insider, with direct involvement in day-to-day affairs, within the entity issuing the statement." *DeAngeles v. Corzine*, 17 F. Supp. 3d 270, 281 (S.D.N.Y. 2014); *see also BISYS*, 397 F. Supp. 2d at 440-41.

Group pleading does not allow a plaintiff to circumvent the requirement of Rule 8 that the complaint give each defendant "fair notice of what the plaintiff's claim is and the ground upon which it rests." *Atuahene*, 10 F. App'x at 34 (internal quotation marks and citation omitted). "By lumping all the defendants together in each claim and

providing no factual basis to distinguish their conduct," a complaint fails to satisfy the minimum pleading standard required by Rule 8. *Id.*; *accord Genesee Cty. Employees' Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3*, 825 F. Supp. 2d 1082, 1202 (D.N.M. 2011) ("A plaintiff has an obligation to 'make clear exactly *who* is alleged to have done *what* to *whom,* to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against' all the bad actors." (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1249-50 (10th Cir. 2008)) (emphasis in original)).

Where a complaint alleges that the directors breached their fiduciary duties, and the corporate charter exculpates a director sued for money damages based on a breach of the duty of care, the claims must be examined on a director-by-director basis. *Chen v. Howard-Anderson*, 87 A.3d 648, 677 (Del. Ch. 2014) ("'The liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director.'") (quoting *In re Emerging Commc'ns S'holders Litig.*, No. Civ. A. 16415, 2004 WL 1305745, at *38 (Del. Ch. May 3, 2004)); *In re Cornerstone Therapeutics Inc, Stockholder Litig.*, 115 A.3d 1173, 1182 (Del. 2015) (same). Here, each volunteer receives immunity under section 8133, and the same rule should apply. Furthermore, the rule against group pleading has been applied in the absence of exculpation clauses; "a plaintiff may not rely on group pleading to assert a breach of fiduciary duty claim." *Steinberg v. Shearman*, No. 07 Civ. 1001(WHP), 2008 WL 2156726, at *5 (S.D.N.Y. May 8, 2008).

34

The problem of group pleading is especially acute when analyzing the *Caremark* claims which require allegations of bad faith or conscious indifference. The *Complaint* alleges a failure to monitor, investigate and supervise the HMS Arbitration, the Debtor's alleged misrepresentations to donors and the accounting for and use of restricted and unrestricted donations. The claims cover a period that spans as much as four years and involves different directors who served at different times. It asserts numerous "red flags" of which the Director Defendants were supposedly aware, (*see Opposition*, pp. 10-12), but does not identify which directors were aware of these "red flags," and the Plaintiff does not contend that the knowledge of any one director is imputed to the other directors or the Board.

The group pleading problem extends to the non-*Caremark* claims involving Board action. For example, the Plaintiff contends that the Board breached its fiduciary duties by approving Mullaney's Employment Agreement and asserts this claim in Count II against the Defendants who were first elected as directors at the December 23, 2015 meeting. The *Complaint* alleges that the Board entered into the Employment Agreement in December 2015, (¶ 68), but the minutes of that meeting indicate that the only directors present were Mullaney, Coneys and Kant and do not reflect any discussion of the Employment Agreement. (*Volume 1 of Exhibits*, Ex. 75.) Misconduct by a board does not necessarily make a director who did not attend the meeting liable for the actions of his codirectors. WILLIAM FLETCHER, CYCLOPEDIA OF THE LAW OF CORPORATIONS §§ 1089, 1091 (September 2019 update). The *Complaint* further alleges that the new directors attended their first Board meeting in March 2016, (¶ 52), after the Board approved the Employment Agreement yet asserts a claim against them for breach

35

of their duty of care based upon the approval of the Employment Agreement.  More generally, the *Complaint* assumes that each member of the Board attended every Board meeting at which a particular action was taken.  Yet, this was not necessarily the case.  (*See Volume 1 of Exhibits*, Ex. 77 (noting that Defendants Atkinson and Price were not present at the June 13, 2016 Board meeting).)

In addition, the case cited by the Plaintiff in opposition is distinguishable.  In *H2O Plus, LLC v. Arch Personal Care Prods., L.P.*, Civ. No. 10–3089 (WJM–MF), 2011 WL 2038775 (D.N.J. May 22, 2011), the plaintiff sued Arch Personal Care Products, L.P. ("Arch PCP") and Arch Chemicals, Inc. ("Arch Chemicals").  The complaint referred to the defendants collectively as "Arch."  The defendants moved to dismiss on a variety of grounds, including that the complaint failed to distinguish between Arch PCP and Arch Chemicals.  *Id.* at *1.  Rejecting this aspect of the motion, the District Court stated that the headings of each count identified which claim was being asserted against a particular defendant and the exhibits provided further specificity.  The Court concluded that "the individualized Counts provide sufficiently specific allegations for Defendants to determine the grounds alleged against each of them, satisfying the pleading standard of Rule 8 and *Twombly*."  *Id.* at *3.  In contrast, and while the First through Third Claims in the *Complaint* do identify the members of the Board sued under the particular count, they do not identify which Directors did what.  In other words, they lump the Defendants together as "the Board."

The one exception relates to the declarations filed by Kokich, Coneys, Levitt, Price, Rappaport and Atkinson in support of the Debtor's opposition to the motion to appoint a chapter 11 trustee ("Trustee Motion").  We know who said what.  Quoting from

36

extracts of the declarations, the *Complaint* alleges that Coneys stated that the

"'WonderWork Board [was] very involved in the organization's decisionmaking,'"

discussing Debtor's 'budget, investments, fundraising strategies, program capacity, and

relationships with hospital partners, among other things,' and "the Board 'provided

Brian with critical operational oversight and consultation' and that Mullaney 'at all

times reports to, is supervised by, and serves at the pleasure of the Board.'" (¶ 25.)  In

addition, Kokich, Levitt, Price, Rappaport and Atkinson described the Board as

"'dedicated, hands-on, and active in its supervision of Brian and the organization's

management generally' and affirmed, under penalty of perjury, that 'the Board has no

potential, planned or pending claims against' Mullaney and that Mullaney had the

Board's 'utmost confidence.'" (¶ 25.)  The Third Claim asserts that these Directors

breached their fiduciary duties by executing declarations in opposition to the Trustee

Motion without adequate investigation of the underlying claims.  (¶ 136.)  None of the

parties paid any attention to this claim in their submissions and I will not consider its

sufficiency without briefing.[15]

---

[15]     Nevertheless, and using the Coneys declaration as an example, Coneys provided the factual bases
for his views regarding his statements about the involvement of the Board in the matters cited by the
Plaintiff and the Board's supervision of Mullaney.  (*See Declaration of John J. Coneys, Jr. in Opposition
to HelpMeSee's Motion to Appoint a Trustee*, dated Feb. 20, 2017, at ¶ 13.)  The Plaintiff has not
challenged the factual bases for his conclusions that the Board was involved in the quoted activities and
supervised Mullaney.  The Plaintiff challenges the conclusions.  Coneys also discussed at length the value
and contributions of Mullaney to the Debtor, (*id.* at ¶¶ 6-11, 15), and the negative impact of the
appointment of a chapter 11 trustee on the Debtor and its creditors.  (*Id.* at ¶¶ 12, 17-19.)  The Plaintiff
does not challenge the factual bases for these statements either.

       The breach of fiduciary duty claim based on the submission of the opposing declarations seems to
be an attempt to punish the Directors for exercising their business judgment to oppose the Trustee
Motion because they believed it would be bad for the Debtor.  If HMS, then represented by the same
lawyer that now represents the Plaintiff, thought the declarations were submitted without an adequate
investigation, HMS could have made a motion for sanctions under Federal Bankruptcy Rule 9011.  It did
not.

Accordingly, the First, Second and Third Claims are dismissed except for the claim on Count 3 that the Director Defendants breached their fiduciary duties by submitting the declarations without adequate investigation.

## E.    Fourth Claim for Relief

Count 4 alleges that Fuchs and Mullaney breached their fiduciary duties of care, loyalty and good faith and committed waste.  Although the Court has dismissed the claims against the Directors based on group pleading, it is necessary to consider the role of the Board *qua* Board in passing on the breach of fiduciary duty claims asserted against Mullaney and Fuchs relating to Mullaney's compensation.

### 1.    Breach of Fiduciary Duty

Officers owe the same fiduciary duties as directors to the corporation and benefit from the same business judgment rule.  The Court's discussion of the duty of care, *supra*, applies equally to Mullaney and Fuchs.[16]  The *Complaint* also alleges that Mullaney and Fuchs breached their fiduciary duties of loyalty and good faith.  The duty of loyalty is breached by engaging in "a self-interested transaction" that is "unfair to the shareholders."  *Burtch v. Huston* (*In re USDigital, Inc.*), 443 B.R. 22, 41 (Bankr. D. Del. 2011).  In addition, the duty of good faith is a "subsidiary element" of the duty of loyalty:

> The Delaware Supreme Court has recognized three non-exclusive categories of conduct indicative of a failure to act in good faith.  First, a failure to act in good faith may be established when a director "intentionally acts with a purpose other than that of advancing the best interests of the corporation."  Second, a failure to act in good faith may be established when a director "acts with the intent to violate applicable

---

[16]    As compensated officers, they do not benefit from the immunity granted to volunteers under 10 DEL. C. § 8133.

positive law."  Third, a failure to act in good faith may be established when a director "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."  The Court, however, noted that the categories are not the only examples of a failure to act in good faith.

*Id.* (quoting *Walt Disney II*, 906 A.2d at 67).  To determine the good faith of a fiduciary

that is not engaged in self-sealing but is charged with facilitating wrongful action by

another "the court must examine the officers' state of mind to determine whether they

acted in bad faith for a purpose other than advancing the best interests of the

corporation."  *Hampshire Group, Ltd. v. Kuttner*, C.A. No. 3607-VCS, 2010 WL

2739995, at *12 (Del. Ch. July 12, 2010) ("*Hampshire*").

### a.    Mullaney's Salary and Bonus

Many of the alleged breaches revolve around Mullaney's compensation.  Certain

aspects of his compensation, particularly his salary and his bonuses, were awarded by

the independent Board or the Compensation Committee.  An officer does not breach his

fiduciary duty by asking for a raise or bonus.  If that were the law, most if not all

corporate officers would be in breach.  Furthermore, a Court will not ordinarily

scrutinize an officer's acceptance of compensation determined by an independent board

or a committee.  *Friedman v. Dolan*, C.A. No. 9425–VCN, 2015 WL 4040806, at *9

(Del. Ch. June 15, 2015).  Instead, an officer will breach his fiduciary duty of loyalty by

accepting compensation that is clearly improper or by wrongfully influencing a

compensation decision.  *Id.*

The Plaintiff contends that Mullaney improperly interjected himself into Pearl

Meyer's selection of peer groups, and hence, wrongfully influenced the decision

regarding his compensation.  (¶¶ 62, 63, 65.)  The Examiner's exhibits show, however,

that Pearl Meyer solicited Mullaney's input and not the other way around.  In its signed

proposal dated May 6, 2013, to Dysart, the Chair of the Debtor's Compensation

Committee, (*Notice of Filing of Volume 2 of Redacted Document Exhibits to Final*

*Report of Jason R. Lilien, Examiner* ("*Volume 2 of Exhibits*"), Ex. 187 (Case No. 16-

13607, ECF Doc. # 338)), Pearl Meyer stated it would work with the Compensation

Committee to develop peer groups.  (*Id.* at 1.)  Defendants Coneys, Dysart and Kant met

telephonically with Peter Lupo, one of the two Pearl Meyer people working on the

engagement, several days later to discuss Mullaney, his compensation and the project.

According to the draft minutes of that meeting, Lupo explained that the relevant peer

groups included not just similarly sized organizations but also other places where

Mullaney might work.  (*Volume 2 of Exhibits*, Ex. 187-1 (Email, dated May 16, 2013, at

7:53 p.m. from Dysart to Coneys and Kant).)

The next day, Lupo wrote to Jim Hudner, the other Pearl Meyer person working

on the engagement, about the need to involve Mullaney in the development of the peer

groups:

> One more thought.  I recommended to the Committee that we get Brian's
> input on the peer group construction.  When you connect with Ted, you
> may want to bring this up.  Given the timeframe involved, it may make
> sense to ask Brian to submit a list of organizations or positions that align
> with his experience.  I'll leave the approach up to you.  I am sure this list
> will be interesting (controversial?)

(*Volume 2 of Exhibits*, Ex. 187-1 (Email, dated May 17, 2013, at 7:23 a.m.).)

Mullaney thereafter worked with Pearl Meyer to develop appropriate peer groups

and the Pearl Meyer Report acknowledged his participation.  (Pearl Meyer Report at 7

("Based on our discussions with the Compensation Committee and CEO Brian

Mullaney, and our subsequent understanding of WonderWork's mission and its plans for growth, we have developed five different peer groups to provide a broader perspective on competitive levels of compensation.").) **Pearl Meyer concluded that Mullaney's** "current base salary is very competitive – and on the higher end of the competitive range (generally around the range of 75th percentile to over the 90th percentile)" but "[g]iven that the CEO is not covered by an incentive program, Mr. Mullaney's total pay is somewhat less competitive when taking into account the amount of incentives paid to CEOs of other organizations. This is mostly true when compared to for-profit organizations." (*Id.* at 2.) Pearl Meyer recommended that Mullaney's base annual salary remain at $475,000.00 (the same salary he received from Smile Train) and the 2012 incentive pay range between $50,000.00 and $200,000.00. (*Id.* at 5.) The Pearl Meyer Report made several recommendations to the Compensation Committee including periodically reviewing Mullaney's award, quantifying the value of his other contract requests and taking into account requests of significant value when considering the amount of his annual incentive. (*Id.* at 4-5.)

Mullaney's participation in the development of the peer groups does not constitute bad faith. He was participating in the process at Pearl Meyer's request with the knowledge of the independent Board and the Board approved his compensation. *Friedman v. Dolan* illustrates why. There, the plaintiffs contended that James Dolan, Cablevision's chief financial officer, had acted in his own self-interest in accepting compensation that was unfair to Cablevision. They charged that he was involved in the selection of a group of peer companies, he negotiated his employment renewal contract

41

and he and his son Charles accepted the compensation committee's awards.  2015 WL
4040806, at *9.

Concluding that these allegations did not state a claim for breach of fiduciary
duty, the Court explained:

> James or Charles did not award themselves compensation, and there is no
> basis in the complaint to infer that either of the two engaged in behavior
> that coerced or influenced the Compensation Committee Defendants to act
> inconsistently with their responsibilities as directors.  Negotiating with
> and providing opinions to an independent committee are not inherently
> wrongful acts, and they do not support a reasonable inference of
> wrongdoing in the current context. . . .  These facts may exist in a context
> where other facts color and inform a finding of wrongdoing.  For example,
> providing opinions to an independent committee could be wrongful if the
> analysis were supported by other facts warranting an inference of
> improper influence.

*Id.*

The only improper influence the Plaintiff alleges is Mullaney's participation in the
development of the peer groups.  But Pearl Meyer sought his input and developed the
compensation information within those peer groups.  Furthermore, Mullaney had the
right to ask for a high level of compensation and did not award himself the
compensation he ultimately received.  The Compensation Committee and/or the Board
approved his compensation and he did not improperly influence or coerce their
decision.  Accordingly, Mullaney did not breach a fiduciary duty by accepting
compensation awarded by the Board.

### b.    "Limbo Pay"

Although Mullaney did not breach a fiduciary duty by accepting bonuses awarded
by the Board, the "limbo pay" scheme did.  Mullaney instructed Fuchs that his annual
salary should not exceed $475,000.00, and she should "accrue" any additional

42

compensation.  (*Volume 2 of Exhibits*, Ex. 196; *see* ¶ 87.)  He did this to minimize his tax

liability.  (*See* ¶ 85.)  Thus, when the Board awarded Mullaney annual bonuses ranging

between $200,000.00 and $250,000.00 in addition to his annual salary of

$475,000.00, Mullaney directed Fuchs to defer the payment and Fuchs tracked the

deferred compensation in a separate ledger.  (¶ 85.)  When Mullaney incurred a

personal expense, he would instruct Fuchs to pay the expense and charge Mullaney's

deferred compensation in that amount.  (¶¶ 89, 92.)  The Debtor never reported

Mullaney's bonus income on his Forms W-2, Mullaney did not pay any FICA taxes on

those amounts, Mullaney's bonuses did not appear in Debtor's general ledger or its

financial statements, (¶ 86; *Examiner's Report* at 205-07), and presumably, the Debtor

did not withhold or pay over federal or state payroll taxes triggered by that

compensation.  In addition, Mullaney and Fuchs certified to KPMG the accuracy of the

financial information the Debtor was providing and signed several Forms CHAR 500

that were submitted to the New York Attorney General and attached the Debtor's federal

income tax returns and financial statements.  Neither the forms nor the financial

information that they transmitted reported Mullaney's 'limbo pay" as income paid to

him.  (*See Volume 1 of Transcripts and Exhibits*, Fuchs Exhibits 5-11.)[17]

　　　As noted earlier, officers act in bad faith and breach their duties of loyalty when

they act with the intent to violate positive law.  In addition, they act in bad faith when

they knowingly cause the corporation to violate tax law.  *Hampshire*, 2010 WL 273995,

at *32.  In their defense, Mullaney and Fuchs maintain that the Board was aware of the

---

[17]　　　The "Fuchs Exhibits" were marked as exhibits at the deposition of Fuchs conducted by the
Examiner's attorney and form part of the exhibits to the *Examiner's Report.*

"limbo pay" practice, including the separate ledger, and the *Complaint* pleads as much. (¶ 91; *see also Volume 2 of Exhibits*, Ex. 213.)  In addition, in a separate complaint filed against KPMG, the Debtor's former auditor, (*Sama v. KPMG LLP*, Adv. Pro. No. 18-01868, ECF Doc. # 1 ("KMPG Complaint") (Bankr. S.D.N.Y. 2008)), the Plaintiff alleged that the Debtor relied on the clean unqualified audits prepared by KPMG through June 2015.  (*See* KPMG Complaint at ¶ 3 ("WonderWork justifiably relied upon KPMG to audit the Financial Statements . . . and that charitable donations were correctly characterized as 'restricted' or 'not restricted', and to alert the Debtor to any material deficiencies and misstatements in connection with its Financial Statements, business and financial position."); *accord* KPMG Complaint at ¶ 33 ("The Debtor relied KPMG's on unqualified Audit Reports with respect to the Financial Statements for each of the years ended June 30, 2012 through June 30, 2015, and the Forms 990 prepared by KPMG, in approving executive compensation, making regulatory and IRS filings, and in managing the Debtor and continuing its operations.").)

The deferred compensation scheme and the tax treatment may not be illegal, an issue I do not decide.  Nevertheless, if it was illegal (and under-reporting income certainly sounds like it is) and if Fuchs and Mullaney knew it was illegal, they cannot rely on the Board's acquiescence or the KPMG clean audits.  *Cf. Hampshire*, 2010 WL 273995, at *32 (officer who was instructed by the Audit Committee to stop the sweater donation program but nevertheless continued it "knowingly caused the corporation to engage in legally questionable activity by facilitating improper tax deductions by Hampshire's employees, board members, and officers [. . . in] breach of the duty of loyalty.")

The *Complaint* alleges that Mullaney and Fuchs knew the "limbo pay" scheme was illegal.  They utilized the same scheme at Smile Train but following an internal investigation, Smile Train reissued Mullaney's Forms W-2 for the years 2002-2010 and reported an additional $1,144,574.00 in income to Mullaney as a result of the deferrals and travel and expense items.  (¶ 85; *see Volume 1 of Exhibits*, Ex. 24.)

These allegations state a claim of breach of the duty of loyalty.  They support the inference that Mullaney and Fuchs knew that the tax treatment of the "limbo pay" program, or at least the portion of the "limbo pay" used to defray Mullaney's personal expenses, violated federal and state tax law.  In addition, they caused the Debtor to fail to make the payroll tax payments required by tax law and to file inaccurate financial information with the State of New York.  Accordingly, the motion to dismiss the breach of fiduciary duty claims against Mullaney and Fuchs based on the "limbo pay" program is denied.

### c.    Reimbursement of Expenses

The *Complaint* alleges that the Debtor improperly reimbursed Mullaney for personal expenses relating to his and his spouse's travel in violation of the Debtor's travel policy, life insurance, commuting expenses and excessive legal fees and expenses. (*See* ¶¶ 71-84.)  The *Complaint* identifies several specific expenses including a dinner at the Four Seasons totaling over $20,000, a three-night trip to Maine that cost Debtor over $6,000; and $30,000 reimbursement to cover some of Mullaney's commuting costs in fiscal year 2014 and 2015.  (¶ 90.)  The *Examiner's Report* also identified several large personal or excessive expenditures that Mullaney ordered Fuchs to deduct from his deferred compensation.  These included a dinner at the Langham Hotel

45

($1,000.00), a dinner at the Four Seasons ($20,000.00), a staff holiday dinner for no more than nine people ($2,300.00) and several trips with his wife and the Debtor's largest donor and his wife to Martha's Vineyard, Newport and Nantucket at an aggregate cost of roughly $30,000.000 although the donors reimbursed the Debtor for their share of their costs. (*Examiner's Report* at 212-14.)

In addition, the *Examiner's Report* identified certain unsubstantiated expenses such as a camera costing $3,500. Rather than submit a receipt for the expense, Mullaney told Fuchs that the camera cost "around $3,500." She paid the current American Express bill and deducted that amount from his "limbo pay." Other unsubstantiated costs included $30,000 to cover "about half" of Mullaney's commuting costs in FY14 and FY15, $3,000.00 for Photoshop lessons in April 2015, $3,750 for more Photoshop lessons in August 2016, and $5,000 for a computer in October 2016. (*Examiner's Report* at 214-15.)

The propriety of these payments and reimbursements is intertwined with the treatment of the "limbo pay" account because many of these payments appear to be the same personal expenses Mullaney ordered Fuchs to deduct from his "limbo pay." The substance of the claim, however, is that the Debtor was forced to bear these expenses, either indirectly through the tax free bonus it awarded that Mullaney used as an offset or directly as an additional payment or reimbursement of a business expense to Mullaney or the vendor. In addition, the *Complaint* alleges that the Board authorized the Debtor to indemnify Mullaney up to $150,000.00 in connection with the Copyright Suit, but he ultimately received indemnity in the sum of $245,357.45. (¶¶ 78, 80.)

An officer breaches his or her fiduciary duty of loyalty when he knowingly causes the corporation to pay personal expenses in violation of the law and corporate policy. *See Hampshire*, 2010 WL 2739995, at *25. Even if they were actual business expenses, the travel policy forbade the reimbursement of unsubstantiated or unreasonable expenses. (Fuchs Exhibit 4.) Accordingly, the *Complaint* states a claim for breach of fiduciary duty of loyalty against Mullaney and Fuchs in connection with the payment of Mullaney's personal expenses or any business expenses in violation of the travel policy.

### d.    The Fuchs Employment Agreement

In December 2011 the Debtor and Fuchs signed the Fuchs Employment Agreement. The Fuchs Employment Agreement ran for a term of three years, paid an annual salary of $200,000.00 and an additional $120,000.00 upon execution. The *Complaint* does not allege whether it was approved by the Board. It appears that Fuchs was already an employee of the Debtor at the time. The Fuchs Employment Agreement recited that she had been an employee of the Debtor since October 2011 and the employment agreement was intended to formalize the terms and conditions of her employment. (*Volume 1 of Exhibits*, Ex. 68.) In addition, the *Complaint* alleges that Fuchs was the Debtor's CFO at all relevant times. (¶ 7.)

The Plaintiff alleges, in substance, that Mullaney bribed Fuchs with the Fuchs Employment Agreement. In April 2011, Fuchs had sued Smile Train to enforce her Smile Train employment agreement. Mullaney asked Fuchs to dismiss her lawsuit to conceal his own malfeasance.[18] Fuchs agreed on the condition that the Debtor enter into

---

[18]    The *Complaint* does not disclose the nature of the malfeasance that would have been exposed in the course of Fuchs' lawsuit.

the Fuchs Employment Agreement. (¶ 93.)  These allegations state a claim for breach of the duty of loyalty.  They imply that Fuchs and Mullaney wrongfully caused the Debtor to compensate Fuchs as a *quid pro quo* to cover up Mullaney's malfeasance and both profited from the cover up at the Debtor's expense.

### e.    Restricted Funds

The *Complaint* alleges, (*see* ¶ 96), that on October 11, 2012, the Board adopted the WonderWork, Inc. Board of Directors Policy Manual ("Policy Manual").  (*Volume 1 of Exhibits*, Ex. 93.)  Among other things, the Policy Manual designated three categories of funds: (1) temporarily restricted funds, which are funds restricted to programs; (2) unrestricted short term operating funds; and (3) Board-designated reserves.  (¶ 97.) The Policy Manual also stated that that Debtor must maintain assets that are no less than 100% of liabilities, maintain general commercial liability insurance, seek competitive bids for any purchases over $25,000.00, obtain co-approval by officers for any purchases over $100,000.00, and approve in advance expenditures, including for travel.  (¶ 97.)  The *Complaint* alleges that the Debtor failed to adhere to the Policy Manual in a variety of ways, including treating all funds as fungible and failing to segregate or spend the funds consistent with applicable law. (¶ 98.)

While the *Complaint* identifies several things the "Debtor" did wrong in connection with the restricted funds, the only allegations specifically directed at Fuchs are that she prepared a "roll forward" schedule to show the change in restricted fund balances over the course of the year, (¶ 98), and "improperly used joint cost accounting principles; charging against the restricted funds a portion of the $25 million Debtor

spent on direct mail." (¶ 99.)  The *Complaint* does not connect the alleged misuse of or improper accounting for restricted funds with any action by Mullaney.

The two allegations directed at Fuchs imply negligent bookkeeping and negligent accounting practices, not bad faith.  The *Complaint* does not allege facts that support a plausible inference that Fuchs knowingly followed bookkeeping and accounting practices that violated the law or were even wrong.  Accordingly, these claims against Mullaney and Fuchs are dismissed.

### f.    Improper Solicitation

Paragraph 106 of the *Complaint* lists numerous misrepresentations by the "Debtor" in its fundraising materials regarding the source and use of donations, the cost of surgeries, grant proposals, gift campaigns and the nature and extent of its programs. The *Examiner's Report* is more specific.  (*See Examiner's Report* at 111-37.)  The Plaintiff does not allege any facts supporting the inference that Fuchs, the CFO, had any role in the solicitation of donations or the distribution of solicitation materials.  Nor for that matter does it attribute any specific misrepresentation to Mullaney.  Rather, the *Complaint* relies on group pleading and alleges that the "Debtor" made the misrepresentations.  Furthermore, and without condoning any misrepresentations, the *Complaint* does not allege how they harmed the Debtor as opposed to the defrauded donors.  Accordingly, the claim based on allegations of misleading solicitation materials is dismissed.[19]

---

[19]    In addition, the Plaintiff has not demonstrated his standing to assert this claim because the claim for any injury resulting from a fraudulent solicitation belongs to the injured donor.

### g.    Post-Petition Payments

Finally, the *Complaint* alleges that Mullaney and Fuchs breached their fiduciary duties of loyal and good faith by permitting the Debtor to pay Mullaney $395,833.32 in post-petition, non-ordinary course payments without disclosure or Court approval on the eve of the release of the *Examiner's Report*. (¶ 142.)  Although Count 4 incorporates the allegations that preceded it, (¶ 139), none of those prior allegations mentioned this payment.  Those factual allegations appeared later in the *Complaint*.  Thus, the only allegation supporting Count 4 was the conclusory statement that the payments were non-ordinary course and the implication that they required Court approval. Accordingly, this claim is dismissed.

### 2.    Waste

The Fourth Claim for Relief also asserts claims sounding in waste.  Initially, a claim for waste will not lie against an officer as only directors may be liable for waste under Delaware law.  *See Giuliano v. Schnabel* (*In re DSI Holdings, LLC*), 574 B.R. 446, 476 (Bankr. D. Del. 2017) ("[T]he Trustee has not cited to (nor did I uncover) any cases in which the Delaware courts have determined that officers or controlling shareholders could be liable for corporate waste.")  Accordingly, any claims of waste asserted against Fuchs, the Debtor's CFO, are dismissed.

Mullaney was both an officer and director, and claims of waste may be asserted against him to the extent that they arise from his actions as a director.  To allege a claim of corporate waste under Delaware law, a Plaintiff must show that the challenged transaction was "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *Walt Disney*

*II*, 906 A.2d at 74 (quoting *Brehm*, 746 A.2d at 263).  A claim of waste arises only in the rare circumstance "where directors irrationally squander or give away corporate assets." *Walt Disney II*, 906 A.2d at 74 (quoting *Brehm*, 746 A.2d at 263).  "The test to show corporate waste is difficult for any plaintiff to meet." *Citigroup*, 964 A.2d at 136.  To prevail, the plaintiff "must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." *Id.* (quoting *White v. Panic*, 783 A.2d 543, 554 n. 36 (Del. 2001)).

The Plaintiff's principal claim of waste in this adversary pleading relates to the payment of "excessive salary and profligate expenses" to Mullaney that was approved by the Board.  (¶¶ 58, 59, 75, 77, 78, 86.)  The Plaintiff does not allege that Mullaney approved his compensation as a member of the Board.  Further, the *Complaint* does not identify any other transactions that the Board, with Mullaney participating as a director, were so one-sided, egregious and irrational as to constitute waste.  Accordingly, the claim of waste asserted against Mullaney is dismissed.

## F.    Fifth, Sixth and Seventh Claims for Relief

Counts 5, 6 and 7 assert constructive fraudulent transfer claims against Mullaney under New York, made applicable under 11 U.S.C. § 544(b), and federal bankruptcy law, 11 U.S.C. § 548, based upon his receipt of excessive salary and benefits and reimbursement for excessive, personal and/or unsubstantiated business expenses.[20]

---

[20]    Although the breach of fiduciary duty claims are governed by Delaware law, the remaining claims are governed by New York law or bankruptcy law.  The Debtor operated in New York, not Delaware, and the parties rely on New York law in their briefs.  Accordingly, New York law controls the remaining non-federal claims. *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).

The payment of salary is presumed to be for fair consideration under New York's Debtor
& Creditor Law ("NYDCL") § 272 for the purposes of NYDCL §§ 273-75 and reasonably
equivalent value under 11 U.S.C. § 548.  To avoid salary payments, the trustee "must
establish that the salary payments were in bad faith or the payments were excessive in
light of the Defendants' employment responsibilities."  *Pryor v. Tiffen* (*In re TC
Liquidations LLC*), 463 B.R. 257, 268 (Bankr. E.D.N.Y. 2011); *accord
Staudinger+Franke GMBH v. Casey*, No. 13 Cv. 6124(JGK), 2015 WL 3561409, at *11
(S.D.N.Y. June 8, 2015); *Geron v. Craig* (*In re Direct Access Partners, LLC*), 602 B.R.
495, 556-57 (Bankr. S.D.N.Y. 2019); *Jacobs v. Altorelli* (*In re Dewey & LeBoeuf LLP*),
518 B.R. 766, 786 (Bankr. S.D.N.Y. 2014).  The rationale for the rule is twofold: (i) it
would be impossible to find officers to turn around financially distressed corporations if
their salaries were subject to avoidance and recovery and (ii) the salaries are on
exchange for roughly contemporaneous services and not as a deliberate preference over
other creditors.  *Direct Access Partners*, 602 B.R. at 557.  Accordingly, the general rule
that treats a preferential payment to an insider of an insolvent corporation as a
fraudulent transfer, *see So. Indus., Inc. v. Jeremias*, 411 N.Y.S.2d 945, 949-50 (N.Y.
App. Div. 1978), does not apply to salary payments.  *American Federated Title Corp. v.
GFI Mgmt. Servs., Inc.*, 13-CV-6437 (KMW), 2016 WL 4290525, at *4 (S.D.N.Y. Aug. 11,
2016), *aff'd*, 716 F. App'x. 23 (2d Cir. 2017).

The Plaintiff makes two arguments in support of his contention that he has
adequately pled lack of fair consideration and reasonably equivalent value.  First, he
maintains that a payment to the insider of an insolvent corporation "is *per se* not in
good faith and not 'fair consideration.'"  (*Opposition*, p. 28.)  But the Plaintiff misstates

the rule — it only applies to preferences — and does not apply to salary payments.

Second, he contends that Mullaney's good faith (an element of fair consideration under

NYDCL § 272 but not of reasonably equivalent value under Bankruptcy Code § 548) is a

question of fact given that Mullaney ran a "nine-person fraudulent charity." (*Id.* at 29.)

### 1.    Salary

The Plaintiff has failed to overcome the presumption that the annual salary

payments in the sum of $475,000.00 to Mullaney were not constructive fraudulent

transfers by the Debtor under 11 U.S.C. § 548.  Mullaney was the Debtor's CEO.  He

came to the Debtor with a very successful track record at Smile Train and the Debtor

paid him same salary he received at Smile Train, (¶ 59), doubtless in the hope and

expectation that he would produce similar results at the Debtor.  The suggestion that he

did not raise as much money for the Debtor and hence, is not entitled to the same

compensation, amounts to excessive compensation by hindsight.  In addition, Pearl

Meyer had concluded that an annual salary of $475,000.00 was at the high end of the

competitive range but was less competitive when considering the incentives paid to

other CEOs.  (Pearl Meyer Report at 2.)  Accordingly, the *Complaint* fails to allege that

the Debtor did not receive reasonably equivalent value for the salary it paid to Mullaney

and the constructive fraudulent transfer claims asserted under Bankruptcy Code alleged

in Counts 6 and 7 are dismissed to that extent.

The Fifth Claim, asserted under the NYDCL, merits separate consideration

because it implicates Mullaney's good faith.  Under NYDCL § 272, fair consideration is

given "[w]hen such property . . . is *received in good faith* to secure a present advance or

antecedent debt in amount not disproportionately small as compared with the value of

the property . . . obtained."  N.Y. DEBT. & CRED. L. § 272(b)  (emphasis added).  "Fair

consideration" is an element of each of the Plaintiff's constructive fraudulent

conveyance claims under NYDCL §§ 273, 274 and 275.  "A party seeking to set aside a

conveyance on the basis of lack of good faith must prove one of the following factors is

lacking: '(1) an honest belief in the propriety of the activities in question; (2) no intent to

take unconscionable advantage of others; and (3) no intent to, or knowledge of the fact

that the activities in question will hinder, delay, or defraud others.'" *Staudinger+Franke*

*GMBH*, 2015 WL 3561409, at \*10 (quoting *So. Indus. v. Jeremias,* 411 N.Y.S.2d at 949).

The Plaintiff has not alleged Mullaney's bad faith relating to his receipt of his

salary for the same reasons that the Plaintiff failed to allege that Mullaney breached his

fiduciary duties of loyalty and good faith by accepting his salary.  Mullaney believed he

was entitled to that salary which was the same salary he received from Smile Train and

his salary was approved by the Board.  The *Complaint* does not plead that he sought to

take unconscionable advantage of others or knew or intended that the payment of his

salary would hinder, delay or defraud the Debtor's creditors.  Accordingly, the

*Complaint* also fails to allege that the Debtor did not receive fair consideration for the

salary it paid to Mullaney and the constructive fraudulent conveyance claim asserted

under the NYDCL in Count 5 is dismissed to that extent.

### 2.    Bonus and Perquisites

I reach the opposite conclusion with respect to the majority of the constructive

fraudulent transfer claims based on the payment of Mullaney's bonuses and payment or

reimbursement of his excessive, personal and/or unsubstantiated expenses.  Initially,

Count 5 seeks to recover payments made on and after December 29, 2010, or within six

years of the Petition Date.  Exhibit A to the *Complaint* does not list a non-salary transfer before December 28, 2012 and hence, fails to state a claim for any transfers prior to that date.  The balance of the discussion concerns non-salary transfers after that date.

The Pearl Meyer Report supports the inference that the bonuses were excessive. Pearl Meyer had recommended an annual bonus in the range of $50,000.00 to $200,000.00 for 2012.  (Pearl Meyer Report at 5.)  In addition, it recommended that the Compensation Committee quantify and factor in incentives of significant value.  (*Id.*) Furthermore, Pearl Meyer was unable to conclude (despite the financial incentive to do so) that Mullaney's compensation was reasonable under the Intermediate Sanctions rule.  The Debtor nevertheless awarded Mullaney an annual bonus of $250,000.00 in 2013, 2014 and 2016 and an annual bonus of $200,000.00 in 2015 and paid or reimbursed Mullaney's debts for substantial attorneys' fees and litigation expenses and significant travel expenses including those incurred by his spouse.  These payments and benefits may turn out to be reasonable and appropriate but present issues for trial.

Furthermore, for the reasons stated, Mullaney received his bonuses and many of his perquisites in bad faith.  Although he obtained dominion and control over his bonus payments, he did not declare them as income or pay taxes even after he used them to satisfy personal obligations.  In addition, the *Complaint* alleges that he requested and received reimbursement for excessive, personal and/or unsubstantiated expenses. Under the circumstances, the excessiveness of these payments and Mullaney's good faith under the NYDCL present factual questions that cannot be resolved on a motion to dismiss Count 5.

### 3.    Financial Condition

The Court must still consider whether the *Complaint* pleads one of the adverse financial conditions listed in the relevant statutes.  A person challenging a conveyance of the debtor's property as constructively fraudulent under the NYDCL must show that it was made without fair consideration and (1) the debtor was insolvent or was rendered insolvent by the transfer, NYDCL § 273, (2) the debtor was left with unreasonably small capital, *id.,* § 274, or (3) the debtor intended or believed that it would incur debts beyond its ability to pay when the debts matured.  *Id.,* § 275.  *See Sharp Int'l Corp. v. State Street Bank & Tr. Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 53 (2d Cir. 2005); *Geron v. Schulman* (*In re Manshul Constr. Corp.*)*,* No. 97 Civ. 8851, 2000 WL 1228866, at *51 (S.D.N.Y. Aug. 30, 2000); *MFS/Sun Life Trust—High Yield Series v. Van Dusen Airport Servs. Co.,* 910 F. Supp. 913, 936 (S.D.N.Y. 1995).

### a.    Insolvency

NYDCL § 273 provides:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

The NYDCL incorporates a "balance sheet" test for insolvency.  *Silverman v. Paul's Landmark, Inc.* (*In re Nirvana Restaurant*), 337 B.R. 495 (Bankr. S.D.N.Y. 2006):

> A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

NYDCL § 271(1).

If the plaintiff shows the absence of "fair consideration," the burden of going

forward with proof of insolvency shifts to the defendant. *Manshul*, 2000 WL 1228866, at *53; *MFS/Sun*, 910 F. Supp. at 938; *ACLI Gov't Secs., Inc. v. Rhoades*, 653 F. Supp. 1388, 1393 (S.D.N.Y. 1987), *aff'd*, 842 F.2d 1287 (2d Cir. 1988); *Tese-Milner v. Edidin* (*In re Operations NY LLC*), 490 B.R. 84, 97 (Bankr. S.D.N.Y. 2013); *Hassett v. Far West Fed. Savs. & Loan Ass'n (In re O.P.M. Leasing Servs., Inc.*), 40 B.R. 380, 393 (Bankr. S.D.N.Y. 1984), *aff'd*, 44 B.R. 1023 (S.D.N.Y. 1984), *aff'd,* 769 F.2d 911 (2d Cir. 1985).

Here, the Plaintiff has pleaded that the non-salary conveyances were not received by Mullaney in good faith and hence, were received without fair consideration. The burden of going forward shifts to Mullaney to prove that the Debtor was not insolvent at the time of the transfers. Mullaney contends, without citation to any authority, that the Debtor was not insolvent until HMS filed its counterclaim in the arbitration on May 9, 2013, (*Mullaney MTD*, p. 25), and the impact loans did not render the Debtor insolvent because Mullaney reasonably believed that they would be forgiven and, in fact, an $8 million loan was actually forgiven. (*Id.*, pp. 26-27.)

The impact loans did not render the Debtor balance sheet insolvent for the simple reason that the $10 million additional debt was matched by a $10 million infusion of cash. On the other hand, it is incorrect to argue that the Debtor was solvent until HMS filed its counterclaim in the arbitration. The Debtor's liability to HMS was disputed, not contingent, because all of the conduct giving rise to the Debtor's liability occurred when the Debtor breached its contract. *See LaMonica v. Tilton* (*In re TransCare Corp.*), 592 B.R. 272, 284-85 (Bankr. S.D.N.Y. 2018). In any event, even contingent claims must be considered in determining insolvency discounted by the likelihood that the contingency will not occur. *In re Xonics Photochemical, Inc.,* 841 F.2d 198, 200 (7th Cir.1988);

*Tronox, Inc. v. Kerr McKee Corp.* (*In re Tronox, Inc.*), 503 B.R. 239, 313 (Bankr.

S.D.N.Y. 2013).  The amount of any discount, and hence, the question of solvency,

presents an issue for trial.  Accordingly, the motion to dismiss the claim to avoid the

non-salary conveyances under NYDCL § 273 is denied.

### b.    Unreasonably Small Capital

NYDCL § 274 states:

> Every conveyance made without fair consideration when the
> person making it is engaged or is about to engage in a business or
> transaction for which the property remaining in his hands after the
> conveyance is an unreasonably small capital, is fraudulent as to creditors
> and as to other persons who become creditors during the continuance of
> such business or transaction without regard to his actual intent.

This test denotes a financial condition short of equitable insolvency, *Moody v. Sec. Pac.*

*Bus. Credit, Inc.,* 971 F.2d 1056, 1070 (3d Cir. 1992); *MFS/Sun Life,* 910 F. Supp. at 944,

and "is aimed at transferees that leave the transferor technically solvent but doomed to

fail."  *MFS/Sun Life,* 910 F. Supp. at 944; *accord Innovative Custom Brands, Inc. v.*

*Minor*, 15-CV-2955 (AJN), 2016 WL 308805, at *3 (S.D.N.Y. Jan. 25, 2016); *Manshul,*

2000 WL 1228866, at *54; *Operations*, 490 B.R. at 98.  The relevant factors include the

transferor's debt to equity ratio, historical capital cushion, and the need for working

capital in the transferor's industry.  *Manshul,* 2000 WL 1228866, at *54; *Direct Access*

*Partners*, 602 B.R. at 536; *Official Comm. of Unsecured Creditors of Vivaro Corp. v.*

*Leucadia Nat'l Corp., Inc. (In re Vivaro Corp.)*, 524 B.R. 536, 551 (Bankr. S.D.N.Y.

2015).

The *Complaint* adequately pleads that the Debtor would be unable to repay the

impact loans when they became due even though their maturity dates were five years in

the future.  Mullaney argues that the impact loans might have been forgiven and, in fact,

a substantial portion were forgiven.  Nevertheless, at the time they were booked they

represented liabilities, and any discount to the face amount based on the probability

that they would be forgiven (assuming that to be the law) must be decided at trial.

Accordingly, the motion to dismiss the claim to avoid the non-salary conveyances under

NYDCL § 274 is denied.

### c.    Ability to Pay

Under DCL § 275, a conveyance is fraudulent, *inter alia,* if the debtor *intends* or

*believes* that it will incur debts that it will be unable to pay as they become due.  This is

generally referred to as equitable insolvency.  *MFS/Sun Life,* 910 F. Supp. at 943.

Although this test does not require proof of *intent to defraud,* the "ability to pay"

financial test requires proof of the transferor's subjective intent or belief that it will

incur debt it cannot pay at maturity.  *Ray v. Ray*, 18 Civ. 7035 (GBD), 2019 WL

1649981, at *8 (S.D.N.Y. Mar. 28, 2019), *appeal docketed*, No. 19-1124 (2d Cir. Apr. 24,

2019);  *Innovative Custom Brands, Inc. v. Minor*, No. 15 Civ. 2955 (AJN), 2016 WL

308805, at *3 (S.D.N.Y. Jan. 25, 2016); *see also Operations*, 490 B.R. at 99 (dismissing

DCL § 275 claim where "the [c]omplaint does not allege any facts relating to the

[d]ebtor's intent to incur debt that it believed it would be unable to pay").

The *Complaint* does not plead the Debtor's subjective belief that it would be

unable to repay the impact loans or any other debts when they became due.  Quite the

opposite, the *Examiner's Report* states that Mullaney had a reasonable belief that the

impact loans would be forgiven.  In addition, the *Complaint* does not allege facts

supporting the inference that the Debtor subjectively believed that it would lose the

arbitration and have to pay a substantial judgment to HMS.  Accordingly, the claim to
avoid the non-salary transfers under NYDCL § 275 is dismissed.

## G.    Eighth Claim for Relief

The Eighth Claim for Relief seeks to recover $484,212.00 as preferential transfers
received by Mullaney within one year of the Filing Date.  They consist of $475,000.00 in
back pay and $9,211.96 in deductions from Mullaney's "limbo pay."  (¶ 161.)  Section
547(b) of the Bankruptcy Code allows a trustee to avoid a transfer of an interest in the
debtor's property:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such
transfer was made;

(3) made while the debtor was insolvent;

(4) made-

(A) on or within 90 days before the date of the filing of the petition;
or

(B) between ninety days and one year before the date of the filing of
the petition, if such creditor at the time of such transfer was an
insider; and

(5) that enables such creditor to receive more than such creditor would
receive if-

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent
provided by the provisions of this title.

Insolvency means a "financial condition such that the sum of such entity's debts
is greater than all of such entity's property, at a fair valuation, exclusive of"
property that has been fraudulently transferred with intent to hinder, delay or
defraud creditors and exempt property.  11 U.S.C. § 101(32(A)).  The debtor is

presumed to be insolvent during the ninety days preceding the filing of the

petition.  11 U.S.C. § 547(f).

Mullaney contends that the Plaintiff failed to plead insolvency during the

one-year period and creditors who did not convert their loans to donations could

have been paid in full in a hypothetical chapter 7 case.  (*Mullaney MTD*, p. 27.)

The Plaintiff responds that these are factual questions and the liquidation

analysis submitted with the disclosure statement showed that the Debtor was

administratively insolvent and unsecured creditors like Mullaney would not have

received any distribution.  However, neither the *Complaint* nor the *Examiner's*

*Report* cited or relied on the disclosure statement and hence, the Court cannot

consider it on Mullaney's motion to dismiss.

Nevertheless, Mullaney's motion to dismiss Count 8 is denied.  Even

without the presumption of insolvency available under the Bankruptcy Code

during the ninety-day period, the *Complaint* pleads sufficient facts to support the

inference that the Debtor was balance sheet insolvent during the year preceding

the Petition Date.  The Debtor owed $10 million, borrowed several years earlier,

to its impact loan lenders and possibly, a substantial amount to HMS.  The

Debtor could not satisfy these obligations with restricted funds.  The *Examiner's*

*Report* stated that as of the Petition Date, the Debtor held cash in the sum of

$20,160,342.00, and only $3,908,830.00 was unrestricted.  (*Examiner's Report*

at 180.)  Clearly, the Debtor's liabilities exceeded the assets it could use to pay

those liabilities as of the Petition Date, and the facts imply that this situation

existed during the year preceding the Petition Date.

Whether the Plaintiff satisfied the hypothetical chapter 7 test under Bankruptcy Code § 547(b)(5) is a separate question though related to insolvency. A plaintiff must prove that the defendant received more as a result of the preference than if the preference was never paid, and instead, he received a distribution on his claim in a hypothetical chapter 7 case. *Savage & Assocs., P.C. v. Mandl* (*In re Teligent, Inc.*), 380 B.R. 324, 339 (Bankr. S.D.N.Y. 2008). This requires the proponent to construct a hypothetical chapter 7 case and determine the percentage distribution that the defendant would have received on the petition date. *Id.* Ordinarily, a trustee satisfies this prong of the preference analysis by showing that the debtor was insolvent on the petition date, *id.* at 340, but this assumes that the defendant received 100% of his claim as a result of the preference. *Geltzer v. Fleck* (*In re ContinuityX, Inc.),* 569 B.R. 29, 35 (Bankr. S.D.N.Y. 2017).

According to the Debtor's amended schedules, Mullaney held a pre-petition claim in the amount of $641,320.00. (¶ 23.) If the preference had not been paid, his claim in a hypothetical chapter 7 case would have increased to $1,125,532.00. The question is whether the *Complaint* alleges facts implying that Mullaney would have received less than $484,212.00 on his $1,125,532.00 claim in a hypothetical chapter 7 distribution.

It does. The Amended Schedule E/F lists unsecured debt in the sum of $26,556,513.06. If Mullaney had not received the preference, that number would rise to approximately $27 million. The Debtor's schedules listed total assets in the amount of $21,770.674.00, mostly cash. (*See Examiner's Report* at 180.) The Debtor's own

records showed that $11,172,058.00 of that amount consisted of restricted funds as of

the Petition Date, (*see Examiner's Report* at 164-65), and as noted, the Examiner

recomputed the unrestricted fund balance at $3.9 million.  The allegations show that the

available, unrestricted cash represented roughly 14% of the unsecured debt.  Assuming

no other higher priority claims, Mullaney would receive a distribution of roughly

$157,574.00 on his $1,125,532.00 claim in a hypothetical chapter 7 case, far less than

the $484,212.00 he actually received.  In fact, he would receive less because the limited,

unrestricted cash would first go to pay the chapter 7 trustee's professionals and the

chapter 7 trustee's commission under 11 U.S.C. § 326.  In short, the *Complaint* and

*Examiner's Report* pleads facts alleging that Mullaney would have received less in a

hypothetical chapter 7 case.

Accordingly, Mullaney's motion to dismiss Count 8 is denied.

## H.    Ninth Claim for Relief

Count 9 alleges that the Debtor made avoidable post-petition transfers under

Bankruptcy Code § 549 to Mullaney in the sum of $456,293.50.  (*Complaint*, Ex. D.)  In

addition to the two payments aggregating $395,833.32 that the Plaintiff characterized as

salary payments under his Employment Agreement, (*id.*), the Debtor paid Mullaney

$942.48 in February 2017 and paid American Express bills aggregating $59,517.70

during the year following the Petition Date.  (*Id.*)

Bankruptcy Code § 549(a) states, in relevant part, that a trustee may avoid a post-

petition transfer that is not authorized under the Bankruptcy Code or by the court.  This

includes payments outside the ordinary course of business which require court approval

under 11 U.S.C. § 363(b).  The thrust of Count 9 is that the salary payments were extraordinary based on their timing.  The first payment in the sum of $237,550.00 was made in September 2017 after the Court issued an order to show cause to hold the Debtor in contempt and the second in the sum of $158,283.00 was made in October 2017 just days before the *Examiner's Report* was scheduled for release.[21]  (*See also* ¶ 142.)  The *Complaint* does not allege facts implying that the $942.48 payment or the American Express payments were extraordinary.

Mullaney contends that the salary payment in the sum of $237,550.00 was paid pursuant to his Employment Agreement for post-petition services in the ordinary course of the Debtor's business and is not avoidable.  He concedes that the $158,283.00 payment is avoidable but argues that he is entitled to a credit in the amount of a "springing" claim that would arise under 11 U.S.C. § 502(h).  As a result, he should have to remit only $66,304.88.  (*See Mullaney MTD*, pp. 28-29 & n. 15.)  The Plaintiff responds that Mullaney does not have an allowed section 502(h) claim to offset, (*Opposition*, pp. 35-38), and states in a footnote that the "[t]here is nothing objectively reasonable about Mullaney's unorthodox and illegal compensation program, which permitted him to extract another $400,000 from Debtor on the eve of the release of the Examiner's Report."  (*Id.*, p. 35 n. 34.)  The Court need not, however, consider

---

[21]     Paragraph 33 of the *Complaint* alleges:

> On September 29, 2017, four days after the Court issued a *sua sponte* Order to Show Cause why Debtor should not be held in contempt for failing to complete the BDO audit, Debtor made a substantial non-ordinary course payment to Mullaney of $237,550 without court approval or any other disclosure. Debtor then made a second payment to Mullaney of $158,283.32 on October 17, 2017, just days before the Examiner Report was scheduled to be released.  Mullaney was not working on a full time basis during the bankruptcy case and his work provided little if any benefit to the estate.

arguments relegated to a footnote. *F.T.C. v. Tax Club, Inc.*, 994 F.Supp.2d 461, 471 n.1 (S.D.N.Y. 2014) ("It is well settled ... that a court need not consider arguments relegated to footnotes ...."); *Primmer v. CBS Studios, Inc.*, 667 F.Supp.2d 248, 256 n.4 (S.D.N.Y. 2009) ("Because the argument is made wholly in a footnote ..., the [c]ourt may choose to disregard it.").

The *Complaint* does not allege facts showing that the payments were extraordinary and required Court approval. To determine whether a transaction is an ordinary course transaction, courts apply the "vertical" test, which asks whether the transaction subjects creditors to economic risks different from those accepted at the time of contract with the debtor and the "horizontal" test which asks whether the transaction is the type that similar businesses engage in as part of their ordinary business operations. *Med. Malpractice Ins. Ass'n v. Hirsch* (*In re Lavigne*), 114 F.3d 379, 384-85 (2d Cir.1997). "Under this two-part analysis, '[t]he touchstone of "ordinariness" is thus the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business.'" *Id.* (quoting *Indian Motorcycle Assocs., Inc. v. Drexel Burnham Lambert Grp., Inc.* (*In re Drexel Burnham Lambert Grp., Inc.*), 157 B.R. 532, 537 (S.D.N.Y. 1993) (quoting *Armstrong World Indus., Inc. v. James A. Phillips, Inc.* (*In re James A. Phillips, Inc.*), 29 B.R. 391, 394 (S.D.N.Y. 1983))) (alteration in original). Thus, the Court must examine the debtor's business and similar businesses in the same industry.

The Pearl Meyer Report provides the only peer group information which would encompass the Debtor's industry. It concluded that Mullaney's annual salary of $475,000.00 was high, especially for traditional non-profit organization CEOs like

65

Mullaney, (*see* Pearl Meyer Report at 8), but still within the salary parameters paid to

CEOs who ran similar charities.  Furthermore, the Debtor had paid Mullaney the same

salary for several years and the Board approved the same salary under the Employment

Agreement; hence, creditors would reasonably expect the Debtor to continue to pay the

same salary post-petition.  In fact, the Plaintiff does not challenge the amount of the

payment.  Accordingly, the claim to avoid the $237,550.00 salary payment under

section 549(a) is legally insufficient and Mullaney's motion to dismiss that aspect of

Count 9 is granted.

Next, Mullaney does not have an allowed section 502(h) claim to offset against

the $158,283.00 he admits is avoidable.  Section 502(h) provides that "[a] claim arising

from the recovery of property under section 522, 550, or 553 of this title shall be

determined, and shall be allowed under subsection (a), (b), or (c) of this section, or

disallowed under subsection (d) or (e) of this section, the same as if such claim had

arisen before the date of the filing of the petition."  Section 502(h) gives a pre-petition

claim to the transferee of an avoidable transfer where the trustee recovers the transfer

under Bankruptcy Code § 550.  *Gowan v. HSBC Mortgage Corp. (USA)* (*In re Dreier*

*LLP*), Adv. No. 10–5456 (SMB), 2012 WL 4867376, at *3 (Bankr. S.D.N.Y. Oct. 12,

2012).  However, the section 502(h) claim is expressly made subject to Bankruptcy Code

§ 502(d).  The latter automatically disallows the claim of any entity that has received an

avoidable transfer until the transfer is repaid.[22]

---

[22]   Section 502(d) states:

Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim
of any entity from which property is recoverable under section 542, 543, 550, or 553 of
this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544,
545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the

Mullaney concedes that he received a post-petition transfer in the sum of $158,283.00 and the *Complaint* also alleges legally sufficient preference claims under 11 U.S.C. § 547 and fraudulent conveyance claims under the NYDCL.  At a minimum, Mullaney must return the entire, avoided post-petition transfer in order to acquire an *allowed* claim for that amount under section 502(h).  At present, his contingent claim under section 502(h) is disallowed under section 502(d) and he cannot reduce his liability based on a disallowed claim.  *Cf.* 11 U.S.C. 553(a)(1) (precluding the set off of a disallowed claim).

Accordingly, the motion to dismiss the avoidance claim based on the payment of $237,550.00 is granted and the motion is otherwise denied.

## I.    Tenth Claim for Relief

Count 10 alleges that "Mullaney breached his duties under the Employment Agreement by promulgating false and misleading fundraising campaigns and overseeing false and misleading financial reporting as further extensively detailed in the Report." (¶ 176.)  Mullaney contends that the *Complaint* does not set forth damages to the Debtor resulting from the activities cited in paragraph 176 and has failed to state a claim for rescission.  (*Mullaney MTD*, pp. 29-32.)  The Plaintiff responds that the fraud perpetuated by Mullaney led to the Debtor's demise and caused extensive damages, including the costs and expenses of the bankruptcy case.  (*Opposition*, p. 38.)  The

---

amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

Plaintiff addresses the rescission argument summarily in a footnote, (*id.*, p. 38 n. 40),
but the Court will not consider an argument relegated to a footnote in a forty-page brief.

The Employment Agreement is expressly governed by New York law.
(Employment Agreement ¶ 13.)  Under New York law, the elements of a breach of
contract claim are (1) the existence of a contract, (2) performance by the party seeking
recovery, (3) breach by the defendant and (4) damages.  *Johnson c. Nextel Commc'ns,
Inc.,* 660 F.3d 131, 142 (2d Cir. 2011); *RCM Telecom Servs., Inc. v. 202 Centre St.
Realty, LLC*, 156 F. App'x 349, 350-51 (2d Cir. 2005).  The *Complaint* does not allege
how these specific breaches damaged the Debtor or provide a basis to compel Mullaney
to return all sums paid under the Employment Agreement.  (¶ 176.)  Even if the Debtor
could have terminated Mullaney immediately for cause, (Employment Agreement ¶
6(b)), he would still have been entitled to any salary and benefits that had accrued prior
to termination.  (*Id.* at ¶ 6(f)(i).)  Furthermore, although the Plaintiff argues in his
opposition brief that the improper solicitations drove the Debtor into bankruptcy, the
*Complaint* alleges that the HMS Arbitration Award drove the Debtor into bankruptcy.
(¶ 121.)

Accordingly, Count 10 is dismissed.

## J.    Eleventh Claim for Relief

Count 11 asserts a claim for unjust enrichment.  It alleges that Mullaney failed to
provide value in exchange for the substantial salary, benefits and perquisites he received
from the Debtor.  (¶¶ 178-180.)  Mullaney contends that the claim is barred because
Mullaney's salary and benefits were governed by the Employment Agreement after

January 1, 2016 and by the agreement of the Board before then and the *Complaint* does not allege why equity and good conscience militate against permitting Mullaney to retain the benefits he received. (*Mullaney MTD*, pp. 32-33.) The Plaintiff responds that it is permissible to plead an unjust enrichment claim as an alternative to a breach of contract claim, Mullaney's compensation arrangement prior to the Employment Agreement is unclear, and it is unclear whether the amounts that Mullaney received after the Employment Agreement went into effect "were under the Agreement." (*Opposition*, pp. 38-39.) Finally, the *Complaint* recites a "litany of bad acts" that justify the recovery of all of the compensation and benefits Mullaney received. (*Id.*, p. 39 n. 43.)

"The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement." *Goldman v. Metropolitan Life Ins. Co.,* 841 N.E.2d 742, 746 (N.Y. 2005); *accord IDT Corp. v. Morgan Stanley Dean Witter & Co.,* 907 N.E.2d 268, 274 (N.Y. 2009). The elements of an unjust enrichment claim under New York law are "(1) the other party was enriched, (2) at the other party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Georgia Malone & Co. v. Rieder,* 973 N.E.2d 743, 746 (N.Y. 2012) (internal quotation marks and citation omitted); *accord Cohen v. BMW Invs., L.P.*, 144 F. Supp. 3d 492, 500 (S.D.N.Y. 2015). Unjust enrichment "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff. Typical cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is

not entitled." *Corsello v. Verizon New York, Inc.,* 967 N.E.2d 1177, 1185 (N.Y. 2012). "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark–Fitzpatrick, Inc. v. Long Is. R.R. Co.,* 516 N.E.2d 190, 193 (N.Y. 1987).

The compensation and benefits paid to or received by Mullaney after January 1, 2016 for any period after January 1, 2016 were governed by the Employment Agreement and the unjust enrichment claim will not lie. The Plaintiff speculates that Mullaney may have received amounts after January 1, 2016 that were not covered by the Employment Agreement but fails to identify what they might be. In any case, if Mullaney received past due benefits after 2015 that accrued before 2016, they would not be covered by the Employment Agreement and that claim would not be barred by *Clark-Fitzpatrick.* The more difficult question is whether Mullaney could be unjustly enriched by payments or benefits that were approved by an informed Board. Mullaney contends that the Board approval of his pre-2016 compensation, bonus and perquisites gave rise to an implied contract and argues that the limitation on unjust enrichment claims covered by a written agreement applies to the amounts received with Board approval. (*Mullaney MTD*, p. 32.)

The unjust enrichment claim is dismissed. "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello*, 967 N.E.2d at 1185. Count 11 duplicates the breach of fiduciary duty claims alleged in Count 4, and expressly relies on the same "litany of bad acts."

70

**K.      Twelfth and Thirteen Claims for Relief**

The Amended Schedules E/F (Case No. 16-13607, ECF Doc. ## 76, 187, 212) listed an undisputed, non-contingent, liquidated claim held by Mullaney in the sum of $641,320.07 based on unpaid "2016 Salary/2016 Bonus/Unreimbursed Expenses."[23] Count 12 asserts that Mullaney's claim should be disallowed because he received excessive and unwarranted payments and benefits in the past based on misleading statements that he was running a model charity when he was actually using the Debtor to further his own interests, breached the very Employment Agreement under which his claims arose and the Employment Agreement was an avoidable transfer.  (¶ 183.) Finally, the Plaintiff is entitled to offset the Debtor's claims against Mullaney against any claims asserted by Mullaney.  (¶ 184.)  Count 13 seeks to disallow his claim under Bankruptcy Code § 502(d), and for the reasons already discussed, Count 13 is sufficient because Mullaney concedes he received an avoidable post-petition transfer and the *Complaint* alleges legally sufficient preference claims and constructive fraudulent conveyance claims under the NYDCL.

As to Count 12, Mullaney contends that the allegations of false pretenses do not satisfy the pleading requirements of Rule 9(f) of the Federal Rules of Civil Procedure and the claim rehashes the other claims and fails for the same reasons.  (*Mullaney MTD*, p. 33.)  The Plaintiff responds that Mullaney's claim is for his illegal and improper "limbo pay" and should be disallowed.  (*Opposition*, p. 39.)

---

[23]      Mullaney's claim is deemed filed because it was scheduled as undisputed, non-contingent and liquidated.  11 U.S.C. § 1111(a).

I agree that the allegations relating to misleading statements and false pretenses do not satisfy Rule 9(b). The *Complaint* does not identify the statements or to whom or when they were made. Nevertheless, Count 12 is legally sufficient. Bankruptcy Code § 502(b)(1) provides, in relevant part, that a claim will be disallowed if it is unenforceable and incorporates the affirmative defenses available to the debtor under non-bankruptcy law. 4 RICHARD LEVIN & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 502.03[2][b], at 502-23 (16th ed. 2019). This would include an offset which is an affirmative defense under New York law. *See Wooten v. New York*, 753 N.Y.S.2d 266, 269 (N.Y. App. Div. 2002) (offset), *leave to appeal denied*, 807 N.E.2d 289 (N.Y. 2003).

The *Complaint* alleges certain legally sufficient pre-petition claims for breach of fiduciary duty against Mullaney that may give rise to a right of recovery against him. At a minimum, these include claims for the reimbursement of unsubstantiated, excessive and/or personal expenses and the payments to Fuchs under her employment contract. Since the Plaintiff may be able to offset these claims against the claims asserted by Mullaney, Count 12 will not be dismissed.

## L.    Leave to Amend

The Plaintiff requests leave to amend any legally deficient claims. Generally, leave to amend should be freely granted when justice so requires unless it would be futile. *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir. 1995); *see Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend.") (quoting *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993)). The decision is committed to the trial court's discretion. *Id.*

As I cannot say that an amended complaint would be futile, the motion to amend is granted with an admonition.  First, a pleading should contain a short and plain statement of the claim showing a plaintiff's entitlement to relief.  FED. R. CIV. P. 8(a)(2). Second, while the *Complaint* portrays the Debtor as a poorly run charity, the Plaintiff is suing to recover money for the creditors based on damage to the Debtor and many of the acts alleged in the *Complaint*, though improper for a charity, did not cause any discernible injury to the *Debtor* or provide a basis for recovery.  The focus of any amended complaint should be on those acts that caused an injury to the Debtor and entitle the Plaintiff to recover damages on behalf of the creditors.

Settle order on notice consistent with this opinion.

Dated:  New York, New York
        January 17, 2020

                                   /s/ *Stuart M. Bernstein*
                                    STUART M. BERNSTEIN
                                United States Bankruptcy Judge