

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| WONDERWORK, INC., | : | Case No. 16-13607 (SMB) |
| Debtor. | : | **AMENDED COMPLAINT** |
| --------------------------------------------- | : | Adv. No. 18-01873 (SMB) |
| VINCENT A. SAMA, as Litigation Trustee of the WW LITIGATION TRUST, | : | **Jury Trial Demanded** |
| Plaintiff, | : | |
| -against- | : | |
| | : | |
| BRIAN MULLANEY, HANA FUCHS, THEODORE DYSART, ~~RAVI KANT,~~ JOHN J. CONEYS, ~~:~~ STEVEN LEVITT, : CLARK KOKICH, STEVEN RAPPAPORT, RICHARD PRICE, and MARK ~~:~~ ATKINSON, | : | |
| :Defendants. : ~~Defendants.~~ | | |

------------------------------------------------------------- X

Plaintiff Vincent A. Sama, as Litigation Trustee of the WW Litigation Trust (the "Litigation Trustee"), as and for his Amended Complaint (the "Amended Complaint")[1] against

Brian Mullaney ("Mullaney"), Hana Fuchs ("Fuchs"), Theodore Dysart ("Dysart"), ~~Ravi Kant ("Kant"),~~ John J. Coneys ("Coneys"), Steven Levitt ("Levitt"), Clark Kokich ("Kokich"), Steven Rappaport ("Rappaport"), Richard Price ("Price"), and Mark Atkinson ("Atkinson"," together with Mullaney, Fuchs, Dysart, ~~Kant,~~ Coneys, Levitt, Kokich, Rappaport, and Price, the "Defendants"), by

his attorneys Arnold & Porter Kaye Scholer LLP ("Arnold & Porter"), alleges as follows:

**Nature of the Action**

1.     The Defendants are former officers and directors of WonderWork, Inc. ("Debtor" or "WonderWork"). While Debtor purported to be a 501(c)(3) charity the purpose of which was

---

[1] Attached as Exhibit E is a redline comparing the Amended Complaint to the original Complaint, including all exhibits attached thereto.

to provide surgeries to underserved populations across the globe, a five-month investigation by an independent court-appointed examiner uncovered that the "reality of Debtor's operations depart[ed] substantially from this stated purpose." Rather than serving impoverished children in need of surgeries, Debtor served the interests of its over-compensated Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), whose actions were left unchecked by a "passive and overly deferential Board of Directors." As a result, during its approximately six year tenure, Debtor "raised, and then misapplied and misused, millions of charitable dollars," including by permitting the ~~Chief Executive Officer and Chief Financial Officer~~CEO and CFO to use Debtor as their own personal piggy bank at the expense of Debtor, its charitable mission, its donors, and its creditors.

2.    Debtor's failings were not isolated or limited to one issue, rather, Debtor "operated in disregard of key legal requirements and industry standards regarding charitable solicitation, restricted gift practices, financial reporting, and compensation standards" from the outset. As documented by the examiner, under Defendants' stewardship, Debtor:

- used false solicitation materials authored by its CEO, in violation of applicable law;

- failed in its reporting obligations, making clearly false and misleading statements in its public filings;

- failed to apply Debtor's restricted assets in accordance with their intended purpose;

- failed to spend money raised for specific purposes in accordance with the solicitation materials;

- failed to honor and account for matching donations;

- failed to keep accurate accounts of its restricted funds; and

- lacked appropriate governance protocols and its Board failed in its duty to monitor and control management's misfeasance.

Finally, "Management of the Debtor further abused the public's trust for their own benefit through excessive compensation and benefits and under reported income." Thus, while Debtor

raised over $50 million in charitable contributions, the "bulk of the money spent by the charity over the years [went] to feed the enormous fundraising machine itself, including both its own highly compensated employees, and third party direct mail service providers."

3. ~~This action seeks to recover damages from Defendants who breached their fiduciary duties to the Debtor and are responsible for the damages suffered by the Debtor. This action also seeks to recover certain avoidable pre- and post-petition transfers made by Debtor to Mullaney~~ and to disallow the claim Mullaney ~~asserted against Debtor, purportedly on account of his back pay. Finally, Mullaney breached his employment agreement and was unjustly enriched by his receipt of his grossly excessive salary, benefits, bonuses, and expenses.~~ As detailed below, Debtor's outside directors sanctioned and enabled management's abuses. Rather than fulfill their fiduciary duties to Debtor, the Board repeatedly acquiesced to the CEO's unreasonable demands, approving each and every year huge, unwarranted bonuses in direct contravention of the recommendations of a compensation consultant and approved the charity paying hundreds of thousands of dollars in additional benefits to its CEO in the form of personal legal and other non-business, excessive, or undocumented expenses. The CEO and CFO, with the Board's knowledge, then engaged in an illegal deferral scheme whereby the CEO would instruct the CFO to "defer" certain amounts of his compensation in a "limbo" pay account that was not part of the general ledger. The CEO and CFO would then run his personal expenses through Debtor to avoid paying tax and to conceal the full amount of his compensation from the regulators and donors. Although one director resigned over his concerns regarding management's abuses, particularly as they relate to the CEO's compensation, he failed to alert the other directors, which allowed Debtor's management to continue its conduct unchecked.

4. Indeed, even after Debtor received a devasting arbitration award that detailed management's malfeasance with multiple charities in detail, including the CEO and CFO's

bizarre and improper practices with respect to salary deferral and expenses, and described the CEO as "reprehensible" and "not a credible witness," directors Coneys, Levitt, Kokich, Rappaport, Price, and Atkinson all worked diligently to protect Debtor's officers at Debtor's expense, including by submitting false and misleading declarations to this Court. Not a single one of these directors ever corrected their statements to this Court regarding Debtor's management, even when it became apparent to them that Debtor's senior management was wholly unfit to run a public charity. Instead, they permitted management to conceal issues from the Court.

5.      As a result of the Board's breach of its fiduciary duties in failing to properly supervise the Debtor and its management (including ignoring red flags that evidenced management's misdeeds), management was permitted to operate the charity with deficient and misleading accounting practices, false solicitation practices, misuse of charitable funds, false and misleading public reporting, and failure to comply with governance protocols. The Board is thus responsible and liable for the resulting millions of dollars of investigation costs into these improper and illegal practices, as well as the ensuing winding up costs.

6.      Finally, this action also seeks to recover certain avoidable pre- and post-petition transfers made by Debtor to its CEO and to disallow the claim the CEO asserted against Debtor, purportedly on account of his back pay.

**The Parties And Other Significant Persons Or Entities**

7.      4.Plaintiff Vincent A. Sama is the Litigation Trustee with his principal place of business at Arnold & Porter Kaye Scholer LLP ("Arnold & Porter"), 250 West 55Seyfarth Shaw LLP, 620 8th StreetAve., New York, New York 10019-9710.10018.

8.      5.Debtor WonderWork, Inc. is a Delaware non-profit that Mullaney formed on or about March 7, 2011. Debtor's registered DBAs were FirstStep, BurnRescue, and 20/20/20 —

solicitations under the FirstStep name sought donations to treat clubfoot, solicitations under the BurnRescue name sought donations to treat burns, and 20/20/20 solicited for blindness.

9. ~~6.~~Defendant Brian Mullaney was at all relevant times the ~~Chief Executive Officer~~CEO of the Debtor and was also the founder of the Debtor.

10. ~~7.~~Defendant Hana Fuchs was at all relevant times the ~~Chief Financial Officer~~CFO of the Debtor, although Fuchs had no professional training in finance or accounting.

11. ~~8.~~Delois Greenwood ("Greenwood") served as the Chief Program Officer of Debtor from inception until September 2017, when she resigned.

12. ~~9.~~Karen Lazarus ("Lazarus") held the title of Director of Strategic Projects, but, in reality her job was to serve as Mullaney's executive assistant.

13. ~~10.~~Defendant Theodore Dysart served on Debtor's Board from March 2011 through November 2015, when he resigned. Dysart was the Vice Chairman of Heidrick & Struggles.

14. ~~11.Defendant~~ Ravi Kant ("Kant") served on Debtor's Board from March 2011 ~~through December 2016, when he resigned. Kant was the former Vice Chairman of Tata Motors.~~until his resignation in December 2016.

15. ~~12.~~Defendant John J. Coneys served on Debtor's Board from and after December 2012 and, at times, served as Debtor's Lead Independent Director. Coneys was the Former Regional Vice Chair of PricewaterhouseCoopers.

16. Richard Steele ("Steele") served on Debtor's Board from December 2015 until his resignation in December 2016.

17. ~~13.~~Defendant Steven Levitt served on ~~the~~Debtor's Board from and after December 2015. Levitt is a Professor of Economics at the University of Chicago. His firm, Greatest Good, performed analytics work for Debtor, for which it received fees from Debtor totaling

approximately $15,000.

18. ~~14.~~Defendant Clark Kokich served on ~~the~~Debtor's Board from and after December 2015. Kokich was the Executive Chairman of Marchex.

19. ~~15.~~Defendant Steven Rappaport served on ~~the~~Debtor's Board from and after December 2015. Rappaport was a Partner at RZ Capital.

20. ~~16.~~Defendant Richard Price served on ~~the Board of~~ Debtor's Board from and after December 2015. Price is the ~~Chief Executive Officer~~CEO of CBRE Global Investors' Asia Pacific Investment.

21. ~~17.~~Defendant Mark Atkinson served on ~~the Board of~~ Debtor's Board from and after December 2015. Atkinson is the Partner and Creative Director for Otto Design and Marketing.

**Jurisdiction and Venue**

22. ~~18.~~This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b) and the Standing Order of Reference.[2]

23. ~~19.~~Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

24. ~~20.~~This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (E), (F), (H) and (O).

25. ~~21.~~Pursuant to Section 12.1(e) of the Plan (as defined below) and Paragraph 39 of the Confirmation Order (as defined below) the Bankruptcy Court retained exclusive jurisdiction to hear and determine any actions commenced by the Litigation Trustee.

26. ~~22.~~In the event that any part of this adversary proceeding is found to be "non-core["]," Plaintiff consents to the entry of final orders and judgments by this Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

---

[2] On March 14, 2019, Levitt, Kokich, Rappaport, and Price moved to withdraw the reference. On January 23, 2020, that request was denied without prejudice to renewal when the claims are ready for trial.

**Procedural History**

27. ~~23.~~On December 29, 2016 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition

for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York. In its Amended Schedules, Debtor stated that Mullaney had a general unsecured claim against the estate in the amount of $641,320, which was purportedly on account of back pay (the "<u>Mullaney Claim</u>").

~~24.~~

28. On January 18, 2017, Debtor's largest creditor, blindness charity Help Me See, Inc. ("<u>HelpMeSee</u>"), filed a motion for the appointment of a chapter 11 trustee (the "<u>Trustee Motion</u>"). ~~The Debtor opposed HelpMeSee's motion, with each of Kokich, Coneys, Levitt, Price, Rappaport, and Aktinson, in their personal capacity and in their capacity as a Board Members of Debtor, filing declarations in support of the Debtor's opposition.~~

~~25.These declarations universally stressed the Board's purported heavy involvement in Debtor's affairs and their complete and unwavering confidence in Mullaney. For instance, Coneys stated that the "WonderWork Board [was] very involved in the organization's decision-making," discussing Debtor's "budget, investments, fundraising strategies, program capacity, and relationships with hospital partners, among other things." Coneys further declared that the Board "provided Brian with critical operational oversight and consultation" and that Mullaney "at all times reports to, is supervised by, and serves at the pleasure of the Board." Kokich, Levitt, Price, Rappaport, and Atkinson likewise described the WonderWork Board as "dedicated, hands-on, and active in its supervision of Brian and the organization's management generally" and affirmed, under penalty of perjury, that "the Board has no potential, planned or pending claims against" Mullaney and that Mullaney had the Board's "utmost confidence."~~

~~26.On March 13, 2017, following oral argument, the Court entered an order to show~~

cause why an examiner should not be appointed.

27.On April 12, 2017, the Bankruptcy Court determined that, rather than appointing a trustee, it would appoint an examiner and impose budgetary controls.

29. 28.On April 21, 2017, the Bankruptcy Court entered an Order Directing the Appointment of an Examiner and Establishing Temporary Bankruptcy Controls, which was subsequently amended on June 20, 2017.

30. 29.On May 5, 2017, the U.S. Trustee filed an application requesting that the Bankruptcy Court appoint Jason R. Lilien, Esq. as examiner. Mr. Lilien had extensive experience in the charitable arena, including serving as the head of the New York Attorney General's Charity Bureau.

31. 30.On May 10, 2017, the Bankruptcy Court entered an Order approving Mr. Lilien as examiner (the "Examiner"). The Examiner was appointed to address, among other things, potential Estate causes of action against various persons and entities.

32. 31.On June 28, 2017, the Court approved the Examiner's retention of Loeb & Loeb LLP ("Loeb") as counsel and on July 21, 2017, the Court approved the Examiner's retention of

Goldin Associates LLC ("Goldin") as his financial advisor. In connection with his $2+ million investigation, the Examiner and/or his advisors reviewed over 25,000 email records from Debtor, 23,000 records from third parties, as well as thousands of other pages of material.

33. The Examiner also conducted formal interviews of Lazarus, Fuchs, Mullaney, Coneys, Greenwood, Kant, and Dysart, among others, and additional informal interviews. Although the Examiner transcribed his interviews with Lazarus, Fuchs, Mullaney and Greenwood, he did not provide a record or transcribe many of his interviews, including those he had with Coneys and

Dysart. The Examiner did not interview Levitt, Kokich, Rappaport, Price, or Atkinson. None of the Examiner's interviews were conducted under penalty of perjury.

34. 32.On May 24, 2017, the Bankruptcy Court approved the Debtor's retention of BDO USA LLP ("BDO") to audit the Debtor's Financial Statements of June 30, 2016 and to prepare

its Form 990. BDO never completed the audit due to numerous issues with Debtor's books and records, including multiple material weaknesses.

33.On September 29, 2017, four days after the Court issued a *sua sponte* Order to Show Cause why Debtor should not be held in contempt for failing to complete the BDO audit, Debtor made a substantial non-ordinary course payment to Mullaney of $237,550 without court approval or any other disclosure. Debtor then made a second payment to Mullaney of $158,283.32 on October 17, 2017, just days before the Examiner Report was scheduled to be released. Mullaney was not working on a full time basis during the bankruptcy case and his work provided little if any benefit to the estate.

35. 34.On or about November 3, 2017, the Examiner publicly filed his Final Report dated October 25, 2017 (the "Report"). The Report spanned 274 pages and recommended that the matter be referred to the New State Attorney General and that a Chapter 11 Trustee be appointed. Mullaney resigned immediately following release of the Report.

36. 35.On November 22, 2017, the Bankruptcy Court appointed Stephen Gray as Chapter 11 Trustee (the "Chapter 11 Trustee"). The Chapter 11 Trustee retained CR3 Partners LLC as his financial advisor, Togut, Segal & Segal LLP as his bankruptcy counsel, Garfunkel Wild, P.C. as his special counsel, Gordon Brothers Asset Advisors, LLC as his intellectual property advisor, and Verdolino & Lowey P.C. as his special accountant.

37. 36.On September 21, 2018, the Bankruptcy Court entered an order (the

"Confirmation Order") confirming an Amended Chapter 11 Plan of Liquidation of WonderWork, Inc. (as it may be modified and together with the Plan Supplement filed on August 8, 2018, the "Plan"). The Plan and Confirmation Order provided for the creation of the WW Litigation Trust (the "Litigation Trust") and the appointment of a Litigation Trustee.

38. 37.The Plan became effective on October 19, 2018.

39. 38.On or about October 19, 2018, the Litigation Trust was created pursuant to the terms of WonderWork Litigation Trust and Declaration of Trust, dated October 19, 2018. The Litigation Trust's purpose was to prosecute the Litigation Trust Claims, as defined in the Plan, and to file, settle, compromise, withdraw or litigate to judgment any cause of action in connection with such claims.

40. 39.In accordance with the Plan, Vincent A. Sama, Esq. was appointed Litigation Trustee as of October 19, 2018. Among the claims assigned to the Litigation Trust were any and all claims identified and referenced in, or arising from the facts described in the Report; to recover unauthorized, improper and/or avoidable post-petition transfers made to or for the benefit of Mullaney and Fuchs; to recover avoidable pre-petition transfers against Mullaney arising from his excessive compensation and bonuses and excess benefits and improper reimbursement of expenses; and against Debtor's current and former officers and directors, including those asserted herein against Defendants.

**Factual Background**

41. 40.On or about March 7, 2011, Mullaney founded Debtor.        Mullaney initially incorporated Debtor under the name Surgery for the Poor, Inc.

42. 41.The Internal Revenue Service (the "IRS") approved Debtor's tax exempt status on

or about September 1, 2011. Mullaney also registered Debtor to solicit charitable contributions

with the New York Attorney General under Article 7-A of the New York Executive Law in May 2012.

43. 42. As an Article 7-A registrant, Debtor was obligated to comply with New York registration and solicitation laws that require Debtor to, among other things, file an annual financial reporting which consists of the New York State CHAR500 disclosure form, which includes the IRS Form 990 and the organization's audited financials as attachments. In addition, two officers of the charity were required to certify, under penalty of perjury, that the forms were true and correct.

44. 43. Each year that a New York State CHAR500 form was filed by Debtor, Mullaney and Fuchs certified that the forms were true and correct.

45. 44. Debtor adopted its first bylaws on or about March 8, 2011. The bylaws required Debtor to have a minimum of three directors and provided for each of the directors to serve one year terms, but placed no limits on the number of terms that a director could serve, and required Debtor to have a minimum of two Board meetings per year. The bylaws also required the Board to elect a chair, president, and a secretary and treasurer. The Board amended the bylaws in Mullaney, Coneys, Kokich, Atkinson, Steele, and Levitt, who sat on the Board at the time, voted to amend the bylaws on March 8, 2016 to provide that each director would have a three year term and would be limited to two consecutive terms, except for Mullaney, for whom no limits were placed.

46. 45. Debtor held its first Board meeting on April 12,11, 2012. The meeting was attended by Dysart and, Mullaney, and Kant. At that meeting, the Board selected Mullaney as President and Dysart as Secretary and Treasurer. On April 13, 2012, Debtor filed a Certificate of Amendment to change its name from Surgery for the Poor, Inc. to WonderWork, Inc.

47. 46. Upon incorporation, Debtor had listed is its purpose as to:

> Provide treatment, surgery, and related assistance to children in developing countries suffering from disease, illness, or malady, including but not necessarily limited to blindness, cleft palate, club foot, hydrocephalus, and burns, and to further support and educate doctors and the public on potential treatments and surgical techniques, as well as creating general awareness of these maladies and available treatments.

By Certificate of Amendment filed on April 2012, Debtor changed its stated purpose by removing cleft palate as a cause, and restated its purpose as providing "assistance to children and adults everywhere, including those in developing countries suffering from disease, illness, or disability, including but not necessarily limited to blindness, clubfoot, hydrocephalus, pediatric cardiac surgery, and burns."

47. Dysart and Mullaney recruited Kant to serve on the Board. Although Kant served on Debtor's Board from March 2011 through December 2016, he generally participated in Board meetings by phone because he lived in India.

48. Coneys thereafter joined the Board in December 2012 and attended his first Board meeting on December 12, 2012.

49. Shortly thereafter, at the February 14, 2013 meeting, the Board formed audit, nominating and compensation committees and determined that Coneys would chair the audit committee and Dysart would chair the nominating and compensation committees.

50. Despite forming these committees, there is no record that any of these committees ever held any formal meetings and there are no minutes of any such meetings.

51. In or about November 2015, Dysart resigned from the Board following disagreements with Mullaney, in particular with respect to Mullaney's compensation and whether employment counsel should be employed in connection with formalizing Mullaney's employment agreement. Upon information and belief, Dysart did not communicate these concerns or his reasons for resigning to either Kant or Coneys. It does not appear that Kant or Coneys were aware of the actual reasons for Dysart's departure.

52.     In December 2015, ~~Steven~~ Levitt, ~~Clark~~ Kokich, ~~Steven~~ Rappaport, ~~Richard~~ Price, ~~Mark~~ Atkinson, and ~~Richard~~ Steele joined the Board. Draft minutes from a January 2016 Board Meeting show that Mullaney was selected as chair of the Board. However, none of the new Board members attended a Board Meeting until March 2016.

53.     At a June 2016 Board Meeting, the Board reconstituted the audit, nominating, and compensation committees, with Coneys, Kant, Kokich, and Levitt serving on the nominating and compensation committee; Coneys and Rappaport serving on the audit committee; and a finance and investment committee consisting of Steele, Coneys, and Mullaney.

54.     Kant and Steele resigned when Debtor filed for bankruptcy in December 2016. Thus, following the Petition Date, the Board Members were Mullaney, Coneys, Kokich, Levitt, Rappaport, Price, and Atkinson.

55.     While it is not clear whether Mullaney was ever formally named as Chairman of the Board, for all intents and purposes, he served in that role: Mullaney prepared the agendas; Mullaney took notes at the meetings; and Mullaney had the minutes prepared by Lazarus, which were then presented to the Board for approval. However, once Debtor was informed that the Better Business Bureau (the "BBB") required a chair of an accredited charity's board to be different from the charity's CEO, Debtor represented to the BBB that there was no chair, but that Coneys served as the "Lead Independent Director." Prior to the bankruptcy, Coneys' role as Lead Independent Director was primarily to finalize Mullaney's employment agreement in late 2015, which had been in negotiation since October 2012 and had taken up a considerable amount of Board time.

56.     The Examiner found that, despite Debtor's mission statement, in practice, Debtor "abused the public's trust from its inception," including "[t]hrough fundraising campaigns designed to mislead donors as to how their contributions would be spent, and an accounting

system which failed to property record and track those contributions." The Examiner further concluded that Debtor was a "poorly governed, costly and highly inefficient operation in which only a small fraction of donations [were] used to help people in need," but whose ~~Chief Executive Officer~~CEO lived lavishly, collecting ~~a~~ grossly excessive ~~salary and benefits~~compensation—all blessed by a Board beaten into submission by a domineering and dominant ~~Chief Executive Officer.~~CEO.

**Mullaney's Compensation Package**

57.     Although Debtor's ostensible purpose was to provide "assistance to children and adults everywhere, including those in developing countries suffering from disease, illness, or disability," the person it benefitted most was Mullaney, who received a base annual salary of $475,000 and annual bonuses in excess of $200,000. In addition, Mullaney received numerous other compensatory benefits, which should have been, but were not, included in his income, including: commuting costs to and from Debtor's offices in New York to his home in Boston; first class travel for him and his spouse; personal life insurance; as well as hundreds of thousands of dollars of illegitimate, undocumented, or excessive business expenses.

58.     ~~Despite~~As detailed below, despite knowledge of Mullaney's excessive ~~salary~~compensation and profligate expenses, the Board, including Dysart, Coneys, Levitt, Kokich, Rappaport, Price, and Atkinson, failed to curb Mullaney's excesses or otherwise control his abuses; instead, ~~the Board~~they sanctioned Mullaney's actions, deliberately turning a blind eye to his excesses.

**Mullaney's ~~Salary~~Compensation**

59.     At Mullaney's insistence, Mullaney's compensation at Debtor, a charity that in its *best year raised around $12 million*, was the same as he received at his prior employer Smile Train, Inc. ("Smile Train"), the world's largest cleft charity, which raised $120 million in

Mullaney's last year there and funded 120,000 surgeries per year. Thus, in addition to an annual base salary of $475,000 per year, the Board awarded Mullaney bonuses ~~of $250,000 in 2013, 2014, and 2016, and a bonus in the amount of $200,000 in 2015.~~annually in 2013 to 2016 as follows:

- $250,000 in 2013 approved by Coneys, Dysart, and Kant;

- $250,000 in 2014 approved by Coneys, Dysart, and Kant;

- $200,000 in 2015 approved by Coneys, Dysart, and Kant;

- $250,000 in 2016 approved by Coneys, Levitt, Kokich, Rappaport, Price and Atkinson.

60.     In May 2013, at Dysart's recommendation and over Mullaney's objection, the Board —including Dysart, Coneys, and Kant—decided to retain a compensation consultant, Pearl Meyer & Partners ("Pearl Meyer").          Pearl Meyer charged Debtor $18,137, to evaluate Mullaney's salary. Prior to preparing their report, Pearl Meyer warned Dysart that they may be unable to conclude that Mullaney's salary was reasonable in the context of section 4958 of the Internal Revenue Code (the "IRC"), which is commonly known as the "Intermediate Sanctions" rule. Pearl Meyer explained the issues of the Intermediate Sanctions Rule to Dysart, Coneys, and Kant at the May 16, 2013 Board meeting. As an inducement, Pearl Meyer's engagement letter provided that Pearl Meyer would receive a $5,000 fee increase if Pearl Meyer could "state pay is reasonable after Intermediate Sanctions." No such statement was contained in their final report, which was presented to ~~the Board~~Dysart, Coneys, and Kant at the June 13, 2013 Board meeting.

~~61.~~ ~~Under the Intermediate Sanctions rule, to establish a rebuttable presumption of reasonableness, the Board must comply with three requirements, none of which were complied with in connection with Pearl Meyer's report.~~

~~62.~~ ~~First, the pay of the "disinterested person" must be made solely by independent Board Members. Here, that did not occur because the disinterested person, Mullaney, had a~~

~~significant amount of input into the process, including at the Board level, as a result of his numerous communications with Pearl Meyer and through his involvement in selecting the alleged "peer list" against which his salary was gauged.~~

~~63.Second, the disinterested person's compensation should include a comparability analysis that includes comparisons to similar positions in like organizations. However, the report went beyond the peer group because Mullaney, with knowledge of one or more members of the Board, met with Pearl Meyer and stated that he ought to be compared to individuals at a group of entities, who were not his peer group. Thus, Pearl Meyer used the following groups in conducting their analysis:~~

~~(1)Traditional Non-Profits, which were entities of purportedly of a comparable size and mission to Debtor; however, those entities were aspirational, with a median revenue of $35.8 million and expenses of $36.8 million;~~

~~(2)High Growth Non-Profits, which were entities with comparable missions that have achieved aggressive growth and whose size exceeds Debtor; in addition some of these entities receive substantial revenue from government grants and program services;~~

~~(3)High Growth For-Profit, which are publicly traded companies that achieve aggressive growth, and~~

~~(4)University Development Officers.~~

~~64.Third, the Board must use the information available to document its decision. At Debtor, there was strikingly little documentation to determine whether Mullaney's salary was reasonable. Indeed, the only "formal documentation" consists of emails from a Board member to Fuchs announcing his salary.~~

<u>61.</u> ~~65.As a result of Mullaney's improper interference, when~~<span style="color:blue"><u>When</u></span> Pearl Meyer presented ~~their~~<span style="color:blue"><u>its</u></span> report to ~~the Board~~<span style="color:blue"><u>Dysart, Coneys, and Kant</u></span> at the June 13, 2013 meeting,

Pearl Meyer did not use ~~traditional~~ non- profits comparable in size to Debtor as a benchmark~~, rather, in addition to using a traditional peer group (which was in fact an aspirational peer group), Pearl Meyer evaluated the competitiveness~~

~~of Mullaney's base compensation as if he were working for a larger high growth non-profit, such as a senior executive at a large foundation or a development officer at a large university.~~ to measure Mullaney's salary, rather, at Mullaney's urging, Pearl Meyer used aspirational groupings of companies, including non-profits more than double Debtor's size, large foundations, and university development officers. However, even ~~in those instances~~with this gerrymandered set of organizations, Pearl Meyer concluded that Mullaney's *base salary* of $475,000 was at the high end of the competitive range. With respect to Mullaney's bonuses, Pearl Meyer noted that the maximum award of $250,000, or 53% of his base salary, was very high for a non-profit and would only be warranted if Mullaney were actually able to repeat Smile Train's growth; something he never came close to achieving.

62. ~~66.~~Pearl Meyer recommended that, if the Board were to accept the "peer" groupings as reasonable, the Board should keep Mullaney's salary at $475,000 and offer him an annual bonus in the range of $50,000 to $200,000 only if his performance warranted it (Pearl Meyer suggested it would be in the 75th percentile compared to "peer" companies). Pearl Meyer also

recommended that the Board "quantify" Mullaney's other contractual requests (such as spousal travel, payment of travel costs and hotels associated with his move to Boston, and personal life insurance policy) in determining bonus payments and that the Board periodically review Mullaney's compensation package to determine whether it was supported by market practices. Finally, Pearl Meyer declined to express an opinion on whether the compensation paid to Mullaney was reasonable or not.

63.    67. Despite the caveats embedded in the Pearl Meyer report, neither the Board failed to comply or any of its members complied with Pearl Meyer's recommendations—it never — no Board member ever evaluated Mullaney's substantial other contractual requests:, including spousal travel, payment of travel costs, hotels associated with Mullaney's move to Boston, and personal life insurance policy. The Board never re-reviewed Mullaney's salary: as recommended by Pearl Meyer and awarded him the full amount of the $250,000 discretionary bonus every year except for 2015, when the Board Dysart, Coneys, and Kant awarded him a $200,000 bonus, without determining whether Mullaney's compensation was supported by market practices or performance.

64.    68. Moreover, two years later, without undergoing a separate review or retaining independent outside counsel, the Board entered into a formal employment agreement (the "Employment Agreement") with Mullaney in December 2015, an effort that was led by Coneys after Dysart resigned from the Board in November 2015 over because of, among other issues, Mullaney's refusal to retain outside counsel to evaluate the agreement. The Employment Agreement outlined Mullaney's duties and responsibilities to Debtor, including that he provide leadership and strategic vision with the goal of maximizing WonderWork's impact on its fundamental mission of providing free surgeries for indigent children and adults and ensure that the charity was in compliance with Debtor's mission, value, and standards.

65.    69. Mullaney's Employment Agreement provided for him to be employed for a five year term, commencing January 1, 2016, and entitled him to yearly compensation of $475,000 and a discretionary bonus of $250,000. In addition, the Employment Agreement formalized many of the other compensatory benefits Mullaney was already receiving, including payment of

the premiums on Mullaney's approved life insurance policy for which his wife was a beneficiary

and allowing for spousal travel at Debtor's expense.

66. ~~70.~~In addition to Mullaney's excessive ~~salary~~compensation, Debtor also failed to apply its other policies and procedures to Mullaney, who abused Debtor to further enrich himself.

**The Travel Policy**

67. ~~71.~~For instance, Debtor had a travel policy, which provided that Debtor: (1) would not reimburse for expenses personal in nature; (2) would only provide reimbursement based on actual and reasonable expenses incurred; (3) would not provide for reimbursement for spousal travel without a business purpose and any such benefits will be reported as compensation as required by federal law; and (4) would only reimburse expenses substantiated by supporting documents and amounts not substantiated must be reported as actual income. Furthermore, travel expenses had to be approved by a supervisor or the ~~chief financial officer~~CFO.

68. ~~72.~~Debtor did not apply the travel policy to Mullaney. Rather, in violation of the travel policy and applicable law, Fuchs caused Debtor to: (1) ~~reimbursed~~reimburse Mullaney for expenses personal in nature; (2) ~~did~~not require substantiation of Mullaney's expenses; (3) ~~reimbursed~~reimburse Mullaney for spousal travel and ~~did~~not report such reimbursements as compensation; (4) ~~did~~not require internal approval for Mullaney's travel expenses; and (5) ~~reimbursed~~reimburse Mullaney for excessive expenses, including paying Mullaney to fly business or first class as a general practice.

69. ~~73.~~In addition, Mullaney recouped, as business expenses, his commuting costs between his home in the Boston area, which he moved to for personal reasons in 2013, and Debtor's offices in New York. Mullaney ultimately recouped from Debtor hundreds of thousands of dollars in commuting expenses, including for transportation costs, meals and hotels, including approximately $400 per night hotel rooms at the Lanham ~~hotel~~Hotel. At no point did any member of the Board question Mullaney's expenses or instruct him that they would not be

reimbursed.

**Insurance**

70. ~~74.~~Although many of Debtor's employees travelled extensively, including throughout the developing world, Debtor did not maintain high value life insurance policies for them and their families. However, for Mullaney and Mullaney alone, Debtor maintained a multimillion dollar life insurance policy from 2012 to 2016. Yearly premiums on Mullaney's life insurance policy varied from year to year, with Debtor paying $9,602 in 2016. While Debtor paid the premiums, Mullaney's wife was the beneficiary.

71. ~~75.~~The Board authorized the payment of these premiums in Mullaney's Employment Agreement. However, there is no evidence that any member of the Board ever considered these policies for purposes of computing the reasonableness of Mullaney's ~~salary~~compensation and Debtor did not include these policies for purposes of reporting Mullaney's ~~salary~~compensation to the relevant governing authorities or Debtor's donors, including the IRS and the N.Y. State Attorney General. **Legal Fees and Expenses**

72. ~~76.~~Prior to his work with WonderWork, Mullaney had been the ~~Chief Executive Officer~~CEO and President of Smile Train. Mullaney left Smile Train in September 2010 following an audit committee investigation into Smile Train's finances and senior management's actions. Fuchs, Lazarus, and Greenwood had also worked at Smile Train and were terminated in February 2011.

73. ~~77.~~Following his departure from Smile Train, Mullaney became personally involved in a series of lawsuits with Smile Train. As set forth below, with Board approval and knowledge, Debtor assumed responsibility for Mullaney's legal fees and expenses for certain of these actions notwithstanding the fact that these proceedings were against Mullaney in his personal capacity.

74. ~~78.~~Specifically, the WonderWork Board at the time—Dysart, Coneys, and Kant—

resolved to indemnify Mullaney for up to $150,000 in connection with Mullaney's defense in, *Smile Train, Inc. v. Brian F. Mullaney*, Case No. 12-cv-9102 (S.D.N.Y.), a litigation Smile Train brought against Mullaney for copyright infringement and misappropriation of trade secrets, including Smile Train's donor list (the "Smile Train Copyright Case").

75. ~~79.~~Debtor was not a named party in the Smile Train Copyright Case.

76. ~~80.~~However, Debtor ultimately spent $245,357.45 in legal fees defending Mullaney in the Smile Train Copyright Case. Coneys reviewed and approved the legal invoices.

77. ~~81.~~In July 2013, Mullaney and Smile Train settled the Smile Train Copyright Case. Although Debtor was not a party to the Smile Train Copyright Case, Coneys signed the Smile Train settlement agreement on behalf of Debtor, which required Debtor to, among other things, pay approximately $450,000 to Smile Train. The payment was characterized as a donation to Smile Train even though Debtor did not perform cleft work, and, in fact, removed cleft palate from one of its purposes in its Certificate of Amendment filed on April ~~2012.~~13, 2012. Upon information and belief, Dysart also knew about the Smile Train settlement payment and legal fees, both of which appeared on WonderWork's financial statements, including its FY 2012 IRS Form 990 and 2013 Form 1096.

78. ~~82.~~In other words, with Board approval and knowledge, Debtor spent $745,357.45 of its money to resolve Mullaney's personal liability to Smile Train.

79. ~~83.~~In addition, ~~one or more Board members reviewed and approved the legal invoices, which totaled~~Debtor paid at least $58,539.38 to quash a subpoena Smile Train served on Mullaney personally in connection with a New York state court lawsuit brought against Smile Train's outside computer consultant, Gregory ~~Sheehan~~Shaheen and his company Ferris Consulting, Inc (the "Shaheen Lawsuit"). Upon information and belief, Coneys was charged with reviewing the legal bills in connection with the Shaheen Lawsuit and Dysart was also aware

of the litigation and Debtor's payment of legal fees. In the lawsuit, Smile Train alleged that ~~Sheehan~~Shaheen assisted Mullaney in obtaining confidential and proprietary information relating to Smile Train.

80. ~~84.~~Finally, Debtor paid in excess of $14,000 for Mullaney's flights and accommodation for two trips Mullaney took to London in 2013 in connection with Smile Train UK's case against Mullaney for violation of the United Kingdom Charities Act of ~~1993,~~1993 (the "Smile Train UK Lawsuit"), even though the suit was filed against Mullaney in his personal capacity and had nothing to do with Debtor. In the Smile Train UK case, Mullaney was ordered to pay Smile Train UK £701,959 in damages and £52,455 in costs for violating UK law by approving his own salary while he served as trustee of Smile Train UK.

81. Mullaney's personal lawsuits, including the Smile Train Copyright Case, Shaheen Lawsuit, and Smile Train UK Lawsuit (collectively, the "Legal Actions") were routinely discussed at Board meetings attended by Dysart, Coneys, and Kant. While Levitt, Kokich, Rappaport, Price, and Atkinson were not on the Board at the time of the Legal Actions, they were aware of these Legal Actions and the allegations against Mullaney.

**Mullaney's Limbo Pay and Excessive Expenses**

82. ~~85.~~Mullaney further exploited Debtor by using Debtor as a means to avoid paying income tax. Specifically, with knowledge of the ~~Board~~entire Board, including Dysart, Coneys, Levitt, Kokich, Rappaport, Price, and Atkinson, Mullaney instructed Fuchs not to pay his base compensation and bonuses when those amounts were awarded, but rather to maintain a separate "payroll ledger" that tracked Mullaney's base pay and bonus and reflected what he referred to as his "limbo pay." This was a continuation of a practice Mullaney and Fuchs had started at Smile Train, which among other issues, resulted in Smile Train, following an internal investigation, reissuing Mullaney's W-2s for the years 2002-2010 that reported an additional $1,144,574 in

income as a result of the deferrals and improper travel and expense items. As a result, Mullaney and Fuchs knew that this practice was improper and illegal.

83. 86.As a result of Mullaney's deferral instructions, even though the Board awarded Mullaney a bonus every year since 2013, Mullaney never paid taxes on his bonus amounts, Mullaney's bonuses were not reported on his W-2, and Mullaney paid no FICA taxes on those amounts. Mullaney's bonuses also did not appear in Debtor's general ledger or its financial statements. The Examiner concluded that "the extent of Debtor's auditors' actual knowledge of the payroll lender is also unknown. Members of the Board, Mullaney, and Fuchs all claimed that KPMG was fully aware of the payroll ledger system and of Mullaney's practice of deferring compensation over $475,000 per year. However Fuchs would not say that she had ever shown the payroll ledger to the accountants."

84. 87.RatherRegardless, every year since 2012, Mullaney instructed Fuchs to maintain his reported compensation at $475,000 per year, and keep the remainder as "limbo pay" in her side ledger. In addition, Mullaney instructed Fuchs when and how much to pay in each particular period, such that his salary payments were erratic:

| Brian Mullaney Compensation | | | | | | | |
|---|---|---|---|---|---|---|---|
| Salary | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
| January | | $24,583 | $136,083 | $136,083 | $50,000 | | $346,750 |
| February | | $24,583 | $39,583 | $39,583 | $425,000 | | $528,750 |
| March | | $24,583 | $39,583 | $39,583 | | | $103,750 |
| April | | $24,583 | $39,583 | $189,583 | | | $253,750 |
| May | | $24,583 | $39,583 | $39,583 | | | $103,750 |
| June | | $214,583 | $39,583 | $30,583 | | $475,000 | $759,750 |
| July | | $39,583 | $39,583 | | | | $79,167 |
| August | | $39,583 | $39,583 | | | | $79,167 |
| September | | $39,583 | $39,583 | | | | $79,167 |
| October | | $18,750 | $22,250 | | | | $41,000 |
| November | | | | | | | $0 |
| December | $275,000 | | | | | | $275,000 |
| | $275,000 | $475,000 | $475,000 | $474,999 | $475,000 | $475,000 | $2,649,999 |
| Bonus - Paid in July | $0 | $0 | $250,000 | $250,000 | $200,000 | $250,000 | $950,000 |
| Total Compensation | $275,000 | $475,000 | $725,000 | $724,999 | $675,000 | $725,000 | $3,599,999 |

85. 88.For instance, as set forth above, from March 2015 to May 2016 Mullaney did

not receive any paychecks through payroll. Then, in June 2016, Mullaney received a check for $475,000 on account of his back pay.

86.    89.In addition, Mullaney would selectively instruct Fuchs to deduct personal, unsubstantiated or excessive expenses that Debtor paid from his "limbo pay." By utilizing his "limbo pay" as an offset against illegitimate expenses, Mullaney avoided paying income tax on his salary or bonus. Thus, as of the Petition Date, the total amount of suspect expenses Mullaney charged to his limbo pay totaled at least $400,000 and, in the year prior to the Petition Date, Mullaney took at least $9,211.96 in personal expenses as a deduction from his back pay.

87.    90.These suspect expenses included, among other things: purely personal expenses, such as dinner with friends, a limousine for his wife's birthday, a hotel stay for a trip he took with his daughter, chauffeured cars, commuting expenses to and from Boston; excessive expenses, including a dinner at the Four Seasons totaling over $20,000 and a three-night trip to Maine that cost Debtor over $6,000; and unsubstantiated expenses, including a $30,000 reimbursement to cover "about half" of Mullaney's commuting costs in fiscal year 2014 and 2015.

88.    91.TheUpon information and belief, each member of the Board was aware of Debtor's practice of maintaining this secret payroll ledger and seeking reimbursement of expenses through the "limbo pay", yet never because, among other things, the members knew or should have known that Debtor's public disclosures did not match Mullaney's actual compensation. Dysart and Coneys openly acknowledged Mullaney's use of the payroll ledger, with Coneys describing the practice to Dysart and Kant as "a fiction with hypothetical income offset by a hypothetical donation back." Dysart even reported to the Examiner that he was uncomfortable with this practice and Atkinson had direct knowledge of the issues that this practice caused at Smile Train. Despite this, not a single member of the Board ever instructed

Mullaney and/or Fuchs to discontinue this practice.

89. 92.Beyond the expenses that Mullaney directed Fuchs to deduct from his "limbo pay²," Mullaney also charged excessive and personal expenses to Debtor largely through his American Express account including hundreds of thousands of dollars in transportation, meals, and other costs connected to Mullaney's commute between his home outside of Boston and Debtor's New York offices, first class travel — including to his most frequent locations, London and Dubai, and thousands of dollars in multiple reoccurring periodical and other subscriptions, among other charges.

**Fuchs Compensation**

90. 93.Mullaney also approved Fuchs' excessive compensation. On April 15, 2011, Fuchs sued Smile Train for over $1 million in damages, seeking to enforce an employment agreement she allegedly entered into with Smile Train. Mullaney requested that Fuchs dismiss her lawsuit against Smile Train in order to conceal his own malfeasance at Smile Train. Fuchs agreed, but demanded that Debtor enter into an employment agreement with her that provided a $120,000 payment upon execution and 3-years of guaranteed employment at a base salary of $200,000 in exchange for Fuchs agreeing to drop her lawsuit against Smile Train. Mullaney agreed to Fuchs' demand and caused Debtor to provide Fuchs with a $120,000 signing bonus and guaranteed her employment at $200,000 per year, until December 31, 2014, at a base salary of $200,000 per year.

91. 94.In addition, Mullaney caused Lazarus and Greenwood to receive substantial signing bonuses. Specifically, Greenwood received a signing bonus via her first paycheck, which was for $29,166.67 whereas all subsequent checks were for $14,583. Similarly, in the first year Lazarus worked for WonderWork she received $169,000 in salary despite only working for part of the year and her salary was subsequently decreased to $121,500 in 2012.

## ~~Failure to Supervise~~
## **Internal Controls, Accounting, and Fundraising**

92. ~~95.~~In addition to the rampant abuses surrounding Mullaney and Fuchs' ~~salary~~compensation and Mullaney's expenses, Debtor lacked the most basic of internal controls and neither its accounting nor fundraising practices were conducted in accordance with law. Issues permeated every aspect of Debtor's business, such that the Examiner concluded that "[f]or every cynical donor who questions whether their donations are being used as promised, the Debtor has confirmed their very fears." Debtor's directors failed to meet their basic fiduciary duties and

abdicated all responsibility for insuring that the Debtor was run in accordance with law to Mullaney and Fuchs, who repeatedly engaged in self-dealing and improper practices.

93. ~~96.~~Debtor even failed to implement the few policies it had. For instance, on or about October 11, 2012, the Board approved a Board of Directors Policy Manual (the "Policy Manual"), which required that two-thirds of the directors be independent and established a number of committees, including: (1) an optional executive committee; (2) an optional investment committee; (3) an audit committee; (4) a finance committee; (5) a nominating committee; and (6) a compensation committee. Notwithstanding these clear policies, for most of its existence, Debtor's Board failed to establish these committees.

94. ~~97.~~The Policy Manual further provided for the investment of donated funds based on three categories of funds: (1) temporarily restricted funds, which are funds restricted to programs; (2) unrestricted short term operating funds; and (3) Board-designated reserves. The Policy Manual also set standards for the management of Debtor's financials and assets, including that Debtor must maintain assets that are no less than 100% of liabilities, must maintain general commercial liability insurance, seek competitive bids of any purchases over $25,000, and obtain co-approval by officers for any purchases over $100,000, and that expenditures, including for

travel must be approved in advance.

95. 98.The Policy Manual was neither followed nor referred to during the course of the day-to-day operations of the Debtor, including its cash management system, which was not set up in accordance with the Policy Manual or applicable law. Rather, Debtor treated all categories of funds as fungible. In fact, Debtor neither classified, accounted for, nor expended its restricted funds consistent with applicable law. It did not segregate its restricted funds; it did not keep track of its restricted funds currently; and it did not have in place adequate controls over the spending of such funds, consistent with proper practices. Rather, only at the end of each fiscal year, in connection with the audit of its financial statements, would Fuchs prepare a "roll forward" schedule to show the change in restricted fund balances over the course of the year. Nor did the Debtor maintain assets in excess of its liabilities. Moreover, as detailed in the Examiner Report (*see* p. 156 to 165), Fuchs, in cooperation with Mullaney, kept misleading books and records that permitted them to misstate Debtor's performance.

99.Fuchs purported to calculate the restricted fund balance by looking at the restricted fund balance from the year preceding the fiscal year. Fuchs would then add the donations that had been received, subtract any grants made together with a portion of the printing, publication and postage charges spent on mailing for that cause. In applying this methodology, Fuchs improperly used joint cost accounting principles; charging against the restricted funds a portion of the $25 million Debtor spent on direct mail.

100.To permit Debtor to utilize restricted funds in this manner, Debtor included certain "public awareness" materials in its direct mailings. These materials were included so Debtor could utilize program restricted funds for its direct mail, not for any real purpose. As a result, Debtor underreported its restricted fund balances and over-reported its program expenditures.

101.In addition to the gross abuses regarding Mullaney's salary and Debtor's failure to

adequately reflect its restricted fund balances, Debtor also overinflated its grant income by falsely reporting millions in "in-kind contributions." Debtor did this by booking as an "in-kind contribution" the difference between the actual surgery cost and the amount it donated to the grantee for surgeries.

102. Specifically, and contrary to its representations to donors, Debtor would pay a set amount per surgery, which was less than the cost of the entire surgery. Debtor would then request that its partner complete an annual survey detailing their actual costs in completing the surgeries. The difference between Debtor's contribution and the actual cost of the surgeries would be reported by Debtor as an "in kind" contribution on its financial statements and Debtor would also book a corresponding grant cancelling out the net effect of this supposed contribution. This practice permitted Debtor to inflate the amount of donations it actually received, as well as the amount of grants it made by an aggregate of more than $5 million.

103. Commencing in June 2016, Debtor undertook an effort to reclassify a greater volume of its contributions received as restricted in anticipation of an adverse ruling in the arbitration it had commenced against HelpMeSee. This effort increased greatly following receipt of the adverse ruling, with Debtor altering its practices to label the majority of the money received as restricted, including creating a new category of funds "restricted to surgery programs," which never existed prior to issuance of the initial arbitration award against it on October 13, 2016. This conduct occurred with knowledge of the Board, including Board members Coneys and Price, who instructed Debtor to "restrict" their donations following receipt of the arbitration award and after the filing of the bankruptcy petition.

104. In addition, although Debtor had historically granted very little money to programs, following receipt of the arbitration award, Debtor dramatically accelerated its grant-making process. Dwarfing its prior grant expenditures, Debtor paid $785,665 in grants from

~~October 13, 2016 through the Petition Date and an additional $2,283,650 in grants from the Petition Date until April 12, 2016, when the Court directed Debtor to stop. These grants were made with the specific intent of preventing HelpMeSee from being able to collect on its judgment.~~

96. ~~105.~~Finally, Debtor's fundraising campaigns, which ~~formed the cornerstone of its work~~were largely drafted by Mullaney personally, grossly misrepresented Debtor's activities. Not only did Mullaney run Debtor's marketing department and make all major marketing decisions, Mullaney was also involved in the minutia of the campaigns, including selecting photos, drafting copy, and approving content, and he often added his own handwritten notes. Upon a comprehensive review of Debtor's fundraising solicitations, the Examiner "identified rampant misrepresentations and systemic problems in the [Debtor's] fundraising materials." The Examiner found ~~Debtor's fundraising~~that the materials ~~to be~~created by Mullaney were "replete with misleading statements" and that "Debtor engaged in a deliberate attempt to present a charitable profile" that is inaccurate. These misrepresentations were "not isolated instances, but [] appeared throughout its solicitations since its inception."

97. ~~106.~~Among other things, Mullaney caused Debtor ~~misrepresented~~to misrepresent:

- That donations would be used to pay for surgeries and surgical programs, when they were in fact used to pay direct mail expenses;

- That donations would be matched, resulting in doubling or tripling the number of surgeries, when in fact the "matching funds" were used for expenses;

- That the donations were used to cure blind individuals, when the majority of patients were not blind;

- That a $300 donation would be used to pay the entire cost of a surgery, when Debtor only paid $25 per surgery and kept the remainder for fundraising and other expenses;

- That surgeries were free to patients, when that was not always the case;
- That Debtor was performing the surgeries directly in developing countries, when Debtor was not performing surgeries, but just making donations to other charitable organizations — including those in Europe and the United States;

- That Debtor was involved in many more countries ~~then~~than actually they were;

- That Debtor incurred virtually no overhead expenses, when donations were used for overhead expenses;

- That Debtor did not receive gifts from large foundations, when it had received millions in gifts from foundations.

98.    ~~107.~~Given that these fundraising campaigns were the bulk of Debtor's activities, the Board knew or should have known that their contents were false and misleading throughout Debtor's existence.

99.    During the bankruptcy, the Examiner, BDO, and Chapter 11 Trustee's professionals were all required to devote substantial resources to investigate the Debtor's accounting and bookkeeping practices, particularly as they related to its fundraising efforts and restricted funds.

**Debtor Enters Into Impact Loans, Which Render it Insolvent**

100.    ~~108.Moreover, the~~The Board (Coneys, Dysart, and Kant) permitted Mullaney to enter into a series of impact loans that collectively totaled close to $10 million payable in five years~~, even though such loans rendered Debtor insolvent and violated the Debtor's own policy that it maintain assets in excess of its liabilities~~. Specifically, beginning in May 2013 and ending a year later, Mullaney —with the knowledge of Dysart and Coneys—solicited "impact lenders" for Debtor, which ultimately resulted in Debtor entering into seven unsecured loan agreements with various charitable foundations and wealthy individuals. The loan agreements had maturity dates starting in May 2018 and ending in January 2020, with approximately $8 million coming due on May 15, 2018.

101.    ~~109.Debtor~~Mullaney pitched these loans as "impact loans" and told the potential "impact" lenders that the loans were a mechanism for Debtor to raise capital to fund Debtor's direct mail program, which would permit Debtor to scale its capacity to provide more surgeries.

102. ~~110.~~The loan agreements reflected these discussions, with six of the seven loan agreements stating that the loans would be used to assist Debtor in "generating additional funding for WonderWork programs and facilitate the more effective and efficient delivery of surgeries for the poor and needy served by WonderWork." These loan agreements further required Debtor to "use the proceeds of the funds exclusively" for these purposes. The other loan agreement provided that the funds would be used to "further Borrower's charitable mission of providing free surgery and related medical treatment to poor children in developing countries" and provided that at least 80% of the loan proceeds would be used to fund surgeries, while the remaining 20% could be used for general operating support. Debtor spent the loan proceeds on its direct market mail and other expenditures.

103. ~~111.~~Debtor's 10-year marketing projections, which ~~it~~were presented to the Board in October 2013, did not project Debtor actually repaying the loans in their entirety until October 2021, despite the maturity dates in the loan agreements beginning in 2018 and ending in 2020, and then only showing a partial repayment of 66%.

104. ~~112.~~There was no way that Debtor could ever repay these loans because it lacked sufficient unrestricted funds to do so nor did it have reasonable means to obtain or otherwise generate sufficient unrestricted funds for repayment. All the money that Debtor raised through direct mail campaigns funded by the impact loans would be restricted to program expenses or otherwise spent on programs and could not be used to repay the impact loans.

~~113.Accordingly, entry into these loan agreements and the Debtor's expenditure of the loan proceeds on fund-raising activities rendered Debtor insolvent.~~

**The HelpMeSee Arbitration**

105. ~~114.~~In fact, at the time Debtor entered into its impact loans, Debtor was already insolvent due to its malfeasance towards HelpMeSee, which ultimately resulted in an arbitration

award in which Debtor was ordered to pay HelpMeSee over $16 million in damages.

106.    ~~115.In~~<u>On</u> August <u>31,</u> 2011, <u>Mullaney caused</u> Debtor ~~entered~~<u>to enter</u> into ~~an~~<u>a</u> fundraising agreement <u>with HelpMeSee, Inc. (the "Agreement")</u>~~with HelpMeSee~~<u>, a 501(c)(3) charity whose mission is to eliminate cataract blindness worldwide. Under the Agreement, Debtor agreed that it would create, manage, and monitor various fundraising and marketing programs for HelpMeSee</u> in exchange for a $2 million per year fee. ~~Unbeknownst to HelpMeSee, in violation of its contractual and fiduciary duties to HelpMeSee, Debtor was using HelpMeSee work and mission to fundraise for itself. In addition, Debtor breached almost every other material clause of the Agreement. On or about August 8, 2012,~~ <u>The Agreement provided that any disputes between the parties would be submitted to arbitration through the American Arbitration Association (the "AAA").</u>

107.    HelpMeSee terminated the ~~agreement~~<u>Agreement</u> for cause.~~116.~~ <u>effective August 17, 2012.</u> On March 21, 2013, ~~WonderWork commenced arbitration against HelpMeSee, Inc.~~<u>Mullaney caused Debtor to file a Demand for Arbitration with the AAA</u>, seeking $1,333,333.28 in damages~~, alleging~~ <u>based on its assertion</u> that HelpMeSee ~~had~~ terminated the Agreement without cause~~.~~<u>, plus costs and attorneys' fees. On May 9, 2013,</u> HelpMeSee counterclaimed for breach of contract, breach of fiduciary duty~~, breach of the implied covenant of good faith and fair dealing~~, fraudulent inducement, copyright infringement~~,~~ <u>and</u> an accounting, ~~conversion,~~<u>and sought damages, both compensatory and punitive, as well as an injunction, costs</u> and attorneys' fees.

~~117.HelpMeSee took issue with Debtor's document production failings repeatedly during the arbitration, including via formal letters to the arbitrator on August 16, 2013 and November 27, 2013, as well as half a dozen letters to opposing counsel in 2014 and 2015~~

~~demanding production of various categories of documents. The arbitrator made clear he would reserve ruling on such issues to the close of arbitration, but warned Debtor that there was evidence of non-production.~~

108. ~~118.In addition, during~~On June 1, 2013, the parties mutually selected AAA Arbitrator John H. Wilkinson, Esq., as their sole neutral arbitrator. Hearings commenced in March 2014 and were completed on March 11, 2016. During opening statements, which occurred on or about March 4, 2014, HelpMeSee stated that it would be seeking in excess of $8 million in damages.

109. On October 13, 2016, the Arbitrator issued the partial final award ("Partial Final Award"), in which he found Debtor to be in substantial breach of its Agreement with HelpMeSee, in clear breach of its fiduciary duty to HelpMeSee, and liable for conversion. In the Partial Final Award, the Arbitrator ordered Debtor to pay HelpMeSee $8,342,314.68 in damages equal to all amounts raised by Debtor during the Agreement term plus interest. The Arbitrator also awarded HelpMeSee reasonable costs and attorneys' fees incurred in connection with the arbitration, but provided that the amount would be the subject of a separate award.

110. On October 20, 2016, HelpMeSee sent a copy of the Partial Final Award to each of Debtor's Board Members, including Coneys, Levitt, Kokich, Rappaport, Price, and Atkinson.

111. On December 21, 2016, the Arbitrator issued a final award (the "Final Award," together with the Partial Final Award, the "Award"), which in addition to the $8,342,314.68 in compensatory damages plus interest already awarded, quantified HelpMeSee's award of fees and costs, granting HelpMeSee $4,706,553.18 in attorneys' fees plus interest, and $149,563.99 in arbitration costs.

112. Due to the provisions in the Agreement directly at issue, including those that referenced Smile Train, and HelpMeSee's fraudulent inducement claim, the Arbitrator evaluated

Mullaney's conduct while at Smile Train as well as his actions toward HelpMeSee. As a result, the arbitration exposed Mullaney's repeated pattern of defrauding the charities he purported to serve, including Operation Smile, Smile Train, and HelpMeSee, as well as his repeated violations of the intellectual property rights of Mercy Ships, a HelpMeSee partner.

113.    The Award further disclosed that, following Mullaney's termination from Smile Train, Smile Train retained accounting firm Grant Thornton to conduct an independent investigation into Mullaney's activities during the timeframe in which Fuchs was acting as Smile Train's CFO. "Grant Thornton uncovered numerous additional transgressions and concluded that Mullaney had expenses amounting to $335,000 that were not appropriate in that they were either unsubstantiated or were personal to Mullaney and without business purpose or both." Grant Thornton "also found that Mullaney had deferred substantial amounts of" his salary as President "which would not then be included on his W-2 forms. As a result, Mullaney's W-2s had to be amended and reissued to reflect $1.13 million of additional income." Although not uncovered in connection with the arbitration proceeding, Mullaney and Fuchs then went onto adopt the same practices at Debtor.

114.    The Arbitrator found Mullaney's conduct, including "acting through [WonderWork] to take HelpMeSee's money, while exploiting HelpMeSee to raise money to pursue his own personal interests," to be "unconscionable." The Arbitrator also awarded costs and attorneys' fees to HelpMeSee, explaining that this award was justified because, among other reasons, Mullaney was "not a credible witness"; "WonderWork declined to comply with discovery orders from the beginning to the end of this arbitration, with the result that the conduct of the arbitration was decidedly less efficient and cost-effective than would otherwise have been the case"; and that the conduct of Debtor and Mullaney as "reprehensible."

115.    ~~119.~~Notwithstanding the gravity of the allegations against ~~Debtor~~Mullaney and

Fuchs and the approximately $925,000 in legal fees and expenses incurred by Debtor, the Board did not become involved in the arbitration or undertake any investigation into the merits of HelpMeSee's claims, including the claims regarding discovery abuses.

**The Trustee Motion and Appointment of an Examiner**

116. A few weeks after the Petition Date, on January 18, 2017, HelpMeSee moved for entry of an order directing the appointment of a Chapter 11 trustee, describing Debtor as "the paradigmatic case for appointment of a trustee." HelpMeSee alerted the Court to Mullaney's prior history of systematically exploiting charities, as well as certain inconsistencies in Debtors schedules.

117. In the Trustee Motion, HelpMeSee explained that, because "Debtor itself likely has claims against Mullaney, senior management, and/or Debtor's Board of Directors for, among other causes of action, breach of fiduciary duty, mismanagement, and indemnification" it would not be in the best interest of the creditors to leave Mullaney in control of Debtor. HelpMeSee further warned that "there is abundant evidence of Debtor's senior management's incompetent and/or intentional mismanagement of Debtor's books and records. The appointment of an independent fiduciary is critical to ensure that this Chapter 11 proceeding is conducted in a fair and honest manner, including that Debtor pursue all options available to maximize recovery to the creditors."

118. The Debtor strenuously opposed HelpMeSee's motion, with each of Kokich, Coneys, Levitt, Price, Rappaport, and Atkinson, in their personal capacity and in their capacity as Board Members of Debtor, filing declarations in support of the Debtor's opposition. Debtor attacked the credibility of HelpMeSee's allegations and the Arbitrator's findings, describing HelpMeSee's concerns as unfounded. Debtor touted its distinguished and impressive Board and management and repeatedly stressed the Board's close supervision of management.

119. For instance, Debtor told the Court that, "contrary to HMS's characterization of Mr. Mullaney as a 'serial fraudster' running WonderWork alone and into the ground, Brian Mullaney is a respected executive under the supervision of a skilled and conscientious Board. Throughout WonderWork's existence, the Board has provided Mr. Mullaney with critical operational oversight and consultation, including issues related to HMS's protracted legal efforts to undermine Mr. Mullaney and the organization as a whole. Mr. Mullaney has the appropriate amount of authority for a chief executive officer, but at all times reports to, is supervised by, and serves at the pleasure of, the Board."

120. ~~On October 13, 2016, the arbitrator issued an award in which he awarded HelpMeSee $8,342,315, plus legal fees and interest. On December 21, 2016, the arbitrator issued his fee award, which awarded HelpMeSee an additional $4,706,554 in attorneys' fees and~~ Debtor also attempted to rebut the Arbitrator's findings regarding Smile Train through the personal declarations submitted by Atkinson, Price, and Levitt, all of whom had

~~$149,564 in arbitration costs, in part as a sanction for Debtor's failure~~ ~~to comply with discovery obligations in connection with the arbitration proceedings. The award related to conduct of the Debtor between August 2011 and August 2012.~~

involvement in Smile Train, stating that the decision of Atkinson, Price, and Levitt to join the WonderWork board provide "compelling circumstantial evidence that Mr. Mullaney's conduct at Smile Train was appropriate." These declarations universally stressed the Board's purported heavy involvement in Debtor's affairs and their complete and unwavering confidence in Mullaney.

121. ~~As a result of the arbitration award, Debtor filed for bankruptcy.~~ For instance, Coneys stated that the "WonderWork Board [was] very involved in the organization's decision-making," including Debtor's "budget, investments, fundraising strategies, program

capacity, and relationships with hospital partners, among other things." Coneys further declared that the Board "provided Brian with critical operational oversight and consultation" and that Mullaney "at all times reports to, is supervised by, and serves at the pleasure of the Board." Kokich, Levitt, Price, Rappaport, and Atkinson likewise described the WonderWork Board as "dedicated, hands-on, and active in its supervision of Brian and the organization's management generally."

122.    However, the Examiner's investigation revealed just the opposite: "WonderWork presents a case study on how a dominant CEO, left unchecked by a passive and overly deferential Board of Directors can damage a charity beyond repair." The Examiner's investigation revealed that the Board was wholly uninvolved with Debtor's operation, deferring entirely to Mullaney and Fuchs with virtually no oversight over Debtor. For instance, the Examiner found that Coneys was "at a minimum, not informed or misled about the types and amounts of expenses being charged on the payroll ledger." No one from the Board ever reviewed any of Mullaney's American Express invoices or other expenditures until May 2017, when Coneys reviewed Mullaney's FY16 invoices in connection with the BDO audit. These expenses were not insignificant. For instance, in the course of five years, Mullaney spent over

$250,000 on his corporate American Express card to cover travel. Coneys also acknowledged that Debtor and Mullaney would face disclosure issues relating to Debtor's payment of Mullaney's commuting expenses between Boston and New York. Moreover, as detailed above, despite the many policies and procedures set by Debtor, there is no evidence that any of these policies were followed by Debtor or any member of the Board and, although fundraising appeals formed the bulk of Debtor's work, the Board was either unaware or indifferent to the gross misrepresentations Mullaney made in those appeals, which misrepresented everything from the work done by Debtor, to the countries in which it operated, to the patients served, and to the use

and accounting of the funds.

123.    Despite the Arbitration ruling finding that Mullaney behaved in a reprehensible and unconscionable manner and an arbitrator who spent pages detailing Mullaney's abuses, Coneys, Kokich, Levitt, Price, Rappaport, and Atkinson all affirmed, under penalty of perjury, that "the Board has no potential, planned or pending claims against" Mullaney and that Mullaney had the Board's "utmost confidence," even though the Board had not conducted an internal investigation.

124.    On April 12, 2017, the Court determined that, rather than appointing a trustee, it would appoint an examiner. The Court relied on the declarations of Kokich, Coneys, Levitt, Price, Rappaport, and Atkinson and their false assertions that the Board was actually supervising Mullaney when issuing her decision, explaining that she was "troubled by the idea of dispossessing this Debtor and appointing a trustee, most particularly because of the unique role played by Mr. Mullaney. And I am concerned that, if he were no longer involved, or no longer incentivized to continue to play the role that he's played, in particular in fundraising, that will sound the death knell for this Debtor."

125.    On April 21, 2017, the Bankruptcy Court entered the Order Directing the Appointment of an Examiner and Establishing Temporary Budgetary Controls (the "Examiner Order"). On May 10, 2017, the Court entered an order approving the appointment of Jason R. Lilien as the Examiner. The Examiner Order further required the Examiner to file a written report (the "Report") of his investigation no later than 90 days from the date of appointment. The Examiner requested multiple extensions of time, ultimately filing his Report on November 3, 2017, in part due to Debtor's failure to complete the audit, which also increased the costs of his investigation.

**The BDO Audit**

126. Debtor was obligated, by federal law, to complete its 2016 FY audit by May 15, 2017 so that it could file its Form 990s. Debtor retained BDO on April 4, 2017, after KPMG, Debtor's prior auditor, and two others refused to audit Debtor. Debtor offered several inconsistent and conflicting reasons for KPMG's refusal to conduct the audit.

127. Due to the abbreviated schedule BDO had to complete the work, Debtor agreed to pay BDO $120,000 for audit services and $5,000 for tax services, which was more than double what Debtor had paid the prior year for similar auditing services from one of the Big Four accounting firms. Upon information and belief, both the Board knew about and approved BDO's retention.

128. BDO failed to complete the audit by the May 15, 2017 deadline and, beginning in May 2017, the BDO team repeatedly communicated its concerns to Debtor's Board of Directors, Mullaney, and Fuchs. BDO's concerns remained generally the same throughout the engagement and included in-kind valuation, loan liabilities (including loan forgiveness), functional expense and joint cost allocation, the accrual of Mullaney's bonus, fiscal years 2015 and 2016 recording of contributions, the release of net assets, and going concern financial statement presentation, as well as the effect of these changes on the overall net assets and results presented in prior years. Notwithstanding the nature and breadth of these issues, Coneys asked BDO not to communicate its concerns formally in writing. On August 28, 2017, BDO informed Debtor's Audit Committee, Coneys and Rappaport, that there was a possibility that it might be unable to complete the audit altogether. On September 1, 2017, Debtor filed a pleading falsely stating "BDO has informed the Debtor that the audit should be concluded soon." That same day, BDO finally communicated its concerns in writing because BDO felt it was necessary for it to formally document the unresolved issues.

129. In BDO's September 1, 2017 letter, BDO stated that it had identified at least ten

(10)   issues that were going to require material adjustments to the financial statements. BDO explained that these items were of such significance that Debtor's inability to resolve any one of them would lead to a modification of BDO's audit report to report an express limit on the scope of the audit and that, the significance of the scope limitation could ultimately lead to the issuance of a disclaimer of an opinion or an adverse opinion. BDO also informed them that, due to the collective magnitude of such matters, BDO might decline to issue a report on Debtor's financial statements altogether. BDO further stated that it found nine (9) material weaknesses and two (2) significant deficiencies in Debtor's internal controls.

130.   BDO urged Coneys, Rapport, and Mullaney to "discuss with your legal counsel what obligations you may have to share this communication with the Examiner appointed by the Bankruptcy Court or other parties involved in the bankruptcy proceedings." BDO further stated that these transactions had caused BDO to incur $350,000 in out of scope costs. Neither Coneys, Rappaport, Mullaney, nor any other Board member disclosed to the Court or, upon information and belief, the Examiner, these significant issues with BDO's audit.

131.   On September 25, 2017, the Court, *sua sponte*, issued an Order to Show Cause why Debtor should not be held in contempt for failing to complete its 2016 Audit. It was only in response to that the Court was informed for the first time the significant issues that it was having regarding Debtor's audit. The costs incurred by the Examiner and his professionals were increased by the delayed audit and would have been mitigated had the Board disclosed these issues to the Court.

**Unauthorized Non-Ordinary Course Payments**

132.   On September 29, 2017, just four days after the Court issued its first *sua sponte* Order to Show Cause why Debtor should not be held in contempt for failing to complete the audit, Mullaney requested and Fuchs authorized Debtor to pay Mullaney $237,500, which

allegedly comprised a payment of Mullaney's past due compensation.

133. On October 19, 2017, the day before the Examiner Report was due to be filed, Mullaney requested and Fuchs authorized Debtor to pay Mullaney $158,333.32, which comprised his salary for the entire month of October even though Mullaney had never previously received a salary payment in advance. Neither Mullaney nor Fuchs sought Court approval for either payment, although Mullaney now acknowledges that he was not entitled to the October payment and it is subject to avoidance.

134. In other words, after BDO had informed the Debtor, including the Board, that his salary practices constituted material weaknesses that may cause them to issue an adverse opinion and Debtor was operating under strict controls, Mullaney and Fuchs authorized the Debtor to make two salary payments to Mullaney consisting of 10-months of salary before he was ousted from the charity or otherwise restricted from access to its funds. Despite red flags, including the BDO audit issues, the Board took no actions to constrain Mullaney or Fuchs. These salary payments were neither in the ordinary course for Debtor, nor the type of transaction commonly undertaken by people in the non-profit industry.

**Bankruptcy Costs**

135. Debtor incurred substantial fees and expenses that could have been avoided or greatly reduced had the Board fulfilled its duties and actively supervised Debtor's management, including the millions in investigation, accounting, and legal fees that Debtor expended to clean up Mullaney and Fuchs' fraud and misreporting. Moreover, the inefficiencies in completing the BDO audit forced the Examiner to incur additional costs that would have been avoided if the audit had been timely completed. In addition, the Chapter 11 Trustee duplicated certain of the work done by BDO and the Examiner in connection with the distribution of restricted funds, which would have been avoided had the Board not submitted false and misleading declarations.

136. ~~122.~~In connection with the bankruptcy, the Debtor ~~incurred substantial fees and expenses.Specifically, the estate has~~ paid :

- Debtor's counsel, Carter Ledyard Milburn LLP, $879,946.56;~~the~~

- The Examiner $380,595.00;

- Goldin $~~470,250, and~~ 470,250;

- Loeb $1,431,391.27;~~and~~

- BDO $~~210,000. In addition, the~~210,000;

- The Chapter 11 Trustee ~~has sought approval and payment of~~'s statutory commissions in the amount of $164,882.42 and $12,291.90 in expenses for a total amount of $177,174.32;

- CR3 Partners, LLC ~~has sought approval and payment of~~ $485,982.50 in fees and $6,011.80 in expenses, for a total amount of $491,940.30;

- Garfunkel Wild, P.C. ~~has sought approval and payment of~~ $259,261.50 in fees and $89.49 in expenses, for a total amount of $259,350.99;

- Gordon Brothers Asset Advisors, LLC~~, has sought approval and payment of fees in the amount of~~ $30,000 in fees;~~and~~

- Togut, Segal & Segal LLP ~~has sought approval and payment of fees in the amount of~~ $899,612.50 in fees and expenses in the amount of $13,760.69, for a total of $913,317.19; and

- Verdolino & Lowey P.C., ~~has sought approval and payment of~~ fees in the amount of $15,000.

In other words, in an estate that had at the outset of the bankruptcy $21.2 million in assets, the Debtor had to expend $5,258,965.63 in fees.

137. ~~123.~~All of these expenditures, or a substantial portion of them, would have been unnecessary had the Board discharged their duties appropriately.

**FIRST CLAIM OF RELIEF**

**Breach of Fiduciary Duties ~~and Waste~~(Against ~~Defendants~~Defendant Theodore Dysart ~~, Ravi Kant, and John J. Coneys~~)**

138. ~~124.~~Plaintiff incorporates by reference the allegations in the preceding paragraphs

of the Amended Complaint as if they were fully restated.

139. ~~125.~~Dysart~~, Kant, and Coneys were each directors~~ served as a director of Debtor from March 2011 ~~until at least~~through November 2015, and as such, owed the fiduciary ~~duty~~duties of care, loyalty, and good faith to Debtor.

140. ~~126.~~Dysart~~, Kant, and Coneys~~ failed to discharge ~~their~~his duties as ~~directors~~a director with the degree of care, skill, prudence, and diligence required ~~of them and their~~and further, consciously disregarded his duties to such a degree that his conduct constituted ~~an extreme departure from the ordinary standard of care~~bad faith, including by deliberately turning a blind eye~~, including~~ by, among other things~~,~~: (a) failing to provide oversight of the Debtor or to control its activities; (b) failing to monitor Debtor, including by failing to implement ~~or enforce~~ internal controls or adequately oversee its operations and financial reporting; (c) approving ~~or permitting~~ inappropriate and excessive compensation and benefits for Mullaney ~~and approving excessive discretionary bonuses; (d~~for the years 2013 to 2015; (d) failing to follow Pearl Meyer's recommendations regarding Mullaney's compensation from the time that the Pearl Meyer Report was issued in June 2013; (e) permitting Mullaney and Fuchs to defer payment of Mullaney's salary and bonus through the use of a secret side payroll ledger and permitting Mullaney to deduct expenses from those "deferred" amounts~~; (e) failing to stay adequately apprised of the arbitration between Debtor and HelpMeSee that spanned the course of several years~~, which permitted Mullaney to illegally avoid

income tax and concealed his full compensation from donors and the regulators; (f) authorizing Debtor to pay Mullaney's personal legal fees and expenses and settlement payments in connection with various lawsuits arising between Mullaney and his prior employer, Smile Train; and (g) abrogating ~~their~~his responsibilities to oversee Debtor's ~~fundraising practices~~management, including ~~its content~~with respect to public filings, record keeping, ~~and accounting practices in~~

general and specifically related to restricted funds, thereby placing undue reliance on Debtor's management; (h) when insolvent, permitting Debtor to enter into "impact" loans, which Debtor's own projections indicated that it could never repay; (i) making or permitting Debtor to make clearly false and misleading statements in Debtor's public filings; and (j) otherwise failing to discharge their duties as directors with the degree of care, skill, prudence, and diligence required of them and acting with negligence, indeed gross negligence and reckless indifference, as outlined in the Report accounting practices, and solicitations and allowing Mullaney and Fuchs to keep fraudulent and misleading books and records and make false public filings.

141. 127. As a result of the above, Debtor suffered millions of dollars in damages. 128. Due to the foregoing acts and omissions, Dysart, Kant, and Coneys breached the fiduciary duties they owed to Debtor and are thus liable to account for their conduct and to pay damages resulting from loss and waste of corporate assets, including the excessive amounts paid to or on behalf of Mullaney.

### SECOND CLAIM OF RELIEF

**Breach of Fiduciary Duties and Waste (Against Defendants Ravi Kant, Defendant John J. Coneys, Steven Levitt, Clark Kokich, Steven Rappaport, Richard Price, and Mark Atkinson)**

142. 129. Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as if they were fully restated.

143. 130. For the period including Coneys served as a director of Debtor from December 2015 2012 through and following the Petition Date, Kant, Coneys, Levitt, Kokich, Rappaport, Price, and Atkinson were each directors of Debtor, and as such, owed the fiduciary duty duties of care, loyalty, and good faith to Debtor.

144. 131. Kant, Coneys, Levitt, Kokich, Rappaport, Price, and Atkinson failed to

discharge ~~their~~his duties as ~~directors~~a director with the degree of care, skill, prudence, and diligence required ~~of them and their~~and further, consciously disregarded his duties to such a degree that his conduct constituted ~~an extreme departure from the ordinary standard of care~~bad faith, including by deliberately turning a blind eye~~, including~~ by, among other things~~:~~; (a) failing to provide oversight of the Debtor or to control its activities; (b) failing to monitor Debtor, including by failing to implement internal controls or adequately oversee its operations and financial reporting; (c) approving ~~and permitting~~ inappropriate and excessive compensation and benefits for Mullaney~~, including by approving the Employment Agreement, which paid Mullaney excessive compensation and ran counter to the advice received by a professional consultant paid to evaluate the reasonableness of Mullaney's salary, without consulting or retaining outside counsel; (d~~ for the years 2013 to 2016; (d) failing to follow Pearl Meyer's recommendations regarding Mullaney's compensation from the time that the Pearl Meyer Report

was issued in June 2013; (e) permitting Mullaney and Fuchs to defer payment of Mullaney's salary and bonus through the use of a secret side payroll ledger and permitting Mullaney to deduct expenses from those "deferred" amounts~~; (e) abrogating their responsibilities to oversee Debtor's fundraising practices, including its content, record keeping, and accounting practices in general and specifically related to restricted funds, thereby placing undue reliance on Debtor's management~~, which permitted Mullaney to illegally avoid income tax and concealed his full compensation from donors and the regulators; (f) authorizing Debtor to pay Mullaney's personal legal fees and expenses and settlement payments in connection with various lawsuits arising between Mullaney and his prior employer, Smile Train;

~~(f)    permitting Debtor to alter its accounting and grant making practices to permit Debtor to try to hinder, delay or defraud HelpMeSee from collecting on its judgment; (g) making or permitting Debtor to make clearly false and misleading statements in Debtor's public filings; and (h) otherwise failing to discharge their duties as directors with the degree of care, skill, prudence, and diligence required of them and acting with negligence, indeed gross negligence and reckless indifference, as outlined in the Report.~~

(g) abrogating his responsibilities to oversee Debtor's management, including with respect to public filings, record keeping, accounting practices, and solicitations and allowing Mullaney and Fuchs to keep fraudulent and misleading books and records and make false public filings; (h) executing a declaration in favor of retaining Mullaney as CEO in opposition to the Trustee motion without adequate investigation into the merits of the underlying claims and despite his knowledge of the serious allegations against Mullaney as detailed in the Arbitration Award; and (i) failing to inform the Court or otherwise take appropriate action in connection with the various issues that arose in the BDO audit.

145. ~~132.~~As a result of the above, Debtor suffered ~~millions of dollars in~~ damages, including the excessive amounts paid to or on behalf of Mullaney. Moreover, because Coney's breaches of duties caused Debtor to incur administrative expenses relating to investigating Debtor's misconduct and subsequent windup, which would have been avoided had Coneys not violated his duties, Coneys is responsible for those costs.

~~133.Due to the foregoing acts and omissions Kant, Coneys, Levitt, Kokich, Rappaport, Price, and Atkinson breached the fiduciary duties they owed to Debtor and are thus liable to account for their conduct and to pay damages resulting from loss and waste of corporate assets.~~

### THIRD CLAIM OF RELIEF

**Breach of Fiduciary Duties ~~and Waste~~(Against ~~Defendants John J. Coneys,~~Defendant Steven Levitt~~, Clark Kokich, Steven Rappaport, Richard Price, and Mark Atkinson~~)**

146. ~~134.~~Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as if they were fully restated.

147. ~~135.Following~~Levitt served as a director of Debtor from December 2015 through

and following the Petition Date~~, Coneys, Levitt, Kokich, Rappaport, Price, and Atkinson were each directors of Debtor~~, and as such, owed the fiduciary ~~duty~~duties of care, loyalty, and good faith to Debtor.

148. ~~136.Coneys,~~ Levitt, ~~Kokich, Rappaport, Price, and Atkinson~~ failed to discharge ~~their~~his duties as ~~directors~~a director with the degree of care, skill, prudence, and diligence required ~~of them and their~~and further, consciously disregarded his duties to such a degree that his conduct constituted ~~an extreme departure from the ordinary standard of care~~bad faith, including by deliberately turning a blind eye~~, including~~ by, among other things~~:~~; (a) failing to provide oversight of the Debtor or to control its activities; (b) failing to monitor Debtor, including by failing to implement internal controls or adequately oversee its operations and financial reporting; (c) ~~permitting Debtor to alter its accounting and grant making~~approving inappropriate and excessive compensation and benefits for Mullaney for the year 2016; (d) failing to follow Pearl Meyer's recommendations regarding Mullaney's compensation; (e) permitting Mullaney and Fuchs to defer payment of Mullaney's salary and bonus through the use of a secret side payroll ledger and permitting Mullaney to deduct expenses from those "deferred" amounts, which permitted Mullaney to illegally avoid income tax and concealed his full compensation from donors and the regulators;

(f) abrogating his responsibilities to oversee Debtor's management, including with respect to public filings, record keeping, accounting practices ~~to permit Debtor to try to hinder, delay or defraud creditors; (d) executing declarations~~, and solicitations and allowing Mullaney and Fuchs to keep fraudulent and misleading books and records and make false public filings; (g) executing a declaration in favor of retaining Mullaney as ~~Chief Executive Officer~~CEO in opposition to the Trustee ~~Motion~~motion without adequate investigation into the merits of the underlying claims~~;~~

~~(e) making or permitting Debtor to make clearly false and misleading statements in Debtor's~~

public filings; and (f) as to Coneys and Price, attempting to hinder, delay, and defraud creditors by retroactively restricting donations made to Debtor. and despite his knowledge of the serious allegations against Mullaney as detailed in the Arbitration Award; and (h) failing to inform the Court or otherwise take appropriate action in connection with the various issues that arose in the BDO audit.

149. ~~137.~~As a result of the above, Debtor suffered ~~millions of dollars in~~ damages, including the excessive amounts paid to or on behalf of Mullaney. Moreover, because Levitt's breaches of duties caused Debtor to incur administrative expenses relating to investigating Debtor's misconduct and subsequent windup, which would have been avoided had Levitt not violated his duties, Levitt is responsible for those costs.

~~138.Due to the foregoing acts and omissions Kant, Coneys, Levitt, Kokich, Rappaport, Price, and Atkinson breached the fiduciary duties they owed to Debtor and are thus liable to account for their conduct and to pay damages resulting from loss and waste of corporate assets.~~

## FOURTH CLAIM OF RELIEF

**Breach of Fiduciary Duties ~~and Waste~~ (Against ~~Defendants Brian Mullaney and Hana Fuchs)~~Defendant Clark Kokich)**

150. Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as if they were fully restated.

151. Kokich served as a director of Debtor from December 2015 through and following the Petition Date, and as such, owed the fiduciary duties of care, loyalty, and good faith to Debtor.

152. Kokich failed to discharge his duties as a director with the degree of care, skill, prudence, and diligence required and further, consciously disregarded his duties to such a degree

that his conduct constituted bad faith, including by deliberately turning a blind eye by, among other things: (a) failing to provide oversight of the Debtor or to control its activities; (b) failing to monitor Debtor, including by failing to implement internal controls or adequately oversee its operations and financial reporting; (c) approving inappropriate and excessive compensation and benefits for Mullaney for the year 2016; (d) failing to follow Pearl Meyer's recommendations regarding Mullaney's compensation; (e) permitting Mullaney and Fuchs to defer payment of Mullaney's salary and bonus through the use of a secret side payroll ledger and permitting Mullaney to deduct expenses from those "deferred" amounts, which permitted Mullaney to illegally avoid income tax and concealed his full compensation from donors and the regulators; (f)      abrogating his responsibilities to oversee Debtor's management, including with respect to public filings, record keeping, accounting practices, and solicitations and allowing Mullaney and Fuchs to keep fraudulent and misleading books and records and make false public filings; (g) executing a declaration in favor of retaining Mullaney as CEO in opposition to the Trustee motion without adequate investigation into the merits of the underlying claims and despite his knowledge of the serious allegations against Mullaney as detailed in the Arbitration Award; and (h)      failing to inform the Court or otherwise take appropriate action in connection with the various issues that arose in the BDO audit.

153.      As a result of the above, Debtor suffered damages, including the excessive amounts paid to or on behalf of Mullaney. Moreover, because Kokich's breaches of duties caused Debtor to incur administrative expenses relating to investigating Debtor's misconduct and subsequent windup, which would have been avoided had Kokich not violated his duties, Kokich is responsible for those costs.

## FIFTH CLAIM OF RELIEF

### Breach of Fiduciary Duties
### (Against Defendant Steven Rappaport)

154.     Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as if they were fully restated.

155.     Rappaport served as a director of Debtor from December 2015 through and following the Petition Date, and as such, owed the fiduciary duties of care, loyalty, and good faith to Debtor.

156.     Rappaport failed to discharge his duties as a director with the degree of care, skill, prudence, and diligence required and further, consciously disregarded his duties to such a degree that his conduct constituted bad faith, including by deliberately turning a blind eye by, among other things: (a) failing to provide oversight of the Debtor or to control its activities; (b) failing to monitor Debtor, including by failing to implement internal controls or adequately oversee its operations and financial reporting; (c) approving inappropriate and excessive compensation and benefits for Mullaney for the year 2016; (d) failing to follow Pearl Meyer's recommendations regarding Mullaney's compensation; (e) permitting Mullaney and Fuchs to defer payment of Mullaney's salary and bonus through the use of a secret side payroll ledger and permitting Mullaney to deduct expenses from those "deferred" amounts, which permitted Mullaney to illegally avoid income tax and concealed his full compensation from donors and the regulators; (f)     abrogating his responsibilities to oversee Debtor's management, including with respect to public filings, record keeping, accounting practices, and solicitations and allowing Mullaney and Fuchs to keep fraudulent and misleading books and records and make false public filings; (g) executing a declaration in favor of retaining Mullaney as CEO in opposition to the Trustee motion without adequate investigation into the merits of the underlying claims and despite his knowledge of the serious allegations against Mullaney as detailed in the Arbitration Award; and (h)     failing to inform the Court or otherwise take appropriate action in connection with the various issues that arose in the BDO audit.

157.     As a result of the above, Debtor suffered damages, including the excessive amounts paid to or on behalf of Mullaney. Moreover, because Rappaport's breaches of duties caused Debtor to incur administrative expenses relating to investigating Debtor's misconduct and subsequent windup, which would have been avoided had Rappaport not violated his duties, Rappaport is responsible for those costs.

## SIXTH CLAIM OF RELIEF

### Breach of Fiduciary Duties
### (Against Defendant Richard Price)

158.     Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as if they were fully restated.

159.     Price served as a director of Debtor from December 2015 through and following the Petition Date, and as such, owed the fiduciary duties of care, loyalty, and good faith to Debtor.

160.     Price failed to discharge his duties as a director with the degree of care, skill, prudence, and diligence required and further, consciously disregarded his duties to such a degree that his conduct constituted bad faith, including by deliberately turning a blind eye by, among other things: (a) failing to provide oversight of the Debtor or to control its activities; (b) failing to monitor Debtor, including by failing to implement internal controls or adequately oversee its operations and financial reporting; (c) approving inappropriate and excessive compensation and benefits for Mullaney for the year 2016; (d) failing to follow Pearl Meyer's recommendations regarding Mullaney's compensation; (e) permitting Mullaney and Fuchs to defer payment of Mullaney's salary and bonus through the use of a secret side payroll ledger and permitting Mullaney to deduct expenses from those "deferred" amounts, which permitted Mullaney to illegally avoid income tax and concealed his full compensation from donors and the regulators; (f)     abrogating his responsibilities to oversee Debtor's management, including with respect to

public filings, record keeping, accounting practices, and solicitations and allowing Mullaney and Fuchs to keep fraudulent and misleading books and records and make false public filings; (g) executing a declaration in favor of retaining Mullaney as CEO in opposition to the Trustee motion without adequate investigation into the merits of the underlying claims and despite his knowledge of the serious allegations against Mullaney as detailed in the Arbitration Award; and (h) failing to inform the Court or otherwise take appropriate action in connection with the various issues that arose in the BDO audit.

161. As a result of the above, Debtor suffered damages, including the excessive amounts paid to or on behalf of Mullaney. Moreover, because Price's breaches of duties caused Debtor to incur administrative expenses relating to investigating Debtor's misconduct and subsequent windup, which would have been avoided had Price not violated his duties, Price is responsible for those costs.

### SEVENTH CLAIM OF RELIEF

**Breach of Fiduciary Duties
(Against Defendant Mark Atkinson)**

162. Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as if they were fully restated.

163. Atkinson served as a director of Debtor from December 2015 through and following the Petition Date, and as such, owed the fiduciary duties of care, loyalty, and good faith to Debtor.

164. Atkinson failed to discharge his duties as a director with the degree of care, skill, prudence, and diligence required and further, consciously disregarded his duties to such a degree that his conduct constituted bad faith, including by deliberately turning a blind eye by, among other things: (a) failing to provide oversight of the Debtor or to control its activities; (b) failing to monitor Debtor, including by failing to implement internal controls or adequately oversee its

operations and financial reporting; (c) approving inappropriate and excessive compensation and benefits for Mullaney for the year 2016; (d) failing to follow Pearl Meyer's recommendations regarding Mullaney's compensation; (e) permitting Mullaney and Fuchs to defer payment of Mullaney's salary and bonus through the use of a secret side payroll ledger and permitting Mullaney to deduct expenses from those "deferred" amounts, which permitted Mullaney to illegally avoid income tax and concealed his full compensation from donors and the regulators;

(f) abrogating his responsibilities to oversee Debtor's management, including with respect to public filings, record keeping, accounting practices, and solicitations and allowing Mullaney and Fuchs to keep fraudulent and misleading books and records and make false public filings; (g) executing a declaration in favor of retaining Mullaney as CEO in opposition to the Trustee motion without adequate investigation into the merits of the underlying claims and despite his knowledge of the serious allegations against Mullaney as detailed in the Arbitration Award; and

(h) failing to inform the Court or otherwise take appropriate action in connection with the various issues that arose in the BDO audit.

165. As a result of the above, Debtor suffered damages, including the excessive amounts paid to or on behalf of Mullaney. Moreover, because Atkinson's breaches of duties caused Debtor to incur administrative expenses relating to investigating Debtor's misconduct and subsequent windup, which would have been avoided had Atkinson not violated his duties, Atkinson is responsible for those costs.

## EIGHTH CLAIM OF RELIEF

### Breach of Fiduciary Duties
### (Against Defendant Brian Mullaney)

166. ~~139.~~Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as if they were fully restated.

167. ~~140.~~Mullaney was a director and officer of Debtor and ~~Fuchs was an officer of~~

~~Debtor, and~~ as such,~~ each~~ owed fiduciary duties of care, loyalty, and good faith to Debtor. Mullaney ~~and Fuchs~~'s fiduciary duties include obligations to exercise good business judgment, to act prudently in the operation of Debtor's business, to discharge ~~their~~his actions in good faith, to act in the best interests of Debtor and its donors, and to put the interests of Debtor before ~~their~~his own.

168. ~~141.~~Mullaney ~~and Fuchs~~ breached ~~their~~his duty of care by failing to discharge ~~their~~his duties as ~~officers~~an officer and ~~directors~~director with the degree of care, skill, prudence, and diligence required of ~~them~~him. ~~Their~~His conduct constituted an extreme departure from the ordinary standard of care rising to the level of bad faith and reckless disregard of ~~their~~his duties and responsibilities, including by, among other things,~~(a)~~

(a) routinely mismanaging the Debtor, including failing to properly account for and spend Debtor's donations and restricted funds; (b) failing to comply with the terms of Debtor's corporate governing documents, policies, and applicable law; (c) improperly accounting for ~~Mullaney's~~his expenditures; (d) making clearly false and misleading statements in Debtor's public filings; (e) authorizing excessive and inappropriate spending of Debtor's funds; (f) misleading donors both in Debtor's public disclosures, including in response to email communications inquiring about Mullaney's compensation; (g) using false solicitation materials, in violation of applicable law;

(h) permitting Debtor to alter its accounting and grant making practices to permit Debtor to try to hinder, delay ~~or~~, and defraud creditors; and (i) otherwise failing to discharge ~~their~~his duties as ~~directors~~a director and/or ~~officers~~officer with the degree of care, skill, prudence, and diligence required of them and acting with gross negligence and reckless indifference as outlined in the Report.

169. ~~142.~~Mullaney ~~and Fuchs breached their~~breached his duties of loyalty and good

faith by, among other things, (a) keeping his "limbo pay" off Debtor's books in a private, side ledger in coordination with Fuchs;

(b) knowingly maintaining such payroll ledger in coordination with Fuchs as a mechanism for making his compensation appear less than it actually was on Debtor's public disclosures and to allow him to evade the payment of income tax; (c) submitting and/or approving inappropriate expenses, including excessive, unsubstantiated, and personal expenses; (d) directing Debtor to fund inappropriate expenditures and excessive salaries, including paying Fuchs a $120,000 signing bonus; and (e) permitting Debtor to pay Mullaney $395,833.32 in post-petition, non- ordinary course payments on the eve of release of the Report without disclosure or approval of the Court, $158,281.21 of which Mullaney now concedes was paid out improperly and is avoidable.

170. As a result of the above, Debtor suffered damages, including the excessive amounts paid to or on behalf of Mullaney and Fuchs. Moreover, because Mullaney's breaches of duties caused Debtor to incur administrative expenses relating to investigating Debtor's misconduct and subsequent windup, which would have been avoided had Mullaney not violated his duties, Mullaney is responsible for those costs.

**NINTH CLAIM OF RELIEF**

**Breach of Fiduciary Duties
(Against Defendant Hana
Fuchs)**

171. Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as if they were fully restated.

172. Fuchs was an officer of Debtor and as such, owed fiduciary duties of care, loyalty, and good faith to Debtor. Fuchs' fiduciary duties include obligations to exercise good business judgment, to act prudently in the operation of Debtor's business, to discharge her actions in good faith, to act in the best interests of Debtor and its donors, and to put the interests of Debtor before her own.

173. Fuchs breached her duty of care by failing to discharge her duties as an officer with the degree of care, skill, prudence, and diligence required of her. Her conduct constituted an extreme departure from the ordinary standard of care rising to the level of bad faith and reckless

disregard of her duties and responsibilities, including by, among other things, (a) failing to comply with the terms of Debtor's corporate governing documents, policies, and applicable law; (b) improperly accounting for Mullaney's expenditures; (c) making clearly false and misleading statements in Debtor's public filings; (d) authorizing excessive and inappropriate spending of Debtor's funds; (e) misleading donors both in Debtor's public disclosures, including in response to email communications inquiring about Mullaney's compensation; and (f) otherwise failing to discharge her duty as an officer with the degree of care, skill, prudence, and diligence required of her and acting with gross negligence and reckless indifference as outlined in the Report.

174. Fuchs breached her duties of loyalty and good faith by, among other things, (a) keeping Mullaney's "limbo pay" off Debtor's books in a private, side ledger; (b) knowingly maintaining such payroll ledger as a mechanism for making Mullaney's compensation appear less than it actually was on Debtor's public disclosures and to allow Mullaney to evade the payment of income tax; (c) submitting and/or approving inappropriate expenses, including excessive, unsubstantiated, and personal expenses; (d) directing Debtor to fund inappropriate expenditures and excessive salaries, including paying ~~Fuchs~~herself a $120,000 signing bonus; and (e) permitting Debtor to pay Mullaney $395,833.32 in post-petition non- ordinary course payments on the eve of release of the Report without disclosure or approval of the Court.

175. ~~143.~~As a result of the above, Debtor suffered ~~millions of dollars in damages.~~damages, including the excessive amounts paid to or on behalf of Mullaney and Fuchs. Moreover, because Fuchs' breaches of

~~144.Due to the foregoing acts and omissions, Mullaney and Fuchs breached the fiduciary duties they owed to Debtor and are thus liable to account for their conduct and to pay damages resulting from loss and waste of corporate assets.~~

duties caused Debtor to incur administrative expenses relating to investigating Debtor's

misconduct and subsequent windup, which would have been avoided had Fuchs not violated her duties, Fuchs is responsible for those costs.

## ~~FIFTH~~TENTH CLAIM FOR RELIEF

### Constructive Fraudulent Conveyance under Section 544(b) of the Bankruptcy Code
### (Against Defendant Brian Mullaney)

176. ~~145.~~Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as if they were fully restated.

177. ~~146.~~On or after December 29, 2010, Debtor conveyed assets to Mullaney in the form of excess ~~salary payments and benefits~~compensation and reimbursement for excessive, personal, or unsubstantiated expenses including, without limitation, ~~as~~those set forth in Exhibit A (the "6-Year Fraudulent Conveyances"), including through the execution of the Employment Agreement that provided Mullaney with excess compensation.

178. ~~147.~~Mullaney was either the initial transferee of each of the 6-Year Fraudulent Conveyances or the entity for whose benefit each of the 6-Year Fraudulent Conveyances was made.

179. ~~148.~~The 6-Year Fraudulent Conveyances were incurred without fair consideration and, on the date that each 6-Year Fraudulent Conveyance was made, (a) Debtor was insolvent, or became insolvent as a result of such 6-Year Fraudulent Conveyances; and (b) Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital~~; and (c) Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured~~.

180. ~~149.~~The 6-Year Fraudulent Transfers made by Debtor to Mullaney described above constituted fraudulent conveyances that are voidable pursuant to section 544(b) of the

Bankruptcy Code and N.Y. Debtor and Creditor Law §§ ~~273,~~273 and 274, ~~and 275,~~ and may be recovered by Plaintiff from Mullaney pursuant to section 550(a)(1).

<h3 align="center">~~SIXTH~~ELEVENTH CLAIM FOR RELIEF</h3>

**Fraudulent Transfer under Section 548(~~b~~a)(1)(B) of the Bankruptcy Code (Against Defendant Brian Mullaney)**

181. ~~150.~~Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as if they were fully restated.

182. ~~151.~~On or after December 29, 2014, Debtor transferred assets to Mullaney in the form of excess ~~salary payments and benefits~~compensation and reimbursement for excessive, personal, or unsubstantiated expenses including, without limitation, ~~as~~those set forth in Exhibit B (the "2-Year Fraudulent Transfers").

183. ~~152.~~Mullaney was either the initial transferee of each of the 2-Year Fraudulent Transfers or the entity for whose benefit each of the 2-Year Fraudulent Transfers was made.

184. ~~153.~~Debtor received less than a reasonably equivalent value in exchange for the 2-Year Fraudulent Transfers and, on the date that the 2-Year Fraudulent Transfers were made: (a) Debtor was insolvent, or became insolvent as a result of such 2-Year Fraudulent Transfers; ~~(b)~~ and

(b) Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital~~; and (c) Debtor intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured~~.

185. ~~154.~~The 2-Year Fraudulent Transfers made by Debtor to Mullaney described above constituted fraudulent transfers that are voidable pursuant to section 548(b) of the Bankruptcy Code, and may be recovered by Plaintiff from Mullaney pursuant to section 550(a)(1).

## ~~SEVENTH~~TWELFTH CLAIM FOR RELIEF

### Fraudulent Conveyance under Section 548(a)(1)(B) of the Bankruptcy Code
### (Against Defendant Brian Mullaney)

186. ~~155.~~Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as if they were fully restated.

187. ~~156.~~On or after December 29, 2014, Debtor conveyed assets to Mullaney in the form of excess ~~salary payments and benefits~~compensation and reimbursement for excessive, personal, or unsubstantiated expenses including, without limitation, ~~as~~those set forth in Exhibit C, including through the execution of the Employment Agreement that provided Mullaney with excess compensation (the "Employment

Fraudulent Transfers").

188. ~~157.~~Debtor received less than a reasonably equivalent value in exchange for the Employment Fraudulent Transfers and Debtor made such transfers to or for the benefit of, Mullaney, an insider, or incurred such obligations to or for the benefit of ~~an~~ Mullaney, under his Employment ~~Contract~~Agreement and not in the ordinary course of business.

189. ~~158.~~Mullaney was either the initial transferee of each of the Employment Fraudulent Conveyances or the entity for whose benefit each of the Employment Fraudulent Conveyances was made.

190. ~~159.~~The Employment Fraudulent Transfers made by Debtor to Mullaney described above constituted avoidable fraudulent transfers, including but not limited to entry into the Employment Agreement, and any transfers or benefits paid thereunder are avoidable pursuant to section 548(a)(1)(B) of the Bankruptcy Code, and may be recovered by Plaintiff from Mullaney pursuant to section 550(a)(1).

## ~~EIGHTH~~THIRTEENTH CLAIM FOR RELIEF

### Avoidance and Recovery of Preferential Transfers

**(Against Defendant Brian Mullaney)**

191.    160. Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as if they were fully restated.

192.    161. On or within the one-year period preceding the Petition Date, Debtor made, or caused to be made, transfers to or for the benefit of its former Chief Executive OfficerCEO, Mullaney, totaling at least

$484,212 (the "Preferential Transfers").      These Preferential Transfers were on account of antecedent debt purportedly owed to Mullaney by the Debtor before the transfer was made in the form of back pay ($475,000) and personal expenses ($9,211.96) purportedly taken as deductions from Mullaney's "limbo" pay.

193.    162. At the time the Preferential Transfers were made, Mullaney was an officer, director, and in control of Debtor and was therefore an insider as defined under section 101(31)(B) of the Bankruptcy Code.

194.    163. Mullaney was either the initial transferee of each of the Preferential Transfers or the entity for whose benefit each of the Preferential Transfers was made.

195.    164. As of the dates that the Preferential Transfers were made, Debtor was insolvent in that: (i) its assets exceeded its liabilities; (ii) it could not reasonably expect to meet its obligations in the ordinary course as and when they came due; and (iii) it did not have adequate capital to withstand reasonable foreseeable fluctuations in its business.

196.    165. As a result of these Preferential Transfers, Mullaney received more than he would have received if: (i) Debtor's bankruptcy was administered under chapter 7 of the Bankruptcy Code; (ii) the Preferential Transfers had not been made; and (iii) Mullaney received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

197.    166. Interest on the Preferential Transfers has accrued and continues to accrue

from the date each of the Preferential Transfers was made.

198. ~~167.~~The Preferential Transfers, to the extent they are avoided pursuant to section 547(b) of the Bankruptcy Code, may be recovered by Plaintiff from Mullaney pursuant to section 550(a)(1) of the Bankruptcy Code.

~~NINTH~~**FOURTEENTH** CLAIM FOR RELIEF

**Avoidable Transfer Under Section 549**
**(Against Defendant Brian Mullaney)**

199. ~~168.~~Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as if they were fully restated.

200. Upon information and belief, during the bankruptcy, Mullaney continued his practice of using his American Express card for excessive, personal and undocumented expenses. As a result, Debtor reimbursed him $59,517.70 for the period December 28, 2016 through September 26, 2017. For the reasons set forth above with respect to the pre-petition American Express charges, the Post-Petition American Express charges should also be avoided.

201. ~~169.~~On the eve of release of the Examiner Report, when ~~Debtor~~Mullaney and Fuchs knew that the Report would be highly critical, and after BDO had announced that it could not complete the audit due to a variety of issues including issues relating to Mullaney's ~~salary~~compensation, and while Debtor was operating under strict Court-ordered budgetary controls, Debtor conveyed assets to Mullaney ~~just days before his resignation outside the ordinary course of business and without Court approval~~, including, without limitation~~, as set forth in Exhibit D~~ two payments totally $395,833.32. Days later, Mullaney resigned. Given the unique circumstances under which these lump sum payments were made, the Post-petition Transfers deviated from Debtor's ordinary course practice and were outside of the ordinary course for the business and practices of the industry.

202. The post-petition transfers (the "Post-petition Transfers")~~170.The Post-petition~~

~~Transfers made by Debtor~~ to Mullaney are set forth in Exhibit D. These Post-petition Transfers were not authorized by the Bankruptcy Code or the Bankruptcy Court. Indeed, the Post-petition Transfers were made to with the actual intent to hinder, delay, or defraud creditors.

203. ~~171.~~Mullaney was either the initial transferee of each of the Post-petition Transfers or the entity for whose benefit each of the Post-petition Transfers was made.

204. ~~172.~~The Post-petition Transfers made by Debtor to Mullaney described above constituted unauthorized transfers of property of the estate after the Petition Date that are avoidable pursuant to Section 549 of the Bankruptcy Code, and may be recovered by Plaintiff from Mullaney pursuant to section 550(a)(1).

~~**TENTH CLAIM FOR RELIEF**~~

~~**Breach of Contract**~~
~~**(Against Defendant Brian Mullaney)**~~

~~173.Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Complaint as if they were fully restated.~~

~~174.Mullaney and Debtor entered into the Employment Agreement, which was effective as of January 1, 2016. In the Employment Agreement, Debtor agreed to pay Mullaney a certain salary and provide benefits in exchange for Mullaney performing his duties and responsibilities under the Employment Agreement.~~

~~175.These duties and responsibilities, included but were not limited to, providing leadership and strategic vision with the goal of maximizing WonderWork's impact on its fundamental mission of providing free surgeries for indigent children and adults and ensuring that the charity was in compliance with Debtor's mission, value, and standards.~~

~~176.Mullaney breached his duties under the Employment Agreement by promulgating false and misleading fundraising campaigns and overseeing false and misleading financial~~

reporting as further extensively detailed in the Report. As a result, Mullaney should be directed to return all amounts paid under the Employment Agreement and should not be entitled to any additional amounts awarded under the Agreement including in respect of the Mullaney Claim.

### ELEVENTH CLAIM FOR RELIEF

**Unjust Enrichment
(Against Defendant Brian Mullaney)**

177. Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Complaint as if they were fully restated.

178. Throughout his tenure at Mullaney, Mullaney received excess payments, including but not limited to an inappropriate and inflated base salary and discretionary bonuses based on the Board's mistaken belief about his performance as Chief Executive Officer. Specifically, Mullaney received a base salary of $475,000 per year, which was disproportionate to the salary he would have earned at a peer institution, and in addition was awarded discretionary bonuses of $250,000 in 2013, 2014, and 2016, and $200,000 in 2015 from Debtor.

179. The Board awarded Mullaney's bonus every year based on their internal discretion and no objective metrics were used to determine bonus eligibility. Mullaney did not disclose to the Board information that would have given the Board a complete picture of his entitlement to a bonus. In addition, Mullaney received other remuneration from Debtor for which Debtor received no value, including payment of Mullaney's personal legal fees and expenses, payment of Mullaney's spouse's travel, payment of Mullaney's personal life insurance policy, payment of Mullaney's commuting costs to and from his home in Boston, among other expenses.

180. Mullaney failed to provide any value to Debtor in exchange for his substantial salary, benefits, and expense payments. Rather, Mullaney used Debtor to fund his own extravagant lifestyle at the expense of Debtor's work and mission. Through his payment of salary, benefits, bonuses and expenses, Mullaney was enriched at Debtor's expense; equity and

good conscience militate against permitting Mullaney to retain these amounts. Accordingly, Mullaney should disgorge the value of amounts he received from Debtor and should not be permitted to collect any further amounts from Debtor including in respect of the Mullaney Claim.

### ~~TWELFTH~~FIFTHTEENTH CLAIM FOR RELIEF

**Disallowance of Claim**
**(Against Defendant Brian Mullaney)**

205.    ~~181.~~Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as if they were fully restated.

206.    ~~182.~~Mullaney is a creditor holding an unsecured claim, which is purportedly on account of unpaid back pay.

207.    Mullaney is not entitled to collect any such amounts. ~~183.Mullaney's salary and back pay were excessive, and unwarranted. Moreover, Mullaney's bonus payments, which form a substantial portion of his salary, were obtained under false and misleading pretenses, including that Mullaney was running a model charity, when in fact he used Debtor to further his own interests at the expense of the charity. Further, the Mullaney Claim which is based on a claim arising under the Employment Agreement is not valid because Mullaney materially breached the Employment Agreement and the Agreement itself is an avoidable transfer.~~ because Mullaney's compensation was excessive and unwarranted.

208.    ~~184.Finally~~In addition, in view of the liability that Mullaney owes to Debtor, the amounts that Debtor owes Mullaney, if any, should be set off against Mullaney's liability to the estate.

209.    ~~185.~~Based on the foregoing, the Mullaney Claim should be disallowed.

### ~~THIRTEENTH~~SIXTEENTH CLAIM FOR RELIEF

**Disallowance of Claim under Section 502(d) of the Bankruptcy Code**

**(Against Defendant Brian Mullaney)**

210. ~~186.~~Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as if they were fully restated.

211. ~~187.~~Mullaney is a creditor holding an unsecured claim in respect of the Mullaney Claim.

212. ~~188.~~Mullaney is the recipient of or the beneficiary of the Preferential Claim, the Employment Fraudulent Transfers, the 2-year Fraudulent Transfers, the 6-Year Fraudulent Conveyances, and the Post-petition Transfers (together, the "Transfers"), which are recoverable from Mullaney pursuant to sections 544, 547, 548, 549 and 550 of the Bankruptcy Code, and Mullaney has not returned the Transfers to Debtor.

213. ~~189.~~Based on the foregoing, and pursuant to section 502(d) of the Bankruptcy Code, the claims asserted by Mullaney against Debtor must be disallowed since Debtor has not paid or surrendered the Transfers.

WHEREFORE, Plaintiff prays for the following relief:

1. On Plaintiff's First Claim for Relief, in favor of Plaintiff and against ~~Defendants~~Defendant Dysart~~, Kant, and Coneys~~, compensatory and punitive damages, plus interest, together with the costs and expenses of this action, including without limitation, attorneys' fees;

2. On Plaintiff's Second Claim for Relief, in favor of Plaintiff and against ~~Defendants Kant,~~Defendant Coneys~~, Levitt, Kokich, Rappaport, Price, and Atkinson~~, compensatory and punitive damages, plus interest, together with the costs and expenses of this action, including without limitation, attorneys' fees;

3. On Plaintiff's Third Claim for Relief, in favor of Plaintiff and against ~~Defendants Coneys,~~Defendant Levitt~~, Kokich, Rappaport, Price, and Atkinson~~, compensatory and punitive damages, plus interest, together with the costs and expenses of this action, including without

limitation, attorneys' fees;

4.    On Plaintiff's Fourth Claim for Relief, in favor of Plaintiff and against ~~Defendants Mullaney and Fuchs~~Defendant Kokich, compensatory and punitive damages, plus interest, together with the costs and expenses of this action, including without limitation, attorneys' fees;

5.    On Plaintiff's Fifth Claim for Relief, in favor of Plaintiff and against Defendant Rappaport, compensatory and punitive damages, plus interest, together with the costs and expenses of this action, including without limitation, attorneys' fees;

6.    On Plaintiff's Sixth Claim for Relief, in favor of Plaintiff and against Defendant Price, compensatory and punitive damages, plus interest, together with the costs and expenses of this action, including without limitation, attorneys' fees;

7.    On Plaintiff's Seventh Claim for Relief, in favor of Plaintiff and against Defendant Atkinson, compensatory and punitive damages, plus interest, together with the costs and expenses of this action, including without limitation, attorneys' fees;

8.    On Plaintiff's Eighth Claim for Relief, in favor of Plaintiff and against Defendant Mullaney, compensatory and punitive damages, plus interest, together with the costs and expenses of this action, including without limitation, attorneys' fees;

9.    On Plaintiff's Ninth Claim for Relief, in favor of Plaintiff and against Defendant Fuchs, compensatory and punitive damages, plus interest, together with the costs and expenses of this action, including without limitation, attorneys' fees;

10.    On Plaintiff's Tenth Claim for Relief, in favor of Plaintiff and against Defendant Mullaney in an amount not less than the amount of the 6-year Fraudulent Conveyances, plus interest from the date of such 6-year Fraudulent Conveyances until payment is made to Plaintiff, together with the costs and expenses of this action, including without limitation, attorneys' fees, and directing Mullaney to turnover such sum to Plaintiff pursuant to sections 544 and 550(a) of

the Bankruptcy Code, and avoiding the Employment Agreement.

11. 6. On Plaintiff's Sixth Eleventh Claim for Relief, in favor of Plaintiff and against Defendant Mullaney in an amount not less than the amount of the 2-Year Fraudulent Transfers, plus interest from the date of such 2-year Fraudulent Transfers until payment is made to Plaintiff, together with the costs and expenses of this action, including without limitation, attorneys' fees, and directing Mullaney to turnover such sum to Plaintiff pursuant to sections 548 and 550(a) of the Bankruptcy Code, and avoiding the Employment Agreement.

12. 7. On Plaintiff's Seventh Twelfth Claim for Relief, in favor of Plaintiff and against Defendant Mullaney in an amount not less than the amount of the Employment Fraudulent Transfers, plus interest from the date of such Employment Fraudulent Transfers until payment is made to Plaintiff, together with the costs and expenses of this action, including without limitation, attorneys' fees, directing Mullaney to turnover such sum to Plaintiff pursuant to sections 548 and 550(a) of the Bankruptcy Code, and avoiding the Employment Agreement.

13. 8. On Plaintiff's Eighth Thirteenth Claim for Relief, in favor of Plaintiff and against Defendant Mullaney in an amount not less than the amount of the Preferential Transfers, plus interest from the date of such Preferential Transfers until full payment is made to Plaintiff, together with the costs and expenses of this action, including, without limitation attorneys' fees; and directing Mullaney to turnover such sum to Plaintiff pursuant to 547(b) and 550(a) of the Bankruptcy Code.

14. 9. On Plaintiff's Ninth Fourteenth Claim for Relief, in favor of Plaintiff and against Defendant Mullaney in an amount not less than the amount of the Post-petition Transfers, plus interest from the date of such Post-petition Fraudulent Transfers until payment is made to Plaintiff, together with the costs and expenses of this action, including without limitation, attorneys' fees, and directing Mullaney to turnover such sum to Plaintiff pursuant to sections 548,

549 and 550(a) of the Bankruptcy Code.

10.On Plaintiff's Tenth Claim for Relief, in favor of Plaintiff and against Defendant, ordering Mullaney to pay damages in an amount equal to all amounts he received under the Employment Agreement, including any amounts he received from Debtor in salary, benefits, or expense reimbursements, together with interest and attorneys' fees, and declare his Employment Agreement without force or effect.

11.On Plaintiff's Eleventh Claim for Relief, in favor of Plaintiff and against Defendant, ordering Mullaney to disgorge all amounts received from Debtor in salary, benefits, or expense reimbursements, together with interest and attorneys' fees.

15.     12.On Plaintiff's TwelfthFifthteenth and ThirteenthSixteenth Claims for Relief, in favor of Plaintiff and Against Defendant Mullaney disallowing Mullaney's Claim against the estate; and

16.     13.Granting such other and further as this Court deems just and proper.

**Jury Trial Demand**

Plaintiff hereby demands a trial by jury, on all issues so triable, pursuant to Fed.

R.     Bankr. P. 9015, and 5005 and Fed. R. Civ. P. Rules 38 and 39.

Dated: New York, New York
December 28, 2018February 14, 2020

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *Benjamin Mintz*

Benjamin Mintz
Peta Gordon
250 West 55th Street New York, New York 10019
Telephone: (212) 836-8000

*Attorneys for Plaintiff Vincent A. Sama, as Trustee of the WW Litigation Trust*

## 6-Year Fraudulent Conveyances

**Mullaney Salary and Bonus Payments**

| Payment Date | Payment Type | Amount |
|---|---|---|
| Dec-11 | Salary | 275,000.00 |
| Jan-12 | Salary | 24,583.00 |
| Feb-12 | Salary | 24,583.00 |
| Mar-12 | Salary | 24,583.00 |
| Apr-12 | Salary | 24,583.00 |
| May-12 | Salary | 24,583.00 |
| Jun-12 | Salary | 214,583.00 |

| | | |
|---|---|---|
| Jul-12 | Salary | 39,583.00 |
| Aug-12 | Salary | 39,583.00 |
| Sep-12 | Salary | 39,583.00 |
| Oct-12 | Salary | 18,750.00 |
| Jan-13 | Salary | 136,083.00 |
| Feb-13 | Salary | 39,583.00 |
| Mar-13 | Salary | 39,583.00 |
| Apr-13 | Salary | 39,583.00 |
| May-13 | Salary | 39,583.00 |
| Jun-13 | Salary | 39,583.00 |
| Jul-13 | Salary | 39,583.00 |
| Jul-13 | Bonus | 250,000.00 |

| | | |
|---|---|---|
| Aug-13 | Salary | 39,583.00 |
| Sep-13 | Salary | 39,583.00 |
| Oct-13 | Salary | 22,250.00 |
| Jan-14 | Salary | 136,083.00 |
| Feb-14 | Salary | 39,583.00 |
| Mar-14 | Salary | 39,583.00 |
| Apr-14 | Salary | 189,583.00 |
| Jul-14 | Bonus | 250,000.00 |
| May-15 | Salary | 50,000.00 |
| Jun-15 | Salary | 425,000.00 |
| Jan-15 | Salary | 39,583.00 |
| Feb-15 | Salary | 30,583.00 |

| | | |
|---|---|---|
| Jul-15 | Bonus | 200,000.00 |
| Jun-16 | Salary (per Employment Agreement) | 475,000.00 |
| Jul-16 | Bonus (per Employment Agreement) | 250,000.00 |
| **TOTAL** | | 3,599,992.00 950,000.00 |

**Life Insurance Premium Payments**

| Payment Date | Payment Type | Amount |
|---|---|---|
| 11/12/2014 | The US Life Insurance Co. | 3,735.00 |
| 10/26/2015 | The US Life Insurance Co. | 326.81 |
| 11/14/2015 | The US Life Insurance Co. | 326.81 |
| 12/11/2015 | The US Life Insurance Co. | 326.81 |
| 01/14/2016 | The US Life Insurance Co. | 326.81 |
| 02/13/2016 | The US Life Insurance Co. | 326.81 |
| 03/12/2016 | The US Life Insurance Co. | 326.81 |
| 03/18/2016 | Lincoln National Life Insurance Company | 4,945.03 |
| 09/20/2016 | Lincoln National Life Insurance Company | 4,945.03 |
| **TOTAL** | | 6,579.08 |

**Other Expenses**

| Payment Date | Ledger Note | Amount |
|---|---|---|
| 10/08/2014 | Reimbursement of personal expense on AmEx card 10/2/14 | 5,994.40 |
| 12/31/2014 | Reimbursed personal expense | 180.00 |
| 08/15/2016 | Reimbursed out of pocket expenses | 2,194.00 |
| 8/16/2016 | Payment of personal legal bill taken as a deduction from salary | 378.63 |
| 10/19/2016 | Payment of personal travel expense taken as a deduction from salary | 8,333.33 |
| 10/31/2016 | Payment of personal expense taken as a deduction from salary | 500.00 |
| **TOTAL** | | 11,585.96 |

**American Express Expenses**

| Payment Date Range | Payment Type | Amount |
|---|---|---|
| 12/28/2012 - 12/27/2013 | American Express | 154,595.35 |
| 12/28/2013 - 12/23/2014 | American Express | 129,728.57 |
| 12/24/2014 - 12/27/2015 | American Express | 133,955.42 |
| 12/28/2015 - 12/27/2016 | American Express | 117,315.62 |
| **TOTAL** | | 535,594.96 |

**Mullaney Legal Fees**

| Payment Date | Law Firm / Ledger Note | Amount |
|---|---|---|
| 12/31/2012 | Kaplan & Levenson P.C. / ST complaint | 2,115.50 |
| 1/8/2013 | Copilevitz & Canter, LLC / ST complaint | 2,250.00 |
| 1/13/2013 | Kaplan & Levenson P.C. /Professional services ST | 309.00 |

| Date | Description | Amount |
|---|---|---|
| 2/26/2013 | Jones Day / Legal services through Jan. 31, 2013 | 34,625.00 |
| 3/20/2013 | Jones Day / ST vs Mullaney through Feb. 28, 2013 | 17,437.84 |
| 4/16/2013 | Jones Day / ST vs Mullaney | 11,308.64 |
| 5/14/2013 | Jones Day / ST vs Mullaney | 34,559.72 |
| 6/18/2013 | Jones Day / Professional services May 13 | 46,604.14 |
| 7/25/2013 | Kravet & Vogel, LLP / ST vs Ferris | 8,024.00 |
| 8/12/2013 | Kravet & Vogel, LLP / July 13 ST vs Ferris - Subpoena Dispute | 17,864.78 |
| 8/15/2013 | Jones Day / Legal services through July 31, 2013 | 17,376.35 |
| 8/21/2013 | Jones Day | 82,053.76 |
| 9/11/2013 | Jones Day / Legal services through Aug. 31, 2013 | 1,392.00 |
| 9/20/2013 | Kravet & Vogel, LLP / Aug.13 ST vs Ferris - Subpoena Dispute | 8,212.13 |
| 10/21/2013 | Kravet & Vogel, LLP / Sep.13 ST vs Ferris - Subpoena Dispute | 1,482.34 |
| 11/21/2013 | Kravet & Vogel, LLP / Oct.13 ST vs Ferris - Subpoena Dispute | 1,020.00 |
| 12/03/2013 | Kravet & Vogel, LLP / Nov.13 ST vs Ferris - Subpoena Dispute Appeal | 14,478.03 |
| 1/13/2014 | Kravet & Vogel, LLP / Dec.13 ST vs Ferris - Subpoena Dispute Appeal | 3,570.84 |
| 1/31/2014 | Kaplan Kravet & Vogel P.C. / Jan.14 Mullaney Subpoena ST v Ferris | 377.75 |
| 2/28/2014 | Kaplan Kravet & Vogel P.C. / Feb.14 ST vs Mullaney | 4,216.00 |
| 2/28/2014 | Kaplan Kravet & Vogel P.C. / Feb.14 Mullaney Subpoena ST v Ferris | 485.04 |
| 3/31/2014 | Kaplan Kravet & Vogel P.C. / Mar.14 ST vs Mullaney | 50.50 |
| 4/30/2014 | Kaplan Kravet & Vogel P.C. / Apr.14 ST vs Mullaney | 510.00 |
| 5/31/2014 | Kaplan Kravet & Vogel P.C. / May 14 Mullaney Subpoena ST v Ferris | 238.00 |
| 5/31/2014 | Kaplan Kravet & Vogel P.C. / May 14 ST vs Mullaney | 676.25 |
| 6/30/2014 | Kaplan Kravet & Vogel P.C. / Jun. 14 Mullaney Subpoena ST v Ferris | 374.00 |
| 6/30/2014 | Kaplan Kravet & Vogel P.C. / Jun. 14 ST vs Mullaney | 1,115.38 |
| 7/31/2014 | Kaplan Kravet & Vogel P.C. / ST vs Mullaney | 1,703.00 |
| 7/31/2014 | Kaplan Kravet & Vogel P.C. / Mullaney subpoena ST vs Ferris | 1,423.75 |
| 8/31/2014 | Kaplan Kravet & Vogel P.C. / ST vs Mullaney | 136.00 |

| | | |
|---|---|---|
| 10/31/2014 | Kaplan Kravet & Vogel P.C. / ST vs Mullaney | 580.72 |
| 11/30/2014 | Kaplan Kravet & Vogel P.C. / ST vs Mullaney | 272.00 |
| 11/30/2014 | Kaplan Kravet & Vogel P.C. / ST vs Ferris | 408.00 |
| 2/28/2015 | Kaplan Kravet & Vogel P.C. / ST vs Mullaney | 1,972.00 |
| 2/28/2015 | Kaplan Kravet & Vogel P.C. / Mullaney Subpoena ST vs Ferris | 1,598.00 |
| 7/31/2016 | Kaplan Kravet & Vogel P.C. / "One Smile at a Time" | 378.63 |
| **TOTAL** | | 321,199.09 |

| | |
|---|---|
| **TOTAL FOR ALL CATEGORIES** | $~~4,474,951.09~~1,824,959.09 |

**Exhibit B**

**2-Year Fraudulent Transfers**

**Mullaney Salary and Bonus Payments**

| Payment Date | Payment Type | Amount |
|---|---|---|
| ~~May-15~~ | ~~Salary~~ | ~~50,000.00~~ |
| ~~Jun-15~~ | ~~Salary~~ | ~~425,000.00~~ |
| ~~Jan-15~~ | ~~Salary~~ | ~~39,583.00~~ |
| ~~Feb-15~~ | ~~Salary~~ | ~~30,583.00~~ |
| Jul-15 | Bonus | 200,000.00 |
| ~~Jun-16~~ | ~~Salary (per Employment Agreement)~~ | ~~475,000.00~~ |
| Jul-16 | Bonus (per Employment Agreement) | 250,000.00 |
| TOTAL | | ~~1,470,166.00~~450,000.00 |

**Life Insurance Premium Payments**

| Payment Date | Payment Type | Amount |
|---|---|---|
| 10/26/2015 | The US Life Insurance Co. | 326.81 |
| 11/14/2015 | The US Life Insurance Co. | 326.81 |
| 12/11/2015 | The US Life Insurance Co. | 326.81 |
| 01/14/2016 | The US Life Insurance Co. | 326.81 |
| 02/13/2016 | The US Life Insurance Co. | 326.81 |
| 03/12/2016 | The US Life Insurance Co. | 326.81 |
| 03/18/2016 | Lincoln National Life Insurance Company | 4,945.03 |
| 09/20/2016 | Lincoln National Life Insurance Company | 4,945.03 |
| TOTAL | | 6,579.08 |

**Other Expenses**

| Payment Date | Ledger Note | Amount |
|---|---|---|
| 08/15/2016 | Reimbursed out of pocket expenses | 2,194.00 |
| 8/16/2016 | Payment of personal legal bill taken as a deduction from salary | 378.63 |
| 10/19/2016 | Payment of personal travel expense taken as a deduction from salary | 8,333.33 |
| 10/31/2016 | Payment of personal expense taken as a deduction from salary | 500.00 |
| TOTAL | | 11,405.96 |

**American Express Expenses**

| Payment Date Range | Payment Type | Amount |
|---|---|---|
| 12/24/2014 - 12/27/2015 | American Express | 133,955.42 |
| 12/28/2015 - 12/27/2016 | American Express | 117,315.62 |
| TOTAL | | 251,271.04 |

**Mullaney Legal Fees**

| Payment Date | Law Firm / Ledger Note | Amount |
|---|---|---|
| 2/28/2015 | Kaplan Kravet & Vogel P.C. / ST vs Mullaney | 1,972.00 |
| 2/28/2015 | Kaplan Kravet & Vogel P.C. / Mullaney Subpoena ST vs Ferris | 1,598.00 |
| 7/31/2016 | Kaplan Kravet & Vogel P.C. / "One Smile at a Time" | 378.63 |
| **TOTAL** | | 3,948.63 |

| | |
|---|---|
| **TOTAL FOR ALL CATEGORIES** | $~~1,743,370.71~~723,204.71 |

**EXHIBIT C**
**Employment Fraudulent Transfers**

**Mullaney Salary and Bonus Payments**

| Payment Date | Payment Type | Amount |
|---|---|---|
| ~~Jun-16~~ | ~~Salary (per Employment Agreement)~~ | ~~475,000.00~~ |
| Jul-16 | Bonus (per Employment Agreement) | 250,000.00 |
| **TOTAL** | | ~~725,000.00~~250,000.00 |

**Life Insurance Premium Payments**

| Payment Date | Payment Type | Amount |
|---|---|---|
| 12/11/2015 | The US Life Insurance Co. | 326.81 |
| 1/14/2016 | The US Life Insurance Co. | 326.81 |
| 2/13/2016 | The US Life Insurance Co. | 326.81 |
| 3/12/2016 | The US Life Insurance Co. | 326.81 |
| 3/18/2016 | Lincoln National Life Insurance Company | 4,945.03 |
| 9/20/2016 | Lincoln National Life Insurance Company | 4,945.03 |
| **TOTAL** | | 6,252.27 |

**Other Expenses**

| Payment Date | Ledger Note | Amount |
|---|---|---|
| 8/15/2016 | Reimbursed out of pocket expenses | 2,194.00 |
| 8/16/2016 | Payment of personal legal bill taken as a deduction from salary | 378.63 |
| 10/19/2016 | Payment of personal travel expense taken as a deduction from salary | 8,333.33 |
| 10/31/2016 | Payment of personal expense taken as a deduction from salary | 500.00 |
| **TOTAL** | | 11,405.96 |

**American Express Expenses**

| Payment Date Range | Payment Type | Amount |
|---|---|---|
| 12/28/2015 - 12/27/2016 | American Express | 117,315.62 |
| **TOTAL** | | 117,315.62 |

| TOTAL FOR ALL CATEGORIES | | $~~859,973.85~~384,973.85 |
|---|---|---|

**Post-Petition Transfers**

**Mullaney Salary and Bonus Payments**

| Payment Date | Payment Type | Amount |
|---|---|---|
| Sep-17 | Salary (per Employment Agreement) | 237,550.00 |
| Oct-17 | Salary (per Employment Agreement) | 158,283.32 |
| **TOTAL** | | 395,833.32 |

**Other Expenses**

| Payment Date | Ledger Note | Amount |
|---|---|---|
| 2/28/2017 | Payment to Mullaney | 942.48 |
| **TOTAL** | | 942.48 |

**American Express Expenses**

| Payment Date Range | Payment Type | Amount |
|---|---|---|
| 12/28/2016 - 9/26/2017 | American Express | 59,517.70 |
| **TOTAL** | | 59,517.70 |

| | |
|---|---|
| **TOTAL FOR ALL CATEGORIES** | **$456,293.50** |