*1301 Avenue of the Americas*
*21st Floor*
*New York, New York 10019*
*Tel: 212 907-9700*
*www.sgrlaw.com*

**SMITH, GAMBRELL & RUSSELL, LLP**
*Attorneys at Law*

*John G. McCarthy*
*Direct Tel: 212-907-9703*
*Direct Fax: 212-907-9803*
*jmccarthy@sgrlaw.com*

February 26, 2020

**Via ECF**

Honorable Stuart M. Bernstein
United States Bankruptcy Judge
One Bowling Green
New York, New York 10004-1408

    Re:    *Sama v. Mullaney (In re WonderWork, Inc.)*
            Adv. Proc. No. 18-1873 (SMB)

Dear Judge Bernstein:

    We are the attorneys for defendants Clark Kokich, Steven Levitt, Richard Price and Steven Rappaport, who are members of the "Class of 2016" (the "2016 Directors"). We respectively submit this letter on their behalf to request that the Court dismiss, *sua sponte*, the Amended Complaint filed on February 14, 2020 by plaintiff Victor A. Sama. (Dkt. No. 72.) He and his attorneys have, once again, ignored this Court's instructions and continue to pursue frivolous claims against the Class of 2016, apparently as punishment for their opposition to the motion to appoint a trustee.

    As this Court noted, Sama is "not like [the usual] plaintiff who has to do the best it can and then hope it's pled a claim." (Dkt. No. 49 at 81.) Most "trustees…come in in this situation usually have a couple of years of investigating their claims." (*Id.*) Mr. Sama and his lawyers have been pursing Charles Wang's vendetta since at least 2011. (*See* S*mileTrain, Inc. v. Ferris Consulting,* No. 653381/2011 (Sup. Ct. N.Y. Cty. 2011). Sama is the beneficiary of the $2+ Million, 274-page Examiner's Report and its four boxes of exhibits.[1] But that is not all. Last June, Plaintiff informed defendants that he possessed, *inter alia*, the following materials: (1) WonderWork's production to the Examiner; (2) third party productions to the Examiner; (3) emails in Debtor's records to/from Brian Mullaney, DeLois Greenwood, Hana Fuchs, Karen

---

[1] The exhibits to the Examiner's Report referenced herein are cited to in the same manner as the "Key of Cited Documents and Transcripts" attached to Plaintiff's July 26, 2019 letter to the Court. (Dkt. No. 55, Ex. A.) Plaintiff has provided the Court with electronic and hard copies of these exhibits, but we would be happy to provide the referenced exhibits, upon the Court's request.

SGR/22382530.1



Atlanta | Austin | Jacksonville | London | Los Angeles | Miami | Munich | New York | Southampton | Washington D.C.

Lazarus, Janet Huang, Elaine Patafio, Michele Sinesky and Ujjal Bhattacharia (one complete set and one from which the Examiner removed non-substantive and duplicate materials); (4) emails in Debtor's records to/from Tiffany Carson, Barbra Schulman, Jenna Minchuck, Kathleen Trainor, Mollie Toomey and Vera Eastman; (5) 72 bankers' boxes of hardcopy documents from WonderWork's offices; and (6) access to WonderWork's Egnyte cloud.

This Court warned Plaintiff's counsel eight months ago that he does not get to rely on improper "group pleading until you get discovery." (Dkt. No. 49 at 82.) At the next conference in September, the Court denied Plaintiff's request to amend the original complaint to address the group pleading, stating: "I'm not going to authorize an amended complaint, because then [defendants are] going to have to make another motion to dismiss." (Dkt. No. 63 at 10.) The Court, in its Decision, admonished Plaintiff that "the one exception …is if the company issues some sort of proxy … if it contains fraudulent statements…it's sufficient to group plead in that situation, but <u>this is not that kind of case</u>." (*Id*. at 82 (emphasis added).) Plaintiff has now had four opportunities to come forward with well-pled factual allegations or evidence to support a plausible claim against our clients instead of improper group pleading, and each time has failed to do so. To avoid the expense of further motion practice, we respectfully request that the Court consider dismissing, *sua sponte*, Plaintiff's most recent pleading.

"The Court has the authority under Fed. R. Civ. P. 12(b)(6) to dismiss a complaint *sua sponte* for 'failure to state a claim upon which relief may be granted' if the complaint lacks an arguable basis either in law or fact." *MPM Silicones, LLC v. Union Carbide Corp.*, 931 F. Supp. 2d 387, 396 (N.D.N.Y. 2013) (*quoting Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991)). Thus, where, as is the case here, it is patently obvious that the plaintiff cannot prevail on the facts alleged in the complaint, it is an efficient use of judicial resources for the court to act on its own initiative. *Bauer v. Marmara*, 942 F. Supp. 2d 31 (D.D.C. 2013); *Pourzandvakil v. Humphry*, No. 94–CV–1594, 1995 WL 316935 (N.D.N.Y. May 23, 1995) (dismissing claims *sua sponte* because, among other things, "plaintiff has repeatedly attempted to replead her claims without being able to articulate actionable conduct.") Notice and an opportunity to be heard are the only prerequisites to the Court's exercise of this inherent power. *Thomas*, 943 F.2d at 260; *Bondi v. Grant Thornton Int'l (In re Parmalat Sec. Litig.)*, 377 F. Supp. 2d 390, 415 (S.D.N.Y. 2005). In light of the briefing schedule requiring motions to dismiss to be filed by March 20, 2020, we respectfully request that the Court allow Sama until March 4 to respond to this letter.

### I. **Plaintiff Made Only Cosmetic Changes to the Allegations Against the "Board"**

As the Court made clear in its January 17, 2020 Decision (Dkt. No. 70) (the "Decision"): "When a complaint is brought against multiple defendants, it cannot 'lump[] all the defendants together in each claim and provid[e] no factual basis to distinguish their conduct.'" (Decision at 33.) Claims against directors must be sufficiently particularized because they must be examined on a director-by-director basis. (*Id*. at 34.) In dismissing the claims

against our clients, the Court held that "while the First through Third claims in the *Complaint* do identify the members of the Board sued under the particular count, they do not identify which Directors did what. In other words, they lump the Defendants together as 'the Board.'" (Decision at 36.) Accordingly, in granting Plaintiff leave to amend, the Court admonished Plaintiff that any pleading must "contain a short and plain statement of the claim showing a plaintiff's entitlement to relief. Fed. R. Civ. P. 8(a)(2)." (*Id.* at 73.)

Rather than correct the group pleading problem as instructed, Plaintiff has simply recycled the same improperly-grouped allegations. The only difference is that this time, Plaintiff has (i) replaced references to "the Board" with the names of all the Board members, and (ii) asserted separate counts against each of our clients, individually. Tellingly, the count sections against our clients each contain *exactly the same* conclusory language, and each incorporate by reference the improperly-pled group allegations contained in the preceding paragraphs. The only difference in the allegations contained in Counts Three, Four, Five and Six against Messrs. Kokich, Levitt, Price and Rappaport is their names. Literally, Plaintiff "copied and pasted" the identical allegations and then ran a "search and replace" of the director's name in order to "distinguish" one director's conduct from that of the other directors.

Take, for example, claims against Richard Price. Prior to the Sixth Claim against him, every paragraph but two that contains the name Price also contains the names Levitt, Kokich and Rappaport. (Dkt. No. 72 at ¶¶ 33, 52, 54, 58, 59, 81, 82, 110, 118, 123 & 124.) The first of those two paragraphs, 20, alleges Price's identity. The other paragraph, 120, mentions that Levitt and Price "had involvement in Smile Train." It is difficult to fathom how Mr. Sama and his attorneys believe this distinguishes Mr. Price's conduct from that of the other directors.

Another particularly egregious example of cosmetic changes is in paragraph 59 of the Amended Complaint concerning the phantom 2016 bonus. The sum total of the new allegation is: "in addition to an annual base salary of $475,000 per year, the Board awarded Mullaney bonuses annually in 2013 to 2016 as follows:…$250,000 in 2016 approved by Coneys, Levitt, Kokich, Rappaport, Price and Atkinson." (Dkt. No. 72 at ¶ 59.) Literally, all Sama did was list the names of all of the Director Defendants who were Board members in 2016 instead of using the words "the Board."

Not only does this conclusory allegation still constitute improper group pleading, it is directly contradicted by Mullaney's Employment Agreement, the Examiner's Report and the Decision. First, it rests in part on Sama's misleading allegation that "Mullaney's Employment Agreement … entitled him to … a discretionary bonus **of** $250,000." (Dkt. No. 72, ¶ 65 (emphasis added).) Mullaney's Employment Agreement actually provided for "an annual bonus **of up to** two hundred fifty thousand dollars and no cents ($250,000) per annum, at the discretion of the Board of Directors." (Mullaney Doc. No. 41, ¶ 3(a) (emphasis added).)

Second, as we noted last May, the Trustee's bald allegation that the Board, including our clients, "approved" the phantom 2016 bonus is directly contradicted by the Examiner's Report.

(Dkt. No. 41 at 5-7.) According to the Examiner, a Board member usually informed Fuchs of Mullaney's bonus by email each year after the Board approved it during its June fiscal year-end meeting. (Ex. Rep. at 207.)) The minutes of the June 2016 meeting make no mention of Mullaney's bonus. (*Id.*, Ex. C.) In the Decision, this Court noted that Messrs. Price and Atkinson were not present at the June 2016 Board meeting. (Decision at 36.) Apparently the Examiner and his staff could not find a 2016 email from a Board member to Fuchs because the Examiner's Report identifies an email dated August 3, 2016 from Mullaney to Fuchs. (Ex. Rep. at 207.) Mullaney's email, which was not copied to any Board member, is the only basis identified in the Amended Complaint or the Examiner's Report for Fuchs to include the "2016 bonus" on her spreadsheet. Mullaney unilaterally instructed Fuchs to add a bonus to the spreadsheet without any reference to it having been approved by the Board or even its amount: "Please send me latest spreadsheet with my taking a large chunk and also being given a bonus so I can decide how much." (Dkt. No. 43, Exs. A at 197 & B.) Not surprisingly, in the nine months since our reply papers, Sama and his attorneys have not located among Fuchs' or Mullaney's emails, 72 boxes of WonderWork paper files, or WonderWork's cloud data any evidence that any of our clients approved the phantom bonus, which was never actually paid to Mullaney. (Dkt. No. 43, Ex. D at 3 of 12.)

Accordingly, as with the original complaint, Plaintiff has again violated Rule 8 (and ignored this Court's directive) by failing to sufficiently identify "which Directors did what." (Decision at 36.) Our clients, volunteer board members for a charity, should not be put to the expense of drafting another motion to dismiss and having this lawsuit hang over their heads for several more months.

## II. Plaintiff Advances The Same Conclusory And Implausible Allegations Already Rejected By This Court

In its Decision, the Court offered a guideline to Sama in the event that he was inclined to re-plead. For example, the Court explained that:

(i) Plaintiff cannot rely on Examiner's conclusory statements, but must instead rely on specific factual statements in the Examiner's Report and the exhibits attached thereto (Decision at 24-25, fn. 12);

(ii) To overcome the business judgment rule, Plaintiff was required to plead facts which establish that certain information was available to the corporate fiduciaries sufficient to rebut the presumption that a board's action was taken in good faith (*Id.* at 26-27); and

(iii) To state a claim for breach of fiduciary duty based on the action or inaction of the Class of 2016, Plaintiff was required to allege facts supporting a showing that each director was grossly negligent, and each

"knew they were not discharging their fiduciary obligations." (*Id.*, at 27-28.)[2]

Even a cursory examination of the Amended Complaint reveals that Sama has blatantly disregarded the Court's direction by continuing to advance implausible claims based on conclusory allegations against all Board members without distinguishing among them. As this Court explained: "'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' 'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' It is not sufficient for the complaint to plead facts that 'permit the court to infer . . . the mere possibility of misconduct; [plaintiff] must state 'the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' Determining whether a complaint states a plausible claim is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." (Decision at 23 (citations omitted).)

In addition to the conclusory allegations that our clients failed to "provide oversight of the Debtor or to control its activities," failed to "monitor Debtor, including by failing to implement internal controls or adequately oversee its operations and financial reporting," and "abrogate[ed] [their] responsibilities to oversee Debtor's management including with respect to public filings, record keeping, accounting practices, and solicitations and allowing Mullaney to keep fraudulent and misleading books and records and make false public filings," Plaintiff alleges that our clients collectively breached their duties by:

(a) approving inappropriate and excessive compensation and benefits for Mullaney for the year 2016;

(b) failing to follow Pearl Meyer's recommendations regarding Mullaney's compensation;

(c) permitting Mullaney and Fuchs to defer payment of his salary and bonus through the use of a secret side payroll ledger and permitting him to deduct expenses from those "deferred" amounts, allowing him to illegally avoid income tax and concealed his full compensation from donors and regulators;

(d) executing a declaration in favor of retaining Mullaney as CEO in opposition to the Trustee motion without adequate investigation into the merits of the

---

[2] Additionally, the Court noted that "the type of conduct that excepts a director from the protections of the volunteer immunity statute arguably required more egregious conduct" then the gross negligence standard applicable under Delaware corporate law. (Decision at 31, n14.)

> underlying claims and despite their knowledge of the serious allegations against Mullaney as detailed in the Arbitration Award; and
>
> (e) failing to inform the Court or otherwise take appropriate action in connection with the various issues that arose in the BDO audit.

These allegations are inexcusably based on bare conclusions, unsupported by facts or evidence, and thus fail to state plausible claims against our clients. They are addressed in turn below.

### A. Compensation and Benefits

#### 1. Benefits

The Amended Complaint alleges, in vague terms, that Mullaney was reimbursed for excessive "benefits" such as "commuting expenses, including for transportation costs, meals and hotels." (Dkt. No. 72, ¶ 69.) However, Plaintiff fails to identify with any particularity a single such expense that was reimbursed by the Company. Not surprisingly, Plaintiff also fails to identify a single "benefit" or "expense" approved by any of our clients.

Instead, Plaintiff merely states, in the most conclusory fashion imaginable, that "[a]t no point did any member of the Board question Mullaney's expenses or instruct him that they would not be reimbursed." However, as the Court observed in its Decision, "[t]he compensation and benefits paid to or received by Mullaney after January 1, 2016 for any period after January 1, 2016 were governed by the Employment Agreement…" (Decision at 70.) Our clients were not involved in the negotiation or approval of Mullaney's employment agreement. They cannot plausibly be charged with breaching their duties by failing to obstruct payments to which Mullaney was contractually entitled.

In any event, the Examiner's Report and the Amended Complaint suggests that almost all allegedly suspect expenses of $400,000 occurred well before our clients joined the Board. (Ex. Rep. at 214; Dkt. No. 72 at Ex. A at 1.) Sama seems to agree with this statement, alleging that "in the year prior to the Petition Date, Mullaney took at least $9,211.96 in personal expenses as a deduction from his back pay." (Dkt. No. 72, ¶ 86.) The evidence supporting the Examiner's Report makes clear that Fuchs approved the travel expense, at Mullaney's request, without our clients' involvement. (*See* Doc. Ex. 207.)

The only other "benefit" in the Amended Complaint alleged to have been paid after our clients joined the Board are life insurance premiums totaling $9,602. (Dkt. No. 72, ¶ 70.) As with the other benefits and expenses, the payment of Mullaney's life insurance policy was approved prior to our clients joining the Board (*id*., ¶ 65) and there is no well-pled factual allegation as to how each of our clients allegedly learned of these payments in 2016.

### 2. 2017 Salary Payment

Plaintiff also alleges that, after the petition, Mullaney and Fuchs authorized the Debtor to make two salary payments "consisting of 10-months of salary." (Dkt. No. 70, ¶ 134.) Once again Sama ignores this Court's directives. The Court already noted that "Pearl Meyer recommended that Mullaney's base salary remain at $475,000." (Decision at 41.) In dismissing a similar claim against Mullaney and Fuchs, the Court held that Sama failed to "allege facts showing that the payments were extraordinary and required Court approval" and that, in any event, "creditors would reasonably expect the Debtor to continue to pay [Mullaney's] same salary post-petition." (Decision at 65-66.) No creditor or interested party, including Sama's client HelpMeSee ("HMS"), raised any issues with Judge Vyskocil concerning payment of Mullaney's salary. Nevertheless, Plaintiff alleges that, in light of the "BDO audit issues," the Board breached its duties by failing to "constrain Mullaney or Fuchs." However, there is no allegation that our clients were aware of these payments before they were made. And these salary payments were disclosed on a monthly operating report filed with the Court on October 26, 2017.

### B. Pearl Meyer's Recommendations

Plaintiff alleges that Pearl Meyer recommended that the Board "periodically review Mullaney's compensation package to determine whether it was supported by market practices" (Dkt. No. 72, ¶ 62), and that our clients breached their duties because they never "re-reviewed" Mullaney's salary. This claim is patently implausible. The Pearl Meyer Report was presented at a June 13, 2013 Board meeting – years before our clients joined. (Decision at 7.) The Amended Complaint lacks any well-pled factual allegations from which one could reasonably infer that our clients were aware of the existence of the Pearl Meyer Report, let alone the "recommendation" in the report that Mullaney's compensation package be reviewed from time to time. More importantly, this claim is implausible as to our clients, given that Mullaney was contractually entitled to his salary and benefits based on a contract signed just before they joined the Board. Moreover, as explained earlier, the phantom 2016 bonus was never approved by the Board or paid by the Debtor.

### C. "Limbo" Pay

Sama begins his allegations about the "Limbo Pay" with the unsubstantiated allegation: "Specifically, with knowledge of the entire Board, including Dysart, Coneys, Levitt, Kokich, Rappaport, Price, and Atkinson, Mullaney instructed Fushs not to pay his base compensation and bonuses when those amounts were awarded, but rather to maintain a separate 'payroll ledger' that tracked Mullaney's base pay and bonus and reflected what he referred to as his 'limbo pay.'" (Dkt. No. 72, ¶ 82.) When asked by the Examiner which Board member knew about the separate payroll ledger, Hannah Fuchs responded: "I don't know about all of the directors. I know some of them." She did not identify any of our clients as among directors whom were allegedly aware of the "limbo pay" spreadsheet. (Dkt. No. 43, Ex. A at 219–220.)

Further contradicting this claim against our clients are the years of clean audits issued by KPMG. Indeed, the Court in the Decision acknowledged that "in a separate complaint filed against KPMG, the Debtor's former auditor, (*Sama v. KPMG LLP,* Adv. Pro. No. 18-1868, Doc. No. 1 ("KMPG Complaint") (Bankr. S.D.N.Y. 2008)), Sama alleged that the Debtor relied on the clean unqualified audits prepared by KPMG through June 2015. (*See id.*, ¶ 3 ("WonderWork justifiably relied upon KPMG to audit the Financial Statements . . . and to alert the Debtor to any material deficiencies and misstatements in connection with its Financial Statements, business and financial position."); *accord id.*, ¶ 33 ("The Debtor relied KPMG's on unqualified Audit Reports with respect to the Financial Statements for each of the years ended June 30, 2012 through June 30, 2015, and the Forms 990 prepared by KPMG, in approving executive compensation, making regulatory and IRS filings, and in managing the Debtor and continuing its operations.").)" Sama offers no well-pled factual allegations as to why the 2016 Directors could not reasonably rely on the KMPG audits.

Later in his "Limbo Pay" allegations, Plaintiff alleges, "upon information and belief" that "each member of the Board" was aware of the so-called "Limbo Pay" because the members "knew or should have known that Debtor's public disclosures did not match Mullaney's actual compensation." (Dkt. No. 72, ¶ 88.) None of our clients is mentioned by name in that paragraph. Moreover, the 2016 Directors began serving on the Board at the March 2016 meeting, and certainly no earlier than December 23, 2015, when they were elected. During their approximately one year of service before the bankruptcy petition, Mullaney only received his base salary of $475,000. Additionally, Sama failed to identify any public disclosure that failed to match his actual compensation during that period.

The Court has now given Mr. Sama three chances to provide evidence or well-pled factual allegations from which it could be inferred that our client's (1) knew about the "Limbo" Pay account and (2) knew it was improper. The Amended Complaint is Mr. Sama's third swing and miss. Accordingly, this claim should be dismissed.

### D. The Arbitration Award And The Declarations Submitted By Defendants In Opposition To The Appointment Of A Trustee

Plaintiff asserts that, given their alleged general awareness of the Debtor's prior litigation with HMS, our clients breached their fiduciary duties to the Debtor by vouching for Mullaney in opposing the appointment of a trustee. (Dkt. No. 72, ¶¶ 148, 152, 156 & 160.)

As the Examiner explained, the award must first be viewed in the context of Wang's deeply personal vendetta underlying the arbitration dispute. In 1999, Mullaney formed SmileTrain with Wang, and turned it into "the world's largest cleft [palate] charity, raising $120 million a year at its peak and helping to provide 120,000 surgeries a year." (Ex. Rep. at 60.)

In early 2010, a dispute between Mullaney and Wang arose with respect to the direction of the charity. Mullaney proposed that SmileTrain devote more time and money to surgically treatable diseases other than cleft, including cataract blindness, while Wang preferred to focus on cleft. It was this disagreement that prompted SmileTrain (under Wang's direction) to conduct an internal investigation into Mullaney.[3]

The resulting "investigation" launched by Wang into Mullaney's dealings centered on a report issued by Levitt, author of *Freakonomics*, regarding the declining number of cases of cleft. According to the arbitrator, the investigation found that "to buy Freakonomics' cooperation," Mullaney had "unilaterally doubled Freakonomics' monthly retainer" to "help justify Mullaney's argument that cleft would soon be eliminated." (Doc. Ex. 58, ¶ 18.)  Levitt, who was not deposed or interviewed in connection with the arbitration, has adamantly denied the arbitrator's findings as "completely false." (Dkt. No. 56, ¶ 10).[4]

Based on the results of Wang's investigation, Smile Train's Board forced Mullaney to resign. (Doc Ex. 58, ¶ 11.)  But Wang did not stop there. After Mullaney was forced out, SmileTrain hired the accounting firm Grant Thornton to investigate management further.  The accountants allegedly found that Mullaney had been reimbursed for expenses that were "either unsubstantiated or were personal" and found that he had deferred salary which would not then be included on his W-2 forms.  (*Id*., ¶ 30.)

In light of KPMG's series of clean audits, none of these "findings" of the arbitrator would give rise to any concern about Mullaney taking inappropriate reimbursements.  This is especially true given that the arbitrator appears to have been more focused on punishing WonderWork than crafting a just award. To put the arbitration award in context, the arbitrator awarded HMS every dollar that WonderWork had raised during the time it had an agreement with HMS – approximately $8.3 million – by determining that the purported purpose of all such donations was in fact to assist HMS. (Doc Ex. 58, ¶ 123.)  The donors were not provided with notice and the opportunity to be heard on this point.  After the Award was rendered, however, major donors whose gifts comprise more than three-quarters of the $8.3 million raised during that period confirmed that they intended their donations to go to WonderWork, not HMS. (*See* Bnkr. Dkt. No. 17, Ex. C.)  Kokich and his wife were among those major donors, and he explained in his declaration to Judge Vyskocil: "As we gather, the arbitrator somehow

---

[3] As an example of the deeply personal feud, the Arbitration Award described an incident where Wang forced Mullaney to sign an "apology letter," to remain at Smile Train, after Wang learned of emails in which Mullaney painted him in a negative light. (Doc Ex. 58, ¶ 22.)

[4] The declarations of Clark Kokich (Bnkr. Dkt. No. 52), Steven Levitt (Bnkr. Dkt. No. 56), Richard Price (Bnkr. Dkt. No. 57) and Steven Rappaport (Bnkr. Dkt. No. 58) filed in opposition to the appointment of a trustee were among the "submission exhibits" Plaintiff provided to the Court. (*See* Dkt. No. 55.)

determined that we were misled into giving to WonderWork. This could not be further from the truth." (Dkt No. 52, ¶ 7.)

Sama's claims are also contradicted by the Examiner's analysis of the arbitration award. The Examiner noted that it was "that feud [with Wang that] ultimately led [Debtor] to Chapter 11." (Ex. Rep. at 2.) Thus, when WonderWork commenced an arbitration for unpaid fees against its former client HMS, Wang/SmileTrain assisted HMS with the defense and the assertion of counterclaims which resulted in "a multi-year, multi-million dollar, hotly-contested arbitration proceeding, encouraged, if not funded, by Wang." (*Id*.) As to Wang's personal animus against Mullaney, the Examiner found "HelpMeSee's expenditure of nearly $5.9 million in fees in the Arbitration to obtain an award of $8.3 million in damages suggests that it was motivated by something more than just obtaining damages," and that SmileTrain's assistance "suggests that it, too, had motives other than seeing a just resolution of the Arbitration." (*Id.*, at 269.) The Examiner found SmileTrain's motives to be "distasteful" and concluded that the Debtor could assert tortious interference claims against both SmileTrain and HMS (*id*. at 264-69), although Plaintiff decided not to bring such a suit.

The Examiner further found that SmileTrain "took actions to ensure that certain fundraising professionals would not work with the Debtor" or Mullaney (*id*. at pp. 50-51), and that Wang was responsible for numerous lawsuits against Mullaney and those associated with him, which "interfered with the Debtor's ability to operate." (*Id*. at p. 50.) In the vast majority of those lawsuits, Wang/SmileTrain was represented by Sama, who also represented HMS in the arbitration against Debtor. (Doc Ex. 58, ¶ 2.) The Examiner also considered other claims against HMS, SmileTrain "and their common counsel" (*i.e*., the Litigation Trustee), and observed that their actions "exhibit a pattern aimed <u>at undermining the Debtor's operations at substantial cost to all three charities</u>," but nevertheless suggested that claims against them for abuse of process or prima facie tort were not worth pursuing. (Ex. Rep. at 269-70.)

Thus, while the Examiner identified what he deemed to be "colorable" claims against everyone – the board of directors, the officers Mullaney and Fuchs, the auditor KPMG, and against SmileTrain and HMS for tortious interference – the Litigation Trustee elected to commence litigation against everyone <u>except</u> his clients SmileTrain and HMS.

Critically, even the Examiner – who identified "at least colorable claims" against everyone – could not recommend asserting claims against our clients, as Plaintiff now does. Instead, the Examiner only went so far as to suggest the existence of "at least colorable" claims against the directors <u>who were involved in the arbitration</u> for "failure to provide adequate direction during the course of the Arbitration." (*Id*. at 45-46.)

The HMS arbitration was commenced on March 21, 2013 (Doc. Ex. 58, ¶ 116), and involved "conduct of the Debtor between August 2011 and August 2012." (*Id*., ¶ 120.) It is not clear why an unfavorable arbitration award in a contract dispute, commenced years before our clients joined the Board, should have raised a red flag such that our clients were placed on a

heightened duty to monitor WonderWork. Moreover, the arbitration award was rendered on October 13, 2016 (*id.*), only two months before the bankruptcy filing.

At bottom, as the Examiner acknowledges, the arbitration was the result of a personal feud between Wang and Mullaney. Our clients understood the nature of the dispute between Wang and Mullaney to be personal, and opposed the application of a trustee on the basis that removal of Mullaney – who had personally raised at least $18 million in Debtor's first six years of existence (Ex. Rep. at 95) – would be a devastating blow to the charity's continued viability. And, as it turns out, they were right. It is simply not plausible that alleged cursory knowledge of the arbitration could give rise to a claim of "gross negligence" against our clients simply for opposing the appointment of a trustee. Accordingly, Sama has failed to plead a cognizable breach of fiduciary duty claim under Delaware law against our clients.

### III. *Sua Sponte* Dismissal Is Appropriate Because Plaintiff Has Been Given Ample Opportunity And Notice And An Opportunity To Be Heard With Respect To Claims Against Our Clients

Although the Court by now is familiar with the issues relating to the claims against our clients, the unusual circumstances surrounding Plaintiff's submission bear repeating. As the Court will recall, our clients sought dismissal of the original complaint on the basis that it violated Rule 8, because our clients could not discern the allegations as made against them, individually, from the allegations made against the other Board members as a group. The prejudicial effect of Plaintiff's improper group pleading was amplified in this action because the bulk of Plaintiff's factual allegations against "the Board" concerned pre-December 23, 2015 conduct, which cannot form the basis of a plausible claim against our clients. Similarly, with respect to the handful of post-December 23, 2015 allegations in the original Complaint, Plaintiff failed to plead any facts making it plausible that the 2016 Directors were grossly negligent in discharging their duties as directors.

In opposition, Plaintiff changed his theory of liability as to our clients. Having failed to plead any facts to support a claim of gross negligence against the our clients, he pointed for the first time to the existence of purported "red flags," which he claimed required the 2016 Directors to exercise a heightened duty of "close and careful monitoring and oversight" with respect to Mullaney. As explained in our reply papers, however, the problem with this argument was that (i) the "red flags" were premised on factual allegations asserted against "the Board" as a whole and were largely based on conduct or events which occurred well before the 2016 Directors joined, and (ii) there were no plausible allegations that the 2016 Directors knew about any of them in real time.

At the June 27, 2019 hearing, when pressed by the Court, plaintiff's counsel conceded that, other than the claims concerning Mullaney's compensation (which are implausible as to

our clients), the claims against the Board are limited to the costs incurred in the *bankruptcy process* for "investigating and remediating" the alleged misconduct. (Dkt. No. 49, pp 16 – 17.)[5]

At that same hearing, responding to objections as to the improper "group pleading" in and conclusory allegations of, the complaint, the Court granted plaintiff leave to submit "a specific factual statement or an exhibit" from the Examiner's Report upon which plaintiff relied in asserting claims against each defendant. (Dkt. No. 49 at 82-83.) At the subsequent hearing on September 24, 2019, the Court rejected plaintiff's submission – which contained plaintiff's own "spin" on the allegations. And even after denying plaintiff leave to serve an amended complaint, the Court gave plaintiff another "Mulligan" to afford him "the opportunity to point out the factual allegations that were in the examiner's report but weren't in the complaint"— with the stated expectation that "there would be very few references." (*Id*. at 9-10.)

To the contrary, however, plaintiff ignored the Court's limited mandate by submitting 11 pages of single-spaced tables (in a small font) containing hundreds of references to documents that essentially recycled its original submission that the Court had rejected, without providing any references to specific allegations in the complaint.

Accordingly, the Court rejected Plaintiff's inappropriate submission, and dismissed Plaintiff's claims against our clients on the basis that the original complaint violated the pleading standards of Rule 8.

Plaintiff has apparently seized this "fourth bite at the apple" as an opportunity to change his theory of liability against our clients yet again. The core claim in the complaint was that the Board improperly approved Mullaney's allegedly excessive compensation package, and permitted him to engage in faulty accounting practices. As explained in our motion to dismiss, those claims are facially implausible as to our clients because, at the time the employment agreement was approved, they had not yet joined the Board, and there is no evidence that they should have been aware of any improper accounting practices, given that KPMG had issued clean audits for every year prior to the bankruptcy filing.

To avoid these glaring deficiencies in his pleading, Plaintiff has now manufactured a brand new theory of liability. His claim apparently is that our clients knew or should have known that Mullaney was a "bad apple," and thus they breached their fiduciary duties by vouching for him in opposition to plaintiff's motion for the appointment of a trustee. Plaintiff's entire basis for asserting this new claim rests upon the rickety foundation that our clients were "aware" that Mullaney had been involved in a personal legal dispute with plaintiff's client,

---

[5] As explained, however, Plaintiff's latest submission confirms that he cannot state a plausible claim against our clients that their actions or inactions resulted in an incremental cost, or prejudice, to the estate by an unreasonable delay in administering the estate.

SmileTrain, and that they should have disavowed him after the arbitrator rendered an unfavorable decision.

As explained above, viewed against the requirement of objective plausibility, Plaintiff has failed – even under the new theory of liability asserted in his Amended Complaint – to plead facts that rise to the level of gross negligence necessary to sustain his claims.[6]

Take, for example, Steven Levitt, professor of Economics at University of Chicago and co-author of the book *Freaknomics*. The only well-plead factual allegations specific to him in the Amended Complaint is that he read an arbitration decision which awarded damages against WonderWork, and that he subsequently submitted a declaration to the Court stating that he believed the award was erroneous and incorrect as to how it characterized his company's involvement in providing analytics for WonderWork. There is not a single plausible allegation that he (or any of our clients) knew about any of the alleged improprieties with respect to Mullaney's compensation or the company' accounting practices.

Accordingly, we respectfully request that the Court dismiss the Amended Complaint *sua sponte* as to Messrs. Kokich, Levitt, Price and Rappaport.

Respectfully yours,

John G. McCarthy

cc: Counsel of record
(via ECF only)

JGM/aeh

---

[6] Given the problematic character, from the outset, of Plaintiff's claims against our clients, as disclosed in the Examiner's Report, the Court should consider whether the case against the Class of 2016 has been prosecuted beyond the point where there was a reasonable and plausible basis to do so. And, if so, the Court, *sua sponte*, may consider whether sanctions are appropriate. *See In re Spectee Group, Inc*. 185 B.R. 146, 168 (Bankr. S.D.N.Y 1995) (Bernstein, J.).