UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

In re:                                                                          Chapter 11

WONDERWORK, INC.                                          Case No. 16-13607(SMB)
                                        Debtor.

-----------------------------------------------------X          Adv. Pro. No.
VINCENT A. SAMA, as Litigation Trustee              18-01873(SMB)
of the WW LITIGATION TRUST,
                                        Plaintiff,
         -against-

BRIAN MULLANEY, HANA FUCHS,
THEODORE DYSART, RAVI KANT,
JOHN J. CONEYS, STEVEN LEVITT,
CLARK KOKICH, STEVEN RAPPAPORT,
RICHARD PRICE and MARK ATKINSON,
                                        Defendants.
-----------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
LITIGATION TRUSTEE'S AMENDED ADVERSARY COMPLAINT
<u>AS AGAINST DEFENDANT JOHN J. CONEYS</u>**

CERTILMAN BALIN ADLER & HYMAN, LLP
*Attorneys for Defendant John J. Coneys*
90 Merrick Avenue – 9th Floor
East Meadow, New York 11554
(516) 296-7000

OF COUNSEL:
  Paul B. Sweeney
  Nicole L. Milone

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ...................................................... 3

ARGUMENT ......................................................................................................................... 9

   A.   VOLUNTEER IMMUNITY DEFENSE ......................................................................... 9

   B.   BEACH OF FIDUCIARY DUTY CLAIMS FAIL AS A MATTER OF LAW .............. 10

      1.   The Business Judgment Rule Requires Dismissal of the Claims that Coneys Breached His Fiduciary Duties .................................................................................................. 12

          a.   Claims Related to Mullaney's Compensation Are Fatally Deficient ....................... 13

          b.   Claims Related to Litigation Expenses and Settlements .......................................... 17

          c.   Claims Related to the Impact Loans ....................................................................... 18

          d.   Claims Related to Coneys' Opposition to the Appointment of a Trustee ................. 19

      2.   Failure to Monitor Claims Fail ....................................................................................... 22

      3.   The Trustee Failed to Allege Damages Sufficient to Support a Breach of Fiduciary Duty Claim ................................................................................................... 25

   C.   TRUSTEE'S CLAIMS AGAINST CONEYS ARE BARRED, IN PART, BY THE APPLICABLE STATUTE OF LIMITATIONS ............................................................... 28

   D.   THE TRUSTEE SHOULD NOT BE GRANTED LEAVE TO AMEND AGAIN ......... 30

CONCLUSION ...................................................................................................................... 32

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*In re AMC Inv'rs, LLC*,
    551 B.R. 148 (D. Del. 2016) ................................................................................... 27

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) ...................................................................................... 3

*Couden v. Duffy*,
    446 F.3d 483 (3d Cir. 2006) ....................................................................................... 9

*Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust ex rel Fed. Nat.
    Mortgage. Assn. v. Raines*,
    534 F.3d 779 (D.C. Cir. 2008) ................................................................................. 15

*In re Ridley*, 453 B.R. 58 (Bankr. E.D.N.Y. 2011) ...................................................... 30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .................................................................................................... 3

*In re W.J. Bradley Mortg. Capital, LLC*,
    598 B.R. 150 (Bankr. D. Del. 2019) .......................................................................... 9

**State Cases**

*Am. Lumbermens Mut. Cas. Co. of Ill. v. Cochrane*,
    129 N.Y.S.2d 489 (Sup. Ct.), *aff'd sub nom. 0Am. Lumbermen's Mut. Cas.
    Co. of Ill. v. Cochrane*, 284 A.D. 884, 134 N.Y.S.2d 473 (App. Div. 1954),
    *aff'd sub nom. Am. Lumbermens Mut. Cas. Co. of Illinois v. Cochrane*, 309
    N.Y. 1017, 133 N.E.2d 461 (1956) .......................................................................... 28

*Aronson v. Lewis*,
    473 A.2d 805 (Del. 1984) ............................................................................. 12, 13, 14

*Brehm v. Eisner*,
    746 A.2d 244 (Del. 2000) .................................................................................. passim

*Brown v. United Water Delaware, Inc.*,
    3 A.3d 272 (Del. 2010) ............................................................................................... 9

*In re Caremark Intern. Inc. Derivative Litig.*,
    698 A.2d 959 (Del.Ch. 2008) ...................................................................... 12, 22, 23

*Cirillo Family Tr. v. Moezinia*,
No. CV 10116-CB, 2018 WL 3388398 (Del. Ch. July 11, 2018) ...........................................15

*In re Citigroup Inc. S'holder Derivative Litig.*,
964 A.2d 106 (Del. Ch. 2009)...........................................................................................19, 23

*Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund II, L.P.*,
624 A.2d 1199 (Del. 1993) .......................................................................................................23

*Desimone v. Barrows*,
924 A.2d 908 (Del. Ch. 2007)..................................................................................................23

*In re Ebix, Inc. Stockholder Litig.*,
No. CV 8526-VCS, 2018 WL 3545046 (Del. Ch. July 17, 2018) ....................................17, 18

*Gantler v. Stephens*,
965 A.2d 695 (Del. 2009) .........................................................................................................10

*In re Goldman Sachs Grp., Inc. S'holder Litig.*,
No. CIV.A. 5215-VCG, 2011 WL 4826104 (Del. Ch. Oct. 12, 2011) ....................................12

*Horman v. Abney*,
No. CV 12290-VCS, 2017 WL 242571 (Del. Ch. Jan. 19, 2017) ............................................23

*Hubbard v. Dunkleberger*,
659 A.2d 227 (Del. 1995) ...........................................................................................................9

*Isaacson, Stolper & Co. v. Artisans' Sav. Bank*,
330 A.2d 130 (Del. 1974) ..........................................................................................................28

*In re Lear Corp. S'holder Litig.*,
967 A.2d 640 (Del. Ch. 2008)............................................................................................13, 20

*Oberly v. Kirby*,
592 A.2d 445 (Del. 1991) ...................................................................................................11, 26

*In re Orchard Enterprises, Inc. Stockholder Litig.*,
88 A.3d 1 (Del. Ch. 2014).........................................................................................................11

*Selectica, Inc. v. Versata Enterprises, Inc.*,
No. CIV.A. 4241-VCN, 2010 WL 703062 (Del. Ch. Feb. 26, 2010), *aff'd*, 5
A.3d 586 (Del. 2010) .................................................................................................................15

*Solomon v. Armstrong*,
747 A.2d 1098 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000)....................................18, 19

*Stone ex. Rel. AmSouth Bancorp. v. Ritter*,
911 A.2d 362 (Del. 2006) ...........................................................................................11, 23, 25

iii

*Verizon Directories Corp. v. Continuum Health Partners, Inc.*,
74 A.D.3d 416, 902 N.Y.S.2d 343 (1st Dep't 2010) ...........................................28

*In re Walt Disney Co. Deriv. Litig.*,
907 A.2d 693 (Del.Ch. 2005), *aff'd* 906 A. 2d 37 (Del. 2006) ..................11, 13, 22

*In re Walt Disney Co. Derivative Litig.*,
906 A.2d 27 (Del. 2006) ................................................................11, 13

*Zimmerman v. Crothall*,
No. 6001-VCP, 2012 WL 707238 (Del.Ch. Mar. 5, 2012)....................................13

**Federal Statutes**

11 U.S.C. § 108(a) ............................................................................28

26 U.S.C. § 501(c) .............................................................................9

**State Statutes**

8 Del. C. § 141(e)...................................................................15, 16, 17

10 Del. C. § 8133(b)(4)..........................................................................9

10 Del. C. § 8133(b)(5)..........................................................................9

10 Del. C. § 8133(d) ............................................................................9

10 Del. C. § 8133 ..............................................................................9

10 Del. C. § 8133(b) ...........................................................................9

**Rules**

CPLR § 202...................................................................................28

Fed. R. Civ. P. Rule 12(b)(6) ...................................................................1

Federal Bankruptcy Rule 9011 .................................................................20

Defendant John J. Coneys ("Coneys"), hereby submits this memorandum of law in support of his motion to dismiss, with prejudice, the Amended Complaint filed against him by Litigation Trustee, Vincent A. Sama ("Trustee") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, without leave to replead.

## PRELIMINARY STATEMENT

This is not a typical motion to dismiss. After the Trustee filed its first Complaint, the defendants moved to dismiss and this Court dismissed the Complaint due to impermissible group pleadings and conclusory allegations that failed to state a claim and specify exactly how the purported conduct damaged the debtor. The Complaint was insufficiently pled despite the fact that the Trustee had the benefit of an extensive investigation and 300-page Examiner's Report with boxes of exhibits of evidence. This Court dismissed the Complaint after providing the Trustee with two opportunities to identify specific facts in the Examiner's Report to supplement the factual allegations in the Complaint, which the Trustee failed to comply with. (Ex. F to Sweeney Dec., Memo Dec. p. 24, n. 12) In the Order dismissing the Complaint, this Court granted permission for the Trustee to file an amended complaint, but with the express admonishment that the Trustee replead its claims with a clear and concise statement and to detail exactly how the factual allegations against the defendants caused damage to the debtor. Once again, the Trustee has failed to heed this Court's admonishment and instead has submitted what is essentially the same complaint with very minor changes attempting (and failing) to address the group pleading problem. The only new factual allegations set forth are completely irrelevant to the claims of breach of fiduciary duty brought against Coneys.

There is still no claim that Coneys was interested in any decision or action by the directors. There is no claim that Coneys benefitted in any way from any conduct alleged in the Amended

1

Complaint.  Rather, the claims asserted by the Trustee against this volunteer director of a charitable organization are based entirely on arguments that question the business judgment of Coneys or claim that he performed his oversight duties negligently.  Contrary to the allegations that Coneys and the other directors were "passive" and "overly deferential," the filings in this action reveal an active and involved board that often relied in good faith upon the representations of management, as well as outside experts that they retained.  There is simply no basis under Delaware Law to hold Coneys liable because the charitable organization was "poorly governed," as the Amended Complaint alleges.  The cause of action asserted against Coneys should be dismissed with prejudice.

<u>**STATEMENT OF FACTS AND PROCEDURAL HISTORY**</u>

The Amended Complaint was filed by the Litigation Trustee in this adversary proceeding stemming from the Chapter 11 filing by the charitable organization, Wonderwork, Inc. ("Wonderwork" or "Debtor"), against former CEO Brian Mullaney ("Mullaney"), former CFO, Hana Fuchs ("Fuchs"), and numerous directors of Wonderwork, including the movant herein Coneys.[1]  Coneys hereby incorporates by reference the other defendants' motions to dismiss the Amended Complaint as if fully set forth herein.

As set forth in the Amended Complaint and Examiner's Report, this action concerns the unfortunate feud between the principals of certain charitable organizations that were unquestionably providing important and valuable medical procedures to persons in need. The dispute, set forth in detail in the Examiner's Report, between defendant Mullaney and Mr. Charles Wang, the co-founders of SmileTrain, Inc. ("SmileTrain"),[2] led to Mullaney's departure from SmileTrain and founding of Wonderwork. According to the Examiner, that ongoing feud led to Wonderwork's Chapter 11 filing, which occurred after another charitable organization, HelpMeSee, Inc. ("HelpMeSee") obtained, with the assistance of Wang and SmileTrain, a $14.2 million arbitration award against Wonderwork.  (Ex. B, ER 2, 269)

---

[1] The Amended Complaint relies extensively on the Final Report of Jason R. Lilien, Examiner's ("Examiner Report" or "ER"). (Exhibit B to the Declaration of Paul B. Sweeney, Esq. ["Sweeney Dec."] in support of the instant motion to dismiss) The Trustee has also filed a complaint against Wonderwork's outside auditor, KPMG, LLP ("KPMG Complaint.")(Exhibit D to Sweeney Dec.)  The Court may consider these filings in connection with this motion – as this Court previously recognized in its Decision on the prior motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (court must consider documents incorporated into the complaint by reference on a motion to dismiss and matters of which courts may take judicial notice); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (court may consider documents plaintiff relied on in bringing suit) (see also, Ex. F to Sweeney Dec., Memo Dec. at pp. 23-24; 44).

[2] SmileTrain was at one time the "world's largest cleft [palate] charity, raising $120 million a year at its peak." (Ex. B, ER 60)

The Examiner recognized that the relationship between SmileTrain on the one hand and Wonderwork and Mullaney on the other hand was "acrimonious", and SmileTrain's motives for interfering in Wonderwork's business were described as "distasteful." (Ex. B, ER. 267) Indeed, the Examiner concluded that Wonderwork had "colorable claims" against both SmileTrain and HelpMeSee for tortious interference with business relations (Ex. B, ER at pp. 267-269)  Notably, "HelpMeSee's expenditure of nearly $5.9 million in fees in the Arbitration to obtain an award of $8.3 million in damages suggests that it was motivated by something more than just obtaining damages." (*Id.* at p. 269) SmileTrain, having expended "substantial attorney's fees of its own" in the arbitration to assist HelpMeSee, also suggests that it had other motives. (*Id.*) The actions by SmileTrain and HelpMeSee were "aimed at undermining the Debtor's operations at substantial cost to all three charities." (*Id.* at 270) That there is "substantial hostility" between these charities is, according to the Examiner, an understatement. (*Id.*)  In fact, it was this feud with Mr. Wang of SmileTrain that ultimately led Wonderwork to file Chapter 11.  (*Id.* at 2)

Caught up in the middle of this hostility are the directors of Wonderwork, such as Coneys. After spending a 39-year career with PricewaterhouseCoopers ("PWC"), Coneys retired from the firm in 2012.[3] (Ex. C to Sweeney Dec., Coneys Aff. ¶2) Upon his retirement, Coneys joined the board of Wonderwork in December 2012.  (Ex. A, Comp. ¶48) Coneys agreed to join the Wonderwork board because he wanted to devote his efforts in retirement to an organization he described as being dedicated to "provid[ing] thousands of surgeries every year, rebuilding the faces and bodies of severely burned children, allowing the crippled to walk for the first time, or giving sight to the blind." (Ex. C, Coneys Aff. ¶19) Coneys joined defendants Theodore Dysart ("Dysart")

---

[3] At PWC, Coneys specialized in board governance, legislative and regulatory compliance, Sarbanes-Oxley oversight, among other areas of practice. (Ex. C to Sweeney Dec., Coneys Aff. ¶2)

4

and Ravi Kant ("Kant") as directors of Wonderwork. (Ex. A, Comp. ¶46) Each of the three were volunteers, independent directors.[4] Coneys was the Chair of the Audit Committee and for a period of time served as the Lead Independent Director.[5] (Ex. A, Comp. ¶¶49, 55) As a reward for volunteering their time to this charitable organization, when the Wang/Mullaney dispute resulted in Wonderwork's Chapter 11 filing, Coneys and the other directors of Wonderwork found themselves caught in the crosshairs and named as defendants in this adversary proceeding brought by the Trustee, who served as counsel for both HelpMeSee and SmileTrain. (Ex. B, ER at pp. 44-45, 269)

The Trustee first filed its Adversary Complaint against the defendants in this action on December 28, 2018. (Dkt. No. 1) Three of the thirteen original causes of action were pled against Coneys, each alleging breaches of fiduciary duty. The defendants filed motions to dismiss the original Complaint on or about April 2, 2019, the director defendants alleging in sum that the Complaint fails to state any fiduciary duty claim for lack of any individually pled factual allegations demonstrating any grossly negligent or bad faith conduct against each of them. (Dkt. Nos. 19 - 31) As pointed out by this Court during oral argument on the motions, the Trustee, unlike a typical plaintiff at the motion to dismiss stage, has had the benefit of a 274-page Examiner's Report complete with four boxes of exhibits and significant time to investigate these claims. (Ex. E to Sweeney Dec., Oral Arg. Tr. 81:10-21) Yet the Trustee still failed to plead any specific factual allegations against each director defendant and instead relied upon conclusory allegations and impermissible group pleading.

---

[4] Additional directors joined the Board in 2015, namely defendants Steven Levitt, Clark Kokich, Steven Rappaport, Richard Price and Mark Atkinson. (Ex. A, Comp. ¶¶17-21)
[5] Coneys' tenure as Lead Independent Director lasted "only a period of a few months, and his responsibilities were limited to finalizing Mullaney's employment agreement." (Ex. B, ER 57)

After oral argument, the Court permitted the parties to make post-argument submissions detailing the facts upon which they relied in the Examiner's Report and its exhibits that were missing from the Complaint or that supported the motions to dismiss. (Ex. E, Oral Arg. Tr.82:20-83:13) The Trustee's first submission contained a seventeen-page table that did not clearly identify the facts it wanted the Court to rely upon. (Dkt. No. 55-1; Ex. F, Memo Dec. 24-25, n. 12) After granting the Trustee another chance to identify these facts, the Trustee provided a fifty-page submission akin to an opposition brief that again failed to pinpoint the pertinent facts it wished the Court to rely upon in the overwhelming Examiner's Report and boxes of exhibits. (Dkt. No. 64; Ex. F, Memo Dec. 24-25, n. 12) Despite being given two opportunities after filing the Complaint to identify specific facts to support its claims against Coneys and the director defendants, the Trustee failed to do so.

The Court granted in part the defendants' motions to dismiss in its January 17, 2020 memorandum decision (the "Memo Decision.") The first, second and third causes of action were dismissed against Coneys and the other director defendants, except for the claim in the third cause of action that the director defendants breached their fiduciary duties by submitting declarations to this Court in opposition to the appointment of a trustee without adequate investigation. (Ex. F, Memo Dec., pp. 36-38) The Memo Decision held the Complaint failed to state a claim against each individual director defendant due to the impermissible group pleading which did "not identify which Directors did what" and "lumped the Defendants together as 'the Board.'" (Ex. F, Memo Dec., p. 36) The Memo Decision then granted the Trustee's request to amend the Complaint, with an admonition: first, that the pleading set forth a "short and plain statement" of the claim, and second, that the "focus of any amended complaint should be on those acts that caused an injury to

the Debtor and entitle the Plaintiff to recover damages on behalf of the creditors[,]". (Ex. F, Memo Dec., p. 73)

On February 14, 2020, the Trustee filed its Amended Complaint (Dkt. No. 72; Ex. A to Sweeney Dec.): the Trustee's fourth shot at demonstrating the factual allegations (based on the Examiner's lengthy report and investigation) against the defendants. Yet the Trustee sets forth the same impermissible group pleading allegations against Coneys and the other director defendants, among other inadequate conclusory allegations that do not state a claim against Coneys as a matter of law.

The Trustee's Amended Complaint asserts sixteen causes of action, most primarily against Mullaney. The second cause of action, however, is asserted against Coneys for breach of fiduciary duties. The Amended Complaint contains few new factual allegations against Coneys – the bulk of the revisions dedicated to changing the term "the Board" and replacing it with whoever sat on the Board at the time of the alleged act. The Amended Complaint largely contains exactly the same allegations using conclusory language and improperly pled group pleading as the original Complaint. Indeed, the few new allegations against Coneys in the Amended Complaint refer to conclusions in the Examiners' Report, which this Court expressly warned the Trustee would not be considered. (Ex. F, Memo Dec. at p. 24) (*See e.g.* Ex. A, Comp. ¶122 [alleging that the Examiner concluded that the Board was "wholly uninvolved" with Debtor's operations]) There are a series of additional factual allegations surrounding the appointment of an examiner and Coneys' (and some of the other director defendants') submission of a declaration in opposition to the appointment of a trustee – yet other than the wholly conclusory allegation that the declaration contained "false assertions," the Amended Complaint makes absolutely no allegations that

challenge the factual bases for the statements made by Coneys in his declaration. (Ex. A, Comp. ¶¶116-125)

As in the original Complaint, there is no claim in the Amended Complaint that Coneys was interested in any transaction at issue in this case, nor is he accused of gaining any personal benefit whatsoever from any conduct at issue. Rather, the allegations in the Amended Complaint against Coneys are further conclusory, group pled allegations that Wonderwork was "poorly governed" and that the directors were "overly deferential" to Mullaney, and failed to supervise Wonderwork's day-to-day operations.  (Ex. A, Comp. ¶¶1, 56, 92-98) There is not a single specifically pled allegation that Coneys engaged in intentional misconduct, knowingly permitted wrongful conduct to take place, or in any way acted in bad faith.  In short, the Amended Complaint contains a litany of conclusory allegations that Coneys was, at worst, negligent in performing his oversight duties as a director of Wonderwork.  Such is plainly insufficient for director liability under Delaware law.

<b><u>ARGUMENT</u></b>

## A. <u>VOLUNTEER IMMUNITY DEFENSE</u>

Under Delaware law, volunteer directors have statutory immunity from civil claims for damages. *See* Del. Code Ann. tit. 10, § 8133. The Delaware Supreme Court has explained that this statutory provision "provides broad immunity for all kinds of volunteers for not-for-profit organizations and governmental agencies." *Hubbard v. Dunkleberger*, 659 A.2d 227 (Del. 1995).

The statute states that "[n]o volunteer of an organization shall be subject to suit directly, derivatively or by way of contribution for any civil damages under the laws of Delaware resulting from any negligent act or omission performed during or in connection with an activity of such organization." tit. 10, § 8133(b). "Organization" is defined to include "[a]ny not-for-profit organization exempt from federal income tax under § 501(c) of the Internal Revenue Code (26 U.S.C. § 501(c))…." tit. 10, § 8133(b)(4). The definition of "Volunteer" expressly includes "any…director…who is engaged in an activity without compensation." tit. 10, § 8133(b)(5). However, "[t]he immunity granted in subsection (b) of this section shall not extend to any act or omission constituting *willful and wanton or grossly negligent conduct*." 10 Del. C. § 8133(d) (emphasis added).

In the context of a breach of a director's duty of care, gross negligence "generally requires that officers, directors, and managers fail to inform themselves fully and in a deliberate manner." *In re W.J. Bradley Mortg. Capital, LLC*, 598 B.R. 150, 163 (Bankr. D. Del. 2019). While the willful and wanton standard has not been applied in connection with a breach of fiduciary duty claim, when used in other contexts in Delaware it is defined as "conduct reflecting a 'conscious indifference' or 'I don't care' attitude." *Brown v. United Water Delaware, Inc.*, 3 A.3d 272, 276 (Del. 2010); *see also Couden v. Duffy*, 446 F.3d 483, 498 (3d Cir. 2006). As this Court previously

9

found, the standard is one of "irrationality", which may be the "functional equivalent of the waste test." *Brehm v. Eisner,* 746 A.2d 244, 264 (Del. 2000). To show corporate waste, the Trustee must show "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Id*. At 263, *citing Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997) ("If, however, there is *any substantial* consideration received by the corporation, and if there is a *good faith judgment* that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude *ex post* that the transaction was unreasonably risky.")

The Trustee does not allege that Coneys' conduct was willful, wanton, irrational or negligent. The Trustee does state, however, that Coneys acted in "bad faith." (Ex. A, Comp. at ¶144) However, bald conclusory allegations of "bad faith" are insufficient to support a claim against a volunteer director under the protections of section 8133. The Amended Complaint has failed to set forth any factual allegations that rise to the level of gross negligence, willful or wanton conduct, or irrationality sufficient to overcome the volunteer immunity statute. For this reason alone, the claims against Coneys should be dismissed.

## B. <u>BEACH OF FIDUCIARY DUTY CLAIMS FAIL AS A MATTER OF LAW</u>

To the extent the volunteer director Coneys is not shielded from liability on volunteer immunity grounds, the claims against him should be dismissed because the allegations in the Amended Complaint are insufficient to overcome the high burden for pleading breach of fiduciary duty claims under Delaware law.

As this Court previously found, under Delaware law, directors owe fiduciary duties of care and loyalty to their corporation. *Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009) (Ex. F, Memo Dec. at p. 25). A violation of the duty of loyalty occurs when a "fiduciary intentionally acts with a

10

purpose other than that of advancing the best interests of the corporation." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006). The duty of loyalty includes a requirement to act in good faith as a "subsidiary element" or a "condition of the fundamental duty of loyalty." *In re Orchard Enterprises, Inc. Stockholder Litig.*, 88 A.3d 1, 32-33 (Del. Ch. 2014), *quoting Stone ex. Rel. AmSouth Bancorp. v. Ritter,* 911 A.2d 362, 370 (Del. 2006). Importantly, a director "cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest." *Stone v. Ritter*, 911 A.2d at 370, *quoting Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003). A director's fiduciary duty of care requires "that amount of care which ordinarily careful and prudent [persons] would use in similar circumstances." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

Notably, the fiduciary duties of directors of a charitable organization are measured by the same standards as that of directors of a non-charitable, or a for-profit, organization. *Oberly v. Kirby*, 592 A.2d 445, 461 (Del. 1991). The business judgment rule applies equally to the decisions of directors of a charity as to directors of a profitable corporation. *Id*. at 462 ("A court cannot second-guess the wisdom of facially valid decisions made by charitable fiduciaries, any more than it can question the business judgment of the directors of a for-profit corporation").

However, judicial scrutiny of a breach of fiduciary duty claim brought against a director of a charitable entity is "limited to (a) any financial harm or jeopardy to the [charitable entity] itself and its beneficiaries and (b) any personal benefit to [the director] or his family, notwithstanding the absence of harm to the [charity]. *Id*. at 462. As there are no allegations in the Amended Complaint that Coneys personally benefitted from any of his conduct, the Trustee must allege "financial harm or jeopardy" to Wonderwork or its beneficiaries in order to sustain a breach of

fiduciary duty claim against Coneys. The Amended Complaint fails to meet this burden. Director liability for an alleged breach of their fiduciary duty may arise in two contexts: (1) liability resulting from a negligent board decision; or (2) liability from the board's alleged failed oversight over the operations of the corporation. *In re Caremark Intern. Inc. Derivative Litig.,* 698 A.2d 959, 967 (Del.Ch. 2008). In the present action, the Trustee alleges that Coneys breached the duty in both manners. However, as shown below, the Trustee's claims are deficient in critical respects and cannot withstand the present motion to dismiss.

### 1. The Business Judgment Rule Requires Dismissal of the Claims that Coneys Breached His Fiduciary Duties

Claims based on the allegation that certain board decisions violated the duty of care are subject to review under the business judgment rule. *In re Caremark,* 698 A.2d at 967. The business judgment rule presumes that "directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984). Accordingly, "directors' decisions will be respected by courts unless the directors are interested or lack independence relative to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available." *Brehm v. Eisner,* 746 A.2d 244, 264, n. 66 (Del. 2000). As this Court stated, "[w]hen making a business decision, a board need not be 'informed of every fact,' but must consider the 'material facts that are reasonably available at the time of the decision.'" *Brehm,* 746 A.2d at 259. This rule protects directors allowing them to make decisions that, "in their business judgment, are in the best interest of the corporation" without the fear that they will be personally liable for losses as a result of a poor decision. *In re Goldman Sachs Grp., Inc. S'holder Litig.*, No.

CIV.A. 5215-VCG, 2011 WL 4826104, at *23 (Del. Ch. Oct. 12, 2011). "Irrationality is the outer limit of the business judgment rule." *Brehm,* 746 A.2d at 264.

This standard imposes the burden on plaintiff to rebut the presumption and establish facts which show that the director's decision was wholly irrational or the result of gross negligence. *In re Lear Corp. S'holder Litig.,* 967 A.2d 640, 651 (Del.Ch. 2008) (*citing Aronson v. Lewis,* 473 A.2d 805, 812-13 (Del. 1984), *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del. 2000). Gross negligence has a "stringent meaning" that limits its application to instances involving "indifference amounting to recklessness." *Zimmerman v. Crothall,* No. 6001-VCP, 2012 WL 707238, at *6 (Del.Ch. Mar. 5, 2012) (*citing Albert v. Alex Brown Mgmt. Serv., Inc.,* No. Civ.A. 762-N, No. Civ.A. 763-N, 2005 WL 2140607, at *4 (Del.Ch. Aug. 26, 2005).[6] The Trustee's claims against Coneys based on allegedly negligent decisions made utterly fail to meet this high standard.

### a. Claims Related to Mullaney's Compensation Are Fatally Deficient

The Trustee claims that Coneys' participation in approving Mullaney's and Fuch's compensation and Mullaney's employment agreement breached his fiduciary duties.[7] (Ex. A, Comp. ¶¶59-66, 144(c)-(e)) The Trustee's claim that Mullaney's compensation was too generous challenges the judgment of the directors that is plainly protected by the business judgment rule. *Brehm,* 746 A.2d at 263; *Aronson,* 473 A.2d at 817. Under the business judgment rule courts will rarely second-guess director's compensation and severance decisions because the "size and

---

[6] *See also In re Walt Disney Co. Deriv. Litig.,* 907 A.2d 693, 749-50 (Del.Ch. 2005)("[C]ompliance with a director's duty of care can never appropriately be judicially determined by reference to *the content of the board decision* that leads to a corporate loss, apart from consideration of the good faith or rationality of the process employed.... [Instead,] whether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through 'stupid' to 'egregious' or 'irrational,' provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in *a good faith* effort to advance corporate interests."), *aff'd,* 906 A.2d 27 (Del. 2006).

[7] The decision on Mullaney's compensation was made by three independent directors. (Ex. B, ER 196)

structure of executive compensation are inherently matters of judgment." *Brehm,* 746 A.2d at 263. Directors have "broad" powers to fix compensation for officers. *Aronson,* 473 A.2d at 817.

Indeed, the allegations of the Amended Complaint as well as the Examiner's Report, which is relied upon extensively in the Amended Complaint, reveal the reasonableness of the directors' approval of Mullaney's compensation. As the Amended Complaint concedes, the directors approved compensation for Mullaney, who had been highly successful as the co-founder of Smile Train, that was the same as he received at Smile Train. (Ex. A, Comp. ¶59). While Smile Train was certainly a larger and more established organization, it was Wonderwork's business plan to within five (5) years raise nearly as much funds as Smile Train. (Ex. A, Comp. ¶59 [Smile Train raised "$120 million" in Mullaney's last year,] Ex. B, ER at 79 [Wonderwork's business plan was raised a projected $75-$100 million over a five-year period.]) The Amended Complaint further concedes that the compensation decisions were not the result of "indifference amounting to recklessness" by the directors in light of the allegation that they hired a compensation consultant and the fact that Mullaney's compensation "had taken up a considerable amount of Board time." (Ex. A, Comp. ¶55) Nor can the Trustee genuinely assert that the directors were "passive and overly deferential" to Mullaney (Ex. A, Comp. ¶1) on the issue of compensation in light of the above, as well as (1) the allegations in the Amended Complaint which reveal that the compensation consultant was hired over the objection of Mullaney (Ex. A, Comp. ¶60); and (2) the fact that the board excluded Mullaney from discussions concerning his compensation so often that Mullaney complained. (Ex. B, ER 52-53)[8]

---

[8] Moreover, while the Trustee alleges that fellow Board member Dysart resigned over issues regarding Mullaney's compensation and employment agreement, the Amended Complaint avers that Dysart did not communicate his concerns to Coneys and Coneys was not aware of the reasons for Dysart's departure. (Ex. A, Comp. ¶51)

Moreover, directors are fully protected from liability when they rely on a qualified expert under Section 141(e) of Delaware General Corporation Law. *Brehm,* 746 A.2d at 261. *See also, Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust ex rel Fed. Nat. Mortgage. Assn. v. Raines,,* 534 F.3d 779, 790 (D.C. Cir. 2008) (dismissing claims under Section 141(e) due to directors' reliance on opinions of the company's outside auditors.); *Cirillo Family Tr. v. Moezinia*, No. CV 10116-CB, 2018 WL 3388398, at *14 (Del. Ch. July 11, 2018) (establishing that Section 141(e) provides a "complete safe harbor" from director liability if the director was disinterested, acted in good faith and relied on expert advice); *Selectica, Inc. v. Versata Enterprises, Inc.*, No. CIV.A. 4241-VCN, 2010 WL 703062, at *17 (Del. Ch. Feb. 26, 2010), *aff'd*, 5 A.3d 586 (Del. 2010) *quoting Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1142 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995) ("A board's reliance on expert advice 'evidence[s] good faith and the overall fairness of the process.'"). As the Amended Complaint concedes, the Board hired a compensation consultant (over Mullaney's objection) and entered into a compensation agreement that was consistent with recommendations by the compensation expert.[9] (Ex. A, Comp. ¶60) While the Amended Complaint alleges that the compensation was at the high-end of the consultant's recommendations, there can be little question that the Board's decision is absolutely protected by Section 141(e).

The Amended Complaint alleges that Mullaney urged Pearl Meyer to use comparable non-profits that were not in line with Wonderwork's size, and thus the peer comparisons for his compensation were "gerrymandered" by Mullaney. (Ex. A, Comp. ¶61) However, this Court

---

[9] The Amended Complaint alleges that Mullaney interfered with the consultant's work regarding his compensation, but there is no allegation that the Board was aware of this alleged interference. (Ex. A, Comp. ¶¶60, 62, 65) Moreover, the Amended Complaint questions the bonus awarded to Mullaney each year but concedes that he did not receive the bonuses awarded. (Ex. A, Comp. ¶87)

previously recognized that Mullaney had no improper influence or coercion over the Board, the Compensation Committee, or Pearl Meyer in the evaluation and approval of his compensation. (Ex. F, Memo Dec. at p. 42) Indeed, the Court recognized, as outlined in the Examiner's Report, that Pearl Meyer sought Mullaney's input in their evaluation of his compensation. (*Id*. at p. 40) Thus, the Court properly concluded that Mullaney did not breach any fiduciary duties by improperly interfering with Pearl Meyer and accepting the compensation awarded by the Board as recommended by Pearl Meyer. (*Id.* At 42) Likewise, any claim against Coneys based on Mullaney's alleged interference with Pearl Meyer must fail.

The claim that Coneys and the director defendants should be liable because they permitted Mullaney's "limbo pay" and allowed him to defer receiving payment of bonuses also fails. (Ex. A, Comp. ¶¶82-89) First as this Court previously recognized, the KPMG Complaint and Examiner's Report concedes the company auditors were aware of the practice and permitted it. (Ex. B, ER 218; Ex. D, KPMG Comp. ¶¶3, 33; Ex. F, Memo Dec. at p. 44) The complaint the Trustee filed in this Court against KPMG alleges that KMPG issued unqualified audit reports for 2013, 2014, 2015 and 2016 that approved of the executive compensation. (Ex. D, KPMG Comp. ¶¶3, 32, 33, 44-46) The KPMG Complaint further states that KPMG failed to identify deficiencies as to "how executive compensation was recorded and accounted for and how donations were classified." (Ex. D, KPMG Comp. ¶¶ 39, 40) The Examiner's Report and KPMG Complaint reveal that the Board relied on the opinions of the company auditors that the executive compensation was properly accounted for and such reliance protects the decision from liability under Section 141(e). (Ex. B, Examiner's Report p. 218, 220; Ex. D, KPMG Comp. ¶3)[10]

---

[10] The Amended Complaint alleges that Mullaney's travel expenses were improper and contrary to Wonderwork's travel policy. (Ex. A, Comp. ¶¶71-73). But there is no allegation the Board was aware of the travel expenses or that the travel policy allegedly was not being followed. The Amended Complaint further alleges that other expenses were

In fact, the Examiner's Report states that Coneys believed in good faith that the "limbo pay" classifications were proper and did not harm the company.   (Ex. B, ER 218, 220) Coneys was surprised when Mullaney claimed the foregone bonuses were due to him based on his prior communications with Mullaney.  (Ex. B, ER 218, 220 [Coneys was "genuinely surprised to learn Mullaney was asserting a claim against Wonderwork of over $600,000 for unpaid prepetition wages" based on the bonuses he did not receive.]) Coneys was certainly entitled to rely in good faith upon the representations of management. *In re Ebix, Inc. Stockholder Litig.*, No. CV 8526-VCS, 2018 WL 3545046, at *13 (Del. Ch. July 17, 2018) (holding under 8 Del. C. § 141(e), directors entitled to rely in good faith on assurances "express and implied" of fellow directors, employees, committees of the board and corporate records, among other things).[11]

**b.  Claims Related to Litigation Expenses and Settlements**

The Amended Complaint alleges that it was improper for the directors to approve the payment of certain legal fees and settlements.  (Ex. A, Comp. ¶72-81) All of these allegations fail under the business judgment rule.  No allegation is made that the Board was acting in bad faith or that they failed to inform themselves fully of these "Legal Actions" – in fact, quite the opposite. The Trustee alleges that these "Legal Actions" were "routinely discussed at Board meetings" - contrary to the conclusory allegations that the Board was passive and deferential.  (Ex. A, Comp. ¶81)

More specifically, in connection with the "Smile Train Copyright Case", the directors approved payment of legal fees up to $150,000 and eventually paid $245,357.45 in fees and

---

deducted from the "limbo pay" bonuses.  (*Id.* ¶89)  Once again, the Amended Complaint fails to allege Coneys or any board member was aware of any specific expense that the Trustee claims was "excessive."  (*Id.* ¶¶89-92)

[11] The Trustee also claims that Coneys and the director defendants are liable "for making or permitting Debtor to make clearly false and misleading statements in [Wonderwork's] public filings."  (Ex. A, Comp. ¶¶126, 131, 136)  There is no question that such a claim is barred under Section 141(e) as Coneys plainly relied upon KPMG with regard to the accuracy of the public filings.

approximately $450,000 as part of the settlement. (Ex. A, Comp. ¶¶74, 76, 77) However, according to the Examiner, this was done because "Wonderwork was the beneficiary of certain donations obtained from donors that had received a copy of the book from Mullaney." (Ex. B, ER p. 46) Such a decision to pay for litigation and related expenses that could negatively impact Wonderwork's fundraising efforts cannot be categorized as "irrational." *Solomon v. Armstrong*, 747 A.2d 1098, 1115–16 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000) (to rebut the presumption that the business judgment rule applies, plaintiff must allege facts that the transaction in question was irrational or amounted to waste). Wonderwork also paid travel expenses for Mullaney in connection with the UK Smile Train litigation based on representations from Mullaney that he was meeting with donors during his trips to the UK. (Ex. A, Comp. ¶80, Ex. B, ER. 47) The Board was clearly entitled to rely upon Mullaney's representation regarding these expenses. *In re Ebix, Inc. Stockholder Litig.*, at *13. Thus, a reasonable basis plainly existed for the directors' decision that protects these decisions under the business judgment rule.

### c. Claims Related to the Impact Loans

The Trustee's claims based on the approval of impact loans is equally unavailing. According to the Amended Complaint, the directors approved of "close to $10 million" of "impact loans" that allegedly had maturity dates "starting in May 2018 and ending in January 2020." (Ex. A, Comp. ¶100) According to the Amended Complaint, "there was no way that Debtor could ever repay these loans[.]" (*Id.* ¶ 104). These allegations fail to satisfy the high burden to overcoming the business judgment rule, as explained by the Examiner. The impact loans were intended to "raise start-up capital" for the newly-formed Wonderwork. (Ex. B, ER 79) The rationale for the impact loans, as opposed to a donation, was that the impact loans were preferable due to "the potential close relationship that could be cultivated" with the donor, were more likely to raise

significant money than donations, and "would give the Debtor an audition period to prove that it deserved the funds." (Ex. B, ER 80)  Most importantly, Mullaney (and the directors) believed "that the loans would be forgiven."  (Ex. B, ER 80)  That belief was shown to be correct as numerous impact loans have been forgiven.  (Ex. B, ER 82, 89)  There is no allegation that the business rationale of the directors in approving the impact loans was incorrect, never mind being so grossly negligent to render them liable under the business judgment rule.  *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009) ("the burden required for a plaintiff to rebut the presumption of the business judgment rule by showing gross negligence is a difficult one, and the burden to show bad faith is even higher."); *Solomon v. Armstrong*, 747 A.2d at 1111–12 (complaint alleging director breach of fiduciary duty claims dismissed due to business judgment rule protecting directors' determination of allocation of value).

### d.  Claims Related to Coneys' Opposition to the Appointment of a Trustee

The Trustee claims that the mere submission of an affidavit by Coneys to this Court in opposition to the motion by HMS to appoint a Chapter 11 trustee is grounds for a breach of fiduciary duty claim.  (Ex. A, Comp. ¶144(h)) That claim must fail.

First, this claim was made in the original Complaint, namely that Coneys breached his fiduciary duty by filing an affidavit stating, *inter alia,* that the "Wonderwork Board [was] very involved in the organization's decision making." (Ex. A, Comp. ¶¶25, 134(d); Ex. F, Memo Dec. p. 37).  Although this Court did not reach a decision on this aspect of Coneys' motion to dismiss,[12] the Court expressed its view of this claim:

---

[12] The Memo Decision stated with regard to the Trustee's claim that the Coneys' affidavit (as well as those filed by other director defendants) that "[n]one of the parties paid any attention to this claim in their submissions and I will not consider its sufficiency without briefing." (Ex. F at p. 37)  In fact, Coneys addressed this issue in his motion to dismiss when he argued: "The Trustee also claims that the mere submission of an affidavit by Coneys in this Court is grounds for a breach of fiduciary duty claim.  (Ex. A, Comp. ¶136(d)) That is nonsense.  According to the Complaint, Coneys' affidavit, submitted herewith as Exhibit C, set forth the manner in which the directors fulfilled their duties, as well as

> "The breach of fiduciary duty claim based on the submission of the opposing declarations seems to be an attempt to punish the Directors for exercising their business judgment to oppose the Trustee Motion because they believed it would be bad for Debtor. If HMS, then represented by the same lawyer that now represents the Plaintiff, though the declarations were submitted without an adequate investigation, HMS could have made a motion for sanctions under Federal Bankruptcy Rule 9011. It did not."

(Ex. F, Memo Dec. at p. 37, n. 15)

The Amended Complaint suffers from the same deficiency – it seeks to punish Coneys for exercising his business judgment and acting in a manner he thought was in the best interests of the Debtor. The Trustee cannot overcome the business judgment rule because Coneys' affidavit reveals that it was not "wholly irrational," but rather was based on a good faith belief as to what was in the best interests of the Debtor. *See Brehm,* 746 A.2d at 259, 264; *In re Lear Corp. S'holder Litig.,* 967 A.2d at 651.

First, Coneys states the importance of Mullaney's connections to Wonderwork's donor base and that Mullaney "is the only Wonderwork employee who works on acquiring and cultivating major donors." (Ex. C, Coneys' Aff. ¶7) He then details Mullaney's close connections to a "network of hospitals" which was necessary for the continuance of the Debtor's work. (*Id.* ¶9) Coneys explains that he is filing the affidavit because he does not believe that a Trustee could perform these tasks (a belief that has proved to be correct.) (*Id.* ¶11) He concludes, that the appointment of a trustee would lead to the closure of a charitable organization and the undeniable good work that it performs. (*Id.* at ¶¶17-19) Just as the Complaint did not challenge the factual

---

their basis for believing Mullaney was providing valuable services to Wonderwork. (Ex. A, Comp. ¶¶25) The affidavit further detailed the importance of Mullaney's connections to Wonderwork's donor base and expressed the view that the appointment of a trustee would lead to the closure of a charitable organization that has unquestionably engaged in many life-changing activities for recipients of its efforts. (Ex. C at ¶¶17-19) Once again, what seems to be the real motivation for the claim is that Coneys also offered his opinion that it was animus from HelpMeSee toward Wonderwork that appeared to him to be the primary motivating factor in the application for a trustee. A good faith affidavit by a director that was expressly intended to save Wonderwork from permanently closing its doors and causing the cessation of its charitable efforts is not a valid basis for a breach of fiduciary duty claim." (Coneys MOL, p. 16, n. 14)

basis for these statements[13], the Amended Complaint does not, and cannot, allege any facts that would call into question Coneys' good faith or that Coneys' concerns about the impact of a Trustee on the Debtor were wrong.

Second, Coneys states in the affidavit that "Wonderwork's Board is very involved in the organization's decision-making" and he details specific ways in which the Board was involved, namely (i) there are 3 meetings per year, with special meetings as needed; (ii) meetings involve discussions on budget, investment, fundraising strategies, among other things; (iii) board members are not passive and ask questions; (iv) between meeting there are numerous communications with Mullaney about the operations of the Debtor; and (v) through this oversight, Mullaney is supervised by the Board and serves at the pleasure of the Board.  (Ex. C, Coneys' Aff. ¶13)  The Amended Complaint does not contest these facts.  Rather, it cites to the Examiner's conclusion that the Board was "passive and overly deferential."[14]  (Ex. A, Comp. ¶122)  That allegation in no way contradicts the factual bases for Coneys' statements about the Board's activities of being very involved with the decision making of the Debtor, but rather disagrees with the decisions made. Indeed, the Amended Complaint recites the Examiner's statement with regard to Mullaney's expenses that Coneys was either not informed or was misled about the expenses being charged on a payroll ledger. (Ex. A, ¶ 122)  Being misled about the expense account is not an adequate basis

---

[13] As this Court stated in the Memo Decision: "Coneys also discussed at length the value of the contributions of Mullaney to the Debtor, and the negative impact of the appointment of a chapter 11 trustee on the Debtor and its creditors. The Plaintiffs does not challenge the factual bases for these statements either."  (Ex. F, Memo Dec., p. 37, n. 15)(Citations omitted.)

[14] This Court previously recognized that the Complaint did not dispute the factual bases for Coneys' statements: "Nevertheless, and using the Coneys declaration as an example, Coneys provided the factual bases for his views regarding his statements about the involvement of the Board in the matters cited by the Plaintiff and the Board's supervision of Mullaney.  The Plaintiff has not challenged the factual bases for his conclusions that the Board was involved in the quoted activities and supervised Mullaney.  The Plaintiff challenges the conclusions." (Ex. F, Memo Dec., p. 37, n. 15)

to challenge the factual bases for Coneys' statements about the Board's involvement in the operations of the Debtor.

Once again, what seems to be the real motivation for the claim is that Coneys also offered his opinion that it was animus from HelpMeSee toward Wonderwork that was the primary motivating factor in the application for a trustee. Coneys' good faith belief was supported by the Examiner's Report.[15]  A good faith affidavit by a director that questioned the motivations of the movant and was expressly intended to save Wonderwork from permanently closing its doors and causing the cessation of its charitable efforts is not a valid basis for a breach of fiduciary duty claim.

### 2. Failure to Monitor Claims Fail

The Amended Complaint's allegations that Coneys failed to exercise proper oversight of Wonderwork are insufficient under Delaware law.  As this Court previously recognized, "[l]iability predicated on the Board's failure to exercise oversight 'is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Intern. Inc. Derivative Litig.,* 698 A.2d 959, 967 (Del.Ch. 2008).  The Trustee must show "lack of good faith as evidenced by sustained or systemic failure…to exercise reasonable oversight." *Walt Disney*, 907 A.2d at 750. The Trustee is required to allege that "either (1) that the directors knew or (2) should have known that violations of law were occurring and, in either event, (3) that the directors took no steps in a good faith effort to prevent or remedy that situation, and (4) that such failure proximately resulted in the losses complained of." *Caremark*, 698 A.2d at 971.

---

[15] See Ex. B, ER at p. 2 (the feud with Trustee's clients, Wang and SmileTrain, ultimately led Wonderwork to Chapter 11, and that Wang and SmileTrain assisted HMS in the arbitration); p. 265-269 (SmileTrain's motivations against Debtor were "distasteful" and Debtor had potential claims against both HMS and SmileTrain); and p. 269-70 (that the Examiner considered claims against HMS, SmileTrain and their counsel, the Trustee.)

Stated in another way, the Trustee has the burden to show:

> "(a) The directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations."

*Stone. v. Ritter,* 911 A.2d at 370, *citing Gutman v. Huang,* 823 A.2d at 506.

Because directors must have "acted with a state of mind consistent with a conscious decision to breach their duty of care," the *Caremark* standard has been described as a "scienter-based standard." *Desimone v. Barrows*, 924 A.2d 908, 935 (Del. Ch. 2007). The *Caremark* test "is rooted in concepts of bad faith; indeed, a showing of bad faith is a *necessary condition* to director oversight liability." *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009) (emphasis added). Bad faith is not simply "bad judgment" but contemplates a "state of mind affirmatively operating with furtive design or ill will." *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund II, L.P.*, 624 A.2d 1199, 1208 n.16 (Del. 1993).

Here, the Trustee has failed to provide any specific factual allegations (as opposed to mere conclusory ones) that Coneys or any director acted in bad faith and consciously disregarded their duties to monitor the company. Essentially, the Trustee's allegation against the directors is that they were asleep at the wheel, but such allegations are plainly insufficient. *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007) ("Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so.") Instead, "to plead a claim under *Caremark*, [] a plaintiff must plead facts that allow a reasonable inference that the directors acted with scienter which, in turn, 'requires [not only] proof that a director acted inconsistently with his fiduciary duties,' but also 'most importantly, that the director *knew he was so acting*.'" *Horman v. Abney*, No. CV 12290-VCS,

2017 WL 242571, at *7 (Del. Ch. Jan. 19, 2017) (quoting *In re Massey Energy Co.*, 2011 WL 2176479, at *22 (Del Ch. May 31, 2011)) (emphasis added).

The allegations in the Amended Complaint regarding the alleged lack of internal controls and monitoring and the facts set forth by the Examiner reveal that any claim of bad faith or scienter fails. (Ex. A, Comp. ¶¶ 92-99) What is noticeably absent from this section of the Amended Complaint is any allegation that the directors knew of any of the alleged failures by Wonderwork during the course of its day-to-day operations.[16] Lacking any such allegations this claim fails the scienter and bad faith pleading requirements.

Specifically, the Amended Complaint alleges failures in the internal controls of the "cash management system" and the manner in which restricted funds were accounted for. (Ex. A, Comp. ¶95) However, the directors relied and were entitled to rely on the outside auditors, KPMG, who issued unqualified audit reports every year "that proper internal accounting controls were in place." (Ex. D, KPMG Comp. ¶¶1-3)[17] The Amended Complaint further alleges that the directors failed to establish committees. However, the Amended Complaint concedes that they established audit, nominating and compensation committees in February 2013. (Ex. A, Comp. ¶49) Since there were only three (3) independent directors,[18] Coneys chaired the audit committee, and Dysart chaired the compensation committees. (*Id.*) Although the Amended Complaint states there is no record of

---

[16] *See e.g.* Ex. A, Comp. ¶93 ("Debtor even failed"); ¶ 95 ("The policy manual was neither followed nor referred to during the course of the day-to-day operations of the Debtor"); ¶ 96 ("Debtor's fundraising campaigns…were largely drafted by Mullaney personally [and] grossly misrepresented Debtor's activities"); ¶ 97 ("Mullaney caused Debtor to misrepresent")

[17] The Examiner conceded that he was applying novel conclusions as to "reliance on accounting rules related to cost allocation [that] may also prove unpopular in the non-profit world" (Ex. B, ER at p. 6), and, on the basis of such judgments, concluded that the actual restricted fund balance was different than what the Debtor had believed (*id.* p. 5). Regardless whether the Examiner is correct or not, the lack of clarity on the proper accounting methods for the restricted funds clearly takes any allegation against the directors for failure to supervise out of the realm of scienter or bad faith.

[18] At nearly every meeting, the Board discussed efforts to add new directors, efforts that were unsuccessful until 2016. (Ex. B, ER. 52)

meetings of these committees (*id.* ¶50), the Examiner recognized that it was because of the small size of the board that much of its functioning was "informal." (Ex. B, ER 51) Moreover, it is clear that Coneys was very much engaged in working with the outside auditors (Ex. B, ER 259), and that the Board was significantly engaged in compensation issues that admittedly took up "a considerable amount of Board time." (Ex. A, Comp. ¶¶ 51, 55)

With regard to the allegedly inaccurate marketing materials, the Amended Complaint does not allege that the directors knew of the alleged inaccuracies, but rather that they "should have known." (Ex. A, Comp. ¶98) That is insufficient under Delaware law, as the Delaware Supreme Court has held that "absent cause for suspicion there is no duty upon the directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists." *Stone,* 911 A.2d at 368, *quoting Graham v. Allis-Chambers Mfg. Co.,* 188 A.2d 125, 130 (Del. 1963) Lacking allegations that Coneys knew of the alleged matters that the board allegedly failed to monitor, this claim must fail.

### 3. The Trustee Failed to Allege Damages Sufficient to Support a Breach of Fiduciary Duty Claim

The Amended Complaint should be dismissed for failure to adequately allege damages. In the Memo Decision, the Court admonished the Trustee that any amended complaint needs to focus on the acts that injured Wonderwork and that would entitle recovery on behalf of the creditors. (Ex. F, Memo Dec. at p. 73) Specifically, the Court held that "while the Complaint portrays the Debtor as a poorly run charity, the Plaintiff is suing to recover money for the creditors based on damage to the Debtor and many of the acts alleged in the Complaint, though improper for a charity, *did not cause any discernible injury to the Debtor or provide a basis for recovery.*" (*Id.*) (emphasis

added)[19] Despite the Court's admonishment in the Memo Decision and the colloquy during oral argument, the Trustee sets forth no specific allegations in the Amended Complaint of any acts by Coneys that demonstrate a "discernible injury" to the Debtor.

As previously recognized by this Court, the damages associated with this breach of fiduciary duty claim brought against Coneys are limited to any "financial harm or jeopardy to the [charity] and its beneficiaries." *Oberly v. Kirby*, 592 A.2d at 462 (Ex. F, Memo Dec. at 29). However, the Amended Complaint only seeks recovery of Mullaney's compensation and the Debtor's post-petition administrative fees as damages against Coneys. (Ex. A, Comp. at ¶145 "Debtor suffered damages including the excessive amounts paid to or on behalf of Mullaney. Moreover, because Coney's breaches of duties caused Debtor to incur administrative expenses relating to investigating Debtor's misconduct and subsequent windup…") Again, these are the same purported damages the Trustee acknowledged were sought in the original Complaint.

The Amended Complaint recognizes that the arbitration award against Wonderwork in favor of HelpMeSee is what drove Wonderwork into bankruptcy. (Ex. A, Comp. ¶¶109-111; Ex. E, Oral Arg. Tr. 8:23-25) The alleged wrongdoing by Coneys and the director defendants did not cause the damage, i.e. the bankruptcy filing, to occur. The damages Trustee seeks to attribute to Coneys' conduct has no causal link to the conduct alleged against him. The Trustee alleges that certain post-petition payments were made to Mullaney in the amounts of $237,500 and $158,333.32; but there is no allegation that Coneys or any board member had any involvement in

---

[19] At oral argument on the prior motions to dismiss the original complaint, the Court questioned the Trustee: "[a]side from the costs of all of these investigations, in other words up until the bankruptcy, and aside from the compensation issues, what is it that they did or didn't do that caused a monetary injury to the debtor?" (Ex. E, Oral Arg. Tr. 15:11-14) The Court continued: "Are you saying that the damages were essentially the cost of investigation, not necessarily what they did before – but the cost of investigating it? Is that what the damages are? […] The cost of investigating and remediating… MR. MINTZ: Yeah, correct." (*Id.* at 16:15-23) Accordingly, the Trustee conceded that in the original complaint there were no damages sought aside from Mullaney's compensation and the cost of post-petition investigation and remediation.

or knowledge of these payments. (Ex. A, Comp. ¶¶132-134) Moreover, the Examiner found that Coneys was "genuinely surprised" to learn that Mullaney asserted a claim against the company for this so-called "limbo pay," indicating he was in fact not aware Mullaney was actually seeking out his unpaid wages after the bankruptcy was filed. (Ex. B, ER 220)

The Trustee then alleges that the Debtor incurred $5,258,965.63 in post-petition administrative fees, including BDO's fees, the Examiner's fees, and Trustee's statutory commissions, among others, that allegedly are attributable to Coneys' alleged breaches of fiduciary duties – but there is simply no alleged conduct by Coneys that proximately caused these fees to be incurred. (*Id.* at ¶¶135-136) For example, the Trustee's claims that Coneys' breaches of fiduciary duty caused damage with regard to the BDO Audit fail. The Amended Complaint alleges that BDO identified issues that required adjustments to Debtor's financial statements and impacted its audit, but omits BDO's statement that Coneys fully cooperated with BDO in providing the necessary information for BDO to complete its audit. (Ex. A, Comp. ¶¶126-131; Ex. G, Statement of BDO USA, LLP Regarding Debtor's Response to Order to Show Cause dated September 25, 2017 "BDO Statement" at ¶¶11-13, 23) In fact, BDO stated that while Debtor and its counsel did not provide the documentation and evidentiary material necessary for BDO to properly complete its audit, Coneys as head of the Audit Committee hired two financial professionals with the explicit purpose of working with BDO to complete its audit. (Ex. G, BDO Statement at ¶¶11-13, 23)

While the Trustee also pled that BDO urged Coneys and others to discuss with legal counsel what obligations they had to disclose certain information contained in BDO's September 1, 2017 letter, there is no allegation that Coneys did not actually seek that counsel. (Ex. A, Comp. ¶130) In fact, Debtor's counsel responded directly to BDO's September 1, 2017 letter. (Ex. G, BDO Statement at ¶9) Importantly, BDO recognized in a statement filed with this Court, "[w]hile

the Debtor and its counsel focused on crafting the story that would become its Response [to the order to show cause], BDO and the Debtor's Audit Committee [of which Coneys is the head] continued to work on a process to allow for the completion of the audit." (*Id*. at 11) In sum, the Trustee's allegations against Coneys do not support a breach of fiduciary duty claim, as Coneys was clearly acting in good faith with BDO, and they certainly do not plead the necessary nexus to any alleged damages.

In fact, the only specifically pled conduct by Coneys that even arguably relates to the damages sought is Coneys' submission of an affidavit in opposition to the appointment of a trustee. However, for the reasons fully stated above, the Trustee cannot demonstrate that Coneys was exhibiting bad faith or gross negligence in his submission of that affidavit because there is no allegation that any of the factual bases upon which Coneys relied for the affidavit were incorrect.

Because the Trustee has not pled any discernible injury to Wonderwork that was caused by Coneys, the claims against Coneys in the Amended Complaint must be dismissed.

C. **TRUSTEE'S CLAIMS AGAINST CONEYS ARE BARRED, IN PART, BY THE APPLICABLE STATUTE OF LIMITATIONS**

Trustee's first cause of action for breach of fiduciary duty is barred, in part, by Delaware's three-year statute of limitations. *In re AMC Inv'rs, LLC*, 551 B.R. 148, 152 (D. Del. 2016) (three-year statute of limitations applies to breach of fiduciary duty claims brought on behalf of corporation against directors).[20] The statute of limitations begins to run when the cause of action

---

[20] Pursuant to New York's borrowing statute, CPLR §202, Trustee's claims must be timely under Delaware law because, as alleged in the Amended Complaint, Wonderwork is incorporated in Delaware and thereby is considered a resident of Delaware by virtue of its state of incorporation. (Ex. A, Comp. ¶8) *See* CPLR §202; *Verizon Directories Corp. v. Continuum Health Partners, Inc.*, 74 A.D.3d 416, 416, 902 N.Y.S.2d 343 (1st Dep't 2010) (holding that a corporate plaintiff is a resident of its state of incorporation for CPLR §202 purposes); *see also Am. Lumbermens Mut. Cas. Co. of Ill. v. Cochrane*, 129 N.Y.S.2d 489, 491 (Sup. Ct.), *aff'd sub nom. Am. Lumbermen's Mut. Cas. Co. of Ill. v. Cochrane*, 284 A.D. 884, 134 N.Y.S.2d 473 (App. Div. 1954), *aff'd sub nom. Am. Lumbermens Mut. Cas. Co. of Illinois v. Cochrane*, 309 N.Y. 1017, 133 N.E.2d 461 (1956) ("A corporation is a resident of the state which creates it

accrues, which is generally when the wrongful act is committed. *Isaacson, Stolper & Co. v. Artisans' Sav. Bank*, 330 A.2d 130, 132 (Del. 1974). ("The general law in this State [of Delaware] is that the statute of limitations here involved begins to run at the time of the wrongful act, and, ignorance of a cause of action, absent concealment or fraud, does not stop it.")

The original Complaint was filed on December 28, 2018 (Dkt. No. 1), and pursuant to 11 U.S.C. § 108(a), the statute of limitations was tolled from Wonderwork's filing of a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on December 29, 2016 (the "Petition Date"). (Ex. A, Comp. ¶27)  Thus, any conduct prior to December 29, 2013 (three years before the Petition Date) is time-barred. The Amended Complaint alleges breaches of fiduciary duty against Coneys for the following alleged conduct that occurred *prior* to December 29, 2013:[21]

- The retention of a compensation consultant regarding Mullaney's salary in May 2013 and the board's actions with respect to their findings presented on June 13, 2013. (Ex. A, Comp. ¶¶60-62);

- The assumption of responsibility for Mullaney's legal fees in the Smile Train Copyright Case which settled in July 2013. (Ex. A, Comp. ¶¶74-79);

- The reimbursement to Mullaney for travel and/or commuter expenses that occurred prior to December 29, 2013. (Ex. A, Comp. ¶¶67-69; 80)(alleging payment for expenses generally without specific dates aside from "2013");

- The authorization of payments for Mullaney's life insurance premiums that occurred prior to December 29, 2013. (Ex. A, Comp. ¶¶70-71)(alleging life insurance policy maintained from 2012-2016);

- Mullaney's "limbo pay and excessive expenses." (Ex. A, Comp. ¶¶82-89)(alleging such payments occurred from 2012 to the present);

---

and for most purposes is deemed to be a nonresident of every other state, even though duly admitted to do business therein.")

[21] Insofar as the Amended Complaint alleges a breach of fiduciary duty claim against Coneys for any conduct that occurred from March 2011 through December 2012 (Ex. A, Comp. ¶15, 48, 143), that claim must be dismissed against Coneys for he cannot be liable for such conduct because Coneys did not join the board of Wonderwork until December 2012.

- Fuchs' compensation (including salary and bonuses) prior to December 29, 2013. (Ex. A, Comp. ¶¶90-91) (alleging payments starting in 2011 through 2014);

- Any allegations of failed internal controls at Wonderwork prior to December 29, 2013. (Ex. A, Comp. ¶¶92-98);

- The impact loans obtained by Mullaney, all but one of which were obtained prior to December 29, 2013. (Ex. A, Comp. ¶¶100-104; Ex. B, ER p. 81-82);

- The HelpMeSee Arbitration, commenced on March 21, 2013 and based on conduct that occurred in 2011-2012. (Ex. A, Comp. ¶¶105-108); and,

- Any other allegations against the board with respect to conduct that occurred prior to December 29, 2013. (Ex. A, Comp. ¶144).

Accordingly, the first claim for relief against Coneys must be dismissed, in part, to the extent it is based upon any conduct that occurred prior to December 29, 2013.

## D. <u>THE TRUSTEE SHOULD NOT BE GRANTED LEAVE TO AMEND AGAIN</u>

As established herein, the Trustee has been granted four opportunities by this Court to plead a claim of breach of fiduciary duty with respect to Coneys and the other director defendants, and the Trustee has utterly failed every time. Despite the wealth of information available to the Trustee as a result of the Debtor's bankruptcy filing, including the extensive Examiner's Report and exhibits thereto, the Trustee simply cannot plead any specific factual allegations against Coneys that demonstrate any grossly negligent, willful, wanton or irrational conduct on his part that supports a breach of fiduciary duty claim against a volunteer director of this charitable organization. The Trustee has been granted numerous opportunities to plead the factual allegations sufficient to support its claim and failed every time, and there is no reason to think that another attempt would be any different. For this reason, the Amended Complaint should be dismissed with prejudice and without leave to replead. *See In re Ridley*, 453 B.R. 58, 77 (Bankr. E.D.N.Y. 2011) ("Where a plaintiff has made a single attempt to state a claim, and the prospect of a plausible claim is suggested, but not established, by the allegations, then it may be that a court's discretion should

30

tip in favor of allowing an amendment. But where, as here, the plaintiff has made three attempts, and a claim still falls short of this measure, the balance tips in the other direction, and leave to replead should be denied.").

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant John J. Coneys respectfully request an order of this

Court dismissing the Trustee's Amended Complaint with prejudice as against Defendant John J.

Coneys, without leave to replead. (*See* Ex. H to Sweeney Dec.)

Dated: East Meadow, New York
      March 25, 2020

                              CERTILMAN BALIN ADLER & HYMAN, LLP


                            By: <u>/s Paul B. Sweeney</u>
                                Paul B. Sweeney
                                Nicole L. Milone
                            *Attorneys for Defendant John J. Coneys*
                            90 Merrick Avenue – 9th Floor
                            East Meadow, New York 11554
                            (516) 296-7000