Bijan Amini
John W. Brewer
Jeffrey Chubak
AMINI LLC
131 West 35th Street, 12th Floor
New York, New York 10001
(212) 490-4700
bamini@aminillc.com
jbrewer@aminillc.com
jchubak@aminillc.com
*Attorneys for Defendant Brian Mullaney*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>WONDERWORK, INC.,<br><br>             Debtor. | Chapter 11<br><br>Case No. 16-13607-smb<br><br>Adv. Pro. No. 18-1873-smb |
| VINCENT A. SAMA, as Litigation Trustee of the WW Litigation Trust,<br><br>           Plaintiff,<br><br>   - against -<br><br>BRIAN MULLANEY, HANA FUCHS, THEODORE DYSART, RAVI KANT, JOHN J. CONEYS, STEVEN LEVITT, CLARK KOKICH, STEVEN RAPPAPORT, RICHARD PRICE and MARK ATKINSON,<br><br>           Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**
**<u>AMENDED COMPLAINT AS AGAINST BRIAN MULLANEY</u>**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .......................................................................................... iii

PRELIMINARY STATEMENT .................................................................................... 1

RELEVANT BACKGROUND FACTS AND KEY ALLEGATIONS OF THE AMENDED
  COMPLAINT .......................................................................................................... 3

I.    THE CHAPTER 11 CASE ................................................................................... 3

II.   PLAINTIFF'S AVOIDANCE CLAIMS .............................................................. 5

      A.    Mr. Mullaney's Bonuses .......................................................................... 5

      B.    Deductions from the Limbo Spreadsheet ................................................. 5

      C.    AmEx Charges .......................................................................................... 7

      D.    Life Insurance Premiums .......................................................................... 8

      E.    Attorneys' Fees ......................................................................................... 8

ARGUMENT .................................................................................................................. 9

I.    THE FRAUDULENT CONVEYANCE AND TRANSFER CLAIMS SHOULD BE
      DISMISSED IN LARGE PART, WITH ANY REMAINING PORTION LIMITED TO
      ELIMINATE DOUBLE-COUNTING, EXCESSIVE VAGUENESS AND PHANTOM
      "TRANSFERS" ................................................................................................... 12

      A.    Deferred Bonuses that were Never Paid are Neither "Conveyances" Nor
            "Transfers," Fraudulent or Otherwise, and the Amended Complaint Fails to
            Identify the Payments Related to the "Limbo Account" he Seeks to Recover ..... 13

      B.    Plaintiff has Not Plausibly Alleged that 100% of the AmEx Bills the Debtor Paid
            Constituted Inappropriate Expenses, and has Failed to Specify Which Subset He
            Does Allege Was Inappropriate .......................................................... 17

      C.    The Amended Complaint Does Not Sufficiently Allege Lack of Reasonably or
            Fair Equivalent Value for Many and Possibly All of the Allegedly Fraudulent
            Conveyances and/or Transfers ............................................................ 18

      D.    The "Other Expenses" Plaintiff Seeks to Recover Are Largely Duplicative and/or
            Contradicted by the Other Documents ................................................ 20

      E.    No Basis is Alleged for Recovering Life Insurance Premiums Paid .................. 21

i

F.     New Facts Added to the Amended Complaint Demonstrate No Basis is Alleged to Treat the Debtor's Payment of Litigation Expenses as Fraudulent Conveyances or Transfers to Mr. Mullaney ................................................................................... 22

G.    The Twelfth Claim for Relief Separately Fails Because the Crucial "Not in the Ordinary Course" Element Is Not Sufficiently Alleged ....................................... 24

II.    THE FOURTEENTH CLAIM FOR RELIEF SHOULD BE DISMISSED AS TO THE $237,550 PAYMENT THAT THIS COURT HAS ALREADY HELD IS NOT AVOIDABLE, AND LIMITED AS TO THE REMAINDER ......................................... 25

III.   PLAINTIFF HAS NOT SUCCESSFULLY REPLEADED ANY OF THE ASPECTS OF THE EIGHTH CLAIM FOR RELIEF THAT THIS COURT PREVIOUSLY DISMISSED .................................................................................................................. 26

A.    No Claim Stated With Respect to Mr. Mullaney Receiving Board-Approved Compensation ...................................................................................................... 27

B.    No Claim Stated With Respect to Handling Restricted Funds ............................ 27

C.    No Claim Stated With Respect to Improper Solicitation...................................... 28

D.    The Amended Complaint Contains No New Bases to Support the Breach of Fiduciary Duty Claim for $237,550 in Post-Petition Salary the Court Dismissed 29

IV.   THE AMENDED COMPLAINT AND DOCUMENTS INCORPORATED INTO IT FAIL TO ALLEGE ANY INJURY RELATED TO THE LIMBO ACCOUNT ............. 29

CONCLUSION............................................................................................................................ 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AgFeed USA, LLC,*
    558 B.R. 116, 129-30 (Bankr. D. Del. 2016) ........................................................................ 10

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................................................... 9, 11, 15, 26

*In re ATM Fin. Servs., LLC,*
    Nos. 08-bk-969, 10-ap-47, 2011 WL 2604247 (Bankr. M.D. Fla. June 21, 2011) ............... 12

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................ 9, 11, 12, 15, 24, 26

*In re Bernard L. Madoff Inv. Secs., LLC,*
    440 B.R. 243 (Bankr. S.D.N.Y.2010) ...................................................................... 10

*B.W. Dyer & Co. v. Monitz, Wallack & Colodney,*
    16 Misc.2d 1033, 184 N.Y.S.2d 445 (Sup. Ct. N.Y. Co. 1959) ........................................... 13

*In re DBSI, Inc.*,
    445 B.R. 351 (Bankr. D. Del. 2011) ...................................................................... 10

*In re Dreier LLP*,
    452 B.R. 451 (Bankr. S.D.N.Y. 2011) .................................................................... 10

*In re Garcia*,
    494 B.R. 799 (Bankr. E.D.N.Y. 2013) .................................................................... 12

*In re Hydrogen, L.L.C.*,
    431 B.R. 337 (Bankr. S.D.N.Y. 2010) .................................................................... 12

*In re Image Masters, Inc.*,
    421 B.R. 164 (Bankr. E.D. Pa. 2009) .................................................................... 12

*Image Masters, Inc. v. Chase Home Finance*,
    489 B.R. 375 (E.D. Pa. 2013) .......................................................................... 12

*In re M. Fabrikant & Sons, Inc.*,
    394 B.R. 721 (Bankr. S.D.N.Y. 2008) ..................................................................... 9

*In re M. Fabrikant & Sons, Inc.*,
    447 B.R. 170 (Bankr. S.D.N.Y. 2011) ..................................................................... 9

*In re M. Fabrikant & Sons, Inc.*,
    480 B.R. 480 (S.D.N.Y. 2012) ........................................................................... 9

*In re M. Fabrikant & Sons, Inc.*,
    541 Fed. App'x 55 (2d Cir. 2013) ..................................................................... 9

*In re Moll Group, LLC*,
    Nos. 02-bk-38198, 04-ap-1113, 2005 WL 6506459 (Bankr. E.D. Pa. 2005) .................. 11, 18

*Pelman ex rel. Pelman v. McDonald's Corp.*,
    396 F. Supp. 2d 439 (S.D.N.Y. 2005) ................................................................ 8

*In re PennySaver USA Publ'g, LLC*,
    602 B.R. 256 (Bankr. D. Del. 2019) ................................................................. 10

*Safety-Kleen Sys., Inc. v. Silogram Lubricants Corp.*,
    No. 12-cv-4849, 2013 WL 6795963 (E.D.N.Y. Dec. 23, 2013) ............................... 11, 15

*SE Prop. Holdings, LLC v. Braswell*,
    No. 13-cv-0267, 2013 WL 4498700 (S.D. Ala. Aug. 21, 2013) ............................... 12

*In re TSIC, Inc.*,
    428 B.R. 103 (Bankr. D. Del. 2010) ................................................................. 24

*White Plains Plaza Realty, LLC v. Cappelli*,
    55 Misc.3d 1214(A), 2017 WL 1654629 (Sup. Ct. Westchester Co. May 2, 2017) .............. 13

**Statutes and Rules**

11 U.S.C. § 548 ........................................................................................... 24, 32

Fed. R. Civ. P. 8 ..................................................................................... 9, 10, 11, 15

Fed. R. Civ. P. 9 ........................................................................................... 9

Fed. R. Civ. P. 12 ......................................................................................... 11

N.Y. Debtor and Creditor Law § 270 ................................................................... 13

N.Y. Debtor and Creditor Law § 275 ................................................................... 1

Defendant Brian Mullaney submits this memorandum of law in support of his motion to dismiss in part the Amended Complaint ("<u>Am. Cplt.</u>") as against him, pursuant to Fed. R. Civ. P. 12(b)(6), and, in the alternative, for a more definite statement regarding the specific prior payments and amounts that Plaintiff seeks to recover from Mr. Mullaney, pursuant to Rule 12(e).

## <u>PRELIMINARY STATEMENT</u>

In its Memorandum Decision of January 17, 2020 (ECF Doc. #70) ("<u>Decision</u>"),[1] this Court granted in part and denied in part Mr. Mullaney's motion to dismiss the original Complaint. The Court also granted Plaintiff leave to replead, although "with an admonition" that the "focus on any amended complaint should be on those acts that caused an injury to the Debtor and entitle the Plaintiff to recover damages on behalf of the creditors." (Decision at 72-73.)

The Amended Complaint primarily focuses on seeking to replead claims against the Director Defendants and devotes little effort into repleading any of the claims against Mr. Mullaney that were dismissed. Indeed, as to some (but not all) of the claims against Mr. Mullaney that were dismissed, the redline submitted with the Amended Complaint (ECF Doc. #72-5) confirms that Plaintiff has abandoned them in conformity with the Decision rather than seek to plead around them.[2]

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Decision.

[2]    Specifically, Plaintiff has abandoned the original Complaint's Tenth Claim for Relief (for breach of contract, *see* Decision at 67-68), the Eleventh Claim for Relief (for unjust enrichment, *see* Decision at 68-70) and  the NYDCL section 275 claim that was advanced in the Fifth Claim for Relief (now the Tenth Claim for Relief, *see* Decision at 59-60). Plaintiff has also modified Exhibits A-C to abandon any claim to the approximately $2.65 million in base pay received by Mr. Mullaney.

Based on how the Court has already ruled, Mr. Mullaney does not in this motion ask the Court to dismiss the Thirteenth, Fifteenth, or Sixteenth Claims for Relief (the same as the original Complaint's Eighth, Twelfth and Thirteenth Claims for Relief).

What minimal effort Plaintiff does devote to bolstering his claims against Mr. Mullaney is insufficient to revive any of the claims dismissed by the Decision, and, indeed, many of the new allegations affirmatively undermine Plaintiff's claims against Mr. Mullaney.

Just as significantly, however, the number of transactions and dollar amounts genuinely in dispute in this litigation remains grossly exaggerated in the Amended Complaint, thus making what should be a narrowly-focused dispute concerning the propriety of a finite and specified number of specific individual payments into a vague and sprawling mess. For example:

- Plaintiff seeks to avoid $950,000 in bonus payments allegedly transferred to Mr. Mullaney in July 2013, July 2014, July 2015 and July 2016, yet it is undisputed that WW never made these payments to Mullaney.

- In addition, Plaintiff's "limbo pay" claim clearly seeks, without actually identifying an actual conveyance by WW, to recover amounts that were never paid to Mr. Mullaney nor plausibly for his benefit, including: year-end bonuses paid to WW's employees in 2015 and 2016; health insurance premiums paid on behalf of all WW employees; and voluntary reductions by Mr. Mullaney of the amounts awarded to him as straight donations. (Limbo Spreadsheet (defined below).)

- Plaintiff further seeks to avoid 100% of every dollar charged to WW's corporate American Express ("AmEx") card between December 28, 2012 and December 27, 2016 (without regard as to when the bills were paid), yet the Plaintiff makes no claim that 100% of the AmEx charges were unjustified or even related to Mr. Mullaney.

Plaintiff also seeks to recover transactions that he has now admitted were authorized by the Board:

- Plaintiff seeks $321,199.09 in payments made to attorneys on lawsuits brought by Mr. Sama against Mr. Mullaney, despite now pleading that the Board was fully informed of the payments and that WW was a party to the resulting settlement.

- Plaintiff seeks $15,585.91 in premium payments made to life insurers as authorized by Mr. Mullaney's Employment Agreement, without any allegation as to why such payments were improper.

These deficiencies are all the more acute given that Plaintiff has had years of expensive and exhaustive discovery (pre- and post-bankruptcy) into every aspect of WW's business. Even notice pleading requires Plaintiff to identify what transactions, on what dates, to whom and for what reason he is seeking to avoid. There is virtually none of that in the Amended Complaint.

This necessary winnowing can be done on the face of the pleadings and by reviewing the undisputed content of other documents referenced therein, and are thus properly before the Court on this motion. In the alternative, this is precisely the situation where a more definite statement is appropriate under Rule 12(e), to separate the wheat from the chaff so that all parties and the Court can accurately assess what is and what is not in dispute.

**RELEVANT BACKGROUND FACTS AND KEY**
**ALLEGATIONS OF THE AMENDED COMPLAINT**

## I.     THE CHAPTER 11 CASE

The Decision has an extensive discussion of the background facts and Plaintiff's allegations. Here, we cover only a few selected highlights important to the issues raised by this motion.

WW was a non-profit that raised funds to donate to charities focused on children's medical needs in the developing world, mainly in South Asia and Africa. Mr. Mullaney was its CEO and

sole fundraiser, and with a staff of nine employees, raised $54.4 million in charitable contributions during his tenure. (Examiner's Report at 4.)

In 2012, Mr. Sama, as litigation counsel for Mr. Mullaney's former employer Smile Train (a WW competitor),[3] commenced a federal action against Mr. Mullaney alleging that he was using proprietary Smile Train information (i.e., its donor list) at WW and for WW's benefit. (Am. Cplt. ¶ 74; *see also* Decision at 10 (discussing the Copyright Suit).) Although WW was not a named defendant, that it was a party in interest to the underlying dispute is clear from the complaint in that action (Amini Decl. Exhibit 1) which asserts two claims premised on Mr. Mullaney's having allegedly "misappropriated Smile Train's donor list by using it to solicit donations for his new organization, WonderWork." The action was resolved by a settlement agreement among Mr. Mullaney, WW, and Smile Train, pursuant to which WW paid Smile Train and agreed to certain injunctive relief. (Examiner's Report at 47.) The settlement agreement was approved by the Board and executed by Director John J. Coneys. (Am. Cplt. ¶ 77-78.)

In 2013, WW commenced an arbitration asserting breach of contract claims against blindness charity HMS, as to which HMS counterclaimed. (Am. Cplt. ¶ 107). Mr. Sama also represented HMS in that arbitration. In December 2016, the arbitrator awarded HMS $8.3 million in damages and $4.7 million in attorneys' fees for Mr. Sama's law firm. (Am. Cplt. ¶ 111).

As a result of the financial crisis created by confirmation of the eight-figure award obtained by Mr. Sama, WW filed a voluntary petition for relief on December 29, 2016.

On November 9, 2017, the Court entered an Order directing the appointment of a chapter 11 trustee and, on November 22, 2017, approved the appointment of Stephen S. Gray as trustee.

---

[3]     In the copyright complaint, Mr. Sama specifically described WW as a "competing charity" and asserted unfair competition claims against it. (Declaration of Bijan Amini ("Amini Decl.") Exhibit 1, ¶ 29.)

(Case No. 16-13607, ECF Doc. #308, #337.)  Mr. Gray subsequently filed Form 990's on behalf of WW and relating to Mr. Mullaney's compensation.  (Amini Decl. Exhibits 6-7.)

A liquidating chapter 11 plan for the Debtor was confirmed on September 21, 2018, which became effective on October 19, 2018. (Case No. 16-13607, ECF Doc. #475, #486.)

## II.    PLAINTIFF'S AVOIDANCE CLAIMS

### A.    Mr. Mullaney's Bonuses

Plaintiff seeks to recover as fraudulent conveyances four bonuses awarded to Mr. Mullaney by the Board:  $250,000 in July 2013, $250,000 in July 2014, $200,000 in July 2015 and $250,000 in July 2016.  (Am. Cplt. Exhibit A.)  However, those bonuses were deferred rather than actually paid out to Mr. Mullaney when awarded.  (Am. Cplt. ¶ 82; Decision at 43; Examiner's Report at 208-10; *see also id.* at 175 n.349.)  The Board was fully aware of Mullaney's practice of deferring his bonuses rather than collecting them when awarded.  (Am. Cplt. ¶ 82.)  But for the disputed expenses, there is no allegation in the Amended Complaint (nor could there be) that Mr. Mullaney was ever paid his bonuses.

### B.    Deductions from the Limbo Spreadsheet

WW's CFO Ms. Fuchs tracked Mr. Mullaney's unpaid bonuses (and unpaid ordinary base pay, which as a general matter was drawn on an irregular payment schedule at all times) using a Microsoft Excel spreadsheet.  (Aug. 15, 2017 Fuchs Tr. at 355-56 (Amini Decl. Exhibit 8); Aug. 17, 2017 Mullaney Tr. at 581-83 (Amini Decl. Exhibit 9).)  The spreadsheet has been previously referred to as a "side ledger," is included in the Examiner's Report as Mullaney Exhibit 54 (Amini Decl. Exhibit 10) and is referred to herein as the "Limbo Spreadsheet."  The Limbo Spreadsheet tracked deferred compensation owed to Mullaney.  It also contains 37 instances over a five-year period where Mr. Mullaney directed Ms. Fuchs to reduce the deferred compensation owed to him by WW.  Those instances were recorded on the final page of the Limbo Spreadsheet by Ms. Fuchs

as and when directed by Mr. Mullaney (*see, e.g.*, e-mails included in Fuchs Exhibits 39-42 (Amini Decl. <u>Exhibit 11</u>); Aug. 17, 2017 Mullaney Tr. at 581, 587), and total approximately $420,000 (Amini Decl. Exhibit 10, last page).[4]

Plaintiff alleges that "the total amount of suspect expenses Mullaney charged to his limbo pay totaled at least $400,000" (Am. Cplt. ¶ 86), and that these reimbursements were not legitimately reimbursable business expenses but instead constituted disguised compensation to Mr. Mullaney that should have been, but was not, included in the Debtor's IRS filings. (Am. Cplt. ¶¶ 86, 88.)

The Amended Complaint does not allege any specific dates, amounts, or even transferees of any payments corresponding to any of the $400,000 in allegedly "suspect" deductions, and it is clear that no fair reading of the Limbo Spreadsheet itself could support this vague and conclusory allegation.

The Limbo Spreadsheet includes on its face hundreds of thousands of dollars of deductions for items (out of a total number of deductions somewhat in excess of $400,000 as already noted) that cannot on their face be characterized as made to Mr. Mullaney or for his personal benefit. Instead, many of the items reflect decisions by Mr. Mullaney to unilaterally reduce his unpaid bonuses to fund benefits for WW as an entity or WW's other employees, for example:

- Straight donations by Mr. Mullaney (i.e., unilateral waiver of specified portions of unpaid bonuses the Board had already awarded) to WW. (E.g., Limbo Spreadsheet, final page, Note 4 ($38,000 contribution) and Note 6 ($50,000 contribution); Fuchs Ex. 40, final page (impact loan).)

---

[4] The amount of Mr. Mullaney's previously deferred bonus awards that were never reduced by any of the deductions on the Limbo Spreadsheet or otherwise paid to Mr. Mullaney makes up the bulk of Mr. Mullaney's scheduled claim.

- Amounts of $36,925 and $41,500 that funded year-end bonuses paid to other WW staff in 2015 and 2016. (Limbo Spreadsheet, final page, Notes 17 and 37.)

- $15,000 in September 2016 to cover increased annual healthcare insurance premiums for WW staff. (*Id.* at Note 32.)

There is no plausible inference from the factual allegations of the Amended Complaint that the foregoing amounts, $181,425 at least of the total, were paid to or even benefitted Mr. Mullaney.

Moreover, a plausible inference of impropriety likewise fails to exist with respect to numerous other items on the Limbo Spreadsheet.

For example, Mr. Mullaney directed $25,000 to be deducted from his unpaid bonus awards to defray the costs of a trip to Bangladesh. (Limbo Spreadsheet, final page, Note 33.) Plaintiff pleads no facts that could support a plausible inference that Mr. Mullaney's trip to Bangladesh was a personal vacation for which he was inappropriately reimbursed rather than a business trip that WW should have reimbursed him for. Bangladesh is a nation that was important to WW's charitable mission and also a nation very rarely visited as a tourist destination.

### C.   AmEx Charges

Separately, Plaintiff also seeks to recover as fraudulent conveyances $535,594.96 of "American Express Expenses." (Am. Cplt. Exhibit A.) No specific payment dates are alleged, only four approximately year-long "payment date ranges" with corresponding dollar amounts. But these do not represent actual *payments* either. Rather the amounts comprise (or are intended to comprise) 100% of all *charges* on WW's corporate AmEx card billed during the twelve-month period referenced.[5] Plaintiff makes no attempt to avoid double-counting, even though many of

---

[5]    For example, total monthly charges incurred December 28, 2014-December 27, 2015 (Amini Decl. Exhibit 14) total $133,955.42, the same amount Plaintiff seeks to recover for the subject period in Am. Cplt. Exhibit A. By Mr. Mullaney's calculation, total monthly charges

the allegedly "suspect" expense reimbursement deductions from the unpaid bonus amounts reflected on the Limbo Spreadsheet appear to correspond with items paid for through the AmEx card (e.g., travel expenses).

### D.   Life Insurance Premiums

Plaintiff also seeks to avoid specified amounts of life insurance premiums paid by WW on specified dates to specified transferees. (Am. Cplt. Exhibit A.)  However, Plaintiff concedes that Mullaney's Employment Agreement provided that WW would pay his life insurance premiums. (Am. Cplt. ¶ 71.)  Plaintiff also alleges that these premium payments were concealed from the IRS and donors (*id*.) but ignores that WW's Form 990's generally disclosed substantial "other compensation" received by Mr. Mullaney beyond his base salary (Amini Decl. <u>Exhibits 2-5</u> (Form 990's)), a category that can and does include employer-paid insurance premiums.

### E.   Attorneys' Fees

Finally, Plaintiff seeks to avoid $245,357.45 in payments made to attorneys representing Mr. Mullaney in the Smile Train action and related disputes, on the ground that such payments covered Mr. Mullaney's personal expenses having nothing to do with WW.  (Am. Cplt. ¶¶ 76-78).  But as noted above, Smile Train also had asserted potential claims against WW, and WW entered into the settlement agreement as a party, paid the ultimate settlement amount and agreed to injunctive provisions dictated by Smile Train.

As set forth in the Decision, Plaintiff initially claimed that the Board had passed a resolution to indemnify Mr. Mullaney for only up to $150,000 in connection with his defense of litigation brought by Smile Train, yet the actual amount of defense costs paid for by WW exceeded

---

incurred in 2013, 2014 and 2016 (Amini Decl. <u>Exhibits 12, 13 and 15</u>) do not accord exactly with Exhibit A but the differences are immaterial.

that budget. (Decision at 46.)  But now, in the Amended Complaint, Plaintiff claims all payments in connection with the Smile Train initiated litigations were reviewed and approved by at least one Board member, with "Board approval and knowledge" of all the amounts being paid for defense costs and to settle the dispute.  (Am. Cplt. ¶¶ 74, 76, 78.)  Indeed, Smile Train's litigations against Mr. Mullaney affected WW so much that they were "routinely discussed at Board meetings."  (Am. Cplt. ¶ 81.)

## ARGUMENT

Much of the law governing Plaintiff's claims is set forth in the Decision and we thus do not repeat it here.[6]  For example, the general Rule 12(b)(6) standard is well-established.  (Decision at 23-24.)

But one key issue for this motion is the requisite level of detail versus vagueness required for the Amended Complaint's specification of the payments Plaintiff seeks to recover as fraudulent conveyances or transfers.  In *In re M. Fabrikant & Sons, Inc*., 394 B.R. 721, 735 (Bankr. S.D.N.Y. 2008), this Court held that "constructive" fraudulent transfer claims (where no actual intent to defraud creditors is alleged) are not subject to Fed. R. Civ. P. 9(b) but to the more lenient notice pleading standard of Fed. R. Civ. P. 8(a).[7]  Other courts in this District have held similarly.  But *Fabrikant* emphasized that even under Rule 8(a), the plaintiff could not simply list each and every payment made to a particular recipient and then just assert that all of them were fraudulent.  447

---

[6]     As this Court noted (Decision at 23-24, citing considerable case law), it may consider documents outside the pleadings to the extent they are incorporated into the pleadings by reference, cited or quoted in part, or otherwise "documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit."

[7]     The case law this Court cited in *Fabrikant* had all been decided prior to *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), which transformed the practical application of Rule 8(a).

B.R. 170, 184 (Bankr. S.D.N.Y. 2011), *aff'd*, 480 B.R. 480 (S.D.N.Y. 2012), *aff'd*, 541 Fed. App'x 55 (2d Cir. 2013) ("It was implausible to contend that every transfer from the debtors to the Fortgang Affiliates was fraudulent," given indications that at least some were bona fide).  That the *Fabrikant* plaintiff had provided much more detail than Mr. Sama has on the transactions attacked (listing approximately 6,000 transactions on a 157-page schedule (*id.* at 184)) did not help when insufficient facts were pleaded to show which subset of that vast majority of transactions could plausibly be alleged to have been fraudulent.

Many courts have likewise held that constructive fraudulent transfer allegations can only be sustained under Rule 8(a) when they—at least—identify each purportedly fraudulent transfer's date, amount, source and transferee. *In re PennySaver USA Publ'g, LLC*, 602 B.R. 256, 266 (Bankr. D. Del. 2019); *In re DBSI, Inc.*, 445 B.R. 351, 356 (Bankr. D. Del. 2011) (failure "to identify any transfers" made specifically *to* or *for the benefit of* a defendant is fatal to a complaint). In *In re Dreier LLP*, 452 B.R. 451, 464-65 (Bankr. S.D.N.Y. 2011) (*citing In re Bernard L. Madoff Inv. Secs., LLC,* 440 B.R. 243, 269-70 (Bankr. S.D.N.Y. 2010), this Court rejected "bald assertion[s]" devoid of "specific facts" concerning receipt of "funds that were transferred … through the fraud," and specifically distinguished such bare bones assertions from situations where a defendant was properly and "adequately apprised...of 'which transactions are claimed to be fraudulent and why, when they took place, how they were executed, and by whom."

Similarly, in *In re AgFeed USA, LLC*, 558 B.R. 116, 129-30 (Bankr. D. Del. 2016) (citations omitted), after the Court dismissed constructive fraudulent transfer claims for failure to allege "specific facts relating to the date of any of the transfers, the amount of any of the transfer, or the transferor of any of the transfers," the court then dismissed amended claims that did no more than aggregate an amount of transfers made over a certain period, and allege that the debtor "made a number of payments" to the defendant on a regular basis, as "insufficient to support a

constructive fraud claim." *See also Safety-Kleen Sys., Inc. v. Silogram Lubricants Corp.*, No. 12-cv-4849, 2013 WL 6795963, at *9 (E.D.N.Y. Dec. 23, 2013) ("Nor does the Complaint allege with any degree of specificity when the transfers occurred, how much money was involved in the transfers, or the basis upon which plaintiff believes that the transfers were made without consideration").

Moreover, this is exactly the sort of situation where, even if the Court were to conclude that Rule 8(a) itself does not require more specificity, Mr. Mullaney's request for relief under Rule 12(e) (requiring "a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague and ambiguous that the party cannot reasonably prepare a response") should be granted in the alternative. Indeed, in *In re Moll Group, LLC*, Nos. 02-bk-38198, 04-ap-1113, 2005 WL 6506459 (Bankr. E.D. Pa. June 15, 2005), decided pre-*Iqbal* and *Twombly*, the bankruptcy trustee was suing to recover a group of payments made by the debtor company on Visa cards which had allegedly been used at least in part for personal charges of the debtor's employees that the debtor ought not to have paid for. *Id*. at *5-6. Under the circumstances, and even recognizing that courts have been lenient with bankruptcy trustees who in many instances are still trying to gain control of a debtor's books and records, the court granted relief under Rule 12(e) and held that "the Trustee will be required to replead [those] counts to specify which charges he considers to be 'personal.'" *Id*. at *9.[8] Here, of course, Plaintiff has had complete access to the Debtor's relevant records and has had years to sift through the documents to assess which specific

---

[8]    *See also Pelman ex rel. Pelman v. McDonald's Corp*., 396 F. Supp. 2d 439 (S.D.N.Y. 2005) (where consumer fraud claim brought pursuant to New York General Business Law was not subject to heightened Rule 9(b) pleading standard, Rule 12(e) motion for more definite statement specifying the exact advertisements claimed to be misleading was appropriate, even if that level of detail was not required—in pre-*Twombly* era—by Rule 8(a)).

payments (including specific individual charges on specific monthly AmEx bills) he believes he has a good-faith basis to seek to recover from Mr. Mullaney.

Just as significantly, *In re Image Masters, Inc.*, 421 B.R. 164, 177 (Bankr. E.D. Pa. 2009), *aff'd in pertinent part*, 489 B.R. 375 (E.D. Pa. 2013), decided in the wake of *Twombly*, held that (emphasis added) "the Trustee must allege *facts* sufficient to show that [the debtor] received less than a reasonably equivalent value in exchange for the payments it made to the Defendants," and a purely conclusory allegation that reasonably equivalent value was not received was insufficient under *Twombly*. *See also*, *e.g.*, *In re Garcia*, 494 B.R. 799, 815 (Bankr. E.D.N.Y. 2013) (*citing In re Hydrogen, L.L.C.*, 431 B.R. 337, 353 (Bankr. S.D.N.Y. 2010)) (dismissing constructive fraudulent transfer claim given "complete absence of facts supporting the allegation that the Debtor received less than reasonably equivalent value in exchange for the payments made to Defendants"); *In re ATM Fin. Servs., LLC*, Nos. 08-bk-969, 10-ap-47, 2011 WL 2604247, at *4 (Bankr. M.D. Fla. June 21, 2011) ("The amended complaint contains *no* factual allegations upon which the Court could infer the debtor received 'less than a reasonably equivalent value' in exchange for the $400,000 wire transfer"); *SE Prop. Holdings, LLC v. Braswell*, No. 13-cv-0267, 2013 WL 4498700, at *4 (S.D. Ala. Aug. 21, 2013) ("Significantly, the pleading is devoid of factual allegations that might lend shape and substance … suggesting that [transferor] did not receive reasonably equivalent value for the subject real property").

## I.    THE FRAUDULENT CONVEYANCE AND TRANSFER CLAIMS SHOULD BE DISMISSED IN LARGE PART, WITH ANY REMAINING PORTION LIMITED TO ELIMINATE DOUBLE-COUNTING, EXCESSIVE VAGUENESS AND PHANTOM "TRANSFERS"

Plaintiff's Tenth, Eleventh and Twelfth Claims for Relief seek to recover under different but related liability theories various alleged "6-Year Fraudulent Conveyances," "2-Year Fraudulent Transfers," and "Employment Fraudulent Transfers," respectively.   Each claim

requires Plaintiff to plead the existence of a conveyance by WW of an interest in property on a date within a specified time period. Because each of these (in the order listed) is a smaller subset of the prior group, we will focus on the Tenth Claim for Relief, making state-law claims under the NYDCL.

### A. Deferred Bonuses that were Never Paid are Neither "Conveyances" Nor "Transfers," Fraudulent or Otherwise, and the Amended Complaint Fails to Identify the Payments Related to the "Limbo Account" he Seeks to Recover

Exhibit A lists all $950,000 in bonuses that were nominally awarded to Mr. Mullaney by the Debtor's Board over four different years as "6-Year Fraudulent Conveyances." But there is no dispute that those bonuses were deferred rather than paid to Mr. Mullaney.

The running balance of deferred compensation reflected on the Limbo Spreadsheet was not a bank account in Mr. Mullaney's name, but an internal bookkeeping convention at the Debtor maintained by Ms. Fuchs. (Amended Complaint ¶ 82.) Nor was any notation by Ms. Fuchs on the Limbo Spreadsheet "an assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property" or the "creation of any lien or incumbrance", and was thus not a "conveyance" as defined in NYDCL section 270. *E.g.*, *White Plains Plaza Realty, LLC v. Cappelli*, 55 Misc.3d 1214(A), 2017 WL 1654629, at *10 (Sup. Ct. Westchester Co. May 2, 2017) (petitioner "fail[ed] to establish that the journal entries on the books of Cappelli Enterprises were conveyances as that term is defined in section 270 of the Debtor and Creditor Law. [T]he journal entries never conveyed anything as there was no payment of money, no assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property … Inasmuch as the journal entries were not 'conveyances' … petitioner's claims under the Debtor and Creditor Law fail"); *B.W. Dyer & Co. v. Monitz, Wallack & Colodney*, 16 Misc.2d 1033, 1042, 184 N.Y.S.2d 445, 453 (Sup. Ct. N.Y. Co. 1959) (rejecting fraudulent conveyance claim because "the transfers complained of were not conveyances within the meaning of" the NYDCL, as "any transfer of funds from the [corporate]

13

account to the futures account must be viewed simply as an internal bookkeeping arrangement. The futures account was in fact regarded as a corporate asset"). Nor did noting a reduction to or deduction from the cumulative running balance of deferred bonuses on the Limbo Spreadsheet constitute a "transfer" under section 101(54)(D) of the Bankruptcy Code, as it did not result in the Debtor otherwise "disposing of or parting with—(i) property; or (ii) an interest in property."

Put simply, no conveyance to Mr. Mullaney could have occurred when the amounts of Mr. Mullaney's deferred bonus awards were initially entered by Ms. Fuchs on the Limbo Spreadsheet, but only on such other date when payments were actually made by the Debtor to Mr. Mullaney or for his benefit. Allegations newly added to the Amended Complaint in which Plaintiff quotes a Board member's description of the credits and debits to the Limbo Spreadsheet as "a fiction with hypothetical income offset by a hypothetical donation back" to WW confirm that these "hypothetical" credits and debits were not actual conveyances or transfers made by the Debtor. (Am. Cplt. ¶ 88.)

There can be no viable claim against Mr. Mullaney to recover amounts never paid by the Debtor to him or for his benefit in the first instance, funds which remained in the Debtor's possession and were assets available to its other creditors. The allegation that "the total amount of suspect expenses Mullaney charged to his limbo pay totaled at least $400,000" (Am. Cplt. ¶ 86), is already a concession that Plaintiff's claims related to the limbo pay are at best less than half of the $950,000 in Board-awarded bonuses that Mr. Mullaney deferred rather than collected from WW when awarded. And even as to that $400,000 estimate, the documents properly before this Court on this motion are replete with references to amounts (e.g., employee bonuses and health insurance premiums) paid to and for the benefit of others that should not for pleading purposes be indiscriminately lumped together with other amounts as to which Plaintiff might potentially (in a less vague pleading) assert some colorable claim.

The $400,000 alleged to have actually been deducted from the "limbo account" for "suspect" payments is completely unspecified as to dates and amounts. In order to have properly come up with the $400,000 figure, Plaintiff should have identified specific payments in specific amounts on specific dates that added up to that sum, but the Amended Complaint does not even provide a breakdown by year. Even notice pleading requires more than this. *E.g.*, *Safety-Kleen*, 2013 WL 6795963, at *7 ("In cases finding that allegations of constructive fraudulent transfers are sufficient to meet Rule 8's pleading requirements, the plaintiff must still at the very least allege a minimum of facts that demonstrate the basis for the claim that a fraudulent transfer has occurred"). Indeed, given that the primary differences between Exhibits A, B and C are different starting dates due to the different statutes of limitations applicable to the different liability theories, the failure to allocate the $400,000 even by year makes it impossible to determine how much is potentially subject to which liability theory.

In sum, the bonus awards whose payment was deferred are not fraudulent conveyances or transfers at all, and the Amended Complaint as supplemented with Exhibits A-C does not comply with Rule 8 with respect to any actual payments to or for the benefit of Mr. Mullaney that might relate to the Limbo Spreadsheet.

The inability to reconcile the vague, unspecified $400,000 figure with the Limbo Spreadsheet makes the above-quoted allegation implausible under *Twombly* and *Iqbal*.[9]

---

[9]     As shown above, hundreds of thousands of dollars in deductions shown on the Limbo Schedule could not conceivably be characterized as "suspect" payments to Mr. Mullaney or for his benefit.

There are also other entries on the Limbo Schedule such as, for example, a March 11, 2016 entry of $2,978 for "all car service charges for 2015," where Plaintiff has not plausibly alleged that *every* single use by Mr. Mullaney of a car service during 2015 was for personal use rather than a legitimate business expense that the Debtor could have reimbursed him for without creating any imputed additional income that would need to be included on his W-2. If Plaintiff wishes to claim

As yet another example of the flaws with Plaintiff's vague "limbo" claims, the $3,500 camera purchase this Court referenced (Decision at 46) is reflected on the Limbo Spreadsheet by a reduction dated October 12, 2012 (Limbo Spreadsheet, first page), more than six years prior to the commencement of this adversary proceeding and thus outside the longest potentially-relevant statute of limitations.

Finally, much if not most of the reductions of the running balance of unpaid bonus awards recorded on the Limbo Spreadsheet that Plaintiff seeks to summarily lump together were applied to pay the same AmEx bills that Plaintiff treats as an entirely separate category of alleged fraudulent conveyance. That, in turn, has inevitably resulted in substantial double-counting. Some of the entries on the Limbo Spreadsheet specifically so state. For example, March 2016 deductions include $23,493.86 for "Langham bills for 2015 per amex," $11,028.60 for "Amtrak for 2015 per amex," and $2,977.56 for "other taxis for 2015 per amex"; and July 2016 deductions include "Langham bills for 2016 per amex through July 31, 2016", "Amtrak bills for 2016 per amex through July 31, 2016, and "other misc taxis bills for 2016 per amex through July 31, 2016. (Limbo Spreadsheet, first page; *id*. at final page, Notes 19-21 and 25-27.) Other entries refer to travel, lodging and similar expenses charged to the AmEx card, such as the above-referenced Bangladesh trip, airline and hotel charges which are listed on the November 27, 2016-December 23, 2016 statement (included in Amini Decl. Exhibit 15). (*See also* Decision at 46 ("The propriety of these payments and reimbursements is intertwined with the treatment of the 'limbo pay' account because many of these payments appear to be the same personal expenses Mullaney ordered Fuchs to

---

that some subset of this $2,978 was for purely personal trips, the cost of which should then allegedly have been included as imputed income on Mr. Mullaney's W-2, he should be required to specify how much of that $2,978 fits into that category, why those particular charges are suspect, and when and to whom they were paid.

deduct from his 'limbo pay'").) In order to eliminate impermissible double-counting, Plaintiff should also be required to specify the amount, date, payee and nature of any allegedly inappropriate payments corresponding with reductions on the running balance shown on the Limbo Spreadsheet that were paid to Mr. Mullaney or for his benefit but *not* paid via the monthly payments on the AmEx card.

Thus, the Tenth, Eleventh and Twelfth Claims for Relief insofar as they relate to bonus payments must be dismissed unless and until Plaintiff can identify specific individual payments (not duplicative of other payments separately listed in Exhibits A-C) that he reasonably contends were fraudulent conveyances or transfers to Mr. Mullaney or for his benefit.

**B.    Plaintiff has Not Plausibly Alleged that 100% of the AmEx Bills the Debtor Paid Constituted Inappropriate Expenses, and has Failed to Specify Which Subset He Does Allege Was Inappropriate**

Exhibits A-C may appear at first glance precise in the amount of AmEx charges they seek to recover, specifying for example $117,315.62 for the period December 28, 2015 through December 27, 2016. But as noted above, that is simply the total of all monthly invoices issued for that AmEx account during that period, rather than all payments made (*see* Note 5, *supra*), even though a fraudulent conveyance can only occur when a payment is made, not when an invoice is received. Nowhere does the Amended Complaint allege that Mr. Mullaney *never* used his corporate AmEx card for *any* legitimately reimbursable business expenses, such that 100% of the charges on the card represented expenses the Debtor should not have reimbursed its CEO for. Nor is that a plausible inference from the facts alleged, or the underlying documents.[10]

---

[10]    For example, of the amount billed in the first AmEx statement challenged ($12,321.86), covering December 28, 2012-January 26, 2013 (included in Amini Decl. Exhibit 12), 69% is clearly travel charges incurred in connection with trips to Los Angeles and Chicago. Similarly, of the amount billed in March 2013 ($26,092) (*id.*, the February 2013 statement is for only $400), 78% is clearly travel charges incurred in connection with trips to India and London. And so on.

Unless and until Plaintiff provides greater specificity (with double-counting eliminated), the Tenth, Eleventh and Twelfth Claims for Relief should be dismissed insofar as they relate to the AmEx payments.

### C. The Amended Complaint Does Not Sufficiently Allege Lack of Reasonably or Fair Equivalent Value for Many and Possibly All of the Allegedly Fraudulent Conveyances and/or Transfers[11]

As set forth above (at 12), Plaintiff must plead facts showing that the Debtor did not receive reasonably equivalent value for the amounts transferred to Mr. Mullaney or for his benefit. He asserts that all of the supposedly "suspect" items scheduled on Exhibits A-C constituted "excess compensation and reimbursements" (Am. Cplt. ¶¶ 177, 182, 187), which might be taken to imply they were in "excess" of whatever cumulative amounts would be reasonably equivalent value for the services Mr. Mullaney provided to the Debtor. But without some allegation of a benchmark for how much compensation would be reasonably equivalent value for those services, Plaintiff cannot allege, and has not alleged, that what was actually received by Mr. Mullaney exceeded that benchmark.

---

On their face these are exactly the sort of expenses the CEO of an organization like WW would incur in carrying out the Debtor's mission and be entitled to reimbursement pursuant to its policies. Plaintiff has had years to review the specific AmEx statements and, like the trustee in *Moll*, should be required to specify what specific charges he contends are inappropriate.

[11] The Court indicated (Decision at 53-54) that the NYDCL claims in the Tenth Claim for Relief may potentially be viable if lack of good faith is sufficiently alleged, separate and apart from whether reasonably equivalent value is sufficiently alleged. But for the federal claims in the Eleventh and Twelfth Claims for Relief, failure to sufficiently allege lack of reasonably equivalent value is a fatal flaw. (*Id.*) It is, however, not clear what damages remedy a plaintiff is entitled to under New York law when lack of good faith but not lack of reasonably equivalent value is shown, since typically in a case where the transferee provided some value the plaintiff must either return that value or net it out in calculating damages as part of setting aside the challenged conveyance. Mr. Mullaney reserves all of his rights on this issue.

The only benchmark Plaintiff advances, one which this Court also found relevant in its earlier Decision, is the Pearl Meyer report. Plaintiff alleges (Am. Cplt. ¶¶ 62-63) that the Board disregarded the advice given in the Pearl Meyer report by awarding larger bonuses than Pearl Meyer had recommended, and also by failing to quantify the value of other perquisites Mr. Mullaney was receiving and then taking that amount into account in assessing the appropriate amount of bonus to award. But as set forth above, the bonus amounts awarded by the Board to Mr. Mullaney were much larger than the amount of any actual conveyances or transfers actually made to Mr. Mullaney or for his benefit. That the Plaintiff may have sufficiently alleged that the bonus amounts, *if* they had actually been paid to Mr. Mullaney, *would* have exceeded reasonably equivalent value for his services is neither here nor there given that there is no dispute that the majority of those amounts were *not* actually paid to him either directly or indirectly, via the limbo account or otherwise.

The Pearl Meyer report certainly did not recommend that the Board give Mr. Mullaney *no* bonus or other perquisites, such that his total compensation package would not be materially greater than the $475,000 base salary. And it provided substantial information about the total dollar value of bonus and perquisites received by executives at various percentile levels of total compensation in the various groups of comparable employers it recommended the Board consider. (Amini Decl. Exhibit 16 (Pearl Meyer report), at WON-EX10767, '773 (high-growth non-profit CEOs), '775 (foundation CEOs) and '776 (university development officers).) This Court already ruled that Plaintiff's original Complaint had not sufficiently alleged that the reasonably equivalent value of Mr. Mullaney's services was so low as not to support his $475,000 per year base salary. (Decision at 53-54.) For essentially the same reasons, it follows that the Amended Complaint has not alleged facts sufficient to create a plausible inference that the reasonably equivalent value of Mr. Mullaney's services was too low to justify a total compensation package

of $475,000 per year in base salary along with a "market-rate" corresponding level of bonus and/or perquisites consistent with the market data in the Pearl Meyer Report, which is Plaintiff's own chosen benchmark.

Despite Plaintiff's apparent acquiescence in the Court's prior holding (by removing base salary payments from Exhibits A-C), the Amended Complaint makes no attempt to quantify the value the Debtor received from Mr. Mullaney. Moreover, it is likely that once the double-counting and other issues discussed above that have led to the numbers on Exhibits A-C being grossly exaggerated have been addressed, the total annual amount of payments actually in dispute will not exceed the annual amount validated as reasonable by the Pearl Meyer report. But in any event, it is Plaintiff's burden to plead facts sufficient to create a plausible inference that any portion of Mr. Mullaney's compensation and reimbursements was "excessive." Because Plaintiff has not met that burden, the Eleventh and Twelfth Claims for Relief should be dismissed on that ground as well as the others set forth herein.

**D. The "Other Expenses" Plaintiff Seeks to Recover Are Largely Duplicative and/or Contradicted by the Other Documents**

The bulk of the "Other Expenses" on Exhibits A-C are a bit over $9,000 in alleged personal expenses allegedly "taken as a deduction from salary" in 2016. But this Court has already held (Decision at 53-54) that Mr. Mullaney was entitled to at least his $475,000 base salary for 2016, so there is no basis to recover any portion of that salary just because it may have been labeled as an expense reimbursement. Nor is there any tax reporting issue, since Mr. Mullaney's W-2 for calendar 2016 (included in Amini Decl. Exhibit 17) shows the full $475,000 amount as taxable wages, not the lesser amount one would expect if the "deduction(s) from salary" had been treated (whether properly or improperly) as non-taxable.

As to the remaining items in that category beyond an under-described $180 payment in 2014, the $5,994.40 2014 payment for "personal expense on AmEx card" appears on its face to be duplicative of the much larger total amount of AmEx payments discussed above, and the $2,194 reimbursement for "out of pocket" expenses is supported by no allegations that it was not a legitimate reimbursement.

For these reasons, the Tenth, Eleventh and Twelfth Claims for Relief should be dismissed insofar as they apply to the payments described on Exhibits A-C as "Other Expenses."

**E.     No Basis is Alleged for Recovering Life Insurance Premiums Paid**

There is no dispute that the Board authorized the payment of life insurance premiums as a fringe benefit for Mr. Mullaney.  Indeed, Plaintiff concedes that that particular benefit was eventually explicitly included in Mr. Mullaney's Employment Agreement.  (Am. Cplt. ¶ 65.)  The comparatively modest amounts involved per year are well within the market-standard amount of perquisites supported by the Pearl Meyer Report, as set forth above.

Nor does the Amended Complaint plausibly plead lack of good faith with respect to the insurance premiums.  The IRS rules for when employer-paid life insurance premiums should or should not be treated as additional imputed income included on the employee's W-2 are complex, and Plaintiff neither sets forth the governing standard nor pleads facts showing that these particular premium payments should have been included as additional imputed income on Mr. Mullaney's W-2.  Indeed, Plaintiff simply alleges (Am. Cplt. ¶ 71) that the premiums were not reported as part of Mullaney's compensation without actually alleging, as opposed to insinuating, that they were required to be reported.  As noted above, the Amended Complaint's allegation that these payments were undisclosed to the IRS and donors is contradicted by WW's Form 990's for the relevant years (Amini Decl. Exhibits 2-5, Part VII, Section A), which disclose substantial "other compensation,"

generally in amounts exceeding $40,000 per year, that presumably included items such as employer paid life and health insurance premiums.[12]

But even assuming arguendo that the premiums were mischaracterized on the Form 990's, they are not alleged to have had anything to do with the "limbo account," and the alleged restatement by Smile Train of Mr. Mullaney's earlier W-2's (Am. Cplt. ¶ 82) is not alleged to have had anything to do with the treatment of employer-paid insurance premiums. The Amended Complaint alleges no facts that give rise to an inference that Mr. Mullaney knew the tax reporting of the premiums was improper or even that he had anything to do with how they were treated in the Debtor's tax reporting. The absence of such allegations means that Plaintiff has failed to plead facts giving rise to a plausible inference that Mr. Mullaney lacked good faith in connection with these payments, and the Plaintiff has thus failed to allege lack of "fair consideration" as required for the NYDCL claims.

For these reasons, the Tenth, Eleventh and Twelfth Claims for Relief should be dismissed insofar as they apply to any payment of life insurance premiums.

### F.    New Facts Added to the Amended Complaint Demonstrate No Basis is Alleged to Treat the Debtor's Payment of Litigation Expenses as Fraudulent Conveyances or Transfers to Mr. Mullaney

This Court noted (Decision at 46) the original Complaint's allegation that the Board had approved up to $150,000 in payment for defense costs associated with Smile Train's litigation campaign against Mr. Mullaney but that total payments of Mr. Mullaney's defense costs had allegedly exceeded that Board-approved cap, thus raising questions about the appropriateness of

---

[12]    The "other compensation" column, by contrast, is left empty in the Form 990's for periods after June 30, 2016 that were filed by WW's bankruptcy trustee after Mr. Mullaney had left the company (Amini Decl. Exhibits 6-7), but Mr. Mullaney cannot be blamed for any potential deficiency in the trustee's IRS filings.

the additional, then allegedly unapproved payments. But Plaintiff now alleges (Amended Complaint ¶¶ 76-78) that payment of *all* of the defense costs (as well as a $450,000 "contribution" as part of the settlement with SmileTrain) were made "with Board approval and knowledge." These new allegations require Plaintiff to overcome the Board's reasonable business judgment that these were appropriate corporate expenditures. (*See* Decision at 26-27.) Plaintiff cannot do so.

Smile Train's complaint against Mr. Mullaney, authored by Mr. Sama, in fact left WW out of that complaint as a named party. But the complaint contained serious, specific allegations against WW, including that it was unlawfully using Smile Train's donor list and misleadingly seeking to create "the impression that WonderWork is sponsored by or affiliated with SmileTrain." (Amini Decl. Exhibit 1, ¶¶ 29, 79.) Thus, not just Mr. Mullaney's personal interests, but also WW's separate corporate interests, were directly implicated by the litigation, a point reflected by the fact of WW's agreeing to make a $450,000 grant to HMS in order to settle the dispute, and expunge all Smile Train donors from WW's records. (Examiner's Report at 47.)

There is no plausible inference that the Debtor made these payments without receiving reasonably equivalent value and/or that good faith was lacking.[13] Just as important, there are no allegations that the sum total of all legal payments WW made in response to lawsuits overseen or brought by Mr. Sama were outside the range of Board decisions protected by the business judgment rule.

In fact, Plaintiff does not even allege that the subject settlement payment by WW to SmileTrain was a fraudulent conveyance or transfer to Mr. Mullaney, and it is not included in his Exhibits A-C schedules of alleged fraudulent conveyances and/or transfers. Plaintiff knows from

---

[13] The Amended Complaint contains no plausible allegation that the tax treatment or reporting of these payments was improper, much less that, if it was, Mr. Mullaney knew that it was and had caused any inaccurate tax reporting.

his direct role in that litigation that there was a legitimate corporate purpose (within the broad scope of discretion afforded by the business judgment rule) behind the Board's decision to settle. It necessarily follows that there was a legitimate corporate purpose for funding the defense of the case until that settlement was reached.

For these reasons, the Tenth, Eleventh and Twelfth Claims for Relief should be dismissed insofar as they apply to any of the Debtor's payments of defense costs to counsel who represented Mr. Mullaney in the lawsuits in question.

### G. The Twelfth Claim for Relief Separately Fails Because the Crucial "Not in the Ordinary Course" Element Is Not Sufficiently Alleged

The Twelfth Claim for Relief appears to be based on section 548(a)(1)(B)(ii)(IV) of the Bankruptcy Code, which allows a trustee to avoid certain transfers to insiders "under an employment contract and not in the ordinary course of business." The AmEx bills included on Exhibit C do not fit this liability theory because there is no non-conclusory allegation that they (or some portion of them) were paid "under an employment contract." As to the remaining items on Exhibit C, in addition to all of the other infirmities set forth above, that last crucial element required under this subsection is missing. Other than a self-serving conclusion, no facts are alleged (as *Twombly* requires) that give rise to a plausible inference that any such payments were not in the ordinary course of the Debtor's business. To the contrary, they are completely consistent with the Debtor's long-standing compensation practices regarding Mr. Mullaney for the much longer time period covered by Exhibit A. (Decision at 6-9, 64.)

The Amended Complaint fails to allege that any of the payments to Mullaney were "unusual and unique" or "neither recurring nor customary". *See In re TSIC, Inc*., 428 B.R. 103, 109-11 (Bankr. D. Del. 2010) (explaining that Congress enacted this section of the Code in the wake of Enron and WorldCom to allow for the claw back of "all those huge payouts and loans and

bonuses and transactions that went to these corporate executives as the company was headed to bankruptcy"). In that case, the court found the defendant's receipt of "an unusual and unique" payment that was "neither recurring nor customary" rendered it out of the ordinary course, and thus within the reach of the statute. *Id*. at 116.

Here, by contrast, the section has no applicability to payments pursuant to Mr. Mullaney's employment agreement that were both "recurring" and "customary" against the background of the lengthy prior course of dealing between WW and Mr. Mullaney. Moreover, as shown above, the actual magnitude of any payments that (after double-counting and other flaws are eliminated) might be characterized as additional compensation to Mr. Mullaney is likely well within the industry-standard range indicated by the Pearl Meyer report for comparable companies. They are thus the sort of payments creditors could have reasonably expected the Debtor to make prepetition, and satisfy the horizontal and vertical dimension tests considered in determining whether the use, sale, or lease of property is in the ordinary course of business under section 363(c)(1) of the Bankruptcy Code. (Decision at 65.)

## II.    THE FOURTEENTH CLAIM FOR RELIEF SHOULD BE DISMISSED AS TO THE $237,550 PAYMENT THAT THIS COURT HAS ALREADY HELD IS NOT AVOIDABLE, AND LIMITED AS TO THE REMAINDER

This claim for relief, seeking to avoid certain post-petition payments, is essentially identical to the Ninth Claim for Relief in the original Complaint. This Court granted Mr. Mullaney's motion to dismiss "the avoidance claim based on the payment of $237,550.00" because the Complaint did "not allege facts showing that the payments were extraordinary and required Court approval." (Decision at 65, 67.) The Amended Complaint alleges no new facts that could change that. All Plaintiff has done is replace a bare allegation that the payments were "out of the ordinary course of business" with an equally bare allegation that "[g]iven the unique circumstances under which these lump sum payments were made" they deviated from the ordinary course of

business.  (Am. Cplt. ¶ 201.)  But no "unique circumstances" are alleged that were not already

alleged in the original Complaint.  Indeed, as Paragraph 84 of the Amended Complaint alleges,

payment of Mr. Mullaney's base salary had long been "erratic" in timing, with catch-up payments

of arrears hardly being unprecedented.  (*See also* Aug. 17, 2017 Mullaney Tr. at 582-83 (Amini

Decl. Exhibit 9).)

Separately, the Amended Complaint alleges (at ¶ 200) that $59,517.70 in post-petition

AmEx payments "should also be avoided" for "the reasons set forth above with respect to the pre-

petition American Express charges."   Again, as set forth above, it is not "plausible" for

*Twombly/Iqbal* purposes that 100% of the AmEx charges were for "excessive, personal and

undocumented" expenses, and Plaintiff should be required to specify what subset of the charges to

that card he alleges were inappropriate in whole or in part, or whether the amounts were even paid

and if so when.

## III.   PLAINTIFF HAS NOT SUCCESSFULLY REPLEADED ANY OF THE ASPECTS OF THE EIGHTH CLAIM FOR RELIEF THAT THIS COURT PREVIOUSLY DISMISSED

The current Eighth Claim for Relief, asserted against Mr. Mullaney for alleged breach of

his fiduciary duties, is essentially the same as the original Complaint's Fourth Claim for Relief.

In the Decision, this Court analyzed the predecessor claim in the original Complaint as having

seven different subparts, which it analyzed individually before dismissing the majority of them in

whole or in part.[14]   The claim remains confusingly-worded even after the parallel claim against

Ms. Fuchs is broken out separately, but Plaintiff does not appear to have withdrawn any of the

---

[14]     Mr. Mullaney does not in this motion seek dismissal of that subpart of the claim relating
to the Fuchs Employment Agreement as discussed on pages 47-48 of the Decision.

parts of the breach of fiduciary duty claim that this Court previously dismissed. Nor has Plaintiff offered any new factual allegations that could revive any of those claims.

A.     **No Claim Stated With Respect to Mr. Mullaney Receiving Board-Approved Compensation**

The Court previously ruled (Decision at 42) that Mr. Mullaney "did not breach a fiduciary duty by accepting compensation awarded by the Board." No additional facts have been alleged that could change that ruling.

B.     **No Claim Stated With Respect to Handling Restricted Funds**

The original Complaint asserted a claim for breach of fiduciary duty against Mr. Mullaney, on account of "several things the 'Debtor' did wrong in connection with the restricted funds." (Decision at 48.)  The Court dismissed the claim as against Mr. Mullaney on the ground that Plaintiff did not "connect the alleged misuse of or improper accounting for restricted funds with any action by Mullaney." (Decision at 49.)  Plaintiff attempted to remedy this defect by adding a single sentence (Am. Cplt. ¶95) asserting that "as detailed in the Examiner Report (see p. 154 to 165), Fuchs, in cooperation with Mullaney, kept misleading books and records that permitted them to misstate Debtor's performance." Telling this Court that relevant facts he could not be bothered to specify in his pleading can be found buried somewhere in the Examiner's Report is exactly the tactic this Court previously told the Plaintiff was unacceptable. (Decision at 24-25 n.12.)

The cited portion of the Examiner's Report, in any event, does not support a breach of fiduciary duty claim against Mr. Mullaney.  The Court held that the "allegations directed at Fuchs imply negligent bookkeeping and negligent accounting practices, not bad faith" which this Court thus held insufficient for a breach of fiduciary duty claim. (Decision at 49.)  In the referenced section of his report, the Examiner expressed his own conclusion (which this Court has already held (Decision at 24) is entitled to no weight) that "many more of the donations" to WW should

have been classified as "restricted" than were contemporaneously so classified by WW. The Examiner (at 156-57) attributed this inaccurate (in his view) classification as consistent with "[t]he somewhat cavalier attitude taken by Debtor," referencing a colloquy with Mr. Mullaney. But this creates no plausible inference that Mr. Mullaney himself *caused* or directed Mr. Fuchs or other personnel to follow improper or unlawful accounting practices, nor does the referenced section strengthen the claim against Ms. Fuchs beyond the accusation of simple negligence that this Court already held insufficient. Indeed, the excerpt describes Ms. Fuchs's preparation of the "roll forward" schedule which had already been referenced in the prior Complaint and already held by this Court (Decision at 47-49) to be both insufficient to state a claim against Ms. Fuchs and completely unconnected to Mr. Mullaney.

The same excerpt of the Examiner's Report (at 157-60) notes that in 2016, WW began to reclassify certain funds as restricted that had previously not been so designated, and that this effort increased as the debtor's financial condition worsened, at the advice of and with the active participation of bankruptcy counsel. But nothing about the Examiner's factual description of this reclassification effort gives rise to any plausible inference that any prior classification errors rectified by the reclassification were the result of a breach of fiduciary duty by Mr. Mullaney.

### C. No Claim Stated With Respect to Improper Solicitation

The Court previously held (Decision at 49) that the claim against Mr. Mullaney regarding the Debtor's allegedly improper solicitation practices was fatally flawed for three separate and independent reasons—lack of direct personal involvement, lack of injury to the Debtor (as opposed to the allegedly misled donors) and lack of standing. Whether or not the Amended Complaint might cure the first defect, it has not cured the other two. Any injury caused by these alleged practices (and thus any standing to sue) remains with the allegedly misled donors, not the Debtor itself. The new assertion (Am. Cplt. ¶ 99) that the Examiner and others spent considerable time

investigating this issue and collected substantial fees from the Debtor for doing so is transparently an inadequate bootstrap argument. The Examiner, charged with identifying potential causes of action against Mr. Mullaney among others (Case No. 16-13607, ECF Doc. #110), chose to devote substantial time to an investigation into the improper solicitation allegations but ultimately failed to identify a viable cause of action against Mr. Mullaney due to, among other things, lack of injury to the Debtor. The cost of that unsuccessful quest cannot itself then be used to magically create the missing injury. Plaintiff was warned by this Court (Decision at 73) that the "focus of any amended complaint should be on those acts that caused an injury to the Debtor" but Plaintiff has not complied with that directive.

### D. The Amended Complaint Contains No New Bases to Support the Breach of Fiduciary Duty Claim for $237,550 in Post-Petition Salary the Court Dismissed

In Paragraph 169(e) of the Amended Complaint, Plaintiff seeks to recover $395,833.32 "in post-petition, non-ordinary course" salary, touting Mr. Mullaney's acknowledgment that $158,281.21 of the amount is avoidable. Plaintiff fails to point out that the balance of $237,550 he now seeks yet again was dismissed by the Court as part of Plaintiff's original Ninth Claim for Relief. (Decision at 66.) The substance of this claim is identical to the allegations upon which the Court ruled Plaintiff's claim for that salary was not avoidable. Given the complete lack of any new allegations and the Court's prior dismissal of all of Plaintiff's salary claims, there is no basis for any breach of fiduciary duty claim against Mr. Mullaney with respect to the $237,550.00 that the Court has already held cannot be avoided.

## IV. THE AMENDED COMPLAINT AND DOCUMENTS INCORPORATED INTO IT FAIL TO ALLEGE ANY INJURY RELATED TO THE LIMBO ACCOUNT

The primary reason the Court previously held that the limbo account allegations (as well as the "intertwined" allegations about excessive or inappropriate expense reimbursements) stated

a cause of action for breach of fiduciary duty (Decision at 45) was its conclusion that the original Complaint had pleaded a plausible inference that Mr. Mullaney knowingly caused the Debtor to violate the tax laws by allegedly misreporting Mr. Mullaney's taxable income. But elsewhere, when addressing the "improper solicitation" allegations, the Court stressed (Decision at 49) that "without condoning any misrepresentations, the [original Complaint] does not allege how they harmed the Debtor," and, as already noted, the Court concluded by stressing (Decision at 73) that the "focus of any amended complaint should be on those acts that caused an injury to the Debtor and entitle the Plaintiff to recover damages on behalf of the creditors."

Absolutely no injury to the Debtor from the allegedly inappropriate tax treatment of transactions related to the "limbo account" is plausibly alleged by the Amended Complaint. Alleged harm to the IRS or state taxing authorities, as opposed to the Debtor itself, is not harm that Plaintiff has standing to pursue, and not harm that those tax authorities have alleged. If the tax authorities had fined or sanctioned the Debtor for alleged irregularities in their tax filings, or for remitting insufficient withholding tax, that might have constituted injury to the Debtor, but there is no allegation that they did so. Indeed, the only claim filed by a taxing authority in WW's bankruptcy case was that of the IRS, for $1,000 of allegedly unpaid FUTA, plus $167.45 in prepetition interest and $250 in penalties (Amini Decl. Exhibit 18-19), which has nothing whatsoever to do with the limbo account. Nor is there any remaining contingent risk of future injury, since any such claim or enforcement action by tax authorities against the Debtor's estate is now impossible due to the passing of the bar date and the consummation of the Debtor's Chapter 11 plan. (*See* Case No. 16-13607, ECF Doc. #178 (bar date order); Case No. 16-13607, ECF Doc. #435 (plan), § 13.3(c) (injunction).)

Further, it is undisputed that, *after* Mr. Mullaney and Ms. Fuchs had left the Debtor's employment and the bankruptcy trustee appointed to manage the Debtor's affairs, that trustee did

not feel the need to revise or restate its prior Form 990's or W-2's. Indeed, it is striking that even after being fully aware of Plaintiff's allegations about the supposed inadequacy of the earlier Form 990's, the more recent Form 990's filed by the bankruptcy trustee (both after the departures of Mr. Mullaney and Ms. Fuchs and after the commencement of this adversary proceeding) likewise fail to disclose the alleged additional compensation to Mr. Mullaney beyond his base pay that the Plaintiff claims was required by law to have been disclosed all along. (Amini Decl. Exhibits 6-7, Part VII, Section A.)

Finally, it is clear that once the double-counting and other issues with Plaintiff's claims are removed and the allegedly "suspect" payments related to the limbo account and expense reimbursements whittled down to any that might genuinely be in dispute, the total cost of all such payments to the Debtor are substantially less than what the Debtor would have spent had Mr. Mullaney drawn in full, rather than deferred, the $950,000 in bonuses the Board expressly agreed to grant him. Whether or not those bonuses, if actually paid, would have been so excessive as to be subject to partial avoidance on other grounds has nothing to do with the fiduciary duty claim, since as the Court has already ruled (Decision at 39, 42), Mr. Mullaney had no fiduciary duty to be modest in his requests for compensation, and no fiduciary duty to refuse to accept whatever the Board, whether prudently or imprudently, decided to award him. Similarly, Plaintiff has now conceded (*see supra* at 8-9) that the Board approved all of the funds the Debtor spent on defense costs and settlement of the lawsuits brought against Mr. Mullaney by his former employer Smile Train, and Mr. Mullaney had no fiduciary duty to decline to allow the Debtor to make those payments.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed in part, specifically as set forth in the following chart:

| Claim for Relief | Requested Relief |
| --- | --- |
| Eighth Claim—Breach of Fiduciary Duty | Dismissal with prejudice of all aspects other than that asserting a claim in respect of Ms. Fuchs' employment agreement and the $158,283.32 payment identified in Exhibit D. |
| Tenth Claim—Constructive Fraudulent Conveyance under NYDCL | Dismissal with prejudice as to life insurance premiums, "other expenses," and defense costs; and dismissal with leave to replead (or in the alternative, sustained but with direction to file a more definite statement) as to any non-duplicative specific payments (identified by exact date, amount and nature) as to which lack of reasonably equivalent value (or, as to the Tenth Claim, lack of good faith) can be alleged. |
| Eleventh Claim—Constructive Fraudulent Transfer under Bankruptcy Code section 548 | |
| Twelfth Claim—"Employment Fraudulent Transfers" under section 548 | Dismissal with prejudice. |
| Fourteenth Claim—Postpetition Transfers | Dismissal with prejudice as to the $237,550 payment; and dismissal as to the AmEx bills with leave to replead (or in the alternative, sustained but with direction to file a more definite statement) as to any non-duplicative specific payments (identified by exact date, amount and nature) as to which lack of reasonably equivalent value can be alleged. |

; and Mr. Mullaney should be granted such other and further relief as the Court deems just and proper.

Dated: March 25, 2020
      New York, New York

Respectfully submitted,

/s/ Bijan Amini
Bijan Amini
John W. Brewer
Jeffrey Chubak
AMINI LLC
131 West 35th Street, 12th Floor
New York, New York 10001
(212) 490-4700
bamini@aminillc.com
jbrewer@aminillc.com
jchubak@aminillc.com
*Attorneys for Defendant Brian Mullaney*