Bijan Amini
John W. Brewer
Jeffrey Chubak
AMINI LLC
131 West 35th Street, 12th Floor
New York, New York 10001
(212) 490-4700
bamini@aminillc.com
jbrewer@aminillc.com
jchubak@aminillc.com
*Attorneys for Defendant Brian Mullaney*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>WONDERWORK, INC.,<br><br>             Debtor. | Chapter 11<br><br>Case No. 16-13607-smb<br><br>Adv. Pro. No. 18-1873-smb |
| VINCENT A. SAMA, as Litigation Trustee<br>of the WW Litigation Trust,<br><br>          Plaintiff,<br><br>   - against -<br><br>BRIAN MULLANEY, HANA FUCHS,<br>THEODORE DYSART, RAVI KANT,<br>JOHN J. CONEYS, STEVEN LEVITT,<br>CLARK KOKICH, STEVEN RAPPAPORT,<br>RICHARD PRICE and MARK ATKINSON,<br><br>         Defendants. | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION TO
DISMISS AMENDED COMPLAINT AS AGAINST BRIAN MULLANEY**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT ......................................................................................................................... 2

I.     PLAINTIFF IGNORES THE RULE 12(b)(6) STANDARD AND IMPROPERLY CLAIMS THIS COURT CANNOT LOOK AT THE DOCUMENTS THE AMENDED COMPLAINT ITSELF REFERENCES AND/OR ARE SUBJECT TO JUDICIAL NOTICE .................................................................................................................... 2

II.    PLAINTIFF CONCEDES MR. MULLANEY'S ALTERNATIVE REQUEST UNDER RULE 12(e) FOR A MORE DEFINITE STATEMENT .................................................... 5

III.   THE AVOIDANCE CLAIMS SHOULD BE DISMISSED AND/OR LIMITED ............. 7

     A.     Fraudulent Conveyance/Transfer Claims ............................................................ 7

           1.     Plaintiff Cannot Recover Moneys That Were Never Paid Out; "Limbo Pay" Allegations are Inconsistent with the Documents and Rife with Double-Counting ......................................................................................... 8

           2.     Plaintiff Offers No Response to the Showing that Many of the AmEx Charges Are Not In the Least Bit Suspicious, and Has Made No Attempt to Identify the Subset He Contends Are Suspicious .................................. 10

           3.     Plaintiff Has Failed to Plausibly Allege Lack of Reasonably Equivalent Value ........................................................................................................ 10

           4.     Plaintiff Offers No Response to Mr. Mullaney's Argument That There Was Nothing Improper About the Payment of Life Insurance Premiums 11

           5.     Plaintiff Offers No Response to Mr. Mullaney's Arguments That There Was Nothing Improper About the Payment of Litigation Defense Costs 12

           6.     The Employment Fraudulent Transfer Claim Should Be Dismissed ........ 13

     B.     Postpetition Transfer Claim ................................................................................ 14

IV.   THE BREACH OF FIDUCIARY DUTY CLAIM SHOULD BE DISMISSED IN SUBSTANTIAL PART ...................................................................................................... 15

V.    THE LAW OF THE CASE DOCTRINE IS A RED HERRING THAT DOES NOT APPLY TO MR. MULLANEY'S ARGUMENTS ......................................................... 19

CONCLUSION .................................................................................................................... 20

                                                                                                          **Page(s)**

**Cases**

*In re AgFeed USA, LLC*,
    558 B.R. 116 (Bankr. D. Del. 2016) ...................................................................................... 8

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................... 4, 5, 7, 10

*AT & T Corp. v. Syniverse Techs., Inc.*,
    No. 12-cv-1812, 2014 WL 4412392 (S.D.N.Y. Sept. 8, 2014) ............................................... 5

*Baker Botts L.L.P. v. Asarco LLP*,
    576 U.S. 121, 135 S. Ct. 2158 (2015).................................................................................. 16

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................... 4, 5, 7, 10

*Brody v. Village of Port Chester*,
    345 F.3d 103 (2d Cir. 2003)................................................................................................ 19

*In re Dewey & LeBoeuf LLP*,
    No. 12-ap-12321, 2014 WL 4746209 (Bankr. S.D.N.Y. Sept. 23, 2014)........................ 13, 14

*Golden Horn Shipping Co. Ltd. v. Volans Shipping Co. Ltd.*,
    No. 14-cv-2168, 2017 WL 3535002 (S.D.N.Y. Aug. 16, 2017)............................................. 19

*Hampshire Group, Ltd. v. Kuttner*,
    C.A. No. 3607-VCS, 2010 WL 2739995 (Del. Ch. July 12, 2010) ........................... 17, 18, 19

*Howe v. City of Akron*,
    801 F.3d 718 (6th Cir. 2013) .............................................................................................. 19

*In re M. Fabrikant & Sons, Inc.*,
    447 B.R. 170 (Bankr. S.D.N.Y. 2011) ................................................................................... 7

*In re M. Fabrikant & Sons, Inc.*,
    480 B.R. 480 (S.D.N.Y. 2012).............................................................................................. 8

*In re M. Fabrikant & Sons, Inc.*,
    541 Fed. App'x 55 (2d Cir. 2013) ......................................................................................... 8

*In re Moll Group, LLC*,
    No. 04-ap-1113, 2005 WL 6506459 (Bankr. E.D. Pa. June 15, 2005) .................................... 5

*Pelman ex rel. Pelman v. McDonald's Corp.*,
    396 F. Supp. 2d 439 (S.D.N.Y. 2005)................................................................................... 5

*Riley v. MEBA Pension Trust*,
  452 F. Supp. 117 (S.D.N.Y. 1978) ........................................................ 19

*In re SRC Liquidation LLC*,
  581 B.R. 78 (D. Del. 2017) .................................................................. 11

*In re UBS AG Secs. Litig.*,
  No. 07-cv-11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ............................................. 5

*Valeant v. Jerney*,
  921 A.2d 732 (Del. Ch. 2007) ........................................................ 15, 16

**Statutes and Rules**

11 U.S.C. § 547 ............................................................................ 13

11 U.S.C. § 548 ........................................................................ 13, 14

11 U.S.C. § 549 ............................................................................ 14

Fed. R. Bankr. P. 7012 .................................................................... 1

Fed. R. Civ. P. 8 .................................................................. 2, 4, 5, 7

Fed. R. Civ. P. 9 .......................................................................... 17

Fed. R. Civ. P. 12 .................................................................. passim

**Other Authorities**

18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper,
  Fed. Prac. & Proc. Juris. § 4478 (4th ed.) ............................................................ 19

Defendant Brian Mullaney submits this reply memorandum of law in further support of his motion to dismiss in part the Am. Cplt. as against him, pursuant to Rule 12(b)(6) and, in the alternative, for a more definite statement, pursuant to Rule 12(e), both as made applicable by Bankruptcy Rule 7012(b).[1]

## **PRELIMINARY STATEMENT**

Despite this Court's focus (*e.g.*, Decision at 55) on allegedly "excessive, unsubstantiated and unreasonable expenses" paid for by WW that were allegedly treated improperly for tax purposes as the heart of this case, Plaintiff continues to seek every penny beyond base salary (ruled definitively off limits in the prior Decision) ever allegedly paid, and over half a million dollars concededly never paid, to Mr. Mullaney and/or for his benefit in the five years he served as the founder and CEO of the Debtor.

Plaintiff now claims to be seeking over $1.8 million (Am. Cplt. Exhibit A), with over $1.5 million of that total consisting of $950,000 in Board-awarded bonuses plus over $535,000 in AmEx charges. But that claim includes: (i) at least $550,000 in deferred bonuses (and possibly over $80,000 more than that) that was never paid out by WW to Mr. Mullaney or anyone else; (ii) over $100,000 that appears from the face of the documents the Am. Cplt. incorporates by reference to have been spent for the benefit of *other* WW employees (via funding their annual bonuses and health care insurance premiums); (iii) another $88,000 that, from the face of the same documents, WW owed Mr. Mullaney but Mr. Mullaney forgave by making a donation back to the organization; (iv) an unknown amount likely to be in the hundreds of thousands of AmEx charges that cannot plausibly be alleged to be for "excessive, unsubstantiated, [or] unreasonable expenses"; (v) a

---

[1] Capitalized terms used but not otherwise defined herein have the meanings given to them in Mr. Mullaney's brief (ECF Doc. #83, "Mullaney Br.").

further unknown amount also likely to be in the hundreds of thousands arising from double-counting the same challenged payments by including them both in the "bonus" total and the AmEx total; as well as (vi) smaller five-figure amounts for "other expenses" that turn out to also be double-counted, and life insurance premiums (barely $15,000 in total paid over three different calendar years) that are a perfectly normal fringe benefit for senior executives. This refusal to specify what actual transactions and amounts are and are not in legitimate dispute renders the vast majority of Plaintiff's damages claims subject to dismissal as failing the "plausibility" standard imposed even on notice pleading subject to Rule 8(a), or, in the alternative, subject to the requirement to make a more definite statement pursuant to Rule 12(e).

For other aspects of his claims, Plaintiff cannot even make a conclusory allegation of a payment to Mr. Mullaney or for Mr. Mullaney's benefit, and has not managed to allege any other injury suffered by WW as a result of Mr. Mullaney's alleged misconduct. Plaintiff instead advances a fanciful claim that the cost of an overly expensive investigation that never managed to identify (as to many of Plaintiff's liability theories against Mr. Mullaney) any actual injury to WW can itself be bootstrapped into the missing injury—a theory contrary to both common sense and the cases cited to support it. Plaintiff fares no better by trying to relabel some of the bill for these investigations as "remediation" costs, since he does not allege any actual remediation of any of the issues investigated, and none did occur.

## ARGUMENT

**I. PLAINTIFF IGNORES THE RULE 12(b)(6) STANDARD AND IMPROPERLY CLAIMS THIS COURT CANNOT LOOK AT THE DOCUMENTS THE AMENDED COMPLAINT ITSELF REFERENCES AND/OR ARE SUBJECT TO JUDICIAL NOTICE**

Plaintiff repeatedly insinuates that this Court is not permitted to look beyond the "four corners" of his pleading (ECF Doc. #94, cited herein as "Plaintiff Br.", at 4, 5, 26, 34), despite the

well-established precedents collected and relied upon by this Court in the Decision (at 23-24), holding this Court may properly consider on this motion the full contents of all documents quoted or referenced in the Am. Cplt., as well as "documents the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit." "If the documents contradict the allegations of a plaintiff's complaint, the documents control and the Court need not accept as true the allegations in the complaint." (*Id.* (citation omitted).)

Yet in responding to Mr. Mullaney's motion, Plaintiff explicitly or implicitly asks this Court to ignore such documents. For example:

- Although the Am. Cplt. references (¶¶ 82, 84, 88) the spreadsheet Ms. Fuchs created to track Mr. Mullaney's "limbo pay," Plaintiff claims (Plaintiff Br. at 34) that the Court should ignore that spreadsheet whenever it contradicts his mischaracterization of it by showing (Mullaney Br. at 5-7; Amini Decl. Exhibits 10-11) that over and over again Mr. Mullaney directed Ms. Fuchs to deduct amounts from the running "limbo pay" balance to cover items such as annual bonuses and healthcare premiums for other WW staff rather than his own personal expenses.

- Although the Am. Cplt. argues (¶¶ 73, 78-81) that Smile Train's litigation against Mr. Mullaney was personal and had nothing to do with WW, Mr. Sama (now the Plaintiff) apparently wants this Court to ignore the contradictions between his prior pleading and his current one. It is obvious from the face of the prior pleading he filed for Smile Train (Amini Decl. Exhibit 1) that, although WW was not sued as such, Mr. Sama made claims and sought relief (*see* Mullaney Br. at 4, 8-9, 23-24) that directly implicated WW's institutional interests and not just Mr. Mullaney's personal interests.

- Although the Am. Cplt. alleges (¶ 71) that Mr. Mullaney is responsible for the failure of WW's public filings to report, among other things, WW's payment of life

insurance premiums, the actual IRS filings disclose on their face substantial "other compensation" given to Mr. Mullaney, a category which typically includes employer-funded insurance premiums (Amini Decl. Exhibits 2-5, Part VII, Section A), to which Plaintiff responds only that the content of those filings presents (Plaintiff Br. at 36) an "issue of fact."

- Finally, although Plaintiff seeks to recover from Mr. Mullaney almost a half million dollars in allegedly improper charges on his corporate AmEx card, when confronted with the actual AmEx statements for that account (Mullaney Br. at 7-8; Amini Decl. Exhibits 12-15) that show that many of the charges Plaintiff is suing on appear to be ordinary and appropriate business expenses, he has said nothing in response.

Indeed, the AmEx statements highlight the importance of this doctrine. The touchstone of Rule 8(a) notice pleading after *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) is plausibility. Here, even a cursory inspection of the AmEx statements themselves discredits Plaintiff's sweeping claim that essentially 100% of all AmEx charges over a multi-year period were inappropriate, and *none* of them were for legitimate business expenses.

Relatedly, Plaintiff's treatment of the Examiner's Report is self-serving, inconsistent and contrary to this Court's prior rulings. In the Decision (at 24), this Court indicated that the Examiner's conclusions were entitled to no weight, yet Plaintiff consistently references those conclusions in his brief (*e.g.*, at 15, 23, 34). On the other hand, the Court indicated that the underlying record evidence in the Examiner's Report and supporting exhibits (Decision at 24 n.12) could be considered in the Rule 12(b)(6) context, yet Plaintiff now argues (Opposition Br. at 5-6) that those aspects of the report are "hearsay" which can be disregarded whenever they contradict his current litigation position.

## II.   PLAINTIFF CONCEDES MR. MULLANEY'S ALTERNATIVE REQUEST UNDER RULE 12(e) FOR A MORE DEFINITE STATEMENT

The whole purpose of Rule 12(e) is to require a plaintiff to provide greater specificity than Rule 8(a) itself requires about exactly which transactions or incidents he is (and is not) suing on, when such specificity will make the litigation fairer to the defendant and more efficient for the Court.  (Mullaney Br. at 11 (citing *In re Moll Group, LLC*, No. 04-ap-1113, 2005 WL 6506459 (Bankr. E.D. Pa. June 15, 2005) and *Pelman ex rel. Pelman v. McDonald's Corp*., 396 F. Supp. 2d 439 (S.D.N.Y. 2005)).)

Plaintiff offers no response at all to this request for alternative relief.  He does not acknowledge or seek to distinguish either *Moll* or *Pelman*.  He has thus conceded the argument. *See, e.g.*, *AT & T Corp. v. Syniverse Techs., Inc.*, No. 12-cv-1812, 2014 WL 4412392, at *7 (S.D.N.Y. Sept. 8, 2014) (citations omitted) ("AT & T did not even discuss [the issue] in its opposition brief.  AT & T's silence concedes the point."); *In re UBS AG Secs. Litig.*, No. 07-cv-11225, 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (citations omitted) (same).

*Moll* (as discussed in the Mullaney Br. at 11) involved strikingly similar facts, where a bankruptcy trustee sought to recover allegedly improper charges on company-funded credit cards used by employees of the debtor but had lumped all payments on those cards together, without distinguishing legitimately suspect ones from the bona fide ones.   Accordingly, the court (before *Iqbal* and *Twombly* had transformed the application of Rule 8(a)) ordered a more definite statement pursuant to Rule 12(e) as the appropriate remedy for that lack of specificity.  Here, the Am. Cplt.'s tenth, eleventh, twelfth and fourteenth claims for relief incorporate by reference (¶¶177, 182, 187, 202) the schedules attached thereto at Exhibits A-D.  These schedules are supposed to provide the needed particularity for those fraudulent conveyance, transfer and avoidance claims by identifying the specific dates and amounts of the payments Plaintiff seeks to recover.  They do not do so,

because (Mullaney Br. at 12-17) they are rife with overinflated numbers and double-counting, including hundreds of thousands of dollars that it is undisputed was never actually paid out to Mr. Mullaney or for his benefit, as well as other amounts that, on the face of the Am. Cplt. (or the documents incorporated therein by reference), are not coherently alleged to have been improper. Rule 12(e) relief is especially appropriate here, because Plaintiff has had the benefit of years of prior investigation and currently has full access to WW's books and records.

An appropriate more definite statement here would require Plaintiff to:

- Specify the dates, amounts and recipients[2] of all payments by WW associated with the so-called "limbo pay" that were "used to defray Mullaney's personal expenses" (Decision at 45) with allegedly inappropriate tax reporting.

- Identify which such allegedly inappropriate payments (*e.g.*, the numerous examples identified in the Mullaney Br. at 16 and the exhibits cited therein) were made via Mr. Mullaney's corporate AmEx card, to avoid double-counting.

- Identify the actual recipient and improper personal benefit to Mr. Mullaney from any payment associated with any allegedly inaccurately-described entry on the Limbo Spreadsheet to the extent Plaintiff disputes (Plaintiff Br. at 34) the accuracy of the descriptions on that spreadsheet showing that numerous deductions from Mr. Mullaney's accumulated "limbo pay" were associated with payments providing no personal benefit to Mr. Mullaney (such as $15,000 to cover increased healthcare premiums for other WW staff, almost $90,000 to fund year-end bonuses for other

---

[2] Plaintiff repeatedly alleges (e.g. Am. Cplt. ¶ 178) that "Mullaney was either the initial transferee of each of the [transfers] or the entity [sic] for whose benefit each of the [transfers] was made." Specifying the recipients of each payment Plaintiff is suing on is necessary to assess the plausibility of that conclusory blanket statement.

WW staff , and $88,000 in "straight donations" by Mr. Mullaney to WW, *see* Mullaney Br. at 6-7 and exhibits cited therein) or appearing on their face to be legitimate business expenses (such as the $25,000 to cover a trip to Bangladesh, Mullaney Br. at 7).

- For each monthly AmEx statement, specify which charges actually paid by WW: (i) were allegedly for Mr. Mullaney's personal benefit rather than legitimate business expenses and thus should have been treated as W-2 income; (ii) otherwise allegedly violated WW's expense reimbursement policy (as read in light of the specific perquisites promised Mr. Mullaney in his Employment Agreement); and/or (iii) are not duplicative of allegedly inappropriate payments to Mr. Mullaney or for his benefit associated with the "limbo pay" issue.

## III.    THE AVOIDANCE CLAIMS SHOULD BE DISMISSED AND/OR LIMITED

### A.    Fraudulent Conveyance/Transfer Claims

While Plaintiff claims that Rule 8(a) often allows multiple fraudulent transfers to be aggregated, Plaintiff has done here what the Rule 8(a) cases he cites (Plaintiff Br. at 36-37) condemn, without even reaching the more stringent mandate of Rule 12(e).  Even leaving aside the inflation caused by double-counting, Plaintiff essentially lumps together *all* payments made by WW related to Mr. Mullaney (save only the base pay that the Court previously rejected Plaintiff's attempt to sue for), without any attempt to distinguish improper or suspicious ones from unquestionably legitimate ones.[3]  *See In re M. Fabrikant & Sons, Inc*., 447 B.R. 170, 184 (Bankr.

---

[3]      The assertion (Plaintiff Br. at 35) that this is just a factual dispute not appropriate for resolution on a Rule 12(b)(6) motion misstates the issue.  It is *plaintiff's* burden to plead facts that make his case "plausible" under *Twombly* and *Iqbal* and it is clear from, for example, the face of the AmEx statements that Plaintiff's claim that 100% of the AmEx charges were improper cannot meet the plausibility test.

S.D.N.Y. 2011), *aff'd*, 480 B.R. 480 (S.D.N.Y. 2012), *aff'd*, 541 Fed. App'x 55 (2d Cir. 2013) (in context, "[i]t was implausible to contend that every transfer [listed on exhibits attached to the complaint] was fraudulent"); *In re AgFeed USA, LLC*, 558 B.R. 116, 129-130 (Bankr. D. Del. 2016) (dismissing avoidance claim that identified only "the aggregate amount of the Alleged Employment Transfers over a 19 month period" and alleged that "on information and belief" the defendant was paid "periodically on a monthly or bi-weekly basis").

> 1. <u>Plaintiff Cannot Recover Moneys That Were Never Paid Out; "Limbo Pay" Allegations are Inconsistent with the Documents and Rife with Double-Counting</u>

There is no dispute that the majority of the $950,000 in deferred bonuses awarded by the Board was never paid out to Mr. Mullaney or for his benefit. Plaintiff himself does not allege (Am. Cplt. ¶ 86) that more than approximately $400,000 of the "limbo pay" bonuses was ever actually paid out.[4] Plaintiff claims that a theoretical conveyance or transfer occurred when the Board originally awarded to Mr. Mullaney the never-collected bonuses, as evidenced by his over $600,000 claim in WW's bankruptcy for unpaid compensation largely in the form of the uncollected balance of those bonuses. (Plaintiff Br. at 32-34; *see also* Am. Cplt. ¶ 88) (referring to deferred bonuses as "hypothetical income").) But the Am. Cplt. has *other* claims for relief (fifteenth and sixteenth) that seek to disallow Mr. Mullaney's unpaid compensation claim. Mr. Mullaney's present motion does *not* seek dismissal of those claims, which he acknowledges will require further proceedings to adjudicate. The tenth, eleventh and twelfth claims for relief, however, which *are* subject to the present motion to dismiss, seek an affirmative monetary

---

[4]     Plaintiff is mistaken when he claims (Plaintiff Br. at 32) that Mr. Mullaney is asking this Court to "reverse" a prior ruling. As shown by the redline (ECF Doc. #72-5), this paragraph is identical to that of ¶ 89 of the original Complaint. To our understanding, the initial Decision did not hold that the full amounts of the awarded-but-deferred bonuses had been paid out by WW.

judgment against Mr. Mullaney, but absolutely no basis is or could be cited for recovering funds that WW never paid out.

As set forth above, this Court has already indicated that Plaintiff's claims of suspicious tax treatment applied most specifically (Decision at 45) to the subset of "limbo pay" used for such purposes. Plaintiff should thus be required to identify and quantify the payments related to the "limbo pay" alleged to have been actually paid out Mr. Mullaney's personal (or excessive or undocumented) expenses. Plaintiff has not attempted to do so. The Am. Cplt.'s vague $400,000 estimate is not even broken down by calendar year (Mullaney Br. at 15), and Plaintiff does not offer to do so. Plaintiff has no response to offer to the showing (Mullaney Br. at 16-17) that the allegedly inappropriate payments associated with the "limbo pay" overlap in substantial part with the charges shown on the same AmEx bills claimed in Exhibits A-C to be a whole separate category of fraudulent conveyances or transfers, thus double-counting.

The potentially inappropriate items previously noted by this Court (*see* Decision at 45-46, citing Examiner's Report) total less than $100,000, but Plaintiff makes no attempt to reconcile that with his $400,000 claim. The $400,000 claim likewise cannot be reconciled with the numbers or descriptions on the Limbo Spreadsheet, as explained in the Mullaney Br. at 15-17. Plaintiff's only response (Plaintiff Br. at 34) is that the spreadsheet might be inaccurate, but he offers no alternative allegation about how an accurate description would differ from the amounts and descriptions on the Limbo Spreadsheet.[5]

---

[5] Separately, Plaintiff completely ignores the showing (Mullaney Br. at 20-21) that the modest amounts of alleged fraudulent conveyances/transfers included in Exhibits A-C as "Other Expenses" were either double-counted or legitimate on their face. He has thus conceded the point, and the claims related to those "Other Expenses" should be dismissed.

2.      Plaintiff Offers No Response to the Showing that Many of the AmEx Charges Are Not In the Least Bit Suspicious, and Has Made No Attempt to Identify the Subset He Contends Are Suspicious

Plaintiff completely ignores the showing (Mullaney Br. at 17-18) that his schedules seek to recover 100% of all charges to Mr. Mullaney's corporate AmEx card even though the face of the AmEx statements (Amini Decl. Exhibits 12-15) make it implausible under *Twombly* and *Iqbal* that 100% of the charges were illegitimate or inappropriate; and even though Plaintiff has not alleged that 100% of the charges were paid by WW as opposed to Mr. Mullaney. Plaintiff has thus conceded the point.

3.      Plaintiff Has Failed to Plausibly Allege Lack of Reasonably Equivalent Value

Plaintiff ignores the case law (Mullaney Br. at 18-20) showing that, post-*Twombly*, it is Plaintiff's burden to allege *facts* plausibly supporting the contention that the services provided by Mr. Mullaney to WW did not constitute reasonably equivalent value for the payments actually made to Mr. Mullaney or on his behalf, with a mere conclusory assertion being inadequate. Plaintiff has neither cited nor attempted to distinguish any of those cases. The only "fact" potentially relevant to reasonably equivalent value alluded to in the Am. Cplt. (¶¶ 61-62) is the substance of the Pearl Meyer report (Amini Decl. Exhibit 16), which this Court (Decision at 55) considered sufficient to show, for pleading purposes, that a fact issue was raised as to whether the total amount of bonuses the Board awarded Mr. Mullaney was excessive. But, as already noted, the bulk of the bonuses awarded were never actually paid out, and are thus not within the scope of the tenth, eleventh or twelfth claims for relief. Pearl Meyer's recommendations indicate, as already shown (Mullaney Br. at 19-20), that a more modest bonus plus a compensation package including some other perquisites would be reasonable and in keeping with market practice for comparable executives. Without both: (i) specific and plausible factual allegations as to the market value of

Mr. Mullaney's services; and (ii) the level of particularity required by Rules 8(a) and 12(e) (after all double-counting and other flaws in Exhibits A-C are eliminated) about what, if any, amount of payments beyond his base pay in which calendar years was actually paid to Mr. Mullaney or for his benefit, the Am. Cplt. does not give rise to a plausible inference that the latter amount exceeds the former.

Finally, while the Court did not in its prior Decision (given its ruling on "group pleading") evaluate the substance of the Plaintiff's allegations that the Director Defendants breached their own fiduciary duties in approving Mr. Mullaney's allegedly excessive compensation, the Director Defendants have renewed their arguments about the insufficiency of those allegations. (*See* ECF Docs. #78 at 11-15, #81 at 13-17, #92-1 at 11-13.) If the Court now holds on the merits that Plaintiff has not advanced a viable claim against the Director Defendants regarding the alleged excessiveness of Mr. Mullaney's bonuses and other compensation, it necessarily follows that Plaintiff has not pleaded the lack-of-reasonably-equivalent-value aspect of his fraudulent conveyance and transfer claims against Mr. Mullaney himself. *See In re SRC Liquidation LLC*, 581 B.R. 78, 97-98 (D. Del. 2017) ("It is undisputed that the bonuses were approved by the board's independent compensation committee [against whom no breach of fiduciary claim had been asserted with respect to the bonuses] and awarded to Defendants for their work in pursuing the Acquisition. [Accordingly,] the Complaint does not sufficiently allege that the Company failed to receive reasonably equivalent value for the bonuses it paid.").

4. <u>Plaintiff Offers No Response to Mr. Mullaney's Argument That There Was Nothing Improper About the Payment of Life Insurance Premiums</u>

In response to Mr. Mullaney's arguments (Mullaney Br. at 21-22) that the comparatively modest amounts paid by WW for life insurance premiums were not sufficiently alleged to have been fraudulent conveyances or transfers, Plaintiff claims (Plaintiff Br. at 35-36) that the business

judgment rule is inapplicable and entire fairness review is appropriate. This makes no sense, because there is no allegation that Mr. Mullaney participated as a director in the Board's decision to pay these insurance premiums as part of his overall compensation package both before and after the execution of his formal Employment Agreement. Lack of reasonably equivalent value has not been sufficiently alleged for reasons already given, an even more glaring issue for this item, where barely $15,000 in total premiums were paid out over multiple years, a tiny fraction of the base salary paid in those years. Finally, Plaintiff claims (Plaintiff Br. at 36) that "what precisely was disclosed on the Form 990 [is] an issue of fact that is irrelevant to the question of whether the transfers at issue were for fair consideration," but simply misunderstands Mr. Mullaney's argument. The insurance premium payments are not alleged to have anything to do with the alleged tax misreporting associated with the "limbo pay" and Plaintiff has not alleged that the insurance premiums were inaccurately reported on the Form 990's.[6] But most importantly Plaintiff has not alleged that any mistake in the disclosure of the insurance premiums (a highly technical issue) was caused by or even known to Mr. Mullaney. Accordingly, no lack of good faith on Mr. Mullaney's part (an element of the NYDCL definition of "fair consideration") has been alleged with respect to WW's payment of the insurance premiums.

5. <u>Plaintiff Offers No Response to Mr. Mullaney's Arguments That There Was Nothing Improper About the Payment of Litigation Defense Costs</u>

Plaintiff completely ignores the arguments Mr. Mullaney raised (Mullaney Br. at 22-24) as to why the Board's decision to cover defense costs related to Smile Train's litigation campaign did not support a fraudulent conveyance or transfer claim against him and has thus conceded the point.

---

[6]   Indeed, while Plaintiff alleges (Am. Cplt. ¶ 71) that the amount of the life insurance premiums was not included in WW's public filings, he never squarely alleges that such disclosure was actually legally *required*, much less cited the provision of the Internal Revenue Code or other law giving rise to any such requirement.

The original Complaint's insinuation that Mr. Mullaney had caused WW to pay more than the Board had authorized was directly contradicted by new allegations about the Board's involvement. (Am. Cplt. ¶¶ 76-79.)  Indeed, those payments are mentioned almost exclusively in the section of Plaintiff's brief devoted to claims against Directors, not that devoted to the claims against Mr. Mullaney.[7]  As shown (Mullaney Br. at 23; Amini Decl. Exhibit 1), the claims made and relief sought in those lawsuits directly implicated WW's institutional interests, not merely Mr. Mullaney's personal interests, and a victory for SmileTrain would have interfered with WW's fundraising abilities (as indeed, to an extent, the settlement did).  Accordingly, WW itself benefited (or so the Board could reasonably have believed within the protection of the business judgment rule) from the defense and settlement of the litigation. More importantly, there is thus no plausible inference from any of the facts alleged in the Am. Cplt. that WW did not itself receive reasonably equivalent value or fair consideration for the amounts it paid in defense costs.[8]

6.    The Employment Fraudulent Transfer Claim Should Be Dismissed

By his twelfth claim for relief, Plaintiff seeks to recover the items listed in Exhibit C to the Am. Cplt. pursuant to section 548(a)(1)(B)(ii)(IV).  To recover under this subsection, Plaintiff must plead and prove that the transfers were "not in the ordinary course of business" as an *element* of his prima facie case.  It is undisputed that the items in question were (Mullaney Br. at 24-25) consistent with WW's own longstanding ordinary business practice, but he contends that they fail

---

[7]    The single passing mention (Plaintiff Br. at 35) lumps these together with the insurance premiums and its claim that the business judgment rule is not relevant fails for the same reason, namely that there is no allegation that Mr. Mullaney, in his capacity as director, participated in the Board's approval of these payments.  Indeed, the Am. Cplt. (¶¶ 76, 79) alleges that Mr. Coneys personally reviewed and approved payment of all of the defense costs at issue.

[8]    Again, the settlement consideration paid by WW, as distinguished from defense costs, is *not* claimed to be a fraudulent conveyance or transfer for Mr. Mullaney's benefit.  (Mullaney Br. at 23-24.)

some separate "objective" test of broader industry practice. But, contrary to his inaccurate description (Plaintiff Br. at 38 n.8), the only case, *In re Dewey & LeBoeuf LLP*, No. 12-ap-12321, 2014 WL 4746209 (Bankr. S.D.N.Y. Sept. 23, 2014), only discusses the "objective" test as one element of a *defense* under Bankruptcy Code section 547(c)(2)(B) (statutory preference defense). Notably, the court did not hold that an "objective" test applies to so-called employment fraudulent transfer claims under 548(a)(1)(B)(ii)(IV), even though such claims had been asserted in the very same adversary proceeding. 2014 WL 4746209, at *4. Plaintiff cites no authority for imposing this industry practice test in this entirely separate statutory context, and we are aware of none.[9]

## B. Postpetition Transfer Claim

By his fourteenth claim for relief, Plaintiff seeks to recover pursuant to Bankruptcy Code section 549 three different amounts (Am. Cplt. Exhibit D) paid by WW post-petition: (i) a $158,283.00 payment Mr. Mullaney has long acknowledged is avoidable; (ii) $59,517.70 in post-petition AmEx Mullaney; and (iii) a $237,550 payment that this Court already ruled (Decision at 65, 67) is *not* avoidable. Plaintiff makes absolutely no response to the argument (Mullaney Br. at 26) that the lack of specificity and plausibility regarding the post-petition AmEx charges is the same as for the pre-petition AmEx charges.

As to the $237,550 payment, Plaintiff simply claims that it was out of the ordinary course because the Am. Cplt. supposedly "detail[s] the highly irregular manner in which that particular

---

[9]    In any event, all components of this claim (as is clear from Exhibit C) have separate fatal flaws: the AmEx payments were not made "under an employment contract" (another element) as well as not being particularized, the "other expenses" and insurance premiums do not state a claim for the other reasons given above, and the "bonus payment" was never paid out. As to the last point, Plaintiff concedes that at least $550,000 of the total $950,000 in "limbo pay" bonuses was never paid out, so on a "first in first out" basis it necessarily follows the $250,000 2016 bonus "payment" listed on Exhibit C, which was the last in time of the four that the Board awarded Mr. Mullaney, never even had its first dollar paid out.

payment was made." (Plaintiff Br. at 38.) But Plaintiff fails to address or rebut the showing (Mullaney Br. at 25-26) that the Am. Cplt. alleges *no* new facts or "details" about how that particular payment was made that were not made in the original Complaint and already found inadequate, as a matter of law, in the Decision (at 66).

## IV. THE BREACH OF FIDUCIARY DUTY CLAIM SHOULD BE DISMISSED IN SUBSTANTIAL PART

This Court directed Plaintiff that "the focus of any amended complaint should be on those acts that caused an injury to the Debtor." (Decision at 73.) At least as to Mr. Mullaney, Plaintiff has failed to do so. He repeatedly claims (Plaintiff Br. at 1, 4, 28, 30) that the Am. Cplt. alleges "investigation and remediation costs" as injury to the Debtor. But there cannot possibly have been any "remediation" *costs*, because there has been no "remediation." Plaintiff does not allege that WW, even after Stephen Gray was appointed chapter 11 trustee, ever restated any of the allegedly inaccurate financial statements (Am. Cplt. ¶¶ 83, 126) that KPMG had issued clean audit opinions on, and it is undisputed that WW did not do so. Nor does Plaintiff allege (nor could he allege) that WW, even after Mr. Gray was appointed trustee, ever remediated any of the unspecified concerns allegedly raised by BDO during its never-completed audit. (Am. Cplt. ¶¶ 34, 129.)

Similarly, Plaintiff does not allege that WW ever restated or amended any of the allegedly inaccurate tax filings (e.g., W-2's and Form 990's) that Plaintiff seeks to blame Mr. Mullaney for. (Am. Cplt. ¶¶ 168(d), 169(b).) It is undisputed that WW did not do so.[10] Moreover, as to the alleged misleading solicitation of donors, Plaintiff does not allege that WW remediated the alleged

---

[10]     Indeed, Plaintiff offers no response to the showing (Mullaney Br. at 20, 22 n.12, 31; Amini Decl. Exhibits 6-7, 17) that the W-2's and Form 990's issued by WW on Mr. Gray's watch (after both Mr. Mullaney and Ms. Fuchs had left) have the same alleged defects as those issued while Mr. Mullaney was still with WW.

fraud by offering refunds to any allegedly misled donors, and it is undisputed that WW did not do so.

Neither of the two cases Plaintiff invokes support his claim that investigation costs, alone, can substitute for a real injury to the company. In *Valeant v. Jerney*, 921 A.2d 732 (Del. Ch. 2007) ("*Jerney*"), the defendant had been both president and director of the company and had failed to recuse himself from the board vote that awarded him a $3 million bonus. The court held that he was required to repay the entire bonus and also pay his pro rata share (only one-twelfth of the total, with that share apparently being less than $75,000) of the special litigation committee's expenses, because (921 A.2d at 754) "[u]nder Delaware law, special litigation committee expenses are recoverable for a breach of fiduciary duty when the plaintiff corporation prevails on the suit and the special litigation committee expenses were necessary to prosecute that suit." This is a narrow exception (rooted in the specific role under Delaware corporate law of special litigation committees)[11] to the general "American Rule" that a successful litigant must bear its own attorney's fees absent a contract or statute to the contrary. *See Baker Botts L.L.P. v. Asarco LLP*, 576 U.S. 121, 135 S. Ct. 2158, 2164 (2015) (absent contractual agreement to pay attorneys' fees, any departure from the American Rule must be "specific and explicit" and must authorize the award of reasonable attorneys' fees or costs to the "prevailing party").

But the key is that the plaintiff must *prevail*, like the *Jerney* plaintiff that recovered approximately $75,000 in special-committee fees and expenses on top of the $3 million disgorged

---

[11]  Plaintiff cites no authority that bankruptcy examiners, trustees or post-confirmation litigation trustees like Plaintiff, none of which are creatures of Delaware corporate law, and none of which are accountable to a Delaware corporation's stakeholders the same way a special litigation committee is, can exercise the rights of a special litigation committee in this regard.

bonus payment and other monetary relief awarded.[12]  *Jerney* thus offers no possible support for

Plaintiff's self-serving contention that the cost of an investigation that did *not* result in a viable

claim due to lack of injury to the corporation can bootstrap the cost of the unsuccessful

investigation itself into the missing injury.

In the only other case Plaintiff cites for his "remediation and investigation costs" theory of

injury, *Hampshire Group, Ltd. v. Kuttner*, C.A. No. 3607-VCS, 2010 WL 2739995 (Del. Ch. July

12, 2010), there *were* (unlike here) actual remediation costs that caused actual out-of-pocket injury

to the company.   As a result of the tax violations caused by the defendant in question, the company

restated three years' worth of previous payrolls, filed amended W-2's for a number of executives,

and paid additional past-due Medicare taxes as a result of those amended W-2's.  *Id*. at *51.  As

noted above, nothing like that is alleged to have happened here.  (In any event, the *Hampshire*

court reacted with extreme skepticism to that plaintiff's attempt to stick the defendants with the

entire tab for a multi-million-dollar investigation, ultimately awarding the company barely five

percent of what it had sought.)  The Am. Cplt. thus fails to cure the fatal defect of lack and injury

and standing that the Decision identified with the "improper solicitation" allegations.[13]  (Decision

---

[12]      Even were Plaintiff able to state a claim against Mr. Mullaney for repayment of some
portion of his compensation deemed excessive under his fraudulent conveyance/transfer theories,
there can be no claim for repayment of excessive compensation under the breach of fiduciary duty
theory because, as the Court has already squarely held, a corporate officer does not breach his
fiduciary duty by accepting allegedly excessive compensation awarded to him by the board.
(Decision at 42.)  Unlike in *Jerney*, there is no allegation or evidence that Mr. Mullaney, as a WW
director, ever participated in any of the votes approving his compensation and fringe benefits.

[13]      Contrary to Plaintiff's mischaracterization (Plaintiff Br. at 30), Mr. Mullaney has not
"concede[d]" that Plaintiff cured the original Complaint's failure to link Mr. Mullaney to the
alleged misrepresentations, but only that (Mullaney Br. at 28) it was irrelevant whether or not that
problem had been cured given the other fatal flaws in the claim.  Moreover, the Court held
elsewhere in the Decision (at 72) that essentially the same set of alleged misstatements "[did] not
satisfy Rule 9(b)" and simply attributing them to Mr. Mullaney rather than "the Debtor" does not
cure that problem.

at 49, dismissing breach of fiduciary claim premised on the foregoing on the ground that "the Complaint does not allege how they [alleged misrepresentations] harmed the Debtor as opposed to the defrauded donors").[14]

Moreover, as set forth in Mr. Mullaney's brief (at 29-30), the allegedly improper tax treatment of payments associated with the "limbo pay" is not alleged to have injured WW, creating the same fatal flaw the Court previously noted with respect to other aspects of the breach of fiduciary duty claim.[15] (Under the Court's prior Decision (at 55), the allegedly improper tax treatment associated with the "limbo pay" may be a basis for the lack of "fair consideration" element of Plaintiff's fraudulent conveyance claim under the NYDCL, but that is a separate liability theory with separate elements than the breach of fiduciary duty claim.) Not only has WW engaged in no remediation of the alleged tax problem the way the company in *Hampshire* did, it is undisputed that the tax authorities have themselves taken no enforcement action against WW,

---

[14]    As to the entirely separate issue of WW's alleged failure to properly account for restricted funds, Plaintiff has simply failed to respond to the showing (Mullaney Br. at 27) that its insertion in the Am. Cplt. of a substance-free boilerplate allegation (¶ 95) that "Fuchs, in cooperation with Mullaney, kept misleading books and records" is insufficient to plead a claim that Mr. Mullaney violated his fiduciary duties in that regard. Plaintiff merely (Plaintiff Br. at 30) cites that paragraph along with a string of other paragraphs saying nothing about the alleged misclassification of funds or Mr. Mullaney's role, if any, in the classification or record-keeping process. Nor has Plaintiff responded by the showing (Mullaney Br. at 27-28) that the ten pages of the Examiner's Report cited in Paragraph 95 likewise fail to give rise to a plausible inference of any misconduct by Mr. Mullaney in this regard, as well as violating this Court's prior ruling (Decision at 24-25 n.12) that simply alluding to the Examiner's Report is not a sufficient substitute for pleading actual facts.

[15]    To be clear, to the extent Plaintiff plausibly alleges that Mr. Mullaney received expense reimbursements in violation of WW corporate policy (as read in light of his Employment Agreement), an issue which cannot be determined without the specificity of the more definite statement requested above, that would allege injury to WW for that facet of the breach of fiduciary duty claim. But to the extent Plaintiff alleges only that compensation or perquisites that the Board agreed to give Mr. Mullaney was misreported for tax purposes, there is no financial or other injury to WW, which would have paid out the same amount of money had the tax reporting been done property, but only injury to the third-party taxing authorities.

and the passage of the bar date and consummation of WW's chapter 11 plan means they never

will. (Case No. 16-13607, ECF Doc. #486 (effective date notice, stating administrative claim bar

date expired November 19, 2018).) While in a more typical case (such as *Hampshire* itself),

allegedly causing a company to make allegedly false tax filings could put that company at serious

risk of potential enforcement action for a period possibly lasting many years into the future (until

all potential statutes of limitations have expired), raising at least the ongoing potential for injury,

here that risk did not manifest itself and there is no chance it will do so in the future.

## V. THE LAW OF THE CASE DOCTRINE IS A RED HERRING THAT DOES NOT APPLY TO MR. MULLANEY'S ARGUMENTS

Plaintiff complains in conclusory fashion (Plaintiff Br. at 7, 28) that unspecified arguments

made by Mr. Mullaney in his brief are barred by the "law of the case" doctrine, without providing

any citation to where in the prior briefing that led up to the Decision Mr. Mullaney had previous

raised these (unspecified) arguments. But law of the case is inapplicable here, because under that

doctrine, in order for "a prior decision to control, [it] must have actually decided the issue … 'A

position that has been assumed without decision for purposes of resolving another issue is not

the law of the case.' … Unlike claim preclusion, the law of the case does not apply to issues

that a party could have raised, but did not." *Howe v. City of Akron*, 801 F.3d 718, 739-40 (6th

Cir. 2013) (citing and quoting 18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper,

Fed. Prac. & Proc. Juris. § 4478 (4th ed.)).[16] Mr. Mullaney's current arguments were not

---

[16] *See also Golden Horn Shipping Co. Ltd. v. Volans Shipping Co. Ltd.*, No. 14-cv-2168, 2017 WL 3535002, at *7 (S.D.N.Y. Aug. 16, 2017) ("The Court declines to apply the law of the case doctrine to an issue that the parties have not previously briefed and argued in full"); *Riley v. MEBA Pension Trust*, 452 F. Supp. 117, 120 (S.D.N.Y. 1978) (quotation and citation omitted) (doctrine does "not preclude consideration of issues which might have been, but were not, actually raised in prior proceedings."). In any event, "[t]he law of the case doctrine is, at best, a discretionary doctrine which does not constitute a limitation on the court's power." *Brody v. Village of Port Chester*, 345 F.3d 103, 110 (2d Cir. 2003).

previously raised and thus not considered or addressed in the Decision. For example, the primary focus of the prior briefing on Plaintiff's fraudulent conveyance/transfer claims was on whether he the insolvency element of those claims was adequately pleaded. (Decision at 57-58.) The present motion does not ask the Court to reopen or revisit that already-decided question, but focuses instead on the failure to plead other necessary elements of those claims that were not addressed in the earlier briefing and Decision.

## **CONCLUSION**

For the foregoing reasons as well as those set forth in the opening papers, the Amended Complaint should be dismissed in part as set forth specifically at page 32 of Mr. Mullaney's opening brief and/or, in the alternative, Plaintiff should be required to serve a more definite statement as specified above.[17]

Dated: May 6, 2020                       Respectfully submitted,
      New York, New York

                                     /s/ Bijan Amini
                                     Bijan Amini
                                     John W. Brewer
                                     Jeffrey Chubak
                                     AMINI LLC
                                     131 West 35th Street, 12th Floor
                                     New York, New York 10001
                                     (212) 490-4700
                                     bamini@aminillc.com
                                     jbrewer@aminillc.com
                                     jchubak@aminillc.com
                                     *Attorneys for Defendant Brian Mullaney*

---

[17]    Mr. Mullaney also incorporates by reference all arguments raised by the Director Defendants to the extent applicable to any of the Plaintiff's claims against him.