UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

In re:                                                    :
                                                          :          Chapter 11
WONDERWORK, INC.,                                         :
                                                          :          Case No. 16-13607 (SMB)
            Debtor                                        :
-------------------------------------------------------X
                                                          :          Adv. Pro. No. 18-01873 (SMB)
VINCENT A. SAMA, as Litigation Trustee                   :
of the WW LITIGATION TRUST,                              :
                                                          :
            Plaintiff,                                    :
                                                          :
      - against -                                         :
                                                          :
BRIAN MULLANEY, HANA FUCHS,                               :
THEODORE DYSART, RAVI KANT,                               :
JOHN J. CONEYS, STEVEN LEVITT,                            :
CLARK KOKICH, STEVEN RAPPAPORT,                           :
RICHARD PRICE, and MARK ATKINSON,                        :
                                                          :
            Defendants.                                   :
-------------------------------------------------------X

## MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS AND DIRECTING IN PART A MORE DEFINITE STATEMENT

**A P P E A R A N C E S :**

ARNOLD & PORTER KAYE SCHOLLER LLP
250 West 55th Street
New York, New York 10019

  Benjamin Mintz, Esq.
  Peta Gordon, Esq.
   Of Counsel

*Attorneys for Plaintiff Vincent A. Sama, as Trustee*
 *of the WW Litigation Trust*

AMINI LLC
131 West 35th Street, 12th Floor
New York, New York 10001

  Bijan Amini, Esq.
  John W. Brewer, Esq.

Jeffrey Chubak, Esq.
Of Counsel

*Attorneys for Defendant Brian Mullaney*

FAEGRE DRINKER BIDDLE & REATH LLP
1177 Avenue of the Americas, 41st Floor
New York, New York 10036-2714

Frank F. Velocci, Esq.
Of Counsel

*Attorneys for Defendant Theodore Dysart*

CERTILMAN BALIN ADLER & HYMAN, LLP
90 Merrick Avenue, 9th Floor
East Meadow, New York 11554

Paul B. Sweeney, Esq.
Nicole L. Milone, Esq.
Of Counsel

*Attorneys for Defendant John J. Coneys*

SMITH, GAMBRELL & RUSSELL, LLP
1301 Avenue of the Americas, 21st Floor
New York, New York 10019

John G. McCarthy, Esq.
Victor M. Metsch, Esq.
Edward J. Heppt, Esq.
Of Counsel

*Attorneys for Defendants Steven Levitt, Clark Kokich,*
   *Steven Rappaport and Richard Price*

LAW OFFICE OF ROBERT R. VIDUCICH
40 Wall Street, 28th Floor
New York, New York 10005

Robert R. Viducich, Esq.
Of Counsel

*Attorneys for Defendant Hana Fuchs*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The Plaintiff, Vincent A. Sama, as Litigation Trustee ("Plaintiff" or "Sama") of the WW Litigation Trust created under the Debtor's confirmed plan (the "Plan"), commenced this adversary proceeding against the Debtor's former officers and directors (the "Defendants") alleging breach of fiduciary duty and bankruptcy avoidance claims. In a prior decision, the Court granted the Director Defendants'[1] motion to dismiss the original complaint (the "*Complaint*")[2] based on group pleading and granted in part and denied in part the motions to dismiss by Brian Mullaney, the Debtor's CEO, and Hana Fuchs, the Debtor's CFO. The Court also granted leave to replead. *Sama v. Mullaney* (*In re Wonderwork, Inc.*), 611 B.R. 169 (Bankr. S.D.N.Y. 2020) ("*Prior Decision*"). The Plaintiff subsequently filed an amended complaint, (*Amended Complaint*, dated Feb. 14, 2020 ("*AC*") (ECF Doc. # 72), and the Defendants filed new motions to dismiss (collectively, the "*Motions*").[3] For the reasons that follow, the *Motions* are granted in part and denied in part, and the Plaintiff is directed to file a more definite statement regarding the avoidance claims to the extent indicated below.

---

[1]    The "Director Defendants" are Theodore Dysart, John J. Coneys, Steven Levitt, Clark Kokich, Steven Rappaport, Richard Price, and Mark Atkinson.

[2]    *Complaint*, dated Dec. 28, 2018 (ECF Doc. # 1). "ECF Doc. #" refers to the electronic docket in this adversary proceeding. "Main Case ECF Doc. #" refers to the electronic docket in the bankruptcy case, No. 16-13607. "(¶  )" refers to the allegations in the *Amended Complaint*.

[3]    *See Memorandum of Law in Support of Motion to Dismiss Litigation Trustee's Amended Adversary Complaint as Against Defendant John J. Coneys*, dated Mar. 25, 2020 ("*Coneys Motion*") (ECF Doc. # 81); *Memorandum of Law in Support of Motion to Dismiss the Trustee's Amended Complaint as Against Theodore Dysart*, dated Mar. 25, 2020 ("*Dysart Motion*") (ECF Doc. # 92-1); *Memorandum of Law in Support of Motion to Dismiss the Third, Fourth, Fifth, and Sixth Claims Asserted in the Amended Complaint*, dated Mar. 20, 2020 ("*2015 Directors Motion*") (ECF Doc. # 78); *Motion of Defendant Mark Atkinson to Dismiss the Seventh Claim of the Amended Complaint*, dated Mar. 25, 2020 ("*Atkinson Motion*") (ECF Doc. # 86); *Memorandum of Law in Support of Motion to Dismiss Amended Complaint as Against Brian Mullaney*, dated Mar. 25, 2020 ("*Mullaney Motion*") (ECF Doc. # 83); *Memorandum of Law in Support of Motion to Dismiss the Amended Complaint as Against Hana Fuchs*, dated Mar. 20, 2020 ("*Fuchs Motion*") (ECF Doc. # 89).

## BACKGROUND

Although the *Motions* are directed at the *AC*, the *AC*, with some exceptions and additions, realleges the factual bases for the claims asserted in the *Complaint*. (*See Plaintiff's Opposition to Defendants' Motions to Dismiss the Amended Complaint*, dated Apr. 22, 2020 ("*Opposition*"), at 4 n.2 (ECF Doc. # 94).) Hence, the Court refers the reader to the *Prior Decision* for the background facts relevant to the disposition of the *Motions*, addressing the specific allegations below.

The *AC* contains the following claims:

| # | Claim | Description |
|---|-------|-------------|
| I | Breach of Fiduciary Duties (against Dysart) | Dysart breached his fiduciary duties by failing to oversee the Debtor or control its activities by, *inter alia*, approving Mullaney's excessive compensation from 2013 to 2015 without following Pearl Meyer's guidance, allowing use of Mullaney's secret side ledger and limbo pay, and authorizing payment of Mullaney's personal expenses and legal fees. |
| II | Breach of Fiduciary Duties (against Coneys) | Coneys breached his fiduciary duties by failing to oversee the Debtor or control its activities by, *inter alia*, approving Mullaney's excessive compensation from 2013 to 2016 without following Pearl Meyer's guidance, allowing use of Mullaney's secret side ledger and limbo pay, authorizing payment of Mullaney's personal expenses and legal fees, executing a declaration in favor of retaining Mullaney as CEO, and failing to inform the Court about or take action in response to the BDO audit. |
| III-VII | Breach of Fiduciary Duties (against Levitt, Kokich, Rappaport, Price, and Atkinson, individually) | Levitt, Kokich, Rappaport, Price, and Atkinson breached their fiduciary duties by failing to oversee the Debtor or control its activities by, *inter alia*, approving Mullaney's excessive compensation for 2016 without following Pearl Meyer's guidance, allowing use of Mullaney's secret side ledger and limbo pay, executing a declaration in favor of retaining Mullaney as CEO, and failing to inform the Court about or take action in response to the BDO audit. |

| VIII | Breach of Fiduciary Duties (against Mullaney) | Mullaney breached his fiduciary duties by, *inter alia*, failing to properly account for and spend Debtor's donations and restricted funds, failing to comply with Debtor's governing documents and policies, improperly accounting for expenses, making false and misleading statements in public filings and fundraising materials, keeping his limbo pay in a private side ledger, directing Debtor to fund excessive salaries, and permitting Debtor to pay $395,833.32 in post-petition, non-ordinary-course payments without approval of the Court. |
|---|---|---|
| IX | Breach of Fiduciary Duties (against Fuchs) | Fuchs breached her fiduciary duties by, *inter alia*, failing to properly account for Debtor's donations and restricted funds, failing to comply with Debtor's governing documents and policies, improperly accounting for expenses, making false and misleading statements in public filings and email communications, keeping Mullaney's limbo pay in a private side ledger, directing Debtor to fund excessive salaries including paying herself a $120,000 signing bonus, and permitting Debtor to pay $395,833.32 in post-petition, non-ordinary-course payments without approval of the Court. |
| X | Constructive Fraudulent Conveyance under 11 U.S.C. § 544(b) and the N.Y. Debtor & Creditor Law ("NYDCL"[4]) (against Mullaney) | Within six years of the Petition Date, Debtor transferred to Mullaney excessive compensation and reimbursement for personal or unsubstantiated expenses and received less than fair consideration.[5] |
| XI | Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B) (against Mullaney) | Within two years of the Petition Date, Debtor transferred to Mullaney excessive compensation and reimbursement for personal or unsubstantiated expenses and received less than reasonably equivalent value.[6] |

---

[4]    All references to the NYDCL refer to the version of the NYDCL in existence at the time of the transfers.  That version was repealed effective April 4, 2020 and replaced by the Uniform Voidable Transactions Act.  *See* 2019 N.Y. Sess. Laws Ch. 580 (A. 5622) (McKinney).

[5]    A summary of "6-Year Fraudulent Conveyances" is attached as Exhibit A to the *AC*.

[6]    A summary of "2-Year Fraudulent Transfers" is attached as Exhibit B to the *AC*.

| XII | Fraudulent Conveyance under 11 U.S.C. § 548(a)(1)(B) (against Mullaney) | Within two years of the Petition Date, Debtor transferred to Mullaney excessive compensation and reimbursement for personal or unsubstantiated expenses, including through the execution of the Employment Agreement, for less than reasonably equivalent value.[7] |
| --- | --- | --- |
| XIII | Avoidance and Recovery of Preferential Transfers under 11 U.S.C. § 547(b) (against Mullaney) | Within one year preceding the Petition Date, Debtor made $484,212 in preferential transfers to Mullaney for back pay ($475,000) and personal expenses ($9,211.96) taken as deductions from Mullaney's limbo pay. |
| XIV | Avoidable Transfer under 11 U.S.C. § 549 (against Mullaney) | After the Petition Date, Debtor transferred to Mullaney $59,517.70 for improper expenses incurred on his American Express card during the bankruptcy and $395,833.32 consisting of two lump sum payments outside the ordinary course of business.[8] |
| XV | Disallowance of Claim (against Mullaney) | Mullaney's claim based on unpaid back pay (1) should be disallowed because his compensation was excessive and (2) should be set off against Mullaney's liability to Debtor. |
| XVI | Disallowance of Claim under 11 U.S.C. § 502(d) (against Mullaney) | Mullaney's claim should be disallowed because Mullaney has not paid back various fraudulent transfers detailed above. |

## DISCUSSION

### A.    Claims Against the Directors

#### 1.    Statute of Limitations

Before addressing of the Plaintiff's specific breach of fiduciary duty claims against

the Director Defendants, I consider Coneys' and Dysart's argument that any claims

accruing more than three years before the commencement of the Debtor's bankruptcy

case on December 29, 2016 ("Petition Date") are time-barred.  The Debtor was formed

---

[7]        A summary of "Employment Fraudulent Transfers" is attached as Exhibit C to the *AC*.

[8]        A summary of "Post-Petition Transfers" is attached as Exhibit D to the *AC*.

under Delaware law, and Delaware law governs the Plaintiff's claims for breach of fiduciary duty. *Prior Decision*, 611 B.R. at 194. Delaware law imposes a three-year statute of limitations on breach of fiduciary duty claims against directors. *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 981 n.43 (Del. Ch. 2016); *see* 10 DEL. C. § 8106(a). Coneys and Dysart argue that the Court must apply Delaware's three-year statute limitations under New York's borrowing statute, N.Y. C.P.L.R. 202.[9] Consequently, any claims that accrued more than three years before the commencement of the bankruptcy case on December 29, 2016 are time-barred.[10]

The Plaintiff contends that New York's six-year statute of limitations applies, and the borrowing statute does not apply because the Plaintiff is deemed a resident of New York. (*Opposition* at 39-40.) New York has both a three-year and six-year statute of limitations covering breach of fiduciary duty claims. As the New York Court of Appeals has explained:

> New York law does not provide a single statute of limitations for breach of fiduciary duty claims. Rather, the choice of the applicable limitations period depends on the substantive remedy that the plaintiff seeks. Where the remedy sought is purely monetary in nature, courts construe the suit as alleging "injury to property" within the meaning of CPLR 214(4), which

---

[9]    N.Y. C.P.L.R. 202 states:

An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

[10]    Bankruptcy Code § 108(a) tolled the statute of limitations for two years. 11 U.S.C. § 108(a). The Plaintiff timely commenced this adversary proceeding on December 28, 2018, one day before the tolled period expired.

has a three-year limitations period. Where, however, the relief sought is
equitable in nature, the six-year limitations period of CPLR 213(1) applies.

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 272 (N.Y. 2009)
(internal citations omitted). Here, the Plaintiff seeks compensatory and punitive
damages against the Director Defendants, and it would appear that New York's three-
year statute of limitations should apply.

However, there is a further gloss. Under N.Y. C.P.L.R. 213(7), a six-year period of
limitations applies to "an action by or on behalf of a corporation against a present or
former director, officer or stockholder for an accounting, or to procure a judgment on
the ground of fraud, or to enforce a liability, penalty or forfeiture, or to recover damages
for waste or for an injury to property or for an accounting in conjunction therewith."
The latter, more specific provision applies to "all actions" by the corporation against
former officers or directors "with no differentiation between legal and equitable claims."
*Roslyn Union Free Sch. Dist. v. Barkan*, 950 N.E.2d 85, 89, 91 (N.Y. 2011) (internal
quotation marks omitted) (corporation's claim against a former director for breach of
fiduciary duty was governed by a six-year statute of limitations); *see Levy v. Young
Adult Institute, Inc.*, 103 F. Supp. 3d 426, 434-35 (S.D.N.Y. 2015) (same); *Whitney
Holdings, Ltd. v. Givotovsky*, 988 F. Supp. 732, 742 (S.D.N.Y. 1997) ("Section 213(7)
supplants all other statutes of limitation potentially applicable to a suit on a
corporation's claim against its director, officer or shareholder."); *Oxbow Calcining USA
Inc. v. Am. Indus. Partners*, 948 N.Y.S.2d 24, 31 (N.Y. App. Div. 2012) (claims on behalf
of corporation against directors governed by six-year statute of limitations of N.Y.
C.P.L.R. 213(7)). The Debtor is a corporation, and the Plaintiff is suing the Debtor's

former directors and officers on behalf of the Debtor's estate.  Accordingly, the six-year
statute of limitations applies if New York law governs the period of limitations.

We turn then to the key dispute: whether Delaware's three-year statute of
limitations or New York's six-year statute of limitations governs the Plaintiff's claims.
The New York borrowing statute, quoted *supra*, only applies if the action is commenced
by a non-resident in New York.  On the other hand, "where the cause of action accrued
in favor of a resident of the state the time limited by the laws of the state shall apply."
N.Y. C.P.L.R. 202.

"The New York Court of Appeals has not specifically addressed whether a
corporation's residence is determined (for purposes of the borrowing statute) by its
principal place of business or its state of incorporation."  *Luv N' Care, Ltd. v. Goldberg
Cohen, LLP*, 703 F. App'x 26, 28 n.1 (2d Cir. 2017) (summary order).  However, the
Court of Appeals has stated that "[w]hen an alleged injury is purely economic, the place
of injury usually is where the plaintiff resides and sustains the economic impact of the
loss."  *Glob. Fin. Corp. v. Triarc Corp.*, 715 N.E.2d 482, 485 (N.Y. 1999).  While there is
some contrary authority, *see Verizon Directories Corp. v. Continuum Health Partners,
Inc.*, 902 N.Y.S.2d 343, 343 (N.Y. App. Div. 2010) ("For purposes of CPLR 202, plaintiff
is a 'resident' of, and its cause of action accrued in, Delaware, the state of its
incorporation."); *Gordon v. Credno*, 960 N.Y.S.2d 360, 361 (N.Y. App. Div. 2013)
(same), the weight of authority supports use of a corporation's principal place of
business as its residence for purposes of the borrowing statute.  *See, e.g.*, *Luv N' Care,
Ltd.*, 703 F. App'x at 28, 28 n.1 (a business entity's residence is determined by its
principal place of business); *Petroholding Dominicana, Ltd. v. Gordon*, No. 18 Civ. 1497

(KPF), 2019 WL 2343658, at *4 (S.D.N.Y. June 3, 2019) (same); *Woori Bank v. Merrill Lynch*, 923 F. Supp. 2d 491, 494-95 (S.D.N.Y.) (same) (collecting cases), *aff'd* 542 F. App'x 81 (2d Cir. 2013).

Coneys and Dysart collectively cite to three cases for the proposition that, for purposes of the borrowing statute, a plaintiff is a resident of its state of incorporation rather than its principal place of business. *See Verizon Directories Corp.*, 902 N.Y.S.2d at 343 (plaintiff was resident of its state of incorporation); *American Lumbermens Mut. Cas. Co. of Ill. v. Cochrane*, 129 N.Y.S.2d 489, 491 (N.Y. Sup. Ct.) (same), *aff'd*, 134 N.Y.S.2d 473 (N.Y. App. Div. 1954), *aff'd*, 133 N.E.2d 461 (N.Y. 1956); *Gordon v. Credno*, 960 N.Y.S.2d at 361 (same). However, these decisions are distinguishable. *Verizon Directories* only rejected the plaintiff's contention that it was a resident of New York "by virtue of its authorization to do business and asserted extensive presence" there. 902 N.Y.S.2d at 343. *American Lumbermens* rejected plaintiff's argument that it was a resident of New York merely because it had "qualified to do business in the State of New York." 129 N.Y.S.2d at 491. Finally, in *Gordon v. Credno*, a corporation resided in its place of incorporation only because it had "minimal business activities."

"When a bankruptcy trustee sues as a representative of the estate of a bankrupt corporation, it is the residency of the corporation which is applicable." *Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 30 (S.D.N.Y. 2002). Although Coneys and Dysart press the point that the application of New York's borrowing statute turns on the corporation's state of incorporation, they do not contest that the Debtor maintained its principal place of business and hence, its residency, in New York. Indeed, and among other things, the Debtor listed its New York address

(either 420 or 411 Fifth Avenue) on its annual New York State CHAR500 disclosure form and IRS Form 990.  (Fuchs Exhibits 5-8.)[11]  Furthermore, the Debtor's chapter 11 petition stated that its principal place of business was located at 411 Fifth Avenue, Suite 702, in New York City and based venue in this Court on that fact.  Accordingly, the Debtor was a resident of New York at all relevant times, New York's borrowing statute does not apply, and New York's six-year statute of limitations governs the timeliness of the Plaintiff's breach of fiduciary duty claims against all Defendants.  As the Debtor was formed on or about March 7, 2011, (¶ 8), or within six years of the Petition Date, the statute of limitations is not a defense to the breach of fiduciary claims.

## 2.    Breach of Fiduciary Duty under Delaware Law

### a.    General Rules

The *Prior Decision* included a lengthy discussion of the principles governing the breach of fiduciary duty claims against officers and directors.  *See Prior Decision*, 611 B.R. at 194-98.  This opinion summarizes these principles and refers the reader to the *Prior Decision* for a more extended discussion.  Officers and directors of Delaware corporations owe fiduciary duties of care and loyalty to their corporation.  *Id.* at 194.  As directors of a charitable organization, the Director Defendants owe fiduciary duties to the corporation and its beneficiaries.  *Id.* at 196.  The duty of care requires directors to "use that amount of care which ordinarily careful and prudent [persons] would use in

---

[11]    The "Fuchs Exhibits" were marked as exhibits at the deposition of Fuchs conducted by the Examiner's attorney and form part of the exhibits to the *Final Report of Jason R. Lilien, Examiner*, dated Oct. 25, 2017 ("*Examiner's Report*") (ECF Main Case Doc. # 303).  Fuchs Exhibits 1-20 were filed with the *Notice of Filing of Volume 1 of Redacted Interview Transcripts and Exhibits to Final Report of Jason R. Lilien, Examiner*, dated Nov. 22, 2017 ("*Volume 1 of Transcripts and Exhibits*") (ECF Main Case Doc. # 339).  Fuchs Exhibits 21-45 were filed with the *Notice of Filing of Volume 2 of Redacted Interview Transcripts and Exhibits to Final Report of Jason R. Lilien, Examiner*, dated Nov. 22, 2017 ("*Volume 2 of Transcripts and Exhibits*") (ECF Main Case Doc. # 340).

similar circumstances" and consider "all material information reasonably available" in making decisions on behalf of the corporation. *Id.* at 195 (quoting *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005) (citations omitted), *aff'd*, 906 A.2d 27 (Del. 2006)). A board need not be "informed of every fact," but must consider the "material facts that are reasonably available at the time of the decision." *Id.* (quoting *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000)). The duty of loyalty may be violated where a fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, and includes circumstances where the fiduciary has a conflict of interest or fails to act in good faith.[12] *Id.* at 194-95.

A director's liability for breach of fiduciary duty may flow "*from a board decision* that results in a loss because that decision was ill advised or 'negligent,'" or "from an *unconsidered failure of the board to act* in circumstances in which due attention would, arguably, have prevented the loss." *Id.* at 195 (quoting *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996) (emphasis in original)). To prove a claim based on director inaction, a *Caremark* claim, a plaintiff must show a "lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight." *Id.* (quoting *Walt Disney Co.*, 907 A.2d at 750). The hallmark of a claim based on director inaction is bad faith rather than negligence. To establish a *Caremark* claim, either "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from

---

[12]     The Plaintiff does not contend that the Director Defendants' actions were motivated by a financial or other conflict with the Debtor.

being informed of risks or problems requiring their attention." *Id.* at 196 (quoting *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006)). In either circumstance, the directors are only liable if they "knew that they were not discharging their fiduciary obligations." *Id.* (quoting *Stone v. Ritter*, 911 A.2d at 370); *accord Teamsters Local 443 Health Services & Insurance Plan v. Chou,* C.A. No. 2019-0816-SG, 2020 WL 5028065, at *16 (Del. Ch. Aug. 24, 2020) ("Because a *Caremark* claim must plead bad faith, 'a plaintiff must allege facts that allow a reasonable inference that the directors acted with scienter which, in turn, requires not only proof that a director acted inconsistently with his fiduciary duties, but also most importantly, that the director knew he was so acting.'") (quoting *Oklahoma Firefighters Pension & Ret. Sys. v. Corbat*, C.A. No. 12151-VCG, 2017 WL 6452240, at *14 (Del. Ch. Dec. 18, 2017)); *In re Citigroup S'holder Derivative Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009) ("[T]o establish oversight liability a plaintiff must show that the directors *knew* they were not discharging their fiduciary obligations or that the directors demonstrated a *conscious* disregard for their responsibilities such as by failing to act in the face of a known duty to act.") (emphasis in original).

### b.    Directors of Charitable Organizations

In addition to the business judgment rule that protects directors of Delaware corporations, the Director Defendants, who are volunteers and do not receive any fees, benefit from additional protections. Under Delaware law, no volunteer of a not-for-profit organization "shall be subject to suit directly, derivatively or by way of contribution for any civil damages under the laws of Delaware resulting from any negligent act or omission performed during or in connection with an activity of such organization." 10 DEL. C. § 8133(b). The statute excepts the grant of immunity for any

13

"act or omission constituting wilful and wanton or grossly negligent conduct." 10 DEL.
C. § 8133(d). "Wilful and wanton" conduct has been described in other contexts as
"conscious indifference" or an "I don't care" attitude. *Prior Decision,* 611 B.R. at 198.
"Gross negligence," an exception to the protection afforded by the business judgment
rule, "generally requires that officers, directors, and managers fail to inform themselves
fully and in a deliberate manner." *Id.* at 197. "To support an inference of gross
negligence, 'the decision has to be so grossly off-the-mark as to amount to reckless
indifference or a gross abuse of discretion.'" *Id.* (quoting *In re Zale Corp. S'holders
Litig.*, No. CV 9388-VCP, 2015 WL 6551418, at *4 (Del. Ch. Oct. 29, 2015)).[13]

### c.   Proof of Damages

Under Delaware law, "[a] claim for breach of fiduciary duty is an equitable
tort.  It has only two formal elements: (i) the existence of a fiduciary duty and (ii) a
breach of that duty." *HOMF II Inv. Corp. v. Altenberg*, C.A. No. 2017-0293-JTL, 2020
WL 2529806, at *43 (Del. Ch. May 19, 2020); *accord Palmer v. Reali*, 211 F. Supp. 3d
655, 666 (D. Del. 2016); *Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601,
607 (S.D.N.Y. 2011).  Damages are not an element of a breach of fiduciary duty claim,
and "[i]n the absence of quantifiable damages . . . , defendants are 'still liable for
damages incidental to their breach of duty.'" *Hughes v. Xiaoming Hu*, C.A. No. 2019-
0112-JTL, 2020 WL 1987029, at *17 (Del. Ch. Apr. 27, 2020) (quoting *Thorpe ex rel.*

---

[13]      The *Prior Decision* speculated that under the doctrine of *noscitur a sociis*, "gross negligence," as
used in section 8133, might mean more egregious conduct than ordinarily attributed to the term by virtue
of the juxtaposition of "wilful and wanton" conduct and "grossly negligent conduct."  611 B.R. at 198 n.14.
However, the Court has not been able to find supporting authority suggesting that the phrase has a
different meaning in the volunteer immunity statute.  In addition, the "wilful and wanton" standard seems
to be analogous to the bad faith standard for *Caremark* claims, discussed in the preceding text, that
requires conscious wrongdoing.

*Castleman v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996)).  These may include additional accounting and professional fees and the costs of defending litigation arising from the breach.  *See id.*  Nevertheless, a plaintiff seeking compensatory damages must prove them.  *See, e.g.*, *Ravenswood Inv. Co., LP v. Estate Winmill*, C.A. No. 3730-VCS, 2018 WL 1410860, at *19-20 (Del. Ch. Mar. 21, 2018) (finding that defendant directors breached their fiduciary duty of loyalty but awarding only nominal damages where plaintiff failed to prove actual damages or that an equitable remedy would be appropriate), *aff'd*, 210 A.3d 705 (Del. 2019); *Triple H Family Ltd. P'ship v. Neal*, C.A. No. 12294-VCMR, 2018 WL 3650242, at *19 (Del. Ch. July 31, 2018) (finding that defendant breached his fiduciary duties but awarding only nominal damages because "no tragedy occurred" as a result of the breach and plaintiff did not request any damages), *aff'd*, 208 A.3d 703 (Del. 2019).

Aside from the claims relating to Mullaney's compensation and other monetary benefits and the costs incurred by the estate in investigating alleged wrongdoing, the *AC* does not identify any damage to the Debtor.  The Court is cognizant of the Defendants' "bootstrapping" concerns — that the Plaintiff is suing to recover the costs of investigating breaches of fiduciary duty that, even if they occurred, did not harm the Debtor or the beneficiaries.  Because an award of damages will depend upon proof of a breach of fiduciary duty and may be nominal or subject to allocation in light of the significant expenses associated with the Examiner's and the estate's investigations, I leave that question for another day.  For present purposes, I consider only whether the *AC* alleges a breach of fiduciary duty without regard to allegations of injury.

### 3.    The Claims

This opinion divides the breach of fiduciary duty claims against the Director
Defendants into four categories: (1) compensation and related claims, including
Mullaney's salary, bonus, perquisites and litigation expenses; (2) operational claims,
including fundraising, solicitation and donations; (3) miscellaneous pre-petition claims;
and (4) miscellaneous post-petition claims.

### a.    Mullaney's Compensation

### i.    Bonuses

Mullaney earned an annual salary of $475,000 for the entire relevant period.  The
Board also awarded Mullaney annual bonuses of $250,000 in 2013, $250,000 in 2014,
$200,000 in 2015, and $250,000 in 2016.  The *AC* has dropped the claims asserted in
the *Complaint* that the Director Defendants breached their fiduciary duties when they
approved Mullaney's annual base pay in the sum of $475,000.00, (*Opposition* at 23),
although he seeks to recover the post-petition salary payments based on theories
discussed below.  However, the Plaintiff still contends that the Director Defendants
breached their fiduciary duties when they awarded Mullaney the bonuses and other
perquisites he received.

The analysis begins with the Pearl Meyer Report.  In May 2013, the Board
retained Pearl Meyer & Partners ("Pearl Meyer") as its compensation consultant to
study and make recommendations regarding Mullaney's compensation.  Pearl Meyer
presented its report ("Pearl Meyer Report") (Mullaney Exhibit 43),[14] at a Board meeting

---

[14]    The "Mullaney Exhibits" were marked as exhibits at the deposition of Mullaney conducted by the
Examiner's attorney and form part of the exhibits to the *Examiner's Report*.  The Mullaney Exhibits were

on June 13, 2013.[15]  Although Pearl Meyer could not conclude that Mullaney's

compensation was reasonable under section 4958 of the Internal Revenue Code, also

known as the "Intermediate Sanctions" rule, it recommended that Mullaney's base

annual salary remain at $475,000.00.  (Pearl Meyer Report at 5.)

Pearl Meyer also recommended that Mullaney should receive a 2012 bonus or

incentive pay between $50,000.00 and $200,000.00 and that the Compensation

Committee periodically review Mullaney's award "to ensure it provides appropriate

rewards for high levels of performance and is supported by market practice."  (*Id.* at 5.)

Mullaney had proposed to Pearl Meyer that the discretionary bonus be $250,000 for an

"A+ performance."  Pearl Meyer opined that Mullaney's proposed maximum bonus of

$250,000 was "not unreasonable as a general comment, but it is very high in a non-

profit environment."  (*Id.* at 4.)

In addition to the bonus, the Debtor reimbursed Mullaney for personal and often

unsubstantiated travel and entertainment expenses for him and his wife in violation of

the Debtor's travel policy, (¶¶ 68-69), and, from 2012 to 2016, paid the premiums on a

multimillion-dollar policy insuring Mullaney's life on which his wife was the beneficiary.

The annual premium varied and totaled $9,602 in 2016.  (¶ 70.)  The Pearl Meyer

Report recommended that the Compensation Committee quantify the value of

---

filed with *Volume 1 of Transcripts and Exhibits*.

[15]      The *AC*, like the *Complaint*, alleges that Mullaney improperly influenced Pearl Meyer's selection
of the peer groups used to determine the reasonableness of Mullaney's compensation. (¶ 61.)  In fact, as
set forth in the *Prior Decision*, 611 B.R. at 202-03, Pearl Meyer solicited Mullaney's input.

Mullaney's other contract requests and consider requests of significant value when considering the amount of his annual incentive.  (¶ 62.)

The *AC* alleges that the Board (*i.e.,* Coneys, Dysart and Kant prior to 2016 and Coneys and the 2015 Directors, defined below, in 2016) did not rely on Pearl Meyer's advice in connection with the award of the bonuses.  Specifically, they did not evaluate "Mullaney's substantial other contractual requests, including spousal travel, payment of travel costs, hotels associated with Mullaney's move to Boston, and personal life insurance," and "awarded him the full amount of the $250,000 discretionary bonus every year except for 2015."  (¶ 63.)

Directors have broad discretion in the amount of compensation they award to a corporation's officers, *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d at 138; *see Brehm v. Eisner*, 746 A.2d at 262 n.56, but "there is an outer limit to that discretion, at which point a decision of the directors on executive compensation is so disproportionately large as to be unconscionable and constitute waste." *Brehm v. Eisner*, 746 A.2d at 262 n.56.  As alleged, Dysart and Coneys ignored Pearl Meyer's view that a $250,000 bonus was "very high in a non-profit environment," (Pearl Meyer Report at 4), and that Mullaney's significant, other benefits should be considered in fixing the amount of the annual bonus.  (*Id.* at 5.)  In essence, they failed to inform themselves of available information identified by Pearl Meyer even though they contend that they relied in good faith on the Pearl Meyer Report (and KPMG) in approving Mullaney's compensation and are entitled, therefore, to the protection of 8 DEL. C. §

141(e).[16]  (*See Dysart Motion* at 16-17; *Coneys Motion* at 16-17 & n.11, 24.)  However, the statutory protection afforded by 8 DEL. C. § 141(e) is not available when the directors do not rely on the expert's advice, *Brehm v. Eisner*, 746 A.2d at 262, and this is precisely what the *AC* pleads.  Ultimately, their reliance on the Pearl Meyer Report or KPMG is a question of fact.

Accordingly, the *AC* adequately alleges that in awarding the bonuses for the years 2013, 2014 and 2015, Coneys and Dysart acted with gross negligence and breached their fiduciary duties.

By December 2015, Dysart had resigned from the Board.  (¶ 64.)  On December 23, 2015, the Board, consisting of Mullaney, Coneys and Kant, approved new Board members Levitt, Kokich, Rappaport, Price and Atkinson ("2015 Directors").  Also in December, the Debtor and Mullaney entered into an Employment Agreement.  (¶ 64; Mullaney Ex. 41.)  The Employment Agreement provided for a five-year term commencing January 1, 2016, an annual salary of $475,000, a discretionary bonus up to $250,000, and other benefits including life insurance with his wife as a beneficiary and spousal travel at the Debtor's expense.  (¶ 65.)  None of the 2015 Directors attended a

---

[16]    Section 141(e) provides:

A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.

8 DEL. C. § 141(e).

Board meeting until March 2016,[17] (¶ 52), and based on the timing, there is no basis to infer that they had any role in the approval of the Employment Agreement.

In 2016, the 2015 Directors and Coneys awarded Mullaney a $250,000 bonus.[18] (¶ 59.)  The *AC* alleges that the 2015 Directors breached their fiduciary duties by, *inter alia*, approving excessive compensation and benefits for Mullaney for 2016, failing to follow Pearl Meyer's recommendations regarding Mullaney's compensation in 2016, and permitting Mullaney to defer payment of his compensation and deduct expenses from the separate payroll ledger to avoid taxes and conceal his compensation from the Debtor's donors, the "limbo pay" scheme discussed below.  (¶¶ 148 (Levitt), 152 (Kokich), 156 (Rappaport), 160 (Price), 164 (Atkinson).)  The *AC* does not, however, allege any facts supporting the inference that the 2015 Directors were aware of the Pearl Meyer Report or its recommendations regarding Mullaney's bonus.  Furthermore, by the time they attended their first meeting, the Employment Agreement was already in place and authorized a discretionary bonus up to $250,000.  Given the wide discretion afforded a Board in fixing officer compensation and, unlike with Coneys, the failure to allege the 2015 Directors' knowledge of the Pearl Meyer recommendations, the *AC* fails to allege facts that overcome the protection to which the 2015 Directors are entitled

---

[17]    Rappaport and Price did not attend the March 2016 Board meeting.  (Ex. 76 at WON-EX 1292.) "Ex." refers to the document exhibits that form part of the *Examiner's Report*.  Exs. 1-100 were filed with the *Notice of Filing of Volume 1 of Redacted Document Exhibits to Final Report of Jason R. Lilien, Examiner*, dated Nov. 21, 2017 (ECF Main Case Doc. # 336).  Exs. 101-214 were filed with the *Notice of Filing of Volume 2 of Redacted Document Exhibits to Final Report of Jason R. Lilien, Examiner*, dated Nov. 22, 2017 (ECF Main Case Doc. # 338).

[18]    The 2015 Directors dispute that the Board ever approved a 2016 bonus.  A member of the Board generally informed Fuchs by email of the amount of Mullaney's bonus following the June meeting. (*Examiner's Report* at 207.)  The minutes of the June 13, 2016 Board meeting, (Ex. 77), which Price and Atkinson did not attend, do not reflect approval of any bonus for Mullaney.  Nevertheless, the *AC* alleges that the 2016 bonus was paid in July 2016.  (¶ 84 (Chart).)

under the business judgment rule with respect to the size of the bonus awarded to Mullaney in 2016.

### ii.    "Limbo Pay"

There is second aspect of the bonus that causes greater concern.  As alleged, Mullaney sought to limit his taxes by deferring his bonus as so-called "limbo pay."  Per Mullaney's instructions, Fuchs maintained a separate ledger that tracked his "limbo pay" and from which she paid his personal expenses, subtracting the payment from the separate ledger balance.  (¶¶ 3, 82.)  Mullaney never paid taxes on his bonus amounts, his bonuses were not reported on his Forms W-2, and Mullaney paid no FICA taxes on those amounts.  (¶ 83.)  Nor for that matter did the Debtor pay its own portion of FICA taxes.  (*Examiner's Report* at 230.)  Mullaney had followed the same practice at his prior employer, Smile Train Inc. ("Smile Train"), but at some point, Smile Train reissued Mullaney's W-2s for the years 2002–2010 that reported an additional $1,144,574 in income as a result of the deferrals and improper travel and expense items.  (¶ 82.)  Coneys and Dysart were aware of the "limbo pay" scheme no later than late 2015, (*Examiner's Report* at 218; Ex. 213), and the *AC* alleges that Atkinson was also aware of this practice.  (¶ 88.)

The "limbo pay" scheme appears to constitute an illegal tax avoidance scheme.  (*See Examiner's Report* at 226-31.)  Mullaney had full use of the "limbo pay"; he tapped into it whenever he chose, directing Fuchs how to apply it to his expenses or to loans he was supposedly making to the Debtor.  (Fuchs Exs. 40-42.)  For example, in 2013, he initially used his entire 2013 bonus to make a $250,000 impact loan to the Debtor.  (*See* Fuchs Ex. 40; Mullaney Ex. 35.)  Logically, he could not loan his bonus without

receiving it.[19]  And during a May 2013 meeting with Pearl Meyer representatives and the

independent directors, "Dysart asked about the treatment of some expenses and if they

needed to be treated as income[,] [and] Coneys agreed to bring up with our audit

partner at his next meeting."  (Ex. 187.1 at 2.)

It appears, therefore, that the Debtor underreported Mullaney's taxable income.

For example, the Debtor's 2013 IRS Form 990 showed that Mullaney had received his

taxable compensation in the amount of his base pay, $475,000, no additional taxable

compensation, and $42,744 in non-taxable benefits.  (Fuchs Ex. 7 (2013 Form 990, Sch.

J).)  Subsequent Form 990 federal returns were to the same effect.  If all or any portion

of the bonus was taxable income, the Debtor would have been required to withhold taxes

from Mullaney's bonus compensation and pay over to the IRS the withheld portions and

the Debtor's corresponding share of FICA taxes.  And as noted, it also appears that the

Debtor underreported Mullaney's income in its submissions to New York State through

Form CHAR500, which attached the Debtor's Form 990 federal tax return, and to the

IRS when it filed that tax return.

A director breaches his fiduciary duty of loyalty when he causes the corporation

to violate positive law, including tax law, *see Prior Decision*, 611 B.R. at 204 (citing

---

19     The Debtor's governmental filings did not disclose Mullaney's impact loans.  The Debtor operated
on a July 1-June 30 fiscal year.  As a result, the Form 990 actually covered six months of the next year.
For example, the 2013 Form 990 covered July 1, 2013 to June 30, 2014.

The Debtor's Forms 990 federal tax returns showed that J. Mullaney, Brian Mullaney's father,
had made an impact loan of $250,000, (*see* Fuchs Ex. 7 (2013 Form 990, Sch. L)), a fact confirmed by a
loan agreement between the Debtor and J. Mullaney.  (Ex. 111.)  Subsequent Forms 990 also showed a
$250,000 impact loan from J. Mullaney.  (*See* Fuchs Ex. 8 (2014 Form 990, Sch. L)); *Declaration of Bijan
Amini*, dated Mar. 25, 2020 ("*Amini Declaration*") (ECF Doc. # 84), Ex. 5 (2015 Form 990, Sch. L, Part
II); *id.*, Ex. 6 (2016 Form 990, Sch. L, Part II).)

*Hampshire Grp., Ltd. v. Kuttner*, C.A. No. 3607-VCS, 2010 WL 2739995, at \*32 (Del.
Ch. July 12, 2010)), and accordingly, the *AC* alleges that Coneys and Dysart breached
their fiduciary duty of loyalty by permitting the Debtor to engage in the "limbo pay"
scheme.  Except for Atkinson who also served on the Smile Train Board of Directors
when Mullaney utilized the same "limbo pay" scheme, the *AC* does not allege facts
suggesting that the other 2015 Directors were aware of the "limbo pay" scheme.

### iii.    Perquisites

#### a.    Travel and Entertainment

Under the Debtor's Travel Policy, effective October 4, 2012, (Ex. 93 at App. G.),
the Debtor would "only approve travel purchases or reimburse expenses incurred in
connection with WonderWork business that are appropriately documented by the
employee in accordance with the acceptable accountable plan under IRS Reg. 1.62-2."
(*Id.* at 1.)  The Debtor would "not approve travel purchases or reimburse travelers for
expenses which are inherently personal in nature such as child care, clothing, personal
recreation or entertainment, etc." (*Id.*)  Travel expenses had to be approved by the
employee's supervisor or by the CFO, if appropriate, and the Debtor would not pay for a
spouse's travel expenses except in unusual circumstances which required the spouse's
presence, and any exception had to be approved by the Debtor's "CEO or other
staff/officer in charge of such decisions, or by the Board of Directors." (*Id.* at 2.)  In
addition, prior to 2016, the Debtor paid the premiums on a multimillion-dollar policy
insuring Mullaney's life on which his spouse was the beneficiary. (¶ 70.)  The
Employment Agreement approved by the Board in December 2015 included provisions
under which the Debtor paid the premiums on approved life insurance policies and

authorized a travel allowance for Mullaney to bring his wife to major donor events, visits, and overseas program trips.  (Mullaney Ex. 41 at 12; ¶ 71.)

The *AC* alleges that each Director Defendant, during his tenure, breached his fiduciary duty by "approving inappropriate and excessive compensation and benefits for Mullaney," (¶¶ 140, 144, 148, 152, 156, 160, 164), including the aforementioned life insurance policies.  (¶ 71.)  The *AC* also implies that the Director Defendants breached their fiduciary duties by allowing Fuchs, in violation of the Travel Policy and applicable law, to reimburse Mullaney for personal, unsubstantiated and/or excessive expenses and spousal travel without reporting the reimbursement as compensation, and allowing Mullaney to recoup, as business expenses, his costly travel expenses commuting between the Boston area, where he lived, and New York.[20]  (¶¶ 68-69.)

There is a significant question whether the Debtor ever reimbursed Mullaney for these perquisites in addition to awarding his annual bonus.  The *Examiner's Report* and the documents forming part of his report indicate that Mullaney was reimbursed for his expenses — business, personal and unsubstantiated — from his "limbo pay." (*Examiner's Report* at 210-17.)  The issues relating to the "limbo pay" scheme, including the failure to pay taxes and in the accuracy of the Debtor's financial and tax reporting, have been discussed.  But if the "limbo pay" was received by and property of Mullaney, as the Plaintiff contends, debiting the "limbo pay" to defray expenses would mean that Mullaney was paying the expenses with his own money.

---

[20]    Fuchs informed the Examiner that Mullaney was not subject to the Travel Policy.  (*Examiner's Report* at 71, 219.)  As written, the Travel Policy applied to all employees, and the *AC* does not allege that the Board exempted Mullaney from the Travel Policy.

Regardless of whether Fuchs deducted the travel expenses from the Board-approved bonuses or separately reimbursed Mullaney, the *AC* fails to allege that the Director Defendants breached their fiduciary duties. In Mullaney's case, the Travel Policy vested the day-to-day reimbursement decisions in Fuchs, the CFO, and the *AC* does not allege that a Director Defendant approved any specific reimbursement request. (*See* ¶ 122 ("No one from the Board ever reviewed any of Mullaney's American Express invoices or other expenditures until May 2017, when Coneys reviewed Mullaney's FY16 invoices in connection with the BDO audit.").) Reimbursement for his spouse's travel, an exception to the usual rules, was vested in the "staff/officer in charge of such decisions, or by the Board of Directors," and was apparently left for Fuchs' judgment along with the other reimbursement decisions. The *AC* essentially alleges a *Caremark* claim against each Director Defendant based on his failure to monitor and oversee Fuchs' reimbursement decisions.

The *AC* fails to allege the bad faith required by *Caremark*. During the relevant period, the Debtor had established a Travel Policy which, in the case of Mullaney, vested Fuchs with the duty to make the reimbursement decisions regarding Mullaney's expenses. The Travel Policy set out the relevant reimbursement criteria, including the business-related and substantiation requirements. While the *AC* implies that the Director Defendants breached their fiduciary duties by failing to approve or monitor Fuchs' reimbursement decisions, including spousal travel, the *AC* does not identify any red flags warning them that that Fuchs was abusing the Travel Policy. Admittedly, Coneys and Dysart, familiar with Pearl Meyer's recommendations, should have been aware of the *amount* of these benefits in fixing Mullaney's bonus. But the *AC* does not

25

allege facts plausibly implying that the Director Defendants "knew that they were not discharging their fiduciary obligations" by vesting the day-to-day reimbursement decisions in Fuchs without personally reviewing Mullaney's receipts.  *See Stone v. Ritter*, 911 A.2d at 370.

### b.    Insurance

The *AC* acknowledges that Mullaney's compensation under the Board-approved Employment Agreement included a life insurance policy with his spouse as the beneficiary.  (¶¶ 70-71.)  The cost in 2016 was $9,602.  (¶ 70.)  The decision to provide this relatively *de minimis* benefit as part of Mullaney's compensation under his Employment Agreement was not "so unconscionable as to constitute waste or fraud," *Brehm v. Eisner*, 746 A.2d at 262, although, for the reasons stated, it should have been factored into the consideration of the amount of his bonus and possibly, his taxable income.

The *AC* does not allege that the Board approved the premium payments in prior years, but the same result would follow if they did.  If, on the other hand, the *AC* is alleging that the Board failed to approve the payment of the insurance premiums prior to 2016, but Fuchs paid them anyway, and the Board breached its fiduciary duty by failing to monitor Fuchs, the Court reaches the same conclusion it did with respect to the travel expenses.  In the absence of red flags, and none are alleged, the *AC* fails to allege that Coneys and Dysart "knew that they were not discharging their fiduciary obligations."

### iv.   Legal Fees and Litigation Expenses

After Mullaney left his prior position as CEO and President of Smile Train, Mullaney became personally involved in a series of lawsuits with Smile Train.  (¶ 73.)  In *Smile Train, Inc. v. Brian F. Mullaney*, No. 12-cv-9102 (S.D.N.Y.), Smile Train sued Mullaney for copyright infringement and misappropriation of trade secrets, including Smile Train's donor list (the "Smile Train Copyright Case").[21]  (¶ 74.)  The Debtor was not a party to the lawsuit, (¶ 75), but the complaint in that case alleged that the Debtor was the primary beneficiary of the copyright infringement and misappropriation of trade secrets.  (*Amini Declaration*, Ex. 1 at ¶¶ 27, 29, 59, 79.)  Dysart, Coneys, and Kant resolved to indemnify Mullaney for up to $150,000, (¶ 74), but the Debtor ultimately spent $245,357.45 in legal fees, which Coneys reviewed and approved.  (¶ 76.)  The parties settled the lawsuit in July 2013.  Coneys signed the settlement agreement under which the Debtor paid the settlement amount of $450,000 that it characterized as a donation, and Dysart also knew about the Smile Train settlement and legal fees.  (¶ 77.)

The Debtor also paid at least $58,539.38 to quash a subpoena that Smile Train served on Mullaney personally in connection with a New York state court lawsuit brought against Smile Train's outside computer consultant, Gregory Shaheen and his company Ferris Consulting, Inc. (¶ 79.)  In the lawsuit, Smile Train alleged that Shaheen had assisted Mullaney in obtaining confidential and proprietary information relating to Smile Train.  (*Id.*)  Coneys reviewed the legal bills, and Dysart was aware of Debtor's payment of Mullaney's legal fees.  (*Id.*)

---

[21]     A copy of the complaint filed in the Smile Train Copyright Case is annexed to the *Amini Declaration* as Exhibit 1.

Finally, the Debtor paid more than $14,000 for Mullaney's flights and accommodations in connection with Smile Train UK's case against Mullaney for violation of the United Kingdom Charities Act of 1993 (the "Smile Train UK Lawsuit"). (¶ 80.)

These lawsuits were routinely discussed at Board meetings attended by Coneys, Dysart and Kant; the payments preceded the election of the 2015 Directors. (¶ 81.) In essence, the Plaintiff contends that it was irrational and an utter dereliction of duty for Coneys and Dysart to allow the Debtor to pay Mullaney's personal legal fees, expenses and settlements in connection with litigations as to which the Debtor was not a party. There may be explanations for why Coneys and Dysart believed it was in the interests of the Debtor to assume these financial burdens though it had no legal obligation to do so, but this is a factual question. The *AC* is sufficient to foist the burden on Dysart and Coneys to provide an explanation. Accordingly, the *AC* states a claim for breach of fiduciary duty by Coneys and Dysart regarding the payment of Mullaney's personal legal fees, expenses and settlements in these three matters.

### b.    Operational Matters

### i.    Impact Loans

Impact loans allow investors to earn a return on their capital while also creating a positive social impact. (*Examiner's Report* at 78.) For approximately one year beginning in May 2013, Mullaney entered into a series of impact loans that collectively totaled close to $10 million payable in five years. (¶ 100.) This involved seven unsecured loan agreements with various charitable foundations and wealthy individuals with maturity dates starting in May 2018, when $8 million would become due, and

ending in January 2020.  (*Id.*)  The Board of Directors Policy Manual, (Ex. 93), provided

that the Board must adopt a budget procedure that maintains "current assets (cash,

accounts receivable, pre-paid expenses, etc.) at any time at no less than 100% of current

liabilities (accounts payable, debt due in 12-months, etc., but excluding deferred

revenues.)"[22]  (*Id.* at 6.)  Despite these maturity dates, the Debtor's ten-year marketing

projections, (Mullaney Ex. 27), presented to the Board in October 2013, showed only

66% repayment by the end of 2020 and full repayment by October 2021.[23]  (¶ 103.)

The *AC* does not allege that the Board approved the impact loans; instead, the

substance of this claim is that Mullaney was entering into impact loans with Coneys' and

Dysart's knowledge that the Debtor projected (at least by October 2013) it could not pay

when due and Coneys and Dysart failed to implement any system, consistent with the

budget procedure specified in the Policy Manual, to monitor Mullaney in regard to the

debt he was adding to the Debtor's balance sheet.

The *AC* adequately alleges a *Caremark* claim against Coneys or Dysart in

connection with the impact loans.  The inability to repay the impact loans when due

violated the budgetary procedures under the Policy Manual.  At a minimum, the

presentation to the Board in October 2013 was a red flag that the Debtor had entered or

was about to enter into a series of transactions that would leave the Debtor equitably

insolvent.  The *AC* implies that Coneys and Dysart, though aware of the looming, future

---

[22]     The Policy Manual actually required the Debtor to "maintain assets that are no less than 100% of liabilities." (¶ 94.)  The Policy Manual was concerned with current assets and current liabilities, not total assets and total liabilities.

[23]     By then, the Debtor had already borrowed $8.1 million.  (*Examiner's Report* at 81.)

problem, did nothing to stop or limit the impact borrowing.  While it may be that some or all of the impact loans were subsequently forgiven, and the Debtor suffered no harm, these allegations state a *Caremark* claim.

### ii.    Misrepresentations

The *AC* alleges that Mullaney made numerous misrepresentations in its fundraising materials regarding the sources and uses of funds.  (*See* ¶ 97.)  "Given that these fundraising campaigns were the bulk of Debtor's activities, the Board knew or should have known that their contents were false and misleading throughout Debtor's existence." (¶ 98.)  The *AC* does not allege that the Director defendants authorized or made the misrepresentations.

This *Caremark* claim suffers from at least two shortcomings.  First, the misrepresentations span several years and several Boards, and allegations regarding what the Board knew or should have known is the same type of group pleading problem that resulted in the dismissal of the claims against the Director Defendants in the *Prior Decision*.  Second, and relatedly, the allegations do not identify any red flags which would have caused a Director Defendant to suspect that Mullaney was making the misrepresentations alleged in the *AC*.  Accordingly, the claim that the members of the "Board" breached their fiduciary duties by failing to monitor Mullaney's representations in the solicitation materials is legally insufficient.

### iii.    Restricted Funds

Generally, a charitable corporation licensed to operate in New York has full ownership of its funds and may use them for "any purpose specified in its certificate of

incorporation." N.Y. NOT-FOR-PROFIT CORP. LAW § 513(a) (2014). Where, however, a donor specifies a purpose in the gift instrument, the donation must be applied to "the purposes specified . . . and to the payment of the reasonable and proper expenses of administration of such assets." N.Y. NOT-FOR-PROFIT CORP. LAW § 513(b); *see also In re Friends for Long Island's Heritage*, 911 N.Y.S.2d 412, 420 (N.Y. App. Div. 2010) (holding that donor-restricted funds cannot be used to satisfy creditors of a charitable corporation). The governing board of the charitable corporation must cause accurate accounts of restricted funds to be kept separate and apart from the accounts of its other assets, and "[u]nless the terms of the particular gift instrument provide otherwise, the treasurer shall make an annual report to the . . . governing board . . . concerning the assets held under this section and the use made of such assets and of the income thereof." N.Y. NOT-FOR-PROFIT CORP. LAW § 513(b). Failure to comply in good faith with the notice or disclosure or reporting provisions of Section 513(b) "shall make the corporation liable for any damage sustained by any person in consequence thereof." N.Y. NOT-FOR-PROFIT CORP. LAW § 521. In addition, the Policy Manual recognized the distinction between restricted and unrestricted funds and the limitations on the use of the latter.[24] (Ex. 93 at 8-9.)

---

[24]    The Policy Manual stated:

> Donations shall be used for purposes consistent with the donor's intent, as described in the relevant solicitation materials, or as specifically directed by the donor. If a donation is not able to be used as directed or promised, WonderWork shall either return the donation or receive the donor's permission to apply the donation to another area of operations.

(Ex. 93 at 8.) While the restriction on the use of donations under the Not-For-Profit-Law looks to the purpose expressed by the donor in an instrument, the Policy Manual also considers the contents of the Debtor's solicitation materials even in the absence of the donor's written direction.

The *AC* alleges that the Debtor did not segregate its restricted funds, did not keep track of its restricted funds currently, and did not adopt adequate controls over the spending of such funds, consistent with proper practices.  (¶ 95.)  The allegation is backed up by the extensive efforts by the Examiner and his professionals to restate the restricted funds balance and usages.  (*Examiner's Report* at 153-83.)  The failure to properly segregate and account for the use of restricted funds was illegal and subjected the Debtor to potential liability under the Not-for-Profit Corporation Law.

In addition, the *AC* pleads that the Debtor misused restricted funds, including funds contributed in response to solicitations describing other uses for the donations. In particular, the *AC* charges that the Debtor represented in its solicitation materials that donations would be used to pay for surgeries but were used to pay direct mail expenses; the donations would be matched, resulting in doubling or tripling the number of surgeries, when in fact the "matching funds" were used for expenses; and a $300 donation would be used to pay the entire cost of a surgery, but the Debtor only paid $25 per surgery and kept the remainder for fundraising and other expenses.[25]  (¶ 97.)

The *AC* alleges that the various committees of the Board, including the audit committee, never met, (¶ 50,) or that the Director Defendants never did anything to ensure that the Debtor was complying with New York law regarding restricted funds. Each of the Director Defendants state or imply that they relied on KPMG's clean audits as a justification for the various acts and omissions alleged in the *AC* regarding the

---

[25]    Some of these alleged misuses of restricted funds and the related misrepresentations may be intertwined with the joint cost allocation accounting rules discussed below in connection with the claims against Fuchs.

restricted funds as well as Mullaney's "limbo pay" and the adequacy of financial

reporting and internal controls.  (*See Coneys Motion* at 16-17 & n.11, 24; *Reply*

*Memorandum of Law in Further Support of Motion to Dismiss the Litigation Trustee's*

*Amended Adversary Complaint as Against Defendant John J. Coneys*, dated May 6,

2020 ("*Coneys Reply*"), at 6-9, 12-13 (ECF Doc. # 95); *Dysart Motion* at 16-17;

*Theodore Dysart's Reply to Plaintiff's Opposition to Defendants' Renewed Motions to*

*Dismiss*, dated May 6, 2020 ("*Dysart Reply*"), at 4 (ECF Doc. # 97); *2015 Directors*

*Motion* at 17, 26, 29; *Reply Memorandum of Law in Further Support of Motion to*

*Dismiss the Third, Fourth, Fifth, and Sixth Claims Asserted in the Amended Complaint*,

dated May 6, 2020 ("*2015 Directors Reply*"), at 6 n.3; 9; 16 (ECF Doc. # 96).)  In fact,

Sama's complaint filed against KPMG pleads as much.  *Prior Decision*, 611 B.R. at 204.

However, a factual statement in one litigation does not qualify as a judicial

admission in another lawsuit brought by the same plaintiff.  *See, e.g.*, *CBRE Inc. v. Pace*

*Gallery LLC*, No. 1:17-CV-2452, 2018 WL 740994, at *2 (S.D.N.Y. Feb. 6, 2018) ("The

binding effect of the judicial admission is in the action in which it was made, not in

separate and subsequent cases.") (internal quotation marks omitted); *MF Glob.*

*Holdings Ltd. v. PricewaterhouseCoopers LLP*, 199 F. Supp. 3d 818, 838 n.12 (S.D.N.Y.

2016) ("[A] judicial admission only binds the party that makes it in the action in which it

is made, not in separate and subsequent cases.").  A court may treat "judicial admissions

made in one action as evidence in a different proceeding, and that evidence may be

contradicted by other evidence when presented." *CBRE Inc. v. Pace Gallery LLC*, 2018

WL 740994, at *2 (internal citations, quotation marks, and ellipses omitted); *Hausler v.*

*JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 37 (S.D.N.Y. 2015) ("[A] court may

[still] consider a judicial admission as evidence in another case.  Such evidence may, however, be contradicted by other evidence when presented.") (insertion in original).

The Director Defendants may ultimately prevail on their contention that they should be absolved of liability because they reasonably relied on KPMG's clean audits pursuant to 8 DEL. C. § 141(e).  But their reasonable reliance presents a factual issue that must be resolved at trial.  The *AC* sufficiently alleges that the Director Defendants continuously failed to monitor the Debtor's adherence to state law or even adopt a system to monitor the correct characterization and use of the restricted donations the Debtor was receiving.  Accordingly, *AC* states a claim for breach of the fiduciary duty of loyalty.

### c.    Miscellaneous Pre-petition Claims

### i.    HMS Arbitration

In 2011, Mullaney caused the Debtor to enter into an agreement with HelpMeSee, Inc. ("HMS") to provide HMS with fundraising services.  (¶ 106.)  HMS terminated the Agreement for cause effective August 17, 2012; Mullaney caused the Debtor to commence an arbitration against HMS in March 2013; and HMS counterclaimed alleging breach of contract, breach of fiduciary duty, fraudulent inducement, copyright infringement and an accounting, and sought compensatory and punitive damages, injunctive relief, costs and attorneys' fees.  (¶ 107.)  Three-and-one-half years later, and after forty-nine days of testimony from fourteen witnesses, (*Examiner's Report* at 44), the Arbitrator issued a partial final award on October 13, 2016, in favor of HMS in the amount of $8,342,314.68 and also awarded HMS reasonable costs and attorneys' fees incurred in connection with the arbitration, to be the subject of a separate award.  (¶

109.)  On December 21, 2016, the Arbitrator issued a final award which, in addition to the $8,342,314.68, granted HMS $4,706,553.18 in attorneys' fees plus interest, and $149,563.99 in arbitration costs.  (¶ 111.)  The Supreme Court of the State of New York confirmed the compensatory award in the sum of $8,342,314.68 plus interest, costs and disbursements for a total award of $11,124,170.78.  *Help Me See, Inc. v. WonderWork, Inc.*, Index No. 655667/2016, 2016 WL 11031095 , at *1 (N.Y. Sup. Ct. Dec. 2, 2016), *aff'd*, 69 N.Y.S.3d 275 (N.Y. App. Div. 2018).[26]

Among other things, the Arbitrator described as "unconscionable" Mullaney's exploitation of HMS by "rais[ing] money to pursue his personal interests," stated that Mullaney was "not a credible witness" and consistently ignored discovery orders, and characterized the conduct of the Debtor and Mullaney as "reprehensible."  (¶ 114.)  The *AC* charges that "[n]otwithstanding the gravity of the allegations against Mullaney and Fuchs and the approximately $925,000 in legal fees and expenses incurred by Debtor, the Board did not become involved in the arbitration or undertake any investigation into the merits of HelpMeSee's claims, including the claims regarding discovery abuses."  (¶ 115.)

The Plaintiff appears to blame the Director Defendants, including the 2015 Directors, for the adverse arbitration award.  And perhaps there is an unspoken assumption that if the Debtor had not sued HMS, HMS never would have sued the Debtor, an assumption without basis.  The Debtor was being sued and had to defend itself.  The "Board minutes reflect discussions of the case, and Coneys was given legal fee

---

[26]    The order entered by the Supreme Court did not reflect confirmation of the award for attorneys' fees.

invoices to review on a regular basis, and the record suggests that he did review and approve payment of each invoice." (*Examiner's Report* at 259; *see* Ex. 66 at 2; Ex. 76 at 3; Ex. 77 at 4; Ex. 190 at WON-EX 1255.)  The Debtor was represented by counsel throughout the arbitration, the Director Defendants discussed the arbitration at Board meetings, and they received updates regarding the legal fees.  (*See* Ex. 76 at 3; Ex. 77 at 4.)  Contending that the Director Defendants breached their fiduciary duties by not getting "involved" or "undertak[ing] an investigation" is wholly conclusory.  Accordingly, any claim that the Director Defendants breached their fiduciary duties by failing to monitor or investigate the claims in the arbitration lacks merit and is dismissed.

### ii.    Dysart's "Noiseless Withdrawal"

The *AC* alleges that Dysart resigned from the Board in November 2015 as a result of disagreements with Mullaney regarding Mullaney's compensation and whether the Debtor should retain employment counsel in connection with Mullaney's proposed employment agreement.  (¶ 51.)  It further alleges, "[u]pon information and belief," that "Dysart did not communicate these concerns or his reasons for resigning to either Kant or Coneys[,] [and] [i]t does not appear that Kant or Coneys were aware of the actual reasons for Dysart's departure."  (*Id.*)  In support of the obligation to make a "noisy withdrawal," the Plaintiff cites *CMS Inv. Holdings, LLC v. Castle*, C.A. No. 9468-VCP, 2015 WL 3894021 (Del. Ch. June 23, 2015).  (*Opposition* at 24-25.)

In *CMS Inv. Holdings, LLC*, the complaint alleged that the Castles and the Wilsons, members of RPH, engaged in self-dealing to the detriment of RPH; they "purposefully took actions to block RPH from receiving much-needed debt refinancing,

facilitated the Company's decline into insolvency, secretly negotiated with its creditors, and then, through Next Org and AMS, purchased on favorable terms the Services Businesses back from RPH in receivership." 2015 WL 3894021, at *19.  A third member of RPH, Stawiarski, resigned from the RPH Board "to avoid having to vote on these matters." *Id.* at *20.  In seeking to dismiss the breach of fiduciary duty claim against himself, Stawiarski argued that the allegations of breach focused on the Castles and the Wilsons and failed to state a claim against him in this regard. *Id.*  The Court denied the motion, stating that a developed record might vindicate Stawiarski, but "[i]f he were aware of those designs, it conceivably could have been a breach of his fiduciary duties to have done nothing other than resign from the Board." *Id.* (citing *In re China Agritech, Inc. S'holder Derivative Litig.*, C.A. No. 7163-VCL, 2013 WL 2181514, at *24 (Del. Ch. May 21, 2013)).[27]

Aside from arguing facts outside the record, Dysart's sole response to the allegation relating to his quiet resignation is that "[t]he Trustee does not cite any authority in support of this prospect, because no such standard of conduct exists." (*Dysart Reply* at 3.)  Dysart's reply ignores the Plaintiff's reliance on *CMS*.  Admittedly,

---

[27]   The requirement to make a "noisy withdrawal" finds some support in Judge Cardozo's admonition:

> A beneficiary, about to plunge into a ruinous course of dealing, may be betrayed by silence as well as by the spoken word.

> The trustee is free to stand aloof, while others act, if all is equitable and fair.  He cannot rid himself of the duty to warn and to denounce, if there is improvidence or oppression, either apparent on the surface, or lurking beneath the surface, but visible to his practiced eye.

*Global Woolen Co. v. Utica Gas & Elec. Co.*, 121 N.E. 378, 380 (N.Y. 1918).

it was well known that the Dysart had a running battle with Mullaney regarding his compensation dating back to the decision to hire Pearl Meyer. Furthermore, Dysart sent a "snarky resignation letter" to Mullaney, (Ex. 73), which is not part of the record but may provide a defense to this charge. However, these matters must await trial. The substance of the Plaintiff's allegation is that Dysart was concerned that the Debtor was about to engage in a ruinous course of conduct by entering into an Employment Agreement with Mullaney without the assistance of counsel and quit rather than raise his concerns with the Coneys and Kant who were otherwise unaware of the danger. This states a claim for breach of fiduciary duty.

### d.    Miscellaneous Post-Petition Claims

### i.    Motion to Appoint a Trustee

On January 18, 2017, HMS moved for the appointment of a chapter 11 trustee (the "Trustee Motion"). The Debtor opposed the motion, and Kokich, Coneys, Levitt, Price, Rappaport, and Atkinson (collectively, the "Director Declarants") filed supporting declarations opposing the Trustee Motion. The Plaintiff asserts that the Director Declarants breached their fiduciary duties of due care and good faith by submitting the declarations, and their actions added to the post-petition expenses incurred by the estate. "[A]ll worked diligently to protect Debtor's officers at Debtor's expense, including by submitting false and misleading declarations to this Court. Not a single one of these directors ever corrected their statements to this Court regarding Debtor's management, even when it became apparent to them that Debtor's senior management was wholly unfit to run a public charity." (¶ 4.) These declarations universally stressed the Board's involvement in the Debtor's affairs and their confidence in Mullaney, but the

38

Examiner's investigation revealed that they were passive and overly deferential to

Mullaney.  (¶¶ 120-22.)  Despite the Arbitration ruling detailing Mullaney's improper

conduct, the Director Declarants "all affirmed, under penalty of perjury, that 'the Board

has no potential, planned or pending claims against' Mullaney and that Mullaney had

the Board's 'utmost confidence,' even though the Board had not conducted an internal

investigation."  (¶ 123.)  Finally, the Court relied on these declarations in deciding to

appoint an examiner rather than a trustee for fear that displacing Mullaney with a

trustee would adversely affect the Debtor.  (¶ 124.)

The Plaintiff characterizes the Director Declarants' declarations as "false and

misleading," (¶ 135), implying the Director Declarants intentionally lied or, at a

minimum, were oblivious to the Board's role and Mullaney's wrongful conduct.  But

there is nothing in the *AC* to challenge the Director Declarants' honest belief at the time

that the Board had done its duty, Mullaney was critical to the future of the Debtor and

the Debtor had no claims against Mullaney.  They were entitled to disagree with the

arbitrator's findings and urge to the Court that displacing Mullaney and appointing a

trustee would spell the death knell of the Debtor, a fear that proved correct even if the

appointment of a trustee was warranted.  In fact, I take judicial notice that their views

were shared by some of the Debtor's creditors, donors and others who opposed HMS's

motion to appoint a trustee and echoed many of the same points made by the

declarants.  (*See Declaration [of Iris Detter] in Opposition to HelpMeSee's Motion to

Appoint a Trustee*, dated Feb. 22, 2017 (Main Case ECF Doc. # 49); *Declaration of Dr.

Joseph G. McCarthy in Opposition to HelpMeSee's Motion to Appoint a Trustee*, dated

Feb. 23, 2017 (Main Case ECF Doc. # 50); *Declaration [of Garrett Moran] in*

*Opposition to HelpMeSee's Motion to Appoint a Trustee*, dated Feb. 15, 2017 (Main

Case ECF Doc. # 53); *Declaration [of Tamsen Ann Ziff] in Opposition to HelpMeSee's*

*Motion to Appoint a Trustee*, dated Feb. 24, 2017 (Main Case ECF Doc. # 59);

*Declaration [of Roman Vinoly] in Opposition to HelpMeSee's Motion to Appoint a*

*Trustee*, dated Feb. 23, 2017 (Main Case ECF Doc. # 63).)

As noted in the *Prior Decision*, the attorney for HMS, the same attorney that now

represents the Plaintiff, never moved to impose sanctions against the Director

Declarants for submitting "false and misleading" declarations, *Prior Decision*, 611 B.R.

at 201 n.15, and while the Plaintiff criticizes their failure to investigate the accuracy of

their statements in light of the Arbitrator's findings before submitting their declarations,

the Plaintiff relies on a 274-page *Examiner's Report* prepared following an extended

investigation to support the claim that the Director Declarations were "false and

misleading."  The Director Declarants were operating on a much shorter timeline and

without the benefit of the Examiner's investigation.  The Plaintiff's allegations relating

to the submission of the Director Declarations fails to state a claim for breach of the

duty of care or loyalty.

### ii.    Failure to Cooperate with BDO

On May 24, 2017, the Bankruptcy Court approved the Debtor's retention of BDO

USA LLP ("BDO") to audit the Debtor's Financial Statements of June 30, 2016 and

prepare its IRS Form 990.  (¶ 34.)  The Debtor's former auditor, KPMG, and two others

40

refused to audit the Debtor.[28]  (¶ 126.)  BDO had to complete the work on an abbreviated schedule, and the Debtor agreed to pay BDO $120,000 for audit services and $5,000 for tax services, more than double what it had paid KPMG for similar services in years past. (¶ 127.)  The *AC* alleges that BDO delayed its work and ultimately failed to complete the audit due to numerous concerns with the Debtor's financial records.  (¶ 128.)  The problems BDO identified included in-kind valuation, loan liabilities (including loan forgiveness), functional expense and joint cost allocation, the accrual of Mullaney's bonus, fiscal years 2015 and 2016 recording of contributions, the release of net assets, and going concern financial statement presentation, as well as the effect of these changes on the overall net assets and results presented in prior years.  (*Id.*)

On August 28, 2017, BDO informed the Debtor's Audit Committee, apparently consisting of Coneys and Rappaport, that there was a possibility that it might be unable to complete the audit altogether, but on September 1, 2017, the Debtor filed a pleading falsely stating "BDO has informed the Debtor that the audit should be concluded soon." (¶ 128; *see Debtor's Reply in Further Support of Motion for Entry of an Order Extending Debtor's Exclusive Periods for Filing a Chapter 11 Plan and Soliciting Acceptances Thereof*, dated Sept. 1, 2017, at ¶ 2 (Main Case ECF Doc. # 227).)

Although Coneys had asked BDO not to communicate its concerns formally in writing, (¶ 128), BDO finally communicated its specific concerns in writing on September 1, 2017.  BDO felt it necessary to formally document the unresolved issues,

---

[28]    The *AC* alleges that Debtor offered several inconsistent and conflicting reasons for KPMG's refusal to conduct the audit, (¶ 126), but does not spell out what they were.

and due to the collective magnitude of these matters, BDO indicated that it might decline to issue a report on Debtor's financial statements altogether. (¶¶ 128-29.) BDO identified at least ten issues that required material adjustments to the financial statements and explained that these items were of such significance that the Debtor's inability to resolve any one of them would lead to a modification of BDO's audit report, and possibly, the issuance of a disclaimer of an opinion or an adverse opinion.[29] (¶ 129.) BDO further stated that these transactions had caused BDO to incur $350,000 in out of scope costs,[30] and neither Coneys, Rappaport, Mullaney, nor any other Board member disclosed to the Court or, upon information and belief, the Examiner, these significant issues with BDO's audit. (¶ 130.)

The Court first learned of the significant issues delaying the completion of the audit issues when BDO filed a response to an order to show cause issued by the Court as to why the 2016 Audit had not been completed. (¶ 131; *see Statement of BDO USA, LLP Regarding Debtor's Response to Order to Show Cause Dated September 25, 2017*, dated Oct. 9, 2017 ("*BDO Statement*") (Main Case ECF Doc. # 256).) According to the *BDO Statement* (and the attached declaration of Ritesh Lall, the audit partner for the engagement ("*Lall Declaration*")), the Debtor had initially left to Fuchs and Debtor's counsel the responsibility for communicating and cooperating with BDO. BDO expressed its concerns both with the problems it had noted and the failure to get the

---

[29]    BDO urged Coneys, Rappaport, and Mullaney to discuss with their legal counsel their obligations to share communications with the Examiner or other parties involved in the bankruptcy proceedings. (¶ 130.) The *AC* does not allege whether they followed BDO's suggestion or if they did, what their lawyers told them.

[30]    The *AC* alleges that the Debtor paid BDO $210,000. (¶ 136.)

information it needed to complete the audit.  On September 29, 2017, Coneys informed

BDO that it had hired two individuals "at the request of the Audit Committee, for

temporary assistance in resolving the outstanding and unresolved matters as set forth in

your letter of September 1, 2017" and "authorized [BDO] to engage directly with them

on all matters pertaining to the audit."  (*BDO Statement*, Ex. 1.)  Despite the prior

problems, BDO assured the Court that it "stands ready and willing to complete the task

for which it was retained, and finally, with the assistance of the Audit Committee and

financial professionals that were recently hired, there now appears to be a path to have

this accomplished."[31]  (*BDO Statement*, p. 3.)  The *AC* charges that Coneys and the 2015

Directors breached their fiduciary duties in "failing to inform the Court or otherwise

take appropriate action in connection with the various issues that arose in the BDO

audit," and seeks to recover the cost of BDO's services.  (¶¶ 144-45, 148-49, 152-153, 156-

57, 160-61, 164-65.)

Initially, the Debtor required an audit for 2016 just like every prior year.  The

Debtor had to pay for that audit, and the *AC* does not allege facts supporting its

apparent contention that Coneys and the 2015 Directors should be liable for the basic

auditing fee even if BDO charged more than KPMG.  It also appears that some of the

concerns that BDO expressed and the need for additional out-of-scope work related to

the previous KPMG audits, such as the 2015 recording of contributions and the effect of

the anticipated changes "on the overall net assets and results presented in prior years."

(¶ 128.)  Coneys and the 2015 Directors cannot be held responsible for the errors or

---

[31]    "BDO never completed the audit due to numerous issues with Debtor's books and records, including multiple material weaknesses."  (¶ 34.)

shortcomings in KPMG's audits absent allegations that they caused them or were at least aware of but ignored them, neither of which is alleged. And although counsel's statements to the Court on August 28, 2017 that "BDO has informed the Debtor that the audit should be concluded soon," (*id.*), if made with knowledge that it was untrue, was inexcusable, the *AC* does not allege or imply that the Coneys and the 2015 Directors were aware of or participated in the making of those statements. The Plaintiff has not cited support for the implicit proposition that directors are personally liable for intentional misstatements made by counsel without their knowledge.

Nevertheless, Coneys and the 2015 Directors may be liable for some portion of the costs related to BDO's work. The *AC* implies that they were grossly negligent in the way they dealt with BDO.[32] According to the *BDO Statement*, BDO had repeatedly communicated its concerns about the questionable transactions beginning in May 2017 to the Board, the Audit Committee Chairman, Fuchs and the Debtor's counsel. (*BDO Statement* ¶ 6.) The Audit Committee took the unusual step of directing BDO to seek information through counsel, who was not able to provide the evidence that BDO required and created inefficiencies. (*Id.* ¶ 17.) The Audit Committee eventually hired two individuals to address BDO's concerns on September 29, 2017 and authorized BDO to deal directly with them. The *AC* implies that the Board and/or the Audit Committee (Coneys and Rappaport) were slow to react to the concerns that BDO had expressed and should have dealt directly with BDO rather than run BDO's informational requests through counsel. Whether the Board and/or the Audit Committee acted reasonably is

---

[32]    I do not mean to suggest that Coneys or the 2015 Directors are liable for any lack of information that BDO needed, and no such claim is alleged.

ultimately a question of fact, but if they did not, they may be liable for the increased costs caused by their actions.

### iii.    Payments to Mullaney

Four days after the Court issued its *sua sponte* Order to Show Cause why Debtor should not be held in contempt for failing to complete the audit, Mullaney requested and Fuchs authorized the Debtor to pay Mullaney $237,500, allegedly for past due compensation. (¶ 132.) On October 19, 2017, the day before the *Examiner's Report* was due to be filed, Mullaney requested and Fuchs authorized the Debtor to pay Mullaney $158,333.32, which included his salary for the month of October, even though Mullaney had never previously received a salary payment in advance. (¶ 133.) Both payments were made without Court approval, and Mullaney now acknowledges that he was not entitled to the October payment, and it is subject to avoidance. (¶ 133.)

The *AC* alleges that the Board breached its fiduciary duty in failing to constrain the payments despite two red flags: BDO had informed the Debtor, including the Board, that Mullaney's salary practices constituted material weaknesses that may cause it to issue an adverse opinion, and the "Debtor was operating under strict controls." (¶ 134.)

These allegations fail to allege a *Caremark* claim. First, the *AC* alleges that the BDO was concerned with the "accrual of Mullaney's bonus," (¶ 128) — the "limbo pay" scheme — not his salary which was the subject of the two payments which the Debtor always reported as taxable income to New York State and the IRS. Thus, the conclusory allegation that BDO had informed the Board that Mullaney's "salary practices constituted material weaknesses that may cause them to issue an adverse opinion," (¶

134), is not supported by and is contrary to the factual allegation regarding BDO's expressed concerns relating to the accrual of the bonus.   Furthermore, the conclusory allegation that the "Debtor was operating under strict controls," (*id.*), does not identify the "strict controls" or how they bear on this issue.   Second, under the Employment Agreement, and as discussed below, the Debtor was obligated to pay Mullaney's salary semi-monthly, and except for a part of the second payment, the amounts he received were past-due administrative expenses.   The payments did not involve the post-petition payment of a pre-petition debt.   The Plaintiff has withdrawn his claims concerning the amount of Mullaney's base salary, and payments made in September and October related to the approved salary.   Third, even if the payments were improper, the *AC* does not allege that Coneys or the 2015 Directors knew or had any reason to believe that Fuchs would make them.   Accordingly, the *AC* fails to allege the "red flags" necessary to support a claim that the Board should have but failed to constrain the salary payments.

## B.    Claims Against Mullaney

Mullaney has moved to dismiss Counts 8 (breach of fiduciary duty), 10-12 (avoidance and recovery of constructive fraudulent transfers under New York State and federal bankruptcy law) and 14 (avoidance and recovery of unauthorized post-petition transfers).   Alternatively, he seeks a more definite statement.   He does not seek to dismiss Counts 13 (avoidance and recovery of preferences) and 15 and 16 (disallowance of Mullaney's claim).   (*Mullaney Motion* at 1 n.2.)

### 1.    Count 8:  Breach of Fiduciary Duty

The Court previously ruled that Mullaney did not breach his fiduciary duty by accepting compensation awarded by the Board unless he sought to improperly influence

or coerce the Board's compensation decision. *Prior Decision*, 611 B.R. at 203-04. The Court dismissed the breach of fiduciary duty claims relating to his acceptance of his salary and his bonus, both of which were awarded by the Board. *Id.* at 204. For the same reason, Mullaney did not breach his fiduciary duty by accepting the benefit of the payment of his legal fees, expenses and settlements approved by the Board. The Court declined, however, to dismiss the breach of fiduciary duty claims relating to the "limbo pay" scheme and the ostensible tax fraud and improper reporting relating to that scheme. *Id.* at 204-05. The *AC* continues to assert the "limbo pay" scheme as a breach of Mullaney's fiduciary duty of loyalty, (¶ 169), and the Court adheres to its previous conclusion.

The Court also previously declined to dismiss the breach of fiduciary duty claims relating to the payment or reimbursement of Mullaney's personal and business expenses in violation of the Travel Policy. *Prior Decision*, 611 B.R. at 205-06. The *Prior Decision* observed, and I have repeated earlier, that there is a substantial, if not complete, overlap between the "limbo pay" scheme, by which Fuchs paid Mullaney's expenses from his bonus and the allegation that the Debtor paid or reimbursed Mullaney's expenses.[33] In other words, there may be no payments or reimbursements that were not covered by the

---

[33]    Mullaney contends that the separate ledger maintained by Fuchs, (*see* Mullaney Ex. 54), demonstrates that (1) the expenses were deducted from Mullaney's "limbo pay" and (2) the deductions reflected legitimate business expenses or contributions to the Debtor. (*Mullaney Motion* at 5-7.) The Court has examined the separate ledger referred to by Mullaney. The *AC* refers to the fact that Fuchs maintained a separate ledger, but whether the exhibit is the ledger referred to in the *AC* remains to be seen. In addition, the exhibit requires testimony to explain its contents.

bonuses.[34]  For this reason, Mullaney has accused the Plaintiff of double-counting or inflating the Debtor's alleged injury.

Nevertheless, the substance of this aspect of the breach of fiduciary duty claim is that the Debtor was forced to bear these expenses, either indirectly through an offset of his tax-free bonus or directly as an additional payment or reimbursement of a business expense to Mullaney or the vendor.  *Id.* at 206.  At bottom, the *AC* charges that Mullaney procured the payment by the Debtor of personal, unsubstantiated and/or excessive expenses in violation of the Debtor's Travel Policy.  The *AC* continues to make the same claim, (¶ 169), and again, I adhere to my earlier conclusion.

The *Prior Decision* also declined to dismiss the breach of fiduciary duty claim relating to Fuchs' Employment Agreement and her compensation, *Prior Decision*, 611 B.R. at 206, and the current motion does not seek to dismiss this subpart.  (*Mullaney Motion* at 26 n.14.)

The *Prior Decision* did not specifically address the part of the claim relating to the reimbursement of premiums on Mullaney's life insurance policy.  Providing life insurance on Mullaney's life with his spouse as the beneficiary was part of his compensation under the Employment Agreement.  However, there is no allegation that the Board authorized the premium payments before then.  (*See Examiner's Report* at 75-76.)  If the Board authorized the payment of the life insurance premiums prior to

---

[34]      As discussed in the text, *infra*, the possibility that some or all of the expenses were paid directly to the vendors by the Debtor and deducted from Mullaney's bonuses, rather than through reimbursing Mullaney for payments he made to the vendors, requires the Plaintiff to file a more definite statement in connection with his fraudulent transfer claims.  It makes no difference in connection with the breach of fiduciary duty claims which allege that either through direct payments or reimbursements, the Debtor was paying Mullaney's personal, unsubstantiated and/or excessive expenses in violation of the Travel Policy.

2016 as part of his compensation, Mullaney did not breach his fiduciary duty by accepting it. However, the *AC* implies, when read in conjunction with the *Examiner's Report*, that Mullaney caused the Debtor to pay or reimburse his life insurance premiums without Board approval. This states a claim for breach of the duty of loyalty.

The Court next turns to the remaining subparts of the breach of fiduciary duty claim dismissed in the *Prior Decision* and considers whether the Plaintiff has successfully repleaded them.

### a.    Restricted Funds

The failure to segregate and account for the use of restricted funds has been discussed earlier in connection with the claims against the Defendant Directors. The Court previously dismissed the same claim against Mullaney because the original complaint did "not connect the alleged misuse of or improper accounting for restricted funds with any action by Mullaney." *Prior Decision*, 611 B.R. at 207. The *AC* attempts to cure this deficiency by adding the following sentence: "Fuchs, in cooperation with Mullaney, kept misleading books and records that permitted them to misstate Debtor's performance." (¶ 95.)[35]

---

[35]    The Plaintiff also relies on the allegations in ¶¶ 96-99. (*Opposition* at 30.) Paragraphs 96 and 97 allege that Mullaney controlled the solicitation materials sent to donors that were rife with misrepresentations, including misrepresentations regarding the use of donations. Paragraph 98 concerns what the Board knew or should have known about the misrepresentations. Paragraph 99 alleges that the Examiner, BDO, and Chapter 11 Trustee's professionals devoted "substantial resources to investigate the Debtor's accounting and bookkeeping practices, particularly as they related to its fundraising efforts and restricted funds." The *AC* alleges that Mullaney breached his duty of care by "failing to properly account for and spend Debtor's donations and restricted funds." (¶ 168.) None of these allegations support an inference that Mullaney had a role in overseeing the segregation or use of restricted funds, a duty imposed on the Board by New York State law.

The "in cooperation with Mullaney" addition does not cure the prior deficiency. It is conclusory, and the *AC* does not allege facts, other than those relating to the "limbo pay" ledger, implying that Mullaney and Fuchs "cooperated" in the creation of any misleading books and records or that Mullaney had any role in the maintenance of the Debtor's books and records. Accordingly, the breach of fiduciary duty claim against Mullaney relating to the failure to segregate or use restricted funds in accordance with the donor's intent is dismissed.[36]

### b.    Fundraising

The *AC* charges that Mullaney breached his fiduciary duty of care by routinely using false solicitation materials. (¶ 168.)[37] The Court previously dismissed a similar claim because the *Complaint* attributed the misrepresentations to the "Debtor" without attributing any specific misrepresentation to Mullaney and did not allege how they harmed the Debtor as opposed to the defrauded donors. *Prior Decision*, 611 B.R. at 207. Relatedly, the Court questioned the Plaintiff's standing to assert the claim that Mullaney made misrepresentations to the donors. *Id.* at 207 n.19.

The *AC* now alleges that the fundraising campaigns were largely drafted by Mullaney, "Mullaney was also involved in the minutia of the campaigns, including

---

[36]    The *AC* also alleges that Mullaney breached his duty of care by "permitting Debtor to alter its accounting and grant making practices to permit Debtor to try to hinder, delay, and defraud creditors." (¶ 168.) This may refer to the claim included in the *Complaint*, at ¶¶ 103-04, that in 2016, the Debtor began to reclassify donations from unrestricted to restricted to prevent HMS from collecting its arbitration award. *See Prior Decision*, 611 B.R. at 186. Those allegations have been removed from the *AC*, (*see AC*, Ex. E (red-lined *AC*)), and no facts are alleged in the *AC* to support the charge.

[37]    The *AC* also alleges that Mullaney made misleading responses in emails inquiring about his compensation. (¶ 168.) The Court is unable to locate an allegation of fact in the *AC* that supports this statement.

selecting photos, drafting copy, and approving content, and he often added his own handwritten notes." (¶ 96.) Mullaney argues "[w]hether or not the Amended Complaint might cure the first defect, it has not cured the other two," to wit, injury and standing, (*Mullaney Motion* at 28), and given the lack of an injury to the Debtor, the Plaintiff cannot bootstrap a demand for the substantial costs incurred in investigating activities that would not result in any cause of action for the estate. (*Id.* at 29.)

As previously discussed, damages are not an element of a breach of fiduciary duty claim under Delaware law, and Mullaney does not seem to contest that using false and misleading solicitation materials was a breach of his fiduciary duty to the Debtor. In this regard, the *AC* attributes the making of the misrepresentations to Mullaney who, as alleged, largely drafted the fundraising materials. Moreover, the allegations of his involvement in fundraising, including the preparation of solicitation materials, is plausible given that the Debtor was paying him a substantial salary and annual bonuses to raise funds. As to bootstrapping, the appropriate award of damages, if any, for the investigation costs relating to the misrepresentations, as well as the investigative costs in general, is the subject for another day. For today, the claim that Mullaney breached his duty of care by making the misrepresentations to prospective donors identified in the *AC*, (¶ 96), and the *Examiner's Report*, (pp. 111-37), is not dismissed.

### c.    Excessive Salaries

The *AC* alleges that Mullaney breached his duty of loyalty by "directing Debtor to fund inappropriate expenditures and excessive salaries, including paying Fuchs a $120,000 signing bonus." (¶ 169.) His compensation has been discussed throughout this opinion, and Mullaney does not seek to dismiss the claims relating to Fuchs'

compensation.  The only other allegation regarding excessive salaries relates to signing

bonuses paid to Karen Lazarus, the Debtor's Director of Strategic Projects, but, in

"Mullaney's executive assistant," (¶ 12), and Delois Greenwood, the Debtor's Chief

Program Officer.  (¶ 11.)  Lazarus, Greenwood and Fuchs worked with Mullaney at Smile

Train until they were terminated in February 2011.  (¶ 72.)  According to the *AC*,

"Greenwood received a signing bonus via her first paycheck, which was for $29,166.67

whereas all subsequent checks were for $14,583.  Similarly, in the first year Lazarus

worked for WonderWork she received $169,000 in salary despite only working for part

of the year and her salary was subsequently decreased to $121,500 in 2012."  (¶ 91.)

The *Mullaney Motion* does not mention or challenge the part of the breach of

fiduciary duty claim asserting that Mullaney caused the Debtor to make excessive bonus

payments to Lazarus and Greenwood.  Hence, it is not be dismissed.

### d.    Post-Petition Payments

The *AC* alleges that Mullaney breached his duty of loyalty by causing the Debtor

"to pay Mullaney $395,833.32 in post-petition, non-ordinary course payments on the

eve of release of the [Examiner's] Report without disclosure or approval of the Court,"

and Mullaney now concedes that the second of the two payments in the sum of

$158.281.21 is avoidable.  (¶ 169; *see also* ¶¶ 132-33.)  The two payments covered ten

months of unpaid salary.  (¶ 134.)  As to the first payment in the sum of $237,500, the

Plaintiff made a similar claim in the original complaint, but it was dismissed because of

the way the original complaint was constructed.  The supporting factual allegations were

not incorporated into the claim (they appeared later in the *Complaint*).  As a result, the

"only allegation supporting Count 4 was the conclusory statement that the payments

were non-ordinary course and the implication that they required Court approval." *Prior Decision*, 611 B.R. at 207.  The *AC* now attempts to cure the prior deficiency.

Under the Employment Agreement, Mullaney was entitled to an annual salary of $475,000, less required deductions, payable in equal semi-monthly installments. (Mullaney Ex. 41, Employment Agreement § 3(a).)  Furthermore, he was entitled to his unpaid salary plus certain other benefits up to the date of his termination even if he was terminated for cause (requiring thirty-days' notice) or he quit without good reason (also requiring thirty-days' notice).  (*Id.* §§ 6(c), (e)-(f).)  The *AC* includes a chart showing that the Debtor made lump sum, multi-month salary payments to Mullaney in the past and alleges that his salary payments were "erratic." (¶ 84.)

It appears from the *AC* that the Debtor had not paid Mullaney any of his 2017 salary, all of which was earned post-petition and would be an administrative expense. *See* 11 U.S.C. § 503(b)(1)(A)(i).  In September 2017, Mullaney requested and Fuchs authorized the Debtor to pay Mullaney $237,500, or six months of his salary, only four days after the Court issued an Order to Show Cause why Debtor should not be held in contempt for failing to complete the audit.  (¶ 132.)  On October 19, 2017, Mullaney requested and Fuchs authorized Debtor to pay Mullaney $158,333.32, or an additional four months of his salary, the day before the *Examiner's Report* was scheduled to be filed.  (¶ 133.)  Assuming that Mullaney was paid in arrears, *i.e.,* after the conclusion of the semi-monthly pay period, the latter payment included a prepayment of the second October installment in the sum of $19,791.67.  The Debtor had never prepaid his salary. (¶ 133.)

While the circumstances of the payments alleged in the *AC* imply that Mullaney acted in bad faith by insisting on the payment of his salary, he was contractually entitled to those payments (except for the second October installment), the Plaintiff no longer challenges the amount of his base pay, and the Debtor would have had to pay those sums on the effective date of the plan even if it fired Mullaney.  *See* 11 U.S.C. § 1129(a)(9)(A).  Absent the circumstances alleged, it cannot be said that Mullaney would have breached a fiduciary duty by asking for the payment of salary which was past due under his Employment Agreement for post-petition services.  Except for the prepayment of the second October installment, the Plaintiff has not articulated a basis for concluding that the payment of his salary, even under the circumstances alleged in the *AC*, violated a duty of good faith or loyalty.  Accordingly, the motion to dismiss the part of the breach of fiduciary duty claim based on the post-petition salary payments is granted except for the second October installment.

### 2.    **Counts 10-12:  Fraudulent Transfers**

Counts 10 through 12 allege that Mullaney received constructive fraudulent transfers under New York State law, (Count 10), and federal bankruptcy law (Counts 11 and 12).[38]  The transfers at issue are allegedly evidenced by exhibits attached to the *AC* that depict the transfers that the Plaintiff is challenging.  In deciding Mullaney's prior motion to dismiss, the Court dismissed the fraudulent transfer claims relating to the salary payments, *Prior Decision*, 611 B.R. at 209-10, but with one exception, denied the

---

[38]    Count 11 challenges transfers made within two years of the Petition Date.  Count 12 challenges transfers during the same period that were made to Mullaney, an insider, under his Employment Agreement.

motion to dismiss as to the bonus payments and the reimbursement of personal, excessive and/or unsubstantiated expenses. *Id.* at 210-12.[39]

Mullaney again challenges the fraudulent transfer claims directed at the bonus and reimbursed expenses on several grounds. First, the portions of the bonuses that were never paid were not transfers. (*Mullaney Motion* at 13-17.) Second, it is not plausible that every American Express charge reimbursed or paid by the Debtor was personal or unsubstantiated, and the Plaintiff should be required to specify the transfers. (*Id.* at 17-18.) Third, the *AC* fails to allege lack of fair consideration or reasonably equivalent value for most or all of the transfers. (*Id.* at 18-20.) Fourth, the "Other Expenses" listed in Exhibits A through C to the *AC* were deducted from Mullaney's salary, the payment of which was not a fraudulent transfer, and the deduction from salary cannot, therefore, itself constitute a fraudulent transfer. (*Id.* at 20-21.) Fifth, the Plaintiff cannot recover the life insurance premiums because they were awarded by the Board, were arguably reported as non-taxable income in the submissions to New York State and the IRS and the *AC* fails to allege lack of good faith. (*Id.* at 21-22.) Sixth, the Plaintiff cannot recover the litigation-related expenses because they were approved by the Board and the $450,000 settlement payment is not even included in the Exhibits attached to the *AC*. (*Id.* at 22-24.)

Although the Court previously sustained portions of the fraudulent transfer claims in the *Prior Decision*, the Court now concludes that it overlooked a fatal deficiency in the *Complaint* and will grant Mullaney's alternative request to file a more

---

[39]    The Court granted the motion to dismiss the claim based on section 275 of the New York Debtor & Creditor Law. *Prior Decision*, 611 B.R. at 212. The *AC* does not assert a claim under § 275. (*See* ¶ 180.)

definite statement, FED R. CIV. P. 12(e), solely with respect to the fraudulent transfer

claims.[40]  The decision to order a more definite statement lies within the Court's

discretion, and if a complaint is overly prolix or complex, a more definite statement may

assist the court in "the cumbersome task of sifting through myriad claims, many of

which may be foreclosed by various defenses."  2 MOORE'S FEDERAL PRACTICE - CIVIL §

12.36 [1] (quoting *Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll.*, 77 F.3d

364, 367 (11th Cir. 1996)).

There are at least two problems with the fraudulent transfer claims relating to the

perquisites.  First, they allege that Mullaney was either the initial transferee or the entity

for whose benefit the transfer was made.  (¶¶ 178, 183, 189.)  These, however, are

different claims subject to different pleading rules, and the *AC* fails to plead a claim to

recover the value of payments made to third parties for the benefit of Mullaney.

The payment of Mullaney's legal fees illustrates this issue.  The Debtor directly

paid the law firm Jones Day $245,357.45 in 2013.  (Ex. 61.)  This amount corresponds to

the legal fees the Debtor paid in connection with the Smile Train Copyright Case, (¶ 76),

and the same approximate amount appears as a fraudulent transfer *to Mullaney* in

Exhibit A to the *AC* which the Plaintiff seeks to recover through Count 10.  The Debtor

didn't pay both Jones Day and Mullaney.  Mullaney was not the transferee of the

payment to Jones Day because he never touched or had dominion and control over

those funds; rather, he was the entity for whose benefit the transfer was made, and an

entity cannot be both the initial transferee and the entity for whose benefit the transfer

---

[40]      The Plaintiff did not object in his opposition to Mullaney's motion for a more definite statement.

was made.  *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 895 (7th Cir.

1988) ("[A] subsequent transferee cannot be the 'entity for whose benefit' the initial

transfer was made.  The structure of the statute separates initial transferees and

beneficiaries, on the one hand, from 'immediate or mediate transferee[s]', on the other.

The implication is that the 'entity for whose benefit' is different from a transferee,

'immediate' or otherwise.").

In order to recover the value of the transfer to Jones Day from Mullaney, the

Plaintiff must plead and ultimately prove that the transfer to Jones Day, the initial

transferee, is avoidable.  *See* 11 U.S.C. § 550(a)(1).  In particular, the Plaintiff must plead

that the Debtor did not receive reasonably equivalent value or fair consideration from

Jones Day rather than Mullaney.  The *AC* does not allege, in this regard, that any

payments made to third parties, as opposed to reimbursements made to Mullaney, are

avoidable, and they may not be.  For example, if any of Mullaney's charges that the

Debtor paid directly to American Express represented charges for goods or services

provided to or for the benefit of the Debtor, American Express would have provided

reasonably equivalent value, and presumably, fair consideration to the Debtor.[41]

Mullaney's argument, in this regard, that it is not plausible for every American Express

charge to be a fraudulent transfer has merit.  The shotgun approach to recover all

American Express payments made over several years, without differentiation, makes it

impossible for Mullaney to frame his answer.

---

[41]     Unlike reasonably equivalent value, "fair consideration" includes a good faith component under
NYDCL § 272.

Second, and relatedly, the *AC* seeks double recovery for many of the same transfers.  For example, the *AC* seeks to avoid both the bonuses awarded to Mullaney, (*see AC*, Ex. A), that Fuchs used through offset to pay his American Express expenses and the direct payments that the Debtor supposedly made to American Express on account of those same expenses.  If a bonus was a fraudulent transfer, Mullaney's use of that same bonus to pay American Express isn't a second fraudulent transfer; instead, American Express would be a subsequent transferee of the initial transfer (the bonus) to Mullaney, and the Debtor would be entitled to a single satisfaction.  11 U.S.C. § 550(d).

The Plaintiff can, of course, plead alternative claims, FED. R. CIV. P. 8(d)(3), but his fraudulent transfer claims conflate two different theories of recovery.  In addition, lumping all of the American Express payments without any effort to identify the underlying charges makes it impossible for Mullaney to answer or assert defenses to any particular reimbursement or direct payment. Accordingly, the Plaintiff must provide a more definite statement identifying claims to recover transfers to Mullaney as an initial transferee on the one hand, and as the "entity for whose benefit" the transfer was made on the other.  This should also streamline the case as the *Examiner's Report* suggests that there may be few if any transfers made directly to Mullaney aside from the bonuses.

### 3.    Count 14:  Unauthorized Post-Petition Transfers

Count 14 alleges that during the post-petition period, Mullaney continued to use his American Express card for excessive, personal and undocumented expenses, and that as a result, the Debtor reimbursed him $59,517.70 for the period December 28, 2016 through September 26, 2017.  (¶ 200; *AC*, Ex. D.)  In addition, he also received two salary payments, discussed *supra*, in the aggregate sum of $395,833.32. (¶ 201.)  The

post-petition transfers deviated from Debtor's ordinary course practice, were outside of the ordinary course for the business and practices of the industry, (¶ 201), and were made "with actual intent to hinder, delay, or defraud creditors." (¶ 202.) As with the pre-petition fraudulent transfer claims, the *AC* alleges that Mullaney was either the initial transferee or the entity for whose benefit each of the Post-petition Transfers was made. (¶ 203.) As noted, Mullaney does not contest the avoidability of the $158,283 payment. In addition, the Plaintiff must separately state the reimbursement claim, distinguishing between direct payments to third party vendors on Mullaney's behalf and payments made directly to Mullaney for the same reasons discussed in connection with the pre-petition fraudulent transfer claims.

This leaves the $237,550 salary payment made in September 2017 that covered six months of past due salary. Bankruptcy Code § 549(a) states, in relevant part, that a trustee may avoid a post-petition transfer that is not authorized under the Bankruptcy Code or by the court. This includes payments outside the ordinary course of business which require court approval under 11 U.S.C. § 363(b). The *Prior Decision* dismissed this claim as asserted in the *Complaint*. Its thrust was that the salary payments were extraordinary based on their timing and the circumstances. The Debtor paid the $237,550 in September 2017 after the Court issued an order to show cause to hold the Debtor in contempt for failing to complete the audit on time, and while not at issue on this claim, paid the $158,283 a few days before the *Examiner's Report* was scheduled for release. *Prior Decision*, 611 B.R. at 215.

The Court concluded that the claim failed to allege that the payment fell outside of the ordinary course of business, and hence, require Court approval. The phrase

"ordinary course of business" has a well understood meaning under bankruptcy law. After discussing the "vertical" and "horizontal" tests articulated in *Med. Malpractice Ins. Ass'n v. Hirsch* (*In re Lavigne*), 114 F.3d 379, 384-85 (2d Cir. 1997) in connection with the meaning of "ordinary course of business," the Court ruled that the Pearl Meyer Report, the only information regarding industry practices, considered the $475,000 high but still within the range of reasonableness and creditors would have reasonably expected the Debtor to continue to pay Mullaney the same salary post-petition. *Prior Decision*, 611 B.R. at 215.

Count 14 repeats this claim.  The *Mullaney Motion* argues that the *AC* does not bolster it with new facts and instead, replaces the conclusory allegation that the payment was outside the ordinary course of business with the "equally bare allegation that '[g]iven the unique circumstances under which these lump sum payments were made' they deviated from the ordinary course of business." (*Mullaney Motion* at 25-26 (quoting ¶ 201).)  The Plaintiff responded that the *AC* cured the deficiencies noted in the *Complaint* by alleging the "highly irregular manner" in which the payment was made on the eve of the release of the Examiner's Report, there was nothing ordinary about the "illegal deferral" scheme, and other non-profit organizations do not pay their salary in lump sum payments, particularly upon the direction of a CEO who is about to resign based on allegations of fraud.  (*Opposition* at 38.)

The *AC* fails to cure the prior deficiencies.  First, the $237,550 related to Mullaney's salary, not the "limbo pay" scheme, and having dropped his excessive salary claim, the Plaintiff has not alleged facts implying that Mullaney was not entitled to his base pay.  Second, the payment was not made on the eve of the release of the Examiner's

Report, which was scheduled to occur in October and actually occurred in November.  It was made four days after the Court issued its order to show cause to hold the Debtor in contempt based on BDO's failure to complete its audit by the deadlines established by the Court.  Third, the *AC* does not allege that non-profit organizations do not make lump sum salary payments, and the Court cannot take judicial notice of that fact.  Fourth, the *AC* does not allege that Mullaney was about to resign in September 2017, and he did not.  Fifth, the *AC* does not allege facts supporting the argument that the September payment was made with the intent to hinder, delay and defraud creditors.  Mullaney's 2017 salary was an administrative claim that had to be paid on the effective date of the plan and before unsecured creditors got paid.  If the Debtor failed or refused to pay his salary, Mullaney could ask the Court to compel payment.  *See* 11 U.S.C. § 503(a).

Sixth, and most importantly, the *AC* fails to cure the pleading deficiencies identified in the ***Prior Decision*** relating to the vertical and horizontal tests that govern the determination of "ordinary course of business."  In fact, the *AC* pleads that Mullaney's salary payments were "erratic," and the accompanying chart confirms this.  For example, in 2015, he received $425,000 in February and in 2016, he received his entire salary, $475,000, in June.  (¶ 84.)  Thus, it was not unusual to pay Mullaney his salary erratically and, at times, in lump sums.

Accordingly, the claim under Bankruptcy Code § 549 to avoid the payment of $237,550 is dismissed.

C.      **Claims Against Fuchs**

The *AC* charges Fuchs with various breaches of her fiduciary duties of care and loyalty similar to those asserted in the *Complaint.* The *Prior Decision* denied the motion to dismiss the claims relating to the "limbo pay" scheme, which included the maintenance of the separate ledger and the certification of filings with New York State that failed to disclose the bonuses awarded by the Board or the income related to the bonuses or, at a minimum, the portions of the bonuses used to pay Mullaney's personal expenses. *Prior Decision*, 611 B.R. at 205. The Court reached that conclusion, in part, based on Fuchs knowledge that Smile Train had recharacterized Mullaney's "limbo pay" as income and issued Forms W-2 for prior years to reflect that income.

Fuchs correctly points to the *AC*'s failure to allege that she knew about the recharacterization of Mullaney's Smile Train "limbo pay" and the issuance of the Forms W-2.[42] Further, the *AC* alleges that Fuchs had no professional training in finance and accounting. (¶ 10.) Nevertheless, and despite the lack or professional training, Fuchs had substantial experience and responsibilities in connection with accounting and auditing, including a twenty-five-year stint with Avon. (*See Examiner's Report* at 61-62.) Her experience and knowledge of accounting and auditing support the inference that she knew that the failure to report "deferred" compensation that Mullaney was free to use and actually used possibly violated tax law as well as the federal and state reporting requirements regarding the amount of income the Debtor paid to Mullaney.

---

[42]      The Plaintiff contends that paragraph 113 of the *AC* alleges Fuchs' knowledge, (*Opposition* at 31), but paragraph 113 does not.

Accordingly, the Court adheres to its prior determination denying the motion to dismiss the breach of fiduciary duty claim related to the "limbo pay" scheme.

The *Prior Decision* also denied the motion to dismiss the claims relating to the payment of Mullaney's expenses in violation of the Travel Policy and the compensation that Fuchs and Mullaney caused the Debtor to pay to Fuchs as a *quid pro quo* to cover up Mullaney's malfeasance.  611 B.R. at 206.  While Fuchs continues to contest those conclusions, Fuchs has not offered a reason to reconsider those conclusions and I adhere to them.[43]  I now turn to the claims that the Court previously dismissed with leave to replead.

### 1.    Fundraising

The *Prior Decision* dismissed a claim alleging that Fuchs had misled donors in the solicitation materials used by the Debtor because the "Plaintiff does not allege any facts supporting the inference that Fuchs, the CFO, had any role in the solicitation of donations or the distribution of solicitation materials."  611 B.R. at 207.  The *AC* drops the allegation regarding the solicitation materials and charges that Fuchs breached her duty of care by "misleading donors both [sic] in Debtor's public disclosures, including in response to email communications inquiring about Mullaney's compensation."  (¶ 173.)

The claim that the donors were misled by public filings is a subset of the more general claim that Fuchs breached her fiduciary duty of care by "making clearly false

---

[43]    The *AC* asserts that Fuchs breached her duty of loyalty and good faith by directing Debtor to fund excessive salaries, (¶ 174), which I assume includes the signing bonuses paid to Lazarus and Greenwood.  The *AC* attributes those payments to actions by Mullaney, not Fuchs.  (¶ 91.)  There are no allegations that Fuchs had any role in these payments, and this aspect of the Plaintiff's breach of fiduciary claim against Fuchs is dismissed.

and misleading statements in Debtor's public filings." (*Id.*)  The filing of false and

misleading public disclosures relating to Mullaney's compensation and the "limbo pay"

scheme constituted a breach of fiduciary duty for the reasons stated above.  However,

the *AC* does not allege any communications, email or otherwise, between Fuchs and any

donors; that Fuchs ever sent copies of the public disclosures to donors; or even that the

donors ever read them.  Accordingly, this claim is insufficient and is dismissed.

### 2.    Accounting for Restricted Funds

The *Complaint* alleged that Fuchs and Mullaney had breached their fiduciary

duties in connection with the Debtor's failure to adhere to the Policy Manual in a variety

of ways, including by treating all funds as fungible and failing to segregate or spend the

funds consistent with applicable law.  *Prior Decision*, 611 B.R. at 206-07.  The only

allegations specifically directed at Fuchs are that she prepared "a 'roll forward' schedule

to show the change in restricted fund balances over the course of the year," (*Complaint*

¶ 98), and "improperly used joint cost accounting principles; charging against the

restricted funds a portion of the $25 million Debtor spent on direct mail."  (*Id.* ¶ 99.)

The Court dismissed the claim because the two allegations directed at Fuchs implied

negligent bookkeeping and negligent accounting, and not bad faith.  *Prior Decision*, 611

B.R. at 207.  To cure the deficiencies, the *AC* adds the following sentence to former

paragraph 98 (now, *AC* ¶ 95):  "Moreover, as detailed in the Examiner Report (*see* p. 156

to 165), Fuchs, in cooperation with Mullaney, kept misleading books and records that

permitted them to misstate Debtor's performance."

The Court has reviewed the referenced portions of the *Examiner's Report*.

Generally, it describes how the Debtor failed to segregate or property account for and

use certain restricted donations.  Fuchs was aware that certain donations were commingled and not segregated although she did know how the funds were used.[44] (*Examiner's Report* at 160.)  In addition, Fuchs prepared a "roll forward" schedule to show the change in restricted fund balances over the course of the year, but because the audit did not occur until after the end of the year, it was impossible to know the exact balance of restricted funds at any point during the year.  (*Id.*)  Finally, Fuchs applied joint cost allocation accounting rules to allocate operating expenses to restricted funds. (*Id.* at 161-62.)  The Examiner did not question the use of joint cost allocation accounting as a general, accounting matter, (*id.* at 162 ("The Examiner does recognize that an argument can be made that to a limited extent, some program related educational material may be included in some of the mailings.")), but opined that the Debtor relied on the joint accounting allocation rules to allocate an excessive portion of its direct mailing expenses against its restricted fund balances.  (*Id.* at 162.)

The Plaintiff has not pointed to any authority precluding the use of a "roll forward" schedule to keep track of restricted balances.  Instead, the *AC* alleges through its adoption of the *Examiner's Report* that the "roll forward" schedule did not allow the

---

[44]    According to the Examiner, the Debtor began an effort to reclassify unrestricted funds as restricted in 2016 to frustrate HMS' ability to enforce its arbitration award.  (*See Examiner's Report* at 157-59.)  The *Examiner's Report* does not conclude that any of the reclassifications were improper; it simply questions the Debtor's motivation and raises the possibility of bankruptcy claims.  (*Id.* at 159 ("While the Examiner's analysis of the Debtor's solicitation materials and other records may, in fact, lead to some of same 'reclassifications' performed by the Debtor and its counsel, the circumstances and timing of Debtor's attempts to make these changes raise serious questions as to its motivation, and with respect to actions taken before December 28, 2016, potential fraudulent conveyances, and with respect to actions taken after December 28, 2016, potential violations of section 549 of the Bankruptcy Code.")  The Plaintiff cannot complain that the Debtor failed to properly classify funds as restricted and also complain when the Debtor belatedly corrected the problem that the reclassification to restricted was improper.  Regardless of the Debtor's motivation, the proper reclassification of funds from unrestricted to restricted protected the funds from the payment of the Debtor's liabilities in accordance with state law and ensured their use in accordance with the donors' intent.

Debtor to determine the balance at any time during the year.  Absent some contrary legal requirement that the Plaintiff has not identified, Fuchs' use of the "roll forward" method involved an element of business judgment, and the Plaintiff has failed to plead around the business judgment rule presumption and failed to allege that she breached her fiduciary duty of care.

Similarly, the alleged misapplication of joint cost allocation accounting principles to allocate excessive direct mailing expenses challenges Fuchs' business judgment.  The Examiner noted that the Debtor used outside vendors, one of which was also used by Smile Train, to perform the joint cost analysis.  (*Examiner's Report* at 162.)  The *AC* does not allege that Fuchs ignored those analyses or did anything inconsistent with them, and the *AC* fails to allege a claim that Fuchs breached her fiduciary duty of care in her use of joint cost allocation accounting principles.

The failure to segregate restricted donations is a different story.  The segregation was required by state law and the Policy Manual, and the failure to follow the law and corporate policy constituted a breach of the duty of care.

### 3.    Post-Petition Payments

The claim that Fuchs caused the Debtor to make the two post-petition payments to Mullaney in breach of her fiduciary duty was dismissed based upon the unusual placement of the allegations in the *Complaint*.  *Prior decision*, 611 B.R. at 207.  The *AC* now relocates the supporting factual allegations to their proper place.  It alleges that Mullaney requested and Fuchs authorized the Debtor to pay Mullaney $237,500 four days after the Court issued an Order to Show Cause why Debtor should not be held in

66

contempt for failing to complete the audit.  (¶ 132.)  In addition, Mullaney requested and Fuchs authorized Debtor to pay Mullaney $158,333.32 the day before the *Examiner's Report* was scheduled to be filed.  (¶ 133.)

The Court has concluded that the payment of all but the last October salary installment did not state a claim for breach of fiduciary duty against Mullaney.  For the same reasons, the motion to dismiss this claim for breach fiduciary duty asserted against Fuchs is also dismissed except for the second October installment.

The Court has considered the remaining arguments made by the parties and concludes that they lack merit or have been rendered moot by dispositions rendered by the Court.  The parties are directed to settle an order or submit a consensual order consistent with this opinion.

Dated:   New York, New York
         December 18, 2020

                                    /s/ *Stuart M. Bernstein*
                                    STUART M. BERNSTEIN
                                    United States Bankruptcy Judge