UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
In re:                                                        :

WONDERWORK, INC.,                                             :

                                        Debtor.               :

------------------------------------------------------------- :
VINCENT A. SAMA, as Litigation Trustee of the                :
WW LITIGATION TRUST,                                         :

                                        Plaintiff,            :

        -against-                                            :

BRIAN MULLANEY, HANA FUCHS, THEODORE                        :
DYSART, JOHN J. CONEYS, STEVEN LEVITT,                       :
CLARK KOKICH, STEVEN RAPPAPORT,
RICHARD PRICE, and MARK ATKINSON,                           :

                                        Defendants.          :

------------------------------------------------------------- X

Chapter 11
Case No. 16-13607 (SMB)

**SECOND AMENDED**
**COMPLAINT**

Adv. No. 18-01873 (SMB)

**Jury Trial Demanded**

Plaintiff Vincent A. Sama, as Litigation Trustee of the WW Litigation Trust (the "Litigation Trustee"), as and for his Second Amended Complaint (the "Second Amended Complaint") against Brian Mullaney ("Mullaney"), Hana Fuchs ("Fuchs"), Theodore Dysart ("Dysart"), John J. Coneys ("Coneys"), Steven Levitt ("Levitt"), Clark Kokich ("Kokich"), Steven Rappaport ("Rappaport"), Richard Price ("Price"), and Mark Atkinson ("Atkinson," together with Mullaney, Fuchs, Dysart, Coneys, Levitt, Kokich, Rappaport, and Price, the "Defendants"), by his attorneys Arnold & Porter Kaye Scholer LLP ("Arnold & Porter"), alleges as follows:

**Nature of the Action**

1.      The Defendants are former officers and directors of WonderWork, Inc. ("Debtor" or "WonderWork").  While Debtor purported to be a 501(c)(3) charity the purpose of which was to provide surgeries to underserved populations across the globe, a five-month investigation by an

independent court-appointed examiner uncovered that the "reality of Debtor's operations depart[ed] substantially from this stated purpose." Rather than serving impoverished children in need of surgeries, Debtor served the interests of its over-compensated Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), whose actions were left unchecked by a "passive and overly deferential Board of Directors." As a result, during its approximately six year tenure, Debtor "raised, and then misapplied and misused, millions of charitable dollars," including by permitting the CEO and CFO to use Debtor as their own personal piggy bank at the expense of Debtor, its charitable mission, its donors, and its creditors.

2.    Debtor's failings were not isolated or limited to one issue, rather, Debtor "operated in disregard of key legal requirements and industry standards regarding charitable solicitation, restricted gift practices, financial reporting, and compensation standards" from the outset. As documented by the examiner, under Defendants' stewardship, Debtor:

- used false solicitation materials authored by its CEO, in violation of applicable law;

- failed in its reporting obligations, making clearly false and misleading statements in its public filings;

- failed to apply Debtor's restricted assets in accordance with their intended purpose;

- failed to spend money raised for specific purposes in accordance with the solicitation materials;

- failed to honor and account for matching donations;

- failed to keep accurate accounts of its restricted funds; and

- lacked appropriate governance protocols and its Board failed in its duty to monitor and control management's misfeasance.

Finally, "Management of the Debtor further abused the public's trust for their own benefit through excessive compensation and benefits and under reported income." Thus, while Debtor raised over $50 million in charitable contributions, the "bulk of the money spent by the charity over the years

[went] to feed the enormous fundraising machine itself, including both its own highly compensated employees, and third party direct mail service providers."

3.    As detailed below, Debtor's outside directors sanctioned and enabled management's abuses.  Rather than fulfill their fiduciary duties to Debtor, the Board repeatedly acquiesced to the CEO's unreasonable demands, approving each and every year huge, unwarranted bonuses in direct contravention of the recommendations of a compensation consultant and approved the charity paying hundreds of thousands of dollars in additional benefits to its CEO in the form of personal legal and other non-business, excessive, or undocumented expenses.  The CEO and CFO, with the Board's knowledge, then engaged in an illegal deferral scheme whereby the CEO would instruct the CFO to "defer" certain amounts of his compensation in a "limbo" pay account that was not part of the general ledger.  The CEO and CFO would then run his personal expenses through Debtor to avoid paying tax and to conceal the full amount of his compensation from the regulators and donors.  Although one director resigned over his concerns regarding management's abuses, particularly as they relate to the CEO's compensation, he failed to alert the other directors, which allowed Debtor's management to continue its conduct unchecked.

4.    Indeed, even after Debtor received a devastating arbitration award that detailed management's malfeasance with multiple charities in detail, including the CEO and CFO's bizarre and improper practices with respect to salary deferral and expenses, and described the CEO as "reprehensible" and "not a credible witness," directors Coneys, Levitt, Kokich, Rappaport, Price, and Atkinson all worked diligently to protect Debtor's officers at Debtor's expense.

5.    As a result of the Board's breach of its fiduciary duties in failing to properly supervise the Debtor and its management (including ignoring red flags that evidenced management's misdeeds), management was permitted to operate the charity with deficient and

misleading accounting practices, false solicitation practices, misuse of charitable funds, false and misleading public reporting, and failure to comply with governance protocols. The Board is thus responsible and liable for the resulting millions of dollars of investigation costs into these improper and illegal practices, as well as the ensuing winding up costs.

6. Finally, this action also seeks to recover certain avoidable pre- and post-petition transfers made by Debtor to or for the benefit of its CEO and to disallow the claim the CEO asserted against Debtor, purportedly on account of his back pay.

### The Parties And Other Significant Persons Or Entities

7. Plaintiff Vincent A. Sama is the Litigation Trustee with his principal place of business at Seyfarth Shaw LLP, 620 8th Ave., New York, New York 10018.

8. Debtor WonderWork, Inc. is a Delaware non-profit that Mullaney formed on or about March 7, 2011. Debtor's registered DBAs were FirstStep, BurnRescue, and 20/20/20—solicitations under the FirstStep name sought donations to treat clubfoot, solicitations under the BurnRescue name sought donations to treat burns, and 20/20/20 solicited for blindness.

9. Defendant Brian Mullaney was at all relevant times the CEO of the Debtor and was also the founder of the Debtor.

10. Defendant Hana Fuchs was at all relevant times the CFO of the Debtor, although Fuchs had no professional training in finance or accounting.

11. Delois Greenwood ("Greenwood") served as the Chief Program Officer of Debtor from inception until September 2017, when she resigned.

12. Karen Lazarus ("Lazarus") held the title of Director of Strategic Projects, but, in reality her job was to serve as Mullaney's executive assistant.

13.     Defendant Theodore Dysart served on Debtor's Board from March 2011 through November 2015, when he resigned.  Dysart was the Vice Chairman of Heidrick & Struggles.

14.     Ravi Kant ("Kant") served on Debtor's Board from March 2011 until his resignation in December 2016.

15.     Defendant John J. Coneys served on Debtor's Board from and after December 2012 and, at times, served as Debtor's Lead Independent Director.  Coneys was the Former Regional Vice Chair of PricewaterhouseCoopers.

16.     Richard Steele ("Steele") served on Debtor's Board from December 2015 until his resignation in December 2016.

17.     Defendant Steven Levitt served on Debtor's Board from and after December 2015. Levitt is a Professor of Economics at the University of Chicago.  His firm, Greatest Good, performed analytics work for Debtor, for which it received fees from Debtor totaling approximately $15,000.

18.     Defendant Clark Kokich served on Debtor's Board from and after December 2015. Kokich was the Executive Chairman of Marchex.

19.     Defendant Steven Rappaport served on Debtor's Board from and after December 2015.  Rappaport was a Partner at RZ Capital.

20.     Defendant Richard Price served on Debtor's Board from and after December 2015. Price is the CEO of CBRE Global Investors' Asia Pacific Investment.

21.     Defendant Mark Atkinson served on Debtor's Board from and after December 2015.  Atkinson is the Partner and Creative Director for Otto Design and Marketing.

## Jurisdiction and Venue

22.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b) and the Standing Order of Reference.[1]

23.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

24.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (E), (F), (H) and (O).

25.     Pursuant to Section 12.1(e) of the Plan (as defined below) and Paragraph 39 of the Confirmation Order (as defined below) the Bankruptcy Court retained exclusive jurisdiction to hear and determine any actions commenced by the Litigation Trustee.

26.     In the event that any part of this adversary proceeding is found to be "non-core," Plaintiff consents to the entry of final orders and judgments by this Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

## Procedural History

27.     On December 29, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York.  In its Amended Schedules, Debtor stated that Mullaney had a general unsecured claim against the estate in the amount of $641,320, which was purportedly on account of back pay (the "Mullaney Claim").

28.     On January 18, 2017, Debtor's largest creditor, blindness charity Help Me See, Inc. ("HelpMeSee"), filed a motion for the appointment of a chapter 11 trustee (the "Trustee Motion").

---

[1] On March 14, 2019, Levitt, Kokich, Rappaport, and Price moved to withdraw the reference.  On January 23, 2020, that request was denied without prejudice to renewal when the claims are ready for trial.

29.     On April 21, 2017, the Bankruptcy Court entered an Order Directing the Appointment of an Examiner and Establishing Temporary Bankruptcy Controls, which was subsequently amended on June 20, 2017.

30.     On May 5, 2017, the U.S. Trustee filed an application requesting that the Bankruptcy Court appoint Jason R. Lilien, Esq. as examiner.  Mr. Lilien had extensive experience in the charitable arena, including serving as the head of the New York Attorney General's Charity Bureau.

31.     On May 10, 2017, the Bankruptcy Court entered an Order approving Mr. Lilien as examiner (the "Examiner").  The Examiner was appointed to address, among other things, potential Estate causes of action against various persons and entities.

32.     On June 28, 2017, the Court approved the Examiner's retention of Loeb & Loeb LLP ("Loeb") as counsel and on July 21, 2017, the Court approved the Examiner's retention of Goldin Associates LLC ("Goldin") as his financial advisor.  In connection with his $2+ million investigation, the Examiner and/or his advisors reviewed over 25,000 email records from Debtor, 23,000 records from third parties, as well as thousands of other pages of material.

33.     The Examiner conducted formal interviews of Lazarus, Fuchs, Mullaney, Coneys, Greenwood, Kant, and Dysart, among others, and additional informal interviews.  Although the Examiner transcribed his interviews with Lazarus, Fuchs, Mullaney and Greenwood, he did not provide a record or transcribe many of his interviews, including those he had with Coneys and Dysart.  The Examiner did not interview Levitt, Kokich, Rappaport, Price, or Atkinson.  None of the Examiner's interviews were conducted under penalty of perjury.

34.     On May 24, 2017, the Bankruptcy Court approved the Debtor's retention of BDO USA LLP ("BDO") to audit the Debtor's Financial Statements of June 30, 2016 and to prepare its

Form 990. BDO never completed the audit due to numerous issues with Debtor's books and records, including multiple material weaknesses.

35. On or about November 3, 2017, the Examiner publicly filed his Final Report dated October 25, 2017 (the "Report"). The Report spanned 274 pages and recommended that the matter be referred to the New State Attorney General and that a Chapter 11 Trustee be appointed. Mullaney resigned immediately following release of the Report.

36. On November 22, 2017, the Bankruptcy Court appointed Stephen Gray as Chapter 11 Trustee (the "Chapter 11 Trustee"). The Chapter 11 Trustee retained CR3 Partners LLC as his financial advisor, Togut, Segal & Segal LLP as his bankruptcy counsel, Garfunkel Wild, P.C. as his special counsel, Gordon Brothers Asset Advisors, LLC as his intellectual property advisor, and Verdolino & Lowey P.C. as his special accountant.

37. On September 21, 2018, the Bankruptcy Court entered an order (the "Confirmation Order") confirming an Amended Chapter 11 Plan of Liquidation of WonderWork, Inc. (as it may be modified and together with the Plan Supplement filed on August 8, 2018, the "Plan"). The Plan and Confirmation Order provided for the creation of the WW Litigation Trust (the "Litigation Trust") and the appointment of a Litigation Trustee.

38. The Plan became effective on October 19, 2018.

39. On or about October 19, 2018, the Litigation Trust was created pursuant to the terms of WonderWork Litigation Trust and Declaration of Trust, dated October 19, 2018. The Litigation Trust's purpose was to prosecute the Litigation Trust Claims, as defined in the Plan, and to file, settle, compromise, withdraw or litigate to judgment any cause of action in connection with such claims.

40.     In accordance with the Plan, Vincent A. Sama, Esq. was appointed Litigation Trustee as of October 19, 2018.  Among the claims assigned to the Litigation Trust were any and all claims identified and referenced in, or arising from the facts described in the Report; to recover unauthorized, improper and/or avoidable post-petition transfers made to or for the benefit of Mullaney and Fuchs; to recover avoidable pre-petition transfers against Mullaney arising from his excessive compensation and bonuses and excess benefits and improper reimbursement of expenses; and against Debtor's current and former officers and directors, including those asserted herein against Defendants.

## Factual Background

41.     On or about March 7, 2011, Mullaney founded Debtor.  Mullaney initially incorporated Debtor under the name Surgery for the Poor, Inc.

42.     The Internal Revenue Service (the "IRS") approved Debtor's tax exempt status on or about September 1, 2011.  Mullaney also registered Debtor to solicit charitable contributions with the New York Attorney General under Article 7-A of the New York Executive Law in May 2012.

43.     As an Article 7-A registrant, Debtor was obligated to comply with New York registration and solicitation laws that require Debtor to, among other things, file an annual financial reporting which consists of the New York State CHAR500 disclosure form, which includes the IRS Form 990 and the organization's audited financials as attachments.  In addition, two officers of the charity were required to certify, under penalty of perjury, that the forms were true and correct.

44.     Each year that a New York State CHAR500 form was filed by Debtor, Mullaney and Fuchs certified that the forms were true and correct.

45.     Debtor adopted its first bylaws on or about March 8, 2011. The bylaws required Debtor to have a minimum of three directors and provided for each of the directors to serve one year terms, but placed no limits on the number of terms that a director could serve, and required Debtor to have a minimum of two Board meetings per year.  The bylaws also required the Board to elect a chair, president, and a secretary and treasurer.  Mullaney, Coneys, Kokich, Atkinson, Steele, and Levitt, who sat on the Board at the time, voted to amend the bylaws on March 8, 2016 to provide that each director would have a three year term and would be limited to two consecutive terms, except for Mullaney, for whom no limits were placed.

46.     Debtor held its first Board meeting on April 11, 2012.  The meeting was attended by Dysart, Mullaney, and Kant.  At that meeting, the Board selected Mullaney as President and Dysart as Secretary and Treasurer.  On April 13, 2012, Debtor filed a Certificate of Amendment to change its name from Surgery for the Poor, Inc. to WonderWork, Inc.

47.     Upon incorporation, Debtor had listed its purpose as to:

Provide treatment, surgery, and related assistance to children in developing countries suffering from disease, illness, or malady, including but not necessarily limited to blindness, cleft palate, club foot, hydrocephalus, and burns, and to further support and educate doctors and the public on potential treatments and surgical techniques, as well as creating general awareness of these maladies and available treatments.

By Certificate of Amendment filed on April 2012, Debtor changed its stated purpose by removing cleft palate as a cause, and restated its purpose as providing "assistance to children and adults everywhere, including those in developing countries suffering from disease, illness, or disability, including but not necessarily limited to blindness, clubfoot, hydrocephalus, pediatric cardiac surgery, and burns."

48.     Coneys thereafter joined the Board in December 2012 and attended his first Board meeting on December 12, 2012.

49.     Shortly thereafter, at the February 14, 2013 meeting, the Board formed audit, nominating and compensation committees and determined that Coneys would chair the audit committee and Dysart would chair the nominating and compensation committees.

50.     Despite forming these committees, there is no record that any of these committees ever held any formal meetings and there are no minutes of any such meetings.

51.     In or about November 2015, Dysart resigned from the Board following disagreements with Mullaney, in particular with respect to Mullaney's compensation and whether employment counsel should be employed in connection with formalizing Mullaney's employment agreement.  Upon information and belief, Dysart did not communicate these concerns or his reasons for resigning to either Kant or Coneys.  It does not appear that Kant or Coneys were aware of the actual reasons for Dysart's departure.

52.     In December 2015, Levitt, Kokich, Rappaport, Price, Atkinson, and Steele joined the Board.  Draft minutes from a January 2016 Board Meeting show that Mullaney was selected as chair of the Board.  However, none of the new Board members attended a Board Meeting until March 2016.

53.     At a June 2016 Board Meeting, the Board reconstituted the audit, nominating, and compensation committees, with Coneys, Kant, Kokich, and Levitt serving on the nominating and compensation committee; Coneys and Rappaport serving on the audit committee; and a finance and investment committee consisting of Steele, Coneys, and Mullaney.

54.     Kant and Steele resigned when Debtor filed for bankruptcy in December 2016.  Thus, following the Petition Date, the Board Members were Mullaney, Coneys, Kokich, Levitt, Rappaport, Price, and Atkinson.

55.     While it is not clear whether Mullaney was ever formally named as Chairman of the Board, for all intents and purposes, he served in that role: Mullaney prepared the agendas; Mullaney took notes at the meetings; and Mullaney had the minutes prepared by Lazarus, which were then presented to the Board for approval.  However, once Debtor was informed that the Better Business Bureau (the "BBB") required a chair of an accredited charity's board to be different from the charity's CEO, Debtor represented to the BBB that there was no chair, but that Coneys served as the "Lead Independent Director."  Prior to the bankruptcy, Coneys' role as Lead Independent Director was primarily to finalize Mullaney's employment agreement in late 2015, which had been in negotiation since October 2012 and had taken up a considerable amount of Board time.

56.     The Examiner found that, despite Debtor's mission statement, in practice, Debtor "abused the public's trust from its inception," including "[t]hrough fundraising campaigns designed to mislead donors as to how their contributions would be spent, and an accounting system which failed to property record and track those contributions."  The Examiner further concluded that Debtor was a "poorly governed, costly and highly inefficient operation in which only a small fraction of donations [were] used to help people in need," but whose CEO lived lavishly, collecting grossly excessive compensation—all blessed by a Board beaten into submission by a domineering and dominant CEO.

**Mullaney's Compensation Package**

57.     Although Debtor's ostensible purpose was to provide "assistance to children and adults everywhere, including those in developing countries suffering from disease, illness, or disability," the person it benefitted most was Mullaney, who received a base annual salary of $475,000 and annual bonuses in excess of $200,000.  In addition, Mullaney received numerous other compensatory benefits, which should have been, but were not, included in his income, including: commuting costs to and from Debtor's offices in New York to his home in Boston; first

class travel for him and his spouse; personal life insurance; as well as hundreds of thousands of dollars of illegitimate, undocumented, or excessive business expenses.

58.     As detailed below, despite knowledge of Mullaney's excessive compensation and profligate expenses, the Board, including Dysart, Coneys, Levitt, Kokich, Rappaport, Price, and Atkinson, failed to curb Mullaney's excesses or otherwise control his abuses; instead, they sanctioned Mullaney's actions, deliberately turning a blind eye to his excesses.

**Mullaney's Compensation**

59.     At Mullaney's insistence, Mullaney's compensation at Debtor, a charity that in its *best year raised around $12 million*, was the same as he received at his prior employer Smile Train, Inc. ("Smile Train"), the world's largest cleft charity, which raised $120 million in Mullaney's last year there and funded 120,000 surgeries per year. Thus, in addition to an annual base salary of $475,000 per year, the Board awarded Mullaney bonuses annually in 2013 to 2016 as follows:

- $250,000 in 2013 approved by Coneys, Dysart, and Kant;

- $250,000 in 2014 approved by Coneys, Dysart, and Kant;

- $200,000 in 2015 approved by Coneys, Dysart, and Kant;

- $250,000 in 2016 approved by Coneys, Levitt, Kokich, Rappaport, Price and Atkinson.

60.     In May 2013, at Dysart's recommendation and over Mullaney's objection, the Board—including Dysart, Coneys, and Kant—decided to retain a compensation consultant, Pearl Meyer & Partners ("Pearl Meyer"). Pearl Meyer charged Debtor $18,137, to evaluate Mullaney's salary. Prior to preparing their report, Pearl Meyer warned Dysart that they may be unable to conclude that Mullaney's salary was reasonable in the context of section 4958 of the Internal Revenue Code (the "IRC"), which is commonly known as the "Intermediate Sanctions" rule. Pearl

Meyer explained the issues of the Intermediate Sanctions Rule to Dysart, Coneys, and Kant at the May 16, 2013 Board meeting.  As an inducement, Pearl Meyer's engagement letter provided that Pearl Meyer would receive a $5,000 fee increase if Pearl Meyer could "state pay is reasonable after Intermediate Sanctions."  No such statement was contained in their final report, which was presented to Dysart, Coneys, and Kant at the June 13, 2013 Board meeting.

61.     When Pearl Meyer presented its report to Dysart, Coneys, and Kant at the June 13, 2013 meeting, Pearl Meyer did not use non-profits comparable in size to Debtor as a benchmark to measure Mullaney's salary, rather, at Mullaney's urging, Pearl Meyer used aspirational groupings of companies, including non-profits more than double Debtor's size, large foundations, and university development officers.  However, even with this gerrymandered set of organizations, Pearl Meyer concluded that Mullaney's *base salary* of $475,000 was at the high end of the competitive range. With respect to Mullaney's bonuses, Pearl Meyer noted that the maximum award of $250,000, or 53% of his base salary, was very high for a non-profit and would only be warranted if Mullaney were actually able to repeat Smile Train's growth; something he never came close to achieving.

62.     Pearl Meyer recommended that, if the Board were to accept the peer groupings as reasonable, the Board should keep Mullaney's salary at $475,000 and offer him an annual bonus in the range of $50,000 to $200,000 only if his performance warranted it (Pearl Meyer suggested it would be in the 75th percentile compared to "peer" companies).  Pearl Meyer also recommended that the Board "quantify" Mullaney's other contractual requests (such as spousal travel, payment of travel costs and hotels associated with his move to Boston, and personal life insurance policy) in determining bonus payments and that the Board periodically review Mullaney's compensation

package to determine whether it was supported by market practices. Finally, Pearl Meyer declined to express an opinion on whether the compensation paid to Mullaney was reasonable or not.

63.     Despite the caveats embedded in the Pearl Meyer report, neither the Board or any of its members complied with Pearl Meyer's recommendations—no Board member ever evaluated Mullaney's substantial other contractual requests, including spousal travel, payment of travel costs, hotels associated with Mullaney's move to Boston, and personal life insurance policy. The Board never re-reviewed Mullaney's salary as recommended by Pearl Meyer and awarded him the full amount of the $250,000 discretionary bonus every year except for 2015, when Dysart, Coneys, and Kant awarded him a $200,000 bonus, without determining whether Mullaney's compensation was supported by market practices or performance.

64.     Moreover, two years later, without undergoing a separate review or retaining independent outside counsel, the Board entered into a formal employment agreement (the "Employment Agreement") with Mullaney in December 2015, an effort that was led by Coneys after Dysart resigned from the Board in November 2015 because of, among other issues, Mullaney's refusal to retain outside counsel to evaluate the agreement.

65.     Mullaney's Employment Agreement provided for him to be employed for a five year term, commencing January 1, 2016, and entitled him to yearly compensation of $475,000 and a discretionary bonus of $250,000. In addition, the Employment Agreement formalized many of the other compensatory benefits Mullaney was already receiving, including payment of the premiums on Mullaney's approved life insurance policy for which his wife was a beneficiary and allowing for spousal travel at Debtor's expense.

66.     In addition to Mullaney's excessive compensation, Debtor also failed to apply its other policies and procedures to Mullaney, who abused Debtor to further enrich himself.

**The Travel Policy**

67.     For instance, Debtor had a travel policy, which provided that Debtor: (1) would not reimburse for expenses personal in nature; (2) would only provide reimbursement based on actual and reasonable expenses incurred; (3) would not provide for reimbursement for spousal travel without a business purpose and any such benefits will be reported as compensation as required by federal law; and (4) would only reimburse expenses substantiated by supporting documents and amounts not substantiated must be reported as actual income.  Furthermore, travel expenses had to be approved by a supervisor or the CFO.

68.     Debtor did not apply the travel policy to Mullaney.  Rather, in violation of the travel policy and applicable law, Fuchs caused Debtor to:  (1) reimburse Mullaney for expenses personal in nature; (2) not require substantiation of Mullaney's expenses; (3) reimburse Mullaney for spousal travel and not report such reimbursements as compensation; (4) not require internal approval for Mullaney's travel expenses; and (5) reimburse Mullaney for excessive expenses, including paying Mullaney to fly business or first class as a general practice.

69.     In addition, Mullaney recouped, as business expenses, his commuting costs between his home in the Boston area, which he moved to for personal reasons in 2013, and Debtor's offices in New York.  Mullaney through this scheme ultimately caused Debtor to pay hundreds of thousands of dollars for his personal benefit, including Mullaney's transportation costs to and from his home to his work, meals and hotels while he was in New York, including approximately $400 per night hotel rooms at the Lanham Hotel.  At no point did any member of the Board question Mullaney's expenses or instruct him that they would not be reimbursed.

**Insurance**

70.     Although many of Debtor's employees travelled extensively, including throughout the developing world, Debtor did not maintain high value life insurance policies for them and their

families. However, for Mullaney and Mullaney alone, Debtor maintained a multimillion dollar life insurance policy from 2012 to 2016. Yearly premiums on Mullaney's life insurance policy varied from year to year, with Debtor paying $9,602 in 2016. While Debtor paid the premiums, the benefit went solely to Mullaney as his wife was the beneficiary.

71. The Board authorized the payment of these premiums in Mullaney's Employment Agreement. However, there is no evidence that any member of the Board ever considered these policies for purposes of computing the reasonableness of Mullaney's compensation and Debtor did not include these policies for purposes of reporting Mullaney's compensation to the relevant governing authorities or Debtor's donors, including the IRS and the N.Y. State Attorney General.

**Legal Fees and Expenses**

72. Prior to his work with WonderWork, Mullaney had been the CEO and President of Smile Train. Mullaney left Smile Train in September 2010 following an audit committee investigation into Smile Train's finances and senior management's actions. Fuchs, Lazarus, and Greenwood had also worked at Smile Train and were terminated in February 2011.

73. Following his departure from Smile Train, Mullaney became personally involved in a series of lawsuits with Smile Train. As set forth below, rather than require Mullaney to pay his own legal fees for his defense, Debtor, with Board approval and knowledge, assumed full responsibility for Mullaney's personal legal fees and expenses notwithstanding the fact that these proceedings were against Mullaney in his personal capacity and Debtor was not a named party.

74. Specifically, Smile Train sued Mullaney personally for copyright infringement and misappropriation of trade secrets, including Smile Train's donor list (the "Smile Train Copyright Case"). The WonderWork Board at the time—Dysart, Coneys, and Kant—approved the Debtor indemnifying Mullaney for up to $150,000 in connection with Mullaney's defense in the Smile Train Copyright Case.

75.     Even though Debtor was not a named party in the Smile Train Copyright Case, Debtor ultimately spent $245,357.45 in legal fees defending Mullaney in the Smile Train Copyright Case.  Mullaney directly benefited from the payment of such fees, whereas Debtor received no benefit.  Coneys reviewed and approved the legal invoices.

76.     In July 2013, Mullaney and Smile Train settled the Smile Train Copyright Case. Coneys signed the Smile Train settlement agreement on behalf of Debtor, which required Debtor to, among other things, pay approximately $450,000 to Smile Train.  The payment was characterized as a donation to Smile Train even though Debtor did not perform cleft work, and, in fact, removed cleft palate from one of its purposes in its Certificate of Amendment filed on April 13, 2012.  Instead, the payment served to benefit Mullaney by extinguishing his personal liability to Smile Train. Upon information and belief, Dysart also knew about the Smile Train settlement payment and legal fees, both of which appeared on WonderWork's financial statements, including its FY 2012 IRS Form 990 and 2013 Form 1096.

77.     In other words, with Board approval and knowledge, Debtor spent $745,357.45 of its money to resolve Mullaney's personal liability to Smile Train with no resulting benefit to Debtor.

78.     In addition, Debtor paid at least $58,539.38 to quash a subpoena Smile Train served on Mullaney personally in connection with a New York state court lawsuit brought against Smile Train's outside computer consultant, Gregory Shaheen and his company Ferris Consulting, Inc. (the "Shaheen Lawsuit").  Upon information and belief, Coneys was charged with reviewing the legal bills in connection with the Shaheen Lawsuit and Dysart was also aware of the litigation and Debtor's payment of legal fees.  In the lawsuit, Smile Train alleged that Shaheen assisted Mullaney in obtaining confidential and proprietary information relating to Smile Train.  While this litigation

had nothing to with Debtor and Debtor received no benefit in squashing the subpoena, Debtor agreed to pay legal fees which were solely for Mullaney's benefit.

79.     Finally, Debtor paid in excess of $14,000 for Mullaney's flights and accommodation for two trips Mullaney took to London in 2013 in connection with his defense of Smile Train UK's case against Mullaney for violation of the United Kingdom Charities Act of 1993 (the "Smile Train UK Lawsuit"), even though the suit was filed against Mullaney in his personal capacity and had nothing to do with Debtor.  In the Smile Train UK case, Mullaney was ordered to pay Smile Train UK £701,959 in damages and £52,455 in costs for violating UK law by approving his own salary while he served as trustee of Smile Train UK.

80.     Mullaney's personal lawsuits, including the Smile Train Copyright Case, Shaheen Lawsuit, and Smile Train UK Lawsuit (collectively, the "Legal Actions") were routinely discussed at Board meetings attended by Dysart, Coneys, and Kant.  While Levitt, Kokich, Rappaport, Price, and Atkinson were not on the Board at the time of the Legal Actions, they were aware of these Legal Actions and the allegations against Mullaney.

**Mullaney's Limbo Pay and Excessive Expenses**

81.     Mullaney further exploited Debtor by using Debtor as a means to avoid paying income tax.  Specifically, with knowledge of the entire Board, including Dysart, Coneys, Levitt, Kokich, Rappaport, Price, and Atkinson, Mullaney instructed Fuchs not to pay his base compensation and bonuses when those amounts were awarded, but rather to maintain a separate "payroll ledger" that tracked Mullaney's base pay and bonus and reflected what he referred to as his "limbo pay."  This was a continuation of a practice Mullaney and Fuchs had started at Smile Train, which among other issues, resulted in Smile Train, following an internal investigation, reissuing Mullaney's W-2s for the years 2002–2010 that reported an additional $1,144,574 in

income as a result of the deferrals and improper travel and expense items. As a result, Mullaney and Fuchs knew that this practice was improper and illegal.

82.     As a result of Mullaney's deferral instructions, even though the Board awarded Mullaney a bonus every year since 2013, Mullaney never paid taxes on his bonus amounts, Mullaney's bonuses were not reported on his W-2, and Mullaney paid no FICA taxes on those amounts. Mullaney's bonuses also did not appear in Debtor's general ledger or its financial statements. The Examiner concluded that "the extent of Debtor's auditors' actual knowledge of the payroll lender is also unknown. Members of the Board, Mullaney, and Fuchs all claimed that KPMG was fully aware of the payroll ledger system and of Mullaney's practice of deferring compensation over $475,000 per year. However Fuchs would not say that she had ever shown the payroll ledger to the accountants."

83.     Regardless, every year since 2012, Mullaney instructed Fuchs to maintain his reported compensation at $475,000 per year, and keep the remainder as "limbo pay" in her side ledger. In addition, Mullaney instructed Fuchs when and how much to pay in each particular period, such that his salary payments were erratic:

**Brian Mullaney Compensation**

| Salary | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|
| January | | $24,583 | $136,083 | $136,083 | $50,000 | | $346,750 |
| February | | $24,583 | $39,583 | $39,583 | $425,000 | | $528,750 |
| March | | $24,583 | $39,583 | $39,583 | | | $103,750 |
| April | | $24,583 | $39,583 | $189,583 | | | $253,750 |
| May | | $24,583 | $39,583 | $39,583 | | | $103,750 |
| June | | $214,583 | $39,583 | $30,583 | | $475,000 | $759,750 |
| July | | $39,583 | $39,583 | | | | $79,167 |
| August | | $39,583 | $39,583 | | | | $79,167 |
| September | | $39,583 | $39,583 | | | | $79,167 |
| October | | $18,750 | $22,250 | | | | $41,000 |
| November | | | | | | | $0 |
| December | $275,000 | | | | | | $275,000 |
| | $275,000 | $475,000 | $475,000 | $474,999 | $475,000 | $475,000 | $2,649,999 |
| Bonus - Paid in July | $0 | $0 | $250,000 | $250,000 | $200,000 | $250,000 | $950,000 |
| Total Compensation | $275,000 | $475,000 | $725,000 | $724,999 | $675,000 | $725,000 | $3,599,999 |

84.     For instance, as set forth above, from March 2015 to May 2016 Mullaney did not receive any paychecks through payroll.  Then, in June 2016, Mullaney received a check for $475,000 on account of his back pay.

85.     In addition, Mullaney would selectively instruct Fuchs to deduct personal, unsubstantiated or excessive expenses that Debtor paid from his "limbo pay."  By utilizing his "limbo pay" as an offset against illegitimate expenses, Mullaney avoided paying income tax on his salary or bonus.  Thus, as of the Petition Date, the total amount of suspect expenses Mullaney charged to his limbo pay totaled at least $400,000 and, in the year prior to the Petition Date, Mullaney took at least $9,211.96 in personal expenses as a deduction from his back pay.

86.     The suspect expenses that were deducted from Mullaney's back pay included, among other things: purely personal expenses, such as dinner with friends, a limousine for his wife's birthday, a hotel stay for a trip he took with his daughter, chauffeured cars, commuting expenses to and from Boston; excessive expenses, including a dinner at the Four Seasons totaling over $20,000 and a three-night trip to Maine that cost Debtor over $6,000; and unsubstantiated expenses, including a $30,000 reimbursement to cover "about half" of Mullaney's commuting costs in fiscal year 2014 and 2015.

87.     Upon information and belief, each member of the Board was aware of Debtor's practice of maintaining this secret payroll ledger and seeking reimbursement of expenses through the "limbo pay" because, among other things, the members knew or should have known that Debtor's public disclosures did not match Mullaney's actual compensation.  Dysart and Coneys openly acknowledged Mullaney's use of the payroll ledger, with Coneys describing the practice to Dysart and Kant as "a fiction with hypothetical income offset by a hypothetical donation back." Dysart even reported to the Examiner that he was uncomfortable with this practice and Atkinson

had direct knowledge of the issues that this practice caused at Smile Train. Despite this, not a single member of the Board ever instructed Mullaney and/or Fuchs to discontinue this practice.

88. Beyond the expenses that Mullaney directed Fuchs to deduct from his "limbo pay," Mullaney also charged excessive and personal expenses to Debtor largely through his American Express account including hundreds of thousands of dollars in transportation, meals, and other costs connected to Mullaney's commute between his home outside of Boston and Debtor's New York offices, first class travel—including to his most frequent locations, London and Dubai, and thousands of dollars in multiple reoccurring periodical and other subscriptions, among other charges. These expenses are set forth in detail in Exhibits B, D, F, and G.

**Fuchs Compensation**

89. Mullaney also approved Fuchs' excessive compensation. On April 15, 2011, Fuchs sued Smile Train for over $1 million in damages, seeking to enforce an employment agreement she allegedly entered into with Smile Train. Mullaney requested that Fuchs dismiss her lawsuit against Smile Train in order to conceal his own malfeasance at Smile Train. Fuchs agreed, but demanded that Debtor enter into an employment agreement with her that provided a $120,000 payment upon execution and 3-years of guaranteed employment at a base salary of $200,000 in exchange for Fuchs agreeing to drop her lawsuit against Smile Train. Mullaney agreed to Fuchs' demand and caused Debtor to provide Fuchs with a $120,000 signing bonus and guaranteed her employment at $200,000 per year, until December 31, 2014, at a base salary of $200,000 per year.

90. In addition, Mullaney caused Lazarus and Greenwood to receive substantial signing bonuses. Specifically, Greenwood received a signing bonus via her first paycheck, which was for $29,166.67 whereas all subsequent checks were for $14,583. Similarly, in the first year Lazarus

worked for WonderWork she received $169,000 in salary despite only working for part of the year and her salary was subsequently decreased to $121,500 in 2012.

**Internal Controls, Accounting, and Fundraising**

91.     In addition to the rampant abuses surrounding Mullaney and Fuchs' compensation and Mullaney's expenses, Debtor lacked the most basic of internal controls and neither its accounting nor fundraising practices were conducted in accordance with law.  Issues permeated every aspect of Debtor's business, such that the Examiner concluded that "[f]or every cynical donor who questions whether their donations are being used as promised, the Debtor has confirmed their very fears."  Debtor's directors failed to meet their basic fiduciary duties and abdicated all responsibility for insuring that the Debtor was run in accordance with law to Mullaney and Fuchs, who repeatedly engaged in self-dealing and improper practices.

92.     Debtor even failed to implement the few policies it had.  For instance, on or about October 11, 2012, the Board approved a Board of Directors Policy Manual (the "Policy Manual"), which required that two-thirds of the directors be independent and established a number of committees, including: (1) an optional executive committee; (2) an optional investment committee; (3) an audit committee; (4) a finance committee; (5) a nominating committee; and (6) a compensation committee.  Notwithstanding these clear policies, for most of its existence, Debtor's Board failed to establish these committees.

93.     The Policy Manual further provided for the investment of donated funds based on three categories of funds: (1) temporarily restricted funds, which are funds restricted to programs; (2) unrestricted short term operating funds; and (3) Board-designated reserves.  The Policy Manual also set standards for the management of Debtor's financials and assets, including that Debtor must maintain assets that are no less than 100% of liabilities, must maintain general commercial liability insurance, seek competitive bids of any purchases over $25,000, and obtain co-approval by officers

for any purchases over $100,000, and that expenditures, including for travel must be approved in advance.

94.     The Policy Manual was neither followed nor referred to during the course of the day-to-day operations of the Debtor, including its cash management system, which was not set up in accordance with the Policy Manual or applicable law.  Rather, Debtor treated all categories of funds as fungible.  In fact, Debtor neither classified, accounted for, nor expended its restricted funds consistent with applicable law.  It did not segregate its restricted funds; it did not keep track of its restricted funds currently; and it did not have in place adequate controls over the spending of such funds, consistent with proper practices.  Rather, only at the end of each fiscal year, in connection with the audit of its financial statements, would Fuchs prepare a "roll forward" schedule to show the change in restricted fund balances over the course of the year.  Nor did the Debtor maintain assets in excess of its liabilities.  Moreover, as detailed in the Examiner Report (*see* p. 156 to 165), Fuchs, in cooperation with Mullaney, kept misleading books and records that permitted them to misstate Debtor's performance.

95.     Finally, Debtor's fundraising campaigns, which were largely drafted by Mullaney personally, grossly misrepresented Debtor's activities.  Not only did Mullaney run Debtor's marketing department and make all major marketing decisions, Mullaney was also involved in the minutia of the campaigns, including selecting photos, drafting copy, and approving content, and he often added his own handwritten notes. Upon a comprehensive review of Debtor's fundraising solicitations, the Examiner "identified rampant misrepresentations and systemic problems in the [Debtor's] fundraising materials."  The Examiner found that the materials created by Mullaney were "replete with misleading statements" and that "Debtor engaged in a deliberate attempt to

present a charitable profile" that is inaccurate. These misrepresentations were "not isolated instances, but [] appeared throughout its solicitations since its inception."

96.     Among other things, Mullaney caused Debtor to misrepresent:

- That donations would be used to pay for surgeries and surgical programs, when they were in fact used to pay direct mail expenses;

- That donations would be matched, resulting in doubling or tripling the number of surgeries, when in fact the "matching funds" were used for expenses;

- That the donations were used to cure blind individuals, when the majority of patients were not blind;

- That a $300 donation would be used to pay the entire cost of a surgery, when Debtor only paid $25 per surgery and kept the remainder for fundraising and other expenses;

- That surgeries were free to patients, when that was not always the case;

- That Debtor was performing the surgeries directly in developing countries, when Debtor was not performing surgeries, but just making donations to other charitable organizations — including those in Europe and the United States;

- That Debtor was involved in many more countries than actually they were;

- That Debtor incurred virtually no overhead expenses, when donations were used for overhead expenses;

- That Debtor did not receive gifts from large foundations, when it had received millions in gifts from foundations.

97.     Given that these fundraising campaigns were the bulk of Debtor's activities, the Board knew or should have known that their contents were false and misleading throughout Debtor's existence.

98.     During the bankruptcy, the Examiner, BDO, and Chapter 11 Trustee's professionals were all required to devote substantial resources to investigate the Debtor's accounting and bookkeeping practices, particularly as they related to its fundraising efforts and restricted funds.

**Debtor Enters Into Impact Loans, Which Render it Insolvent**

99.     The Board (Coneys, Dysart, and Kant) permitted Mullaney to enter into a series of impact loans that collectively totaled close to $10 million payable in five years. Specifically, beginning in May 2013 and ending a year later, Mullaney—with the knowledge of Dysart and Coneys—solicited "impact lenders" for Debtor, which ultimately resulted in Debtor entering into seven unsecured loan agreements with various charitable foundations and wealthy individuals. The loan agreements had maturity dates starting in May 2018 and ending in January 2020, with approximately $8 million coming due on May 15, 2018.

100.     Mullaney pitched these loans as "impact loans" and told the potential "impact" lenders that the loans were a mechanism for Debtor to raise capital to fund Debtor's direct mail program, which would permit Debtor to scale its capacity to provide more surgeries.

101.     The loan agreements reflected these discussions, with six of the seven loan agreements stating that the loans would be used to assist Debtor in "generating additional funding for WonderWork programs and facilitate the more effective and efficient delivery of surgeries for the poor and needy served by WonderWork." These loan agreements further required Debtor to "use the proceeds of the funds exclusively" for these purposes. The other loan agreement provided that the funds would be used to "further Borrower's charitable mission of providing free surgery and related medical treatment to poor children in developing countries" and provided that at least 80% of the loan proceeds would be used to fund surgeries, while the remaining 20% could be used for general operating support. Debtor spent the loan proceeds on its direct market mail and other expenditures.

102.     Debtor's 10-year marketing projections, which were presented to the Board in October 2013, did not project Debtor actually repaying the loans in their entirety until October

2021, despite the maturity dates in the loan agreements beginning in 2018 and ending in 2020, and then only showing a partial repayment of 66%.

103.     There was no way that Debtor could ever repay these loans because it lacked sufficient unrestricted funds to do so nor did it have reasonable means to obtain or otherwise generate sufficient unrestricted funds for repayment.  All the money that Debtor raised through direct mail campaigns funded by the impact loans would be restricted to program expenses or otherwise spent on programs and could not be used to repay the impact loans.

**The HelpMeSee Arbitration**

104.     In fact, at the time Debtor entered into its impact loans, Debtor was already insolvent due to its malfeasance towards HelpMeSee, which ultimately resulted in an arbitration award in which Debtor was ordered to pay HelpMeSee over $16 million in damages.

105.     On August 31, 2011, Mullaney caused Debtor to enter into a fundraising agreement with HelpMeSee, Inc. (the "Agreement"), a 501(c)(3) charity whose mission is to eliminate cataract blindness worldwide.  Under the Agreement, Debtor agreed that it would create, manage, and monitor various fundraising and marketing programs for HelpMeSee in exchange for a $2 million per year fee.  The Agreement provided that any disputes between the parties would be submitted to arbitration through the American Arbitration Association (the "AAA").

106.     HelpMeSee terminated the Agreement for cause effective August 17, 2012.  On March 21, 2013, Mullaney caused Debtor to file a Demand for Arbitration with the AAA, seeking $1,333,333.28 in damages based on its assertion that HelpMeSee terminated the Agreement without cause, plus costs and attorneys' fees.  On May 9, 2013, HelpMeSee counterclaimed for breach of contract, breach of fiduciary duty, fraudulent inducement, copyright infringement and an accounting, and sought damages, both compensatory and punitive, as well as an injunction, costs and attorneys' fees.

107.    On June 1, 2013, the parties mutually selected AAA Arbitrator John H. Wilkinson, Esq., as their sole neutral arbitrator.  Hearings commenced in March 2014 and were completed on March 11, 2016.  During opening statements, which occurred on or about March 4, 2014, HelpMeSee stated that it would be seeking in excess of $8 million in damages.

108.    On October 13, 2016, the Arbitrator issued the partial final award ("Partial Final Award"), in which he found Debtor to be in substantial breach of its Agreement with HelpMeSee, in clear breach of its fiduciary duty to HelpMeSee, and liable for conversion.  In the Partial Final Award, the Arbitrator ordered Debtor to pay HelpMeSee $8,342,314.68 in damages equal to all amounts raised by Debtor during the Agreement term plus interest.  The Arbitrator also awarded HelpMeSee reasonable costs and attorneys' fees incurred in connection with the arbitration, but provided that the amount would be the subject of a separate award.

109.    On October 20, 2016, HelpMeSee sent a copy of the Partial Final Award to each of Debtor's Board Members, including Coneys, Levitt, Kokich, Rappaport, Price, and Atkinson.

110.    On December 21, 2016, the Arbitrator issued a final award (the "Final Award," together with the Partial Final Award, the "Award"), which in addition to the $8,342,314.68 in compensatory damages plus interest already awarded, quantified HelpMeSee's award of fees and costs, granting HelpMeSee $4,706,553.18 in attorneys' fees plus interest, and $149,563.99 in arbitration costs.

111.    Due to the provisions in the Agreement directly at issue, including those that referenced Smile Train, and HelpMeSee's fraudulent inducement claim, the Arbitrator evaluated Mullaney's conduct while at Smile Train as well as his actions toward HelpMeSee.  As a result, the arbitration exposed Mullaney's repeated pattern of defrauding the charities he purported to

serve, including Operation Smile, Smile Train, and HelpMeSee, as well as his repeated violations of the intellectual property rights of Mercy Ships, a HelpMeSee partner.

112.    The Award further disclosed that, following Mullaney's termination from Smile Train, Smile Train retained accounting firm Grant Thornton to conduct an independent investigation into Mullaney's activities during the timeframe in which Fuchs was acting as Smile Train's CFO.  "Grant Thornton uncovered numerous additional transgressions and concluded that Mullaney had expenses amounting to $335,000 that were not appropriate in that they were either unsubstantiated or were personal to Mullaney and without business purpose or both."  Grant Thornton "also found that Mullaney had deferred substantial amounts of" his salary as President "which would not then be included on his W-2 forms.  As a result, Mullaney's W-2s had to be amended and reissued to reflect $1.13 million of additional income."  Although not uncovered in connection with the arbitration proceeding, Mullaney and Fuchs then went onto adopt the same practices at Debtor.

113.    The Arbitrator found Mullaney's conduct, including "acting through [WonderWork] to take HelpMeSee's money, while exploiting HelpMeSee to raise money to pursue his own personal interests," to be "unconscionable."  The Arbitrator also awarded costs and attorneys' fees to HelpMeSee, explaining that this award was justified because, among other reasons, Mullaney was "not a credible witness"; "WonderWork declined to comply with discovery orders from the beginning to the end of this arbitration, with the result that the conduct of the arbitration was decidedly less efficient and cost-effective than would otherwise have been the case"; and that the conduct of Debtor and Mullaney as "reprehensible."

114.    Notwithstanding the gravity of the allegations against Mullaney and Fuchs and the approximately $925,000 in legal fees and expenses incurred by Debtor, the Board did not become

involved in the arbitration or undertake any investigation into the merits of HelpMeSee's claims, including the claims regarding discovery abuses.

**The Trustee Motion and Appointment of an Examiner**

115.    A few weeks after the Petition Date, on January 18, 2017, HelpMeSee moved for entry of an order directing the appointment of a Chapter 11 trustee, describing Debtor as "the paradigmatic case for appointment of a trustee." HelpMeSee alerted the Court to Mullaney's prior history of systematically exploiting charities, as well as certain inconsistencies in Debtors schedules.

116.    In the Trustee Motion, HelpMeSee explained that, because "Debtor itself likely has claims against Mullaney, senior management, and/or Debtor's Board of Directors for, among other causes of action, breach of fiduciary duty, mismanagement, and indemnification" it would not be in the best interest of the creditors to leave Mullaney in control of Debtor.  HelpMeSee further warned that "there is abundant evidence of Debtor's senior management's incompetent and/or intentional mismanagement of Debtor's books and records.  The appointment of an independent fiduciary is critical to ensure that this Chapter 11 proceeding is conducted in a fair and honest manner, including that Debtor pursue all options available to maximize recovery to the creditors."

117.    The Debtor strenuously opposed HelpMeSee's motion, with each of Kokich, Coneys, Levitt, Price, Rappaport, and Atkinson, in their personal capacity and in their capacity as Board Members of Debtor, filing declarations in support of the Debtor's opposition.  Debtor attacked the credibility of HelpMeSee's allegations and the Arbitrator's findings, describing HelpMeSee's concerns as unfounded.  Debtor touted its distinguished and impressive Board and management and repeatedly stressed the Board's close supervision of management.

118.    For instance, Debtor told the Court that, "contrary to HMS's characterization of Mr. Mullaney as a 'serial fraudster' running WonderWork alone and into the ground, Brian Mullaney is a respected executive under the supervision of a skilled and conscientious Board. Throughout WonderWork's existence, the Board has provided Mr. Mullaney with critical operational oversight and consultation, including issues related to HMS's protracted legal efforts to undermine Mr. Mullaney and the organization as a whole. Mr. Mullaney has the appropriate amount of authority for a chief executive officer, but at all times reports to, is supervised by, and serves at the pleasure of, the Board."

119.    Debtor also attempted to rebut the Arbitrator's findings regarding Smile Train through the personal declarations submitted by Atkinson, Price, and Levitt, all of whom had involvement in Smile Train, stating that the decision of Atkinson, Price, and Levitt to join the WonderWork board provide "compelling circumstantial evidence that Mr. Mullaney's conduct at Smile Train was appropriate."   These declarations universally stressed the Board's purported heavy involvement in Debtor's affairs and their complete and unwavering confidence in Mullaney.

120.    For instance, Coneys stated that the "WonderWork Board [was] very involved in the organization's decision-making," including Debtor's "budget, investments, fundraising strategies, program capacity, and relationships with hospital partners, among other things." Coneys further declared that the Board "provided Brian with critical operational oversight and consultation" and that Mullaney "at all times reports to, is supervised by, and serves at the pleasure of the Board."   Kokich, Levitt, Price, Rappaport, and Atkinson likewise described the WonderWork Board as "dedicated, hands-on, and active in its supervision of Brian and the organization's management generally."

121.    However, the Examiner's investigation revealed just the opposite: "WonderWork presents a case study on how a dominant CEO, left unchecked by a passive and overly deferential Board of Directors can damage a charity beyond repair." The Examiner's investigation revealed that the Board was wholly uninvolved with Debtor's operation, deferring entirely to Mullaney and Fuchs with virtually no oversight over Debtor. For instance, the Examiner found that Coneys was "at a minimum, not informed or misled about the types and amounts of expenses being charged on the payroll ledger." No one from the Board ever reviewed any of Mullaney's American Express invoices or other expenditures until May 2017, when Coneys reviewed Mullaney's FY16 invoices in connection with the BDO audit. These expenses were not insignificant. For instance, in the course of five years, Mullaney spent over $250,000 on his corporate American Express card to cover travel. Coneys also acknowledged that Debtor and Mullaney would face disclosure issues relating to Debtor's payment of Mullaney's commuting expenses between Boston and New York. Moreover, as detailed above, despite the many policies and procedures set by Debtor, there is no evidence that any of these policies were followed by Debtor or any member of the Board and, although fundraising appeals formed the bulk of Debtor's work, the Board was either unaware or indifferent to the gross misrepresentations Mullaney made in those appeals, which misrepresented everything from the work done by Debtor, to the countries in which it operated, to the patients served, and to the use and accounting of the funds.

122.    Despite the Arbitration ruling finding that Mullaney behaved in a reprehensible and unconscionable manner and an arbitrator who spent pages detailing Mullaney's abuses, Coneys, Kokich, Levitt, Price, Rappaport, and Atkinson all affirmed, under penalty of perjury, that "the Board has no potential, planned or pending claims against" Mullaney and that Mullaney had the Board's "utmost confidence," even though the Board had not conducted an internal investigation.

123.    On April 12, 2017, the Court determined that, rather than appointing a trustee, it would appoint an examiner.  The Court relied on the declarations of Kokich, Coneys, Levitt, Price, Rappaport, and Atkinson and their false assertions that the Board was actually supervising Mullaney when issuing her decision, explaining that she was "troubled by the idea of dispossessing this Debtor and appointing a trustee, most particularly because of the unique role played by Mr. Mullaney.  And I am concerned that, if he were no longer involved, or no longer incentivized to continue to play the role that he's played, in particular in fundraising, that will sound the death knell for this Debtor."

124.    On April 21, 2017, the Bankruptcy Court entered the Order Directing the Appointment of an Examiner and Establishing Temporary Budgetary Controls (the "Examiner Order").  On May 10, 2017, the Court entered an order approving the appointment of Jason R. Lilien as the Examiner.  The Examiner Order further required the Examiner to file a written report (the "Report") of his investigation no later than 90 days from the date of appointment.  The Examiner requested multiple extensions of time, ultimately filing his Report on November 3, 2017, in part due to Debtor's failure to complete the audit, which also increased the costs of his investigation.

**The BDO Audit**

125.    Debtor was obligated, by federal law, to complete its 2016 FY audit by May 15, 2017 so that it could file its Form 990s.  Debtor retained BDO on April 4, 2017, after KPMG, Debtor's prior auditor, and two others refused to audit Debtor.  Debtor offered several inconsistent and conflicting reasons for KPMG's refusal to conduct the audit.

126.    Due to the abbreviated schedule BDO had to complete the work, Debtor agreed to pay BDO $120,000 for audit services and $5,000 for tax services, which was more than double

what Debtor had paid the prior year for similar auditing services from one of the Big Four accounting firms. Upon information and belief, both the Board knew about and approved BDO's retention.

127. BDO failed to complete the audit by the May 15, 2017 deadline and, beginning in May 2017, the BDO team repeatedly communicated its concerns to Debtor's Board of Directors, Mullaney, and Fuchs. BDO's concerns remained generally the same throughout the engagement and included in-kind valuation, loan liabilities (including loan forgiveness), functional expense and joint cost allocation, the accrual of Mullaney's bonus, fiscal years 2015 and 2016 recording of contributions, the release of net assets, and going concern financial statement presentation, as well as the effect of these changes on the overall net assets and results presented in prior years. Notwithstanding the nature and breadth of these issues, Coneys asked BDO not to communicate its concerns formally in writing. On August 28, 2017, BDO informed Debtor's Audit Committee, Coneys and Rappaport, that there was a possibility that it might be unable to complete the audit altogether. On September 1, 2017, Debtor filed a pleading falsely stating "BDO has informed the Debtor that the audit should be concluded soon." That same day, BDO finally communicated its concerns in writing because BDO felt it was necessary for it to formally document the unresolved issues.

128. In BDO's September 1, 2017 letter, BDO stated that it had identified at least ten (10) issues that were going to require material adjustments to the financial statements. BDO explained that these items were of such significance that Debtor's inability to resolve any one of them would lead to a modification of BDO's audit report to report an express limit on the scope of the audit and that, the significance of the scope limitation could ultimately lead to the issuance of a disclaimer of an opinion or an adverse opinion. BDO also informed them that, due to the

collective magnitude of such matters, BDO might decline to issue a report on Debtor's financial statements altogether. BDO further stated that it found nine (9) material weaknesses and two (2) significant deficiencies in Debtor's internal controls.

129. BDO urged Coneys, Rapport, and Mullaney to "discuss with your legal counsel what obligations you may have to share this communication with the Examiner appointed by the Bankruptcy Court or other parties involved in the bankruptcy proceedings." BDO further stated that these transactions had caused BDO to incur $350,000 in out of scope costs. Neither Coneys, Rappaport, Mullaney, nor any other Board member disclosed to the Court or, upon information and belief, the Examiner, these significant issues with BDO's audit.

130. On September 25, 2017, the Court, *sua sponte*, issued an Order to Show Cause why Debtor should not be held in contempt for failing to complete its 2016 Audit. It was only in response to that the Court was informed for the first time the significant issues that it was having regarding Debtor's audit. The costs incurred by the Examiner and his professionals were increased by the delayed audit and would have been mitigated had the Board disclosed these issues to the Court.

**<u>Unauthorized Non-Ordinary Course Payments</u>**

131. On September 29, 2017, just four days after the Court issued its first *sua sponte* Order to Show Cause why Debtor should not be held in contempt for failing to complete the audit, Mullaney requested and Fuchs authorized Debtor to pay Mullaney $237,500, which allegedly comprised a payment of Mullaney's past due compensation.

132. On October 19, 2017, the day before the Examiner Report was due to be filed, Mullaney requested and Fuchs authorized Debtor to pay Mullaney $158,333.32, which comprised his salary for the entire month of October even though Mullaney had never previously received a salary payment in advance. Neither Mullaney nor Fuchs sought Court approval for either payment,

although Mullaney now acknowledges that he was not entitled to the October payment and it is subject to avoidance.

133.    In other words, after BDO had informed the Debtor, including the Board, that his salary practices constituted material weaknesses that may cause them to issue an adverse opinion and Debtor was operating under strict controls, Mullaney and Fuchs authorized the Debtor to make two salary payments to Mullaney consisting of 10-months of salary before he was ousted from the charity or otherwise restricted from access to its funds. Despite red flags, including the BDO audit issues, the Board took no actions to constrain Mullaney or Fuchs. These salary payments were neither in the ordinary course for Debtor, nor the type of transaction commonly undertaken by people in the non-profit industry.

134.    During the bankruptcy, Mullaney continued his practice, as described above, of using his American Express card for excessive, personal and undocumented expenses. From December 28, 2016 through September 26, 2017, Debtor paid $59,517.70 to American Express for Mullaney's benefit, of which at least $23,330.90 was excessive, personal and/or undocumented as reflected in Exhibit G.

**Bankruptcy Costs**

135.    Debtor incurred substantial fees and expenses that could have been avoided or greatly reduced had the Board fulfilled its duties and actively supervised Debtor's management, including the millions in investigation, accounting, and legal fees that Debtor expended to clean up Mullaney and Fuchs' fraud and misreporting. Moreover, the inefficiencies in completing the BDO audit forced the Examiner to incur additional costs that would have been avoided if the audit had been timely completed. In addition, the Chapter 11 Trustee duplicated certain of the work

done by BDO and the Examiner in connection with the distribution of restricted funds, which would have been avoided had the Board not submitted false and misleading declarations.

136. In connection with the bankruptcy, the Debtor paid:

- Debtor's counsel, Carter Ledyard Milburn LLP, $879,946.56;

- The Examiner $380,595.00;

- Goldin $470,250;

- Loeb $1,431,391.27;

- BDO $210,000;

- The Chapter 11 Trustee's statutory commissions in the amount of $164,882.42 and $12,291.90 in expenses for a total amount of $177,174.32;

- CR3 Partners, LLC $485,982.50 in fees and $6,011.80 in expenses, for a total amount of $491,940.30;

- Garfunkel Wild, P.C. $259,261.50 in fees and $89.49 in expenses, for a total amount of $259,350.99;

- Gordon Brothers Asset Advisors, LLC $30,000 in fees;

- Togut, Segal & Segal LLP $899,612.50 in fees and expenses in the amount of $13,760.69, for a total of $913,317.19; and

- Verdolino & Lowey P.C., fees in the amount of $15,000.

In other words, in an estate that had at the outset of the bankruptcy $21.2 million in assets, the Debtor had to expend $5,258,965.63 in fees and expenses.

137. A substantial portion of these expenditures would have been unnecessary had the Board discharged their duties appropriately.

# FIRST CLAIM OF RELIEF

## Breach of Fiduciary Duties
### (Against Defendant Theodore Dysart)

138.     Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Second Amended Complaint as if they were fully restated.

139.     Dysart served as a director of Debtor from March 2011 through November 2015, and as such, owed the fiduciary duties of care, loyalty, and good faith to Debtor.

140.     Dysart failed to discharge his duties as a director with the degree of care, skill, prudence, and diligence required and further, consciously disregarded his duties to such a degree that his conduct constituted bad faith, including by deliberately turning a blind eye by, among other things: (a) failing to provide oversight of the Debtor or to control its activities; (b) failing to monitor Debtor, including by failing to implement internal controls or adequately oversee its operations and financial reporting; (c) approving inappropriate and excessive compensation for Mullaney for the years 2013 to 2015; (d) failing to follow Pearl Meyer's recommendations regarding Mullaney's compensation from the time that the Pearl Meyer Report was issued in June 2013; (e) permitting Mullaney and Fuchs to defer payment of Mullaney's salary and bonus through the use of a secret side payroll ledger and permitting Mullaney to deduct expenses from those "deferred" amounts, which permitted Mullaney to illegally avoid income tax and concealed his full compensation from donors and the regulators; (f) authorizing Debtor to pay Mullaney's personal legal fees and expenses and settlement payments in connection with various lawsuits arising between Mullaney and his prior employer, Smile Train; and (g) abrogating his responsibilities to oversee Debtor's management, including with respect to public filings, record keeping and accounting practices and allowing Mullaney and Fuchs to keep fraudulent and misleading books and records and make false public filings.

141.    As a result of the above, Debtor suffered damages, including the excessive amounts paid to or on behalf of Mullaney.

142.    Plaintiff does not hereby assert any claims against Dysart which were dismissed pursuant to the Court's Memorandum Decision Granting in Part and Denying in Part Defendants' Motions to Dismiss and Directing in Part a More Definite Statement (ECF Doc. #104) (the "Decision").

## SECOND CLAIM OF RELIEF

### Breach of Fiduciary Duties
### (Against Defendant John J. Coneys)

143.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Second Amended Complaint as if they were fully restated.

144.    Coneys served as a director of Debtor from December 2012 through and following the Petition Date, and as such, owed the fiduciary duties of care, loyalty, and good faith to Debtor.

145.    Coneys failed to discharge his duties as a director with the degree of care, skill, prudence, and diligence required and further, consciously disregarded his duties to such a degree that his conduct constituted bad faith, including by deliberately turning a blind eye by, among other things: (a) failing to provide oversight of the Debtor or to control its activities; (b) failing to monitor Debtor, including by failing to implement internal controls or adequately oversee its operations and financial reporting; (c) approving inappropriate and excessive compensation for Mullaney for the years 2013 to 2016; (d) failing to follow Pearl Meyer's recommendations regarding Mullaney's compensation from the time that the Pearl Meyer Report was issued in June 2013; (e) permitting Mullaney and Fuchs to defer payment of Mullaney's salary and bonus through the use of a secret side payroll ledger and permitting Mullaney to deduct expenses from those "deferred" amounts, which permitted Mullaney to illegally avoid income tax and concealed his

full compensation from donors and the regulators; (f) authorizing Debtor to pay Mullaney's personal legal fees and expenses and settlement payments in connection with various lawsuits arising between Mullaney and his prior employer, Smile Train; (g) abrogating his responsibilities to oversee Debtor's management, including with respect to public filings, record keeping and accounting practices and allowing Mullaney and Fuchs to keep fraudulent and misleading books and records and make false public filings; and (h) failing to inform the Court or otherwise take appropriate action in connection with the various issues that arose in the BDO audit.

146.     As a result of the above, Debtor suffered damages, including the excessive amounts paid to or on behalf of Mullaney.  Moreover, because Coney's breaches of duties caused Debtor to incur administrative expenses relating to investigating Debtor's misconduct and subsequent windup, which would have been avoided had Coneys not violated his duties, Coneys is responsible for those costs.

147.     Plaintiff does not hereby assert any claims against Coneys which were dismissed pursuant to the Decision.

## THIRD CLAIM OF RELIEF

### Breach of Fiduciary Duties
### (Against Defendant Steven Levitt)

148.     Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Second Amended Complaint as if they were fully restated.

149.     Levitt served as a director of Debtor from December 2015 through and following the Petition Date, and as such, owed the fiduciary duties of care, loyalty, and good faith to Debtor.

150.     Levitt failed to discharge his duties as a director with the degree of care, skill, prudence, and diligence required and further, consciously disregarded his duties to such a degree

that his conduct constituted bad faith, including by deliberately turning a blind eye by, among other things: (a) failing to provide oversight of the Debtor or to control its activities; (b) failing to monitor Debtor, including by failing to implement internal controls or adequately oversee its operations; and (c) failing to inform the Court or otherwise take appropriate action in connection with the various issues that arose in the BDO audit.

151.    As a result of the above, Debtor suffered damages.  Moreover, because Levitt's breaches of duties caused Debtor to incur administrative expenses relating to investigating Debtor's misconduct and subsequent windup, which would have been avoided had Levitt not violated his duties, Levitt is responsible for those costs.

152.    Plaintiff does not hereby assert any claims against Levitt which were dismissed pursuant to the Decision.

**FOURTH CLAIM OF RELIEF**

**Breach of Fiduciary Duties**
**(Against Defendant Clark Kokich)**

153.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Second Amended Complaint as if they were fully restated.

154.    Kokich served as a director of Debtor from December 2015 through and following the Petition Date, and as such, owed the fiduciary duties of care, loyalty, and good faith to Debtor.

155.    Kokich failed to discharge his duties as a director with the degree of care, skill, prudence, and diligence required and further, consciously disregarded his duties to such a degree that his conduct constituted bad faith, including by deliberately turning a blind eye by, among other things: (a) failing to provide oversight of the Debtor or to control its activities; (b) failing to monitor Debtor, including by failing to implement internal controls or adequately oversee its

operations; and (c) failing to inform the Court or otherwise take appropriate action in connection with the various issues that arose in the BDO audit.

156.    As a result of the above, Debtor suffered damages.  Moreover, because Kokich's breaches of duties caused Debtor to incur administrative expenses relating to investigating Debtor's misconduct and subsequent windup, which would have been avoided had Kokich not violated his duties, Kokich is responsible for those costs.

157.    Plaintiff does not hereby assert any claims against Kokich which were dismissed pursuant to the Decision.

## FIFTH CLAIM OF RELIEF

### Breach of Fiduciary Duties
### (Against Defendant Steven Rappaport)

158.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Second Amended Complaint as if they were fully restated.

159.    Rappaport served as a director of Debtor from December 2015 through and following the Petition Date, and as such, owed the fiduciary duties of care, loyalty, and good faith to Debtor.

160.    Rappaport failed to discharge his duties as a director with the degree of care, skill, prudence, and diligence required and further, consciously disregarded his duties to such a degree that his conduct constituted bad faith, including by deliberately turning a blind eye by, among other things: (a) failing to provide oversight of the Debtor or to control its activities; (b) failing to monitor Debtor, including by failing to implement internal controls or adequately oversee its operations; and (c) failing to inform the Court or otherwise take appropriate action in connection with the various issues that arose in the BDO audit.

161. As a result of the above, Debtor suffered damages. Moreover, because Rappaport's breaches of duties caused Debtor to incur administrative expenses relating to investigating Debtor's misconduct and subsequent windup, which would have been avoided had Rappaport not violated his duties, Rappaport is responsible for those costs.

162. Plaintiff does not hereby assert any claims against Rappaport which were dismissed pursuant to the Decision.

## SIXTH CLAIM OF RELIEF

### Breach of Fiduciary Duties
### (Against Defendant Richard Price)

163. Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Second Amended Complaint as if they were fully restated.

164. Price served as a director of Debtor from December 2015 through and following the Petition Date, and as such, owed the fiduciary duties of care, loyalty, and good faith to Debtor.

165. Price failed to discharge his duties as a director with the degree of care, skill, prudence, and diligence required and further, consciously disregarded his duties to such a degree that his conduct constituted bad faith, including by deliberately turning a blind eye by, among other things: (a) failing to provide oversight of the Debtor or to control its activities; (b) failing to monitor Debtor, including by failing to implement internal controls or adequately oversee its operations; and (c) failing to inform the Court or otherwise take appropriate action in connection with the various issues that arose in the BDO audit.

166. As a result of the above, Debtor suffered damages. Moreover, because Price's breaches of duties caused Debtor to incur administrative expenses relating to investigating Debtor's misconduct and subsequent windup, which would have been avoided had Price not violated his duties, Price is responsible for those costs.

167.    Plaintiff does not hereby assert any claims against Price which were dismissed pursuant to the Decision.

### SEVENTH CLAIM OF RELIEF

**Breach of Fiduciary Duties**
**(Against Defendant Mark Atkinson)**

168.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Second Amended Complaint as if they were fully restated.

169.    Atkinson served as a director of Debtor from December 2015 through and following the Petition Date, and as such, owed the fiduciary duties of care, loyalty, and good faith to Debtor.

170.    Atkinson failed to discharge his duties as a director with the degree of care, skill, prudence, and diligence required and further, consciously disregarded his duties to such a degree that his conduct constituted bad faith, including by deliberately turning a blind eye by, among other things: (a) failing to provide oversight of the Debtor or to control its activities; (b) failing to monitor Debtor, including by failing to implement internal controls or adequately oversee its operations and financial reporting; (c) permitting Mullaney and Fuchs to defer payment of Mullaney's salary and bonus through the use of a secret side payroll ledger and permitting Mullaney to deduct expenses from those "deferred" amounts, which permitted Mullaney to illegally avoid income tax and concealed his full compensation from donors and the regulators; (d) abrogating his responsibilities to oversee Debtor's management, including with respect to public filings, record keeping, and accounting practices and allowing Mullaney and Fuchs to keep fraudulent and misleading books and records and make false public filings; and (e) failing to inform the Court or otherwise take appropriate action in connection with the various issues that arose in the BDO audit.

171.    As a result of the above, Debtor suffered damages.  Moreover, because Atkinson's breaches of duties caused Debtor to incur administrative expenses relating to investigating Debtor's misconduct and subsequent windup, which would have been avoided had Atkinson not violated his duties, Atkinson is responsible for those costs.

172.    Plaintiff does not hereby assert any claims against Atkinson which were dismissed pursuant to the Decision.

## EIGHTH CLAIM OF RELIEF

### Breach of Fiduciary Duties
### (Against Defendant Brian Mullaney)

173.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Second Amended Complaint as if they were fully restated.

174.    Mullaney was a director and officer of Debtor and as such, owed fiduciary duties of care, loyalty, and good faith to Debtor.  Mullaney's fiduciary duties include obligations to exercise good business judgment, to act prudently in the operation of Debtor's business, to discharge his actions in good faith, to act in the best interests of Debtor and its donors, and to put the interests of Debtor before his own.

175.    Mullaney breached his duty of care by failing to discharge his duties as an officer and director with the degree of care, skill, prudence, and diligence required of him. His conduct constituted an extreme departure from the ordinary standard of care rising to the level of bad faith and reckless disregard of his duties and responsibilities, including by, among other things, (a) routinely mismanaging the Debtor, including failing to properly account for and spend Debtor's donations; (b) failing to comply with the terms of Debtor's corporate governing documents, policies, and applicable law; (c) improperly accounting for his expenditures; (d) making clearly false and misleading statements in Debtor's public filings; (e) authorizing excessive and

inappropriate spending of Debtor's funds; (f) misleading donors both in Debtor's public disclosures, including in response to email communications inquiring about Mullaney's compensation; (g) using false solicitation materials, in violation of applicable law; (h) permitting Debtor to alter its accounting and grant making practices to permit Debtor to try to hinder, delay, and defraud creditors; (i) approving Fuchs' Employment Agreement and causing Debtor to pay Fuchs' excessive signing bonus and compensation; (j) causing Debtor to pay excessive compensation to Lazarus and Greenwood; and (k) otherwise failing to discharge his duties as a director and/or officer with the degree of care, skill, prudence, and diligence required of them and acting with gross negligence and reckless indifference as outlined in the Report.

176. Mullaney breached his duties of loyalty and good faith by, among other things, (a) keeping his "limbo pay" off Debtor's books in a private, side ledger in coordination with Fuchs; (b) knowingly maintaining such payroll ledger in coordination with Fuchs as a mechanism for making his compensation appear less than it actually was on Debtor's public disclosures and to allow him to evade the payment of income tax; (c) submitting and/or approving inappropriate expenses, including excessive, unsubstantiated, and personal expenses; (d) directing Debtor to fund inappropriate expenditures and excessive salaries, including paying Fuchs a $120,000 signing bonus; and (e) permitting Debtor to pay Mullaney $158,333.32 in post-petition, non-ordinary course payments on the eve of release of the Report without disclosure or approval of the Court, which Mullaney now concedes was paid out improperly and is avoidable.

177. As a result of the above, Debtor suffered damages, including the excessive amounts paid to or on behalf of Mullaney and Fuchs. Moreover, because Mullaney's breaches of duties caused Debtor to incur administrative expenses relating to investigating Debtor's misconduct and

subsequent windup, which would have been avoided had Mullaney not violated his duties, Mullaney is responsible for those costs.

178.    Plaintiff does not hereby assert any claims against Mullaney which were dismissed pursuant to the Decision.

## NINTH CLAIM OF RELIEF

### Breach of Fiduciary Duties
### (Against Defendant Hana Fuchs)

179.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Second Amended Complaint as if they were fully restated.

180.    Fuchs was an officer of Debtor and as such, owed fiduciary duties of care, loyalty, and good faith to Debtor.  Fuchs' fiduciary duties include obligations to exercise good business judgment, to act prudently in the operation of Debtor's business, to discharge her actions in good faith, to act in the best interests of Debtor and its donors, and to put the interests of Debtor before her own.

181.    Fuchs breached her duty of care by failing to discharge her duties as an officer with the degree of care, skill, prudence, and diligence required of her.  Her conduct constituted an extreme departure from the ordinary standard of care rising to the level of bad faith and reckless disregard of her duties and responsibilities, including by, among other things, (a) failing to comply with the terms of Debtor's corporate governing documents, policies, and applicable law; (b) improperly accounting for Mullaney's expenditures; (c) making clearly false and misleading statements in Debtor's public filings; (d) authorizing excessive and inappropriate spending of Debtor's funds; (e) misleading donors both in Debtor's public disclosures, including in response to email communications inquiring about Mullaney's compensation; and (f) otherwise failing to

discharge her duty as an officer with the degree of care, skill, prudence, and diligence required of her and acting with gross negligence and reckless indifference as outlined in the Report.

182.     Fuchs breached her duties of loyalty and good faith by, among other things, (a) keeping Mullaney's "limbo pay" off Debtor's books in a private, side ledger; (b) knowingly maintaining such payroll ledger as a mechanism for making Mullaney's compensation appear less than it actually was on Debtor's public disclosures and to allow Mullaney to evade the payment of income tax; (c) submitting and/or approving inappropriate expenses, including excessive, unsubstantiated, and personal expenses; (d) directing Debtor to fund inappropriate expenditures and excessive salaries, including paying herself a $120,000 signing bonus; and (e) permitting Debtor to pay Mullaney $158,333.32 in post-petition non-ordinary course payments on the eve of release of the Report without disclosure or approval of the Court.

183.     As a result of the above, Debtor suffered damages, including the excessive amounts paid to or on behalf of Mullaney and Fuchs.  Moreover, because Fuchs' breaches of duties caused Debtor to incur administrative expenses relating to investigating Debtor's misconduct and subsequent windup, which would have been avoided had Fuchs not violated her duties, Fuchs is responsible for those costs.

184.     Plaintiff does not hereby assert any claims against Fuchs which were dismissed pursuant to the Decision.

### TENTH CLAIM FOR RELIEF

**Constructive Fraudulent Conveyance under Section 544(b) of the Bankruptcy Code
(Against Defendant Brian Mullaney)**

185.     Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Second Amended Complaint as if they were fully restated.

186.     On or after December 29, 2010, Debtor conveyed assets to Mullaney in the form of excess compensation and reimbursement for excessive, personal, and/or unsubstantiated expenses including, without limitation, those set forth in Exhibit A (the "6-Year Fraudulent Conveyances to Mullaney"), including through the execution of the Employment Agreement that provided Mullaney with excess compensation.

187.     Mullaney was the initial transferee of each of the 6-Year Fraudulent Conveyances to Mullaney.

188.     On or after December 29, 2010, Debtor also conveyed assets to various third parties for the benefit of Mullaney, including without limitation, those set forth in Exhibit B (the "6-Year Fraudulent Conveyances Made for the Benefit of Mullaney" and together with the 6-Year Fraudulent Conveyances to Mullaney, the "6-Year Fraudulent Conveyances").  Debtor did not receive reasonably equivalent value or fair consideration from the third parties for any of the 6-Year Fraudulent Conveyances Made for the Benefit of Mullaney.

189.     As a result of the 6-Year Fraudulent Conveyances Made for the Benefit of Mullaney, Mullaney received a direct, ascertainable and quantifiable financial benefit.

190.     To the extent that this claim seeks amounts that are also sought pursuant to another theory of recovery, the Trustee is pleading in the alternative. However, in the event there is overlap, the conveyances are avoidable under either theory and the Trustee only seeks to recover for each conveyance one time.

191.     The 6-Year Fraudulent Conveyances were each incurred without fair consideration and, on the date that each 6-Year Fraudulent Conveyances were made, (a) Debtor was insolvent, or became insolvent as a result of such 6-Year Fraudulent Conveyances; and (b) Debtor was

engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital.

192.     The 6-Year Fraudulent Conveyances described above constituted fraudulent conveyances that are voidable pursuant to section 544(b) of the Bankruptcy Code and N.Y. Debtor and Creditor Law §§ 273 and 274, and may be recovered by Plaintiff from Mullaney pursuant to section 550(a)(1).

## ELEVENTH CLAIM FOR RELIEF

**Fraudulent Transfer under Section 548(a)(1)(B) of the Bankruptcy Code
(Against Defendant Brian Mullaney)**

193.     Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Second Amended Complaint as if they were fully restated.

194.     On or after December 29, 2014, Debtor transferred assets to Mullaney in the form of excess compensation and reimbursement for excessive, personal, and/or unsubstantiated expenses including, without limitation, those set forth in Exhibit C (the "2-Year Fraudulent Transfers to Mullaney").

195.     Mullaney was the initial transferee of each of the 2-Year Fraudulent Transfers to Mullaney.

196.     On or after December 29, 2014, Debtor also conveyed assets to various third parties for the benefit of Mullaney, including without limitation, those set forth in Exhibit D (the "2-Year Fraudulent Conveyances Made for the Benefit of Mullaney" and together with the 2-Year Fraudulent Transfers to Mullaney the "2-Year Fraudulent Conveyances").  Debtor did not receive reasonably equivalent value or fair consideration from the third parties for any of the 2-Year Fraudulent Conveyances Made for the Benefit of Mullaney.

197. As a result of the 2-Year Fraudulent Conveyances Made for the Benefit of Mullaney, Mullaney received a direct, ascertainable and quantifiable financial benefit.

198. To the extent that this claim seeks amounts that are also sought pursuant to another theory of recovery, the Trustee is pleading in the alternative. However, in the event there is overlap, the conveyances are avoidable under either theory and the Trustee only seeks to recover for each conveyance one time.

199. Debtor received less than a reasonably equivalent value in exchange for each of the 2-Year Fraudulent Transfers and, on the date that the 2-Year Fraudulent Transfers were made: (a) Debtor was insolvent, or became insolvent as a result of such 2-Year Fraudulent Transfers; and (b) Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital.

200. The 2-Year Fraudulent Conveyances made by Debtor to Mullaney described above constituted fraudulent transfers that are voidable pursuant to section 548(b) of the Bankruptcy Code, and may be recovered by Plaintiff from Mullaney pursuant to section 550(a)(1).

## TWELFTH CLAIM FOR RELIEF

**Fraudulent Conveyance under Section 548(a)(1)(B) of the Bankruptcy Code**
**(Against Defendant Brian Mullaney)**

201. Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Second Amended Complaint as if they were fully restated.

202. On or after December 29, 2014, Debtor conveyed assets to Mullaney in the form of excess compensation and reimbursement for excessive, personal, and/or unsubstantiated expenses including, without limitation, those set forth in Exhibit E, including through the execution of the

Employment Agreement that provided Mullaney with excess compensation (the "Employment Fraudulent Transfers to Mullaney").

203.    Mullaney was the initial transferee of each of the Employment Fraudulent Conveyances to Mullaney.

204.    On or after December 29, 2014, Debtor also conveyed assets to various third parties for the benefit of Mullaney including, without limitation, those set forth in Exhibit F, including through the execution of the Employment Agreement that provided Mullaney with excess compensation (the "Employment Fraudulent Transfers Made for the Benefit of Mullaney" and together with the Employment Fraudulent Transfers to Mullaney, the "Employment Fraudulent Transfers").    Debtor did not receive reasonably equivalent value or fair consideration from the third parties for any of the Employment Fraudulent Transfers Made for the Benefit of Mullaney.

205.    As a result of the Employment Fraudulent Conveyances Made for the Benefit of Mullaney, Mullaney received a direct, ascertainable and quantifiable financial benefit.

206.    To the extent that this claim seeks amounts that are also sought pursuant to another theory of recovery, the Trustee is pleading in the alternative.    However, in the event there is overlap, the transfers are avoidable under either theory and the Trustee only seeks to recover for each transfer one time.

207.    Debtor received less than a reasonably equivalent value in exchange for the Employment Fraudulent Transfers and Debtor made such transfers to or for the benefit of, Mullaney, an insider, or incurred such obligations to or for the benefit of Mullaney, under his Employment Agreement and not in the ordinary course of business.

208.    The Employment Fraudulent Transfers described above constituted avoidable fraudulent transfers, including but not limited to entry into the Employment Agreement, and any

transfers or benefits paid thereunder are avoidable pursuant to section 548(a)(1)(B) of the Bankruptcy Code, and may be recovered by Plaintiff from Mullaney pursuant to section 550(a)(1).

## THIRTEENTH CLAIM FOR RELIEF

### Avoidance and Recovery of Preferential Transfers
### (Against Defendant Brian Mullaney)

209.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Second Amended Complaint as if they were fully restated.

210.    On or within the one-year period preceding the Petition Date, Debtor made, or caused to be made, transfers to or for the benefit of its former CEO, Mullaney, totaling at least $484,212 (the "Preferential Transfers").  These Preferential Transfers were on account of antecedent debt purportedly owed to Mullaney by the Debtor before the transfer was made in the form of back pay ($475,000) and personal expenses ($9,211.96) purportedly taken as deductions from Mullaney's "limbo" pay.

211.    At the time the Preferential Transfers were made, Mullaney was an officer, director, and in control of Debtor and was therefore an insider as defined under section 101(31)(B) of the Bankruptcy Code.

212.    Mullaney was either the initial transferee of each of the Preferential Transfers or the person for whose benefit each of the Preferential Transfers was made.

213.    As of the dates that the Preferential Transfers were made, Debtor was insolvent in that: (i) its assets exceeded its liabilities; (ii) it could not reasonably expect to meet its obligations in the ordinary course as and when they came due; and (iii) it did not have adequate capital to withstand reasonable foreseeable fluctuations in its business.

214.    As a result of these Preferential Transfers, Mullaney received more than he would have received if: (i) Debtor's bankruptcy was administered under chapter 7 of the Bankruptcy

Code; (ii) the Preferential Transfers had not been made; and (iii) Mullaney received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

215.     Interest on the Preferential Transfers has accrued and continues to accrue from the date each of the Preferential Transfers was made.

216.     The Preferential Transfers, to the extent they are avoided pursuant to section 547(b) of the Bankruptcy Code, may be recovered by Plaintiff from Mullaney pursuant to section 550(a)(1) of the Bankruptcy Code.

## FOURTEENTH CLAIM FOR RELIEF

### Avoidable Transfer Under Section 549
### (Against Defendant Brian Mullaney)

217.     Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Second Amended Complaint as if they were fully restated.

218.     Upon information and belief, during the bankruptcy, Mullaney continued his practice of using his American Express card for excessive, personal and undocumented expenses. As a result, Debtor paid at least $23,330.90 to American Express for the benefit of Mullaney for the period December 28, 2016 through September 26, 2017 (the "Post-Petition American Express Payments").  Debtor did not receive reasonably equivalent value or fair consideration with respect to the Post-Petition American Express Payments.  As a result of the Post-Petition American Express Payments, Mullaney received a direct, ascertainable and quantifiable financial benefit. For the reasons set forth above with respect to the pre-petition American Express charges, the Post-Petition American Express Payments should also be avoided.

219.     The Post-Petition American Express Payments are set forth in Exhibit G.  The Post-Petition American Express Payments were not authorized by the Bankruptcy Code or the

Bankruptcy Court. Indeed, the Post-Petition American Express Payments were made to with the actual intent to hinder, delay, or defraud creditors.

220. Mullaney was the person for whose benefit each of the Post-Petition American Express Payments were made.

221. On the eve of release of the Examiner Report, when Mullaney and Fuchs knew that the Report would be highly critical, and after BDO had announced that it could not complete the audit due to a variety of issues including issues relating to Mullaney's compensation, and while Debtor was operating under strict Court-ordered budgetary controls, Debtor conveyed assets directly to Mullaney, including, without limitation a payment of $158,333.32 (the "Post-Petition Transfer to Mullaney" and together with the Post-Petition American Express Payments, the "Post-Petition Transfers"). Days later, Mullaney resigned. Given the unique circumstances under which this lump sum payment was made, the Post-petition Transfer to Mullaney deviated from Debtor's ordinary course practice and were outside of the ordinary course for the business and practices of the industry.

222. The Post-Petition Transfer to Mullaney is set forth in Exhibit H. The Post-petition Transfer to Mullaney was not authorized by the Bankruptcy Code or the Bankruptcy Court. Indeed, the Post-petition Transfer to Mullaney were made to with the actual intent to hinder, delay, or defraud creditors.

223. Mullaney was the initial transferee of the Post-Petition Transfer to Mullaney.

224. The Post-Petition Transfers described above constituted unauthorized transfers of property of the estate after the Petition Date that are avoidable pursuant to Section 549 of the Bankruptcy Code, and may be recovered by Plaintiff from Mullaney pursuant to section 550(a)(1).

## FIFTHTEENTH CLAIM FOR RELIEF

### Disallowance of Claim
### (Against Defendant Brian Mullaney)

225.     Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Second Amended Complaint as if they were fully restated.

226.     Mullaney is a creditor holding an unsecured claim, which is purportedly on account of unpaid back pay.

227.     Mullaney is not entitled to collect any such amounts because Mullaney's compensation was excessive and unwarranted.

228.     In addition, in view of the liability that Mullaney owes to Debtor, the amounts that Debtor owes Mullaney, if any, should be set off against Mullaney's liability to the estate.

229.     Based on the foregoing, the Mullaney Claim should be disallowed.

## SIXTEENTH CLAIM FOR RELIEF

### Disallowance of Claim under Section 502(d) of the Bankruptcy Code
### (Against Defendant Brian Mullaney)

230.     Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Second Amended Complaint as if they were fully restated.

231.     Mullaney is a creditor holding an unsecured claim in respect of the Mullaney Claim.

232.     Mullaney is the recipient of or the beneficiary of the Preferential Claim, the Employment Fraudulent Transfers, the 2-year Fraudulent Transfers, the 6-Year Fraudulent Conveyances, and the Post-petition Transfers (together, the "Transfers"), which are recoverable from Mullaney pursuant to sections 544, 547, 548, 549 and 550 of the Bankruptcy Code, and Mullaney has not returned the Transfers to Debtor.

233. Based on the foregoing, and pursuant to section 502(d) of the Bankruptcy Code, the claims asserted by Mullaney against Debtor must be disallowed since Debtor has not paid or surrendered the Transfers.

WHEREFORE, Plaintiff prays for the following relief:

1. On Plaintiff's First Claim for Relief, in favor of Plaintiff and against Defendant Dysart, compensatory and punitive damages, plus interest, together with the costs and expenses of this action, including without limitation, attorneys' fees;

2. On Plaintiff's Second Claim for Relief, in favor of Plaintiff and against Defendant Coneys, compensatory and punitive damages, plus interest, together with the costs and expenses of this action, including without limitation, attorneys' fees;

3. On Plaintiff's Third Claim for Relief, in favor of Plaintiff and against Defendant Levitt, compensatory and punitive damages, plus interest, together with the costs and expenses of this action, including without limitation, attorneys' fees;

4. On Plaintiff's Fourth Claim for Relief, in favor of Plaintiff and against Defendant Kokich, compensatory and punitive damages, plus interest, together with the costs and expenses of this action, including without limitation, attorneys' fees;

5. On Plaintiff's Fifth Claim for Relief, in favor of Plaintiff and against Defendant Rappaport, compensatory and punitive damages, plus interest, together with the costs and expenses of this action, including without limitation, attorneys' fees;

6. On Plaintiff's Sixth Claim for Relief, in favor of Plaintiff and against Defendant Price, compensatory and punitive damages, plus interest, together with the costs and expenses of this action, including without limitation, attorneys' fees;

7.      On Plaintiff's Seventh Claim for Relief, in favor of Plaintiff and against Defendant Atkinson, compensatory and punitive damages, plus interest, together with the costs and expenses of this action, including without limitation, attorneys' fees;

8.      On Plaintiff's Eighth Claim for Relief, in favor of Plaintiff and against Defendant Mullaney, compensatory and punitive damages, plus interest, together with the costs and expenses of this action, including without limitation, attorneys' fees;

9.      On Plaintiff's Ninth Claim for Relief, in favor of Plaintiff and against Defendant Fuchs, compensatory and punitive damages, plus interest, together with the costs and expenses of this action, including without limitation, attorneys' fees;

10.     On Plaintiff's Tenth Claim for Relief, in favor of Plaintiff and against Defendant Mullaney in an amount not less than the amount of the 6-year Fraudulent Conveyances, plus interest from the date of such 6-year Fraudulent Conveyances until payment is made to Plaintiff, together with the costs and expenses of this action, including without limitation, attorneys' fees, and directing Mullaney to turnover such sum to Plaintiff pursuant to sections 544 and 550(a) of the Bankruptcy Code, and avoiding the Employment Agreement.

11.     On Plaintiff's Eleventh Claim for Relief, in favor of Plaintiff and against Defendant Mullaney in an amount not less than the amount of the 2-Year Fraudulent Conveyances, plus interest from the date of such 2-year Fraudulent Conveyances until payment is made to Plaintiff, together with the costs and expenses of this action, including without limitation, attorneys' fees, and directing Mullaney to turnover such sum to Plaintiff pursuant to sections 548 and 550(a) of the Bankruptcy Code, and avoiding the Employment Agreement.

12.     On Plaintiff's Twelfth Claim for Relief, in favor of Plaintiff and against Defendant Mullaney in an amount not less than the amount of the Employment Fraudulent Transfers, plus

interest from the date of such Employment Fraudulent Transfers until payment is made to Plaintiff, together with the costs and expenses of this action, including without limitation, attorneys' fees, directing Mullaney to turnover such sum to Plaintiff pursuant to sections 548 and 550(a) of the Bankruptcy Code, and avoiding the Employment Agreement.

13. On Plaintiff's Thirteenth Claim for Relief, in favor of Plaintiff and against Defendant Mullaney in an amount not less than the amount of the Preferential Transfers, plus interest from the date of such Preferential Transfers until full payment is made to Plaintiff, together with the costs and expenses of this action, including, without limitation attorneys' fees; and directing Mullaney to turnover such sum to Plaintiff pursuant to 547(b) and 550(a) of the Bankruptcy Code.

14. On Plaintiff's Fourteenth Claim for Relief, in favor of Plaintiff and against Defendant Mullaney in an amount not less than the amount of the Post-Petition Transfers, plus interest from the date of such Post-Petition Transfers until payment is made to Plaintiff, together with the costs and expenses of this action, including without limitation, attorneys' fees, and directing Mullaney to turnover such sum to Plaintiff pursuant to sections 548, 549 and 550(a) of the Bankruptcy Code.

15. On Plaintiff's Fifteenth and Sixteenth Claims for Relief, in favor of Plaintiff and Against Defendant Mullaney disallowing Mullaney's Claim against the estate; and

16. Granting such other and further as this Court deems just and proper.

### Jury Trial Demand

Plaintiff hereby demands a trial by jury, on all issues so triable, pursuant to Fed. R. Bankr. P. 9015, and 5005 and Fed. R. Civ. P. Rules 38 and 39.

Dated: New York, New York
   January 21, 2021

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *Benjamin Mintz*

Benjamin Mintz
Peta Gordon
250 West 55th Street
New York, New York 10019
Telephone: (212) 836-8000

*Attorneys for Plaintiff Vincent A. Sama,*
*as Trustee of the WW Litigation Trust*